**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HAEMONETICS CORPORATION<br><br>*Plaintiff and Counterclaim Defendant*,<br><br>v.<br><br>FRESENIUS KABI USA, LLC<br>FRESENIUS KABI AG<br><br>*Defendants*, and<br><br>FENWAL, INC.<br><br>*Defendant and Counterclaim Plaintiff* | Case No.: 1:25-cv-08680<br><br>**JURY TRIAL DEMANDED**<br><br>Honorable LaShonda A. Hunt |

**DEFENDANT FENWAL, INC.'S COUNTERCLAIMS AND ANSWER AND DEFENSES TO FIRST AMENDED COMPLAINT**

Fenwal, Inc. ("Fenwal"), by and through its undersigned counsel, hereby submits its Counterclaims and Answer and Defenses to the First Amended Complaint (ECF No. 32) filed by Haemonetics Corporation ("Haemonetics").

## FENWAL'S COUNTERCLAIMS

For its Counterclaims against Haemonetics, defendant Fenwal alleges as follows:

## INTRODUCTION

1. For more than 75 years, Fenwal has been a leader among life science companies, developing groundbreaking and innovative medical devices in pursuit of its mission to save and improve lives with high-quality, accessible, and innovative healthcare products. As a premier research-intensive life science company, Fenwal invests years researching, engineering, and developing each of its many products. Through the efforts of Fenwal's product development,

regulatory affairs, and other business teams, Fenwal's research results in life-saving medical technology related to blood collection, separation, and transfusion, which is used globally to ensure a safe and available supply of blood products that provide care for critically and chronically ill patients.

2. As just one example, Fenwal has pioneered the development of plasmapheresis systems, which withdraw the donor's blood, separate and collect the donor's plasma from the blood, and return the remaining blood components to the donor. Fenwal's plasmapheresis devices make plasma donation more accessible, convenient, and safer for donors. And in the case of the Adaptive Nomogram, they enable plasma collection facilities to collect an overall greater amount of plasma per donation session.

3. Plasma collected using Fenwal's systems are used to create life-saving therapies and medications for patients with serious medical conditions, including immune deficiencies, clotting disorders, autoimmune diseases, severe trauma, and cancer. These treatments cannot be synthetically produced; they must be derived from human plasma. Hundreds of plasma donations are typically required to treat just one patient with an immune disorder or autoimmune condition. Fenwal is one of the largest suppliers of plasmapheresis products in the United States. Fenwal's technologies have far-reaching impact, as its products are used to help treat patients on six continents.[1]

4. Haemonetics' patent infringement lawsuit against Fenwal and its affiliates seeks to rewrite history, re-casting Haemonetics—founded decades after Fenwal—as the leading innovator in the field. The reality is that far from being a leader, Haemonetics habitually follows Fenwal to

---

[1] https://firstwordhealthtech.com/story/1410735 (last visited December 2, 2025) (FENWAL 00004760-FENWAL 00004762).

market with its products. Rather than competing fairly in the market, Haemonetics seeks a competitive advantage through baseless litigation, using patents that cannot validly cover Fenwal's innovative plasmapheresis systems.

5. Fenwal is entitled to have the cloud of infringement allegations removed from its innovative systems. Thus, Fenwal brings counterclaims under 28 U.S.C. § 2201 to seek declaratory judgment that the patents asserted by Haemonetics (U.S. Patent Nos. 10,758,652, 12,171,916, and 12,186,474) (collectively the "Haemonetics Asserted Patents") against Fenwal's plasmapheresis devices in the First Amended Complaint are neither valid nor infringed.

6. Fenwal also counterclaims against Haemonetics under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, to vindicate its intellectual property rights based on Haemonetics' infringement of Fenwal's pioneering patents that cover plasmapheresis devices. Haemonetics makes, uses, sells/leases, offers for sale or lease, and/or unlawfully imports into the United States: (i) plasmapheresis devices, including the NexSys PCS® device, including those with YES® Technology and/or PERSONA® Technology (collectively, "NexSys PCS"), (ii) the disposable components and kits, including those used with the NexSys PCS ("Disposable Kits") and (iii) donor management software and related software, including software used with the NexSys PCS (collectively, "Accused Haemonetics Products").

7. The Accused Haemonetics Products infringe at least the following valid and enforceable patents owned by Fenwal: U.S. Patent Nos. 10,431,334 ("the '334 Patent"); 10,643,748 ("the '748 Patent"); 10,872,693 ("the '693 Patent"); 11,672,891 ("the '891 Patent"); 12,397,089 ("the '089 Patent"); 11,285,251 ("the '251 Patent"); 11,369,724 ("the '724 Patent"); 11,730,873 ("the '873 Patent"); and 12,144,624 ("the '624 Patent") (collectively, the "Fenwal Asserted Patents").

## NATURE OF THE ACTION

8. This is an action for: (i) patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*; (ii) invalidity of the Haemonetics Asserted Patents under the Declaratory Judgment Act (28 U.S.C. § 2201); (iii) non-infringement of the Haemonetics Asserted Patents under 28 U.S.C. § 2201; and (iv) such other relief as the Court deems just and proper.

## THE PARTIES

9. Fenwal is a medical technology corporation organized and existing pursuant to the laws of the state of Delaware and has a principal place of business at 3 Corporate Drive, Lake Zurich, Illinois 60047.[2] Fenwal is a subsidiary of Fresenius Kabi AG, a corporation organized and existing under the laws of the Federal Republic of Germany.

10. Haemonetics Corporation (Haemonetics) is a Massachusetts corporation with its principal place of business at 125 Summer Street, Boston, Massachusetts 02110. Haemonetics is the FDA registered Specification Developer for the Accused Haemonetics Products that are manufactured, used, sold, leased, offer for sale or lease, and/or imported into the United States.

11. On information and belief, Haemonetics designs, develops, makes, imports, tests, offers for sale/lease, leases, and sells in the United States infringing plasmapheresis systems, their components, and related software, including devices sold under the tradenames NexSys PCS®, NexSys PCS® with YES® Technology, and NexSys PCS with PERSONA® Technology.[3] On

---

[2] Fenwal, Inc. Statement of Good Standing (State of Delaware Dept. of State, Division of Corporations) (dated November 18, 2025) (FENWAL 00004766).

[3] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm?start_search=1&showList=1&establishmentName=haemonetics&regNum=&StateName=&CountryName=&OwnerOperatorNumber=&OwnerOperatorName=&ProductCode=&DeviceName=&ProprietaryName=&establishmentType=&PAGENUM=10&SortColumn=EstablishmentName20%25ASC&RegistrationNumber=1219343 (last visited December 2, 2025) (FENWAL 00004774-FENWAL 00004778).

information and belief, Haemonetics launched the NexSys PCS with YES® Technology in the United States in 2018 and the NexSys PCS with PERSONA® Technology in the United States in 2020.[4]

**JURISDICTION**

12. This Court has jurisdiction over Fenwal's counterclaims pursuant to 28 U.S.C. §§ 2201 *et seq.* and 28 U.S.C. §§ 1331, 1338(a), and § 1367. Furthermore, an actual, substantial, and continuing justiciable controversy exists between Fenwal and Haemonetics based on Haemonetics having filed its First Amended Complaint (ECF No. 32) against Fenwal alleging infringement of the Haemonetics Asserted Patents. The controversy concerns the invalidity and non-infringement of the Haemonetics Asserted Patents.

13. This Court has personal jurisdiction over Haemonetics at least because Haemonetics has submitted to the personal jurisdiction of this Court by filing its Complaint (ECF No. 1) and First Amended Complaint (ECF No. 32) in this Court. This Court also has personal jurisdiction over Haemonetics because Haemonetics has committed acts of infringement in this District and the State of Illinois, including at least because it, directly and/or indirectly, advertises, makes, uses, sells, leases, and/or offers for sale/lease the infringing products at issue in this case in this District and the State of Illinois, and places those infringing products in the stream of commerce with the expectation and knowledge that they will be used by customers such as blood

---

[4] https://haemonetics.gcs-web.com/news-releases/news-release-details/haemonetics-announces-regulatory-clearances-nexsys-pcstm (last visited December 2, 2025) (FENWAL 00004770-FENWAL 00004772) (Haemonetics Press Release re: YES Technology); 510(k) Letter - BK180185 (FENWAL 00004721-FENWAL 00004723); 510(k) Summary - BK180185 (FENWAL 00004724-FENWAL 00004728); https://haemonetics.gcs-web.com/news-releases/news-release-details/haemonetics-receives-fda-clearance-nexsys-pcsr-personatm (last visited December 2, 2025) (FENWAL 00005399-FENWAL 00005404) ("Haemonetics Press Release re: PERSONA Technology").

collection facilities in this District. Thus, Haemonetics has committed tortious acts of patent infringement in this District and the State of Illinois; has expressly aimed its actions at this District and the State of Illinois with the knowledge that they would cause harm and substantial injury to Fenwal in the District and the State of Illinois; and Fenwal's counterclaims relate to technologies in Haemonetics' products that infringe the Fenwal Asserted Patents and are imported, advertised, marketed, manufactured, used, offered for sale/lease, leased, and/or sold in this District and in the State of Illinois.

## VENUE

14. Venue properly lies in this District under 28 U.S.C. §§ 1391 and 1400(b), because Haemonetics has consented to venue in this Court by filing its First Amended Complaint for patent infringement in this Court, and seeking other relief from this Court, thereby waiving any objections to venue for any counterclaims asserted against it. *See, e.g.*, *E & J Gallo Winery v. Morand Bros. Beverage Co.*, 247 F. Supp. 2d 973, 976-77 (N.D. Ill. 2002); *Shapo v. Engle*, No. 98-cv-7909, 2000 WL 198435, at *5 (N.D. Ill. Feb. 11, 2000).

## FENWAL IS A WORLD LEADER IN BLOOD COLLECTION AND SEPARATION TECHNOLOGIES

15. Fenwal has been a pioneer in blood-collection and blood-separation technologies, for more than 75 years, bringing numerous innovative products including reusable devices and disposable sets for blood collection, separation, and transfusion to the market during this time. Fenwal's products address critical medical needs, enabling collection of blood components used in life-saving therapies which help treat patients on six continents.

16. Fenwal was founded as Fenwal Laboratories in 1945, shortly after World War II, by T.L. Fenn and Carl Walter. From its inception, Fenwal Laboratories was dedicated to advancing blood collection and separation technologies. The company quickly distinguished itself

as an innovator: In 1948, it introduced the first plastic blood bag to replace glass bottles—a milestone that revolutionized blood collection by improving safety and sterility, making blood separation and modern blood banking possible. This early innovation set the stage for Fenwal's ongoing leadership in the transfusion and plasmapheresis fields.[5]

17. In 1959, Baxter International ("Baxter") acquired Fenwal Laboratories and operated it as Baxter's transfusion therapies division. Over the following decades, the Fenwal division continued to pioneer the development of technologies focused on automating the collection, separation, filtration, and transfusion of blood and blood components, with a focus on the evolving needs of blood centers and hospitals worldwide.[6]

18. In 1972, the Fenwal division invented its landmark product, the "Fenwal CS-3000," an automated blood-cell separating device.[7] The term "apheresis," a Greek word for "to separate," was coined as a result and the term started to be used by clinicians in 1979.[8] The Fenwal CS-3000

---

[5] https://www.biospace.com/fenwal-launched-as-independent-corporation-following-completion-of-divestiture-from-baxter-healthcare-corporation# (last visited December 2, 2025) (FENWAL 00004763-FENWAL 00004765); https://www.bioworld.com/articles/455418 (last visited December 2, 2025) (FENWAL 00004779-FENWAL 00004780).

[6] https://www.biospace.com/fenwal-launched-as-independent-corporation-following-completion-of-divestiture-from-baxter-healthcare-corporation# (last visited December 2, 2025) (FENWAL 00004763-FENWAL 00004765); Fenwal Company Fact Sheet (FENWAL 00005323-FENWAL 00005324) at 2; https://staging.giveplasma.ca/a-brief-history-of-apheresis-machines/ (last visited December 2, 2025) (FENWAL 00004710-FENWAL 00004711).

[7] https://staging.giveplasma.ca/a-brief-history-of-apheresis-machines/ (last visited December 2, 2025) (FENWAL 00004710-FENWAL 00004711); https://americanhistory.si.edu/collections/object/nmah_600368 (last visited December 2, 2025) (FENWAL 00004719-FENWAL 00004720); Fenwal Company Fact Sheet at 2.

[8] https://staging.giveplasma.ca/a-brief-history-of-apheresis-machines/ (last visited December 2, 2025) (FENWAL 00004710-FENWAL 00004711).

enabled the automated, continuous-flow collection of specific blood components, from a single donor. This revolutionized the blood donation process making it possible for donors to donate blood more frequently than they otherwise would be able to because the process allows for the collection of plasma from donated blood, while returning the remaining components—primarily red blood cells and platelets—back to the donor. The Fenwal CS-3000 was distributed worldwide, and the inventors were widely recognized for their achievement through awards including the prestigious Dale A. Smith Memorial Award from the Association for the Advancement of Blood and Biotherapies (AABB), formally known as the American Association for Blood Bankers.[9]

19. The Fenwal division continued to innovate in the field of plasmapheresis. In 1984, Fenwal introduced the Autopheresis-C device, an automated system that further streamlined plasma collection. Whereas the Fenwal CS-3000 device was a centrifugal apheresis system, the Autopheresis-C device used a unique spinning membrane technology, which resulted in virtually cell-free plasma. And in 2003, the Fenwal division introduced the Alyx, a portable/mobile, automated cell separation device. This device collects two units of red blood cells or red cells and plasma from a single donor in less than 30 minutes.

20. In 2007, private investors acquired the Fenwal division from Baxter and launched it as Fenwal, Inc.[10] In 2012, Fenwal was acquired by Fresenius Kabi, a leading global healthcare company that focuses on medicines and medical devices aimed at improving human healthcare.

---

9 https://staging.giveplasma.ca/a-brief-history-of-apheresis-machines/ (last visited December 2, 2025) (FENWAL 00004710-FENWAL 00004711); https://www.aabb.org/about-aabb/history#:~:text=Since%20its%20inception%20in%201947,advancing%20donor%20and%20patient%20care (last visited December 2, 2025) (FENWAL 00004712-FENWAL 00004718).

10 *See* https://www.bioworld.com/articles/455418 (last visited December 2, 2025) (FENWAL 00004779-FENWAL 00004780).

Fenwal's integration with Fresenius Kabi provided Fenwal with resources to further its technological advancements.

21. By April 2012, Fenwal received FDA clearance to market a revolutionary new plasma collection system called the Aurora plasmapheresis system ("the Aurora System"). The Aurora System contains improved hardware and software, to support two-way, wireless data communication, improving the system's accuracy and safety and enhancing the operator and patient experience. Among other things, the Aurora System had an interactive touch-screen display with intuitive menus and icons, connectivity with Fenwal DXT software, and a controller that work in conjunction with other components of the system to provide an improved system. For example, the Aurora System enhanced donor safety in a revolutionary way by enabling more reliable identification and confirmation of the donor, ensuring that appropriate procedural parameters are set for each donor. The Aurora System also enhanced donor efficiency by automating the plasmapheresis procedure in a manner not achieved before.

22. Fenwal continued to advance its plasmapheresis technologies, and in 2016, Fenwal released the Aurora Xi plasmapheresis system. This machine, which incorporated faster processing speeds and larger spinning membrane, improved plasma donation center efficiency and donor experience by reducing donation times.

23. Fenwal's recent innovations were critical in addressing the shortage of plasma precipitated by the COVID pandemic. During the pandemic, donations decreased, and the inventory of collected plasma relied upon to stabilize plasma-derived therapies was depleted. Pharmaceutical manufacturers, who rely on plasma collectors, utilized all source plasma reserves to meet the growing demand for plasma-based therapies.

24. Fenwal's innovations related to the Adaptive Nomogram responded to this increased need for plasma. This proprietary and innovative nomogram, which is used with the Aurora Xi system to collect plasma, considers a donor's unique characteristics to determine an optimal amount of plasma to safely collect from the donor while providing an advantage compared to other on-market nomograms. In January 2025, Fenwal received FDA clearance for the Adaptive Nomogram.[11]

25. The Adaptive Nomogram represents a significant industry milestone as it enabled the collection of an average of 11.5% more plasma per donation, supporting higher production of plasma-derived therapies.

26. In bringing its plasmapheresis devices to market, Fenwal has made substantial investments including testing, research, development, engineering, design, data collection and analysis, clinical trials, manufacturing, sales, and marketing. Fenwal has conducted numerous clinical trials, costing millions of dollars each, to demonstrate the safety and efficacy of its products.[12]

27. Today, Fenwal remains an innovative, market leader in blood collection systems. Fenwal's products have been used in millions of procedures worldwide, contributing to the safety, quality, and availability of plasma and other blood components for therapeutic use.

[11] https://www.fresenius-kabi.com/us/news-and-events/receives-fda-510k-clearance-adaptive-nomogram-enhancing-plasma-collection-efficiency-aurora-xi-plasmapheresis-system (last visited December 2, 2025) (FENWAL 00004767-FENWAL 00004769).

[12] https://clinicaltrials.gov/search?term=fenwal,%20inc (last visited December 2, 2025) (FENWAL 00005320-FENWAL 00005322).

## THE FENWAL ASSERTED PATENTS

28. As a leading medical technology innovator, Fenwal invests in its intellectual property and possesses a significant portfolio of patents covering various aspects of plasmapheresis and systems for carrying out these procedures, including patents infringed by Haemonetics' devices (the "Fenwal Asserted Patents").[13] The Fenwal Asserted Patents fall into three groups:

(i) **The 2011 Fenwal Patents**: U.S. Patent No. 10,431,334 ("the '334 Patent"), U.S. Patent No. 10,643,748 ("the '748 Patent"), and U.S. Patent No. 10,872,693 ("the '693 Patent").

(ii) **The 2016 Fenwal Patents:** U.S. Patent No. 11,672,891 ("the '891 Patent") and U.S. Patent No. 12,397,089 ("the '089 Patent").

(iii) **The 2018 Fenwal Patents**: U.S. Patent No. 11,852,251 ("the '251 Patent"), U.S. Patent No. 11,369,724 ("the '724 Patent"), U.S. Patent No. 11,730,873 ("the '873 Patent"), and U.S. Patent No. 12,144,624 ("the '624 Patent").

### ***The 2011 Fenwal Patents***

29. While continuing to research and develop its plasmapheresis technology, Fenwal recognized that plasma collection, when performed improperly, posed a health and safety risk to patients and donors.

30. For example, plasmapheresis procedures, when performed with incorrect parameters (*e.g.*, inaccurate donor-specific inputs), can lead and have led to adverse donor events, including hypotension, arrhythmias, hemolysis, shock, and in extreme cases, even death. *See e.g.* Garozzo *et al*., "Adverse reactions to blood donations: the READ project," Blood Transfus. 2010, 8: 49-62 (FENWAL 00005420-FENWAL 00005433); Gupte, "Automation in Blood Centre: Its

[13] *See, e.g.*, https://www.chicagobusiness.com/technology/chicagos-most-innovative-companies-2025 (Chicago's Most Innovative Companies 2025) (Oct. 3, 2025) (FENWAL 00004735-FENWAL 00004752) (identifying Fenwal as a leading patent holder among Chicago-area companies).

impact on blood safety," Asian Journal of Transfusion Science, April 2015, Vol. 9, Supp. 1 (FENWAL 00005415-FENWAL 00005419). Use of procedure parameters that are unsuited to the patient/donor can also lead to inefficient under-collection of donor plasma. As explained in the specification of the 2011 Fenwal Patents, Fenwal inventors recognized these problems with use of procedure parameters that are not tailored to the donor:

> It is axiomatic that the parameters under which an at least partially automated medical procedure is performed, including without limitation blood donations and apheresis, should correspond or be appropriate to the characteristics of the donor or patient upon which the procedure is being performed. For example, when performing a blood donation procedure, it may be advantageous for a number of parameters, such as the sex and weight of the donor or patient, to be taken into consideration. If the incorrect operational parameters are used, the procedure may be less efficient than it would otherwise be and/or in certain circumstances could possibly be harmful to the donor or patient. Accordingly, care should be taken that the operational parameters correspond to the unique characteristics of the donor or patient.

Exhibit 5 (the '693 Patent) at 1:28-41.

31. Prior to Fenwal's inventions, these issues arose in part from errors in entry of donor or patient information into the system controlling the plasmapheresis collection, which led to inefficiencies in the collection procedure and/or dangers to the patient. *Id.* at 1:42-45, 1:46-52. The potential for error due to inaccurate application of donor-specific parameters was exacerbated by the fact that multiple different plasmapheresis devices may coexist in a single location, each running unique collection nomograms, with multiple donors being treated at the same time.

32. Unlike the prior art systems, the systems and methods described in the 2011 Fenwal Patents enhance the plasmapheresis process by reducing error and increasing safety. The 2011 Fenwal Patents ensure the plasmapheresis procedures are accurately tailored to each donor's unique characteristics, including, for example, by the entry of donor-specific information, once, into a data storage location that can be reliably transmitted to control the plasmapheresis collection.

33. The 2011 Fenwal Patents disclose a system that includes a database, a user interface, an apheresis treatment device, and a controller. The database is pre-programmed with one or more subject data entries, each subject data entry having associated with it subject-specific information (such as name, weight, sex, age, *etc.*). Additionally, the subject data entry may include procedural information, such as one or more parameters with which the medical procedure is to be performed (*e.g.*, processing time in an apheresis procedure, flow rate, *etc.*). The user interface is adapted to receive an identity input from a unique subject. The controller is configured to compare the identity input to the subject-specific information of the subject data entries. If the identity input corresponds to the subject-specific information of a subject data entry, the controller commands the treatment device to perform a medical procedure with respect to the subject. If the identity input does not correspond to the subject-specific information of any of the subject data entries, the controller prevents the performance of the medical procedure with respect to the subject. *See* Exhibit 5 at 1:66-2:17.

34. The 2011 Fenwal Patents consist of three patents, listed below. The three patents share the same specification and claim priority to U.S. Application Ser. No. 13/110,520 ("the '520 Application"), which was filed on May 18, 2011 by inventors Brian C. Case and Lan. L Nguyen.

35. Fenwal owns by assignment the full right, title, and interest in each patent and patent application in the family that claims priority to the '520 Application. *See* Exhibits 2, 4, 6.

***U.S. Patent No. 10,431,334***

36. U.S. Patent No. 10,431,334 is titled "Performing an apheresis procedure on a human subject with identity confirmation" and issued on October 1, 2019, with Brian C. Case and Lan L. Nguyen as inventors. A copy of the '334 Patent is attached as Exhibit 1.

37. The ’334 Patent duly and legally issued from U.S. Application No. 16/162,867, a continuation of U.S. Application No. 15/836,227, which claims priority to the ’520 Application through a chain of continuation applications.

38. Fenwal owns by assignment the full right, title, and interest in the ’334 Patent. A copy of the assignment history of the ’334 Patent is attached as Exhibit 2.

39. The ’334 Patent is valid and enforceable.

***U.S. Patent No. 10,643,748***

40. U.S. Patent No. 10,643,748 is titled “Performing an apheresis procedure on a human subject with identity confirmation” and issued on May 5, 2020, with Brian C. Case and Lan L. Nguyen as inventors. A copy of the ’748 Patent is attached as Exhibit 3.

41. The ’748 Patent duly and legally issued from U.S. Application No. 16/545,962, a continuation of U.S. Application No. 16/162,867 (which issued as the ’334 Patent).

42. The ’748 Patent is in the same family as the ’334 Patent and also claims priority to the ’520 Application.

43. Fenwal owns by assignment the full right, title, and interest in the ’748 Patent. A copy of the assignment history of the ’748 Patent is attached as Exhibit 4.

44. The ’748 Patent is valid and enforceable.

***U.S. Patent No. 10,872,693***

45. The ’693 Patent is titled “Performing an apheresis procedure on a human subject with identity confirmation” and issued on December 22, 2020, with Brian C. Case and Lan L. Nguyen as inventors. A copy of the ’693 Patent is attached as Exhibit 5.

46. The ’693 Patent duly and legally issued from U.S. Application No. 16/842,879, a continuation of U.S. Application No. 16/545,962 (which issued as the ’748 Patent).

47. The ’693 Patent is in the same family as the ’334 and ’748 Patents and also claims priority to the ’520 Application.

48. Fenwal owns by assignment the full right, title, and interest in the ’693 Patent. A copy of the assignment history of the ’693 Patent is attached as Exhibit 6.

49. The ’693 Patent is valid and enforceable.

***The 2016 Fenwal Patents***

50. Processing biological materials such as blood to separate out medically useful components safely, efficiently and economically, presents many challenges. At the time of the 2016 patent inventions, the industry recognized the importance of automated systems for blood processing. *See e.g.*, Pietersz et al. “Processing and storage of blood components: strategies to improve patient safety;” International Journal of Clinical Transfusion Medicine 2015:3 55–64 at 57 (FENWAL 00005331-FENWAL 00005340) (“Today, automated equipment for collecting whole blood in plastic bags, mixing, measuring the blood flow, weighing the blood components, calculating the collection time, and documenting all data has been developed and has contributed to the safety by collecting a standardized volume of blood.”).

51. As described by the 2016 patents, in using automated equipment, there are several processing parameters that must be accounted for. These include, for example, the time required for the procedure, flow rates, centrifugation speeds, collection volumes and appropriate stopping points. *See e.g.*, Exhibit 7 (the ’891 Patent) at 1:39-52. Running a procedure that fails to properly accord with one or more processing parameters incurs risks such as damaging the desired biological end-product, safety concerns due to overcollection of biological material from a donor, and prematurely ending the collection process impacting yield. Before the 2016 invention, processing operators had to rely on their own prior experience with the device and procedure

and/or empirical data to estimate appropriate parameters for a processing procedure. This approach was less than ideal and raised, *inter alia*, safety, efficiency, and waste concerns.

52. The novel system of the 2016 Fenwal Patents avoids the need to make assumptions regarding the operation of the processing equipment based on potentially unreliable empirical data, which may have poor correlation to the operational conditions in individual procedures. The system provides for pre-process evaluation of one or more outputs and/or in process conditions in advance of performing the process. Such pre-process evaluation may prevent damage to the material being processed, avoid unsafe operating conditions, prevent wastage of the processor's disposable elements and avoid producing a product that fails to meet the desired specifications. *See e.g.*, *id.* at 1:39-52, 5:5-18, 5:45-53, 5:62-67, 6:1-18. The 2016 Fenwal Patents describe a controller that calculates outputs prior to process initiation and can prevent the process from starting if the predicted process would exceed the system's physical or operational constraints. In addition, the 2016 Fenwal Patents discloses real-time in process monitoring to compare parameters to pre-calculated expectations from the mathematical model. See, e.g., *id.* at 5:1-17. If a deviation is detected, the system can alert the operator. *See, e.g.*, *id.* at 6:10-19.

53. Specifically, the 2016 patents describe and claim systems and methods for performing a series of concrete steps that include, for example, a processing circuit configured to receive activation from the operator to turn the blood processing system on, conduct self-checks on the system, receive input data for a process parameter value from a touch screen, verify that value is within a present range for the value, prior to initiating the centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected, provide that information to the operator via the touchscreen, prompt the operator to mount the disposable fluid circuit, automatically confirm that the circuit is installed, prime tubing of the disposable fluid

circuit with a fluid, begin the centrifugation separation process on the biological fluid, check the air detector sensor for fluid/air interface; weigh the product container during the centrifugal separation process, process the biological fluid until the predetermined volume of the blood component is collected and alert the operator when the process is complete. *See e.g.*, *id.* at 12:53-19:41, Figures 6 and 7.

54. The ’089 and ’891 Patents share the same specification and claim priority to provisional U.S. Application Ser. No. 62/342,675 (“the ’675 Provisional Application”), which was filed on May 27, 2016 by inventors Christopher Wegener, Daniel Boggs, Bret Olson, Steven Binninger, and James Hosek.

55. Fenwal owns by assignment the full right, title, and interest in the patent and patent application in the family that claims priority to the ’675 Application (including the ’089 and ’891 Patents). *See* Exhibits 8, 10.

***U.S. Patent No. 11,672,891***

56. U.S. Patent No. 11,672,891 is titled “Cell processing system and method with preliminary process evaluation” and issued on June 13, 2023, with Christopher Wegener, Daniel Boggs, Bret Olson, Steven Binninger, and James Hosek as inventors. A copy of the ’891 Patent is attached as Exhibit 7.

57. The ’891 Patent duly and legally issued from U.S. Application No. 17/398,780, a continuation of U.S. Application No. 15/456,853. The ’891 Patent ultimately claims priority to the ’675 Provisional Application.

58. Fenwal owns by assignment the full right, title, and interest in the ’891 Patent. A copy of the assignment history of the ’891 Patent is attached as Exhibit 8.

59. The ’891 Patent is valid and enforceable.

### *U.S. Patent No. 12,397,089*

60. U.S. Patent No. 12,397,089 is titled "Cell processing system and method with preliminary process evaluation" and issued on August 26, 2025, with Christopher Wegener, Daniel Boggs, Bret Olson, Steven Binninger, and James Hosek as inventors. A copy of the '089 Patent is attached as Exhibit 9.

61. The '089 Patent duly and legally issued from U.S. Application No. 18/180,637, a continuation of U.S. Application No. 17,398,780 (which issued as the '891 Patent).

62. The '089 Patent is in the same family as the '891 Patent and also claims priority to the '675 Provisional Application.

63. Fenwal owns by assignment the full right, title, and interest in the '089 Patent. A copy of the assignment history of the '089 Patent is attached as Exhibit 10.

64. The '089 Patent is valid and enforceable.

### ***The 2018 Fenwal Patents***

65. Plasma saves lives. Countless patients with rare, chronic, and life-threatening conditions need regular therapies derived from plasma. The proteins in blood plasma provide the primary ingredients for many important biologic medicines. But each donation only contains a tiny amount of what is required to create a single dose for a patient. For example, more than 1200 plasma donations are required to treat a 150 lb. hemophilia patient for a year.[14] Plasma cannot be manufactured, and the sole source of this lifesaving blood component is donors. Studies show that

[14] *See* https://plasma.fresenius-kabi.us/donate (last visited December 2, 2025) (FENWAL 00004755-FENWAL 00004758).

a donor's physical experience significantly impacts their willingness to repeat donations.[15] Thus, crucial to ensuring an ample supply of plasma is safeguarding the health and safety of the donors and making the donation process as efficient and relaxed as possible to encourage repeat donors, while maximizing the amount of plasma that can be safely collected.

66. The 2018 inventions strive to meet the ever-growing demand for plasma-derived medicines for patients in need, by focusing on donor-impacting details, such as safety and convenience, while safely optimizing the volume of raw plasma to be collected for a particular donor. *See* Exhibit 13 ('724 Patent) at 1:25-29. At the time of the inventions of the 2018 Fenwal Patents, plasma collection centers primarily used a simplified nomogram issued by the FDA to set the maximum plasma collection volumes based on donor weight. *See id.* at 2:8-10; 4:36-38 and Figure 1. As described by the patents, the FDA's simplified nomogram permitted the same volume of plasma to be drawn from for example, a donor weighing 110 pounds, and a donor weighing 149 pounds. Thus, it allowed for disproportionate collection among donors and potentially placed individuals particularly at the fringes of the weight groups, at risk for adverse events. Further, by failing to account for individual characteristics, the simplified nomogram did not maximize plasma collection volume.

67. The 2018 inventions allow for a personalized and improved donor experience. *See, e.g.*, *id.* at 51-59. They provide an automated system that maximizes the amount of plasma safely harvested from a donor, based on characteristics such as weight, height, hematocrit and the anticoagulant to whole blood ratio. ("ACR"). *See, e.g.*, *id.* at 2:66-3:21. The 2018 Fenwal Patents disclose aspects of the inventions including:

---

15 Kumari, "Prevalence of acute adverse reactions among whole blood donors: A 7 years study," Journal of Applied Hematology, vol. 6, Issue 4, October-December 2015 (FENWAL 00005325-FENWAL 00005330).

- An automated plasmapheresis system performing multiple cycles of draw and return, comprising a hardware component (with pumps, sensors, controller) and a disposable kit (including a separator, collection containers and tubing). *See, e.g.*, *id.* at 3:22-30, 6:26-35.
- A controller that is programmable and receives donor-specific parameters (such as weight, height, sex, hematocrit) either manually or electronically from a donor management system. The controller can be paired with a touchscreen for display and data entry. *See, e.g.*, *id.* at Abstract, 5:10-33, 6:3-6.
- The system can calculate the target of plasma to be collected based on the combination of donor hematocrit and the ACR. The system can control the ACR and consider the anticoagulant volume in the plasma product collected. *See, e.g.*, *id.* at 3:39-67. Algorithms that factor in donor hematocrit and total blood volume, among other factors, to determine the maximum safe volume of raw plasma that can be collected are disclosed. Id. During the plasmapheresis procedure, the donor's hematocrit changes as the plasma is removed and red-blood cells are returned to the donor. The system can re-calculate allowable plasma product to be collected after each cycle, ensuring maximum safe amount of plasma is collected throughout the procedure. *See e.g.*, *id.* at 17:3-6.

68. Three of the four 2018 Fenwal Patents (the '251, '724 '873 Patents), share the same specification and claim priority to: (i) U.S. Application Ser. No. 62/846,400, filed May 10, 2019 ("the '400 Provisional Application"); (ii) U.S. Application Ser. No. 62/752,480 filed Oct. 30, 2018 ("the '480 Provisional Application"); (iii) U.S. Application Ser. No. 62/674,144, filed May 21,

2018 ("the '144 Provisional Application"); and (iv) PCT/US2019/033318 ("the '318 PCT Application").

69. The '624 Patent claims priority to the '400, '480, '144 Provisional Applications, the '318 PCT Applications, as well as to: (i) U.S. Application Ser. No. 63/140,534 filed on Jan. 22, 2021 ("the '534 Provisional Application"); and (ii) U.S. Application Ser. No. 17/306,099 ("the '099 Application") filed on May 3, 2021, which is a continuation-in-part of U.S. application No. 16/739,441 ("the '441 Application") filed on January 20, 2020.

70. Fenwal owns by assignment the full right, title, and interest in the '251, '724, '873 and '624 Patents. *See* Exhibits 12, 14, 16, 18.

***U.S. Patent No. 11,285,251***

71. U.S. Patent No. 11,285,251 is titled "Systems and methods for optimization of plasma collection volumes" and issued on March 29, 2022, with Amit J. Patel, Samantha M. Planas, Walter T. Watts, Kyungyoon Min, and Daniel R. Boggs as inventors. A copy of the '251 Patent is attached as Exhibit 11.

72. The '251 Patent duly and legally issued from U.S. Application No. 17/386,992, a continuation of U.S. Application No. 17/194,410, which claims priority to the '144 Provisional Application through a chain of continuation applications.

73. Fenwal owns by assignment the full right, title, and interest in the '251 Patent. A copy of the assignment history of the '251 Patent is attached as Exhibit 12.

74. The '251 Patent is valid and enforceable.

***U.S. Patent No. 11,369,724***

75. U.S. Patent No. 11,369,724 is titled "Systems and methods for optimization of plasma collection volumes" and issued on June 28, 2022, with Amit J. Patel, Samantha M. Planas,

Walter T. Watts, Kyungyoon Min, and Daniel R. Boggs as inventors. A copy of the ’724 Patent is attached as Exhibit 13.

76. The ’724 Patent duly and legally issued from U.S. Application No. 17/675,824, a continuation of U.S. Application No. 17/386,992 (which issued as the ’251 Patent).

77. Fenwal owns by assignment the full right, title, and interest in the ’724 Patent. A copy of the assignment history of the ’724 Patent is attached as Exhibit 14.

78. The ’724 Patent is valid and enforceable.

***U.S. Patent No. 11,730,873***

79. U.S. Patent No. 11,730,873 is titled “Systems and methods for optimization of plasma collection volumes” and issued on August 22, 2023, with Amit J. Patel, Samantha M. Planas, Walter T. Watts, Kyungyoon Min, and Daniel R. Boggs as inventors. A copy of the ’873 Patent is attached as Exhibit 15.

80. The ’873 Patent duly and legally issued from U.S. Application No. 18/109,547, a continuation of U.S. Application No. 17/825,918.

81. Fenwal owns by assignment the full right, title, and interest in the ’873 Patent. A copy of the assignment history of the ’873 Patent is attached as Exhibit 16.

82. The ’873 Patent is valid and enforceable.

***U.S. Patent No. 12,144,624***

83. U.S. Patent No. 12,144,624 is titled “Systems and methods for plasma collection” and issued on November 19, 2024, with Amit J. Patel, Samantha M. Planas, Walter T. Watts, Kyungyoon Min, Daniel R. Boggs, and Katherine N. Radwanski as inventors. A copy of the ’624 Patent is attached as Exhibit 17.

84. The ’624 Patent duly and legally issued from U.S. Application No. 18/371,795, a continuation of U.S. Application No. 17/861.437.

85. Fenwal owns by assignment the full right, title, and interest in the ’624 Patent. A copy of the assignment history of the ’624 Patent is attached as Exhibit 18.

86. The ’624 Patent is valid and enforceable.

**HAEMONETICS AND THE ACCUSED HAEMONETICS PRODUCTS**

87. Haemonetics competes with Fenwal’s Aurora and Aurora Xi device product lines in the automated plasma collection market.[16] Haemonetics has three principal businesses: Plasma, Blood Center, and Hospital.[17] Haemonetics’ “Plasma” business “includes plasma collection devices and disposables, [and] donor management software and supporting software solutions sold to plasma customers.”[18] Its “Blood Center” business “includes blood collection and processing devices and disposables for plasma, red cells and platelets.”[19]

88. Through its Plasma business, Haemonetics offers “automated plasma collection systems, donor management software and supporting software solutions.”[20] Haemonetics’ plasma products include plasma collection devices, associated disposable/consumable products, and software and services that are designed to support multiple facets of plasma collector operations.[21]

---

16 https://haemonetics.gcs-web.com/static-files/c3810e5b-ce8f-46e3-8e76-c66ff4145609 (last visited December 2, 2025) (“2025 Haemonetics 10-K”) (FENWAL 00004590-FENWAL 00004709) at 3.

17 *Id.* at 1.

18 *Id.* at 1.

19 *Id.* at 1.

20 *Id.* at 1.

21 *Id.* at 2.

89. The plasmapheresis systems that Haemonetics makes/manufactures, imports, offers for sale/lease, leases, sells, and/or uses in the United States include: (i) the NexSys PCS plasmapheresis device, including those used with YES® and/or PERSONA® Technologies (collectively, NexSys PCS), (ii) Disposable Kits, and (iii) donor management software and related software used with the NexSys PCS (collectively, Accused Haemonetics Products). The Accused Haemonetics Products form an integrated system (the "NexSys PCS System") and are used by blood establishment centers and other entities in the United States to collect plasma.[22]

90. Haemonetics represents that the NexSys PCS System includes the following parts that collectively function as a system:

- **NexSys PCS device:** The electro-mechanical device and graphical user interface (GUI) screen. The NexSys PCS device has built-in guided operation, automated procedure programming, donor information display, and bi-directional connectivity to Blood Establishment Computer Systems ("BECS"), which runs Haemonetics' NexLynk Data Management System or another third-party donor management system.[23, 24] The NexSys PCS device is offered with the Standard nomogram, the YES Technology nomogram ("NexSys PCS YES"), or the PERSONA Technology nomogram ("NexSys PCS PERSONA").

---

22 NexSys PCS User Manual, 117649-US(AG) (Jan. 2020) ("NexSys PCS User Manual") (FENWAL 00004781-FENWAL 00004905) at 10; https://plasma.haemonetics.com/device-solutions (last visited December 2, 2025) (FENWAL 00004753-FENWAL 00004754).

23 https://plasma.haemonetics.com/device-solutions/nexsys-pcs (last visited December 2, 2025) (FENWAL 00005301-FENWAL 00005305).

24 https://plasma.haemonetics.com/-/media/files/plasma/persona_brochure.pdf (last visited December 2, 2025) (FENWAL 00005316-FENWAL 00005319) ("NexSys PCS PERSONA Brochure").

- **Protocol:** The embedded software that controls the process used to gather blood components from a donor (including nomograms such as the YES® or PERSONA® nomograms)
- **Disposable set:** Single-use collection components (Disposable Kits), which are also sold by Haemonetics
- **Solutions:** Anticoagulant and (optionally) saline solutions for collecting and processing blood components (also sold by Haemonetics).[25]

91. In 2018, Haemonetics received 510(k) clearance from the U.S. Food and Drug Administration ("FDA") for use of the YES® Technology with the NexSys PCS device and released the device in the United States.[26] On the FDA Establishment Registration & Device Listing website, Haemonetics is listed as the Specification Developer for the NexSys PCS device with YES® Technology.[27]

---

[25] NexSys PCS User Manual at 10; 2025 Haemonetics 10-K at 7.

[26] https://haemonetics.gcs-web.com/news-releases/news-release-details/haemonetics-announces-regulatory-clearances-nexsys-pcstm (last accessed December 2, 2025) (FENWAL 00004770-FENWAL 00004772); 510(k) Letter - BK180185 (FENWAL 00004721-FENWAL 00004723); 510(k) Summary - BK180185 (FENWAL 00004724-FENWAL 00004728).

[27] On information and belief, the YES® nomogram was first released for PCS 300. On further information and belief, the FDA premarket submission number for the YES® nomogram is BK180185. *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm?start_search=1&showList=1&establishmentName=&regNum=&StateName=&CountryName=&OwnerOperatorNumber=&OwnerOperatorName=&ProductCode=GKT&DeviceName=&ProprietaryName=&establishmentType=&PAGENUM=10&SortColumn=EstablishmentName20%25ASC&RegistrationNumber=1219343 (FENWAL 00005397-FENWAL 00005398); https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm?lid=584566&lpcd=GKT (Establishment Registration & Device Listing for PCS 300, NexSys PCS, listing Haemonetics as the Specification Developer) (last visited December 2, 2025) (FENWAL 00004759).

92. Haemonetics has stated that Plasma Target Selection for the YES® Technology has the "option to target based on Plasma Volume/Weight or Collection Volume."[28]

93. In 2020, Haemonetics received FDA 510(k) clearance for use of the PERSONA® Technology with the NexSys PCS and released the device in the United States.[29] On the FDA Establishment Registration & Device Listing website, Haemonetics is listed as the Specification Developer for the NexSys PCS® device with PERSONA® Technology.[30]

94. Haemonetics advertises the PERSONA® Technology as "built upon the NexSys PCS platform."[31] On information and belief, the Persona Technology calculates a target volume of plasma for collection from the donor based on the donor's weight, height, and hematocrit (*i.e.*, the percentage of red blood cells in the total volume of blood). Haemonetics states that "NexSys PCS with Persona technology uses a percent plasma nomogram that customizes plasma collection based on an individual donor's body composition."[32]

---

[28] 510(k) Summary - BK180185.

[29] 2025 Haemonetics 10-K at 2; Haemonetics Press Release re: PERSONA Technology.

[30] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm?start_search=1&showList=1&establishmentName=haemonetics&regNum=&StateName=&CountryName=&OwnerOperatorNumber=&OwnerOperatorName=&ProductCode=&DeviceName=&ProprietaryName=&establishmentType=&PAGENUM=10&SortColumn=EstablishmentName20%25ASC&RegistrationNumber=1219343 (last visited December 2, 2025) (FENWAL 00004759).

[31] NexSys PCS PERSONA Brochure.

[32] *Id.* at 2; *see also* Sept. 30, 2020 Haemonetics 510(k) Summary Submission (FENWAL 00004729-FENWAL 00004734) at 1.

95. The NexSys PCS forms "bi-directional connectivity" with a BECS and may receive donor information stored on the BECS and send reports of a donor's plasmapheresis procedure to the BECS.[33]

96. Haemonetics offers supporting software applications to provide connectivity between the NexSys PCS and BECS, including:

- **HaemoCommunicator**: This is a software application that "serves as middleware for data communication" between NexSys PCS and the BECS;[34]
- **NexSys PCS Device Driver:** This driver enables HaemoCommunicator to send and receive data from NexSys PCS. According to Haemonetics, "[w]ith this data, the NexSys PCS device can be pre-programmed for each collection, with information about the collection sent back to HaemoCommunicator once the donation is complete."[35]
- **HaemoCommunicator HTTP Driver:** This driver connects with BECS software solutions to permit integration of the NexSys PCS device with the BECS.[36]
- **NexSys PCS HL7 Driver:** On information and belief, similar to the HaemoCommunicator HTTP Driver, this driver enables data transfer between HaemoCommunicator and non-Haemonetics BECS software.[37]

---

33 https://plasma.haemonetics.com/-/media/files/plasma/plasma-connectivity-brochure.pdf (last visited December 2, 2025) (FENWAL 00004909- FENWAL 00004911) ("NexSys PCS Bi-Directional Connectivity Brochure").

34 NexSys PCS Bi-Directional Connectivity Brochure.

35 *Id.*

36 *Id.*

37 NexSys PCS Bi-Directional Connectivity Brochure.

97. NexSys PCS includes bi-directional connectivity to Haemonetics' NexLynk Donor Management System ("DMS") to automate programming of donation procedures and automated data capture of procedure data.[38] Among other things, the NexLynk DMS software solution stores donor information (*e.g.*, donor characteristics) and provides donor information to the NexSys PCS.[39, 40]

98. The Disposable Kits used with the NexSys PCS plasmapheresis devices include:

- Disposable Bowl;[41]
- Harness (includes the anticoagulant spike; a needle adapter; turning stops; Donor Pressure Monitor (DPM) Filter; Bowl Connector; Blood Filter; and Tubing (including the donor line and the anticoagulant line ));[42]
- Plasma Collection Container;[43]
- Venipuncture needle.[44]

---

38 2025 Haemonetics 10-K at 2.

39 https://plasma.haemonetics.com/-/media/files/plasma/nexsys_pcs_brochure.pdf (last visited December 2, 2025) (FENWAL 00005310-FENWAL 00005315) ("NexSys PCS Brochure").

40 https://plasma.haemonetics.com/-/media/files/plasma/nexlynk_dms_brochure.pdf (last visited December 2, 2025) (FENWAL 00004905-FENWAL 00004908) ("NexLynk DMS Brochure").

41 NexSys PCS User Manual at 40-42.

42 *Id.* at 42-43.

43 *Id.* at 43.

44 *See, e.g.*, https://www.graylinemedical.com/products/haemonetics-corp-apheresis-collection-needles-sysloc-black-eye-needle-sterile-17g-x-1-824-1704#:~:text=Home%20Haemonetics%20Corp%20Apheresis%20Collection,Give%20us%20a%20call (last visited December 2, 2025) (FENWAL 00004773).

99. On information and belief, as explained below, Haemonetics makes, uses, sells/leases, offers for sale/lease, and/or imports automated plasmapheresis systems (including NexSys PCS), their components, and related software in the United States.

100. On further information and belief, Haemonetics has entered into agreements with its U.S. customers to adopt NexSys PCS in their global collection network.[45] On further information and belief, Haemonetics' customers are using the NexLynk DMS donor management software.[46]

101. Haemonetics leases the NexSys PCS devices to its blood-bank and plasma center customers under contractual arrangements that typically include an operating or sales-type lease as well as the purchase and consumption of a certain level of disposable products.[47] On information and belief, Haemonetics transfers the rights of possession and use of the NexSys PCS devices to its customers until the devices are returned to Haemonetics upon the termination or expiration of the agreement between Haemonetics and the customers and receives a fee from its customer for the use of the device in plasmapheresis procedures. On further information and belief, Haemonetics also sells some NexSys PCS devices to its customers.[48] On information and belief, Haemonetics imports NexSys PCS devices into the United States.[49]

---

45 2025 Haemonetics 10-K at 3.

46 *Id.*

47 *See, e.g.*, 2025 Haemonetics 10-K at 84 ("Lessor Activity").

48 *Id.* at 58 ("Product Revenues").

49 *See* Haemonetics Malaysia Sdn Bhd Establishment Registration & Device Listing (FENWAL 00005434-FENWAL 00005436) and Importation Records (FENWAL 00005437).

102. On further information and belief, Haemonetics also sells[50] to its customers disposable products (Disposable Kits) that are used with the NexSys PCS device in plasmapheresis procedures.

103. On information and belief, Haemonetics sells and/or provides certain software to its customers, including the NexLynk DMS and other supporting software.[51]

104. On further information and belief, Haemonetics' capital equipment is manufactured in Malaysia, Australia and the United States.[52] On information and belief, Haemonetics makes its plasma collection devices in Malaysia (through its wholly owned Malaysian subsidiary Haemonetics Malaysia) and/or in the United States.[53, 54] On further information and belief, Haemonetics' primary disposable/consumable manufacturing operations are in North America and Malaysia.[55]

105. On information and belief, Haemonetics provides training and services to its U.S. customers regarding the use of the Accused Haemonetics Products as a system to perform plasmapheresis. For example, Haemonetics provides user and service manuals for the NexSys

---

50 *See, e.g.*, 2025 Haemonetics 10-K at 84 ("Lessor Activity"), 58 ("Product Revenues").

51 *See, e.g.*, *id.* at 1 ("Company Overview"), 34 ("Our Business"), 57, 59 ("Software and Other Revenues").

52 *Id.* at 7.

53 *Id.*

54 *See, e.g.*, *id.* at Ex. 21.1.

55 2025 Haemonetics 10-K at 7 ("Manufacturing").

PCS System.[56] Moreover, Haemonetics makes available to its customers an Education Portal "featur[ing] useful information about the NexSys PCS® system, plasma software solutions, and more."[57]

106. On further information and belief, Haemonetics employs a device and software implementation team to "support the planning and installation of the NexSys PCS Connectivity Package and provide support in establishing bi-directional communication with [the] BECS."[58] On information and belief, the Haemonetics Technical Service Team installs NexSys PCS devices, and the Haemonetics Software Implementation Team installs HaemoCommunicator and other software applications.[59] Haemonetics also provides ongoing product support to its customers.[60]

**COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 10,431,334**

107. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-106 as if fully set forth herein.

108. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1, 2, 5, 7-12, and 16 of the '334 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the Accused Haemonetics Products in the United States. The Accused Haemonetics

---

56 *See, e.g.*, NexSys PCS User Manual; NexSys PCS Service Manual (device LN PCS-300-US; software version PCS300.1.3.x) (Jan. 2019) (FENWAL 00004915-FENWAL 00005176) ("NexSys PCS Service Manual").

57 https://plasma.haemonetics.com/device-solutions/nexsys-pcs-persona-technology (last visited December 2, 2025) (FENWAL 00005306-FENWAL 00005309).

58 NexSys PCS Bi-Directional Connectivity Brochure.

59 *Id.*

60 *Id.*

Products meet each limitation of each of these claims, literally and/or under the doctrine of equivalents, as described in Exhibit 19,[61] which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '334 Patent against Haemonetics based on discovery that will become available in due course.

109. Claim 1 of the '334 Patent recites:

> 1. A system for performing an apheresis procedure on a human subject, comprising:
>
> an apheresis treatment device configured to draw blood from a human subject, separate the blood by blood component, and return at least one of the components to the human subject; and
>
> a remote data storage device located remotely from the apheresis treatment device and configured to communicate with the apheresis treatment device over a network, the remote data storage device programmed with a plurality of subject data entries, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, the remote data storage device configured to download subject-specific information comprising a name and a birth date from the subject data entry and further configured to program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure;
>
> the apheresis treatment device comprising:
>
>> a wireless circuit configured to communicate with the remote data storage device;
>>
>> a touch screen configured to receive an input; and
>
> a controller configured to confirm an identity of the human subject based on the input and, based at least in part on the result of the confirmation, provide access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device.

110. The Accused Haemonetics Products meet each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 19.

---

[61] All cites to Exhibits 19-27 are representative only.

111. The Accused Haemonetics Products form a system for performing an apheresis procedure, *e.g.*, a plasmapheresis procedure, on a human subject (*e.g.*, a plasma donor).

112. The NexSys PCS is an apheresis treatment device that is configured to draw blood from a human subject, separate the blood components (*e.g.*, plasma and red blood cells), and return at least one of the components (*e.g.,* red blood cells) to the human subject.

113. The Accused Haemonetics Products have a remote data storage device located remotely from the NexSys PCS apheresis treatment device and configured to communicate with the apheresis treatment device over a network (*e.g.*, wired or wireless internet).

114. On information and belief, the remote data storage device of the Accused Haemonetics Products runs the NexLynk DMS or a third party's donor management system software.

115. The remote data storage device of the Accused Haemonetics Products is programmed with a plurality of subject data entries, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information.

116. The subject-specific information programmed in the remote storage device includes, for example, donor name, donor ID, and donor date of birth.

117. Moreover, the data storage device of the Accused Haemonetics Products is configured to download subject-specific information comprising and is also configured to program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure.

118. For example, subject-specific information used with the Accused Haemonetics Products may include donor name, donor ID, and donor birth date from the subject data entry.

119. For example, the parameters used with the Accused Haemonetics Products may include one or more of: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.

120. The NexSys PCS apheresis device further includes a wireless circuit (*e.g.*, a Wi-Fi modem) that is configured to communicate with the remote data storage device.

121. The NexSys PCS apheresis device also includes a touch screen that is configured to receive user touch input.

122. The NexSys PCS apheresis device also includes a controller that is configured to confirm an identity of the human subject based on the user input and, based at least in part on the result of the confirmation, provide access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device. Alternatively, the NexSys PCS apheresis device meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation (confirm an identity of the human subject based on the user input and, based at least in part on the result of the confirmation, provide access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device), in substantially the same way, and achieves substantially the same result.

123. Claim 2 of the ’334 Patent recites: “The system of claim 1, wherein the processing circuit is configured to generate an error signal that prevents the performance of the apheresis procedure with respect to the human subject in the case where the identity of the human subject is not confirmed.”

124. The Accused Haemonetics Products practice claim 2 of the ’334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

125. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

126. The processing circuit (controller) in the NexSys PCS is configured to generate an error signal that prevents the apheresis procedure from being performed on the human subject in the case where the identity of the human subject is not confirmed.

127. Claim 5 of the '334 Patent recites: "The system of claim 1, wherein if the controller confirms the identity of the human subject, the controller commands the treatment device to perform the apheresis procedure."

128. The Accused Haemonetics Products practice claim 5 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

129. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

130. In the NexSys PCS, if the controller confirms the human subject's identity, the controller commands the NexSys PCS to perform the plasmapheresis procedure.

131. Claim 7 of the '334 Patent recites: "The system of claim 1, wherein if the controller does not confirm the identity of the human subject, the controller is configured to respond by disabling or declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert."

132. The Accused Haemonetics Products practice claim 7 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

133. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

134. On information and belief, in the NexSys PCS, if the controller does not confirm the human subject's identity, the controller is configured to not allow the apheresis procedure to proceed and is also configured to provide at least a visual alert or alarm to inform the user.

135. Claim 8 of the '334 Patent recites: "The system of claim 7, wherein the alarm or alert comprises a text error message displayed on the touch screen."

136. The Accused Haemonetics Products practice claim 8 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

137. As explained above, the Accused Haemonetics Products form a system that practices claim 7.

138. On information and belief, the NexSys PCS informs the user that donor identity has not been confirmed through a notification that includes a text message.

139. Claim 9 of the '334 Patent recites: "The system of claim 1, further comprising a bar code reader coupled to the apheresis treatment device."

140. The Accused Haemonetics Products practice claim 9 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

141. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

142. The NexSys PCS has a bar code reader.

143. Claim 10 of the '334 Patent recites: "The system of claim 1, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject."

144. The Accused Haemonetics Products practice claim 10 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

145. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

146. On information and belief, the remote data storage device of the Accused Haemonetics Products is pre-programmed with the subject-specific information at a time before the system carrying out the apheresis procedure on the human subject.

147. On information and belief, the remote data storage device of the Accused Haemonetics Products runs the NexLynk DMS or a third party's donor management system software.

148. Claim 11 of the '334 Patent recites: "The system of claim 1, wherein at least one of the parameters used to program the apheresis treatment device for the apheresis medical procedure is stored in the subject data entry."

149. The Accused Haemonetics Products practice claim 11 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

150. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

151. On information and belief, at least "Plasma Target Volume" is a parameter that is used to program the NexSys PCS device for the apheresis medical procedure. On information and belief, "Plasma Target Volume" is the collection volume that is computed on the BECS (*e.g.*, NexLynk DMS) using the PERSONA nomogram. On further information and belief, Plasma Target Volume is stored in the data entry.

152. Claim 12 of the '334 Patent recites:

> 12. A system for performing an apheresis procedure on a human subject, comprising:

> an apheresis treatment device configured to draw blood from a human subject, separate the blood by blood component, and return at least one of the components to the human subject; and
>
> a remote data storage device located remotely from the apheresis treatment device and configured to communicate with the apheresis treatment device over a network, the remote data storage device programmed with a plurality of subject data entries, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, the data storage device configured to download a plurality of the subject-specific information of the human subject from the subject data entry and further configured to pre-program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure;
>
> the apheresis treatment device comprising:
>
>> an input device configured to receive a user input; and
>>
>> a processing circuit, wherein the processing circuit is disposed within the apheresis treatment device, the processing circuit configured to confirm the human subject based on the received user input and using the plurality of subject-specific information downloaded from the data storage device to provide access to an apheresis procedure on the apheresis treatment device operated according to the pre-programmed parameters.

153. The Accused Haemonetics Products meet each of the foregoing limitations of claim 12, literally and/or under the doctrine of equivalents, as described in Exhibit 19.

154. The Accused Haemonetics Products constitute a system for an apheresis procedure, *e.g.*, a plasmapheresis procedure, on a human subject, *e.g.*, a plasma donor.

155. The NexSys PCS is an apheresis treatment device configured to draw blood from a donor, separate the blood components (*i.e.*, plasma and red blood cells), and return at least one of the components (red blood cells) to the donor.

156. The Accused Haemonetics Products have a remote data storage device (which may run the NexLynk DMS and/or a third-party donor management system software) that is located

remotely from the NexSys PCS apheresis treatment device and configured to communicate with the apheresis treatment device over a network (*e.g.*, wired or wireless internet).

157. The remote data storage device of the Accused Haemonetics Products is programmed with a plurality of subject data entries, each subject data entry associated with a donor, each subject data entry comprising subject-specific information (*e.g.*, donor name, donor ID, and donor date of birth).

158. Moreover, the data storage device of Accused Haemonetics Products is configured to download a plurality of the subject-specific information of the donor from the subject data entry and is also configured to pre-program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure. For example, the parameters may include one or more of: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.

159. The NexSys PCS apheresis device further includes an input device configured to receive a user input.

160. The NexSys PCS apheresis device also includes a processing circuit, wherein the processing circuit is disposed within the apheresis treatment device. For example, the Device Controller (DC) alone and/or in combination with the Motor Controller (MC) and/or the UI Processor,[62] constitute a "processing circuit."

161. The processing circuit of Accused Haemonetics Products is configured to confirm the donor based on the received user input and using the plurality of subject-specific information downloaded from the data storage device to provide access to an apheresis procedure on the apheresis treatment device operated according to the pre-programmed parameters.

---

[62] *See, e.g.*, NexSys PCS Service Manual at 37-78

162. Claim 16 of the ’334 Patent recites: “The system of claim 12, wherein the downloaded plurality of subject-specific information comprises name, sex, weight and birthdate of the donor, wherein the apheresis treatment device is configured to operate the apheresis procedure based at least in part on a parameter derived from at least one of the sex and weight of the human subject upon which the apheresis procedure is performed.”

163. The Accused Haemonetics Products practice claim 16 of the ’334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

164. As explained above, the Accused Haemonetics Products form a system that practices claim 12.

165. The plurality of subject-specific information downloaded by the NexSys PCS includes donor name, donor ID, weight, and birthdate.

166. The NexSys PCS is configured to operate the plasmapheresis procedure using the PERSONA nomogram, which is based at least in part on a parameter derived from at least one of the sex and weight of the donor on whom the plasmapheresis procedure is performed. For example, the PERSONA nomogram determines a donor’s target plasma collection volume using: (i) the donor’s body-mass index (BMI), derived from the donor’s height and weight; and (ii) the donor’s hematocrit.

167. Haemonetics directly infringes at least claims 1, 2, 5, 7-12, and 16 of the ’334 Patent by using (including in tests, commercial demonstrations, and clinical trials), importing, making, offering to sell/lease, selling, and/or leasing the Accused Haemonetics Products in the United States to its partners, clients, customers, and/or end users who use the products across this country, including in this District.

168. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '334 Patent.

169. In addition to directly infringing the '334 Patent, Haemonetics has indirectly infringed at least claims 1, 2, 5, 7-12, and 16 of the '334 Patent of the '334 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '334 Patent (including claims 1, 2, 5, 7-12, and 16) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[63] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '334 Patent. On information and belief, Haemonetics performed, and continues to perform, the acts that

---

[63] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ’334 Patent.

170. Haemonetics has had knowledge of the ’334 Patent since at least the filing of these Counterclaims. Haemonetics also has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’334 Patent since at least the filing of these Counterclaims.

171. Haemonetics has also indirectly infringed at least claims 1, 2, 5, 7-12, and 16 of the ‘334 Patent as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ’334 Patent by third parties, such as its customers and end users. Such third parties infringe the ’334 Patent at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the ’334 Patent (including claims 1, 2, 5, 7-12, and 16) because those components constitute a material part of the invention of the ’334 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the ’334 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

172. As a consequence of Haemonetics’ direct and indirect infringement of the ’334 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

173. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

174. On information and belief, unless enjoined, Haemonetics will continue to infringe the ’334 Patent.

**COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 10,643,748**

175. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-174 as if fully set forth herein.

176. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1, 2, 5, 7-12, 15, 17, 19, and 20 of the '748 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the Accused Haemonetics Products in the United States. The use of the Accused Haemonetics Products meet each limitation of each of these claims, literally and/or under the doctrine of equivalents, as described in Exhibit 20, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '748 Patent against Haemonetics based on discovery that will become available in due course.

177. Claim 1 of the '748 Patent covers a novel method of performing apheresis and recites:

> A method of performing an apheresis procedure on a donor, comprising:
>
> receiving donor information used to identify a donor;
>
> storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors;
>
> transmitting the donor information comprising a name and a birth date from the database to an apheresis treatment device;
>
> transmitting a plurality of parameters to the apheresis treatment device to program the apheresis treatment device for an apheresis procedure;
>
> receiving an input from a touch screen of the apheresis treatment device;
>
> confirming an identity of the donor based on the input; and
>
> performing the apheresis procedure according to the programmed parameters on the apheresis treatment device based on confirming the identity of the donor.

178. The use of the Accused Haemonetics Products meets each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 20.

179. Claim 1 of the ’748 Patent recites in part, “[a] method of performing an apheresis procedure on a donor.”

180. As shown by at least the NexSys PCS User Manual, the Accused Haemonetics Products practice a method of performing an apheresis procedure on a donor. The NexSys PCS User Manual discloses instructions for the “plasmapheresis system designed for the highly efficient collection of plasma from donors.”[64]

181. End users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of performing an apheresis procedure on a donor.

182. Claim 1 of the ’748 Patent also recites in part, “receiving donor information used to identify a donor.”

183. As shown by at least the NexSys PCS User Manual, the Accused Haemonetics Products practice the step of “receiving donor information used to identify a donor.” The NexSys PCS User Manual discloses instructions for “verifying the donor” including “scan[ning] a donor barcode” or “enter[ing] the donor’s ID.”[65]

184. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “receiving donor information used to identify a donor.”

---

[64] NexSys PCS User Manual, at 10.

[65] NexSys PCS User Manual, at 59.

185. Claim 1 of the ’748 Patent also recites in part, “storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors.”

186. As shown by at least the NexSys PCS User Manual and NexLynk DMS Brochure, the Accused Haemonetics Products practice the step of “storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors.” The NexSys PCS User Manual describes a “BECS” which is a “central monitoring software system that exchanges information with the device via an approved server application.”[66] It further describes how the Accused Haemonetics Products “receive[] [donor] information from the BECS.”[67]

187. The NexLynk DMS Brochure describes the software as helping users “manage information about your donors” and providing “donor management” functionality.[68]

188. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual and utilizing the NexLynk DMS software or other third-party donor management system will perform the step of “storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors.”

189. Claim 1 of the ’748 Patent also recites in part, “transmitting the donor information comprising a name and a birth date from the database to an apheresis treatment device.”

190. As stated above, the NexSys PCS User Manual discloses that the Accused Haemonetics Products, including the NexSys PCS, “receive[] [donor] information from the

---

[66] NexSys PCS User Manual, at 59.

[67] *Id.* at 59.

[68] NexLynk DMS Brochure, at 3.

BECS."[69] As shown in the NexSys PCS User Manual, that donor information includes the donor name and birth date.[70]

191. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "transmitting the donor information comprising a name and a birth date from the database to an apheresis treatment device."

192. Claim 1 of the '748 Patent also recites in part, "transmitting a plurality of parameters to the apheresis treatment device to program the apheresis treatment device for an apheresis procedure."

193. As shown at least in the NexSys PCS User Manual and NexLynk DMS Brochure, the Accused Haemonetics Products transmit a plurality of parameters to the NexSys PCS device to program the device for an apheresis procedure. For example, the NexLynk DMS Brochure describes how the software "integrate[s] bidirectionally with the plasma collection device."[71]

194. The parameters may include: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.[72]

195. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "transmitting a plurality of parameters to the apheresis treatment device to program the apheresis treatment device for an apheresis procedure."

---

69 NexSys PCS User Manual, at 59.

70 *Id.* at 60, Fig. 22.

71 NexLynk DMS Brochure, at 4.

72 *See, e.g.*, NexSys PCS User Manual, at 59-60.

196. Claim 1 of the ’748 Patent also recites in part, “receiving an input from a touch screen of the apheresis treatment device.”

197. As shown in the NexSys PCS User Manual, the NexSys PCS device includes a “touchscreen graphical user interface.”[73] The manual describes how the device receives inputs from a touchscreen periodically as part of its intended operation.[74]

198. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “receiving an input from a touch screen of the apheresis treatment device.”

199. Claim 1 of the ’748 Patent also recites in part, “confirming an identity of the donor based on the input.”

200. As shown in the NexSys PCS User Manual, as part of the “verifying the donor” instructions, the touchscreen displays a “Confirm” button that the user presses to confirm donor information including donor identity.[75]

201. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “confirming an identity of the donor based on the input.”

202. Claim 1 of the ’748 Patent also recites in part, “performing the apheresis procedure according to the programmed parameters on the apheresis treatment device based on confirming the identity of the donor.”

---

[73] NexSys PCS User Manual, at 11.

[74] *See, e.g.*, NexSys PCS User Manual, at 60, 71, 74.

[75] NexSys PCS User Manual, at 60.

203. As shown at least in the PCS PERSONA Brochure and NexSys PCS User Manual, the Accused Haemonetics Products comprise "plasmapheresis system designed for the highly efficient collection of plasma from donors," *i.e.*, performing an apheresis procedure. The NexSys PCS User Manual shows that the apheresis procedure is performed according to parameters that are based on a confirmed donor identity.[76]

204. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "performing the apheresis procedure according to the programmed parameters on the apheresis treatment device based on confirming the identity of the donor."

205. Claim 2 of the '748 recites: "The method of claim 1, generating an error signal that prevents the performance of the apheresis procedure with respect to the donor in the case where the identity of the donor is not confirmed."

206. The use of the Accused Haemonetics Products practices claim 2, literally and/or under the doctrine of equivalents, as described in Exhibit 20.

207. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

208. During use of the NexSys PCS, the NexSys PCS generates an error signal that prevents the apheresis procedure from being performed on the human subject if the identity of the human subject is not confirmed.

[76] *See, e.g.*, NexSys PCS User Manual, at 59-60.

209. Claim 5 of the ’748 Patent recites: “The method of claim 1, wherein if the identity of the donor is confirmed, the method comprises commanding the treatment device to perform the apheresis procedure.”

210. The use of the Accused Haemonetics Products practices claim 5 of the ’748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

211. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

212. As described above, during use of the NexSys PCS, donor identity is confirmed via an input to the touchscreen. The NexSys PCS User Manual thereafter explains the performance of an apheresis procedure, specifically plasmapheresis, initiated by a command to the treatment device.

213. Claim 7 of the ’748 Patent recites: “The method of claim 1, wherein if the identity of the donor does not match the input, the apheresis treatment device responds by disabling or declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert.”

214. The use of the Accused Haemonetics Products practices claim 7 of the ’748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

215. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

216. On information and belief, during the use of the NexSys PCS, if the donor identity does not match the user input, the NexSys PCS does not proceed with the apheresis procedure and generates at least a visual alarm or alert for the user.

217. Claim 8 of the '748 Patent recites: "The method of claim 7, wherein the alarm or alert comprises a text error message displayed on the touch screen."

218. The use of the Accused Haemonetics Products practices claim 8 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

219. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 7.

220. On information and belief, during the use of the NexSys PCS, if the donor identity does not match the user input, the NexSys PCS does not proceed with the apheresis procedure and generates at least a visual alarm or alert for the user, and this visual alarm or alert includes a text message.

221. Claim 9 of the '748 Patent recites: "The method of claim 1, further comprising receiving data from a bar code reader coupled to the apheresis treatment device."

222. The use of the Accused Haemonetics Products practices claim 9 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

223. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

224. As described in the NexSys PCS User Manual, the first step in the "verifying the donor" section is to "scan a donor barcode."[77] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the NexSys PCS device to "receiv[e] data from a bar code reader coupled to the apheresis treatment device."

225. Claim 10 of the '748 Patent recites: "The method of claim 1, wherein receiving and storing the donor information occurs at a time prior to carrying out the apheresis procedure on the donor."

226. The use of the Accused Haemonetics Products practices claim 10 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

227. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

228. During the use of the NexSys PCS, receiving the donor information and storing the donor information in a data entry of a database (on the NexLynk DMS and/or other third-party donor management system) takes place before the plasmapheresis procedure is begun.

229. Furthermore, as shown in the NexSys PCS User Manual, donor information is received and stored prior to carrying out the apheresis procedure on the donor, such that the information can be retrieved from NexLynk DMS or another third-party donor management system, prior to initiating the procedure.

---

[77] NexSys PCS User Manual at 59.

230. Claim 11 of the '748 Patent recites: "The method of claim 1, wherein at least one of the parameters used to program the apheresis treatment device for the apheresis procedure is stored in the data entry."

231. The use of the Accused Haemonetics Products practices claim 11 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

232. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

233. On information and belief, during use of the NexSys PCS, "Plasma Target Volume" is a parameter that is stored in the data entry.

234. Plasma Target Volume is the collection volume that is computed on the BECS (*e.g.*, NexLynk DMS) using the PERSONA nomogram.

235. Claim 12 of the '748 Patent recites:

> 12. A method of performing an apheresis procedure on a human subject, comprising:
>
> receiving over a network donor information comprising a plurality of donor-specific information;
>
> receiving over the network a plurality of parameters for an apheresis procedure;
>
> receiving a user input from a touch screen to confirm a donor based on the plurality of donor-specific information;
>
> in response to confirming the donor, proceeding with an apheresis procedure operated according to the plurality of parameters, the apheresis procedure comprising drawing blood from a human subject, separating the blood by blood component, and returning at least one of the components to the donor.

236. The use of the Accused Haemonetics Products practices claim 12 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

237. As described above in relation to claim 1, the Accused Haemonetics Products practice a method of performing an apheresis procedure on a human subject. The NexSys PCS User Manual discloses instructions for the "plasmapheresis system designed for the highly efficient collection of plasma from donors."[78]

238. At least end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of performing an apheresis procedure on a human subject.

239. Claim 12 of the '748 Patent also recites in part, "receiving over a network donor information comprising a plurality of donor-specific information."

240. As shown at least in the NexSys PCS Bi-Directional Connectivity Brochure, the NexSys PCS device communicates over a network with software systems. The NexSys PCS device includes an ethernet connection that "enables the device to communicate with the approved server application."[79] Information received includes donor-specific information such as name, weight, and date of birth.[80]

241. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the NexSys PCS device to perform the step of "receiving over a network donor information comprising a plurality of donor-specific information."

242. Claim 12 of the '748 Patent also recites in part, "receiving over the network a plurality of parameters for an apheresis procedure."

---

[78] NexSys PCS User Manual, at 10.

[79] NexSys PCS User Manual, at 28.

[80] *Id.* at 60.

243. As described above in relation to claim 1, when used according to the NexSys PCS User Manual, the NexSys PCS device receives a plurality of parameters for an apheresis procedure. As shown in at least the NexSys PCS Bi-Directional Connectivity Brochure, such plurality of parameters may be received over a network.

244. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the NexSys PCS device to perform the step of "receiving over the network a plurality of parameters for an apheresis procedure."

245. Claim 12 of the '748 Patent also recites in part, "receiving a user input from a touch screen to confirm a donor based on the plurality of donor-specific information."

246. As described above in relation to claim 1, at least the NexSys PCS User Manual describes the user confirming a donor via a touchscreen input based on a plurality of donor-specific information. Said information may include name and date of birth.

247. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the NexSys PCS device to perform the step of "receiving a user input from a touch screen to confirm a donor based on the plurality of donor-specific information."

248. Claim 12 of the '748 Patent also recites in part, "in response to confirming the donor, proceeding with an apheresis procedure operated according to the plurality of parameters, the apheresis procedure comprising drawing blood from a human subject, separating the blood by blood component, and returning at least one of the components to the donor."

249. As described above in relation to claim 1, in response to the user confirming the donor via a touchscreen input, the NexSys PCS device performs an apheresis procedure according

to the plurality of parameters, the apheresis procedure comprising drawing blood from a human subject, separating the blood by blood component, and returning at least one of the components to the donor, at least including a plasmapheresis procedure.

250. Claim 15 of the ’748 Patent recites: “The method of claim 12, wherein the plurality of donor-specific information are received wirelessly.”

251. The use of the Accused Haemonetics Products practices claim 15 of the ’748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

252. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 12.

253. During use of the NexSys PCS for a plasmapheresis procedure, the device receives donor-specific information wirelessly (through Wi-Fi).[81]

254. Claim 17 of the ’748 Patent recites:

> 17. A method of performing an apheresis procedure on a human subject, comprising:
>
> storing a plurality of subject data entries in a data storage device located remotely from an apheresis treatment device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject;
>
> downloading subject-specific information comprising a name and a birth date from a subject data entry;
>
> programming the apheresis treatment device with a plurality of parameters for the apheresis medical procedure;

[81] *See, e.g.*, NexSys PCS Service Manual at 64 (explaining adjustments to wireless connection settings to connect the device to a “server application”).

> receiving an input from a touch screen; and
>
> confirming an identity of the human subject based on the input and, based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device.

255. The use of the Accused Haemonetics Products practices claim 17 of the ’748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

256. As described above in relation to claim 1, the Accused Haemonetics Products practice a method of performing an apheresis procedure on a human subject. The NexSys PCS User Manual discloses instructions for the "plasmapheresis system designed for the highly efficient collection of plasma from donors."[82]

257. Claim 17 of the ’748 Patent also recites in part, "storing a plurality of subject data entries in a data storage device located remotely from an apheresis treatment device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject."

258. As shown at least in the NexLynk DMS Brochure, the Accused Haemonetics Products store subject data in a data storage device remotely from the apheresis treatment device. Said subject data is associated with a human subject, *e.g.*, plasma donors, and comprises subject-specific information, *e.g.*, name, weight, and birth date.

259. As evidenced at least by the NexSys PCS User Manual, said remote data storage device is pre-programmed with this information prior to the system carrying out the apheresis

[82] NexSys PCS User Manual, at 10.

procedure on the human subject. The User Manual describes steps for "verifying the donor" that include retrieval of pre-programmed donor-specific information from a remote data storage device (*e.g.*, BECS, NexLynk DMS, or other third-party donor management system).

260. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of "storing a plurality of subject data entries in a data storage device located remotely from an apheresis treatment device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject."

261. Claim 17 of the '748 Patent also recites in part, "downloading subject-specific information comprising a name and a birth date from a subject data entry."

262. As shown at least in the NexSys PCS User Manual, the NexSys PCS device downloads subject-specific information from a subject data entry including name and birth date. NexSys PCS User Manual, at 60. Said information is downloaded via or from the NexLynk DMS or other third-party donor management system.

263. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of "downloading subject-specific information comprising a name and a birth date from a subject data entry."

264. Claim 17 of the '748 Patent also recites in part, "programming the apheresis treatment device with a plurality of parameters for the apheresis medical procedure."

265. As described above in relation to claim 1, the Accused Haemonetics Products comprise a "plasmapheresis system designed for the highly efficient collection of plasma from donors," *i.e.*, performing an apheresis procedure. The apheresis procedure is performed by the apheresis treatment device that is "pre-programmed for each collection" according to data received by the device comprising "a plurality of parameters."[83]

266. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of "programming the apheresis treatment device with a plurality of parameters for the apheresis medical procedure."

267. Claim 17 of the '748 Patent also recites in part, "receiving an input from a touch screen."

268. As described above in relation to claim 1, the instructions for use of the NexSys PCS device include touchscreen inputs by the user.

269. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of "receiving an input from a touch screen."

270. Claim 17 of the '748 Patent also recites in part, "confirming an identity of the human subject based on the input."

271. As described above in relation to claim 1, the instructions for use of the NexSys PCS device include confirming the identity of the human subject (*i.e.*, donor) through an input to the touchscreen.

---

[83] *See* NexSys PCS User Manual, at 59-60; NexSys PCS Bi-Directional Connectivity Brochure, at 2.

272. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of "confirming an identity of the human subject based on the input."

273. Claim 17 of the '748 Patent also recites in part, "based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device."

274. As described above in relation to claim 1, the NexSys PCS device carries out an apheresis procedure (*e.g.*, plasmapheresis) based at least in part on the confirmation of human subject (*i.e.*, donor) identity. The apheresis procedure is operated according to the programmed parameters.[84]

275. Accordingly, end users, such as customers and phlebotomists, following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of "based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device."

276. Claim 19 of the '748 Patent recites: "The method of claim 17, wherein if the controller does not confirm the identity of the human subject the controller is configured to respond by declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert, wherein the alarm or alert comprises a text error message displayed on the touch screen."

---

[84] *See* NexSys PCS User Manual, at 59-60; NexSys PCS Bi-Directional Connectivity Brochure, at 2.

277. The use of the Accused Haemonetics Products practices claim 19 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

278. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

279. If the donor identity does not match the user input, the NexSys PCS does not proceed with the apheresis procedure and generates at least a visual alarm or alert for the user. On information and belief, this visual alarm or alert includes a text message.

280. Claim 20 of the '748 Patent recites: "The method of claim 17, wherein at least one of the parameters used to program the apheresis treatment device for the apheresis medical procedure is stored in the subject data entry and downloaded from the subject data entry."

281. The use of the Accused Haemonetics Products practices claim 20 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

282. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

283. On information and belief, "Plasma Target Volume" is the collection volume that is computed on the BECS (*e.g.*, NexLynk DMS) using the PERSONA nomogram and is a parameter that is stored in the data entry.

284. In addition to end users of the Accused Haemonetics Products, on information and belief, Haemonetics and its agents directly infringe at least claims 1, 2, 5, 7-12, 15, 17, 19, and 20 of the '748 Patent by using the Accused Haemonetics Products in the United States (for example in tests and commercial demonstrations) according to the instructions and guidance that

Haemonetics provides to its end customers in the NexSys PCS User Manual and the NexSys PCS Service Manual.[85]

285. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '748 Patent.

286. In addition to directly infringing the '748 Patent, Haemonetics has indirectly infringed the '748 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '748 Patent (including claims 1, 2, 5, 7-12, 15, 17, 19, and 20) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[86] On

[85] *See generally* NexSys PCS User Manual; NexSys PCS Service Manual.

[86] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the ’748 Patent. On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ’748 Patent.

287. Haemonetics has had knowledge of the ’748 Patent since at least the filing of these Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’748 Patent since at least the filing of these Counterclaims.

288. Haemonetics has also indirectly infringed the ‘748 Patent (including claims 1, 2, 5, 7-12, 15, 17, 19, and 20) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ’748 Patent by third parties, such as its customers and end users. Such third parties infringe the ’748 Patent (including claims 1, 2, 5, 7-12, 15, 17, 19, and 20) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the ’748 Patent because those components constitute a material part of the invention of the ’748 Patent (as their use practices all limitations of the claims), are specially made or adapted for use in infringing the ’748 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

289. As a consequence of Haemonetics’ direct and indirect infringement of the ’748 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

290. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

291. On information and belief, unless enjoined, Haemonetics will continue to infringe the ’748 Patent.

**COUNT 3: INFRINGEMENT OF U.S. PATENT NO. 10,872,693**

292. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-291 as if fully set forth herein.

293. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1, 2, 4, 5, 7-9, 11, 12, 15, 17, 19, and 20 of the ’693 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the Accused Haemonetics Products in the United States. The Accused Haemonetics Products meet each limitation of each of these claims, literally and/or under the doctrine of equivalents, as described in Exhibit 21, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the ’693 Patent against Haemonetics based on discovery that will become available in due course.

294. Claim 1 of the ’693 Patent recites:

> 1. A system for performing an apheresis procedure on a donor, comprising:
>
> an apheresis device; and
>
> a server configured to:
>
> > receive donor information used to identify a donor;
> >
> > store the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors; and
> >
> > transmit the donor information comprising a name and a birth date from the database to the apheresis device;
> >
> > transmit a plurality of parameters to the apheresis device to program the apheresis device for an apheresis procedure; and
>
> the apheresis device configured to:

> receive an input from a touch screen of the apheresis device;
>
> confirm an identity of the donor based on the input; and
>
> perform the apheresis procedure according to the programmed parameters on the apheresis device based on confirming the identity of the donor.

295. The Accused Haemonetics Products meet each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

296. The Accused Haemonetics Products comprise a system for performing an apheresis procedure (i.e., plasmapheresis) on a donor.

297. The NexSys PCS is an apheresis device.

298. The system of the Accused Haemonetics Products includes a server. For example, the NexLynk DMS software (or other third-party donor management system) and/or their associated software applications (*e.g.*, HaemoCommunicator) constitute a server. Additionally, the aforementioned software, together with the hardware on which it runs, constitutes a server.

299. On information and belief, the server of the Accused Haemonetics Products is configured to receive donor information to identify a donor.

300. For example, donor information may include donor name, donor ID, and donor date of birth.

301. On information and belief, the server of the Accused Haemonetics Products is configured to store the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors. The database resides in and/or communicates with the NexLynk DMS software or other third-party donor management system.

302. The server is configured to transmit the donor information comprising a name and a birth date from the database to the NexSys PCS.

303. The sever is configured to transmit a plurality of parameters to the apheresis device to program the NexSys PCS for the plasmapheresis procedure.

304. For example, the parameters may include: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.

305. The NexSys PCS is configured to receive user input from the device's touch screen.

306. The NexSys PCS is configured to confirm the identity of the donor based on the user input received from the touchscreen.

307. The NexSys PCS is configured to perform plasmapheresis with the programmed parameters based on confirming the identity of the donor.

308. Claim 2 of the '693 Patent recites: "The system of claim 1, the apheresis device configured to generate an error signal that prevents the performance of the apheresis procedure with respect to the donor in the case where the identity of the donor is not confirmed."

309. The Accused Haemonetics Products meet each of the foregoing limitations of claim 2, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

310. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

311. The NexSys PCS is configured to generate an error signal that prevents the plasmapheresis procedure from being performed on the donor in the case where the identity of the donor is not confirmed.

312. Claim 4 of the '693 Patent recites: "The system of claim 1, wherein the apheresis procedure is a plasmapheresis procedure."

313. The Accused Haemonetics Products meet each of the foregoing limitations of claim 4, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

314. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

315. The NexSys PCS performs is a plasmapheresis machine, which performs a plasmapheresis procedure.

316. Claim 5 of the ’693 Patent recites: “The system of claim 1, wherein if the identity of the donor is confirmed, the device is commanded to perform the apheresis procedure.”

317. The Accused Haemonetics Products meet each of the foregoing limitations of claim 5, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

318. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

319. The NexSys PCS is configured such that, if the identity of the donor is confirmed, the NexSys PCS is commanded to perform the plasmapheresis procedure.

320. Claim 7 of the ’693 Patent recites: “The system of claim 1, wherein if the identity of the donor does not match the input, the apheresis device responds by disabling or declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert.”

321. The Accused Haemonetics Products practice claim 7 of the ’693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

322. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

323. On information and belief, the NexSys PCS is configured such that, if the identity of the donor does not match the input, the device responds by disabling or declining to proceed with the plasmapheresis procedure for the tripper and by triggering at least a visual alert or alarm to inform the user.

324. Claim 8 of the ’693 Patent recites: “8. The system of claim 7, wherein the alarm or alert comprises a text error message displayed on the touch screen.”

325. The Accused Haemonetics Products practice claim 8 of the ’693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

326. As explained above, the Accused Haemonetics Products form a system that practices claim 7.

327. On information and belief, the NexSys PCS is configured such that the visual alarm or alert includes a text error message displayed on the touch screen.

328. Claim 9 of the ’693 Patent recites: “The system of claim 1, further comprising a bar code reader coupled to the apheresis device configured to receive data.”

329. The Accused Haemonetics Products practice claim 9 of the ’693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

330. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

331. The NexSys PCS includes a bar code reader that is coupled to the apheresis device and is configured to received data (*e.g.* donor bar code).

332. Claim 11 of the ’693 Patent recites: “The system of claim 1, wherein at least one of the parameters used to program the apheresis device for the apheresis procedure is stored in the data entry.”

333. The Accused Haemonetics Products practice claim 11 of the ’693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

334. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

335. At least of one of the parameters of the Accused Haemonetics Products used to program the NexSys PCS for the plasmapheresis procedure is stored in the data entry.

336. On information and belief, "Plasma Target Volume" is a parameter that is used to program the NexSys PCS device and is stored in the data entry.

337. Claim 12 of the '693 Patent covers a novel system for performing an apheresis procedure and recites:

> 12. A system for performing an apheresis procedure on a donor, comprising:
>
> an apheresis device configured to:
>
> > receive over a network donor information comprising donor-specific information;
> >
> > receive over the network a plurality of parameters for an apheresis procedure;
> >
> > receive a user input from a touch screen to confirm a donor based on the donor-specific information; and
> >
> > in response to confirming the donor, proceed with an apheresis procedure operated according to the plurality of parameters, the apheresis procedure configured to draw whole blood from the don[o]r, separate at least one component from the whole blood, and return at least one other component of the whole blood to the donor.

338. The Accused Haemonetics Products meet each of the foregoing limitations of claim 12, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

339. The Accused Haemonetics Products form a system for an apheresis procedure (i.e., a plasmapheresis procedure), on a plasma donor.

340. The system includes the NexSys PCS, which is an apheresis device.

341. The NexSys PCS is configured to receive over a network (*e.g.*, internet) donor information. On information and belief, the NexSys PCS receives the donor information from the NexLynk DMS or another third-party data management system.

342. For example, donor information includes donor-specific information, such as donor name, date of birth, and donor ID.

343. The NexSys PCS is configured to receive over the network a plurality of parameters for an apheresis procedure. For example, the parameters may include: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume. On information and belief, the NexSys PCS receives this information from the NexLynk DMS or another third-party data management system.

344. The NexSys PCS is configured to receive a user input from a touch screen to confirm a donor based on the donor-specific information.

345. The NexSys PCS is configured such that, in response to confirming the donor, it proceeds with a plasmapheresis procedure (which is an apheresis procedure) operated according to the plurality of parameters. The plasmapheresis procedure is configured to draw whole blood from the donor, separate at least one component (plasma) from the whole blood, and return at least one other component of the whole blood (red blood cells) to the donor.

346. Claim 15 of the ’693 Patent recites: “The system of claim 12, wherein the apheresis procedure is a plasmapheresis procedure, wherein the at least one component separated from the whole blood comprises plasma.”

347. The Accused Haemonetics Products practice claim 15 of the ’693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

348. As explained above, the Accused Haemonetics Products form a system that practices claim 12.

349. The apheresis procedure that the NexSys PCS device performs is a plasmapheresis procedure, and at least component that is separate from the whole blood drawn from the donor includes plasma.

350. Claim 17 of the ’693 Patent recites:

> 17. A system for performing an apheresis procedure on a human subject, comprising:
>
> an apheresis device; and
>
> a server configured to:
>
>> store a plurality of subject data entries in a data storage device located remotely from the apheresis device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject;
>>
>> download subject-specific information comprising a name and a birth date from a subject data entry;
>>
>> program the apheresis device with a plurality of parameters for the apheresis medical procedure;
>>
>> wherein the apheresis device is configured to:
>>
>> receive an input from a touch screen;
>>
>> confirm an identity of the human subject based on the input; and
>>
>> based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis device.

351. The Accused Haemonetics Products practice claim 17 of the ’693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

352. The Accused Haemonetics Products comprise a system for performing an apheresis procedure (plasmapheresis) on a human subject (*e.g.*, a donor).

353. The system includes the NexSys PCS, which is an apheresis device.

354. The system of the Accused Haemonetics Products includes a server. For example, the NexLynk DMS software (or other third-party donor management system) and/or their associated software applications (*e.g.*, HaemoCommunicator) constitute a server. Additionally, the aforementioned software, together with the hardware on which it runs, constitutes a server.

355. The server that is part of the system of the Accused Haemonetics Products is configured to store a plurality of subject data entries in a data storage device (which runs the NexLynk DMS and/or other third-party donor management system) that is located remotely from the apheresis device.

356. Further, each subject data entry is associated with a donor, and each subject data entry includes subject-specific information. For example, said subject-specific information may include donor name, donor ID, donor date of birth, and donor weight.

357. The remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the donor.

358. The server that is part of the system is configured to download subject-specific information, including donor name and donor date of birth, from the subject data entry in NexLynk DMS or other third-party donor management system.

359. The server that is part of the system is configured to program the apheresis device with a plurality of parameters for the apheresis medical procedure. For example, the parameters may include: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.

360. The NexSys PCS is configured to receive an input from the touch screen on the device.

361. The NexSys PCS is also configured to confirm an identity of the human subject based on the user input received from the touch screen.

362. The NexSys PCS is also configured such that, based at least in part on the result of the confirmation, the NexSys PCS allows a plasmapheresis procedure to be performed with the device according to the programmed parameters.

363. Claim 19 of the ’693 Patent recites: “The system of claim 17, wherein if the apheresis device does not confirm the identity of the human subject, the apheresis device is configured to respond by declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert, wherein the alarm or alert comprises a text error message displayed on the touch screen.”

364. The Accused Haemonetics Products practice claim 19 of the ’693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

365. As explained above, the Accused Haemonetics Products form a system that practices claim 17.

366. If the NexSys PCS cannot confirm the identity of the human subject, the device is configured to respond by declining to proceed with the plasmapheresis procedure and by triggering an audible and/or visual alarm or alert, wherein the alarm or alert comprises a text error message displayed on the touch screen. On information and belief, the NexSys PCS informs the user that donor identity has not been confirmed through a notification that includes a text message.

367. Claim 20 of the ’693 Patent recites: “The system of claim 17, wherein at least one of the parameters used to program the apheresis device for the apheresis medical procedure is stored in the subject data entry and downloaded from the subject data entry.”

368. The Accused Haemonetics Products practice claim 20 of the ’693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

369. As explained above, the Accused Haemonetics Products form a system that practices claim 17.

370. On information and belief, “Plasma Target Volume” is used to program the NexSys PCS (with YES or PERSONA Technologies) for the apheresis medical procedure and is stored in the data entry.

371. Haemonetics directly infringes at least claims 1, 2, 4, 5, 7-9, 11, 12, 15, 17, 19, and 20 of the ’693 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering for sale/lease, selling, and/or leasing the Accused Haemonetics Products in the United States.

372. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics’ customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics’ partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used,

result in infringement of the ’693 Patent, including at least claims 1, 2, 4, 5, 7-9, 11, 12, 15, 17, 19, and 20.

373. In addition to directly infringing the ’693 Patent, Haemonetics has indirectly infringed the ’693 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the ’693 Patent (including claims 1, 2, 4, 5, 7-9, 11, 12, 15, 17, 19, and 20) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[87] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the ’693 Patent (including claims 1, 2, 4, 5, 7-9, 11, 12, 15, 17, 19, and 20). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ’693 Patent (including claims 1, 2, 4, 5, 7-9, 11, 12, 15, 17, 19, and 20).

374. Haemonetics has had knowledge of the ’693 Patent since at least the filing of these Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’693 Patent since at least the filing of these Counterclaims.

---

[87] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

375. Haemonetics has also indirectly infringed the ‘693 Patent (including claims 1, 2, 4, 5, 7-9, 11, 12, 15, 17, 19, and 20) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ’693 Patent by third parties, such as its customers and end users. Such third parties infringe the ’693 Patent (including claims 1, 2, 4, 5, 7-9, 11, 12, 15, 17, 19, and 20) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the ’693 Patent because those components constitute a material part of the invention of the ’693 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the ’693 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

376. As a consequence of Haemonetics’ direct and indirect infringement of the ’693 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

377. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

378. On information and belief, unless enjoined, Haemonetics will continue to infringe the ’693 Patent.

**COUNT 4: INFRINGEMENT OF U.S. PATENT NO. 11,672,891**

379. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-378 as if fully set forth herein.

380. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1-3, 5, 6, 8, 11, 13, and 15 of the ’891 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the NexSys PCS YES, the NexSys PCS PERSONA, and Disposable Kits in the

United States. The Accused Haemonetics Products meet each limitation of each of foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 22, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the ’891 Patent against Haemonetics based on discovery that will become available in due course.

381. Claim 1 of the ’891 Patent covers a novel system for collecting a blood component and recites:

> 1. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component in a product container, the reusable hardware comprising a weight scale configured to weigh the product container and an air detector sensor;
>
> a touch screen configured to receive input from an operator;
>
> a transmitter/receiver device configured to communicate over a network and to receive process parameters from a server computer; and
>
> a processing circuit coupled to the blood processing apparatus and the network, the processing circuit configured to receive the process parameters from the server computer and store them in a memory, the processing circuit configured to store default process parameters in the memory, the processing circuit configured to:
>
>> receive an activation from the operator to switch on the blood processing system;
>>
>> conduct self-checks on the blood processing apparatus;
>>
>> receive input data for a value of a process parameter from the touch screen;
>>
>> verify that the value is within a preset range for the value;
>>
>> prior to operating the blood processing apparatus according to a centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected in the product container and provide an indication of the volume to an operator via the touch screen;

> prompt the operator to mount the disposable fluid circuit;
>
> automatically check to determine whether the disposable fluid circuit is installed;
>
> prime tubing of the disposable fluid circuit with a fluid;
>
> commence the centrifugal separation process on the biological fluid;
>
> check the air detector sensor for a fluid/air interface;
>
> weigh the product container during the centrifugal separation process;
>
> process the biological fluid until the volume of the blood component to be collected is collected; and
>
> upon completion of the centrifugal separation process, prompt the operator.

382. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute "blood processing system[s]" that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

383. The NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

384. Each of the NexSys PCS YES and NexSys PCS PERSONA has a touch screen which is configured to receive an input (*e.g.*, donor ID, various parameters) from the touch screen.

385. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and to receive data from a server computer. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a "server" run on a server computer.

386. Each of the NexSys PCS YES and the NexSys PCS PERSONA includes a processing circuit that is coupled to the blood processing apparatus and a network, and the processing circuit is configured to receive the data from the server computer and store the data in a memory. The processing circuit of the NexSys PCS YES and the NexSys PCS PERSONA is also configured to store default process parameters in a memory.

387. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and the NexSys PCS PERSONA are turned on with a switch by the operator.

388. When the NexSys PCS YES and the NexSys PCS PERSONA are powered on, the processing circuits of each is configured conduct self-checks on the blood processing apparatus.

389. The NexSys PCS YES and the NexSys PCS PERSONA have a touch screen and the processing circuits in the NexSys PCS YES and the NexSys PCS PERSONA are configured to receive input data for the value of a process parameter. For example, values for process parameters such as pump speed and "Max Plasma Per Cycle" can be input via the touch screen.

390. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA verify that the value of the process parameter is within a present range. For example, values for process parameters such as "Max Plasma Per Cycle," "Total Saline Volume to Return," "Empty AC Bag Weight," and "AC Solution Volume" must fall within the preset ranges.

391. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to store a pre-process calculation of a volume of the blood component to be collected. For example, using the PERSONA nomogram, a target plasma collection volume is calculated based on weight, height, and hematocrit of the donor. Further, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to display on the touch screen the volume of the blood component to be collected before the blood processing procedure commences.

392. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), a Disposable Kit comprising a single-use disposable set that includes the Harness connecting disposable components is installed on the NexSys PCS YES and the NexSys PCS PERSONA. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, through the touch screen, to install the disposable tubing set.

393. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed.

394. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to commence the centrifugal separation process on the biological fluid.

395. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA check air detectors which are ultrasonic sensors for the donor line, the anticoagulant line, and the blood line. The ultrasonic air sensors in the NexSys PCS YES and the NexSys PCS PERSONA

detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface.

396. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA operate the processing of the biological fluid until the volume of the blood component to be collected is collected. Upon completion, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to provide visual prompts to the operator.

397. Claim 2 of the ’891 Patent recites: *“*The blood processing system of claim 1, further comprising a barcode reader, wherein the processing circuit is further configured to receive input data for a value for a second process parameter from a barcode reader.”

398. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 2 of the ’891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

399. As explained above, NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 1.

400. The NexSys PCS YES and the NexSys PCS PERSONA each comprise a barcode reader, and a processing circuit of each device is configured to receive input data for a value for a second process parameter from the barcode reader.

401. Claim 3 of the ’891 Patent recites: *“*The blood processing system of claim 1, wherein the disposable fluid circuit comprises a saline access site.*”*

402. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 3 of the ’891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

403. As explained above, NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 1.

404. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, include a disposable fluid circuit which comprises a saline access site.

405. Claim 5 of the ’891 Patent covers a novel system for collecting a blood component and recites:

> 5. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component in a product container, the reusable hardware comprising a weight scale configured to weigh the product container and an air detector sensor;
>
> a touch screen configured to receive input from an operator;
>
> a transmitter/receiver device configured to communicate over a network and to receive data from a server computer; and
>
> a processing circuit coupled to the blood processing apparatus and the network, the processing circuit configured to receive the data from the server computer and store the data in a memory, the processing circuit configured to store default process parameters in the memory, the processing circuit configured to:
>
>> receive an instruction from the operator to activate the blood processing system;
>>
>> conduct self-checks on the blood processing apparatus;
>>
>> receive input data for a value of a process parameter from the touch screen;
>>
>> verify that the value is within a preset range for the value;

> prior to operating the blood processing apparatus according to a centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected in the product container based at least in part on the value of the process parameter received from the touch screen;
>
> provide an indication of the volume to be collected to an operator via the touch screen;
>
> prompt the operator to mount the disposable fluid circuit;
>
> automatically check to determine whether the disposable fluid circuit is installed;
>
> prime tubing of the disposable fluid circuit with a fluid;
>
> commence the centrifugal separation process on the biological fluid;
>
> check the air detector sensor for a fluid/air interface;
>
> weigh the product container during the centrifugal separation process;
>
> process the biological fluid until the volume of the blood component to be collected is collected.

406. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute "blood processing system[s]" that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

407. The NexSys PCS YES and the NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that

weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

408. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen which is configured to receive an input (*e.g.*, donor ID, various process parameters) from an operator.

409. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and to receive data from a server computer. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a "server" run on a server computer.

410. Each of the NexSys PCS YES and the NexSys PCS PERSONA includes a processing circuit that is coupled to the blood processing apparatus and a network and is configured to receive the data from the server computer and store the data in a memory. The processing circuit of the NexSys PCS YES and the NexSys PCS PERSONA is also configured to store default process parameters in a memory.

411. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a processing circuit configured to receive an activation from the operator when the NexSys PCS YES and the NexSys PCS PERSONA are activated with a switch by the operator.

412. When the NexSys PCS YES and the NexSys PCS PERSONA are powered on, a processing circuit of each is configured conduct self-checks on the blood processing apparatus.

413. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen, and the processing circuits of each device are configured to receive an input data for the value of a process parameter. For example, values for process parameters such as target collection volume, pump speed, "Max Plasma Per Cycle" can be input via the touch screen.

414. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA verify that the value of the process parameter is within a present range. For example, values for process parameters such as "Max Plasma Per Cycle," "Total Saline Volume to Return," "Empty AC Bag Weight," and "AC Solution Volume" must fall within the preset ranges.

415. The processing circuits of the NexSys PCS with YES and PERSONA are configured to store a pre-process calculation of a volume of the blood component to be collected based on the value of the process parameter received from the touch screen. For example, the target plasma volume can be based on the value for target plasma collection volume received through the touch screen. Further, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to display on the touch screen the volume of the blood component to be collected before the blood processing procedure commences.

416. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), a Disposable Kit comprising a single-use disposable set that includes the Harness connecting disposable components is installed on the NexSys PCS YES and the NexSys PCS PERSONA. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, through the touch screen, to install the disposable tubing set. A processing circuit of the NexSys PCS YES and the NexSys PCS PERSONA automatically checks to determine whether the disposable fluid circuit is installed.

417. The processing circuits of the NexSys PCS with YES and PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the processing circuits

of the NexSys PCS YES and the NexSys PCS PERSONA are configured to commence the centrifugal separation process on the biological fluid.

418. The processing circuits of the NexSys PCS with YES and PERSONA check air detectors which are ultrasonic sensors for the donor line, the anticoagulant line, and the blood line. The ultrasonic air sensors in the NexSys PCS with YES and PERSONA detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface.

419. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA operate the processing of the biological fluid until the volume of the blood component to be collected is collected.

420. Claim 6 of the ’891 Patent recites: “The blood processing system of claim 5, wherein the processing circuit is further configured to, upon completion of the centrifugal separation process, prompt the operator.”

421. The NexSys PCS YES and the NexSys PCS PERSONA NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 6 of the ’891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

422. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 5.

423. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to provide visual prompts to alert the operator upon completion of the centrifugal separation process.

424. Claim 8 of the ’891 Patent recites: “The blood processing system of claim 5, wherein the pre-process calculation is based at least in part on the data received from the server computer.”

425. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 8 of the ’891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

426. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 5.

427. The NexSys PCS with YES and PERSONA calculates a pre-collection target plasma volume based on data received from the server computer. For example, the calculation can be based on donor information such as weight and hematocrit received from the BECS ran in a remote server computer.

428. Claim 11 of the ’891 Patent covers a novel system for collecting a blood component and recites:

> 11. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component to a product container, the reusable hardware comprising a weight scale configured to weigh the product container and an air detector sensor;
>
> a touch screen configured to receive input from an operator; and
>
> a control unit coupled to the blood processing apparatus, the control unit configured to store default process parameters in the memory, the control unit configured to:
>
>> receive an instruction from the operator to activate the blood processing system;

> conduct self-checks on the blood processing apparatus;
>
> receive input data for a value of a process parameter from the touch screen;
>
> prior to operating the blood processing apparatus according to a centrifugal separation process, calculate a volume of the blood component to be collected in the product container based at least in part on the value of the process parameter received from the touch screen;
>
> provide an indication of the volume to be collected to an operator via the touch screen;
>
> prime tubing of the disposable fluid circuit with a fluid;
>
> commence the centrifugal separation process on the biological fluid using the default process parameters;
>
> check the air detector sensor for a fluid/air interface;
>
> weigh the product container during the centrifugal separation process;
>
> process the biological fluid to collect the volume of the blood component to be collected.

429. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute "blood processing system[s]" that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

430. The NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a

plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

431. Each of the NexSys PCS YES and NexSys PCS PERSONA has a touch screen which is configured to receive an input (*e.g.*, donor ID, various process parameters) from the operator.

432. Each of the NexSys PCS YES and NexSys PCS PERSONA includes a control unit coupled to the blood processing apparatus. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to store default process parameters in a memory.

433. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator.

434. When the NexSys PCS YES and NexSys PCS PERSONA are activated, a control unit of each conducts self-checks on the blood processing apparatus.

435. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive input data for a value of a process parameter from the touch screen. For example, values for process parameters such as target plasma volume, pump speed and "Max Plasma Per Cycle" can be input via the touch screen.

436. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to calculate a volume of the blood component to be collected based on the value of the process parameter received from the touch screen. For example, the target plasma volume can be based on the value for target plasma collection volume received through the touch screen. The control unit is configured to provide an indication of the volume to be collected by displaying the volume on the touch screen.

437. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the control units are configured to commence the centrifugal separation process.

438. The control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to check air detectors which are ultrasonic sensors for the donor line, the anticoagulant line, and the blood line. The ultrasonic air sensors in the NexSys PCS YES and the NexSys PCS PERSONA detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface.

439. The control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation. The control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to operate the processing of the biological fluid until the volume of the blood component to be collected is collected.

440. Claim 13 of the '891 Patent recites: "The blood processing system of claim 11, further comprising a transmitter/receiver device configured to communicate over a network and to receive data from a server computer, the control unit configured to receive the data from the server computer and store the data in a memory."

441. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practices claim 13 of the '891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

442. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 11.

443. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive data from a server computer and the control unit of each device is configured to receive data from the server computer and store the data in a memory. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a "server" run on a server computer.

444. Claim 15 of the '891 Patent recites: "The blood processing system of claim 14, wherein the control unit is further configured to: prompt the operator to mount the disposable fluid circuit; and automatically check to determine whether the disposable fluid circuit is installed."

445. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practices claim 15 of the '891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

446. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 14.

447. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), the control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, on the touch screen, to install the Disposable Kit. The control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed.

448. Haemonetics directly infringes at least claims 1, 3, 5, 6, 8, 11, 13, and 15 of the '891 Patent by using (including in tests, commercial demonstrations, and clinical trials), making,

importing, offering for sale/lease, selling, and/or leasing the Accused Haemonetics Products in the United States.

449. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '891 Patent, including at least claims 1, 3, 5, 6, 8, 11, 13, and 15.

450. In addition to directly infringing the '891 Patent, Haemonetics has indirectly infringed the '891 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '891 Patent (including claims 1, 3, 5, 6, 8, 11, 13, and 15) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[88] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics

[88] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

to cause direct infringement of the ’891 Patent (including claims 1, 3, 5, 6, 8, 11, 13, and 15). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ’891 Patent (including claims 1, 3, 5, 6, 8, 11, 13, and 15).

451. Haemonetics has had knowledge of the ’891 Patent since at least the filing of these Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’891 Patent since at least the filing of these Counterclaims.

452. Haemonetics has also indirectly infringed the ‘891 Patent (including claims 1, 3, 5, 6, 8, 11, 13, and 15) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ’891 Patent by third parties, such as its customers and end users. Such third parties infringe the ’891 Patent (including claims 1, 3, 5, 6, 8, 11, 13, and 15) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the ’891 Patent because those components constitute a material part of the invention of the ’891 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the ’891 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

453. As a consequence of Haemonetics’ direct and indirect infringement of the ’891 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

454. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

455. On information and belief, unless enjoined, Haemonetics will continue to infringe the ’891 Patent.

**COUNT 5: INFRINGEMENT OF U.S. PATENT NO. 12,397,089**

456. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-455 as if fully set forth herein.

457. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 16, 18, 20, 21, and 23 of the ’089 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the NexSys PCS YES, the NexSys PCS PERSONA, and Disposable Kits in the United States. The Accused Haemonetics Products meet each limitation of each of foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 23, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the ’089 Patent against Haemonetics based on discovery that will become available in due course.

458. Claim 16 of the ’089 Patent covers a novel system for collecting plasma and recites:

> 16. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component in a product container, the reusable hardware comprising a weight scale configured to weigh the product container;
>
> a transmitter/receiver device configured to communicate over a network and to receive instructions and/or information from a server computer;
>
> a barcode reader configured to receive input data for a pre-process calculation from a barcode; and
>
> a processing circuit coupled to the blood processing apparatus and the network, the processing circuit configured to receive the input data for the pro-process calculation from the barcode reader and store the input data in

> a memory, the processing circuit configured to store default process parameters in the memory, the processing circuit configured to:
>
> > receive an activation from the operator to switch on the blood processing system;
> >
> > conduct self-checks on the blood processing apparatus;
> >
> > receive the input data for the pre-process calculation from the barcode reader;
> >
> > verify that the value is within a preset range for the value;
> >
> > prior to operating the blood processing apparatus according to a centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected in the product container and provide an indication of the volume to an operator via the touch screen;
> >
> > prompt the operator to mount the disposable fluid circuit;
> >
> > automatically check to determine whether the disposable fluid circuit is installed;
> >
> > prime tubing of the disposable fluid circuit with a fluid;
> >
> > commence the centrifugal separation process on the biological fluid;
> >
> > weigh the product container during the centrifugal separation process;
> >
> > process the biological fluid until the volume of the blood component to be collected is collected; and
> >
> > upon completion of the centrifugal separation process, prompt the operator.

459. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute "blood processing system[s]" that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

460. The NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

461. Each of the NexSys PCS YES and NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive instructions and/or information from a server computer. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a "server" run on a server computer.

462. Each of the NexSys PCS YES and NexSys PCS PERSONA has a barcode reader which is configured to receive input data for a pre-process calculation from a barcode.

463. Each of the NexSys PCS YES and NexSys PCS PERSONA includes a processing circuit coupled to the blood processing apparatus and a network. The processing circuit of each is configured to receive input data for a pre-process calculation from the barcode reader and store the input data in memory. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are also configured to store default process parameters in memory.

464. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator.

465. When the NexSys PCS YES and NexSys PCS PERSONA is powered on, the processing circuit of each is configured to conduct self-checks on the blood processing apparatus.

466. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive input data for a pre-process calculation from a barcode reader. For example, through the bar code reader, the processing circuit can receive information such as process parameters or donor information such as weight and hematocrit, which is used to calculate a target plasma volume. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to verify that the values received are within a preset range.

467. Prior to operating the blood centrifugal separation process, the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA store a pre-collection volume of the blood component to be collected. Further, the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to provide an indication of the volume of the blood component to be collected to the operator via a touch screen.

468. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, on the touch screen, to install the Disposable Kit. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed.

469. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the blood processing procedure (*e.g.*, a plasmapheresis procedure) is commenced, including centrifugal separation process on the biological fluid.

470. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to operate the processing of the biological fluid until the volume of the blood component to be collected is collected. Upon completion, the processing circuit of the NexSys PCS with YES and PERSONA is configured to prompt the operator with visual alerts.

471. Claim 18 of the ’089 Patent recites: *"The blood processing system of claim 16, wherein the disposable fluid circuit comprises a saline access site."*

472. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 18 of the ’089 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 23.

473. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 16.

474. The tubing of the Disposable Kit used with NexSys PCS YES and the NexSys PCS PERSONA comprise a saline access site.

475. Claim 20 of the ’089 Patent covers a novel system for collecting a blood component and recites:

> 20. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component in a product container, the reusable hardware comprising a weight scale configured to weigh the product container;
>
> a touch screen configured to receive input from an operator;
>
> a transmitter/receiver device configured to communicate over a network and to receive data from a server computer; and

> a processing circuit coupled to the blood processing apparatus and the network, the processing circuit configured to receive the data from the server computer and store the data in a memory, the processing circuit configured to store default process parameters in the memory, the processing circuit configured to:
>
> > receive an instruction from the operator to activate the blood processing system;
> >
> > conduct self-checks on the blood processing apparatus;
> >
> > receive input data for a value of a process parameter from the touch screen;
> >
> > verify that the value is within a preset range for the value;
> >
> > prior to operating the blood processing apparatus according to the centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected in the product container based at least in part on the value of the process parameter received from the touch screen and/or based on the data received from the server computer;
> >
> > provide an indication of the volume to be collected to an operator via the touch screen;
> >
> > prompt the operator to mount the disposable fluid circuit;
> >
> > prime tubing of the disposable fluid circuit with a fluid;
> >
> > commence the centrifugal separation process on the biological fluid, wherein the centrifugal separation process is based at least in part on the default process parameters;
> >
> > process the biological fluid until the volume of the blood component to be collected is collected.

476. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute "blood processing system[s]" that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

477. The NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

478. Each the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen which is configured to receive an input (*e.g.*, donor ID, various process parameters) from the operator.

479. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive data from a server computer. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a "server" run on a server computer.

480. Each of the NexSys PCS YES and the NexSys PCS PERSONA includes a processing circuit coupled to the blood processing apparatus and a network, that is configured to receive data from a server computer and to store the data in a memory. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to store default process parameters in a memory.

481. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator.

482. When the NexSys PCS YES and NexSys PCS PERSONA are powered on, the processing circuit is configured to conduct self-checks on the blood processing apparatus.

483. The NexSys PCS YES and NexSys PCS PERSONA have a touch screen and a processing circuit of each is configured to receive an input data for a value of a process parameter through the touch screen. For example, values for process parameters such as pump speed and "Max Plasma Per Cycle" can be input via the touch screen.

484. The processing circuit of the NexSys PCS YES and NexSys PCS PERSONA verifies that the value of the process parameter is within a present range. For example, values for process parameters such as "Max Plasma Per Cycle," "Total Saline Volume to Return," "Empty AC Bag Weight," and "AC Solution Volume" must fall within the preset ranges.

485. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to store a pre-collection calculation of a volume of the blood component to be collected in the product container based on the value of the process parameter received from the touch screen and/or based on the data received from the server computer. For example, the server computer transmits donor information to the NexSys PCS YES and NexSys PCS PERSONA. Using the PERSONA nomogram, a target plasma collection volume is calculated based on weight, height, and hematocrit of the donor received from the touch screen or from the server computer. The processing circuit of each device is configured to provide an indication of the volume of the blood component via the touch screen.

486. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), a single-use disposable set that includes the Harness connecting disposable components is installed on the NexSys PCS with YES and PERSONA. The processing circuits of

the NexSys PCS YES and NexSys PCS PERSONA are configured to prompt an operator, through the touch screen, to install the disposable tubing set.

487. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the blood processing procedure (*e.g.*, a plasmapheresis procedure) is commenced, including the centrifugal separation process which is based at least in part on default process parameters. A processing circuit of each device operates the processing of the biological fluid until the volume of blood component to be collected is collected.

488. Claim 21 of the '089 Patent recites: "The blood processing system of claim 20, wherein the processing circuit is further configured to, upon completion of the centrifugal separation process, prompt the operator."

489. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practices claim 21 of the '089 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 23, which is incorporated herein by reference.

490. As explained above, the Accused Haemonetics Products form a system that practices claim 20.

491. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to provide visual prompts to alert the operator upon completion of the centrifugal separation process.

492. Claim 23 of the ’089 Patent recites: “The blood processing system of claim 20, wherein the processing circuit is configured to automatically check to determine whether the disposable fluid circuit is installed.”

493. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practices claim 23 of the ’089 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 23.

494. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 20.

495. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed.

496. Haemonetics directly infringes at least claims 16, 18, 20, 21, and 23 of the ’089 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering for sale/lease, selling, and/or leasing the Accused Haemonetics Products in the United States.

497. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics’ customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics’ partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the ’089 Patent, including at least claims 16, 18, 20, 21, and 23.

498. In addition to directly infringing the ’089 Patent, Haemonetics has indirectly infringed the ’089 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the ’089 Patent (including claims 16, 18, 20, 21, and 23) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[89] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the ’089 Patent (including claims 16, 18, 20, 21, and 23). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ’089 Patent (including claims 16, 18, 20, 21, and 23).

499. Haemonetics has had knowledge of the ’089 Patent since at least the filing of these Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’089 Patent since at least the filing of these Counterclaims.

500. Haemonetics has also indirectly infringed the ‘089 Patent (including claims 16, 18, 20, 21, and 23) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ’089 Patent by third parties, such as its customers and end users. Such third parties infringe the ’089 Patent (including claims 16, 18, 20, 21, and 23) at least by using the

---

[89] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

Accused Haemonetics Products in plasma donation centers. Haemonetics' affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the '089 Patent because those components constitute a material part of the invention of the '089 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the '089 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

501. As a consequence of Haemonetics' direct and indirect infringement of the '089 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

502. Due to Haemonetics' infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

503. On information and belief, unless enjoined, Haemonetics will continue to infringe the '089 Patent.

**COUNT 6: INFRINGEMENT OF U.S. PATENT NO. 11,285,251**

504. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-503 as if fully set forth herein.

505. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, claims 1-9 of the '251 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the NexSys PCS PERSONA and Disposable Kits in the United States. The Accused Haemonetics Products meet each limitation of each of foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 24, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '251 Patent against Haemonetics based on discovery that will become available in due course.

506. Claim 1 of the '251 Patent covers a novel system for collecting plasma and recites:

> 1. A system for collecting plasma, comprising:
>
> a venipuncture needle configured to draw whole blood from a donor;
>
> a separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;
>
> a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump;
>
> an anticoagulant line coupled to an anticoagulant source, flow through the anticoagulant line being controlled by a second pump to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR);
>
> a touchscreen configured to receive input from an operator; and
>
> a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a donor management system, to use a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor; the controller to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor, wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).

507. The NexSys PCS PERSONA with a Disposable Kit meets each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 24, which is incorporated herein by reference.

508. The NexSys PCS PERSONA with a Disposable Kit constitutes "[a] system for collecting plasma."

509. The Disposable Kit includes a venipuncture needle for withdrawing whole blood from the donor.

510. The NexSys PCS PERSONA with the Disposable Kit has a separator (including, for example, the centrifuge and disposable bowl) that is configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells.[90]

511. The blood separator has a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container. The disposable bowl has a plasma output port that is coupled to a plasma line (which is part of the tubing), and the plasma line is configured to send the plasma product (plasma and anticoagulant) to a plasma product collection container (the Plasma Collection Container).[91]

512. The Disposable Kit includes a donor line that is fluidly coupled to the venipuncture needle and is configured to introduce the whole blood from the donor to the separator. The flow through the donor line is controlled by a "first pump" (the Blood Pump).[92]

513. The Disposable Kit includes an anticoagulant line that is coupled to an anticoagulant source (the anticoagulant solution bag).[93] The flow through the anticoagulant line is controlled by a second pump (the Anticoagulant Pump).[94] The second pump combines

---

[90] *See, e.g.*, NexSys PCS User Manual at 21-22, 40-41; NexSys PCS Service Manual at 186-188.

[91] *See, e.g.*, NexSys PCS User Manual at 43.

[92] *See, e.g.*, NexSys PCS User Manual at 23.

[93] *See, e.g.*, NexSys PCS User Manual at 23.

[94] *Id.* at 23.

anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR) of 1:16.[95]

514. The NexSys PCS PERSONA has a touchscreen that is configured to receive an input from an operator.[96]

515. The NexSys PCS PERSONA has a "controller" that is programmed (via software/firmware) to control the operation of the system composed of the NexSys PCS PERSONA and Donor Kit.

516. The controller is coupled to the touchscreen and is also programmed to receive donor parameters electronically from a donor management system.[97]

517. The controller is programmed to use a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume. The NexSys PCS PERSONA determines the donor's total blood volume using donor weight and height.

518. The NexSys PCS PERSONA controller sets the target volume for raw plasma is prior to blood collection from the donor.

519. The controller controls the NexSys PCS PERSONA and Disposable Kit system to operate draw and return phases (Draw Cycle and Return Cycle respectively)[98] to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component (*e.g.*, red blood cells) and to return the second blood component to the donor.

---

[95] *Id.*

[96] *See, e.g.*, NexSys PCS User Manual at 20, 28-29.

[97] *See* NexSys PCS Service Manual at 31, 37-38, 59-60.

[98] *See, e.g.*, NexSys PCS User Manual at 10.

520. The NexSys PCS PERSONA controller is configured to operate the draw and return phases until a volume of raw plasma ($V_{RP}$) in the collection container (Plasma Collection Container) equals the target volume of raw plasma. The volume of raw plasma ($V_{RP}$) is based on a measured volume of plasma product ($V_{PP}$). The NexSys PCS PERSONA weighs the plasma product to determine if the volume of raw plasma collected equals the target volume of raw plasma.

521. Alternatively, the NexSys PCS PERSONA meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation ("a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a donor management system, to use a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor; the controller to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor, wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma ($V_{RP}$) in the collection container equals the target volume of raw plasma, the volume of raw plasma ($V_{RP}$) based on a measured volume of plasma product ($V_{PP}$)"), in substantially the same way, and achieves substantially the same result.

522. Claim 2 of the '251 Patent recites: "The system of claim 1, wherein ACR=Volume of Whole Blood/Volume of Anticoagulant."

523. The NexSys PCS PERSONA with Disposable Kit meets each element of claim 2 of the '251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

524. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

525. The ACR used in the NexSys PCS PERSONA is equal to the volume of whole blood divided by the volume of anticoagulant. For example, where the system combines 16 units of whole blood with 1 unit of anticoagulant, the ACR is 16/1 or 16.

526. Claim 3 of the '251 Patent recites: "The system of claim 1, wherein the volume of plasma product (VPP) is measured by a weigh scale."

527. The NexSys PCS PERSONA with Disposable Kit meets each element of claim 3 of the '251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

528. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

529. The NexSys PCS PERSONA measures the volume of plasma product by using a weigh scale which measures the plasma collection container as plasma product (anticoagulant and raw plasma) is being collected in the container.

530. Claim 4 of the '251 Patent recites: "The system of claim 1, wherein the controller is configured to receive the donor's weight and hematocrit electronically from the donor management system, wherein the donor management system is used for qualification screening."

531. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 4 of the '251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24, which is incorporated herein by reference.

532. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

533. The NexSys PCS PERSONA has a controller that is further configured to receive the donor's weight and hematocrit electronically from the donor management system (*e.g.*, the NexLynk DMS or another third-party donor management system), wherein the donor management system is used for qualification screening.

534. On information and belief, the donor management system (*e.g.*, the NexLynk DMS and/or another third-party donor management system) is used for qualification screening, *e.g.*, to ensure that donor is medically qualified to donate plasma.

535. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to receive the donor's weight and hematocrit electronically from the donor management system, wherein the donor management system is used for qualification screening), in substantially the same way, to achieve substantially the same result.

536. Claim 5 of the '251 Patent recites: "The system of claim 1, wherein the controller is programmed to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total blood volume or the total plasma volume for the donor."

537. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 5 of the '251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

538. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

539. The NexSys PCS PERSONA has a controller that is programmed to calculate, using the PERSONA nomogram, the target volume of raw plasma (VRP) by calculating a fraction of the total blood volume or the total plasma volume for the donor. Specifically, the controller calculates the target volume of raw plasma as 28.5% of the total plasma volume of the donor.

540. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total blood volume or the total plasma volume for the donor), in substantially the same way, to achieve substantially the same result.

541. Claim 6 of the ’251 Patent recites: “The system of claim 1, wherein the controller is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.”

542. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 6 of the ’251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

543. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

544. The NexSys PCS PERSONA has a controller that is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.

545. Alternatively, the NexSys PCS PERSONA device meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase), in substantially the same way, to achieve substantially the same result.

546. Claim 7 of the ’251 Patent recites: “The system of claim 1, wherein the venipuncture needle is a single needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase.”

547. NexSys PCS PERSONA with the Disposable Kit meets each element of claim 7 of the ’251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

548. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

549. The Disposable Kit has a single venipuncture needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase.

550. Claim 8 of the ’251 Patent recites: “The system of claim 1, wherein the controller is configured to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.”

551. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 8 of the ’251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

552. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

553. The NexSys PCS PERSONA controller is configured to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.

554. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (control

operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant), in substantially the same way, to achieve substantially the same result.

555. Claim 9 of the ’251 Patent recites: “The system of claim 1, wherein the donor management system calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, wherein the donor management system transmits the target volume for raw plasma to the controller.”

556. The NexSys PCS PERSONA with the Disposable Kit meet each element of claim 9 of the ’251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

557. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

558. The donor management system (*e.g.*, the NexSys Link or a third-party donor management system) running on the BECS uses the PERSONA nomogram to calculate the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume. In the PERSONA nomogram, the algorithm uses donor height and weight to calculate donor blood volume. The algorithm also uses hematocrit to calculate the total donor plasma volume.

559. The donor management system (*e.g.*, NexLynk DMS or other third-party donor management system) transmits the target volume for raw plasma to the controller.

560. Haemonetics directly infringes at least claims 1-9 of the ’251 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering

for sale/lease, selling, and/or leasing the NexSys PCS PERSONA and Disposable Kits in the United States.

561. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '251 Patent, including at least claims 1-9.

562. In addition to directly infringing the '251 Patent, Haemonetics has indirectly infringed the '251 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '251 Patent (including claims 1-9) at least by using the NexSys PCS PERSONA and Disposable Kits in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[99] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics

[99] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

to cause direct infringement of the ’251 Patent (including claims 1-9). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ’251 Patent (including claims 1-9).

563. Haemonetics has had knowledge of the ’251 Patent since at least the filing of these Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’251 Patent since at least the filing of these Counterclaims.

564. Haemonetics has also indirectly infringed the ‘251 Patent (including claims 1-9) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ’251 Patent by third parties, such as its customers and end users. Such third parties infringe the ’251 Patent (including claims 1-9) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the ’251 Patent because those components constitute a material part of the invention of the ’251 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the ’251 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

565. As a consequence of Haemonetics’ direct and indirect infringement of the ’251 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

566. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

567. On information and belief, unless enjoined, Haemonetics will continue to infringe the ’251 Patent.

**COUNT 7: INFRINGEMENT OF U.S. PATENT NO. 11,369,724**

568. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-567 as if fully set forth herein.

569. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1-16 and 19-25 of the ’724 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing NexSys PCS PERSONA and Disposable Kits in the United States. The Accused Haemonetics Products meet each limitation of each of foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 25, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the ’724 Patent against Haemonetics based on discovery that will become available in due course.

570. Claim 1 of the ’724 Patent covers a novel system for collecting plasma and recites:

> 1. A system for collecting plasma, comprising:
>
> a separator configured to separate whole blood into a plasma product and a second blood component comprising red blood cells, the separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;
>
> a donor line configured to introduce the whole blood from a donor to the separator;
>
> a touchscreen configured to receive input from an operator; and
>
> a controller configured to control operation of the system, the controller coupled to the touchscreen and configured to receive donor parameters electronically from a donor management system,
>
> to use a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume,
>
> the target volume for raw plasma based on the total donor blood volume, wherein the target volume for raw plasma is set prior to blood collection from the donor;

> the controller to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor,
>
> wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).

571. The NexSys PCS PERSONA meets each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 25.

572. The NexSys PCS PERSONA with a Disposable Kit forms a system for collecting plasma of a human subject, *e.g.*, a plasma donor.

573. The NexSys PCS PERSONA with the Disposable Kit has a "separator" (including, for example, the centrifuge and disposable bowl) that is configured to separate whole blood into a plasma product and a second blood component comprising red blood cells.[100]

574. The disposable bowl of the separator has a plasma output port that is coupled to a plasma line (which is part of the tubing), and the plasma line is configured to send the plasma product (plasma and anticoagulant) to a plasma product collection container (the Plasma Collection Container).[101]

575. The NexSys PCS PERSONA with the Disposable Kit includes a donor line configured to introduce the whole blood from the donor to the separator.

---

[100] *See, e.g.*, NexSys PCS User Manual at 21-22, 40-41; NexSys PCS Service Manual at 186-188.

[101] *See, e.g.*, NexSys PCS User Manual at 43.

576. The NexSys PCS PERSONA with the Disposable Kit has an anticoagulant line coupled to an anticoagulant source (the anticoagulant solution bag)[102] configured to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR).[103]

577. The NexSys PCS PERSONA with the Disposable Kit has a touchscreen that is configured to receive an input from an operator.[104]

578. The NexSys PCS PERSONA with the Disposable Kit has a "controller" that is configured (via software/firmware) to control the operation of the system composed of the NexSys PCS PERSONA and Donor Kit.

579. The controller is coupled to the touchscreen and is also programmed to receive donor parameters electronically from a donor management system (*e.g.*, NexLynk DMS).[105]

580. The controller is programmed to use a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume. The NexSys PCS PERSONA with the Disposable Kit determines the donor's total blood volume using donor weight and height.

581. The controller computes the target volume for raw plasma based on the total donor blood volume, wherein the target volume for raw plasma is set prior to blood collection from the donor.

582. The controller controls the system consisting of the NexSys PCS PERSONA and the Disposable Kit to operate draw and return phases (Draw Cycle and Return Cycle

---

[102] *See, e.g.*, NexSys PCS User Manual at 23.

[103] *Id.*

[104] *See, e.g.*, NexSys PCS User Manual at 20, 28-29.

[105] *See* NexSys PCS Service Manual at 31, 37-38, 59-60.

respectively)[106] to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component (*e.g.*, red blood cells) and to return the second blood component to the donor.

583. The controller is also configured to operate the draw and return phases until a volume of raw plasma ($V_{RP}$) in the collection container (Plasma Collection Container) equals the target volume of raw plasma. The volume of raw plasma ($V_{RP}$) is based on a measured volume of plasma product ($V_{PP}$). The NexSys PCS PERSONA weighs the plasma product to determine if the volume of raw plasma collected equals the target volume of raw plasma.

584. Alternatively, the NexSys PCS PERSONA device meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation ("a controller configured to control operation of the system, the controller coupled to the touchscreen and configured to receive donor parameters electronically from a donor management system, to use a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume, wherein the target volume for raw plasma is set prior to blood collection from the donor; the controller to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor, wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma ($V_{RP}$) in the collection container equals the target volume of raw plasma, the volume of raw plasma ($V_{RP}$) based on a measured volume of plasma product ($V_{PP}$)"), in substantially the same way, and achieves substantially the same result.

---

[106] *See, e.g.*, NexSys PCS User Manual at 10.

585. Claim 2 of the ’724 Patent recites: “The system of claim 1, wherein ACR=Volume of Whole Blood/Volume of Anticoagulant.”

586. The NexSys PCS PERSONA with Disposable Kit meets each element of claim 2 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

587. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

588. The ACR used in the NexSys PCS PERSONA is equal to the volume of whole blood divided by the volume of anticoagulant. For example, where the system combines 16 units of whole blood with 1 unit of anticoagulant, the ACR is 16/1 or 16.

589. Claim 3 of the ’724 Patent recites: “The system of claim 1, wherein the volume of plasma product ($V_{PP}$) is measured by a weigh scale.”

590. The NexSys PCS PERSONA with Disposable Kit meets each element of claim 3 of the ’251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

591. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

592. The NexSys PCS PERSONA measures the volume of plasma product by using a weigh scale which measures the weight of the plasma collection container as plasma product (raw plasma and anticoagulant) is being collected in the container.

593. Claim 4 of the ’724 Patent recites: “The system of claim 3, wherein the controller is configured to calculate the volume of raw plasma ($V_{RP}$) in the collection container based on a measured volume of plasma product ($V_{PP}$), the ACR and a hematocrit of the donor.”

594. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 4 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

595. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 3.

596. The NexSys PCS PERSONA controller is configured to calculate the volume of raw plasma in the Plasma Collection Container based on the measured volume of plasma product, the ACR and the donor hematocrit.

597. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to calculate the volume of raw plasma ($V_{RP}$) in the collection container based on a measured volume of plasma product ($V_{PP}$), the ACR and a hematocrit of the donor), in substantially the same way, to achieve substantially the same result.

598. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 4 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25, which is incorporated herein by reference.

599. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

600. The NexSys PCS PERSONA has a controller that is further configured to receive the donor’s weight and hematocrit electronically from the donor management system (*e.g.*, the NexLynk DMS or another third-party donor management system), wherein the donor management system is used for qualification screening.

601. On information and belief, the donor management system (*e.g.*, the NexLynk DMS and/or another third-party donor management system) is used for qualification screening, *e.g.*, to ensure that donor is medically qualified to donate plasma.

602. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to receive the donor's weight and hematocrit electronically from the donor management system, wherein the donor management system is used for qualification screening), in substantially the same way, to achieve substantially the same result.

603. Claim 6 of the '724 Patent recites: "The system of claim 5, further comprising the donor management system."

604. The NexSys PCS PERSONA with Donor Kit, together with the NexLynk DMS donor management system or a third-party donor management system, practices claim 6 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25, which is incorporated herein by reference.

605. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 5.

606. The NexLynk DMS is a donor management system. On information and belief, third party providers also offer donor management systems that can function with the NexSys PCS PERSONA in an integrated system.

607. Claim 7 of the '724 Patent recites: "The system of claim 1, wherein the target volume for raw plasma is based on the raw plasma volume of the donor."

608. The NexSys PCS PERSONA with Disposable Kit practices claim 7 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

609. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

610. On information and belief, the NexSys PCS PERSONA tailors the raw plasma donation targets to each donor based on the raw plasma volume of the donor.

611. Claim 8 of the ’724 Patent recites: “The system of claim 7, wherein the controller is configured to calculate the target volume for raw plasma by calculating a fraction of the plasma volume for the donor.”

612. The NexSys PCS PERSONA with Disposable Kit practices claim 8 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

613. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 7.

614. The NexSys PCS PERSONA controller is configured to calculate the target volume for raw plasma based on a calculated percentage (fraction) of the donor’s total plasma volume.

615. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to calculate the target volume for raw plasma by calculating a fraction of the plasma volume for the donor), in substantially the same way, to achieve substantially the same result.

616. Claim 9 of the ’724 Patent recites: “The system of claim 1, wherein the controller is configured to perform the draw and return cycles at least three times and the controller is configured to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.”

617. The NexSys PCS PERSONA with Disposable Kit practices claim 9 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

618. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

619. The NexSys PCS PERSONA controller is programmed to collect at least three collection and reinfusion cycles and to draw a lower volume of whole blood in the final cycle.

620. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to perform the draw and return cycles at least three times and the controller is configured to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase), in substantially the same way, to achieve substantially the same result.

621. Claim 10 of the '724 Patent recites: "The system of claim 9, wherein a first draw phase of a draw and return cycle draws approximately 500 mL of whole blood."

622. The NexSys PCS PERSONA with Disposable Kit practices claim 10 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

623. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 9.

624. The NexSys PCS PERSONA with Disposable Kit is configured to collect up to 300 mL of plasma per cycle (with the default value being 300 mL), which would require drawing approximately 500 mL of whole blood per cycle, depending on the donor's hematocrit.

625. Claim 11 of the '724 Patent recites: "The system of claim 1, further comprising a venipuncture needle which is a single needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase."

626. The NexSys PCS PERSONA with Disposable Kit practices claim 11 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

627. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

628. The Disposable Kit includes a venipuncture needle, which is a single needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase.[107]

629. Claim 12 of the ’724 Patent recites: “The system of claim 1, wherein the controller is configured to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.”

630. The NexSys PCS PERSONA with Disposable Kit practices claim 12 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

631. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

632. The NexSys PCS PERSONA controller is configured to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.[108]

633. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant), in substantially the same way, to achieve substantially the same result.

634. Claim 13 of the ’724 Patent recites: “The system of claim 1, wherein the donor management system calculates the target volume for raw plasma based at least in part on donor

---

[107] *See, e.g.*, NexSys PCS User Manual at 1, 42.

[108] *See id.* at 23.

height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, wherein the donor management system transmits the target volume for raw plasma to the controller."

635. The NexSys PCS PERSONA with Disposable Kit practices claim 13 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

636. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

637. The NexLynk DMS is a donor management system that, on information and belief, uses the PERSONA nomogram to calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume. The target volume for raw plasma collection with the NexSys PCS PERSONA is based on a calculated percentage of the donor's total plasma volume, hematocrit, weight, and height.

638. On further information and belief, the NexLynk DMS donor management system transmits the target volume for raw plasma to the NexSys PCS PERSONA controller. According to the NexSys PCS User Manual, when the device is connected to a Blood Establishment Computer Systems (BECS) or compatible central monitoring software system (which runs the NexLynk DMS), the NexSys PCS PERSONA receives donor information, including hematocrit and plasma target, from the BECS.

639. Claim 14 of the '724 Patent recites: "The system of claim 1, wherein the controller is configured to use hematocrit (Hct) to calculate total donor plasma volume, the target volume for raw plasma based on the total donor plasma volume."

640. The NexSys PCS PERSONA with Disposable Kit practices claim 14 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

641. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

642. The NexSys PCS PERSONA controller is configured to use hematocrit to calculate total donor plasma volume. Furthermore, the controller is configured to calculate the target volume of raw plasma based on the total plasma volume.

643. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to use hematocrit (Hct) to calculate total donor plasma volume, the target volume for raw plasma based on the total donor plasma volume), in substantially the same way, to achieve substantially the same result.

644. Claim 15 of the ’724 Patent recites: “The system of claim 1, wherein ACR is a ratio of volume of anticoagulant to volume of anticoagulated blood.”

645. The NexSys PCS PERSONA with Disposable Kit practices claim 15 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

646. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

647. The NexSys PCS PERSONA calculates an AC ratio as the volume of anticoagulant over the volume of whole blood (1:16).

648. Claim 16 of the ’724 Patent recites: “The system of claim 1, wherein the controller is configured to receive from the touch screen a donor ID, donor weight, donor hematocrit and a target plasma volume.”

649. The NexSys PCS PERSONA with Disposable Kit practices claim 16 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

650. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

651. The NexSys PCS PERSONA controller is configured to receive from the touchscreen donor ID, donor weight, donor hematocrit, and a target plasma volume.

652. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to receive from the touch screen a donor ID, donor weight, donor hematocrit and a target plasma volume), in substantially the same way, to achieve substantially the same result.

653. Claim 19 of the ’724 Patent covers a novel system for collecting plasma and recites:

> 19. A system for collecting plasma, comprising:
>
> a blood separator configured to separate whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;
>
> a donor line configured to introduce the whole blood from the donor to the blood separator;
>
> an anticoagulant line coupled to an anticoagulant source configured to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR);
>
> a touchscreen configured to receive input from an operator; and
>
> a controller configured to control operation of the system, the controller coupled to the touchscreen and configured to receive donor parameters electronically from a donor management system, to determine a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, the controller to control the system to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to reinfuse the second blood

> component to the donor, wherein the controller is programmed to perform the collection and reinfusion cycles at least three times and the controller is programmed to perform a final collection and reinfusion cycle by drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle.

654. The NexSys PCS PERSONA meets each of the foregoing limitations of claim 19, literally and/or under the doctrine of equivalents, as described in Exhibit 25.

655. The NexSys PCS PERSONA with a Disposable Kit forms a system for collecting plasma.

656. The NexSys PCS PERSONA with the Disposable Kit has a "blood separator" (including, for example, the centrifuge and disposable bowl) that is configured to separate whole blood into a plasma product and a second blood component comprising red blood cells.[109]

657. The disposable bowl of the blood separator has a plasma output port that is coupled to a plasma line (which is part of the tubing), and the plasma line is configured to send the plasma product (plasma and anticoagulant) to a plasma product collection container (the Plasma Collection Container).[110]

658. The NexSys PCS PERSONA with the Disposable Kit includes a donor line configured to introduce the whole blood from the donor to the separator.

---

[109] *See, e.g.*, NexSys PCS User Manual at 21-22, 40-41; NexSys PCS Service Manual at 186-188.

[110] *See, e.g.*, NexSys PCS User Manual at 43.

659. The NexSys PCS PERSONA with the Disposable Kit has an anticoagulant line coupled to an anticoagulant source (the anticoagulant solution bag)[111] configured to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR).[112]

660. The NexSys PCS PERSONA with the Disposable Kit has a touchscreen that is configured to receive an input from an operator.[113]

661. The NexSys PCS PERSONA with the Disposable Kit has a "controller" that is configured (via software/firmware) to control the operation of the system composed of the NexSys PCS PERSONA with Donor Kit.

662. The controller is coupled to the touchscreen and is also configured to receive donor parameters electronically from a donor management system (*e.g.*, NexLynk DMS).[114]

663. The controller is configured to determine a target volume for plasma product (anticoagulant and raw plasma) and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume. The NexSys PCS PERSONA controller is configured to determine the donor's total blood volume using donor weight and height. The NexSys PCS PERSONA controller is configured to compute the target volume for raw plasma based on the total donor blood volume and hematocrit (Hct) which is used to calculate donor plasma volume.

664. The controller controls the system consisting of the NexSys PCS PERSONA with Disposable Kit to operate collection and reinfusion phases (Draw Cycle and Return Cycle

---

[111] *See, e.g.*, NexSys PCS User Manual at 23.

[112] *Id.*

[113] *See, e.g.*, NexSys PCS User Manual at 20, 28-29.

[114] *See* NexSys PCS Service Manual at 31, 37-38, 59-60.

respectively)[115] to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component (*e.g.*, red blood cells) and to reinfuse the second blood component to the donor.

665. The controller is also programmed to perform the collection and reinfusion cycles at least three times and the controller is programmed to perform a final collection and reinfusion cycle by drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle. The NexSys PCS PERSONA with Disposable Kit is configured to collect up to 300 mL of plasma per cycle (with the default value being 300 mL), which would require drawing approximately 500 mL of whole blood per cycle, depending on the donor's hematocrit. At least for certain collection ranges, the NexSys PCS PERSONA with Disposable Kit must withdraw whole blood in at least three cycles, and the volume of whole blood drawn in the third cycle is less than the volume of whole blood drawn in prior collection cycles (approximately 500 mL).

666. Alternatively, the NexSys PCS PERSONA device meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation ("a controller configured to control operation of the system, the controller coupled to the touchscreen and configured to receive donor parameters electronically from a donor management system, to determine a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, the controller to control the system to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to reinfuse the second

[115] *See, e.g.*, NexSys PCS User Manual at 10.

blood component to the donor, wherein the controller is programmed to perform the collection and reinfusion cycles at least three times and the controller is programmed to perform a final collection and reinfusion cycle by drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle"), in substantially the same way, and achieves substantially the same result.

667. Claim 20 of the '724 Patent recites: "The system of claim 19, wherein the controller is configured to use the parameters received from the donor management system to determine the target volume for plasma product and/or raw plasma."

668. The NexSys PCS PERSONA with Disposable Kit practices claim 20 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

669. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 19.

670. The NexSys PCS PERSONA controller is configured to use the parameters received from the donor management system (*e.g.*, NexLynk DMS) to determine the target volume for plasma collection.

671. Alternatively, the NexSys PCS PERSONA meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation ("to use the parameters received from the donor management system to determine the target volume for plasma product and/or raw plasma"), in substantially the same way, and achieves substantially the same result.

672. Claim 21 of the '724 Patent recites: "The system of claim 19, further comprising the donor management system, wherein the donor management system is used for qualification screening and is in electronic communication with the controller."

673. The NexSys PCS PERSONA with Disposable Kit and the donor management system (*e.g.*, NexLynk DMS or other third-party donor management system) together practice claim 21 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

674. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 19.

675. On information and belief, the donor management system (*e.g.*, the NexLynk DMS and/or another third-party donor management system) is used for qualification screening, *e.g.*, to ensure that donor is medically qualified to donate plasma and is in electronic communication with the controller using a wired or wireless network.

676. Claim 22 of the ’724 Patent recites: “The system of claim 21, wherein the donor management system is configured to calculate the target volume for plasma product and/or raw plasma and the controller is configured to determine a target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system.”

677. The NexSys PCS PERSONA with Disposable Kit and the donor management system (*e.g.*, NexLynk DMS or other third-party donor management system) together practice claim 22 of the ’724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

678. As explained above, the NexSys PCS PERSONA with Disposable Kit and the donor management system (*e.g.*, NexLynk DMS or other third-party donor management system) together a system that practices claim 21.

679. On information and belief, the NexLynk DMS and/or other third-party donor management system is configured to calculate the target volume for plasma product (based on the donor's total plasma volume, hematocrit, weight, and height), and the NexSys PCS PERSONA controller is also configured to determine a target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system.

680. Alternatively, NexSys PCS PERSONA meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation ("to determine a target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system"), in substantially the same way, and achieves substantially the same result.

681. Claim 23 of the '724 Patent recites: "The system of claim 19, wherein the controller is configured to determine the target volume for plasma product and/or raw plasma by calculating the target volume for plasma product and/or raw plasma and wherein the controller is local to and coupled to the blood separator."

682. The NexSys PCS PERSONA with Disposable Kit practices claim 23 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

683. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 19.

684. The NexSys PCS PERSONA controller is configured to determine the target volume for plasma product by calculating the target volume for plasma product. The NexSys PCS PERSONA controller is local to and coupled to the blood separator because they are both within the housing of the NexSys PCS PERSONA.

685. Alternatively, NexSys PCS PERSONA meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation ("to determine the target volume for plasma product and/or raw plasma by calculating the target volume for plasma product and/or raw plasma"), in substantially the same way, and achieves substantially the same result.

686. Claim 24 of the '724 Patent recites: "The system of claim 19, wherein the controller is configured to determine the donor's total blood volume before whole blood is withdrawn from the donor during a donation."

687. The NexSys PCS PERSONA with Disposable Kit practices claim 24 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

688. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 19.

689. The NexSys PCS PERSONA controller is configured to determine the donor's total blood volume before whole blood is withdrawn from the donor during a donation. The NexSys PCS PERSONA controller uses donor characteristics (height, weight, and hematocrit) to determine the target plasma collection volume based on total available plasma prior to the start of the donation procedure. On information and belief, the NexSys PCS PERSONA controller is configured to determine determines the donor's total blood volume and uses that value to calculate the total available plasma.

690. Alternatively, the NexSys PCS PERSONA meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation ("to determine the donor's total blood volume before whole blood is withdrawn from

the donor during a donation"), in substantially the same way, and achieves substantially the same result.

691. Claim 25 of the '724 Patent recites: "The system of claim 19, wherein the controller is configured to determine the target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight and the donor's hematocrit."

692. The NexSys PCS PERSONA with Disposable Kit practices claim 25 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

693. As explained above, NexSys PCS PERSONA with Disposable Kit is a system that practices claim 19.

694. The NexSys PCS PERSONA controller is configured to determine the target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight and the donor's hematocrit. Specifically, the controller is configured to compute the target volume for plasma product based at least in part on the anticoagulant ration, the donor's body-mass index (which is calculated using the donor's height and weight), and the donor's hematocrit.

695. Haemonetics directly infringes at least claims 1-16 and 19-25 of the '724 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering for sale/lease, selling, and/or leasing the Accused Haemonetics Products in the United States.

696. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '724 Patent, including at least claims 1-16 and 19-25.

697. In addition to directly infringing the '724 Patent, Haemonetics has indirectly infringed the '724 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '724 Patent (including claims 1-16 and 19-25) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[116] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '724 Patent (including claims 1-16 and 19-25). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with

[116] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

knowledge or at least willful blindness that the induced acts would constitute infringement of the ’724 Patent (including claims 1-16 and 19-25).

698. Haemonetics has had knowledge of the ’724 Patent since at least the filing of these Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’724 Patent since at least the filing of these Counterclaims.

699. Haemonetics has also indirectly infringed the ‘724 Patent (including claims 1-16 and 19-25) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ’724 Patent by third parties, such as its customers and end users. Such third parties infringe the ’724 Patent (including claims 1-16 and 19-25) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the ’724 Patent because those components constitute a material part of the invention of the ’724 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the ’724 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

700. As a consequence of Haemonetics’ direct and indirect infringement of the ’724 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

701. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

702. On information and belief, unless enjoined, Haemonetics will continue to infringe the ’724 Patent.

**COUNT 8: INFRINGEMENT OF U.S. PATENT NO. 11,730,873**

703. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-702 as if fully set forth herein.

704. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1-10 and 12-23 of the ’873 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the Accused Haemonetics Products in the United States. The use of the Accused Haemonetics Products meets each limitation of each of foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 26, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the ’873 Patent against Haemonetics based on discovery that will become available in due course.

705. Claim 1 of the ’873 Patent covers a novel method of collecting plasma and recites:

> 1. A method of collecting plasma, comprising:
>
> receiving input from an operator via a touchscreen of a plasma collection device;
>
> receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system;
>
> storing a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume;
>
> setting the target volume for raw plasma prior to blood collection from a donor;
>
> controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor,

> wherein each draw and return phase comprises:
>
> introducing whole blood from the donor to a separator via a donor line;
>
> combining anticoagulant with the whole blood from the donor using an anticoagulant line based on an anticoagulant ratio (ACR);
>
> separating whole blood into the plasma product and the second blood component comprising red blood cells; and
>
> sending the plasma product to a plasma product collection container,
>
> wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).

706. The use of the NexSys PCS PERSONA with a Disposable Kit meets each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 26.

707. Claim 1 of the ’873 Patent recites in part, “[a] method of collecting plasma.”

708. As shown by at least the NexSys PCS User Manual, the Accused Haemonetics Products practice a method of collecting plasma. The NexSys PCS User Manual discloses instructions for the “plasmapheresis system designed for the highly efficient collection of plasma from donors.”[117]

709. End users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of collecting plasma.

710. Claim 1 of the ’873 Patent also recites in part, “receiving input from an operator via a touchscreen of a plasma collection device.”

---

[117] NexSys PCS User Manual, at 10.

711. As shown in the NexSys PCS User Manual, the NexSys PCS device includes a "touchscreen graphical user interface." NexSys PCS User Manual, at 11. The manual describes how the device receives inputs from a touchscreen periodically as part of its intended operation.[118]

712. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "receiving an input from a touch screen of the apheresis treatment device."

713. Claim 1 of the '873 Patent also recites in part, "receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system."

714. The NexSys PCS User Manual describes a "BECS" which is a "central monitoring software system that exchanges information with the device via an approved server application." NexSys PCS User Manual, at 120. It further describes how the NexSys PCS device "receives [donor] information from the BECS."[119]

715. The donor management system may be the Haemonetics NexLynk DMS system or a third-party donor management system. The NexLynk DMS Brochure describes the software as helping users "manage information about your donors" and providing "donor management" functionality.[120]

716. The NexSys PCS User Manual describes how the NexSys PCS device receives donor parameters and displays them at the touchscreen user interface.[121]

---

[118] *See, e.g.*, NexSys PCS User Manual, at 60, 71, 74.

[119] NexSys PCS User Manual, at 59.

[120] NexLynk DMS Brochure, at 3.

[121] NexSys PCS User Manual, at 59-60.

717. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system."

718. Claim 1 of the '873 Patent also recites in part, "storing a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume."

719. The NexSys PCS PERSONA stores a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume. For example, the NexSys PCS PERSONA Brochure describes plasma collection according to total blood volume based on BMI, which is a function of height and weight.[122]

720. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "storing a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume."

721. Claim 1 of the '873 Patent also recites in part, "setting the target volume for raw plasma prior to blood collection from a donor."

---

[122] NexSys PCS PERSONA Brochure, at 2.

722. The NexSys PCS User Manual shows the target volume for raw plasma on the user interface, which is displayed with other donor information prior to blood collection from the donor.[123]

723. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "setting the target volume for raw plasma prior to blood collection from a donor."

724. Claim 1 of the '873 Patent also recites in part, "controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor."

725. The NexSys PCS User Manual describes the operation comprising two phases, Draw and Return.[124]

726. The User Manual also describes how, "during the collection procedure," the device separates "plasma components" of whole blood which are directed into a "plasma collection container for storage" while the non-selected blood components "are returned to the donor during the Return cycle." [125]

727. The User Manual also describes the parameters controlling the Draw and Return phases and provides instructions to modify those parameters.[126]

---

[123] NexSys PCS User Manual, at 59.

[124] NexSys PCS User Manual, at 33.

[125] *Id.* at 10.

[126] *Id.* at 79-80.

728. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor."

729. Claim 1 of the '873 Patent also recites in part, "wherein each draw and return phase comprises: introducing whole blood from the donor to a separator via a donor line."

730. The NexSys PCS User Manual describes disposable sets of tubing including one set connected to a donor via a venipuncture needle when drawing whole blood.[127]

731. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "wherein each draw and return phase comprises: introducing whole blood from the donor to a separator via a donor line."

732. Claim 1 of the '873 Patent also recites in part, "combining anticoagulant with the whole blood from the donor using an anticoagulant line based on an anticoagulant ratio (ACR)."

733. The NexSys PCS User Manual describes an anticoagulant pump which mixes anticoagulant solution with whole blood from the donor.[128] The device regulates mixing based on an "AC [anticoagulant] ratio."[129]

734. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step

---

[127] NexSys PCS User Manual, at 10, 42, 68.

[128] NexSys PCS User Manual, at 23.

[129] NexSys PCS User Manual, at 23.

"combining anticoagulant with the whole blood from the donor using an anticoagulant line based on an anticoagulant ratio (ACR)."

735. Claim 1 of the '873 Patent also recites in part, "separating whole blood into the plasma product and the second blood component comprising red blood cells."

736. The NexSys PCS User Manual describes how the NexSys PCS device separates whole blood in a centrifuge separator into layers of blood components, of which one layer is plasma and a second layer comprises red cells.[130]

737. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "separating whole blood into the plasma product and the second blood component comprising red blood cells."

738. Claim 1 of the '873 Patent also recites in part, "sending the plasma product to a plasma product collection container."

739. The NexSys PCS User Manual describes how, "during the collection procedure," the device separates "plasma components" of whole blood which are directed into a "plasma collection container for storage."[131]

740. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "sending the plasma product to a plasma product collection container."

741. Claim 1 of the '873 Patent also recites in part, "wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma

[130] NexSys PCS User Manual, at 10, 40.

[131] NexSys PCS User Manual, at 10, 41, 68.

product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP)."

742. A controller of the NexSys PCS PERSONA is configured to operate the draw and return phases until a volume of raw plasma collected equals the target volume of raw plasma. For example, the NexSys PCS User Manual describes how the device measures the collection volume of plasma and ends the collection cycle "when the plasma target collection has been achieved."[132]

743. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP)."

744. Claim 2 of the '873 Patent recites: "The method of claim 1, wherein ACR=Volume of Whole Blood/Volume of Anticoagulant."

745. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 2 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

746. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

747. During use of the NexSys PCS PERSONA, the ACR utilized is equal to the volume of whole blood divided by the volume of anticoagulant. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User

[132] NexSys PCS User Manual, at 25.

Manual will perform the step: "wherein ACR=Volume of Whole Blood/Volume of Anticoagulant."

748. Claim 3 of the '873 Patent recites: "The method of claim 1, further comprising calculating the volume of raw plasma (VRP) in the collection container based on a measured volume of plasma product (VPP), the ACR and a hematocrit of the donor."

749. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 3 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

750. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

751. The NexSys PCS User Manual discloses how the device calculates the amount of anticoagulant in the plasma product based on the measured volume of plasma product, the AC ratio and the hematocrit of the donor.[133] Since the volume of raw plasma in the collection container is the difference between measured plasma volume and anticoagulant volume, the NexSys PCS User Manual discloses calculating the volume of raw plasma in the collection container based on the parameters recited in the claim. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "calculating the volume of raw plasma (VRP) in the collection container based on a measured volume of plasma product (VPP), the ACR and a hematocrit of the donor."

[133] NexSys PCS User Manual, at 116.

752. Claim 4 of the ’873 Patent recites: “The method of claim 1, further comprising receiving the donor’s weight and hematocrit electronically at the controller from the donor management system, wherein the donor management system is used for qualification screening.”

753. The use of the Accused Haemonetics Products practices claim 4 of the ’873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

754. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

755. The NexSys PCS PERSONA comprises a controller that is coupled to a touchscreen and is configured to electronically receive donor parameters, such as weight and hematocrit, from the NexLynk DMS or another third-party data management system. The data management system (*e.g.*, NexLynk DMS) downloads and transmits the donor information—including donor ID, donor name, donor birth date, donor weight, and donor hematocrit—from a database to the NexSys PCS device. The NexSys PCS device displays information about the donor that is used for qualification screening (*e.g.*, verify the identity of the donor).[134] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “receiving the donor’s weight and hematocrit electronically at the controller from the donor management system, wherein the donor management system is used for qualification screening.”

756. Claim 5 of the ’873 Patent recites: “The method of claim 1, further comprising calculating the target volume for raw plasma by calculating a fraction of total donor plasma volume.”

---

[134] *See, e.g.* NexSys PCS User Manual, at 59-60.

757. The use of the NexSys PCS PERSONA meets each element of claim 5 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

758. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

759. The target volume for raw plasma collection with the NexSys PCS PERSONA is calculated based on a calculated percentage of the donor's total plasma volume.[135]. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "calculating the target volume for raw plasma by calculating a fraction of total donor plasma volume."

760. Claim 6 of the '873 Patent recites: "The method of claim 1, further comprising performing the draw and return cycles at least three times and determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase."

761. The use of the NexSys PCS PERSONA meets each element of claim 6 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

762. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

763. The controller of the NexSys PCS PERSONA can be programmed to collect at least three collection and reinfusion cycles and to draw a lower volume of whole blood in the final

---

[135] *See, e.g.*, NexSys PCS PERSONA Brochure, at 2.

cycle.[136] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "performing the draw and return cycles at least three times and determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase."

764. Claim 7 of the '873 Patent recites: "The method of claim 1, further comprising combining anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant."

765. The use of the NexSys PCS PERSONA meets each element of claim 7 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

766. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

767. The NexSys PCS PERSONA mixes anticoagulant with the donor's whole blood as whole blood is drawn from the donor to prevent blood from clotting. The NexSys PCS PERSONA combines anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.[137] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "combining anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant."

768. Claim 8 of the '873 Patent recites: "The method of claim 1, wherein the donor management system calculates the target volume for raw plasma based at least in part on donor

---

[136] *See* NexSys PCS User Manual, at 33-34.

[137] NexSys PCS User Manual, at 23.

height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, further comprising transmitting the target volume for raw plasma from the donor management system to the controller."

769. The use of the Accused Haemonetics Products meets each element of claim 8 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

770. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

771. The donor management system calculates the target volume for raw plasma based on donor height and weight used to calculate total donor blood volume and hematocrit used to determine the total donor plasma volume.[138] Further, The NexSys PCS User Manual states that when the device is connected to a BECS or compatible central monitoring software system, the target volume for raw plasma is transmitted from the donor management system to the controller.[139] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "wherein the donor management system calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, further comprising transmitting the target volume for raw plasma from the donor management system to the controller."

772. Claim 9 of the '873 Patent recites: "The method of claim 1, wherein ACR is a ratio of volume of anticoagulant to volume of anticoagulated blood."

---

[138] *See, e.g.*, NexSys PCS PERSONA Brochure, at 2.

[139] NexSys PCS User Manual, at 59.

773. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 9 of the ’873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

774. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

775. The NexSys PCS PERSONA mixes anticoagulant with the donor’s whole blood in the venipuncture needle adaptor as whole blood is drawn from the donor to prevent blood from clotting. This can be done wherein ACR is a ratio of volume of anticoagulant to volume of anticoagulated blood.[140] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “wherein ACR is a ratio of volume of anticoagulant to volume of anticoagulated blood.”

776. Claim 10 of the ’873 Patent recites: “The method of claim 1, further comprising receiving via the touchscreen a donor ID, donor weight, donor hematocrit and a target plasma volume.”

777. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 10 of the ’873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

778. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

[140] *See* NexSys PCS User Manual, at 23, 116

779. The NexSys PCS PERSONA is configured to receive via a touchscreen a donor ID, weight, donor hematocrit and a target plasma volume.[141] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "receiving via the touchscreen a donor ID, donor weight, donor hematocrit and a target plasma volume."

780. Claim 12 of the '873 Patent covers a novel method of collecting plasma and recites:

> 12. A method of collecting plasma, comprising:
>
> receiving input from an operator via a touchscreen of a plasma collection device;
>
> receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system;
>
> determining a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume;
>
> controlling the plasma collection device to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to reinfuse the second blood component to the donor, wherein each collection and reinfusion cycle comprises:
>
> introducing the whole blood from the donor to a blood separator;
>
> combining anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR);
>
> separating whole blood into the plasma product and the second blood component comprising red blood cells; and
>
> sending the plasma product to a plasma product collection container,
>
> wherein the controller controls the plasma collection device to operate the collection and reinfusion cycles on the donor at least

[141] NexSys PCS User Manual, at 59-60.

> three times, wherein a final collection and reinfusion cycle comprises drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle.

781. The use of the NexSys PCS PERSONA with a Disposable Kit meets each of the foregoing limitations of claim 12, literally and/or under the doctrine of equivalents, as described in Exhibit 26.

782. Claim 12 of the '873 Patent recites in part, "[a] method of collecting plasma."

783. As shown by at least the NexSys PCS User Manual, the NexSys PCS PERSONA with a Disposable Kit practices a method of collecting plasma. The NexSys PCS User Manual discloses instructions for the "plasmapheresis system designed for the highly efficient collection of plasma from donors."[142]

784. End users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of collecting plasma.

785. Claim 12 of the '873 Patent also recites in part, "receiving input from an operator via a touchscreen of a plasma collection device."

786. As described above in relation to claim 1, the NexSys PCS device includes a "touchscreen graphical user interface."[143] The User Manual describes how the device receives inputs from a touchscreen periodically as part of its intended operation.[144]

---

[142] NexSys PCS User Manual, at 10.

[143] NexSys PCS User Manual, at 11.

[144] *See, e.g.*, NexSys PCS User Manual, at 60, 71, 74.

787. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "receiving an input from a touch screen of the apheresis treatment device."

788. Claim 12 of the '873 Patent also recites in part, "receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system."

789. As described above in relation to claim 1, the NexSys PCS User Manual describes a BECS which is a "central monitoring software system that exchanges information with the device via an approved server application."[145] It further describes how the NexSys PCS device "receives [donor] information from the BECS."[146]

790. The donor management system may be the Haemonetics NexLynk DMS system or a third-party donor management system. The NexLynk DMS Brochure describes the software as helping users "manage information about your donors" and providing "donor management" functionality.[147]

791. The NexSys PCS User Manual describes how the NexSys PCS device receives donor parameters and displays them at a controller of the plasma collection device, namely the touchscreen user interface.[148]

792. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of

[145] NexSys PCS User Manual, at 120.

[146] *Id.* at 59.

[147] NexLynk DMS Brochure, at 3.

[148] NexSys PCS User Manual, at 59-60.

"receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system."

793. Claim 12 of the '873 Patent also recites in part, "determining a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume."

794. The NexSys PCS PERSONA determines a target volume for plasma product and/or raw plasma based on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume. For example, the NexSys PCS PERSONA Brochure describes plasma collection according to total blood volume based on BMI, which is a function of height and weight, and donor plasma volume based on hematocrit.[149]

795. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "determining a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume."

796. Claim 12 of the '873 Patent also recites in part, "controlling the plasma collection device to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to reinfuse the second blood component to the donor."

[149] NexSys PCS PERSONA Brochure, at 2.

797. As described above in relation to claim 1, The NexSys PCS User Manual describes the operation comprising two phases, Draw (*i.e.,* collection) and Return (*i.e.*, reinfusion).[150]

798. The User Manual also describes how, "during the collection procedure," the device separates "plasma components" of whole blood which are directed into a "plasma collection container for storage" while the non-selected blood components "are returned to the donor during the Return cycle."[151]

799. The User Manual also describes the parameters controlling the Draw and Return phases and provides instructions to modify those parameters.[152]

800. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "controlling the plasma collection device to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to reinfuse the second blood component to the donor."

801. Claim 12 of the '873 Patent also recites in part, "wherein each collection and reinfusion cycle comprises: introducing the whole blood from the donor to a blood separator."

802. As described above in relation to claim 1, the NexSys PCS User Manual describes disposable sets of tubing including one set connected to a donor via a venipuncture needle when

[150] NexSys PCS User Manual, at 33.

[151] *Id.* at 10.

[152] *Id.* at 79-80.

drawing whole blood.[153] The NexSys PCS device introduces the whole blood to a blood separator where it is "separated by centrifugal force into its various components."[154]

803. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "wherein each collection and reinfusion cycle comprises: introducing the whole blood from the donor to a blood separator."

804. Claim 12 of the '873 Patent also recites in part, "combining anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR)."

805. As described above in relation to claim 1, the NexSys PCS User Manual describes an anticoagulant pump which mixes anticoagulant solution with whole blood from the donor.[155] The device regulates mixing based on an "AC [anticoagulant] ratio."[156]

806. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "combining anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR)."

807. Claim 12 of the '873 Patent also recites in part, "separating whole blood into the plasma product and the second blood component comprising red blood cells."

---

[153] NexSys PCS User Manual, at 10, 42, 68.

[154] *Id.* at 10.

[155] NexSys PCS User Manual, at 23.

[156] *Id.*

808. As described above in relation to claim 1, the NexSys PCS User Manual describes how the NexSys PCS device separates whole blood in a centrifuge separator into layers of blood components, of which one layer is plasma and a second layer comprises red cells.[157]

809. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "separating whole blood into the plasma product and the second blood component comprising red blood cells."

810. Claim 12 of the '873 Patent also recites in part, "sending the plasma product to a plasma product collection container."

811. As described above in relation to claim 1, the NexSys PCS User Manual describes how, "during the collection procedure," the device separates "plasma components" of whole blood which are directed into a "plasma collection container for storage."[158]

812. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "sending the plasma product to a plasma product collection container."

813. Claim 12 of the '873 Patent also recites in part, "wherein the controller controls the plasma collection device to operate the collection and reinfusion cycles on the donor at least three times, wherein a final collection and reinfusion cycle comprises drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle."

---

[157] NexSys PCS User Manual, at 10, 40.

[158] NexSys PCS User Manual, at 10, 41, 68.

814. As described above in relation to claim 6, the controller of the NexSys PCS PERSONA can be programmed to collect at least three collection and reinfusion cycles and to draw a lower volume of whole blood in the final cycle.[159]

815. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "wherein the controller controls the plasma collection device to operate the collection and reinfusion cycles on the donor at least three times, wherein a final collection and reinfusion cycle comprises drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle."

816. Claim 13 of the '873 Patent recites: "The method of claim 12, wherein the controller uses the parameters received from the donor management system to determine the target volume for plasma product and/or raw plasma."

817. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 13 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

818. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 12.

819. The NexSys PCS System with NexLynk DMS is configured to connect a data storage device and the apheresis treatment device over a network (*e.g.*, wired or wireless internet). The remote data storage device communicates electronically with the controller and provides parameters to the NexSys PCS PERSONA which are used to determine the target volume for

[159] *See* NexSys PCS User Manual, at 33-34.

plasma product and/or raw plasma. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: wherein the controller uses the parameters received from the donor management system to determine the target volume for plasma product and/or raw plasma."

820. Claim 14 of the '873 Patent recites: "The method of claim 13, further comprising performing qualification screening using the donor management system."

821. The use of the Accused Haemonetics Products meets each element of claim 14 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

822. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 13.The use of the NexSys PCS device with a donor management system (such as NexLynk DMS) in electronic communication with the controller, is designed to use parameters received from the donor management system to perform qualification screening. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "performing qualification screening using the donor management system."

823. Claim 15 of the '873 Patent recites: "The method of claim 12, wherein the donor management system calculates the target volume for plasma product and/or raw plasma and the controller determines the target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system."

824. The use of the Accused Haemonetics Products meets each element of claim 15 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

825. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 12.

826. The NexSys PCS System, including NexSys PCS PERSONA configurations with YES, is designed to interface with donor management systems (DMS) or BECS. The DMS can calculate the target volume for plasma product (and/or raw plasma) and the controller of the NexSys PCS PERSONA can determine the target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system. For example, the DMS will calculate the target volume for raw plasma and transmit it to the NexSys PCS PERSONA. The NexSys PCS PERSONA will then determine the target volume for plasma product. The Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "wherein the donor management system calculates the target volume for plasma product and/or raw plasma and the controller determines the target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system."

827. Claim 16 of the '873 Patent recites: "The method of claim 12, further comprising determining the total donor blood volume before whole blood is withdrawn from the donor during a donation."

828. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 16 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

829. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 12.

830. The NexSys PCS system determines the total donor blood volume before whole blood is withdrawn from the donor during a donation. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "determining the total donor blood volume before whole blood is withdrawn from the donor during a donation."

831. Claim 17 of the '873 Patent covers a novel method of collecting plasma and recites:

> 17. A method of collecting plasma, comprising:
>
> receiving input from an operator via a touchscreen of a plasma collection device;
>
> receive donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system;
>
> setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor;
>
> controlling the plasma collection device to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component and to return the second blood component to the donor, controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor,
>
> wherein each draw and return phase comprises:
>
> pumping whole blood from a donor to a separator of the plasma collection device;

> combining anticoagulant from an anticoagulant source with the whole blood from the donor based on an anticoagulant ratio (ACR);
>
> separating the whole blood into a plasma product and a second blood component comprising red blood cells; and
>
> sending the plasma product to a plasma product collection container,
>
> wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).

832. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 17 of the ’873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

833. Claim 17 of the ’873 Patent recites in part, “[a] method of collecting plasma.”

834. As shown by at least the NexSys PCS User Manual, the Accused Haemonetics Products practice a method of collecting plasma. The NexSys PCS User Manual discloses instructions for the “plasmapheresis system designed for the highly efficient collection of plasma from donors.”[160]

835. End users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of collecting plasma.

836. Claim 17 of the ’873 Patent also recites in part, “receiving input from an operator via a touchscreen of a plasma collection device.”

[160] NexSys PCS User Manual, at 10.

837. As described in relation to claim 1, the NexSys PCS device includes a "touchscreen graphical user interface." NexSys PCS User Manual, at 11. The manual describes how the device receives inputs from a touchscreen periodically as part of its intended operation.[161]

838. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "receiving input from an operator via a touchscreen of a plasma collection device."

839. Claim 17 of the '873 Patent also recites in part, "receive [sic] donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system."

840. As described in relation to claim 1, the NexSys PCS User Manual describes a BECS which is a "central monitoring software system that exchanges information with the device via an approved server application."[162] It further describes how the NexSys PCS device "receives [donor] information from the BECS."[163]

841. The donor management system may be the Haemonetics NexLynk DMS system or a third-party donor management system. The NexLynk DMS Brochure describes the software as helping users "manage information about your donors" and providing "donor management" functionality.[164]

---

[161] *See, e.g.*, NexSys PCS User Manual, at 60, 71, 74.

[162] NexSys PCS User Manual, at 120.

[163] *Id.* at 59.

[164] NexLynk DMS Brochure, at 3.

842. The NexSys PCS User Manual describes how the NexSys PCS device receives donor parameters and displays them at a controller of the plasma collection device, namely the touchscreen user interface.[165]

843. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "receive [sic] donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system."

844. Claim 17 of the '873 Patent also recites in part, "setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor."

845. The NexSys PCS System sets a target volume for raw plasma based on donor parameters comprising donor weight and height used to calculate total donor blood volume and hematocrit to calculate total donor plasma volume. For example, the NexSys PCS PERSONA Brochure describes plasma collection according to total blood volume based on BMI, which is a function of height and weight, and donor plasma volume based on hematocrit.[166]

846. The NexSys PCS User Manual shows the target volume for raw plasma on the user interface, which is displayed with other donor information prior to blood collection from the donor.[167]

---

[165] NexSys PCS User Manual, at 59-60.

[166] NexSys PCS PERSONA Brochure, at 2.

[167] NexSys PCS User Manual, at 59.

847. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor."

848. Claim 17 of the '873 Patent also recites in part, "controlling the plasma collection device to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component and to return the second blood component to the donor, controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor."

849. As described above in relation to claim 12, the NexSys PCS User Manual describes the operation comprising two phases, Draw and Return.[168]

850. The User Manual also describes how, "during the collection procedure," the device separates "plasma components" of whole blood which are directed into a "plasma collection container for storage" while the non-selected blood components "are returned to the donor during the Return cycle."[169]

---

[168] NexSys PCS User Manual, at 33.

[169] *Id.* at 10.

851. The User Manual also describes the parameters controlling the Draw and Return phases and provides instructions to modify those parameters.[170]

852. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "controlling the plasma collection device to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component and to return the second blood component to the donor, controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor."

853. Claim 17 of the '873 Patent also recites in part, "wherein each draw and return phase comprises: pumping whole blood from a donor to a separator of the plasma collection device."

854. As described above in relations to claims 1 and 12, the NexSys PCS User Manual describes disposable sets of tubing including one set connected to a donor via a venipuncture needle when drawing whole blood.[171] The NexSys PCS device comprises a blood pump for pumping whole blood to the separator centrifuge.[172]

855. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step

[170] *Id.* at 79-80.

[171] NexSys PCS User Manual, at 10, 42, 68.

[172] *Id.* at 23, 68.

"wherein each draw and return phase comprises: pumping whole blood from a donor to a separator of the plasma collection device."

856. Claim 17 of the '873 Patent also recites in part, "combining anticoagulant from an anticoagulant source with the whole blood from the donor based on an anticoagulant ratio (ACR)."

857. As described above in relation to claims 1 and 12, the NexSys PCS User Manual describes an anticoagulant pump which mixes anticoagulant solution with whole blood from the donor.[173] The device regulates mixing based on an "AC [anticoagulant] ratio." *Id.*

858. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "combining anticoagulant from an anticoagulant source with the whole blood from the donor based on an anticoagulant ratio (ACR)."

859. Claim 17 of the '873 Patent also recites in part, "separating the whole blood into a plasma product and a second blood component comprising red blood cells."

860. As described above in relation to claims 1 and 12, the NexSys PCS User Manual describes how the NexSys PCS device separates whole blood in a centrifuge separator into layers of blood components, of which one layer is plasma and a second layer comprises red cells.[174]

861. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "separating the whole blood into a plasma product and a second blood component comprising red blood cells."

---

[173] NexSys PCS User Manual, at 23.

[174] NexSys PCS User Manual, at 10, 40.

862. Claim 17 of the '873 Patent also recites in part, "sending the plasma product to a plasma product collection container."

863. As described above in relation to claims 1 and 12, the NexSys PCS User Manual describes how, "during the collection procedure," the device separates "plasma components" of whole blood which are directed into a "plasma collection container for storage."[175]

864. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "sending the plasma product to a plasma product collection container."

865. Claim 17 of the '873 Patent also recites in part, "wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP)."

866. As described above in relation to claim 1, on information and belief, the controller of the NexSys PCS device is configured to operate the draw and return phases until a volume of raw plasma collected equals the target volume of raw plasma. For example, the NexSys PCS User Manual describes how the device measures the collection volume of plasma and ends the collection cycle "when the plasma target collection has been achieved."[176]

867. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "wherein the controller is further configured to operate the draw and return phases until a volume

[175] NexSys PCS User Manual, at 10, 41, 68.

[176] NexSys PCS User Manual, at 25.

of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP)."

868. Claim 18 of the '873 Patent recites: "The method of claim 17, wherein ACR = Volume of Whole Blood/Volume of Anticoagulant."

869. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 18 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

870. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

871. The ACR used in the NexSys PCS PERSONA is equal to the volume of whole blood divided by the volume of anticoagulant. For example, where the system combines 16 units of whole blood with 1 unit of anticoagulant, the ACR is 16/1 or 16. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "wherein ACR = Volume of Whole Blood/Volume of Anticoagulant."

872. Claim 19 of the '873 Patent recites: "The method of claim 17, further comprising performing donor qualification screening using the donor management system, wherein the donor parameters received from the donor management system comprise the donor weight and height and hematocrit (Hct)."

873. The use of the Accused Haemonetics Products meets each element of claim 19 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

874. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

875. The use of the NexSys PCS PERSONA with a donor management system (such as NexLynk DMS) in electronic communication with the controller, is designed to use donor parameters (*e.g.*, weight, height hematocrit) received from the donor management system to perform qualification screening (*e.g.*, verify the identity of the donor). Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "performing donor qualification screening using the donor management system, wherein the donor parameters received from the donor management system comprise the donor weight and height and hematocrit (Hct)."

876. Claim 20 of the '873 Patent recites: "The method of claim 17, wherein the controller is programmed to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total donor blood volume or the total donor plasma volume."

877. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 20 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

878. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

879. The controller of the NexSys PCS PERSONA using the PERSONA nomogram is programmed to calculate a target volume of raw plasma by calculating a fraction of the total donor plasma volume. Accordingly, end users such as customers and phlebotomists following the

instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "The method of claim 17, wherein the controller is programmed to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total donor blood volume or the total donor plasma volume."

880. Claim 21 of the '873 Patent recites: "The method of claim 17, further comprising operating the draw and return phases at least three times and further comprising determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase."

881. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 21 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

882. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

883. The controller of the NexSys PCS PERSONA can be programmed to collect at least three draw and return phases and to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "operating the draw and return phases at least three times and further comprising determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase."

884. Claim 22 of the ’873 Patent recites: “The method of claim 17, further comprising combining the anticoagulant with the whole blood at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.”

885. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 22 of the ’873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

886. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

887. The NexSys PCS PERSONA mixes anticoagulant with the donor’s whole blood as whole blood is drawn from the donor to prevent blood from clotting. NexSys PCS PERSONA combines anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “combining the anticoagulant with the whole blood at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.”

888. Claim 23 of the ’873 Patent recites: “The method of claim 17, further comprising: calculating the target volume for raw plasma at the donor management system based at least in part on the donor height and weight used to calculate the total donor blood volume and the hematocrit used to calculate the total donor plasma volume; and transmitting the target volume for raw plasma from the donor management system to the controller.”

889. The use of the Accused Haemonetics Products meets each element of claim 23 of the ’873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

890. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

891. The target volume for raw plasma collection with the NexSys PCS PERSONA using the PERSONA nomogram is based on a calculated percentage of the donor's total plasma volume, and the hematocrit, weight and height of the donor. This calculation can be done at the donor management system. The user manual for the NexSys PCS device states that when the device is connected to a BECS or compatible central monitoring software system, the target volume for raw plasma is transmitted from the donor management system to the controller. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "calculating the target volume for raw plasma at the donor management system based at least in part on the donor height and weight used to calculate the total donor blood volume and the hematocrit used to calculate the total donor plasma volume; and transmitting the target volume for raw plasma from the donor management system to the controller."

892. In addition to end users of the Accused Haemonetics Products, on information and belief, Haemonetics and its agents directly infringe at least claims 1-10 and 12-23 of the '873 Patent by using the Accused Haemonetics Products in the United States (for example in tests and commercial demonstrations) according to the instructions and guidance that Haemonetics provides to its end customers in the NexSys PCS User Manual and the NexSys PCS Service Manual.

893. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the

United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the ’873 Patent.

894. In addition to directly infringing the ’873 Patent, Haemonetics has indirectly infringed the ’873 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the ’873 Patent (including claims 1-10 and 12-23) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[177] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the ’873 Patent. On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ’873 Patent.

[177] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

895. Haemonetics has had knowledge of the ’873 Patent since at least the filing of these Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’873 Patent since at least the filing of these Counterclaims.

896. Haemonetics has also indirectly infringed the ‘873 Patent (including claims 1-10 and 12-23) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ’873 Patent by third parties, such as its customers and end users. Such third parties infringe the ’873 Patent (including claims 1-10 and 12-23) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the ’873 Patent because those components constitute a material part of the invention of the ’873 Patent (as their use practices all limitations of the claims), are specially made or adapted for use in infringing the ’873 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

897. As a consequence of Haemonetics’ direct and indirect infringement of the ’873 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

898. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

899. On information and belief, unless enjoined, Haemonetics will continue to infringe the ’873 Patent.

**COUNT 9: INFRINGEMENT OF U.S. PATENT NO. 12,144,624**

900. Fenwal realleges and incorporates the allegations set forth in the foregoing paragraphs 1-899 as if fully set forth herein.

901. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1, 2, 7, and 8 of the ’624 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the NexSys PCS PERSONA and Disposable Kits in the United States. The use of the Accused Haemonetics Products meets each limitation of each of foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 27, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the ’624 Patent against Haemonetics based on discovery that will become available in due course.

902. Claim 1 of the ’624 Patent recites:

> 1. A system for collecting plasma from a donor comprising:
>
> a) a venipuncture needle for withdrawing whole blood from the donor,
>
> b) a blood separator for separating the whole blood into a plasma product and a second blood component comprising red blood cells;
>
> c) a donor line coupled to the venipuncture needle for introducing whole blood from the donor to the blood separator;
>
> d) a first pump for controlling flow through the donor line;
>
> e) an anticoagulant line coupled to an anticoagulant source for combining anticoagulant with the whole blood;
>
> f) a second pump for controlling flow through the anticoagulant line;
>
> g) a touchscreen is provided for receiving input from an operator; and
>
> h) a programmable controller configured to: determine a target volume of plasma product to be collected (TVPP) based on a weight of the donor, or based on a weight and height of the donor, and a percentage of anticoagulant in the target volume of plasma product to be collected (% $AC_{TVPP}$) based on a pre-determined anticoagulant ratio (ACR) and a hematocrit (Hct) of the donor, control the system to operate a draw and return cycle to withdraw whole blood from the donor, add anticoagulant to the whole blood at a pre-determined ratio (ACR), separate the anticoagulated whole blood into the

> plasma product and the second component and to return the second component to the donor, and stop withdrawing whole blood from the donor and initiate a final return of the second blood component when a measured volume of plasma product in a plasma collection container reaches the target volume for plasma product, TVPP.

903. The NexSys PCS PERSONA with the Disposable Kit practices claim 1 of the '624 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 27.

904. To the extent the preamble is limiting, the NexSys PCS PERSONA and the Disposable Kit comprise a system for collecting plasma from a donor.

905. The Disposable Kit used with the NexSys PCS PERSONA includes a venipuncture needle for withdrawing whole blood from the donor.

906. The Disposable Kit used with the NexSys PCS PERSONA includes a disposable bowl to separate the whole blood into a plasma product and a second blood component comprising red blood cells. The NexSys PCS PERSONA includes a centrifuge which holds the disposable bowl in place during device operation.

907. The Disposable Kit used with the NexSys PCS PERSONA include a donor line coupled to the venipuncture needle for introducing whole blood from the donor to the blood separator.

908. The NexSys PCS PERSONA includes a blood pump ("first pump") for controlling fluid flow through the donor line.

909. The Disposable Kit used with the NexSys PCS PERSONA includes an anticoagulant line coupled to an anticoagulant source (an anticoagulant bag) for combining anticoagulant with the whole blood.

910. The NexSys PCS PERSONA includes an anticoagulant pump ("second pump") for controlling anticoagulant flow through the anticoagulant line.

911. The NexSys PCS PERSONA includes a touchscreen for receiving input from an operator.

912. The NexSys PCS PERSONA includes a programmable controller that is configured to perform the following actions:

a. determine a target volume of plasma product to be collected (TVPP) based on a weight of the donor, or based on a weight and height of the donor, and a percentage of anticoagulant in the target volume of plasma product to be collected (% $AC_{TVPP}$) based on a pre-determined anticoagulant ratio (ACR) and a hematocrit (Hct) of the donor;

b. control the plasmapheresis system to operate a draw and return cycle to withdraw whole blood from the donor;

c. add anticoagulant to the whole blood at a pre-determined ratio (ACR);

d. separate the anticoagulated whole blood into the plasma product and the second component and to return the second component to the donor; and

e. stop withdrawing whole blood from the donor and initiate a final return of the second blood component when a measured volume of plasma product in a plasma collection container reaches the target volume for plasma product, TVPP.

913. Claim 2 recites "the system of claim 1, wherein the controller is further programmed to calculate (i) a target volume of pure plasma product to be collected (TVP) from the weight of the donor and (ii) the percentage of anticoagulant in the target volume of plasma product to be collected, % $AC_{TVPP}$, based on the pre-determined anticoagulant ratio, ACR, and the hematocrit, Hct, of the donor, wherein the TVPP=TVP/(1−% $AC_{TVPP}$)."

914. The NexSys PCS PERSONA with the Disposable Kit practices claim 2 of the '624 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 27.

915. As explained above, the NexSys PCS PERSONA with a Disposable Kit form a system that practices claim 1.

916. A controller in the NexSys PCS PERSONA is programmed to calculate a target volume of pure plasma product to be collected (TVP) from the weight of the donor. Specifically, the PERSONA nomogram uses donor weight to calculate the donor's total blood volume. In turn, total blood volume is used to determine total plasma volume. The target volume of pure plasma is calculated as 28.5% of total plasma volume.

917. Claim 7 recites "the system of claim 1, wherein ACR is the ratio of the amount of whole blood to the amount of anticoagulant (ACR=WB/AC), and the controller is further configured to determine the percent of anticoagulant in the target volume of plasma product, % $AC_{TVPP}$, such that % ACTVPP=1/(1+ACR (1−Hct))."

918. The NexSys PCS PERSONA with the Disposable Kit practices claim 7 of the '624 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 27.

919. As explained above, the NexSys PCS PERSONA with the Disposable Kit forms a system that practices claim 1.

920. The NexSys PCS PERSONA can use an ACR wherein the ACR is equal to the volume of whole blood divided by the volume of anticoagulant. Moreover, on information and belief, a controller in the NexSys PCS PERSONA is configured to determine the percent of anticoagulant in the target volume of plasma product such that % $AC_{TVPP}$ = 1/(1+ACR (1−Hct)).

921. Claim 8 recites: "The system of claim 1, wherein ACR is the ratio of volume of whole blood plus the volume of anticoagulant to the volume of anticoagulant

(ACR=(WB+AC)/AC), and the controller is further configured to determine the percent of anticoagulant in the target volume of plasma product, % $AC_{TVPP}$, such that % $AC_{TVPP}$=1/(1+(ACR−1)(1−Hct))."

922. The NexSys PCS PERSONA with the Disposable Kit practices claim 8 of the '624 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 27.

923. As explained above, the NexSys PCS PERSONA with the Disposable Kit forms a system that practices claim 1.

924. The NexSys PCS PERSONA can use an ACR wherein the ACR is equal to the volume of whole blood divided by the volume of anticoagulant. For example, where the system combines 16 units of whole blood with 1 unit of anticoagulant, the ACR is 16+1/1 or 17. Moreover, on information and belief, a controller in the NexSys PCS PERSONA is configured to determine the percent of anticoagulant in the target volume of plasma product such that % $AC_{TVPP}$ = 1/(1+ACR (1−Hct)).

925. Haemonetics directly infringes at least claims 1, 2, 7, and 8 of the '624 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering for sale/lease, selling, and/or leasing the NexSys PCS PERSONA with the Disposable Kit in the United States.

926. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through

contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the ’624 Patent, including at least claims 1, 2, 7, and 8.

927. In addition to directly infringing the ’624 Patent, Haemonetics has indirectly infringed the ’624 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the ’624 Patent (including claims 1, 2, 7, and 8) at least by using the NexSys PCS PERSONA with the Disposable Kit in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[178] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the ’624 Patent (including claims 1, 2, 7, and 8). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ’624 Patent (including claims 1, 2, 7, and 8).

928. Haemonetics has had knowledge of the ’624 Patent since at least the filing of these Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the ’624 Patent since at least the filing of these Counterclaims.

[178] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

929. Haemonetics has also indirectly infringed the '624 Patent (including claims 1, 2, 7, and 8) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the '624 Patent by third parties, such as its customers and end users. Such third parties infringe the '624 Patent (including claims 1, 2, 7, and 8) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics' affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the '624 Patent because those components constitute a material part of the invention of the '624 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the '624 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

930. As a consequence of Haemonetics' direct and indirect infringement of the '624 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

931. Due to Haemonetics' infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

932. On information and belief, unless enjoined, Haemonetics will continue to infringe the '624 Patent.

**COUNT 10: NON-INFRINGEMENT OF U.S. PATENT NO. 10,758,652**

933. Fenwal repeats and realleges paragraphs 1-932 as if fully set forth herein.

934. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fenwal (ECF No. 32), an actual and justiciable controversy exists between Fenwal and Haemonetics concerning alleged infringement of the U.S. Patent No. 10,758,652 ("the '652 patent").

935. Fenwal has not made, used, offered to sell, or sold any alleged invention claimed in the '652 patent within the United States, or imported any alleged invention claimed in the '652

patent into the United States. Fenwal therefore has not infringed and does not currently infringe any asserted claim of the ’652 patent, literally or under the doctrine of equivalents, directly or indirectly. For example, with respect to asserted claim 11, Fenwal has not made, used, offered to sell, sold, or imported within or into the United States any system that includes the following (to the extent such terms are understandable at this junction without the benefit of formal claim construction): “the controller configured to calculate (1) a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container, and (2) a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component, the controller configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container.”

936. Fenwal has not actively induced any infringement of the ’652 patent.

937. Fenwal has not contributed to any infringement of the ’652 patent.

938. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the ’652 patent, that it has not actively induced the infringement of the ’652 patent, and that it has not contributed to the infringement of the ’652 patent.

**COUNT 11: INVALIDITY OF U.S. PATENT NO. 10,758,652**

939. Fenwal repeats and re-alleges paragraphs 1-938 as if fully set forth herein.

940. Due to at least the allegations contained in Haemonetics’ First Amended Complaint, an actual and justiciable controversy exists between Fenwal and Haemonetics concerning the validity of the ’652 patent.

941. The claims of the ’652 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* IPR2025-01391 (petition for *inter partes* review of U.S. Patent No. 10,758,652). The Court may take judicial notice of IPR2025-01391, which is a matter of public

record before the USPTO, and which Fenwal incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

942. For example, the claims of the '652 patent are anticipated by the prior art, under 35 U.S.C. §§102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. U.S. Patent No. 8,075,468 to Min et al. ("Min")

b. U.S. Patent No. 9,370,324 to Barret et al. ("Barrett")

c. U.S. Patent No. 6,296,602 to Headley ("Headley")

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. U.S. Patent Publication No. 2017/0029762 ("Turgut")

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S-0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. U.S. Patent Publication No. 2012/0175313 to Barry et al. ("Barry")

i. U.S. Publication No. 2002/0033370 to Bainbridge et al. ("Bainbridge")

j. U.S. Patent No. 10,195,319 to Kimura ("Kimura")

k. U.S. Patent No. 6,743,192 to Sakota et al. ("Sakota")

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

943. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '652 patent, are invalid for failure to meet the

conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**COUNT 12: NON-INFRINGEMENT OF U.S. PATENT NO. 12,171,916**

944. Fenwal repeats and realleges paragraphs 1-943 as if fully set forth herein.

945. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fenwal (ECF No. 32), an actual and justiciable controversy exists between Fenwal and Haemonetics concerning alleged infringement of the U.S. Patent No. 12,171,916 ("the '916 patent").

946. Fenwal has not made, used, offered to sell, or sold any alleged invention claimed in the '916 patent within the United States, or imported any alleged invention claimed in the '916 patent into the United States. Fenwal therefore has not infringed and does not currently infringe any asserted claim of the '916 patent, literally or under the doctrine of equivalents, directly or indirectly. For example, with respect to asserted claim 14, the accused Fenwal products do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this junction without the benefit of formal claim construction): "a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor."

947. Fenwal has not actively induced any infringement of the '916 patent.

948. Fenwal has not contributed to any infringement of the '916 patent.

949. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the ’916 patent, that it has not actively induced the infringement of the ’916 patent, and that it has not contributed to the infringement of the ’916 patent.

**COUNT 13: INVALIDITY OF U.S. PATENT NO. 12,171,916**

950. Fenwal repeats and re-alleges paragraphs 1-949 as if fully set forth herein.

951. Due to at least the allegations contained in Haemonetics’ First Amended Complaint, an actual and justiciable controversy exists between Fenwal and Haemonetics concerning the validity of the ’916 patent.

952. The claims of the ’916 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* PGR2025-00078 (petition for post-grant review of U.S. Patent No. 12,171,916). The Court may take judicial notice of PGR2025-00078, which is a matter of public record before the USPTO, and which Fenwal incorporates by reference. *Lecat’s Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

953. For example, the claims of the ’916 patent are anticipated by the prior art, under 35 U.S.C. §§102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. Min

b. Barrett

c. Headley

d. “Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study,” Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. Turgut

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. Barry

i. Bainbridge

j. Kimura

k. Sakota

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

954. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '916 patent, are invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**COUNT 14: NON-INFRINGEMENT OF U.S. PATENT NO. 12,186,474**

955. Fenwal repeats and realleges paragraphs 1-954 as if fully set forth herein.

956. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fenwal (ECF No. 32), an actual and justiciable controversy exists between Fenwal and Haemonetics concerning alleged infringement of the U.S. Patent No. 12,186,474 ("the '474 patent").

957. Fenwal has not made, used, offered to sell, or sold any alleged invention claimed in the '474 patent within the United States, or imported any alleged invention claimed in the '474 patent into the United States. Fenwal therefore has not infringed and does not currently infringe any asserted claim of the '474 patent, literally or under the doctrine of equivalents, directly or

indirectly. For example, with respect to asserted claim 9, the accused Fenwal products do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this junction without the benefit of formal claim construction): "a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume, the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor."

958. Fenwal has not actively induced any infringement of the '474 patent.

959. Fenwal has not contributed to any infringement of the '474 patent.

960. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the '474 patent, that it has not actively induced the infringement of the '474 patent, and that it has not contributed to the infringement of the '474 patent.

**COUNT 15: INVALIDITY OF U.S. PATENT NO. 12,186,474**

961. Fenwal repeats and re-alleges paragraphs 1-960 as if fully set forth herein.

962. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fenwal and Haemonetics concerning the validity of the '474 patent.

963. The claims of the '474 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* PGR2025-00077 (petition for post-grant review of U.S. Patent No.

12,186,474). The Court may take judicial notice of PGR2025-00077, which is a matter of public record before the USPTO, and which Fenwal incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

964. For example, the claims of the '474 patent are anticipated by the prior art, under 35 U.S.C. §§102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. Min

b. Barrett

c. Headley

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. Turgut

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. Barry

i. Bainbridge

j. Kimura

k. Sakota

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

965. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the ’474 patent, are invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**PRAYER FOR RELIEF**

966. Fenwal respectfully requests that this Court enter judgment in its favor and grant the following relief:

i. A determination that Haemonetics has infringed each of the Fenwal Asserted Patents (the ’334 Patent, the ’748 Patent, the ’693 Patent, the ’891 Patent, the ’089 Patent, the ’251 Patent, the ’724 Patent, the ’873 Patent, and the ’624 Patent).

ii. An award of a permanent injunction enjoining Haemonetics form continuing to infringe, directly and indirectly, the ’334, ’748, ’693, ’891, ’089, ’251, ’724, ’873, and the ’624 Patents;

iii. An award of damages to be paid by Haemonetics adequate to compensate Fenwal for Haemonetics’ infringement of the ’334, ’748, ’693, ’891, ’089, ’251, ’724, ’873, and the ’624 Patents that is no less than a reasonable royalty for the use of the Accused Haemonetics Products or lost profits suffered by Fenwal, as well as pre- and post-judgment interest;

iv. An adjudication that Haemonetics’ infringement has been willful and an award of treble damages;

v. A determination and declaratory judgment that Fenwal has not infringed any valid claim of the ’652 patent;

vi. A determination and declaratory judgment that each and every claim of the ’652 patent is invalid;

vii. A determination and declaratory judgment that Fenwal has not infringed any valid claim of the ’916 patent;

viii. A determination and declaratory judgment that each and every claim of the ’916 patent is invalid;

ix. A determination and declaratory judgment that Fenwal has not infringed any valid claim of the ’474 patent;

x. A determination and declaratory judgment that each and every claim of the ’474 patent is invalid;

xi. An order declaring that this is an exceptional case and awarding Fenwal its costs, expenses, and reasonable attorneys’ fees under 35 U.S.C. § 285 and/or 15 U.S.C. § 1117(a) and all other applicable statutes, rules, and common law;

xii. All costs be taxed against Haemonetics; and

xiii. Any such other relief as the Court may deem appropriate and just under the circumstances.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Fenwal, by and through is undersigned counsel, hereby demands a trial by jury on all claims so triable in this action.

*    *    *

# FENWAL'S ANSWER AND DEFENSES TO HAEMONETICS' FIRST AMENDED COMPLAINT

## GENERAL DENIAL

Pursuant to Fed. R. Civ. P. 8(b)(3), Fenwal denies all allegations in Haemonetics' First Amended Complaint ("FAC"), whether express or implied, except those specifically admitted below. Each of the paragraphs 1-178 below corresponds to the same-numbered paragraphs in Haemonetics' FAC. Any factual allegation below is admitted only as to the specific admitted facts, not as to any purported conclusions, characterizations, implications, or speculations that arguably follow from the admitted facts. Fenwal denies that Haemonetics is entitled to the relief requested or any other relief.

Pursuant to Fed. R. Civ. P. 15(a)(3), Fenwal hereby answers Haemonetics' FAC as follows:

## NATURE OF ACTION[179]

1. This is an action for patent infringement of U.S. Patent Nos. 10,758,652 (the "'652 Patent"), 12,171,916 (the "'916 Patent"), and 12,186,474 (the "'474 Patent") (collectively, the "Asserted Patents"). This action arises under the United States patent laws, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271 and 281.

**ANSWER**: Paragraph 1 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal admits that Haemonetics' FAC purports to be a patent infringement action alleging infringement pursuant to the United States patent laws, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271 and 281. To the extent there are allegations not expressly admitted above, those allegations are denied.

## THE PARTIES

2. Haemonetics is a Massachusetts corporation with its principal place of business at 125 Summer Street, Boston, MA 02110.

---

179 Fenwal repeats the headings recited in the FAC for convenience. To the extent such headings contain factual allegations to which a response is required, Fenwal denies all such allegations.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 2, and, therefore, denies those allegations.

3. On information and belief, Fresenius Kabi USA, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at Three Corporate Drive, Lake Zurich, Illinois 60047.

**ANSWER**: Admitted.

4. On information and belief, Fresenius Kabi USA, LLC, alone or in concert with the other Defendants, manufactures and distributes plasma collection systems, including the Aurora Xi Plasmapheresis System (the "Accused Products").

**ANSWER**: Denied.

5. On information and belief, Fresenius Kabi USA, LLC, alone or in concert with the other Defendants, sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services into the stream of commerce that incorporate infringing technology knowing that they would be sold and or used in this judicial district and elsewhere in the United States.

**ANSWER**: Paragraph 5 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies those allegations.

6. On information and belief, Fresenius Kabi AG is a corporation organized and existing under the laws of Germany with its principal place of business at Else-Kröner-Straße 1, 61352 Bad Homburg, Germany.

**ANSWER**: Admitted.

7. On information and belief, Fresenius Kabi AG, alone or in concert with the other Defendants, manufactures and distributes the "Accused Products".

**ANSWER**: Denied.

8. On information and belief, Fresenius Kabi AG, alone or in concert with the other Defendants, sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services into the stream of commerce that incorporate infringing technology knowing that they would be sold and or used in this judicial district and elsewhere in the United States.

**ANSWER**: Paragraph 8 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies those allegations.

9. On information and belief, Fenwal, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at Three Corporate Drive, Lake Zurich, Illinois 60047.

**ANSWER**: Admitted.

10. On information and belief and based on the representation of defense counsel, Fenwal, Inc., alone or in concert with the other Defendants, manufactures and distributes the "Accused Products".

**ANSWER**: Paragraph 10 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies those allegations.

11. On information and belief and based on the representation of defense counsel, Fenwal, Inc., alone or in concert with the other Defendants, sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services into the stream of commerce that incorporate infringing technology knowing that they would be sold and or used in this judicial district and elsewhere in the United States.

**ANSWER**: Paragraph 11 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies those allegations.

12. All allegations contained within this First Amended Complaint relating to Fenwal, Inc. are based on the representations of defense counsel.

**ANSWER**: Denied.

**JURISDICTION AND VENUE**

13. This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

**ANSWER**: Paragraph 13 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal admits that Haemonetics purports to bring this action under the Patent Laws of the United States, Title 35 of the United States Code. To the extent there are allegations not expressly admitted above, those allegations are denied.

14. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER**: Paragraph 14 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal does not contest subject matter jurisdiction in the Northern

District of Illinois for purposes of this litigation. To the extent there are allegations not expressly admitted above, those allegations are denied.

15. Venue is proper in this judicial district under 28 U.S.C. § 1400(b) because Fresenius Kabi USA, LLC and Fenwal, Inc. reside in this District, have regular and established places of business in this District, and have committed acts of infringement in this District.

**ANSWER**: Paragraph 15 contains legal conclusions to which no answer is required. To the extent an answer is required, for purposes of this litigation, Fenwal does not contest venue in the Northern District of Illinois. To the extent there are allegations not expressly admitted above, those allegations are denied.

16. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) – (c) because Fresenius Kabi AG has committed acts of infringement in this District, including at least the sale of infringing Accused Products in this District, and because at least one of the Defendants is incorporated in the State of Delaware.

**ANSWER**: Paragraph 16 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies the allegations.

17. Venue is proper in this judicial district under 28 U.S.C. § 1391(c)(3) because Fresenius Kabi AG is a foreign company and may be sued in any judicial district.

**ANSWER**: Paragraph 17 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies the allegations.

18. Fresenius Kabi USA, LLC is subject to this Court's general and specific personal jurisdiction because, on information and belief, it is registered to do business in the state of Illinois. Fresenius Kabi USA, LLC has purposefully availed itself of the privileges and benefits of the laws of the state of Illinois. And, on information and belief, Fresenius Kabi USA, LLC has sufficient minimum contacts with the state of Illinois, regularly conducts and solicits business within the state of Illinois, and Haemonetics' causes of action arise directly from Fresenius Kabi USA, LLC's business contacts and other activities in the state of Illinois. Additionally, Fresenius Kabi USA, LLC, either directly or through its related entities, has purposefully and voluntarily placed its infringing products into the stream of commerce with the intention and expectation that they will be acquired and used by customers in this District.

**ANSWER**: Paragraph 18 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies the allegations.

19. Fresenius Kabi USA, LLC engages in activities within this judicial district that infringe (directly or indirectly) the Asserted Patents, either literally or under the doctrine of equivalents, including the provision of, use, operation, sales, offering for sale, installation, and advertising of the Accused Products. Fresenius Kabi USA, LLC also infringes the Asserted Patents by making, using, offering for sale, selling, installing, maintaining, providing instructions, and/or advertising the Accused Products within this District, either literally or under the doctrine of equivalents.

**ANSWER**: Paragraph 19 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies those allegations.

20. Fresenius Kabi USA, LLC encourages and induces third parties, including partners and customers, to use the Accused Products in an infringing way at least by advertising and distributing the Accused Products and providing instructions, materials, training, and services regarding the Accused Products.

**ANSWER**: Paragraph 20 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies those allegations.

21. Fenwal, Inc. is subject to this Court's general and specific personal jurisdiction because, on information and belief, it is registered to do business in the state of Illinois. Fenwal, Inc. has purposefully availed itself of the privileges and benefits of the laws of the state of Illinois. And, on information and belief, Fenwal, Inc. has sufficient minimum contacts with the state of Illinois, regularly conducts and solicits business within the state of Illinois, and Haemonetics' causes of action arise directly from Fenwal, Inc.'s business contacts and other activities in the state of Illinois. Additionally, based on the representations of defense counsel, Fenwal, Inc., either directly or through its related entities, has purposefully and voluntarily placed its infringing products into the stream of commerce with the intention and expectation that they will be acquired and used by customers in this District.

**ANSWER**: Paragraph 21 contains legal conclusions to which no answer is required. Fenwal admits it is registered to do business in the State of Illinois. Fenwal denies any remaining allegations.

22. Fenwal, Inc. engages in activities within this judicial district that infringe (directly or indirectly) the Asserted Patents, either literally or under the doctrine of equivalents, including the provision of, use, operation, sales, offering for sale, installation, and advertising of the Accused Products. Fenwal, Inc. also infringes the Asserted Patents by making, using, offering for sale, selling, installing, maintaining, providing instructions, and/or advertising the Accused Products within this District, either literally or under the doctrine of equivalents.

**ANSWER**: Paragraph 22 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies those allegations.

23. Fenwal, Inc. encourages and induces third parties, including partners and customers, to use the Accused Products in an infringing way at least by advertising and distributing the Accused Products and providing instructions, materials, training, and services regarding the Accused Products.

**ANSWER**: Paragraph 23 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal denies those allegations.

24. Fresenius Kabi AG is subject to this Court's general and specific personal jurisdiction because, on information and belief, it has purposefully availed itself of the privileges and benefits of the laws of the state of Illinois. And, on information and belief, Fresenius Kabi AG has sufficient minimum contacts with the state of Illinois, regularly conducts and solicits business within the state of Illinois, and Haemonetics' causes of action arise directly from Fresenius Kabi AG's business contacts and other activities in the state of Illinois. Additionally, Fresenius Kabi AG, either directly or through its related entities, has purposefully and voluntarily placed its infringing products into the stream of commerce with the intention and expectation that they will be acquired and used by customers in this District.

**ANSWER**: Paragraph 24 contains legal conclusions to which no answer is required. Fenwal lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 24, and, therefore, denies those allegations.

25. Fresenius Kabi AG is also subject to this Court's general and specific personal jurisdiction pursuant to 28 U.S.C. § 1391(c)(3) because it is a foreign company.

**ANSWER**: Paragraph 25 contains legal conclusions to which no answer is required. Fenwal lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 25, and, therefore, denies those allegations.

26. Fresenius Kabi AG engages in activities within this judicial district that infringe (directly or indirectly) the Asserted Patents, either literally or under the doctrine of equivalents, including the provision of, use, operation, sales, offering for sale, installation, and advertising of the Accused Products. Fresenius Kabi AG also infringes the Asserted Patents by making, using, offering for sale, selling, installing, maintaining, providing instructions, and/or advertising the Accused Products within this District, either literally or under the doctrine of equivalents.

**ANSWER**: Paragraph 26 contains legal conclusions to which no answer is required. Fenwal lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 21, and, therefore, denies those allegations.

27. Fresenius Kabi AG encourages and induces third parties, including partners and customers, to use the Accused Products in an infringing way at least by advertising and distributing the Accused Products and providing instructions, materials, training, and services regarding the Accused Products.

**ANSWER**: Paragraph 27 contains legal conclusions to which no answer is required. Fenwal lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 27, and, therefore, denies those allegations.

## BACKGROUND

28. Haemonetics is a global medical technology company dedicated to improving the quality, effectiveness, safety, and efficiency of healthcare. Haemonetics' innovative solutions address critical medical needs, including end-to-end plasma collection technologies to optimize operations for plasma centers; products to enable blood centers to collect blood components in the greatest demand; and a suite of hospital technologies designed to help enhance clinical outcomes and advance standards of care.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 28 and therefore denies those allegations.

29. Haemonetics Corporation was formed in 1971 by Jack Latham to develop and market apheresis and transfusion systems. Mr. Latham created the revolutionary Latham Bowl, an integral component for separating blood into its various components so that desired components can be collected while unneeded components can be returned to the donor, improving efficiency of donation while decreasing the time the donor must wait to make another donation. Mr. Latham's technology formed a foundation for the apheresis and transfusion systems used today. Haemonetics has been improving upon Mr. Latham's concepts and continuing to innovate in these areas ever since.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 29 and therefore denies those allegations.

30. Haemonetics invests significant resources into these improvements. For example, for the fiscal year that ended March 30, 2024, Haemonetics invested over $64 million in research and development of its products, which is directed out of its laboratory in Boston, Massachusetts.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 30 and therefore denies those allegations.

31. Through its research and development efforts, Haemonetics has become an industry leader in plasma solutions, providing integrated plasma collection systems.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 3, and therefore denies those allegations.

32. Plasma donation centers utilize Haemonetics' systems to collect blood plasma from donors. Haemonetics' systems collect physical characteristic information from a donor, collect the donor's blood, utilize the revolutionary centrifugation bowl technology and method to separate plasma from the donor blood, and then return the blood components, without the plasma, back to the donor.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 32 and therefore denies those allegations.

33. Haemonetics' systems are cleared by the United States Food and Drug Administration (the "U.S. FDA") and actively and commercially used to efficiently collect donated plasma.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 33 and therefore denies those allegations.

34. Human plasma is the indispensable source material for drugs that are known as plasma-derived medicinal products. Most of the plasma intended for fractionation into plasma-derived medicinal products is collected by plasmapheresis and is known as "source plasma." The frequency and volume of source plasma donations are strictly regulated by national regulatory authorities, for example by the U.S. FDA.

**ANSWER**: Fenwal admits that human plasma can be a source material for plasma-derived medicinal products. Fenwal admits that plasmapheresis is a process for the collection of plasma. Fenwal admits that the U.S. FDA has regulations regarding plasma donations. To the extent further answer is required, Fenwal lacks knowledge sufficient to answer and therefore denies those allegations.

35. After more than 20 years commercializing its market-leading PCS®2 plasmapheresis device, in 2017, Haemonetics announced its next generation NexSys PCS®

plasmapheresis system, which today is used throughout the United States for plasma donation collection. Haemonetics' NexSys PCS® with YES® Technology, introduced in 2018, provides higher plasma collection volumes per donation by stopping the blood collection volume only when the correct volume of actual plasma, excluding the anticoagulant added during the procedure, has been reached. In 2020, Haemonetics introduced the NexSys PCS® with PERSONA® Technology, a proprietary plasma collection system that yields more plasma per donation on average, resulting in a more efficient donation and more efficient device functionality. Both technologies were significant leaps forward in the plasma collection field when released by Haemonetics, providing a way to collect more plasma per donation on average, thereby optimizing the donation volume for each donor and improving collection efficiency.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 35 and therefore denies those allegations.

36. Haemonetics designs, manufactures, and sells its NexSys PCS® systems to plasma collection companies that use them in the collection of plasma at donation centers around the country. Individual donors are then able to donate plasma utilizing Haemonetics' systems when visiting a donation center.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 36 and therefore denies those allegations.

37. Haemonetics has long been the industry leader in plasma collection systems, with five decades of industry experience and over 75 million collections to date on NexSys PCS®, including over 30 million collections using Persona® Technology. The NexSys PCS® is the industry's most advanced, completely integrated system designed to streamline plasma collections and improve yield, productivity, safety, quality, compliance, and donor satisfaction.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 37 and therefore denies those allegations.

38. Haemonetics has invested millions of dollars into research and development of the NexSys PCS® with YES® Technology and NexSys PCS® with PERSONA® Technology.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 38 and therefore denies those allegations.

## ASSERTED PATENTS

39. During the research and development of its NexSys PCS® systems, Haemonetics recognized that other plasma collection systems were inefficient and not optimized for plasma collection. Plasma collection amounts were primarily based on the U.S. FDA's "simplified nomogram" ("Volume Limits - Automated Collection of Source Plasma," November 1992), which

prescribed the amount of blood plasma that could be collected based on three categories of donor weight. Because donors were classified into one of just three weight ranges, however, and because physiology of individual donors varies even within a particular weight category, collections were inefficient and did not tailor the amount of plasma that could safely be taken from an individual donor.

**ANSWER**: Fenwal admits that the U.S. FDA authored a document titled "Volume Limits – Automated Collection of Source Plasma" in November 1992 that references a "simplified nomogram" and included three categories of donor weight. To the extent further answer is required, Fenwal lacks knowledge or information to form a basis as to the truth of the remaining allegations in paragraph 39 and therefore denies those allegations.

40. At the time Haemonetics developed the NexSys PCS® system, plasma collection systems on the market utilized the U.S. FDA's simplified nomogram. Prior collection systems also only focused on the full collection volume of a donation procedure—which includes both anticoagulant and blood plasma—instead of homing in on the actual blood plasma-only volume. So, plasma collections which fell into the U.S. FDA-prescribed ranges indeed included less plasma than allowed because some of the counted volume was merely anticoagulant.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 40 and therefore denies those allegations.

41. Recognizing these deficiencies in prior collection systems, Haemonetics created innovative approaches to plasma collection systems, embodied in their NexSys PCS® with YES® Technology and PERSONA® Technology. These technologies optimized plasma collections on an individual basis by focusing on accuracy of each collection—based on a donor's individual characteristics—and still ensuring the safety of the donor.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 41 and therefore denies those allegations.

42. The NexSys PCS® with PERSONA® Technology is configured to utilize an individual donor's actual height, weight, and hematocrit to calculate the correct volume of plasma to be collected, within the guidelines the U.S. FDA cleared for YES® (2018) and PERSONA® (2020). This individually tailored approach typically yields an increased amount of plasma collected during one donation, on average, while still ensuring the safety and comfort of the individual donor. In 2020, in a prospective, multicenter, double-blinded, randomized, controlled trial the NexSys PCS® with PERSONA® Technology was used with 3,443 donors in over 23,000 donations to demonstrate a plasma collection yield improvement, on average of 8% per donation as compared to the NexSys PCS® with YES® Technology alone.

**ANSWER**: Fenwal admits that NexSys PCS® with PERSONA® "utilize[s] an individual donor's actual height, weight, and hematocrit" to calculate the volume of plasma to be collected. To the extent that further answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the remaining allegations in paragraph 42 and therefore denies those allegations.

43. Haemonetics' NexSys PCS® with YES® Technology is configured to calculate the volume of actual plasma within the collection container, instead of utilizing the plasma and anticoagulant volume as a base for determining when to stop the collection. Collections performed with the NexSys PCS® system with YES® Technology achieve an average increase in yield of 18-26 mL of plasma per donation over the same system without YES® Technology implemented.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 43 and therefore denies those allegations.

44. Again, this approach and these specially-configured systems allow for increased plasma collection during a single donation without impacting the safety or comfort of the donor. The increases in plasma collected in each procedure offered by Haemonetics' innovations revolutionized the industry. The increases, multiplied by the tens of millions of collections each year, offered hundreds of thousands of liters of additional plasma available to be collected from the same pool of donors, having a value of hundreds of million dollars for the plasma collection/fractionation industry.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 44 and therefore denies those allegations.

45. Haemonetics patented these novel approaches and systems beginning in 2017. The patents acknowledged the issues in the prior art and created novel systems to overcome the existing shortcomings.

**ANSWER**: Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 45 and therefore denies those allegations.

46. For example, as explained in the '652 Patent: "Prior art plasma collection systems are unable to determine the total volume of plasma that has been collected (*e.g.*, because the product collected is a mixture of plasma and anticoagulant) and, therefore collect based on the total collection volume, even if the total volume of plasma that has been collected is below the limit prescribed by the FDA." Exhibit A at 1:38-44.

**ANSWER**: Fenwal admits that the '652 Patent, at 1:38-44, states: "Prior art plasma collection systems are unable to determine the total volume of plasma that has been collected (*e.g.*, because the product collected is a mixture of plasma and anticoagulant) and, therefore collect based on the total collection volume, even if the total volume of plasma that has been collected is below the limit prescribed by the FDA." To the extent further answer is required, Fenwal lacks knowledge sufficient to answer and therefore denies those allegations.

47. Haemonetics recognized the inefficiencies in existing approaches and patented its systems which optimized the collection process by more efficiently collecting an optimized volume of plasma per-patient with increased accuracy pursuant to U.S. FDA guidelines. The '652 Patent, which is exemplary of the Asserted Patents, discussed the problems inherent in the preexisting prior art plasma collection systems that the patent improves upon:

> Various embodiment[s] of the present invention provide numerous benefits over prior art plasma collection systems. In particular, as noted above, prior art plasmapheresis devices end plasma collection based on a total volume of anticoagulated plasma (*e.g.*, pure plasma plus the added anticoagulant). Although this is the easiest method because it requires only that the product collection container be weighed, the amount of true product—the pure plasma—is dependent on the donor's hematocrit. In other words, **prior art systems will collect more plasma from low hematocrit donors than from high hematocrit donors because of the variation of the percentage of anticoagulant in the product.**

*Id.* at 9:53-64 (emphasis added).

**ANSWER**: Fenwal admits the '652 Patent, at 9:53-64, states:

> Various embodiment[s] of the present invention provide numerous benefits over prior art plasma collection systems. In particular, as noted above, prior art plasmapheresis devices end plasma collection based on a total volume of anticoagulated plasma (*e.g.*, pure plasma plus the added anticoagulant). Although this is the easiest method because it requires only that the product collection container be weighed, the amount of true product—the pure plasma—is dependent on the donor's hematocrit. In other words, prior art systems will collect more plasma from low hematocrit donors than from high hematocrit donors because of the variation of the percentage of anticoagulant in the product.

To the extent further answer is required, Fenwal lacks knowledge sufficient to answer and therefore denies those allegations.

48. The plasma collection systems claimed in the Asserted Patents "address the issues of prior art systems by collecting a standard volume (*e.g.*, a target volume) of pure plasma from each donor." *Id.* at 9:65-67. The claimed systems improve upon the accuracy of prior art systems by "using knowledge of the donor's hematocrit and the amount of anticoagulant collected within the plasma collection container 216 (*e.g.*, by counting pump rotations and/or using scale/weight sensors, etc.) to determine the percentage of anticoagulant in the product." *Id*. at 10:2-6.

**ANSWER**: Fenwal admits the '652 Patent contains the following language:

> "address the issues of prior art systems by collecting a standard volume (*e.g.*, a target volume) of pure plasma from each donor."

'652 Patent at 9:65-67; and

> "using knowledge of the donor's hematocrit and the amount of anticoagulant collected within the plasma collection container 216 (*e.g.*, by counting pump rotations and/or using scale/weight sensors, etc.) to determine the percentage of anticoagulant in the product."

'652 Patent at 10:2-6. To the extent further answer is required, Fenwal lacks knowledge sufficient to answer and therefore denies those allegations.

49. The claimed invention allows the blood processing system to optimize plasma collection by tailoring the appropriate amount to each donor based on individualized donor information. Moreover, "by stopping the plasma collection process based on a volume of pure plasma collected, embodiments of the present invention are able to collect a greater volume of plasma as compared to prior art systems that stop based on a plasma/anticoagulant mixture." *Id.* at 10:6-11.

**ANSWER**: Fenwal admits the '652 Patent contains the following language:

> "by stopping the plasma collection process based on a volume of pure plasma collected, embodiments of the present invention are able to collect a greater volume of plasma as compared to prior art systems that stop based on a plasma/anticoagulant mixture."

'652 Patent at 10:6-11. To the extent further answer is required, Fenwal lacks knowledge sufficient to answer, and therefore denies those allegations.

50. As such, the Asserted Patents are directed to a "blood processing system that collects plasma" which is tailored to the individual donor and which is capable of determining the

actual plasma volume within a collection container with accuracy not seen before in this industry. *Id.* at 10:12-13.

**ANSWER**: Fenwal admits the ’652 Patent, at 10:6-11, contains the following language: “blood processing system that collects plasma.” To the extent further answer is required, Fenwal lacks knowledge sufficient to answer and therefore denies those allegations.

51. The claims of the Asserted Patents recite an improved blood processing system that optimizes plasma collection in a manner that improves upon the prior art. The claimed system is not merely focused on a computerized process via the controller; rather, the claims recite mechanical improvements and other hardware improvements (*e.g.*, optical sensors and weight sensors) that result in an accurate, efficient blood processing system to optimize the amount of plasma collected per donor, while ensuring the safety of the donor.

**ANSWER**: Paragraph 51 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 51 and therefore denies those allegations.

52. The elements claimed by the Asserted Patents, taken alone or in combination, were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of invention. Rather, the Asserted Patents teach unconventional methods and systems, utilizing the novel approaches described above and embodied in Haemonetics’ NexSys PCS® YES® and PERSONA® systems.

**ANSWER**: Paragraph 52 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 52 and therefore denies those allegations.

53. As explained in the specifications of the Asserted Patents, these unconventional approaches increase efficiency of the claimed plasma collection systems, resulting in more plasma collected, on average, per-donation, increasing the amount of donated plasma and availability of its components for life saving therapies, ensuring accuracy in the volume of plasma that is collected, without requiring an increase in the number of donations. The claims of the Asserted Patents accordingly describe technological solutions to the problems persistent in prior art collection systems and methods of how to collect the maximum allowable plasma volume from each donor. And these novel methods and systems result in maximum plasma collection volume without sacrificing a donor’s comfort level or safety.

**ANSWER**: Paragraph 53 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 53 and therefore denies those allegations.

54. The systems and methods covered by the Asserted Patents, therefore, differ from prior art collection systems and methods in use at the time of invention. The prior art systems lacked the novel features of the Asserted Patents, including, for example, tailoring collection volumes based on an individual donor's physical characteristics, determining the volume of actual plasma within a collection container, utilizing plasma weighers and optical sensors, and/or configuring an all-in-one plasma collection system capable of carrying out these methods.

**ANSWER**: Paragraph 54 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 54 and therefore denies those allegations.

55. By enabling a plasma collection system to perform these calculations and determinations resulting in a more efficient and accurate machine, the claims are directed to specific, unconventional improvements to the way plasma collection systems operate. Moreover, the claimed standalone plasma collection system can collect blood, provide anticoagulant, separate plasma, return blood components, and utilize a controller to make determinations about the correct volume of plasma and calculate that volume. The claimed invention constitutes an unconventional and novel approach and system that optimizes plasma collection.

**ANSWER**: Paragraph 55 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 55 and therefore denies those allegations.

56. The dependent claims are further directed to specific, unconventional improvements to the way plasma collection systems operate. They claim nuances in the specific ways in which target collection volume is calculated, which individual characteristics are used in performing calculation determinations, and different ways to configure the controller using identified ratios. The written description of the Asserted Patents provides details regarding these different calculations and ways of configuring the collection device to carry out the claimed methods.

**ANSWER**: Paragraph 56 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 56 and therefore denies those allegations.

57. The specific combination of claim elements recite systems and methods for a continuous nomogram for an individual donor in a way that had never been done before. This individualized nomogram created a new solution in the plasma donation industry. The inventive combinations of claim elements, whether previously known or unknown, constitute inventive concepts.

**ANSWER**: Paragraph 57 contains legal conclusions to which no answer is required. To the extent an answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 57 and therefore denies those allegations.

58. Haemonetics is the assignee and owner of the right, title, and interest in and to the ’652 Patent, including the right to assert all causes of action arising under the ’652 Patent and the right to any remedies for infringement thereof.

**ANSWER**: Paragraph 58 contains legal conclusions to which no answer is required. Fenwal admits Haemonetics Corporation is listed as the Assignee on the face of the ’652 Patent. To the extent a further answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 58 and therefore denies those allegations.

59. The ’652 Patent, entitled “System and Method for Collecting Plasma,” was duly issued by the United States Patent and Trademark Office on September 1, 2020 to Michael Ragusa. The ’652 Patent issued from United States Patent Application No. 15/608,183 which was filed on May 30, 2017. A copy of the ’652 Patent is attached as Exhibit A.

**ANSWER**: Fenwal admits the ’652 Patent states “System and Method for Collecting Plasma,” “Inventor: Michael Ragusa,” “Date of Patent: Sept. 1, 2020,” “Appl. No.: 15/608,183,” and “Filed: May 30, 2017.” Fenwal admits Exhibit A of the FAC purports to be a copy of the ’652 Patent. To the extent a further answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 59 and therefore denies those allegations.

60. The ’652 Patent is valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

**ANSWER**: Denied.

61. Haemonetics is the assignee and owner of the right, title, and interest in and to the ’916 Patent, including the right to assert all causes of action arising under the ’916 Patent and the right to any remedies for infringement thereof.

**ANSWER**: Paragraph 61 contains legal conclusions to which no answer is required. Fenwal admits Haemonetics Corporation is listed as the Assignee on the face of the ’916 Patent. To the extent a further answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 61 and therefore denies those allegations.

62. The ’916 Patent, entitled “System and Method for Collecting Plasma,” was duly issued by the United States Patent and Trademark Office on December 24, 2024 to Michael Ragusa. The ’916 Patent issued from United States Patent Application No. 17/205,374 which was filed on March 18, 2021. A copy of the ’916 Patent is attached as Exhibit B.

**ANSWER**: Fenwal admits the ’916 Patent states “System and Method for Collecting Plasma,” “Inventor: Michael Ragusa,” “Date of Patent: *Dec. 24, 2024,” “Appl. No.: 17/205,374,” and “Filed: Mar. 18, 2021.” Fenwal admits Exhibit B of the FAC purports to be a copy of the ’916 Patent. To the extent a further answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 62 and therefore denies those allegations.

63. The ’916 Patent is valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

**ANSWER**: Denied.

64. Haemonetics is the assignee and owner of the right, title, and interest in and to the ’474 Patent, including the right to assert all causes of action arising under the ’474 Patent and the right to any remedies for infringement thereof.

**ANSWER**: Paragraph 64 contains legal conclusions to which no answer is required. Fenwal admits Haemonetics Corporation is listed as the Assignee on the face of the ’474 Patent. To the extent a further answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 64 and therefore denies those allegations.

65. The ’474 Patent, entitled “System and Method for Collecting Plasma,” was duly issued by the United States Patent and Trademark Office on January 7, 2025 to Michael Ragusa. The ’474 Patent issued from United States Patent Application No. 17/205,400 which was filed on March 18, 2021. A copy of the ’474 Patent is attached as Exhibit C.

**ANSWER**: Fenwal admits the ’474 Patent states “System and Method for Collecting Plasma,” “Inventor: Michael Ragusa,” “Date of Patent: *Jan. 7, 2025,” “Appl. No.: 17/205,400,” and “Filed: Mar. 18, 2021.” Fenwal admits Exhibit C of the FAC purports to be a copy of the ’474 Patent. To the extent a further answer is required, Fenwal lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 65 and therefore denies those allegations.

66. The ’474 Patent is valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

**ANSWER**: Denied.

67. Fresenius Kabi USA LLC has had knowledge of the ’652 Patent, the ’916 Patent, and the ’474 Patent at least since the filing of the first Complaint on July 25, 2025.

**ANSWER**: Denied.

68. On information and belief, Fresenius Kabi AG and Fenwal, Inc. have had knowledge of the ’652 Patent, the ’916 Patent, and the ’474 Patent at least since the filing of the original Complaint on July 25, 2025.

**ANSWER**: Denied.

## ACCUSED PRODUCTS

69. On information and belief, Defendants make, use, sell, offer for sale, and/or import the Aurora Xi Plasmapheresis System (“Aurora Xi System”).

**ANSWER**: Denied.

70. For example, the Aurora Xi System is advertised on Fresenius Kabi USA, LLC’s website. *See, e.g.,* https://plasma.fresenius-kabi.us/devices/; https://www.fresenius-kabi.com/us/products/medtech. On its website, Fresenius Kabi USA, LLC provides “plasma support” and “customer service” through Fresenius Kabi email addresses: plasma.us@fresenius-kabi.com and MDservice.usa@fresenius-kabi.com. See https://plasma.fresenius-kabi.us/devices/. Similarly, that website includes plasma support, customer service, and sales phone numbers which connect to Fresenius Kabi. Id. Fresenius Kabi USA, LLC also provides publicly-available videos

on YouTube regarding these systems. *See, e.g.,* https://www.youtube.com/watch?v=F1fBzM2gcdk.

**ANSWER**: Fenwal admits the Aurora Xi System is referenced on the website https://plasma.fresenius-kabi.us/devices/. Fenwal denies that the Aurora Xi System is referenced on the website https://www.fresenius-kabi.com/us/products/medtech. Fenwal admits the phrases "plasma support" and "customer service" and the email addresses plasma.us@fresenius-kabi.com and MDservice.usa@fresenius-kabi.com appear on the website https://plasma.fresenius-kabi.us/devices/. Fenwal admits phone numbers appear on the website https://plasma.fresenius-kabi.us/devices/. Fenwal also admits the Aurora Xi System is shown in the video at https://www.youtube.com/watch?v=F1fBzM2gcdk. Fenwal denies any of these websites demonstrate Fenwal makes, uses, sells, offers for sale, and/or imports the Aurora Xi Plasmapheresis System ("Aurora Xi System"). To the extent a further answer is required, Fenwal denies those allegations.

71. Fresenius Kabi AG is also directly associated with the Aurora Xi System according to publicly-available sources. For example, when the Aurora Xi System received FDA clearance on January 24, 2025, the applicant was listed as "Fresenius Kabi AG."[180] *See* https://www.fda.gov/media/185301/download. Fresenius Kabi AG referred to this on its May 7, 2025 Q1 earnings call as follows: "we received FDA clearance for ***our*** new Adaptive Nomogram software. We expect to distribute this to more than 160 US plasma collection centers by the end of 2025." https://www.fresenius.com/sites/default/files/2025-05/Fresenius_Transcript_Q1_25_20250507.pdf (emphasis added). The Fresenius Kabi AG 2024 Annual Report further acknowledged that it was Fresenius Kabi AG who "developed a software solution to optimize plasma yield and donor efficiency" and submitted it to the FDA in 2024. https://www.fresenius.com/sites/default/files/2025-03/Fresenius_Annual_Report_2024.pdf at 101. This same Annual Report indicates that the "disposable products for ***our*** Aurora Xi" are produced in the Haina plant in the Dominican Republic. *Id.* at 125. Thus, on information and belief, Fresenius Kabi AG and/or Fresenius Kabi USA, LLC imports these disposable products into the United States for sale.

[180] Notably, the correspondent address for the 2025 FDA application was that belonging to both Fresenius Kabi USA, LLC and Fenwal, Inc. further demonstrating the interplay between all three Defendant entities as it pertains to the Accused Products. https://www.fda.gov/media/185301/download.

**ANSWER**: Fenwal admits https://www.fda.gov/media/185301/download states "Applicant Name: Fresenius Kabi AG." Fenwal admits https://www.fresenius.com/sites/default/files/2025-05/Fresenius_Transcript_Q1_25_20250507.pdf is a "Transcript Conference Call Q1 2025 results" with Fresenius SE & Co. KGaA corporate participants. In the transcript, Michael Sen, the CEO of Fresenius SE & Co. KGaA, stated "we received FDA clearance for our new Adaptive Nomogram software. We expect to distribute this to more than 160 US plasma collection centers by the end of 2025." Fenwal admits the https://www.fresenius.com/sites/default/files/2025-03/Fresenius_Annual_Report_2024.pdf website is a "Fresenius Annual Report" that states: "For our plasma donation product, Aurora Xi, we developed a software solution to optimize plasma yield and donor efficiency. The corresponding clinical study was successfully completed, and the software update was submitted to the FDA for review in October 2024." Fenwal denies the allegation that "[t]his same Annual Report indicates that the 'disposable products for our Aurora Xi' are produced in the Haina plant in the Dominican Republic," as the exact quotation provided by Haemonetics does not appear in the Annual Report. Fenwal admits the Annual Report states "disposable products of the successor system, Aurora Xi, are also produced in Haina." Fenwal objects to the footnote on the bottom of page 17 of the FAC pursuant Fed. Rule Civ. Pro. 10(b) as improper. Fenwal denies any remaining allegations of paragraph 71 including statements in footnotes on page 17 of the FAC.

72. Moreover, the Aurora Xi operator's manual published in 2025 lists Fresenius Kabi AG on the cover page. https://eifu.fresenius-kabi.com/medtech/pages/viewers/pdf?projectKey=66941d1caf17220d655e1cc7&itemKey=67be172ce73ea60e227ff26d. The same manual provides "Manufacturing facility / Manufactured by: Fresenius Kabi Warrendale," a Fresenius Kabi manufacturing facility in Warrendale, Pennsylvania. *Id.*

**ANSWER**: Fenwal admits the Aurora Xi operator's manual found at https://eifu.fresenius-kabi.com/medtech/pages/viewers/pdf?projectKey=66941d1caf17220d655e1cc7&itemKey=67be172ce73ea60e227ff26d lists Fresenius Kabi AG on the cover page and states "Manufacturing facility / Manufactured by: Fresenius Kabi Warrendale 770 Commonwealth Drive Warrendale, PA 15086 USA." Fenwal denies any remaining allegations of paragraph 72.

73. Additionally, Fresenius Kabi AG owns all copyrights to the "Fresenius Kabi Transfusion and Cell Technologies Product Catalog" which includes the Aurora Xi system and accessories (at pages 23-25). https://www.fresenius-kabi.com/content/dam/fresenius-kabi/us/documents/products/medtech/catalogs/Transfusion%20and%20Cell%20Technologies%20Product%20Catalog.pdf.coredownload.inline.pdf.

**ANSWER**: Fenwal admits that the "Fresenius Kabi Transfusion and Cell Technologies Product Catalog" available at https://www.fresenius-kabi.com/content/dam/fresenius-kabi/us/documents/products/medtech/catalogs/Transfusion%20and%20Cell%20Technologies%20Product%20Catalog.pdf.coredownload.inline.pdf, states "Copyright © 2025 Fresenius Kabi AG" and references the "Aurora Xi Plasmapheresis System." Fenwal denies any remaining allegations of paragraph 73.

74. Accordingly, on information and belief both Fresenius Kabi USA, LLC and Fresenius Kabi AG are involved with the make, use, sale, offer for sale, and importation of the Accused Products.

**ANSWER**: Denied.

75. Based on the representation of defense counsel, Fenwal, Inc. makes, uses, sells, offers for sale, and/or imports the Aurora Xi System.

**ANSWER**: Paragraph 75 contains legal conclusions to which a response is not required. To the extent a response is required, Fenwal denies any such allegations.

76. Defendants' Aurora Xi System is used to collect blood, process and remove plasma, and return blood to a donor. The Aurora Xi System received FDA clearances in September 2016 and December 2022. On January 24, 2025, Fresenius received clearance from the FDA for the Aurora Xi System with an "Adaptive Nomogram." *See* https://www.fresenius-kabi.com/us/news-and-events/receives-fda-510k-clearance-adaptive-nomogram-enhancing-plasma-collection-efficiency-aurora-xi-plasmapheresis-system; *see* also https://www.fda.gov/vaccines-blood-

biologics/substantially-equivalent-510k-device-information/bk251160-adaptive-nomogram-bottle (Fresenius Kabi AG received FDA clearance for the Adaptive Nomogram Bottle). According to Fresenius, among the Adaptive Nomogram's innovative features, "[t]he newly cleared Adaptive Nomogram considers each donor's individual characteristics in calculating the volume of plasma to collect, enabling an average 11.5% increase in plasma collection per donation." *Id.*

**ANSWER**: Fenwal admits the website https://www.fresenius-kabi.com/us/news-and-events/receives-fda-510k-clearance-adaptive-nomogram-enhancing-plasma-collection-efficiency-aurora-xi-plasmapheresis-system states "Fresenius Kabi Receives FDA 510(k) Clearance for Adaptive Nomogram, Enhancing Plasma Collection Efficiency with the Aurora Xi Plasmapheresis System" and "[t]he newly cleared Adaptive Nomogram considers each donor's individual characteristics in calculating the volume of plasma to collect, enabling an average 11.5% increase in plasma collection per donation while maintaining safe and effective operation," and bears the date January 28, 2025. Fenwal also admits the website https://www.fda.gov/vaccines-blood-biologics/substantially-equivalent-510k-device-information/bk251160-adaptive-nomogram-bottle references 510(k) Number BK251160, which relates to "Device Name: Adaptive Nomogram Bottle" and references a "Decision Date: 2/21/2025." To the extent there are allegations not expressly admitted above, Fenwal lacks knowledge sufficient to answer, and therefore denies those allegations.

77. On information and belief, Defendants have made the Accused Products available to third parties, including Haemonetics customers.

**ANSWER**: Denied.

78. On information and belief, each Defendant, either alone or in combination with one another, makes, sells, offers for sale, and distributes the Accused Products.

**ANSWER**: Denied.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 10,758,652

79. Haemonetics realleges and incorporates the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER**: Paragraph 79 does not contain allegations that require a response. To the extent a response is required, Fenwal denies any allegations.

80. On information and belief, Defendants have infringed and continue to infringe, directly and indirectly, literally and under the doctrine of equivalents, at least claims 11, 13, 14, 15, 16, 17, and 18 of the '652 Patent by making, using, selling, and/or offering for sale the Accused Products.

**ANSWER**: Denied.

81. Claim 11 of the '652 Patent covers a novel plasma collection system and recites:

A system for collecting plasma comprising:

a venous-access device for drawing whole blood from a subject and returning blood components to the subject;

a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device having an outlet and being configured to send the plasma component to a plasma container;

a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump;

an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood; and

a controller configured to control the operation of the blood component separation device and the blood draw pump, the controller configured to calculate (1) a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container, and (2) a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component, the controller configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container.

**ANSWER:** Fenwal admits Claim 11 of the '652 Patent states:

A system for collecting plasma comprising:

a venous-access device for drawing whole blood from a subject and returning blood components to the subject;

a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device

having an outlet and being configured to send the plasma component to a plasma container;

a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump;

an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood; and

a controller configured to control the operation of the blood component separation device and the blood draw pump, the controller configured to calculate (1) a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container, and (2) a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component, the controller configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container.

To the extent there are allegations not expressly admitted above, those allegations are denied.

82. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

83. The Accused Products are systems for collecting plasma.

**ANSWER**: Paragraph 83 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products are systems for collecting plasma as claimed in the ’652 Patent.

84. The Accused Products have a venous-access device for drawing whole blood from a subject and returning blood components to the subject.

**ANSWER**: Paragraph 84 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a venous-access device for drawing whole blood from a subject and returning blood components to the subject as required by the system for collecting plasma as claimed in the ’652 Patent.

85. The Accused Products have a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device having an outlet and being configured to send the plasma component to a plasma container.

**ANSWER**: Paragraph 85 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device having an outlet and being configured to send the plasma component to a plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

86. The Accused Products have a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump.

**ANSWER**: Paragraph 86 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump as required by the system for collecting plasma as claimed in the '652 Patent.

87. The Accused Products have an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood.

**ANSWER**: Paragraph 87 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood as required by the system for collecting plasma as claimed in the '652 Patent.

88. The Accused Products have a controller configured to control the operation of the blood component separation device and the blood draw pump.

**ANSWER**: Paragraph 88 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a controller configured

to control the operation of the blood component separation device and the blood draw pump as required by the system for collecting plasma as claimed in the '652 Patent.

89. The controllers of the Accused Products are configured to calculate a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container.

**ANSWER**: Paragraph 89 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are configured to calculate a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

90. The controllers of the Accused Products are also configured to calculate a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component.

**ANSWER**: Paragraph 90 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are also configured to calculate a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component as required by the system for collecting plasma as claimed in the '652 Patent.

91. The controllers of the Accused Products are configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container.

**ANSWER**: Paragraph 91 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

92. Claim 13 of the '652 Patent depends from claim 11 and recites:

A system according to claim 11, further comprising:

an anticoagulant source weight sensor configured to measure the weight of the anticoagulant source,

the controller further configured to monitor a change in volume within the anticoagulant source based on the measured weight of the anticoagulant source,

the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the change in volume within the anticoagulant source.

**ANSWER**: Fenwal admits Claim 13 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fenwal admits that Claim 13 recites:

A system according to claim 11, further comprising:

an anticoagulant source weight sensor configured to measure the weight of the anticoagulant source,

the controller further configured to monitor a change in volume within the anticoagulant source based on the measured weight of the anticoagulant source,

the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the change in volume within the anticoagulant source.

To the extent there are allegations not expressly admitted above, those allegations are denied.

93. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

94. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, supra.

**ANSWER**: Denied.

95. The Accused Products include an anticoagulant source weight sensor configured to measure the weight of the anticoagulant source.

**ANSWER**: Paragraph 95 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products include an anticoagulant source weight sensor configured to measure the weight of the anticoagulant source as required by the system for collecting plasma as claimed in the '652 Patent.

96. The Accused Products have a controller further configured to monitor a change in volume within the anticoagulant source based on the measured weight of the anticoagulant source.

**ANSWER**: Paragraph 96 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a controller further configured to monitor a change in volume within the anticoagulant source based on the measured weight of the anticoagulant source as required by the system for collecting plasma as claimed in the '652 Patent.

97. The Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the change in volume within the anticoagulant source.

**ANSWER**: Paragraph 97 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the change in volume within the anticoagulant source as required by the system for collecting plasma as claimed in the '652 Patent.

98. Claim 14 of the '652 Patent depends from claim 11 and recites:

> A system according to claim 11, wherein the controller is configured to monitor a number of rotations of an anticoagulant pump to determine a volume of anticoagulant introduced into the whole blood,
>
> the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the number of rotations of the anticoagulant pump.

**ANSWER**: Fenwal admits Claim 14 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fenwal admits that Claim 14 recites:

> A system according to claim 11, wherein the controller is configured to monitor a number of rotations of an anticoagulant pump to determine a volume of anticoagulant introduced into the whole blood,
>
> the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the number of rotations of the anticoagulant pump.

To the extent there are allegations not expressly admitted above, those allegations are denied.

99. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

100. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, *supra.*

**ANSWER**: Denied.

101. The Accused Products have a controller configured to monitor a number of rotations of an anticoagulant pump to determine a volume of anticoagulant introduced into the whole blood.

**ANSWER**: Paragraph 101 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a controller configured to monitor a number of rotations of an anticoagulant pump to determine a volume of anticoagulant introduced into the whole blood as required by the system for collecting plasma as claimed in the ’652 Patent.

102. The Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the number of rotations of the anticoagulant pump.

**ANSWER**: Paragraph 102 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the number of rotations of the anticoagulant pump as required by the system for collecting plasma as claimed in the ’652 Patent.

103. Claim 15 of the ’652 Patent depends from claim 11 and recites:

A system according to claim 11, further comprising:

an optical sensor located on the blood component separation device and configured to monitor the contents of the blood component separation device and determine if a volume of anticoagulant remains within the blood component separation device,

the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the volume of anticoagulant within the blood component separation device.

**ANSWER**: Fenwal admits Claim 15 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fenwal admits that Claim 15 recites:

A system according to claim 11, further comprising:

an optical sensor located on the blood component separation device and configured to monitor the contents of the blood component separation device and determine if a volume of anticoagulant remains within the blood component separation device,

the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the volume of anticoagulant within the blood component separation device.

To the extent there are allegations not expressly admitted above, those allegations are denied.

104. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

105. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, *supra.*

**ANSWER**: Denied.

106. The Accused Products include an optical sensor located on the blood component separation device and configured to monitor the contents of the blood component separation device and determine if a volume of anticoagulant remains within the blood component separation device.

**ANSWER**: Paragraph 106 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products include an optical sensor located on the blood component separation device and configured to monitor the contents of the blood component separation device and determine if a volume of anticoagulant remains within the blood component separation device as required by the system for collecting plasma as claimed in the '652 Patent.

107. The Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the volume of anticoagulant within the blood component separation device.

**ANSWER**: Paragraph 107 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products calculate the volume of

anticoagulant in the collected plasma component based, at least in part, on the volume of anticoagulant within the blood component separation device as required by the system for collecting plasma as claimed in the ’652 Patent.

108. Claim 16 of the ’652 Patent depends from claim 11 and recites:

A system according to claim 11, further comprising:

a plasma container weight sensor configured to monitor a volume of plasma component collected within the plasma container,

the calculated volume of pure plasma collected within the plasma component based, at least in part, on the monitored volume of collected plasma component.

**ANSWER**: Fenwal admits Claim 16 of the ’652 Patent purports to depend from claim 11 of the ’652 Patent. Fenwal admits that Claim 16 recites:

A system according to claim 11, further comprising:

a plasma container weight sensor configured to monitor a volume of plasma component collected within the plasma container,

the calculated volume of pure plasma collected within the plasma component based, at least in part, on the monitored volume of collected plasma component.

To the extent there are allegations not expressly admitted above, those allegations are denied.

109. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

110. The Accused products are a system according to claim 11. *See* ¶¶ 81-91, *supra*.

**ANSWER**: Denied.

111. The Accused Products include a plasma container weight sensor configured to monitor a volume of plasma component collected within the plasma container.

**ANSWER**: Paragraph 111 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products include a plasma container weight sensor configured to monitor a volume of plasma component collected within the plasma container as required by the system for collecting plasma as claimed in the ’652 Patent.

112. The Accused Products calculate the volume of pure plasma collected within the plasma component based, at least in part, on the monitored volume of collected plasma component.

**ANSWER**: Paragraph 112 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products calculate the volume of pure plasma collected within the plasma component based, at least in part, on the monitored volume of collected plasma component as required by the system for collecting plasma as claimed in the '652 Patent.

113. Claim 17 of the '652 Patent depends from claim 11 and recites:
A system according to claim 11, further comprising:

a plasma container weight sensor configured to monitor a weight of plasma component collected within the plasma container,

the calculated volume of pure plasma collected within the plasma component based, at least in part, on the monitored weight of collected plasma component.

**ANSWER**: Fenwal admits Claim 17 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fenwal admits that Claim 17 recites:

A system according to claim 11, further comprising:

a plasma container weight sensor configured to monitor a weight of plasma component collected within the plasma container,

the calculated volume of pure plasma collected within the plasma component based, at least in part, on the monitored weight of collected plasma component.

To the extent there are allegations not expressly admitted above, those allegations are denied.

114. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

115. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, *supra*.

**ANSWER**: Denied.

116. The Accused Products include a plasma container weight sensor configured to monitor a weight of plasma component collected within the plasma container.

**ANSWER**: Paragraph 116 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products include a plasma container weight sensor configured to monitor a weight of plasma component collected within the plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

117. The Accused Products calculate the volume of pure plasma collected within the plasma component based, at least in part, on the monitored weight of collected plasma component.

**ANSWER**: Paragraph 117 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products calculate the volume of pure plasma collected within the plasma component based, at least in part, on the monitored weight of collected plasma component as required by the system for collecting plasma as claimed in the '652 Patent.

118. Claim 18 of the '652 Patent depends from claim 11 and recites:

A system according to claim 11, further comprising:

an optical sensor located on the blood component separation device and configured to monitor a volume of red blood cells collected within the blood component separation device,

the controller configured to determine the subject's hematocrit based, at least in part, upon on the monitored volume of red blood cells collected within the blood component separation device and a volume of whole blood withdrawn from the subject.

**ANSWER**: Fenwal admits Claim 18 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fenwal admits that Claim 18 recites:

A system according to claim 11, further comprising:

an optical sensor located on the blood component separation device and configured to monitor a volume of red blood cells collected within the blood component separation device,

the controller configured to determine the subject's hematocrit based, at least in part, upon on the monitored volume of red blood cells collected within the blood component separation device and a volume of whole blood withdrawn from the subject.

To the extent there are allegations not expressly admitted above, those allegations are denied.

119. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

120. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, *supra.*

**ANSWER**: Denied.

121. The Accused Products include an optical sensor located on the blood component separation and configured to monitor a volume of red blood cells collected within the blood component separation device.

**ANSWER**: Paragraph 121 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products include an optical sensor located on the blood component separation and configured to monitor a volume of red blood cells collected within the blood component separation device as required by the system for collecting plasma as claimed in the '652 Patent.

122. The Accused Products have a controller configured to determine the subject's hematocrit based, at least in part, on the monitored volume of red blood cells collected within the blood component separation device and a volume of whole blood withdrawn from the subject.

**ANSWER**: Paragraph 122 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a controller configured to determine the subject's hematocrit based, at least in part, on the monitored volume of red blood cells collected within the blood component separation device and a volume of whole blood withdrawn from the subject as required by the system for collecting plasma as claimed in the '652 Patent.

123. On information and belief, Defendants market and sell the Accused Products in the United States to their partners, clients, customers, and/or end users who use the Accused Products across this country and in this District.

**ANSWER**: Denied.

124. On information and belief, Defendants have induced and continue to induce others to infringe at least one claim of the ‘652 Patent under 35 U.S.C. § 271(b) by, among other things, actively aiding and abetting others to infringe with specific intent or willful blindness, such others including, but not limited to, Defendants’ partners, clients, customers, and/or end users, whose use of the Accused Products constitutes direct infringement of at least one claim of the ’652 Patent.

**ANSWER**: Denied.

125. In particular, on information and belief, Defendants’ actions that aid and abet others such as their partners, clients, customers, and/or end users to infringe include advertising and distributing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.

**ANSWER**: Denied.

126. On information and belief, Defendants are liable for contributory infringement of the ’652 Patent under 35 U.S.C. § 271(c) for offering to sell and selling in the United States the Accused Products which are especially made or adapted for use to infringe the ’652 Patent. The Accused Products are a material component for use in practicing the ’652 Patent, are specifically made for an infringing use, and are not a staple article of commerce suitable for a non-infringing use. For example, the Accused Products and the example functionality described above have no substantial non-infringing uses, but are specifically designed to practice the claims of the ’652 Patent. The Accused Products have no substantial non-infringing uses because the accused functionality is an integral part of the Accused Products and must be performed for the Accused Products to perform their intended purpose. Indeed, the Accused Products are plasma collection systems, containing all the structural elements claimed in the ’652 Patent, specifically designed for plasma collection.

**ANSWER**: Denied.

127. In addition, the Accused Products provided by Defendants constitute a material part of the claimed invention, providing all components and features of the claimed system of the ’652 Patent. For example, the Accused Products constitute a material part of the invention claimed because they contain each and every element of the claimed system, including a venous-access device, blood component separation device, plasma container, blood draw line, blood drawn pump, anticoagulant line, anticoagulant source, and a controller configured to carry out the claimed functionality.

**ANSWER**: Denied.

128. On information and belief, the infringing acts of each partner or customer regarding the Accused Product are attributable to Defendants. For example, on information and belief, Defendants direct and control the activities or actions of their third-party customers in connection with the Accused Products by contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Product which, when followed and used, result in infringement.

**ANSWER**: Denied.

129. As a consequence of Defendants' direct and indirect infringement of the '652 Patent, both literally and under the doctrine of equivalents, Haemonetics has been and continues to be irreparably harmed.

**ANSWER**: Denied.

130. On information and belief, Defendants' infringement of the '652 Patent will continue in the future, and Haemonetics will be irreparably harmed as a consequence unless Defendants' infringing acts are enjoined by this Court.

**ANSWER**: Denied.

**COUNT II – INFRINGEMENT OF U.S. PATENT NO. 12,171,916**

131. Haemonetics realleges and incorporates the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER**: Paragraph 131 does not contain allegations that require a response. To the extent an answer is required, Fenwal denies any allegations.

132. On information and belief, Defendants have infringed and continue to infringe, directly and indirectly, literally and under the doctrine of equivalents, at least claim 14 of the '916 Patent by making, using, selling, and/or offering for sale the Accused Products.

**ANSWER**: Denied.

133. Claim 14 of the '916 Patent covers a novel plasma collection system and recites:

A system for collecting plasma comprising:

a venipuncture needle configured to draw whole blood from a donor;

a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;

a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump;

an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump;

a touchscreen configured to receive input from an operator; and

a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

**ANSWER**: Fenwal admits Claim 14 of the '916 Patent recites:

A system for collecting plasma comprising:

a venipuncture needle configured to draw whole blood from a donor;

a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;

a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump;

an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump;

a touchscreen configured to receive input from an operator; and

a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

To the extent there are allegations not expressly admitted above, those allegations are denied.

134. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

135. The Accused Products are systems for collecting plasma.

**ANSWER**: Paragraph 135 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products are systems for collecting plasma as claimed in the ’916 Patent.

136. The Accused Products have a venipuncture needle configured to draw whole blood from a donor.

**ANSWER**: Paragraph 136 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a venipuncture needle configured to draw whole blood from a donor as required by the system for collecting plasma as claimed in the ’916 Patent.

137. The Accused Products have a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container.

**ANSWER**: Paragraph 137 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container as required by the system for collecting plasma as claimed in the ’916 Patent.

138. The Accused Products have a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump.

**ANSWER**: Paragraph 138 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump as required by the system for collecting plasma as claimed in the ’916 Patent.

139. The Accused Products have an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump.

**ANSWER**: Paragraph 139 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump as required by the system for collecting plasma as claimed in the ’916 Patent.

140. The Accused Products have a touchscreen configured to receive input from an operator.

**ANSWER**: Paragraph 140 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a touchscreen configured to receive input from an operator as required by the system for collecting plasma as claimed in the ’916 Patent.

141. The Accused Products have a controller programmed to control operation of the system.

**ANSWER**: Paragraph 141 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a controller programmed to control operation of the system as required by the system for collecting plasma as claimed in the ’916 Patent.

142. The controllers of the Accused Products are coupled to the touchscreen and programmed to receive donor parameters electronically from a control system.

**ANSWER**: Paragraph 142 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are coupled to the touchscreen and programmed to receive donor parameters electronically from a control system as required by the system for collecting plasma as claimed in the ’916 Patent.

143. The controllers of the Accused Products are also programmed to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters.

**ANSWER**: Paragraph 143 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are also programmed to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters as required by the system for collecting plasma as claimed in the '916 Patent.

144. The controllers of the Accused Products are also programmed to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

**ANSWER**: Paragraph 144 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are also programmed to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor as required by the system for collecting plasma as claimed in the '916 Patent.

145. On information and belief, Defendants market and sell the Accused Products in the United States to their partners, clients, customers, and/or end users who use the Accused Products across this country and in this District.

**ANSWER**: Denied.

146. On information and belief, Defendants have induced and continue to induce others to infringe at least one claim of the '916 Patent under 35 U.S.C. § 271(b) by, among other things, actively aiding and abetting others to infringe with specific intent or willful blindness, such others including, but not limited to, Defendants' partners, clients, customers, and/or end users, whose use of the Accused Products constitutes direct infringement of at least one claim of the '916 Patent.

**ANSWER**: Denied.

147. In particular, on information and belief, Defendants' actions that aid and abet others such as their partners, clients, customers, and/or end users to infringe include advertising and

distributing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.

**ANSWER**: Denied.

148. On information and belief, Defendants are liable for contributory infringement of the '916 Patent under 35 U.S.C. § 271(c) for offering to sell and selling in the United States the Accused Products which are especially made or adapted for use to infringe the '916 Patent. The Accused Products are a material component for use in practicing the '916 Patent, are specifically made for an infringing use, and are not a staple article of commerce suitable for a non-infringing use. For example, the Accused Products and the example functionality described above have no substantial non-infringing uses, but are specifically designed to practice the claims of the '916 Patent. The Accused Products have no substantial non-infringing uses because the accused functionality is an integral part of the Accused Products and must be performed for the Accused Products to perform their intended purpose. Indeed, the Accused Products are plasma collection systems, containing all the structural elements claimed in the '916 Patent, specifically designed for plasma collection.

**ANSWER**: Denied.

149. In addition, the Accused Products provided by Defendants constitute a material part of the claimed invention, providing all components and features of the claimed system of the '916 Patent. For example, the Accused Products constitute a material part of the invention claimed because they contain each and every element of the claimed system, including a venipuncture needle, blood separator, plasma product collection container, donor line, a first pump, anticoagulant line, anticoagulant source, a second pump, touchscreen, and a controller configured to carry out the claimed functionality.

**ANSWER**: Denied.

150. On information and belief, the infringing acts of each partner or customer regarding the Accused Product are attributable to Defendants. For example, on information and belief, Defendants direct and control the activities or actions of their third-party customers in connection with the Accused Products by contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Product which, when followed and used, result in infringement.

**ANSWER**: Denied.

151. As a consequence of Defendants' direct and indirect infringement of the '916 Patent, both literally and under the doctrine of equivalents, Haemonetics has been and continues to be irreparably harmed.

**ANSWER**: Denied.

152. On information and belief, Defendants' infringement of the '916 Patent will continue in the future, and Haemonetics will be irreparably harmed as a consequence unless Defendants' infringing acts are enjoined by this Court.

**ANSWER**: Denied.

**COUNT III – INFRINGEMENT OF U.S. PATENT NO. 12,186,474**

153. Haemonetics realleges and incorporates the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER**: Paragraph 153 does not contain allegations that require a response. To the extent an answer is required, Fenwal denies any allegations.

154. On information and belief, Defendants have infringed and continue to infringe, directly and indirectly, literally and under the doctrine of equivalents, at least claims 9 and 14 of the '474 Patent by making, using, selling, and/or offering for sale the Accused Products.

**ANSWER**: Denied.

155. Claim 9 of the '474 Patent covers a novel plasma collection system and recites:

A system for collecting plasma, comprising:

a venipuncture needle configured to draw whole blood from a donor;

a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;

a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump;

an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump;

a touchscreen configured to receive input from an operator; and

a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume, the controller

programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

**ANSWER**: Fenwal admits Claim 9 of the '474 Patent recites:

A system for collecting plasma, comprising:

a venipuncture needle configured to draw whole blood from a donor;

a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;

a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump;

an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump;

a touchscreen configured to receive input from an operator; and

a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume, the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

To the extent there are allegations not expressly admitted above, those allegations are denied.

156. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

157. The Accused Products are a system for collecting plasma.

**ANSWER**: Paragraph 157 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products are systems for collecting plasma as claimed in the ’474 Patent.

158. The Accused Products have a venipuncture needle configured to draw whole blood from a donor.

**ANSWER**: Paragraph 158 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies Accused Products have a venipuncture needle configured to draw whole blood from a donor as required by the system for collecting plasma as claimed in the ’474 Patent.

159. The Accused Products have a blood separator configured to separate the whole blood into a plasma product and a second blood component, the second blood component including red blood cells and the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container.

**ANSWER**: Paragraph 159 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a blood separator configured to separate the whole blood into a plasma product and a second blood component, the second blood component including red blood cells and the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container as required by the system for collecting plasma as claimed in the ’474 Patent.

160. The Accused Products have a donor line fluidly connected to the venipuncture needle and configured to introduce drawn whole blood to the blood separator, the flow through the first line being controlled by a first pump.

**ANSWER**: Paragraph 160 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a donor line fluidly connected to the venipuncture needle and configured to introduce drawn whole blood to the blood separator, the flow through the first line being controlled by a first pump as required by the system for collecting plasma as claimed in the ’474 Patent.

161. The Accused Products have an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, the flow through the anticoagulant line being controlled by a second pump.

**ANSWER**: Paragraph 161 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, the flow through the anticoagulant line being controlled by a second pump as required by the system for collecting plasma as claimed in the '474 Patent.

162. The Accused Products have a touchscreen configured to receive input from an operator.

**ANSWER**: Paragraph 162 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a touchscreen configured to receive input from an operator as required by the system for collecting plasma as claimed in the '474 Patent.

163. The Accused Products have a controller programmed to control operation of the system.

**ANSWER**: Paragraph 163 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a controller programmed to control operation of the system as required by the system for collecting plasma as claimed in the '474 Patent.

164. The controllers of the Accused Products are coupled to the touchscreen and programmed to receive at least a donor's weight, height, and hematocrit.

**ANSWER**: Paragraph 164 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are coupled to the touchscreen and programmed to receive at least a donor's weight, height, and hematocrit as required by the system for collecting plasma as claimed in the '474 Patent.

165. The controllers of the Accused Products are also programmed to determine a target volume for plasma product including raw plasma and anticoagulant, the target volume for plasma product determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume.

**ANSWER**: Paragraph 165 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are also programmed to determine a target volume for plasma product including raw plasma and anticoagulant, the target volume for plasma product determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume as required by the system for collecting plasma as claimed in the '474 Patent.

166. The controllers of the Accused Products are also programmed to control the system to operate draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

**ANSWER**: Paragraph 166 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have controllers that are also programmed to control the system to operate draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor as required by the system for collecting plasma as claimed in the '474 Patent.

167. Claim 14 of the '474 Patent depends from claim 9 and recites:

> The system of claim 9, wherein the controller is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.

**ANSWER**: Fenwal admits Claim 14 of the '474 Patent purports to depend from claim 9 of the '474 Patent. Fenwal admits that Claim 14 recites:

> The system of claim 9, wherein the controller is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a

> volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.

To the extent there are allegations not expressly admitted above, those allegations are denied.

168. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

169. The Accused Products are a system of claim 9. *See* ¶¶ 155-166, *supra*.

**ANSWER**: Denied.

170. The Accused Products have a controller programmed to perform the draw and return cycles at least three times.

**ANSWER**: Paragraph 170 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a controller programmed to perform the draw and return cycles at least three times as required by the system for collecting plasma as claimed in the ’474 Patent.

171. The Accused Products have a controller programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.

**ANSWER**: Paragraph 171 contains legal conclusions to which no response is required. To the extent an answer is required, Fenwal denies the Accused Products have a controller programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase as required by the system for collecting plasma as claimed in the ’474 Patent.

172. On information and belief, Defendants market and sell the Accused Products in the United States to their partners, clients, customers, and/or end users who use the Accused Products across this country and in this District.

**ANSWER**: Denied.

173. On information and belief, Defendants have induced and continue to induce others to infringe at least one claim of the ‘474 Patent under 35 U.S.C. § 271(b) by, among other things, actively aiding and abetting others to infringe with specific intent or willful blindness, such others

including, but not limited to, Defendants' partners, clients, customers, and/or end users, whose use of the Accused Products constitutes direct infringement of at least one claim of the '474 Patent.

**ANSWER**: Denied.

174. In particular, on information and belief, Defendants' actions that aid and abet others such as their partners, clients, customers, and/or end users to infringe include advertising and distributing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.

**ANSWER**: Denied.

175. On information and belief, Defendants are liable for contributory infringement of the '474 Patent under 35 U.S.C. § 271(c) for offering to sell and selling in the United States the Accused Products which are especially made or adapted for use to infringe the '474 Patent. The Accused Products are a material component for use in practicing the '474 Patent, are specifically made for an infringing use, and are not a staple article of commerce suitable for a non-infringing use. For example, the Accused Products and the example functionality described above have no substantial non-infringing uses, but are specifically designed to practice the claims of the '474 Patent. The Accused Products have no substantial non-infringing uses because the accused functionality is an integral part of the Accused Products and must be performed for the Accused Products to perform their intended purpose. Indeed, the Accused Products are a plasma collection system, containing all the structural elements claimed in the '474 Patent, specifically designed for plasma collection.

**ANSWER**: Denied.

176. In addition, the Accused Products provided by Defendants constitute a material part of the claimed invention, providing all components and features of the claimed system of the '474 Patent. For example, the Accused Products constitute a material part of the invention claimed because it contains each and every element of the claimed system, including a venipuncture needle, blood separator, plasma product collection container, donor line, first pump, anticoagulant line, anticoagulant source, second pump, touchscreen, and a controller configured to carry out the claimed functionality.

**ANSWER**: Denied.

177. On information and belief, the infringing acts of each partner or customer regarding the Accused Products are attributable to Defendants. For example, on information and belief, Defendants direct and control the activities or actions of their third-party customers in connection with the Accused Products by contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Products which, when followed and used, result in infringement. As a consequence of Defendants' direct and indirect infringement of the '474 Patent, both literally and under the doctrine of equivalents, Haemonetics has been and continues to be harmed.

**ANSWER**: Denied.

178. On information and belief, Defendants' infringement of the '474 Patent will continue in the future, and Haemonetics will be irreparably harmed as a consequence unless Defendants' infringing acts are enjoined by this Court.

**ANSWER**: Denied.

**[HAEMONETICS'] JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Haemonetics demands a trial by jury on all triable issues.

**ANSWER**: No response is required to Haemonetics' demand for a trial by jury in this case.

**FENWAL'S RESPONSE TO HAEMONETICS' PRAYER FOR RELIEF**

Fenwal denies Haemonetics is entitled to any relief sought in Haemonetics' Prayer for Relief.

**FENWAL'S DEFENSES**

1. Without prejudice to the denials set forth in its Answer, and without admitting any allegations of the FAC not expressly admitted, Fenwal asserts the following defenses to the FAC without assuming the burden of proof on any such defense that would otherwise rest with Haemonetics. Fenwal reserves the right to amend its Answer to add additional defenses, including for example unenforceability due to inequitable conduct, consistent with the facts discovered in this case.

**FIRST DEFENSE (FAILURE TO STATE A CLAIM)**

2. The FAC fails to state a claim upon which relief can be granted.

**SECOND DEFENSE (NON-INFRINGEMENT)**

3. Fenwal has not infringed and does not infringe, under any theory of infringement including directly, whether individually or jointly, or whether literally or under the doctrine of equivalents, or indirectly, whether contributorily or by inducement, any valid and enforceable

claim of U.S. Patent Nos. 10,758,652, 12,171,916, and 12,186,474. Haemonetics has not shown, and cannot show, that Fenwal has infringed any valid and enforceable claim of the Haemonetics Asserted Patents.

**THIRD DEFENSE (INVALIDITY)**

4. Each claim of U.S. Patent Nos. 10,758,652, 12,171,916, and 12,186,474 is invalid for failure to comply with one or more of the requirements of the patent laws of the United States, including without limitation, 35 U.S.C. §§ 101, 102, 103, and 112, and the rules, regulations, and laws pertaining thereto. The claims of the Haemonetics Asserted Patents are directed to non-statutory subject matter under 35 U.S.C. § 101, are anticipated by the prior art, including prior art disclosed by Fenwal, under 35 U.S.C. § 102, are rendered obvious by the prior art under 35 U.S.C. § 103, and fail to satisfy the requirements of 35 U.S.C. §112.

**FOURTH DEFENSE (PROSECUTION HISTORY ESTOPPEL AND PROSECUTION HISTORY DISCLAIMER)**

5. The claims of the Haemonetics Asserted Patents are not entitled to a scope sufficient to encompass any system employed by Fenwal. For example, the doctrines of prosecution history estoppel (based on amendments and arguments made during prosecution of the Haemonetics Asserted Patents and related patent applications), disclosure-dedication (based on subject matter stated by not claimed in the Haemonetics Asserted Patents), and ensnarement of the prior art each preclude Haemonetics from asserting the Asserted Patents in the manner purportedly stated in the First Amended Complaint. Accordingly, the doctrine of equivalents is unavailable. Haemonetics' claims are further barred in whole or in part by the doctrine of waiver and/or other equitable doctrines.

**FIFTH DEFENSE (LACK OF STANDING)**

6. To the extent that Haemonetics is not the sole and total owner of any of the Haemonetics Asserted Patents as of the filing date of the FAC, Haemonetics lacks standing to assert, in this case, infringement of any claim from such patent.

**SIXTH DEFENSE (FAILURE TO MARK)**

7. Haemonetics' patent infringement claims are barred in whole or in part for failure to plead compliance with patent marking pursuant to the requirements of 35 U.S.C. § 287(a).

**SEVENTH DEFENSE (STATUTE OF LIMITATIONS)**

8. Haemonetics is barred from recovery, in whole or in part, under the applicable statute of limitations as set forth in 35 U.S.C. § 286.

**EIGHTH DEFENSE (NOT AN EXCEPTIONAL CASE)**

9. The FAC fails to state a claim for exceptional case.

**NINTH DEFENSE (PATENT MISUSE)**

10. Each of the Haemonetics Asserted Patents is unenforceable because Haemonetics has misused the patents by attempting to enforce them against Fenwal while knowing that the Haemonetics Asserted Patents are invalid.

**TENTH DEFENSE (EQUITABLE RELIEF)**

11. Haemonetics is not entitled to equitable relief because the remedies at law to which it is entitled, if any, are adequate.

**ELEVENTH DEFENSE (NO COSTS)**

12. To the extent any claim of the Haemonetics Asserted Patents is invalid, Haemonetics is barred by 35 U.S.C. § 288 from recovering costs associated with its action.

**TWELFTH DEFENSE (SAFE HARBOR)**

13. Haemonetics' patent infringement claims are barred at least in part by the safe harbor provision of 35 U.S.C. § 271(e)(1).

**THIRTEENTH DEFENSE (NO WILLFUL INFRINGEMENT)**

14. Fenwal has not willfully infringed, and does not willfully infringe, any valid claim of any of the Asserted Patents.

* * *

15. Fenwal reserves all defenses, at law or equity, which may now exist or in the future be available on discovery and further factual investigation in this case. Fenwal further reserves the right to supplement and/or amend the foregoing defenses.

Dated: December 5, 2025

Respectfully submitted,

**FENWAL, INC.**

By: */s/ Tasha Francis Gerasimow*
Tasha Francis Gerasimow (ARDC# 6334781)
tasha.gerasimow@kirkland.com
James F. Hurst (ARDC# 6202190)
james.hurst@kirkland.com
**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

Patricia A. Carson (PHV)
patricia.carson@kirkland.com
Gregory S. Arovas (NY 2553782)
greg.arovas@kirkland.com
Joseph A. Loy (PHV)
joseph.loy@kirkland.com
Brad Deem (PHV)
brad.deem@kirkland.com
**KIRKLAND & ELLIS LLP**

601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Attorneys for Defendant and Counterclaim Plaintiff, Fenwal, Inc.*