**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

HAEMONETICS CORPORATION

*Plaintiff and Counterclaim Defendant,*

v.

FRESENIUS KABI USA, LLC
FRESENIUS KABI AG
FENWAL, INC.

*Defendants and Counterclaim Plaintiffs.*

Case No.: 1:25-cv-08680

**JURY TRIAL DEMANDED**

Honorable LaShonda A. Hunt

**DEFENDANTS FRESENIUS KABI USA, LLC AND FRESENIUS KABI AG'S FIRST AMENDED COUNTERCLAIMS AND ANSWER AND DEFENSES TO FIRST AMENDED COMPLAINT**

Defendants Fresenius Kabi USA, LLC and Fresenius Kabi AG (collectively "Fresenius"), by and through their undersigned counsel, hereby submit their First Amended Counterclaims and Answer and Defenses to the First Amended Complaint (ECF No. 32) filed by Haemonetics Corporation ("Haemonetics").

**FRESENIUS KABI USA, LLC AND FRESENIUS KABI AG'S FIRST AMENDED COUNTERCLAIMS**

For its First Amended Counterclaims against Haemonetics, Defendants Fresenius Kabi USA, LLC and Fresenius Kabi AG allege as follows:

**INTRODUCTION**

1. Haemonetics' failure to conduct a diligent investigation into its claims has resulted in a scattershot approach that improperly ensnares defendants Fresenius Kabi USA, LLC and

Fresenius Kabi AG (collectively "Fresenius") in this litigation based on nothing more than "information and belief."

2. Haemonetics filed its Original Complaint against Fresenius Kabi USA, LLC on July 25, 2025. (ECF No. 1). As part of the meet and confer required under the Northern District of Illinois Local Rules prior to filing a motion to dismiss, counsel for Fresenius Kabi USA highlighted the deficiencies in Haemonetics' Complaint against Fresenius Kabi USA, advising that Fresenius Kabi USA had no involvement in the allegations and products described in that complaint.

3. The parties filed a Joint Motion to Vacate Case Deadlines, which the Court granted, to allow time for Haemonetics to investigate the proper parties for the lawsuit. (ECF Nos. 27, 31).

4. Haemonetics' First Amended Complaint ("FAC") contains the same deficiencies identified its Original Complaint, containing only conclusory, formulaic recitations of the elements of direct infringement and lacking any factual content to support its allegations that either Fresenius Kabi USA and/or Fresenius Kabi AG infringe the asserted Haemonetics patents.

5. Haemonetics alleges Fresenius' infringement consists of "market[ing]" and "advertising" activities, "[being] directly associated with the Aurora Xi System," and "own[ing] all copyrights," but these are not acts of alleged infringement. *E.g.,* FAC ¶¶ 123, 145, 172 ("market[ing]"), 19, 20, 26, 27, 70, 125, 147 ("advertising"), ¶ 71 ("associated with"), ¶ 73 ("owns all copyrights"); *see also Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) ("[A]dvertisements are not considered offers for sale, but are instead merely solicitations for offers."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (communications that describe the allegedly infringing materials but "do not contain any price terms . . . on their face . . . cannot be construed as an 'offer' which [the offeree]

could make into a binding contract by simple acceptance"). Nor are postings of YouTube videos (FAC ¶ 70) or serving as correspondent or Applicant on a 510(k) submission (*id.* ¶ 76). *See* 35 U.S.C. § 271(a). Haemonetics' remaining allegations against Fresenius are alleged on "information and belief." *See e.g.*, FAC ¶¶ 3-8, 18, 24, 68-69, 71, 74, 77-78, 80, 123-126, 128, 130, 132, 145-148, 150, 152, 154, 172-175, 177-178, *etc.* (40 allegations based "on information and belief").

6. That Haemonetics' allegations against Fresenius are deficient is not surprising. Neither Fresenius entity "makes" or "manufactures" the accused Aurora Xi plasmapheresis device, nor do they "offer for sale," "sell" or "import" the Aurora Xi or induce parties to engage in any alleged infringing acts related to the Aurora Xi devices.

7. By failing to exercise the requisite due diligence expected before asserting claims of patent infringement, Haemonetics has recklessly cast a cloud of uncertainty over Fresenius and forced them to incur significant, unwarranted litigation costs. Despite having been alerted to this issue by counsel for Fresenius Kabi USA, Haemonetics turned a blind eye. This pattern of behavior suggests a litigation strategy of harassment rather than a good-faith pursuit of legal rights.

8. Consequently, Defendants/Counterclaim Plaintiffs Fresenius Kabi USA, LLC and Fresenius Kabi AG (collectively "Fresenius"), by and through its undersigned attorneys, hereby assert the following counterclaims against Plaintiff/Counterclaim Defendant Haemonetics Corporation ("Haemonetics" or "Counterclaim Defendant") for declaratory judgment that the claims of U.S. Patent Nos. 10,758,652 (the "'652 Patent"), 12,171,916 (the "'916 Patent"), and 12,186,474 (the "'474 Patent") (collectively, the "Haemonetics Asserted Patents") are invalid and not infringed by the products that are the subject matter of Haemonetics' FAC.

## NATURE OF THE ACTION

9. This is an action for: (i) invalidity and unenforceability of the Haemonetics Asserted Patents under the Declaratory Judgment Act (28 U.S.C. § 2201); (ii) non-infringement of the Haemonetics Asserted Patents under 28 U.S.C. § 2201; (iii) damages and injunctive relief for attempted monopolization under the antitrust laws, 15 U.S.C. §§ 1 *et seq.*; and (iv) such other relief as the Court deems just and proper.

## THE PARTIES

10. Fresenius Kabi USA, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at Three Corporate Drive, Lake Zurich, Illinois 60047.

11. Fresenius Kabi AG is a corporation organized and existing under the laws of Germany with its principal place of business at Else-Kröner-Straße 1, 61352 Bad Homburg, Germany.

12. Haemonetics Corporation is a Massachusetts corporation with its principal place of business at 125 Summer Street, Boston, Massachusetts 02110.

## JURISDICTION

13. This Court has jurisdiction over Fresenius' counterclaims pursuant to 28 U.S.C. §§ 2201 *et seq.* and 28 U.S.C. §§ 1331, 1338(a), and § 1367. Furthermore, an actual, substantial, and continuing justiciable controversy exists between Fresenius and Haemonetics based on Haemonetics having filed its First Amended Complaint (ECF No. 32) against Fresenius alleging infringement of the Haemonetics Asserted Patents. The controversy concerns the invalidity and non-infringement of the Haemonetics Asserted Patents, as well as Haemonetics' violation of the antitrust laws.

14. This Court has personal jurisdiction over Haemonetics at least because Haemonetics has submitted to the personal jurisdiction of this Court by filing its Complaint (ECF No. 1) and First Amended Complaint (ECF No. 32) in this Court. Haemonetics has consented to this Court's jurisdiction for the purpose of this proceeding. FAC ¶ 14.

**VENUE**

15. Venue properly lies in this District under 28 U.S.C. §§ 1391 and 1400(b), because Haemonetics has consented to venue in this Court by filing its First Amended Complaint for patent infringement in this Court, and seeking other relief from this Court, thereby waiving any objections to venue for any counterclaims asserted against it. *See, e.g.*, *E & J Gallo Winery v. Morand Bros. Beverage Co.*, 247 F. Supp. 2d 973, 976-77 (N.D. Ill. 2002); *Shapo v. Engle*, No. 98-cv-7909, 2000 WL 198435, at *5 (N.D. Ill. Feb. 11, 2000); *see also* FAC ¶¶ 15-17.

**COUNT 1: NON-INFRINGEMENT OF U.S. PATENT NO. 10,758,652**

16. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

17. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fresenius (ECF No. 32), an actual and justiciable controversy exists between Fresenius and Haemonetics concerning alleged infringement of the U.S. Patent No. 10,758,652 ("the '652 patent").

18. Fresenius has not made, used, offered to sell, or sold any alleged invention claimed in the '652 patent within the United States, or imported any alleged invention claimed in the '652 patent into the United States. Fresenius therefore has not infringed and does not currently infringe any asserted claim of the '652 patent, literally or under the doctrine of equivalents, directly or indirectly.

19. Neither Fresenius Kabi AG nor Fresenius Kabi USA "make" or "manufacture" the Aurora Xi, nor does Fresenius Kabi AG or Fresenius Kabi USA "offer for sale," "sell" or "import" the Aurora Xi. Haemonetics alleges Fresenius engaged in "market[ing]" and "advertising," "[is] directly associated with the Aurora Xi System," and "owns all copyrights," but these are not acts of direct infringement. *See e.g.*, FAC ¶¶ 123, 145, 172 ("market[ing]"), ¶¶ 19, 20, 26, 27, 70, 125, 147 ("advertising"), ¶ 71 ("associated with"), ¶ 73 ("owns all copyrights"); *see also Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) ("[A]dvertisements are not considered offers for sale, but are instead merely solicitations for offers."); *Indag GmbH & Co. v. IMA S.P.A*, 150 F. Supp. 3d 946, 966 (N.D. Ill. 2015) ("To constitute an 'offer to sell' under traditional contract principles, an offer requires a definite price term, otherwise the offeree could make the offer into a binding contract by a simple acceptance."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1376 (Fed. Cir. 2005) (communications that describe the allegedly infringing materials but "do not contain any price terms . . . on their face . . . cannot be construed as an 'offer' which [the offeree] could make into a binding contract by simple acceptance"). In addition, acting as correspondent on a 510(k) submission is not an act of direct infringement, nor is acting as an Applicant for 510(k) clearance forms. *See* 35 U.S.C. § 271(a); *see also* FAC ¶ 71 (alleged submission of software to FDA).

20. Similarly, neither Fresenius Kabi AG nor Fresenius Kabi USA indirectly infringe the '652 patent. As an initial matter, there is no indirect infringement because there is no direct infringement of the '652 patent by the accused plasmapheresis systems at least because the accused plasmapheresis do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): "the controller configured to calculate (1) a volume of anticoagulant

in the collected plasma component as the plasma component is being collected in the plasma container, and (2) a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component, the controller configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container." Absent direct infringement of the claims of a patent, there can be neither contributory infringement nor inducement of infringement. 35 U.S.C. § 271.

21. Fresenius has not actively induced any infringement of the '652 patent. Fresenius lacks the requisite specific knowledge and intent to encourage infringement of the '652 patent.

22. Fresenius has not contributed to any infringement of the '652 patent. Fresenius does not offer to sell, sell, or import the Accused Products or any component thereof into the United States.

23. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the '652 patent, that it has not actively induced the infringement of the '652 patent, and that it has not contributed to the infringement of the '652 patent.

**COUNT 2: INVALIDITY OF U.S. PATENT NO. 10,758,652**

24. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

25. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fresenius and Haemonetics concerning the validity of the '652 patent.

26. The claims of the '652 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* IPR2025-01391 (petition for *inter partes* review of U.S. Patent No. 10,758,652). The Court may take judicial notice of IPR2025-01391, which is a matter of public

record before the USPTO, and which Fresenius incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

27. For example, the claims of the '652 patent are anticipated by the prior art, under 35 U.S.C. § 102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. U.S. Patent No. 8,075,468 to Min et al. ("Min")

b. U.S. Patent No. 9,370,324 to Barret et al. ("Barrett")

c. U.S. Patent No. 6,296,602 to Headley ("Headley")

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. U.S. Patent Publication No. 2017/0029762 ("Turgut")

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S-0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. U.S. Patent Publication No. 2012/0175313 to Barry et al. ("Barry")

i. U.S. Publication No. 2002/0033370 to Bainbridge et al. ("Bainbridge")

j. U.S. Patent No. 10,195,319 to Kimura ("Kimura")

k. U.S. Patent No. 6,743,192 to Sakota et al. ("Sakota")

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

28. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '652 patent is invalid for failure to meet the

conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**COUNT 3: NON-INFRINGEMENT OF U.S. PATENT NO. 12,171,916**

29. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

30. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fresenius (ECF No. 32), an actual and justiciable controversy exists between Fresenius and Haemonetics concerning alleged infringement of the U.S. Patent No. 12,171,916 ("the '916 patent").

31. Fresenius has not made, used, offered to sell, or sold any alleged invention claimed in the '916 patent within the United States, or imported any alleged invention claimed in the '916 patent into the United States. Fresenius therefore has not infringed and does not currently infringe any asserted claim of the '916 patent, literally or under the doctrine of equivalents, directly or indirectly.

32. Neither Fresenius Kabi AG nor Fresenius Kabi USA "make" or "manufacture" the Aurora Xi, nor does Fresenius Kabi AG or Fresenius Kabi USA "offer for sale," "sell" or "import" the Aurora Xi. Haemonetics alleges Fresenius engaged in "market[ing]" and "advertising," "[is] directly associated with the Aurora Xi System," and "owns all copyrights," but these are not acts of direct infringement. *See e.g.*, FAC ¶¶ 123, 145, 172 ("market[ing]"), ¶¶ 19, 20, 26, 27, 70, 125, 147 ("advertising"), ¶ 71 ("associated with"), ¶ 73 ("owns all copyrights"); *see also Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) ("[A]dvertisements are not considered offers for sale, but are instead merely solicitations for offers."); *Indag GmbH & Co. v. IMA S.P.A*, 150 F. Supp. 3d 946, 966 (N.D. Ill. 2015) ("To constitute an 'offer to sell' under traditional contract principles, an offer requires a definite price term, otherwise the offeree could

make the offer into a binding contract by a simple acceptance."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (communications that describe the allegedly infringing materials but "do not contain any price terms . . . on their face . . . cannot be construed as an 'offer' which [the offeree] could make into a binding contract by simple acceptance"). In addition, acting as correspondent on a 510(k) submission is not an act of direct infringement, nor is acting as an Applicant for 510(k) clearance forms. *See* 35 U.S.C. § 271(a); *see also* FAC ¶ 71 (alleged submission of software to FDA).

33. Similarly, neither Fresenius Kabi AG nor Fresenius Kabi USA indirectly infringe the '916 patent. As an initial matter, there is no indirect infringement because there is no direct infringement of the '916 patent by the accused plasmapheresis systems at least because the accused plasmapheresis do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): "a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor." Absent direct infringement of the claims of a patent, there can be neither contributory infringement nor inducement of infringement. 35 U.S.C. § 271.

34. Fresenius has not actively induced any infringement of the '916 patent. Fresenius lacks the requisite specific knowledge and intent to encourage infringement of the '916 patent.

35. Fresenius has not contributed to any infringement of the '916 patent. Fresenius does not offer to sell, sell, or import the Accused Products or any component thereof into the United States.

36. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the '916 patent, that it has not actively induced the infringement of the '916 patent, and that it has not contributed to the infringement of the '916 patent.

**COUNT 4: INVALIDITY OF U.S. PATENT NO. 12,171,916**

37. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

38. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fresenius and Haemonetics concerning the validity of the '916 patent.

39. The claims of the '916 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* PGR2025-00078 (petition for post-grant review of U.S. Patent No. 12,171,916). The Court may take judicial notice of PGR2025-00078, which is a matter of public record before the USPTO, and which Fresenius incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

40. For example, the claims of the '916 patent are anticipated by the prior art, under 35 U.S.C. § 102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. Min

b. Barrett

c. Headley

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. Turgut

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. Barry

i. Bainbridge

j. Kimura

k. Sakota

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

41. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '916 patent, is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**COUNT 5: NON-INFRINGEMENT OF U.S. PATENT NO. 12,186,474**

42. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

43. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fresenius (ECF No. 32), an actual and justiciable controversy exists between

Fresenius and Haemonetics concerning alleged infringement of the U.S. Patent No. 12,186,474 ("the '474 patent").

44. Fresenius has not made, used, offered to sell, or sold any alleged invention claimed in the '474 patent within the United States, or imported any alleged invention claimed in the '474 patent into the United States. Fresenius therefore has not infringed and does not currently infringe any asserted claim of the '474 patent, literally or under the doctrine of equivalents, directly or indirectly.

45. Neither Fresenius Kabi AG nor Fresenius Kabi USA "make" or "manufacture" the Aurora Xi, nor does Fresenius Kabi AG or Fresenius Kabi USA "offer for sale," "sell" or "import" the Aurora Xi. Haemonetics alleges Fresenius engaged in "market[ing]" and "advertising," "[is] directly associated with the Aurora Xi System," and "owns all copyrights," but these are not acts of direct infringement. *See e.g.*, FAC ¶¶ 123, 145, 172 ("market[ing]"), ¶¶ 19, 20, 26, 27, 70, 125, 147 ("advertising"), ¶ 71 ("associated with"), ¶ 73 ("owns all copyrights"); *see also Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) ("[A]dvertisements are not considered offers for sale, but are instead merely solicitations for offers."); *Indag GmbH & Co. v. IMA S.P.A*, 150 F. Supp. 3d 946, 966 (N.D. Ill. 2015) ("To constitute an 'offer to sell' under traditional contract principles, an offer requires a definite price term, otherwise the offeree could make the offer into a binding contract by a simple acceptance."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1376 (Fed. Cir. 2005) (communications that describe the allegedly infringing materials but "do not contain any price terms . . . on their face . . . cannot be construed as an 'offer' which [the offeree] could make into a binding contract by simple acceptance"). In addition, acting as correspondent on a 510(k) submission is not an act of direct

infringement, nor is acting as an Applicant for 510(k) clearance forms. *See* 35 U.S.C. § 271(a); *see also* FAC ¶ 71 (alleged submission of software to FDA).

46. Similarly, neither Fresenius Kabi AG nor Fresenius Kabi USA indirectly infringe the ’474 patent. As an initial matter, there is no indirect infringement because there is no direct infringement of the ’474 patent by the accused plasmapheresis systems at least because the accused plasmapheresis do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): “a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive at least a donor’s weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on the donor’s total blood volume and/or the donor’s plasma volume, the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.” Absent direct infringement of the claims of a patent, there can be neither contributory infringement nor inducement of infringement. 35 U.S.C. § 271.

47. Fresenius has not actively induced any infringement of the ’474 patent. Fresenius lacks the requisite specific knowledge and intent to encourage infringement of the ’474 patent.

48. Fresenius has not contributed to any infringement of the ’474 patent. Fresenius does not offer to sell, sell, or import the Accused Products or any component thereof into the United States.

49. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the ’474 patent, that it has not actively induced the infringement of the ’474 patent, and that it has not contributed to the infringement of the ’474 patent.

**COUNT 6: INVALIDITY OF U.S. PATENT NO. 12,186,474**

50. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

51. Due to at least the allegations contained in Haemonetics’ First Amended Complaint, an actual and justiciable controversy exists between Fresenius and Haemonetics concerning the validity of the ’474 patent.

52. The claims of the ’474 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* PGR2025-00077 (petition for post-grant review of U.S. Patent No. 12,186,474). The Court may take judicial notice of PGR2025-00077, which is a matter of public record before the USPTO, and which Fresenius incorporates by reference. *Lecat’s Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

53. For example, the claims of the ’474 patent are anticipated by the prior art, under 35 U.S.C. § 102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. Min

b. Barrett

c. Headley

d. “Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study,” Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. Turgut

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. Barry

i. Bainbridge

j. Kimura

k. Sakota

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

54. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '474 patent, is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**COUNT 7: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE '652, '916, AND '474 PATENTS DUE TO INEQUITABLE CONDUCT (FENWAL PRIOR ART)**

55. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

56. Haemonetics' Asserted Patents (the '652, '916, and '474 patents) are unenforceable on account of inequitable conduct before the United States Patent and Trademark Office ("USPTO").

57. Haemonetics obtained the Asserted Patents through fraud. Unable to compete with Fenwal's innovative Aurora Xi Plasmapheresis system on the merits, Haemonetics chose a

different path: copy Fenwal's published patent claims nearly verbatim, conceal the copied source from the Patent Office, and suppress disclosure of Fenwal's prior art device that would have rendered Haemonetics' patents unpatentable.

58. Over 98% of the claim language in Haemonetics' applications was lifted directly from Fenwal's prior-published patent application, including technical terminology that does not even appear in Haemonetics' own patent specification.

59. The named inventor of the Asserted Patents, Michael Ragusa, and prosecuting attorney, John Lovely, knew of Fenwal's Aurora Xi device and Fenwal's related publications and patents, yet deliberately withheld this material information from the USPTO with the specific intent to deceive the Patent Office Examiner and secure patents Haemonetics could weaponize against its only competitors.

60. The Asserted Patents are the fruit of this fraud and should be declared unenforceable in their entirety. *See Guardant Health, Inc. v. Found. Med., Inc.*, No. CV 17-1616-LPS-CJB, 2020 WL 2477522, at *4 (D. Del. Jan. 7, 2020) ("Inequitable conduct regarding any single claim in the prosecution of a patent renders the entire patent unenforceable, not just that claim. Moreover, the taint of a finding of inequitable conduct can affect not just the improperly-prosecuted patent, but can also 'render unenforceable other related patents and applications to the same technology. This concept is what courts have referred to as the doctrine of 'infectious unenforceability.'") (citing *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1288-89 (Fed. Cir. 2011) (en banc)).

61. Upon information and belief, at least one individual associated with the filing and prosecution of the applications that issued as the Asserted Patents, which include Johnathan

Perullo, Michael Ragusa, and/or Johnathan Lovely and/or their agent(s), engaged in inequitable conduct before the USPTO.

62. The inequitable conduct comprised intentional misrepresentations and/or omissions including, without limitation, the material omission of copying from Fenwal's published applications and the failure to disclose one or more pieces of prior art, during prosecution of the Asserted Patents in breach of the duty of candor and good faith required by 37 CFR § 1.56 with the intent to deceive the Patent Office.

63. Despite clear knowledge of its main competitor in the field, Fenwal, and Fenwal's patents and competing products, the above-mentioned individuals failed to disclose critical information about the source of their copied claims, Fenwal's prior art devices, patents and publications that would have been material to the patentability of the Asserted Patents, with the goal of obtaining patents for Haemonetics to assert against the competition in hopes of gaining a competitive edge, and greater market share, as opposed to fairly competing within the market.

***Haemonetics' Prosecution of the Asserted Patents***

64. The '652 patent issued from United States Patent Application Serial No. 15/608,183 ("the '183 application"), titled "System and Method for Collecting Plasma," which was filed on May 30, 2017. On the same date, John Perullo, the Vice President, Legal Affairs of Haemonetics, executed a Power of Attorney appointing the law firm of Sunstein Kann Murphy & Timbers to represent Haemonetics Corporation in connection with any and all patent applications where Haemonetics Corporation is named. The '916 patent is a continuation of the '652 patent and the '474 patent is a continuation in part of the '652 patent.

65. Shortly after the '183 application was filed, Johnathan C. Lovely, an attorney then with the law firm of Sunstein Kann Murphy & Timbers, filed a Response to Informational Notice

to Applicant and submitted an inventor's executed declaration to the USPTO. Michael Ragusa (the sole inventor of the Asserted Patents) signed a Declaration that was submitted to the USPTO. The Declaration stated that Ragusa believed himself "to be the original inventor … of a claimed invention in the application." HAEM-FRE_0003516 at -4668. In addition, he "acknowledge[d] the duty to disclose to the US Patent and Trademark Office all information known to me to be material to patentability." *Id.* The Declaration acknowledged and cited 18 U.S.C. § 1001, which proscribes the making of a false statement to the federal government.

66. Thus, during prosecution of the Asserted Patents, at the very least, the following persons were subject to the duty of disclosure under 37 CFR § 1.56 and had a duty of candor and good faith in dealing with the USPTO: Perullo, Ragusa, and/or Lovely, and/or their agent(s).

***Fenwal Prior Art***

67. Fenwal has been an innovator in the field of apheresis dating back more than 75 years. During this time, Fenwal has brought to market several successful apheresis products. Each time, Haemonetics subsequently released copycat versions.

68. For example, in 2012, Fenwal debuted its Aurora plasmapheresis device. FENWAL 00004760. The Aurora system built on the proprietary separation technology that powered Fenwal's prior Autopheresis-C® system and improved operator and donor experience.

69. Fenwal continued to innovate, later launching its Aurora Xi products in 2016. FENWAL 00013973. Haemonetics followed in 2017 and 2018 with its NexSys PCS device. FENWAL 00004724; FENWAL 00004770.

70. Most recently, Fenwal received FDA approval for its Adaptive Nomogram in January 2025, FENWAL 00004767; with Haemonetics following a year later with its NexSys PCS

Persona Plus device in February 2026, HAEM-FRE_0091553, available at: https://www.fda.gov/media/191271/download?attachment (510K Summary Letter).

71. In other words: Fenwal invented, Haemonetics followed.

72. Relevant to the inequitable conduct claims, in September 2016, Fenwal received FDA clearance for its Aurora Xi System. *See* FAC ¶ 76 ("The Aurora Xi System received FDA clearance[] in September 2016.").

73. The 2016 Aurora Xi System was made available to the public after FDA approval in 2016.

74. An Operator's Manual and Service Manual ("Prior Art Manuals") for the Aurora Xi System were published in October 2016 and accompanied each Aurora Xi Device. FENWAL 00029246 (WI-MF-936PK001 C - Aurora Xi Packaging Prep).

75. The 2016 Prior Art Manuals describe the Aurora Xi 2016 System and its functionality. FENWAL 00006371; FENWAL 00013985.

76. The Fresenius Aurora Xi Plasmapheresis System Operator's Manual Software Version 1.0 and related Service Manual, dated October 2016 and January 2017, in addition to the Aurora Xi System itself (collectively the "Aurora Xi Prior Art"), constitute material prior art that was withheld from the Examiner during prosecution of the Asserted Patents.

***Haemonetics Monitored Fenwal***

77. Haemonetics (including at least Ragusa, Perullo, and Lovely) was aware of Fenwal, its patent applications, and its devices, including the Aurora Xi device, prior to the filing of the applications for the Asserted Patents.

78. Haemonetics claims the U.S. market for plasmapheresis devices was "highly concentrated" as of 2025 and "include[d] only three main competitors" – Haemonetics, Fenwal (a

Fresenius Kabi AG subsidiary), and Terumo. FENWAL 00013903 at -3909 (IPR2025-01391, PO's Brief Requesting Discretionary Denial).

79. At the time the Asserted Patents were being prosecuted, the market was even more concentrated because Terumo had not yet entered. *Id.* (Terumo did not "enter[] this highly concentrated market with its competing product [until] 2022").

80. Prior to May 30, 2017, by Haemonetics' admission, the only competitors in the field were Haemonetics and Fenwal/Fresenius Kabi. FENWAL 00029160 (Haemonetics Corp. Analyst Investor Day, May 20, 2014), at -9180 ("Who's the competition?"…Plasma, it's us and it's Fenwal."); FENWAL 00013976 (Haemonetics Corp. Company Conference Presentation, January 14, 2015), at -3979 ("Let me start with plasma . . . . The biggest competitor in that space being Fenwal now owned by Fresenius.").

81. Haemonetics was aware of its only competitor Fenwal's plasmapheresis products. Haemonetics characterizes the market to be "a tightly confined industry, where each participant closely monitors the others' products, regulatory filings, and patent activity," making awareness of competitor products "undeniable." FENWAL 00013903 at -3909. Haemonetics further states, "[u]nlike some broader industries, there can be no doubt about competitor awareness here." *Id.*

82. Haemonetics was well aware of and actively monitored Fenwal's plasmapheresis devices, including the Aurora Xi device.

83. Haemonetics consistently referenced Fenwal and the Aurora Xi in its public statements, including its 10-K submissions and at conferences. In the context of its 2015 10-K submissions to the SEC, Haemonetics specifically stated, "In the automated plasma collection market, we principally compete with Fresenius, which acquired Fenwal." FENWAL 00014351 (Haemonetics Corp. 2015 Form 10-K), at -4359.

84. In Haemonetics' 2018 10-K, Haemonetics clarified, "in the automated plasma collection market, we principally compete with Fresenius' Fenwal Aurora and Aurora Xi product line." FENWAL 00014578 (Haemonetics Corp. 2018 Form 10-K), at -4586.

85. As another example, each year at the Raymond James Annual Institution Investors Conference, Haemonetics identified "Fresenius Fenwal (Aurora)" as its competition in the Plasmapheresis space. FENWAL 00029256 at -9262, available at: https://haemonetics.gcs-web.com/static-files/b855d07a-edcd-4b70-b6d9-8690de1a7daa ; FENWAL 00029275 at 7, available at: https://haemonetics.gcs-web.com/static-files/8d70200b-0ee6-4e3c-bbee-0c01fb2d51df.

86. Individuals involved in the prosecution of the Asserted Patents on behalf of Haemonetics had specific knowledge of Fenwal's devices. Ragusa, the sole named inventor of the Asserted Patents, has been employed by Haemonetics for more than 30 years. Over the three decades Ragusa has worked for Haemonetics, he has held roles ranging from Manager of Research and Development in the Apheresis Department, Director of all R&D Departments, and VP of R&D Donor Division, where he was a Member of the Division Executive Staff.

87. Ragusa worked on plasma collection devices. FENWAL 00014347 (Ragusa LinkedIn Biography). He was R&D Manager of Apheresis Development; he published articles related to "Personalized Collection of plasma from healthy donors" and "Source plasma collection in the United States." *Id.* at -4737. Ragusa was "responsible for technical product roadmap across all business segments" including "plasmapheresis." *Id.* at -4738. Throughout this work, Ragusa admits that he "immersed himself in customer's business and identified areas of technical need." *Id.* at -4739. He was involved in "technical due diligence" projects. And he was responsible for

"expand[ing] and manag[ing], with Legal support, the Intellectual Property portfolio." *Id.* at -4738.

88. Ragusa, who has spent his entire professional career working for Haemonetics developing devices, was aware of the Aurora Xi device—the plasmapheresis product of its main competitor.

89. On information and belief, Ragusa was involved in the development of the NexSys PCS Plasma Apheresis System for which Haemonetics Corporation received FDA 510(k) clearance on July 25, 2017—the device designed to compete against the Aurora Xi.

90. Thus, Ragusa was simultaneously developing the competing NexSys PCS device and prosecuting the Asserted Patents—all while fully aware of Fenwal's Aurora Xi device.

91. Ragusa is the named inventor on 24 issued U.S. patents (in addition to the three Asserted Patents), all of which are assigned to Haemonetics and relate to blood processing devices and/or fluid sampling systems. He also communicated directly with the Executive and Board members about his work related to plasmapheresis products. By the time of the filing of the '916 and '474 applications in 2021, Ragusa was the Senior Director of Research and Development where he admits he "provided review of technical initiatives to CEO and Board Members." FENWAL 00014347 at -4349.

92. Perullo, the Vice President, Associate General Counsel, and Chief Intellectual Property Officer, has worked for Haemonetics for more than 21 years, and now "oversees all general, commercial, and regulatory compliance for the global hospital business and all IP legal matters corporate-wide." FENWAL 00017083. He "participat[es] in strategic business discussions throughout the entire decision making process [at Haemonetics] and advis[es] on IP, technology, competitor, and market landscape issues." *Id.* at -7084. He admits to managing

Haemonetics' "portfolio of 400+ issued patents and almost 300 pending applications" and "working with innovators on new concepts." *Id.* In addition, Perullo was responsible for "drafting and negotiating business-focused contracts" for Haemonetics. *Id.*

93. Given his responsibilities at Haemonetics, and the limited competition in 2021 (only Fresenius/Fenwal competed with Haemonetics), Perullo was aware of the Aurora Xi.

94. Lovely, who had been prosecuting patents for Haemonetics in the field of blood collection systems since at least November 2007, knew about Haemonetics' main competitor's devices at least as part of the diligence that accompanies the filing of new patent applications.

***<u>Haemonetics Copied Fenwal</u>***

95. On January 21, 2021, Fenwal's U.S. 17/062,368 patent application, which is related to "a plasmapheresis system and a method for operating a plasmapheresis system," published as US2021/0015989A1. FENWAL 00017060.

96. Figure 2 of the Fenwal '989 Publication includes a technical drawing of the Aurora Xi device (compare Figure 2 of the '989 Publication on the left with an image of Aurora Xi device):




*Fig. 2*

FENWAL 00017060 at -17062.



FENWAL 00013973 at -3973.

97. On March 18, 2021, two months ***after*** Fenwal's US2021/0015989A1 application was published, Haemonetics filed patent application numbers 17/205,374 (the "'374 application") and 17/205,400 (the "'400 application"), which granted as the '916 and '474 asserted Haemonetics patents, respectively. HAEM-FRE_0004804; HAEM-FRE_0005372.

98. The claims in the '374 and '400 applications, as submitted by Lovely and Ragusa on March 18, 2021, are identical or nearly identical to the claims in Fenwal's US2021/0015989A1 publication.

99. For example, and as shown below, Claim 1 of the Haemonetics '400 application is a verbatim copy of Claim 42 of Fenwal's '989 Publication:

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1**<br>**Claim 42**<br><br>**Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,400**<br>**COPIED Claim 1**<br><br>**Filed March 18, 2021** |
|---|---|
| A system for collecting plasma, comprising:<br>a venipuncture needle configured to draw whole blood from a donor; | A system for collecting plasma, comprising:<br>a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; and | a touchscreen configured to receive input from an operator; and |
| a controller programmed to control operation of the system, | a controller programmed to control operation of the system, |
| the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit,<br><br>to determine a target volume for plasma product and/or raw plasma, to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood component and | the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit,<br><br>to determine a target volume for plasma product and/or raw plasma, to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood component and |

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1**<br>**Claim 42**<br><br>**Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,400**<br>**COPIED Claim 1**<br><br>**Filed March 18, 2021** |
|---|---|
| to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. | to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. |

100. Haemonetics did not just copy Claim 42 of the Fenwal ’989 Publication. All 27 claims of the ’400 application were copied from the earlier Fenwal ’989 Publication.

101. 21 claims were copied verbatim, 4 claims were modified to drop the phrase “from a donor management system” and 2 claims were modified to use the term “control system” instead of “donor management system.” This copying is evidenced in Appendix E-1 to Defendants’ Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, which is attached hereto as Exhibit A.

102. In sum, Haemonetics copied more than 1,750 Fenwal claim words and claimed them as its own in the ’400 application.

103. Further evidence of Haemonetics’ copying is provided by the fact that technical claim language Haemonetics introduced in its ’400 application does not appear anywhere in the specification accompanying the ’400 application.

104. For example, the claim language “plasma output port” (Haemonetics Claims 1, 7, 10, 16) does not appear anywhere in the Haemonetics specification for the ’400 application—it

only appears in the copied claim language. In comparison, "plasma output port" is found in both the specification ([0021], [0038], [0096]) and claims (Claims 48, 52 and 60) of the Fenwal '989 Publication.

105. Similarly, "donor parameters," which appears in Haemonetics' copied claims 16, 21, and 22, does not appear in the Haemonetics specification. "Donor parameters" appears in the Fenwal specification at paragraphs [0059], [0064], and [0095] and claims 60, 65, and 66.

106. Likewise, the claim language "current value of the hematocrit of the donor" of Haemonetics Claim 1 appears only in the copied claim language. In comparison, this language is present in both the specification ([0066] ("current value for the hematocrit of the donor")) and claims (Claim 42) of the Fenwal '989 Publication.

107. Other examples of Haemonetics' copied claims including Fenwal technical language include:

(i) "Raw Plasma," which only appears in Haemonetics copied Claims 1-3, 5, 6, 7, 10, 16, 17, 19, 20, 21, 22, 26 but which originally appears in Fenwal's '989 Publication 98 times including, for example, at Abstract, [0001], [0007] and Claims 42-44, 46-49.

(ii) "Venipuncture Needle," which only appears in Haemonetics copied Claims 1, 7, 10, 16, but which originally appears in Fenwal's '989 Publication 14 times including, for example, at [0021], [0030] and Claims 42, 48, 52, 60.

(iii) "Draw and Return Cycle," which only appears in Haemonetics copied Claims 1, 2, 10, 15, but which originally appears in Fenwal's '989 Publication at [0066] and Claims 42, 43, 44.

(iv) "Reservoir," which only appears in Haemonetics copied Claim 27, but which originally appears in Fenwal's '989 Publication at [0021], [0038], [0039] and Claim 71.

(v) "Anticoagulant Ratio," which only appears in Haemonetics copied Claims 10 and 26, but which originally appears in Fenwal's '989 publication at [0016], [0017], [0056] and Claims 49, 52, 56.

108. Haemonetics' copying is not limited to the '400 application. In the '374 application, filed on the same day, Haemonetics similarly copied the earlier published Fenwal claims, making comparable minor variations.

109. For example, and as shown below, Claim 10 of the Haemonetics '374 application is a verbatim copy of Claim 52 of Fenwal's '989 Publication, but for Haemonetics' omission of the word "height" in two instances (see highlighting):

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1<br>Claim 52<br><br>Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,374<br>COPIED Claim 10<br><br>Filed March 18, 2021** |
|---|---|
| A system for collecting plasma, comprising: | A system for collecting plasma, comprising: |
| a venipuncture needle configured to draw whole blood from a donor; | a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; and | a touchscreen configured to receive input from an operator; and |

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1<br>Claim 52<br><br>Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,374<br>COPIED Claim 10<br><br>Filed March 18, 2021** |
|---|---|
| a controller | a controller |
| programmed to control operation of the system, the controller coupled to the touchscreen<br><br>and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant,<br><br>wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight, height and the donor's hematocrit,<br><br>the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor. | programmed to control operation of the system, the controller coupled to the touchscreen<br><br>and programmed to receive at least a donor's weight and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant,<br><br>wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight and the donor's hematocrit,<br><br>the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor. |

110. In other words, out of the 264 words in Fenwal's Claim 52, 262 of those words (over 99%) were copied into Haemonetics' later-filed Claim 10.

111. Out of the 232 words in Fenwal's Claim 48, 228 of those words (over 98%) are present in Haemonetics' Claim 7 (which is identical but for Haemonetics' removal of the words "height" and "sex" in two instances).

112. Likewise, out of the 276 words in Fenwal's Claim 42, 274 of those words (over 98%) are identical to Haemonetics' 278-word Claim 1; here, Haemonetics merely changed the word "touchscreen" found in Fenwal's patent application to "user interface."

113. Other examples of copying are evident from a cursory review of the remaining claims in the '374 application, as evidenced in Appendix E-2 to Defendants' Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, which is attached hereto as Exhibit B.

114. Haemonetics, including prosecuting attorney Lovely, drafted the applications that became the '916 and '474 patents by copying Fenwal's claims nearly verbatim.

115. Following the initial filing of its '374 and '400 applications, Haemonetics continued to rely on Fenwal's '989 Publication to modify its own patent claims to track Fenwal's—again without disclosure to the PTO.

116. In its first response to an Office Action in the pending '400 application prosecution, which occurred on August 6, 2024, Haemonetics amended "its" claims to further mirror Fenwal's claims by revising the copied claim language to add additional Fenwal claim limitations.

117. Specifically, Haemonetics amended the independent claims to include the limitation "to determine a target volume for plasma product and/or raw plasma based on the donor's total blood volume and/or the donor's plasma volume" (addition underlined), which is copied from claims found in Fenwal's '989 Publication. For example:

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1**<br>**Claim 46**<br><br>**Published January 21, 2021** | **Haemonetics US Patent No. 12,186,474**<br><br>**Amended August 6, 2024** |
|---|---|
| Claim 42 | COPIED Claim 1 |

| | |
|---|---|
| A system for collecting plasma comprising: | A system for collecting plasma, comprising: |
| a venipuncture needle configured to draw whole blood from a donor; | a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, |
| the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; | a touchscreen configured to receive input from an operator; and |
| and a controller programmed to control operation of the system, | a controller programmed to control operation of the system, |
| the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit, | the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit, |
| to determine a target volume for plasma product and/or raw plasma, | to determine a target volume for plasma product and/or raw plasma based on the donor's total blood volume and/or the donor's plasma volume, |
| to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood | to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood |

| | |
|---|---|
| component and to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. | component and to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. |
| Claim 46 | |
| 46. The system of claim 42, wherein the controller is programmed to determine the target volume for plasma product and/or raw plasma based on the donor's total blood volume and the donor's plasma volume. | |

118. Strikingly, the phrase "based on the donor's total blood volume and/or donor's plasma volume" does not appear anywhere in the specification of the Haemonetics '400 application. It only exists in the context of the Haemonetics copied claims (and the Fenwal application from which it was derived).

119. Haemonetics' copying of Fenwal's claims infects the patents Haemonetics asserts. For example, Claim 10 of the '916 Patent as issued is identical to the copied Claim 10 of Haemonetics' '374 application (and by extension, Fenwal's '989 Publication).

120. Other asserted claims exhibit only minor differences. For example, Claim 14 of the '916 Patent replaces the term "donor management system" from Claim 60 of the '989 Publication with "control system," but is otherwise identical. *See also, e.g.*, Claim 15 of the '474 Patent versus Claim 60 of the '989 Publication (omitting "from a donor management system" and adding "donor's total blood volume" and "donor's total plasma volume" language originally found in Fenwal's '989 Publication).

121. In sum, the overlap is substantial, with the minor differences being essentially minor word variations or omissions.

122. It is simply unbelievable that Haemonetics independently wrote identical claims without knowledge of Fenwal's activities and patent claims. The only reasonable conclusion is that Haemonetics, including at least Ragusa and Lovely, had knowledge of Fenwal's patents and the information they contained, including the Aurora Xi, and copied Fenwal's claims.

123. Haemonetics, including Ragusa and Lovely, did not cite the '989 Publication when filing its application 17/205,374 and 17/205,400. Nor did they file any Information Disclosure Statement during the prosecution of the '652, '474 or '916 patents which disclosed any of the following: (a) the Aurora Xi System; (b) the Aurora Xi System Operator's Manual (October 2016); or (c) the Aurora Xi System Service Manual (January 2017).

124. Haemonetics, including at least Ragusa and Lovely, committed fraud upon the USPTO when they failed to cite Fenwal U.S. Patent Application Publication No. 2021/0015989 and the Aurora Xi Prior Art when filing its 17/205,374 and 17/205,400 applications.

***<u>Haemonetics Acknowledges the Materiality of the Prior Art</u>***

125. Haemonetics (specifically Perullo, Ragusa and Lovely) knew disclosure of the Aurora Xi Prior Art and Fenwal application during the prosecution of the Asserted Patents would have been material to the patentability of these applications.

126. As an initial matter, the fact that Haemonetics' issued patents contain nearly identical claims as a prior Fenwal published application raises a substantial inventorship question that is material to the patentability of the Haemonetics' patents. *See, e.g.*, *Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1360 (Fed. Cir. 2010) (finding failure to disclose

a patent application containing nearly identical claim language during prosecution was material at least with regard to inventorship).

127. Moreover, Haemonetics' failure to disclose the prior art Aurora Xi device impacted the patentability of the claims. Haemonetics acknowledges the materiality of the Aurora Xi device Prior Art by citing to it in Haemonetics' First Amended Complaint. *See, e.g.*, *Upsher-Smith Labs., Inc. v. Pamlab, LLC*, 412 F.3d 1319, 1322 (2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'").

128. The same images and text that Haemonetics cites from the 2025 Aurora Xi Manual to support allegations of infringement of its patents appear in the prior art versions of the Operator's Manual and Service Manual (and the publicly available device itself) that were published in October 2016 and January 2017, respectively.

129. Both manuals predate the earliest priority date of Haemonetics' Asserted Patents. Relevant examples from Haemonetics' infringement allegations as to the '916 Patent are reproduced below, with the claim limitation on the left, Haemonetics' infringement allegations in the middle, and identical or nearly identical text and images from Fenwal's October 2016 or January 2017 manuals on the right.

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[d] an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | **Figure 1: Collection Phase**<br><br><br>FENWAL_00007068 | <br><br>2.1 Collection Phase<br>FENWAL 00014012 |

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[a] a venipuncture needle configured to draw whole blood from a donor; | The disposable set also includes several tubing lines for transporting anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant within the device during the Collection/Reinfusion Phases. The individual lines in a set are as follows:<br>FENWAL_00007083<br><br>**AC Line:** Transports AC solution through the AC pump to the Y1-connector.<br>FENWAL_00007083<br><br>**Blood Line:** Transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this tubing from the reservoir and go back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL_00007083<br><br>**Donor Line:** Transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir and go back to the donor.<br>FENWAL_00007083<br><br>**Plasma Line:** Transports plasma from the separator to the plasma collection container.<br>FENWAL_00007083<br><br>**Reinfusion Line:** Transports reservoir contents from the reservoir to the blood line.<br>FENWAL_00007083<br><br>**Saline Line:** Transports saline from the saline container to the Y5-connector. The line does not transport fluids for a No Saline Protocol, although it may contain blood on the right side of the saline clamp while performing a No Saline Protocol.<br>FENWAL_00007083 | **Disposable Set Tubing**<br>The disposable set also includes several tubing lines; each of which is used to transport either anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant from one location on the instrument to another during the Collection/Reinfusion Phases. The individual lines comprising a set are as follows:<br>FENWAL 00014028<br>• **AC Line:** The AC line tubing transports AC solution through the AC pump to the Y1-connector.<br>FENWAL 00014029<br>• **Blood Line:** The blood line tubing transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this section of tubing from the reservoir back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL 00014029<br>• **Donor Line:** The donor line tubing transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir back to the donor.<br>FENWAL 00014029<br>• **Plasma Line:** The plasma line transports plasma from the separator to the plasma collection container.<br>FENWAL 00014029<br>• **Reinfusion Line:** The reinfusion line tubing transports reservoir contents from the reservoir to the blood line.<br>FENWAL 00014029<br>• **Saline Line:** The saline line tubing transports saline from the saline container to the Y5-connector. The line is not used to transport fluids for a No Saline Protocol although it may contain blood on the right side of the saline clamp while performing a No Saline Protocol.<br>FENWAL 00014029 |

<table>
<tr>
<th>’916 Patent Claims 14-17, 19, 22</th>
<th>Representative Evidence of the Accused Instrumentalities</th>
<th>Aurora Xi Plasmapheresis Plasmapheresis System Operator’s Manual Version 1.0 dated October 2016</th>
</tr>
<tr>
<td>14[b] a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;</td>
<td>

The plasma then moves from the plasma output port, through the plasma line, and into the plasma collection container. Concentrated cells are pumped from the concentrated cell output port and into the reservoir.

**Figure 9: Separator**




The disposable set also includes several tubing lines for transporting anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant within the device during the Collection/Reinfusion Phases. The individual lines in a set are as follows:

FENWAL_00007082 (annotated)

**AC Line:** Transports AC solution through the AC pump to the Y1-connector.

FENWAL_00007083

**Blood Line:** Transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this tubing from the reservoir and go back to the donor (i.e., from the Y3-connector to the Y2-connector).

FENWAL_00007083

**Donor Line:** Transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir and go back to the donor.

FENWAL_00007083

</td>
<td>




2.9 Separator

FENWAL 00014028

**Disposable Set Tubing**

The disposable set also includes several tubing lines; each of which is used to transport either anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant from one location on the instrument to another during the Collection/Reinfusion Phases. The individual lines comprising a set are as follows:

FENWAL 00014028

- **AC Line:** The AC line tubing transports AC solution through the AC pump to the Y1-connector.

FENWAL 00014029

- **Blood Line:** The blood line tubing transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this section of tubing from the reservoir back to the donor (i.e., from the Y3-connector to the Y2-connector).

FENWAL 00014029

- **Donor Line:** The donor line tubing transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir back to the donor.

FENWAL 00014029

</td>
</tr>
</table>

<table>
<tr>
<th>’916 Patent Claims 14-17, 19, 22</th>
<th>Representative Evidence of the Accused Instrumentalities</th>
<th>Aurora Xi Plasmapheresis Plasmapheresis System Operator’s Manual Version 1.0 dated October 2016</th>
</tr>
<tr>
<td>14[c] a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump;</td>
<td>

**Pumps**

Three peristaltic pumps are located on the front panel. The individual functions are described below.

- **AC Pump:** Delivers the AC solution at a controlled rate into the blood line as whole blood enters the set from the donor during the Collection Phase. This pump does not operate during the Reinfusion Phase.
- **Blood Pump:** Primes the disposable set and clears air from the donor line. Collects whole blood from the donor and delivers anticoagulated blood to the separator during the Collection Phase (see Figure 1 — Collection Phase). The blood pump reverses and pumps concentrated cellular components from the reservoir back to the donor through the same venipuncture site during the Reinfusion Phase (see Figure 2 — Reinfusion Phase). If a Saline Protocol is used, the blood pump also delivers saline to the donor during the Final Reinfusion Phase.
- **Cell Pump:** Delivers concentrated cellular components from the separator to the reservoir during the Collection Phase. It also primes the disposable set. This pump does not operate during the Reinfusion Phase except to clear blood from the separator during the Final Reinfusion Phase.

FENWAL_00007073

</td>
<td>

**Pumps**

Three peristaltic pumps are located on the front panel. The individual functions are described below.

- **AC Pump:** During the Collection Phase, delivers the AC solution at a controlled rate into the blood line as whole blood enters the set from the donor. This pump does not operate during the Reinfusion Phase.
- **Blood Pump:** It primes the disposable set and clears air from the donor line. During the Collection Phase, collects whole blood from the donor and delivers anticoagulated blood to the separator (see Figure 2.1 for a diagram showing the Collection Phase). During the Reinfusion Phase, the blood pump reverses and pumps concentrated cellular components from the reservoir back to the donor through the same venipuncture site (see Figure 2.2 for a diagram showing the Reinfusion Phase). It may also deliver saline to the donor during the Final Reinfusion Phase, if a Saline Protocol is used.
- **Cell Pump:** During the Collection Phase, delivers concentrated cellular components from the separator to the reservoir. It also primes the disposable set. This pump does not operate during the Reinfusion Phase except to clear blood from the separator during the Final Reinfusion Phase.

FENWAL 00014018-19

</td>
</tr>
</table>

| ’916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator’s Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[f] a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw … | **Main Data Entry Overlay**<br>**Donor ID Button:** If enabled, allows entry of the donor ID number for the procedure.<br>**Donor Gender Button:** If enabled, allows entry of the donor's gender for the procedure.<br>**Donor Height Button:** If enabled, allows entry of the donor's height for the procedure. This can be in inches or centimeters, depending on the administrative settings.<br>**Donor Weight Button:** Allows entry of the weight of the donor. This can be in kilograms or pounds, depending on administrative settings.<br>**Figure 45: Typical Main Data Entry Screen – Donor Data**<br><br><br>**Donor Hematocrit/Hemoglobin Button:** Allows entry of the hematocrit or hemoglobin value of the donor. Note this displays as either hematocrit or hemoglobin, depending on the administrative settings.<br>**Target Saline Infusion Volume Button:** Allows entry of the target saline infusion volume for the procedure during a Saline Protocol.<br>FENWAL_00007118 | *Main Data Entry Overlay*<br><br><br>**4.8 Typical Main Data Entry Screen — Donor Data**<br>**Donor ID Button:** If enabled, allows entry of the donor ID number for the procedure. For information on the overlay, see the alphanumeric extended keypad information in Chapter 2.<br>**Donor Gender Button:** If enabled, allows entry of the donor's gender for the procedure. This overlay is shown in the Donor Gender Overlay section.<br>**Donor Height Button:** If enabled, allows entry of the donor's height for the procedure. This can be in inches or centimeters, depending on the administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Donor Weight Button:** Allows entry of the weight of the donor. This can be in kilograms or pounds, depending on administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Donor Hematocrit/Hemoglobin Button:** Allows entry of the hematocrit or hemoglobin value of the donor. Note that this is either the hematocrit or hemoglobin, depending on the administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Target Saline Infusion Volume Button:** Allows entry of the target saline infusion volume for the procedure, if a saline protocol is selected.<br>FENWAL 00014061-62 |

130. Full comparisons for the infringement allegations found in Haemonetics’ First Amended Complaint and accompanying claim charts as to the asserted claims in the ’916 and ’474 Patents are found in Exhibit C (’916 Patent comparison chart) and Exhibit D (’474 Patent comparison chart) attached hereto.

131. In its Initial Infringement Contentions served on March 31, 2026, and amended on April 15, 2026, Haemonetics continues to acknowledge the materiality of the 2016 Aurora Xi device, as it cites the October 2016 and January 2017 Aurora Xi manuals as evidence of infringement. This is evidenced by Appendices E-3 and E-4 to Defendants’ Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, both of which Fresenius incorporates by reference.

132. Thus, by Haemonetics' own interpretation of the Asserted Patent claims, the Aurora Xi 2016 device is material prior art.

133. Haemonetics (specifically Ragusa, Perullo, and Lovely) never provided information about the Aurora Xi device or the related manuals to the US Patent Office during prosecution of the Asserted Patents.

134. No Information Disclosure Statement filed during prosecution of U.S. Patent Application Serial No. 15/608,183 (which issued as the '652 Patent), U.S. Patent Application Serial No. 17/205,374 (which issued as the '916 Patent), or U.S. Patent Application Serial No. 17/205,400 (which issued as the '474 Patent) disclosed (a) the Aurora Xi System, (b) the Aurora Xi System Operator's Manual (October 2016), or (c) the Aurora Xi System Service Manual (January 2017).

135. Thus, across the prosecution of all three Asserted Patents, despite full awareness of the Aurora Xi device and its manuals, Haemonetics never disclosed any of these material references to the USPTO.

136. The decision not to search for or disclose Fenwal's prior art was not an inadvertent oversight—it was a deliberate choice by individuals who admittedly monitored Fenwal's every move in the marketplace.

137. In fact, during the late stages of prosecution of the '916 patent, the Examiner identified Fenwal art US2012/0165685 (not previously disclosed) and issued a rejection. HAEM-FRE_0004804 ('916 Patent FH May 3, 2024 Non Final Rejection), at -4874. US2012/0165685 relates to "blood collection system[s] including an operator user interface to allow an operator to configure the system for a blood collection procedure form a donor." HAEM-FRE_0065504 ('685 Publication), at -5504. US2012/0165685 also includes an image of an Aurora device in Figure 1:




FIG. 1

138. The Examiner issued a rejection noting the pending Haemonetics' claims were obvious over Fenwal US2012/0165685, which "discloses a plasmapheresis apparatus with venous access, containers, and pumps, coupled with a touchscreen user interface to enter patient parameters, enter control schemes, and relay information." *See, e.g.*, HAEM-FRE_0004804 at -4874–75.

139. Instead of attempting to distinguish the art, Haemonetics, specifically Lovely, filed a terminal disclaimer, improperly claiming priority to the '652 priority date of May 2017 to overcome the rejection. *Id.* at -4863. But, yet again, Haemonetics was not forthright with the Examiner because, in reality, there is no support for these claims in the applications it claims priority to. *See, e.g.*, FENWAL 00033667 at -3764 (PGR2025-00078, Petition for Post Grant

Review of U.S. Patent No. 12,171,916 filed by Terumo alleging lack of written description support in the specification of the ’916 patent1 for the Asserted Claims).

140. Haemonetics cannot rely on any alleged claim to the May 30, 2017 priority date of the ’652 patent to avoid its disclosure obligations or to insulate the ’916 and ’474 patents from Fenwal’s prior art.

141. As a threshold matter, a claimed priority date has no bearing on the duty of candor. Under 37 C.F.R. § 1.56, Haemonetics owed a continuing duty of candor and good faith to the USPTO throughout the pendency of each application, which obligated it to disclose all information known to be material to patentability—including the ’989 Publication and the Aurora Xi Prior Art—as of the actual filing date of the ’374 and ’400 applications on March 18, 2021 and throughout the entire period those applications remained pending.

142. No priority claim can override or eliminate the applicant’s obligation to disclose material prior art known at the time the application was filed and prosecuted. The duty of disclosure exists to ensure the Examiner has the full picture of relevant art when evaluating claims, and Haemonetics’ deliberate concealment of the very publication from which it copied its claims is not excused by pointing to an earlier priority date.

143. Moreover, Haemonetics’ claim to the May 2017 priority date is itself false. Under 35 U.S.C. § 120, a continuation or continuation-in-part application is entitled to the benefit of an earlier filing date only for claims supported by the written description of the earlier application.

144. The claims Haemonetics copied from Fenwal’s ’989 Publication contain technical terminology—including “plasma output port,” “donor parameters,” “current value of the

[1] The specification of the ’916 patent is substantially identical to the specification of the ’652 patent.

hematocrit of the donor," "raw plasma," "venipuncture needle," "draw and return cycle," "reservoir," "anticoagulant ratio," and "based on the donor's total blood volume and/or the donor's plasma volume"—that does not appear anywhere in the specification of the '652 patent or its continuations.

145. Because these claim terms originate from Fenwal's application and not from Haemonetics' own disclosure, the earlier-filed Haemonetics applications do not provide written description support for the copied claims, and Haemonetics is not entitled to any earlier priority date for them.

146. Terumo BCT—the other of Haemonetics' two competitors, which Haemonetics is also attempting to exclude from the market—has raised precisely this point. In Post Grant Review Petition No. PGR2025-00078, Terumo alleges that the specification of the '916 patent lacks adequate written description support for the asserted claims.

147. That Haemonetics filed a terminal disclaimer to the '652 patent to overcome the Examiner's rejection based on Fenwal prior art US2012/0165685—rather than distinguishing its claims on the merits—further confirms that Haemonetics knew its copied claims could not withstand scrutiny against Fenwal's prior art and chose procedural maneuvering over candor with the Patent Office. Haemonetics cannot shield its fraud on the PTO behind a priority date to which it is not entitled for claims it did not invent and cannot support with its own specification.

148. The fact that Haemonetics failed to distinguish its claimed invention from this art further demonstrates the materiality of the Fenwal art. By failing to bring to the Examiner's attention Fenwal prior art known to (and copied by) Haemonetics (specifically Ragusa and Lovely), including the Aurora Xi device and manual, it is clear Haemonetics had the intent to

purposefully omit material prior art to the PTO in an effort to obtain the patents it now seeks to assert against its (only) two competitors in the field of plasmapheresis.

***Haemonetics' History and Motivation to Litigate***

149. It is beyond dispute that Haemonetics (specifically Ragusa and Lovely) filed the original applications for the Asserted Patents after the Aurora Xi device was in use in the public domain and known to them.

150. The single most reasonable inference from this evidence is that Haemonetics (specifically Ragusa, Perullo, and/or Lovely) withheld this information with the specific intent to mislead or deceive the Patent Office and with knowledge that the withheld information was material to patentability, so the Asserted Patents would issue, and Haemonetics would have leverage to assert over its competitors.

151. In other words, Haemonetics (specifically Ragusa, Perullo, and/or Lovely) made a deliberate decision not to disclose the Aurora art to the USPTO for the purpose of avoiding rejection.

152. The motivation is simple—Haemonetics, including Perullo, sought to obtain intellectual property rights to leverage in the future, with the goal of gaining market share through litigation, as opposed to competing fairly in the market.

153. In 2021, Haemonetics enjoyed a dominant market position, commanding approximately 75% share of the U.S. market for plasmapheresis devices. But the market was threatened in 2021 when a third competitor—Terumo BCT—announced that it would be entering the market and, worse for Haemonetics, that competitor was collaborating with a major Haemonetics customer to develop a new plasmapheresis device. These competitive forces had a demonstrable impact.

154. On information and belief, Haemonetics now faces new price pressure and has even been forced to make price concessions to try to lock in other customers.

155. Faced with these strong competitive pressures, Haemonetics chose not to compete on the merits and instead turned to its thicket "of 400+ issued patents and almost 300 pending applications" to try to protect its market position. FENWAL 00017083 at -7083.

156. On information and belief, Haemonetics sought to prevent customers from contracting with Fenwal by publicly threatening to sue Fenwal for infringement.

157. Haemonetics then did in fact file infringement lawsuits against both of its competitors. It filed the instant lawsuits against Fenwal, Fresenius Kabi USA, and Fresenius Kabi AG.

158. Haemonetics filed a comparable lawsuit against Terumo for alleged infringement of nine Haemonetics patents, three of which overlap with the Asserted Patents in this case. Compl. ¶ 1, *Haemonetics Corp. v. Terumo BCT, Inc.*, No. 25-cv-1409, 2025 WL 1841196 (D. Colo. May 5, 2025).

159. If Haemonetics' lawsuits succeed, neither Fenwal nor Terumo will be able to offer their current plasmapheresis devices in the United States, and Haemonetics will once again be dominant.

160. This is not the first time Haemonetics has engaged in this type of anticompetitive behavior. Haemonetics has a history of attempting to leverage litigation to gain a competitive advantage in this highly concentrated market.

161. For example, in 2005 (when Perullo was counsel for Haemonetics), Haemonetics filed a lawsuit alleging Fenwal's ALYX System (a blood component collection system) infringed a patent Haemonetics purchased from a third party. *See Haemonetics Corp. v. Fenwal, Inc.*, 811

F. Supp. 2d 548, 549 (D. Mass. 2011); FENWAL 00028284 (assignment of '983 patent from Biofluid Systems to Haemonetics for "valuable consideration").

162. Following a trial, appeal, and remand, Fenwal was victorious and found to not infringe the asserted patent. *Haemonetics Corp.*, 811 F. Supp. 2d at 553 ("Fenwal's products do not infringe the '983 Patent, either literally or under the doctrine of equivalents.").

163. In sum, Haemonetics' conduct before the USPTO was not mere negligence or oversight—it was a calculated scheme to obtain patent rights through deception and for the purpose of preventing fair competition in the marketplace.

164. Haemonetics copied Fenwal's claims word-for-word, concealed the source of its copied claims from the USPTO, and deliberately withheld disclosure of Fenwal's Aurora Xi prior art device—all while knowing this information was material to patentability and with the specific intent to deceive the Patent Office into issuing patents it otherwise would not have granted.

165. The single most reasonable inference from the evidence is that Haemonetics, through Ragusa and Lovely, committed fraud on the USPTO to obtain patents it now seeks to wield against the very competitor whose innovations it copied. Such inequitable conduct renders all claims of the Asserted Patents and related family members unenforceable.

## COUNT 8: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE '652, '916, AND '474 PATENTS DUE TO INEQUITABLE CONDUCT (UNCLEAN HANDS)

166. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

167. Haemonetics and its agents have engaged in a pattern of litigation and prosecution misconduct to gain an advantage in this litigation that constitutes unclean hands.

168. Defendants request that the Court declare that Haemonetics' unclean hands bar any recovery in this suit.

## COUNT 9: *WALKER PROCESS* ANTITRUST VIOLATION (ATTEMPTED MONOPOLIZATION, 15 U.S.C. §§ 2, 15(a), 26)

169. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

170. During prosecution of the Asserted Haemonetics Patents, Haemonetics, the named inventor, and its prosecuting attorneys intentionally failed to cite and withheld material prior art information and publications describing Fenwal's Aurora Xi device and related patent publications.

171. Had these individuals not withheld this prior art information, the Patent Office would not have issued any of the Asserted Patents.

172. Haemonetics' withholding and selective disclosure of prior art related to the Aurora Xi and Fenwal's patents renders the Asserted Haemonetics Patents unenforceable. *See American Calcar, Inc. v. American Honda Motor Co.*, 768 F.3d 1185, 1188-92 (Fed. Cir. 2014).

173. According to Haemonetics, the U.S. market for plasma collection or apheresis devices is a highly concentrated, three-player market consisting of Haemonetics, Fresenius Kabi/Fenwal, and Terumo BCT.

174. At the time of filing the fraudulent patent applications, Haemonetics was the dominant market leader.

175. On information and belief, Haemonetics expected and feared a dramatic erosion of its dominant position in 2021 at least because Terumo BCT had announced that it was collaborating with a major Haemonetics customer to develop a new plasmapheresis device.

176. Haemonetics responded by using litigation—specifically patent infringement litigation—to try to maintain its market dominance. That use of patents to exclude rivals is

exclusionary conduct that gives rise to antitrust liability under Section 2 of the Sherman Act. *See Walker Process Equip., Inc. v. Food Machinery Corp.*, 382 U.S. 172 (1965).

177. On information and belief, Haemonetics' fraud on the Patent Office, assertion of the asserted patents against Defendants, and threats of infringement litigation in the marketplace are anticompetitive conduct designed to monopolize the market for plasmapheresis devices generally, and the submarket for automated plasma collection systems specifically, in violation of the Sherman Act, 15 U.S.C. § 2.

178. Haemonetics obtained the patents by knowing and willful fraud on the patent office and maintained and enforced the patents with knowledge of the fraudulent procurement. *See TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016); *see also In re Lipitor Antitrust Litig.*, 868 F.3d 231, 266 (3d Cir. 2017); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1073 (Fed. Cir. 1998).

179. Through its fraud and litigation-related conduct, Haemonetics engaged in predatory and anticompetitive conduct with a specific intent to monopolize the market.

180. The relevant product market is plasmapheresis devices, which are not reasonably interchangeable with or substitutable for other blood collection technologies; they serve a distinct function in separating plasma from whole blood for commercial fractionation. Automated plasma collection systems constitute a recognized submarket within the broader blood collection equipment market.

181. The relevant geographic market is the United States.

182. There are significant barriers to entering the markets, including: (i) Haemonetics' exclusionary and fraudulently obtained Asserted Patents, which Haemonetics is now wielding against its only competitors to prevent entry and expansion; (ii) substantial capital costs required

to develop, manufacture, and obtain FDA approval for plasmapheresis devices; (iii) technological obstacles inherent in designing systems that meet the stringent regulatory and performance requirements for blood collection equipment; (iv) the need for partnerships with plasma collectors, which Haemonetics has cultivated over decades through its dominant market position; and (v) Haemonetics' deliberate strategy of maintaining a closed, non-interoperable software ecosystem that locks customers into its platform and prevents competitors from offering competing products compatible with its software.

183. In light of its broad construction of its patents and the limited number of competitors, both of whom would be largely barred from the market if Haemonetics' litigation tactics are successful, there is a dangerous probability that Haemonetics will achieve monopoly power in the market for plasmapheresis devices and the submarket for automated plasma collection systems.

184. Haemonetics' attempted enforcement of the Asserted Patents and its anticompetitive conduct did cause and threatens to continue to cause significant injury to Defendants, which have expended substantial amounts of money, time, and human resources defending this action.

185. Moreover, Haemonetics' patents and actions during prosecution and thereafter have forced Fresenius Kabi/Fenwal to change its business behavior, have disturbed Fresenius Kabi/Fenwal's course of business dealings, and have resulted in lost profits.

186. Beyond that, on information and belief, Haemonetics has disseminated information about this litigation to customers to dissuade customers from purchasing Fresenius Kabi/Fenwal's plasmapheresis devices, resulting in reputational damage and additional lost sales.

187. Haemonetics' anticompetitive conduct has caused harm to the competitive process, and it has caused harm and continues to cause harm specifically to Fresenius Kabi/Fenwal's business.

188. Because of Haemonetics' unlawful acts, Defendants did and will continue to suffer antitrust injury in an amount to be proven at trial.

189. Haemonetics has violated Section 2 of the Sherman Act.

**PRAYER FOR RELIEF**

190. Fresenius respectfully requests that this Court enter judgment in its favor and grant the following relief:

i. A determination and declaratory judgment that Fresenius has not infringed any valid claim of the '652 patent;

ii. A determination and declaratory judgment that each and every claim of the '652 patent is invalid;

iii. A determination and declaratory judgment that Fresenius has not infringed any valid claim of the '916 patent;

iv. A determination and declaratory judgment that each and every claim of the '916 patent is invalid;

v. A determination and declaratory judgment that Fresenius has not infringed any valid claim of the '474 patent;

vi. A determination and declaratory judgment that each and every claim of the '474 patent is invalid;

vii. A determination and declaratory judgment that the '652, '916, and '474 patents are unenforceable due to inequitable conduct;

viii. A judgment that Haemonetics has violated the Sherman Act, 15 U.S.C. § 2;

ix. An award of the cost of suit and treble damages for all antitrust injuries under the Clayton Act, 15 U.S.C. § 15, including legal fees incurred in this lawsuit;

x. An award of a permanent injunction enjoining Haemonetics from attempting to monopolize the relevant product and geographic markets, as provided by 15 U.S.C. § 26;

xi. An order declaring that this is an exceptional case and awarding Fresenius its costs, expenses, and reasonable attorneys' fees under 35 U.S.C. § 285 and/or 15 U.S.C. § 1117(a) and all other applicable statutes, rules, and common law;

xii. All costs be taxed against Haemonetics; and

xiii. Any such other relief as the Court may deem appropriate and just under the circumstances.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Fresenius, by and through its undersigned counsel, hereby demands a trial by jury on all claims so triable in this action.

* * *

**DEFENDANTS FRESENIUS KABI USA, LLC AND FRESENIUS KABI AG'S FIRST AMENDED ANSWER AND DEFENSES TO FIRST AMENDED COMPLAINT**

Defendants Fresenius Kabi USA, LLC and Fresenius Kabi AG (collectively "Fresenius"), by and through their undersigned counsel, hereby submit their Answer and Defenses to the First Amended Complaint (ECF No. 32) filed by Haemonetics Corporation ("Haemonetics").

Pursuant to Fed. R. Civ. P. 8(b)(3), Fresenius denies all allegations in Haemonetics' First Amended Complaint ("FAC"), whether express or implied, except those specifically admitted below. Each of the paragraphs 1-178 below corresponds to the same-numbered paragraphs in Haemonetics' FAC. Any factual allegation below is admitted only as to the specific admitted

facts, not as to any purported conclusions, characterizations, implications, or speculations that arguably follow from the admitted facts. Fresenius denies that Haemonetics is entitled to the relief requested or any other relief.

Pursuant to Fed. R. Civ. P. 15(a)(3), Fresenius hereby answers Haemonetics' FAC as follows:

## NATURE OF ACTION[2]

1. This is an action for patent infringement of U.S. Patent Nos. 10,758,652 (the "'652 Patent"), 12,171,916 (the "'916 Patent"), and 12,186,474 (the "'474 Patent") (collectively, the "Asserted Patents"). This action arises under the United States patent laws, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271 and 281.

**ANSWER**: Paragraph 1 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius admits that Haemonetics' FAC purports to be a patent infringement action alleging infringement pursuant to the United States patent laws, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271 and 281. To the extent there are allegations not expressly admitted above, those allegations are denied.

## THE PARTIES

2. Haemonetics is a Massachusetts corporation with its principal place of business at 125 Summer Street, Boston, MA 02110.

**ANSWER**: Fresenius understands based on Haemonetics' Complaint that Haemonetics claims to be a Massachusetts corporation with a principal place of business at 125 Summer Street, Boston, MA 02110. (ECF No. 32 at ¶ 2).

3. On information and belief, Fresenius Kabi USA, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at Three Corporate Drive, Lake Zurich, Illinois 60047.

---

[2] Fresenius repeats the headings recited in the FAC for convenience. To the extent such headings contain factual allegations to which a response is required, Fresenius denies all such allegations.

**ANSWER**: Admitted.

4. On information and belief, Fresenius Kabi USA, LLC, alone or in concert with the other Defendants, manufactures and distributes plasma collection systems, including the Aurora Xi Plasmapheresis System (the "Accused Products").

**ANSWER**: Denied.

5. On information and belief, Fresenius Kabi USA, LLC, alone or in concert with the other Defendants, sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services into the stream of commerce that incorporate infringing technology knowing that they would be sold and or used in this judicial district and elsewhere in the United States.

**ANSWER**: Paragraph 5 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

6. On information and belief, Fresenius Kabi AG is a corporation organized and existing under the laws of Germany with its principal place of business at Else-Kröner-Straße 1, 61352 Bad Homburg, Germany.

**ANSWER**: Admitted.

7. On information and belief, Fresenius Kabi AG, alone or in concert with the other Defendants, manufactures and distributes the "Accused Products".

**ANSWER**: Denied.

8. On information and belief, Fresenius Kabi AG, alone or in concert with the other Defendants, sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services into the stream of commerce that incorporate infringing technology knowing that they would be sold and or used in this judicial district and elsewhere in the United States.

**ANSWER**: Paragraph 8 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

9. On information and belief, Fenwal, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at Three Corporate Drive, Lake Zurich, Illinois 60047.

**ANSWER**: Admitted.

10. On information and belief and based on the representation of defense counsel, Fenwal, Inc., alone or in concert with the other Defendants, manufactures and distributes the "Accused Products".

**ANSWER**: Paragraph 10 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

11. On information and belief and based on the representation of defense counsel, Fenwal, Inc., alone or in concert with the other Defendants, sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services into the stream of commerce that incorporate infringing technology knowing that they would be sold and or used in this judicial district and elsewhere in the United States.

**ANSWER**: Paragraph 11 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

12. All allegations contained within this First Amended Complaint relating to Fenwal, Inc. are based on the representations of defense counsel.

**ANSWER**: Denied.

## JURISDICTION AND VENUE

13. This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

**ANSWER**: Paragraph 13 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius admits that Haemonetics purports to bring this action under the Patent Laws of the United States, Title 35 of the United States Code. To the extent there are allegations not expressly admitted above, those allegations are denied.

14. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER**: Paragraph 14 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius does not contest subject matter jurisdiction in the Northern District of Illinois for purposes of this litigation. To the extent there are allegations not expressly admitted above, those allegations are denied.

15. Venue is proper in this judicial district under 28 U.S.C. § 1400(b) because Fresenius Kabi USA, LLC and Fenwal, Inc. reside in this District, have regular and established places of business in this District, and have committed acts of infringement in this District.

**ANSWER**: Paragraph 15 contains legal conclusions to which no answer is required. To the extent an answer is required, for purposes of this litigation, Fresenius does not contest venue in the Northern District of Illinois. To the extent there are allegations not expressly admitted above, those allegations are denied.

16. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) – (c) because Fresenius Kabi AG has committed acts of infringement in this District, including at least the sale of infringing Accused Products in this District, and because at least one of the Defendants is incorporated in the State of Delaware.

**ANSWER**: Paragraph 16 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies the allegations.

17. Venue is proper in this judicial district under 28 U.S.C. § 1391(c)(3) because Fresenius Kabi AG is a foreign company and may be sued in any judicial district.

**ANSWER**: Paragraph 17 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies the allegations.

18. Fresenius Kabi USA, LLC is subject to this Court's general and specific personal jurisdiction because, on information and belief, it is registered to do business in the state of Illinois. Fresenius Kabi USA, LLC has purposefully availed itself of the privileges and benefits of the laws of the state of Illinois. And, on information and belief, Fresenius Kabi USA, LLC has sufficient minimum contacts with the state of Illinois, regularly conducts and solicits business within the state of Illinois, and Haemonetics' causes of action arise directly from Fresenius Kabi USA, LLC's business contacts and other activities in the state of Illinois. Additionally, Fresenius Kabi USA, LLC, either directly or through its related entities, has purposefully and voluntarily placed its infringing products into the stream of commerce with the intention and expectation that they will be acquired and used by customers in this District.

**ANSWER**: Paragraph 18 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies the allegations.

19. Fresenius Kabi USA, LLC engages in activities within this judicial district that infringe (directly or indirectly) the Asserted Patents, either literally or under the doctrine of equivalents, including the provision of, use, operation, sales, offering for sale, installation, and advertising of the Accused Products. Fresenius Kabi USA, LLC also infringes the Asserted Patents

by making, using, offering for sale, selling, installing, maintaining, providing instructions, and/or advertising the Accused Products within this District, either literally or under the doctrine of equivalents.

**ANSWER**: Paragraph 19 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

20. Fresenius Kabi USA, LLC encourages and induces third parties, including partners and customers, to use the Accused Products in an infringing way at least by advertising and distributing the Accused Products and providing instructions, materials, training, and services regarding the Accused Products.

**ANSWER**: Paragraph 20 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

21. Fenwal, Inc. is subject to this Court's general and specific personal jurisdiction because, on information and belief, it is registered to do business in the state of Illinois. Fenwal, Inc. has purposefully availed itself of the privileges and benefits of the laws of the state of Illinois. And, on information and belief, Fenwal, Inc. has sufficient minimum contacts with the state of Illinois, regularly conducts and solicits business within the state of Illinois, and Haemonetics' causes of action arise directly from Fenwal, Inc.'s business contacts and other activities in the state of Illinois. Additionally, based on the representations of defense counsel, Fenwal, Inc., either directly or through its related entities, has purposefully and voluntarily placed its infringing products into the stream of commerce with the intention and expectation that they will be acquired and used by customers in this District.

**ANSWER**: Paragraph 21 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies any remaining allegations.

22. Fenwal, Inc. engages in activities within this judicial district that infringe (directly or indirectly) the Asserted Patents, either literally or under the doctrine of equivalents, including the provision of, use, operation, sales, offering for sale, installation, and advertising of the Accused Products. Fenwal, Inc. also infringes the Asserted Patents by making, using, offering for sale, selling, installing, maintaining, providing instructions, and/or advertising the Accused Products within this District, either literally or under the doctrine of equivalents.

**ANSWER**: Paragraph 22 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

23. Fenwal, Inc. encourages and induces third parties, including partners and customers, to use the Accused Products in an infringing way at least by advertising and distributing the Accused Products and providing instructions, materials, training, and services regarding the Accused Products.

**ANSWER**: Paragraph 23 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

24. Fresenius Kabi AG is subject to this Court's general and specific personal jurisdiction because, on information and belief, it has purposefully availed itself of the privileges and benefits of the laws of the state of Illinois. And, on information and belief, Fresenius Kabi AG has sufficient minimum contacts with the state of Illinois, regularly conducts and solicits business within the state of Illinois, and Haemonetics' causes of action arise directly from Fresenius Kabi AG's business contacts and other activities in the state of Illinois. Additionally, Fresenius Kabi AG, either directly or through its related entities, has purposefully and voluntarily placed its infringing products into the stream of commerce with the intention and expectation that they will be acquired and used by customers in this District.

**ANSWER**: Paragraph 24 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

25. Fresenius Kabi AG is also subject to this Court's general and specific personal jurisdiction pursuant to 28 U.S.C. § 1391(c)(3) because it is a foreign company.

**ANSWER**: Paragraph 25 contains legal conclusions to which no answer is required. Fresenius admits Fresenius Kabi AG is a foreign company and denies any remaining allegations.

26. Fresenius Kabi AG engages in activities within this judicial district that infringe (directly or indirectly) the Asserted Patents, either literally or under the doctrine of equivalents, including the provision of, use, operation, sales, offering for sale, installation, and advertising of the Accused Products. Fresenius Kabi AG also infringes the Asserted Patents by making, using, offering for sale, selling, installing, maintaining, providing instructions, and/or advertising the Accused Products within this District, either literally or under the doctrine of equivalents.

**ANSWER**: Paragraph 26 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

27. Fresenius Kabi AG encourages and induces third parties, including partners and customers, to use the Accused Products in an infringing way at least by advertising and distributing the Accused Products and providing instructions, materials, training, and services regarding the Accused Products.

**ANSWER**: Paragraph 27 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius denies those allegations.

## BACKGROUND

28. Haemonetics is a global medical technology company dedicated to improving the quality, effectiveness, safety, and efficiency of healthcare. Haemonetics' innovative solutions address critical medical needs, including end-to-end plasma collection technologies to optimize operations for plasma centers; products to enable blood centers to collect blood components in the greatest demand; and a suite of hospital technologies designed to help enhance clinical outcomes and advance standards of care.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 28 and therefore denies those allegations.

29. Haemonetics Corporation was formed in 1971 by Jack Latham to develop and market apheresis and transfusion systems. Mr. Latham created the revolutionary Latham Bowl, an integral component for separating blood into its various components so that desired components can be collected while unneeded components can be returned to the donor, improving efficiency of donation while decreasing the time the donor must wait to make another donation. Mr. Latham's technology formed a foundation for the apheresis and transfusion systems used today. Haemonetics has been improving upon Mr. Latham's concepts and continuing to innovate in these areas ever since.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 29 and therefore denies those allegations.

30. Haemonetics invests significant resources into these improvements. For example, for the fiscal year that ended March 30, 2024, Haemonetics invested over $64 million in research and development of its products, which is directed out of its laboratory in Boston, Massachusetts.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 30 and therefore denies those allegations.

31. Through its research and development efforts, Haemonetics has become an industry leader in plasma solutions, providing integrated plasma collection systems.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 31, and therefore denies those allegations.

32. Plasma donation centers utilize Haemonetics' systems to collect blood plasma from donors. Haemonetics' systems collect physical characteristic information from a donor, collect the donor's blood, utilize the revolutionary centrifugation bowl technology and method to separate plasma from the donor blood, and then return the blood components, without the plasma, back to the donor.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 32 and therefore denies those allegations.

33. Haemonetics' systems are cleared by the United States Food and Drug Administration (the "U.S. FDA") and actively and commercially used to efficiently collect donated plasma.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 33 and therefore denies those allegations.

34. Human plasma is the indispensable source material for drugs that are known as plasma-derived medicinal products. Most of the plasma intended for fractionation into plasma-derived medicinal products is collected by plasmapheresis and is known as "source plasma." The frequency and volume of source plasma donations are strictly regulated by national regulatory authorities, for example by the U.S. FDA.

**ANSWER**: Fresenius admits that human plasma can be a source material for plasma-derived medicinal products. Fresenius admits that plasmapheresis is a process for the collection of plasma. Fresenius admits that the U.S. FDA has regulations regarding plasma donations. To the extent further answer is required, Fresenius lacks knowledge sufficient to answer and therefore denies those allegations.

35. After more than 20 years commercializing its market-leading PCS®2 plasmapheresis device, in 2017, Haemonetics announced its next generation NexSys PCS® plasmapheresis system, which today is used throughout the United States for plasma donation collection. Haemonetics' NexSys PCS® with YES® Technology, introduced in 2018, provides higher plasma collection volumes per donation by stopping the blood collection volume only when the correct volume of actual plasma, excluding the anticoagulant added during the procedure, has been reached. In 2020, Haemonetics introduced the NexSys PCS® with PERSONA® Technology, a proprietary plasma collection system that yields more plasma per donation on average, resulting in a more efficient donation and more efficient device functionality. Both technologies were significant leaps forward in the plasma collection field when released by Haemonetics, providing a way to collect more plasma per donation on average, thereby optimizing the donation volume for each donor and improving collection efficiency.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 35 and therefore denies those allegations.

36. Haemonetics designs, manufactures, and sells its NexSys PCS® systems to plasma collection companies that use them in the collection of plasma at donation centers around the

country. Individual donors are then able to donate plasma utilizing Haemonetics' systems when visiting a donation center.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 36 and therefore denies those allegations.

37. Haemonetics has long been the industry leader in plasma collection systems, with five decades of industry experience and over 75 million collections to date on NexSys PCS®, including over 30 million collections using Persona® Technology. The NexSys PCS® is the industry's most advanced, completely integrated system designed to streamline plasma collections and improve yield, productivity, safety, quality, compliance, and donor satisfaction.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 37 and therefore denies those allegations.

38. Haemonetics has invested millions of dollars into research and development of the NexSys PCS® with YES® Technology and NexSys PCS® with PERSONA® Technology.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 38 and therefore denies those allegations.

## ASSERTED PATENTS

39. During the research and development of its NexSys PCS® systems, Haemonetics recognized that other plasma collection systems were inefficient and not optimized for plasma collection. Plasma collection amounts were primarily based on the U.S. FDA's "simplified nomogram" ("Volume Limits - Automated Collection of Source Plasma," November 1992), which prescribed the amount of blood plasma that could be collected based on three categories of donor weight. Because donors were classified into one of just three weight ranges, however, and because physiology of individual donors varies even within a particular weight category, collections were inefficient and did not tailor the amount of plasma that could safely be taken from an individual donor.

**ANSWER**: Fresenius admits that the U.S. FDA authored a document titled "Volume Limits – Automated Collection of Source Plasma" in November 1992 that references a "simplified nomogram" and included three categories of donor weight. To the extent further answer is required, Fresenius lacks knowledge or information to form a basis as to the truth of the remaining allegations in paragraph 39 and therefore denies those allegations.

40. At the time Haemonetics developed the NexSys PCS® system, plasma collection systems on the market utilized the U.S. FDA's simplified nomogram. Prior collection systems also only focused on the full collection volume of a donation procedure—which includes both anticoagulant and blood plasma—instead of homing in on the actual blood plasma-only volume. So, plasma collections which fell into the U.S. FDA-prescribed ranges indeed included less plasma than allowed because some of the counted volume was merely anticoagulant.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 40 and therefore denies those allegations.

41. Recognizing these deficiencies in prior collection systems, Haemonetics created innovative approaches to plasma collection systems, embodied in their NexSys PCS® with YES® Technology and PERSONA® Technology. These technologies optimized plasma collections on an individual basis by focusing on accuracy of each collection—based on a donor's individual characteristics—and still ensuring the safety of the donor.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 41 and therefore denies those allegations.

42. The NexSys PCS® with PERSONA® Technology is configured to utilize an individual donor's actual height, weight, and hematocrit to calculate the correct volume of plasma to be collected, within the guidelines the U.S. FDA cleared for YES® (2018) and PERSONA® (2020). This individually tailored approach typically yields an increased amount of plasma collected during one donation, on average, while still ensuring the safety and comfort of the individual donor. In 2020, in a prospective, multicenter, double-blinded, randomized, controlled trial the NexSys PCS® with PERSONA® Technology was used with 3,443 donors in over 23,000 donations to demonstrate a plasma collection yield improvement, on average of 8% per donation as compared to the NexSys PCS® with YES® Technology alone.

**ANSWER**: Fresenius admits that NexSys PCS® with PERSONA® "utilize[s] an individual donor's actual height, weight, and hematocrit" to calculate the volume of plasma to be collected. To the extent that further answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the remaining allegations in paragraph 42 and therefore denies those allegations.

43. Haemonetics' NexSys PCS® with YES® Technology is configured to calculate the volume of actual plasma within the collection container, instead of utilizing the plasma and anticoagulant volume as a base for determining when to stop the collection. Collections performed with the NexSys PCS® system with YES® Technology achieve an average increase in yield of 18-26 mL of plasma per donation over the same system without YES® Technology implemented.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 43 and therefore denies those allegations.

44. Again, this approach and these specially-configured systems allow for increased plasma collection during a single donation without impacting the safety or comfort of the donor. The increases in plasma collected in each procedure offered by Haemonetics' innovations revolutionized the industry. The increases, multiplied by the tens of millions of collections each year, offered hundreds of thousands of liters of additional plasma available to be collected from the same pool of donors, having a value of hundreds of million dollars for the plasma collection/fractionation industry.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 44 and therefore denies those allegations.

45. Haemonetics patented these novel approaches and systems beginning in 2017. The patents acknowledged the issues in the prior art and created novel systems to overcome the existing shortcomings.

**ANSWER**: Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 45 and therefore denies those allegations.

46. For example, as explained in the '652 Patent: "Prior art plasma collection systems are unable to determine the total volume of plasma that has been collected (*e.g.*, because the product collected is a mixture of plasma and anticoagulant) and, therefore collect based on the total collection volume, even if the total volume of plasma that has been collected is below the limit prescribed by the FDA." Exhibit A at 1:38-44.

**ANSWER**: Fresenius admits that the '652 Patent, at 1:38-44, states: "Prior art plasma collection systems are unable to determine the total volume of plasma that has been collected (*e.g.*, because the product collected is a mixture of plasma and anticoagulant) and, therefore collect based on the total collection volume, even if the total volume of plasma that has been collected is below the limit prescribed by the FDA." To the extent further answer is required, Fresenius lacks knowledge sufficient to answer and therefore denies those allegations.

47. Haemonetics recognized the inefficiencies in existing approaches and patented its systems which optimized the collection process by more efficiently collecting an optimized volume of plasma per-patient with increased accuracy pursuant to U.S. FDA guidelines. The '652 Patent, which is exemplary of the Asserted Patents, discussed the problems inherent in the preexisting prior art plasma collection systems that the patent improves upon:

> Various embodiment[s] of the present invention provide numerous benefits over prior art plasma collection systems. In particular, as noted above, prior art plasmapheresis devices end plasma collection based on a total volume of anticoagulated plasma (*e.g.*, pure plasma plus the added anticoagulant). Although this is the easiest method because it requires only that the product collection container be weighed, the amount of true product—the pure plasma—is dependent on the donor's hematocrit. In other words, **prior art systems will collect more plasma from low hematocrit donors than from high hematocrit donors because of the variation of the percentage of anticoagulant in the product.**

*Id.* at 9:53-64 (emphasis added).

**<u>ANSWER</u>**: Fresenius admits the '652 Patent, at 9:53-64, states:

> Various embodiment[s] of the present invention provide numerous benefits over prior art plasma collection systems. In particular, as noted above, prior art plasmapheresis devices end plasma collection based on a total volume of anticoagulated plasma (*e.g.*, pure plasma plus the added anticoagulant). Although this is the easiest method because it requires only that the product collection container be weighed, the amount of true product—the pure plasma—is dependent on the donor's hematocrit. In other words, prior art systems will collect more plasma from low hematocrit donors than from high hematocrit donors because of the variation of the percentage of anticoagulant in the product.

To the extent further answer is required, Fresenius lacks knowledge sufficient to answer and therefore denies those allegations.

48. The plasma collection systems claimed in the Asserted Patents "address the issues of prior art systems by collecting a standard volume (*e.g.*, a target volume) of pure plasma from each donor." *Id.* at 9:65-67. The claimed systems improve upon the accuracy of prior art systems by "using knowledge of the donor's hematocrit and the amount of anticoagulant collected within the plasma collection container 216 (*e.g.*, by counting pump rotations and/or using scale/weight sensors, etc.) to determine the percentage of anticoagulant in the product." *Id*. at 10:2-6.

**<u>ANSWER</u>**: Fresenius admits the '652 Patent contains the following language:

> "address the issues of prior art systems by collecting a standard volume (*e.g.*, a target volume) of pure plasma from each donor."

'652 Patent at 9:65-67; and

> "using knowledge of the donor's hematocrit and the amount of anticoagulant collected within the plasma collection container 216 (*e.g.*, by counting pump rotations and/or using scale/weight sensors, etc.) to determine the percentage of anticoagulant in the product."

'652 Patent at 10:2-6. To the extent further answer is required, Fresenius lacks knowledge sufficient to answer and therefore denies those allegations.

49. The claimed invention allows the blood processing system to optimize plasma collection by tailoring the appropriate amount to each donor based on individualized donor information. Moreover, "by stopping the plasma collection process based on a volume of pure plasma collected, embodiments of the present invention are able to collect a greater volume of plasma as compared to prior art systems that stop based on a plasma/anticoagulant mixture." *Id.* at 10:6-11.

**ANSWER**: Fresenius admits the '652 Patent contains the following language:

> "by stopping the plasma collection process based on a volume of pure plasma collected, embodiments of the present invention are able to collect a greater volume of plasma as compared to prior art systems that stop based on a plasma/anticoagulant mixture."

'652 Patent at 10:6-11. To the extent further answer is required, Fresenius lacks knowledge sufficient to answer, and therefore denies those allegations.

50. As such, the Asserted Patents are directed to a "blood processing system that collects plasma" which is tailored to the individual donor and which is capable of determining the actual plasma volume within a collection container with accuracy not seen before in this industry. *Id.* at 10:12-13.

**ANSWER**: Fresenius admits the '652 Patent, at 10:13-14, contains the following language: "blood processing system that collects plasma." To the extent further answer is required, Fresenius lacks knowledge sufficient to answer and therefore denies those allegations.

51. The claims of the Asserted Patents recite an improved blood processing system that optimizes plasma collection in a manner that improves upon the prior art. The claimed system is not merely focused on a computerized process via the controller; rather, the claims recite mechanical improvements and other hardware improvements (*e.g.*, optical sensors and weight sensors) that result in an accurate, efficient blood processing system to optimize the amount of plasma collected per donor, while ensuring the safety of the donor.

**ANSWER**: Paragraph 51 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 51 and therefore denies those allegations.

52. The elements claimed by the Asserted Patents, taken alone or in combination, were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of invention. Rather, the Asserted Patents teach unconventional methods and systems, utilizing the novel approaches described above and embodied in Haemonetics' NexSys PCS® YES® and PERSONA® systems.

**ANSWER**: Paragraph 52 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 52 and therefore denies those allegations.

53. As explained in the specifications of the Asserted Patents, these unconventional approaches increase efficiency of the claimed plasma collection systems, resulting in more plasma collected, on average, per-donation, increasing the amount of donated plasma and availability of its components for life saving therapies, ensuring accuracy in the volume of plasma that is collected, without requiring an increase in the number of donations. The claims of the Asserted Patents accordingly describe technological solutions to the problems persistent in prior art collection systems and methods of how to collect the maximum allowable plasma volume from each donor. And these novel methods and systems result in maximum plasma collection volume without sacrificing a donor's comfort level or safety.

**ANSWER**: Paragraph 53 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 53 and therefore denies those allegations.

54. The systems and methods covered by the Asserted Patents, therefore, differ from prior art collection systems and methods in use at the time of invention. The prior art systems lacked the novel features of the Asserted Patents, including, for example, tailoring collection volumes based on an individual donor's physical characteristics, determining the volume of actual plasma within a collection container, utilizing plasma weighers and optical sensors, and/or configuring an all-in-one plasma collection system capable of carrying out these methods.

**ANSWER**: Paragraph 54 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 54 and therefore denies those allegations.

55. By enabling a plasma collection system to perform these calculations and determinations resulting in a more efficient and accurate machine, the claims are directed to specific, unconventional improvements to the way plasma collection systems operate. Moreover, the claimed standalone plasma collection system can collect blood, provide anticoagulant, separate plasma, return blood components, and utilize a controller to make determinations about the correct volume of plasma and calculate that volume. The claimed invention constitutes an unconventional and novel approach and system that optimizes plasma collection.

**ANSWER**: Paragraph 55 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 55 and therefore denies those allegations.

56. The dependent claims are further directed to specific, unconventional improvements to the way plasma collection systems operate. They claim nuances in the specific ways in which target collection volume is calculated, which individual characteristics are used in performing calculation determinations, and different ways to configure the controller using identified ratios. The written description of the Asserted Patents provides details regarding these different calculations and ways of configuring the collection device to carry out the claimed methods.

**ANSWER**: Paragraph 56 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 56 and therefore denies those allegations.

57. The specific combination of claim elements recite systems and methods for a continuous nomogram for an individual donor in a way that had never been done before. This individualized nomogram created a new solution in the plasma donation industry. The inventive combinations of claim elements, whether previously known or unknown, constitute inventive concepts.

**ANSWER**: Paragraph 57 contains legal conclusions to which no answer is required. To the extent an answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 57 and therefore denies those allegations.

58. Haemonetics is the assignee and owner of the right, title, and interest in and to the ’652 Patent, including the right to assert all causes of action arising under the ’652 Patent and the right to any remedies for infringement thereof.

**ANSWER**: Paragraph 58 contains legal conclusions to which no answer is required. Fresenius admits Haemonetics Corporation is listed as the Assignee on the face of the ’652 Patent.

To the extent a further answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 58 and therefore denies those allegations.

59. The ’652 Patent, entitled “System and Method for Collecting Plasma,” was duly issued by the United States Patent and Trademark Office on September 1, 2020 to Michael Ragusa. The ’652 Patent issued from United States Patent Application No. 15/608,183 which was filed on May 30, 2017. A copy of the ’652 Patent is attached as Exhibit A.

**ANSWER**: Fresenius admits the ’652 Patent states “System and Method for Collecting Plasma,” “Inventor: Michael Ragusa,” “Date of Patent: Sept. 1, 2020,” “Appl. No.: 15/608,183,” and “Filed: May 30, 2017.” Fresenius admits Exhibit A of the FAC purports to be a copy of the ’652 Patent. To the extent a further answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 59 and therefore denies those allegations.

60. The ’652 Patent is valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

**ANSWER**: Denied.

61. Haemonetics is the assignee and owner of the right, title, and interest in and to the ’916 Patent, including the right to assert all causes of action arising under the ’916 Patent and the right to any remedies for infringement thereof.

**ANSWER**: Paragraph 61 contains legal conclusions to which no answer is required. Fresenius admits Haemonetics Corporation is listed as the Assignee on the face of the ’916 Patent. To the extent a further answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 61 and therefore denies those allegations.

62. The ’916 Patent, entitled “System and Method for Collecting Plasma,” was duly issued by the United States Patent and Trademark Office on December 24, 2024 to Michael Ragusa. The ’916 Patent issued from United States Patent Application No. 17/205,374 which was filed on March 18, 2021. A copy of the ’916 Patent is attached as Exhibit B.

**ANSWER**: Fresenius admits the ’916 Patent states “System and Method for Collecting Plasma,” “Inventor: Michael Ragusa,” “Date of Patent: *Dec. 24, 2024,” “Appl. No.: 17/205,374,”

and "Filed: Mar. 18, 2021." Fresenius admits Exhibit B of the FAC purports to be a copy of the '916 Patent. To the extent a further answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 62 and therefore denies those allegations.

63. The '916 Patent is valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

**ANSWER**: Denied.

64. Haemonetics is the assignee and owner of the right, title, and interest in and to the '474 Patent, including the right to assert all causes of action arising under the '474 Patent and the right to any remedies for infringement thereof.

**ANSWER**: Paragraph 64 contains legal conclusions to which no answer is required. Fresenius admits Haemonetics Corporation is listed as the Assignee on the face of the '474 Patent. To the extent a further answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 64 and therefore denies those allegations.

65. The '474 Patent, entitled "System and Method for Collecting Plasma," was duly issued by the United States Patent and Trademark Office on January 7, 2025 to Michael Ragusa. The '474 Patent issued from United States Patent Application No. 17/205,400 which was filed on March 18, 2021. A copy of the '474 Patent is attached as Exhibit C.

**ANSWER**: Fresenius admits the '474 Patent states "System and Method for Collecting Plasma," "Inventor: Michael Ragusa," "Date of Patent: *Jan. 7, 2025," "Appl. No.: 17/205,400," and "Filed: Mar. 18, 2021." Fresenius admits Exhibit C of the FAC purports to be a copy of the '474 Patent. To the extent a further answer is required, Fresenius lacks sufficient knowledge or information to form a basis as to the truth of the allegations in paragraph 65 and therefore denies those allegations.

66. The '474 Patent is valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

**ANSWER**: Denied.

67. Fresenius Kabi USA LLC has had knowledge of the ’652 Patent, the ’916 Patent, and the ’474 Patent at least since the filing of the first Complaint on July 25, 2025.

**ANSWER**: Denied.

68. On information and belief, Fresenius Kabi AG and Fenwal, Inc. have had knowledge of the ’652 Patent, the ’916 Patent, and the ’474 Patent at least since the filing of the original Complaint on July 25, 2025.

**ANSWER**: Denied.

**ACCUSED PRODUCTS**

69. On information and belief, Defendants make, use, sell, offer for sale, and/or import the Aurora Xi Plasmapheresis System (“Aurora Xi System”).

**ANSWER**: Denied.

70. For example, the Aurora Xi System is advertised on Fresenius Kabi USA, LLC’s website. *See, e.g.,* https://plasma.fresenius-kabi.us/devices/; https://www.fresenius-kabi.com/us/products/medtech. On its website, Fresenius Kabi USA, LLC provides “plasma support” and “customer service” through Fresenius Kabi email addresses: plasma.us@fresenius-kabi.com and MDservice.usa@fresenius-kabi.com. See https://plasma.fresenius-kabi.us/devices/. Similarly, that website includes plasma support, customer service, and sales phone numbers which connect to Fresenius Kabi. Id. Fresenius Kabi USA, LLC also provides publicly-available videos on YouTube regarding these systems. *See, e.g.,* https://www.youtube.com/watch?v=F1fBzM2gcdk.

**ANSWER**: Fresenius admits the Aurora Xi System is referenced on the website https://plasma.fresenius-kabi.us/devices/. Fresenius denies that the Aurora Xi System is referenced on the website https://www.fresenius-kabi.com/us/products/medtech. Fresenius admits the phrases “plasma support” and “customer service” and the email addresses plasma.us@fresenius-kabi.com and MDservice.usa@fresenius-kabi.com appear on the website https://plasma.fresenius-kabi.us/devices/. Fresenius admits phone numbers appear on the website https://plasma.fresenius-kabi.us/devices/. Fresenius also admits the Aurora Xi System is shown in the video at https://www.youtube.com/watch?v=F1fBzM2gcdk. Fresenius denies any of these websites demonstrate Fresenius makes, uses, sells, offers for sale, and/or imports the Aurora Xi

Plasmapheresis System ("Aurora Xi System"). To the extent a further answer is required, Fresenius denies those allegations.

71. Fresenius Kabi AG is also directly associated with the Aurora Xi System according to publicly-available sources. For example, when the Aurora Xi System received FDA clearance on January 24, 2025, the applicant was listed as "Fresenius Kabi AG."[3] *See* https://www.fda.gov/media/185301/download. Fresenius Kabi AG referred to this on its May 7, 2025 Q1 earnings call as follows: "we received FDA clearance for ***our*** new Adaptive Nomogram software. We expect to distribute this to more than 160 US plasma collection centers by the end of 2025." https://www.fresenius.com/sites/default/files/2025-05/Fresenius_Transcript_Q1_25_20250507.pdf (emphasis added). The Fresenius Kabi AG 2024 Annual Report further acknowledged that it was Fresenius Kabi AG who "developed a software solution to optimize plasma yield and donor efficiency" and submitted it to the FDA in 2024. https://www.fresenius.com/sites/default/files/2025-03/Fresenius_Annual_Report_2024.pdf at 101. This same Annual Report indicates that the "disposable products for ***our*** Aurora Xi" are produced in the Haina plant in the Dominican Republic. *Id.* at 125. Thus, on information and belief, Fresenius Kabi AG and/or Fresenius Kabi USA, LLC imports these disposable products into the United States for sale.

**ANSWER**: Fresenius admits https://www.fda.gov/media/185301/download states "Applicant Name: Fresenius Kabi AG." Fresenius admits https://www.fresenius.com/sites/default/files/2025-05/Fresenius_Transcript_Q1_25_20250507.pdf is a "Transcript Conference Call Q1 2025 results" with Fresenius SE & Co. KGaA corporate participants. In the transcript, Michael Sen, the CEO of Fresenius SE & Co. KGaA, stated "we received FDA clearance for our new Adaptive Nomogram software. We expect to distribute this to more than 160 US plasma collection centers by the end of 2025." Fresenius admits the https://www.fresenius.com/sites/default/files/2025-03/Fresenius_Annual_Report_2024.pdf website is a "Fresenius Annual Report" that states: "For our plasma donation product, Aurora Xi, we developed a software solution to optimize plasma

[3] Notably, the correspondent address for the 2025 FDA application was that belonging to both Fresenius Kabi USA, LLC and Fenwal, Inc. further demonstrating the interplay between all three Defendant entities as it pertains to the Accused Products. https://www.fda.gov/media/185301/download.

yield and donor efficiency. The corresponding clinical study was successfully completed, and the software update was submitted to the FDA for review in October 2024." Fresenius denies the allegation that "[t]his same Annual Report indicates that the 'disposable products for our Aurora Xi' are produced in the Haina plant in the Dominican Republic," as the exact quotation provided by Haemonetics does not appear in the Annual Report. Fresenius admits the Annual Report states "disposable products of the successor system, Aurora Xi, are also produced in Haina." Fresenius objects to the footnote on the bottom of page 17 of the FAC pursuant Fed. Rule Civ. Pro. 10(b) as improper. Fresenius denies any remaining allegations of paragraph 71 including statements in footnotes on page 17 of the FAC.

72. Moreover, the Aurora Xi operator's manual published in 2025 lists Fresenius Kabi AG on the cover page. https://eifu.fresenius-kabi.com/medtech/pages/viewers/pdf?projectKey=66941d1caf17220d655e1cc7&itemKey=67be172ce73ea60e227ff26d. The same manual provides "Manufacturing facility / Manufactured by: Fresenius Kabi Warrendale," a Fresenius Kabi manufacturing facility in Warrendale, Pennsylvania. *Id.*

**ANSWER**: Fresenius admits the Aurora Xi operator's manual found at https://eifu.fresenius-kabi.com/medtech/pages/viewers/pdf?projectKey=66941d1caf17220d655e1cc7&itemKey=67be172ce73ea60e227ff26d lists Fresenius Kabi AG on the cover page and states "Manufacturing facility / Manufactured by: Fresenius Kabi Warrendale 770 Commonwealth Drive Warrendale, PA 15086 USA." Fresenius denies any remaining allegations of paragraph 72.

73. Additionally, Fresenius Kabi AG owns all copyrights to the "Fresenius Kabi Transfusion and Cell Technologies Product Catalog" which includes the Aurora Xi system and accessories (at pages 23-25). https://www.fresenius-kabi.com/content/dam/fresenius-kabi/us/documents/products/medtech/catalogs/Transfusion%20and%20Cell%20Technologies%20Product%20Catalog.pdf.coredownload.inline.pdf.

**ANSWER**: Fresenius admits that the "Fresenius Kabi Transfusion and Cell Technologies Product Catalog" available at https://www.fresenius-kabi.com/content/dam/fresenius-

kabi/us/documents/products/medtech/catalogs/Transfusion%20and%20Cell%20Technologies%20Product%20Catalog.pdf.coredownload.inline.pdf, states "Copyright © 2025 Fresenius Kabi AG" and references the "Aurora Xi Plasmapheresis System." Fresenius denies any remaining allegations of paragraph 73.

74. Accordingly, on information and belief both Fresenius Kabi USA, LLC and Fresenius Kabi AG are involved with the make, use, sale, offer for sale, and importation of the Accused Products.

**ANSWER**: Denied.

75. Based on the representation of defense counsel, Fenwal, Inc. makes, uses, sells, offers for sale, and/or imports the Aurora Xi System.

**ANSWER**: Paragraph 75 contains legal conclusions to which a response is not required. To the extent a response is required, Fresenius denies any such allegations.

76. Defendants' Aurora Xi System is used to collect blood, process and remove plasma, and return blood to a donor. The Aurora Xi System received FDA clearances in September 2016 and December 2022. On January 24, 2025, Fresenius received clearance from the FDA for the Aurora Xi System with an "Adaptive Nomogram." *See* https://www.fresenius-kabi.com/us/news-and-events/receives-fda-510k-clearance-adaptive-nomogram-enhancing-plasma-collection-efficiency-aurora-xi-plasmapheresis-system; *see* also https://www.fda.gov/vaccines-blood-biologics/substantially-equivalent-510k-device-information/bk251160-adaptive-nomogram-bottle (Fresenius Kabi AG received FDA clearance for the Adaptive Nomogram Bottle). According to Fresenius, among the Adaptive Nomogram's innovative features, "[t]he newly cleared Adaptive Nomogram considers each donor's individual characteristics in calculating the volume of plasma to collect, enabling an average 11.5% increase in plasma collection per donation." *Id.*

**ANSWER**: Fresenius admits the website https://www.fresenius-kabi.com/us/news-and-events/receives-fda-510k-clearance-adaptive-nomogram-enhancing-plasma-collection-efficiency-aurora-xi-plasmapheresis-system states "Fresenius Kabi Receives FDA 510(k) Clearance for Adaptive Nomogram, Enhancing Plasma Collection Efficiency with the Aurora Xi Plasmapheresis System" and "[t]he newly cleared Adaptive Nomogram considers each donor's individual characteristics in calculating the volume of plasma to collect, enabling an average 11.5% increase in plasma collection per donation while maintaining safe and effective operation,"

and bears the date January 28, 2025. Fresenius also admits the website https://www.fda.gov/vaccines-blood-biologics/substantially-equivalent-510k-device-information/bk251160-adaptive-nomogram-bottle references 510(k) Number BK251160, which relates to "Device Name: Adaptive Nomogram Bottle" and references a "Decision Date: 2/21/2025." To the extent there are allegations not expressly admitted above, Fresenius lacks knowledge sufficient to answer, and therefore denies those allegations.

77. On information and belief, Defendants have made the Accused Products available to third parties, including Haemonetics customers.

**ANSWER**: Denied.

78. On information and belief, each Defendant, either alone or in combination with one another, makes, sells, offers for sale, and distributes the Accused Products.

**ANSWER**: Denied.

**COUNT I – INFRINGEMENT OF U.S. PATENT NO. 10,758,652**

79. Haemonetics realleges and incorporates the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER**: Paragraph 79 does not contain allegations that require a response. To the extent a response is required, Fresenius denies any allegations.

80. On information and belief, Defendants have infringed and continue to infringe, directly and indirectly, literally and under the doctrine of equivalents, at least claims 11, 13, 14, 15, 16, 17, and 18 of the '652 Patent by making, using, selling, and/or offering for sale the Accused Products.

**ANSWER**: Denied.

81. Claim 11 of the '652 Patent covers a novel plasma collection system and recites:

A system for collecting plasma comprising:

a venous-access device for drawing whole blood from a subject and returning blood components to the subject;

a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device

having an outlet and being configured to send the plasma component to a plasma container;

a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump;

an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood; and

a controller configured to control the operation of the blood component separation device and the blood draw pump, the controller configured to calculate (1) a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container, and (2) a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component, the controller configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container.

**ANSWER:** Fresenius admits Claim 11 of the ’652 Patent states:

A system for collecting plasma comprising:

a venous-access device for drawing whole blood from a subject and returning blood components to the subject;

a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device having an outlet and being configured to send the plasma component to a plasma container;

a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump;

an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood; and

a controller configured to control the operation of the blood component separation device and the blood draw pump, the controller configured to calculate (1) a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container, and (2) a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component, the controller configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container.

To the extent there are allegations not expressly admitted above, those allegations are denied.

82. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

83. The Accused Products are systems for collecting plasma.

**ANSWER**: Paragraph 83 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products are systems for collecting plasma as claimed in the '652 Patent.

84. The Accused Products have a venous-access device for drawing whole blood from a subject and returning blood components to the subject.

**ANSWER**: Paragraph 84 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a venous-access device for drawing whole blood from a subject and returning blood components to the subject as required by the system for collecting plasma as claimed in the '652 Patent.

85. The Accused Products have a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device having an outlet and being configured to send the plasma component to a plasma container.

**ANSWER**: Paragraph 85 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device having an outlet and being configured to send the plasma component to a plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

86. The Accused Products have a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump.

**ANSWER**: Paragraph 86 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to

the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump as required by the system for collecting plasma as claimed in the '652 Patent.

87. The Accused Products have an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood.

**ANSWER**: Paragraph 87 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood as required by the system for collecting plasma as claimed in the '652 Patent.

88. The Accused Products have a controller configured to control the operation of the blood component separation device and the blood draw pump.

**ANSWER**: Paragraph 88 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a controller configured to control the operation of the blood component separation device and the blood draw pump as required by the system for collecting plasma as claimed in the '652 Patent.

89. The controllers of the Accused Products are configured to calculate a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container.

**ANSWER**: Paragraph 89 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are configured to calculate a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

90. The controllers of the Accused Products are also configured to calculate a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component.

**ANSWER**: Paragraph 90 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are also configured to calculate a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component as required by the system for collecting plasma as claimed in the '652 Patent.

91. The controllers of the Accused Products are configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container.

**ANSWER**: Paragraph 91 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

92. Claim 13 of the '652 Patent depends from claim 11 and recites:

A system according to claim 11, further comprising:

an anticoagulant source weight sensor configured to measure the weight of the anticoagulant source,

the controller further configured to monitor a change in volume within the anticoagulant source based on the measured weight of the anticoagulant source,

the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the change in volume within the anticoagulant source.

**ANSWER**: Fresenius admits Claim 13 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fresenius admits that Claim 13 recites:

A system according to claim 11, further comprising:

an anticoagulant source weight sensor configured to measure the weight of the anticoagulant source,

the controller further configured to monitor a change in volume within the anticoagulant source based on the measured weight of the anticoagulant source,

the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the change in volume within the anticoagulant source.

To the extent there are allegations not expressly admitted above, those allegations are denied.

93. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

94. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, supra.

**ANSWER**: Denied.

95. The Accused Products include an anticoagulant source weight sensor configured to measure the weight of the anticoagulant source.

**ANSWER**: Paragraph 95 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products include an anticoagulant source weight sensor configured to measure the weight of the anticoagulant source as required by the system for collecting plasma as claimed in the '652 Patent.

96. The Accused Products have a controller further configured to monitor a change in volume within the anticoagulant source based on the measured weight of the anticoagulant source.

**ANSWER**: Paragraph 96 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a controller further configured to monitor a change in volume within the anticoagulant source based on the measured weight of the anticoagulant source as required by the system for collecting plasma as claimed in the '652 Patent.

97. The Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the change in volume within the anticoagulant source.

**ANSWER**: Paragraph 97 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the change in volume within the anticoagulant source as required by the system for collecting plasma as claimed in the '652 Patent.

98. Claim 14 of the ’652 Patent depends from claim 11 and recites:

> A system according to claim 11, wherein the controller is configured to monitor a number of rotations of an anticoagulant pump to determine a volume of anticoagulant introduced into the whole blood,
>
> the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the number of rotations of the anticoagulant pump.

**ANSWER**: Fresenius admits Claim 14 of the ’652 Patent purports to depend from claim 11 of the ’652 Patent. Fresenius admits that Claim 14 recites:

> A system according to claim 11, wherein the controller is configured to monitor a number of rotations of an anticoagulant pump to determine a volume of anticoagulant introduced into the whole blood,
>
> the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the number of rotations of the anticoagulant pump.

To the extent there are allegations not expressly admitted above, those allegations are denied.

99. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

100. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, *supra.*

**ANSWER**: Denied.

101. The Accused Products have a controller configured to monitor a number of rotations of an anticoagulant pump to determine a volume of anticoagulant introduced into the whole blood.

**ANSWER**: Paragraph 101 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a controller configured to monitor a number of rotations of an anticoagulant pump to determine a volume of anticoagulant introduced into the whole blood as required by the system for collecting plasma as claimed in the ’652 Patent.

102. The Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the number of rotations of the anticoagulant pump.

**ANSWER**: Paragraph 102 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the number of rotations of the anticoagulant pump as required by the system for collecting plasma as claimed in the '652 Patent.

103. Claim 15 of the '652 Patent depends from claim 11 and recites:

A system according to claim 11, further comprising:

an optical sensor located on the blood component separation device and configured to monitor the contents of the blood component separation device and determine if a volume of anticoagulant remains within the blood component separation device,

the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the volume of anticoagulant within the blood component separation device.

**ANSWER**: Fresenius admits Claim 15 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fresenius admits that Claim 15 recites:

A system according to claim 11, further comprising:

an optical sensor located on the blood component separation device and configured to monitor the contents of the blood component separation device and determine if a volume of anticoagulant remains within the blood component separation device,

the calculated volume of anticoagulant in the collected plasma component being based, at least in part, on the volume of anticoagulant within the blood component separation device.

To the extent there are allegations not expressly admitted above, those allegations are denied.

104. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

105. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, *supra.*

**ANSWER**: Denied.

106. The Accused Products include an optical sensor located on the blood component separation device and configured to monitor the contents of the blood component separation device and determine if a volume of anticoagulant remains within the blood component separation device.

**ANSWER**: Paragraph 106 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products include an optical sensor located on the blood component separation device and configured to monitor the contents of the blood component separation device and determine if a volume of anticoagulant remains within the blood component separation device as required by the system for collecting plasma as claimed in the ’652 Patent.

107. The Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the volume of anticoagulant within the blood component separation device.

**ANSWER**: Paragraph 107 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products calculate the volume of anticoagulant in the collected plasma component based, at least in part, on the volume of anticoagulant within the blood component separation device as required by the system for collecting plasma as claimed in the ’652 Patent.

108. Claim 16 of the ’652 Patent depends from claim 11 and recites:

A system according to claim 11, further comprising:

a plasma container weight sensor configured to monitor a volume of plasma component collected within the plasma container,

the calculated volume of pure plasma collected within the plasma component based, at least in part, on the monitored volume of collected plasma component.

**ANSWER**: Fresenius admits Claim 16 of the ’652 Patent purports to depend from claim 11 of the ’652 Patent. Fresenius admits that Claim 16 recites:

A system according to claim 11, further comprising:

a plasma container weight sensor configured to monitor a volume of plasma component collected within the plasma container,

the calculated volume of pure plasma collected within the plasma component based, at least in part, on the monitored volume of collected plasma component.

To the extent there are allegations not expressly admitted above, those allegations are denied.

109. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

110. The Accused products are a system according to claim 11. *See* ¶¶ 81-91, *supra*.

**ANSWER**: Denied.

111. The Accused Products include a plasma container weight sensor configured to monitor a volume of plasma component collected within the plasma container.

**ANSWER**: Paragraph 111 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products include a plasma container weight sensor configured to monitor a volume of plasma component collected within the plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

112. The Accused Products calculate the volume of pure plasma collected within the plasma component based, at least in part, on the monitored volume of collected plasma component.

**ANSWER**: Paragraph 112 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products calculate the volume of pure plasma collected within the plasma component based, at least in part, on the monitored volume of collected plasma component as required by the system for collecting plasma as claimed in the '652 Patent.

113. Claim 17 of the '652 Patent depends from claim 11 and recites:
A system according to claim 11, further comprising:

a plasma container weight sensor configured to monitor a weight of plasma component collected within the plasma container,

the calculated volume of pure plasma collected within the plasma component based, at least in part, on the monitored weight of collected plasma component.

**ANSWER**: Fresenius admits Claim 17 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fresenius admits that Claim 17 recites:

A system according to claim 11, further comprising:

a plasma container weight sensor configured to monitor a weight of plasma component collected within the plasma container,

the calculated volume of pure plasma collected within the plasma component based, at least in part, on the monitored weight of collected plasma component.

To the extent there are allegations not expressly admitted above, those allegations are denied.

114. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

115. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, *supra*.

**ANSWER**: Denied.

116. The Accused Products include a plasma container weight sensor configured to monitor a weight of plasma component collected within the plasma container.

**ANSWER**: Paragraph 116 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products include a plasma container weight sensor configured to monitor a weight of plasma component collected within the plasma container as required by the system for collecting plasma as claimed in the '652 Patent.

117. The Accused Products calculate the volume of pure plasma collected within the plasma component based, at least in part, on the monitored weight of collected plasma component.

**ANSWER**: Paragraph 117 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products calculate the volume of pure plasma collected within the plasma component based, at least in part, on the monitored weight of collected plasma component as required by the system for collecting plasma as claimed in the '652 Patent.

118. Claim 18 of the '652 Patent depends from claim 11 and recites:

A system according to claim 11, further comprising:

an optical sensor located on the blood component separation device and configured to monitor a volume of red blood cells collected within the blood component separation device,

the controller configured to determine the subject's hematocrit based, at least in part, upon on the monitored volume of red blood cells collected within the blood component separation device and a volume of whole blood withdrawn from the subject.

**ANSWER**: Fresenius admits Claim 18 of the '652 Patent purports to depend from claim 11 of the '652 Patent. Fresenius admits that Claim 18 recites:

A system according to claim 11, further comprising:

an optical sensor located on the blood component separation device and configured to monitor a volume of red blood cells collected within the blood component separation device,

the controller configured to determine the subject's hematocrit based, at least in part, upon on the monitored volume of red blood cells collected within the blood component separation device and a volume of whole blood withdrawn from the subject.

To the extent there are allegations not expressly admitted above, those allegations are denied.

119. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

120. The Accused Products are a system according to claim 11. *See* ¶¶ 81-91, *supra.*

**ANSWER**: Denied.

121. The Accused Products include an optical sensor located on the blood component separation and configured to monitor a volume of red blood cells collected within the blood component separation device.

**ANSWER**: Paragraph 121 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products include an optical sensor located on the blood component separation and configured to monitor a volume of red blood cells collected within the blood component separation device as required by the system for collecting plasma as claimed in the '652 Patent.

122. The Accused Products have a controller configured to determine the subject's hematocrit based, at least in part, on the monitored volume of red blood cells collected within the blood component separation device and a volume of whole blood withdrawn from the subject.

**ANSWER**: Paragraph 122 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a controller configured to determine the subject's hematocrit based, at least in part, on the monitored volume of red blood cells collected within the blood component separation device and a volume of whole blood withdrawn from the subject as required by the system for collecting plasma as claimed in the '652 Patent.

123. On information and belief, Defendants market and sell the Accused Products in the United States to their partners, clients, customers, and/or end users who use the Accused Products across this country and in this District.

**ANSWER**: Denied.

124. On information and belief, Defendants have induced and continue to induce others to infringe at least one claim of the '652 Patent under 35 U.S.C. § 271(b) by, among other things, actively aiding and abetting others to infringe with specific intent or willful blindness, such others including, but not limited to, Defendants' partners, clients, customers, and/or end users, whose use of the Accused Products constitutes direct infringement of at least one claim of the '652 Patent.

**ANSWER**: Denied.

125. In particular, on information and belief, Defendants' actions that aid and abet others such as their partners, clients, customers, and/or end users to infringe include advertising and distributing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.

**ANSWER**: Denied.

126. On information and belief, Defendants are liable for contributory infringement of the '652 Patent under 35 U.S.C. § 271(c) for offering to sell and selling in the United States the Accused Products which are especially made or adapted for use to infringe the '652 Patent. The Accused Products are a material component for use in practicing the '652 Patent, are specifically made for an infringing use, and are not a staple article of commerce suitable for a non-infringing use. For example, the Accused Products and the example functionality described above have no substantial non-infringing uses, but are specifically designed to practice the claims of the '652 Patent. The Accused Products have no substantial non-infringing uses because the accused functionality is an integral part of the Accused Products and must be performed for the Accused Products to perform their intended purpose. Indeed, the Accused Products are plasma collection

systems, containing all the structural elements claimed in the ’652 Patent, specifically designed for plasma collection.

**ANSWER**: Denied.

127. In addition, the Accused Products provided by Defendants constitute a material part of the claimed invention, providing all components and features of the claimed system of the ’652 Patent. For example, the Accused Products constitute a material part of the invention claimed because they contain each and every element of the claimed system, including a venous-access device, blood component separation device, plasma container, blood draw line, blood drawn pump, anticoagulant line, anticoagulant source, and a controller configured to carry out the claimed functionality.

**ANSWER**: Denied.

128. On information and belief, the infringing acts of each partner or customer regarding the Accused Product are attributable to Defendants. For example, on information and belief, Defendants direct and control the activities or actions of their third-party customers in connection with the Accused Products by contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Product which, when followed and used, result in infringement.

**ANSWER**: Denied.

129. As a consequence of Defendants’ direct and indirect infringement of the ’652 Patent, both literally and under the doctrine of equivalents, Haemonetics has been and continues to be irreparably harmed.

**ANSWER**: Denied.

130. On information and belief, Defendants’ infringement of the ‘652 Patent will continue in the future, and Haemonetics will be irreparably harmed as a consequence unless Defendants’ infringing acts are enjoined by this Court.

**ANSWER**: Denied.

**COUNT II – INFRINGEMENT OF U.S. PATENT NO. 12,171,916**

131. Haemonetics realleges and incorporates the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER**: Paragraph 131 does not contain allegations that require a response. To the extent an answer is required, Fresenius denies any allegations.

132. On information and belief, Defendants have infringed and continue to infringe, directly and indirectly, literally and under the doctrine of equivalents, at least claim 14 of the '916 Patent by making, using, selling, and/or offering for sale the Accused Products.

**ANSWER**: Denied.

133. Claim 14 of the '916 Patent covers a novel plasma collection system and recites:

A system for collecting plasma comprising:

a venipuncture needle configured to draw whole blood from a donor;

a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;

a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump;

an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump;

a touchscreen configured to receive input from an operator; and

a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

**ANSWER**: Fresenius admits Claim 14 of the '916 Patent recites:

A system for collecting plasma comprising:

a venipuncture needle configured to draw whole blood from a donor;

a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;

a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump;

an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump;

a touchscreen configured to receive input from an operator; and

a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

To the extent there are allegations not expressly admitted above, those allegations are denied.

134. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

135. The Accused Products are systems for collecting plasma.

**ANSWER**: Paragraph 135 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products are systems for collecting plasma as claimed in the '916 Patent.

136. The Accused Products have a venipuncture needle configured to draw whole blood from a donor.

**ANSWER**: Paragraph 136 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a venipuncture needle configured to draw whole blood from a donor as required by the system for collecting plasma as claimed in the '916 Patent.

137. The Accused Products have a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container.

**ANSWER**: Paragraph 137 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container as required by the system for collecting plasma as claimed in the '916 Patent.

138. The Accused Products have a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump.

**ANSWER**: Paragraph 138 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump as required by the system for collecting plasma as claimed in the '916 Patent.

139. The Accused Products have an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump.

**ANSWER**: Paragraph 139 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump as required by the system for collecting plasma as claimed in the '916 Patent.

140. The Accused Products have a touchscreen configured to receive input from an operator.

**ANSWER**: Paragraph 140 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a touchscreen

configured to receive input from an operator as required by the system for collecting plasma as claimed in the '916 Patent.

141. The Accused Products have a controller programmed to control operation of the system.

**ANSWER**: Paragraph 141 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a controller programmed to control operation of the system as required by the system for collecting plasma as claimed in the '916 Patent.

142. The controllers of the Accused Products are coupled to the touchscreen and programmed to receive donor parameters electronically from a control system.

**ANSWER**: Paragraph 142 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are coupled to the touchscreen and programmed to receive donor parameters electronically from a control system as required by the system for collecting plasma as claimed in the '916 Patent.

143. The controllers of the Accused Products are also programmed to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters.

**ANSWER**: Paragraph 143 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are also programmed to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters as required by the system for collecting plasma as claimed in the '916 Patent.

144. The controllers of the Accused Products are also programmed to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

**ANSWER**: Paragraph 144 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are

also programmed to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor as required by the system for collecting plasma as claimed in the '916 Patent.

145. On information and belief, Defendants market and sell the Accused Products in the United States to their partners, clients, customers, and/or end users who use the Accused Products across this country and in this District.

**ANSWER**: Denied.

146. On information and belief, Defendants have induced and continue to induce others to infringe at least one claim of the '916 Patent under 35 U.S.C. § 271(b) by, among other things, actively aiding and abetting others to infringe with specific intent or willful blindness, such others including, but not limited to, Defendants' partners, clients, customers, and/or end users, whose use of the Accused Products constitutes direct infringement of at least one claim of the '916 Patent.

**ANSWER**: Denied.

147. In particular, on information and belief, Defendants' actions that aid and abet others such as their partners, clients, customers, and/or end users to infringe include advertising and distributing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.

**ANSWER**: Denied.

148. On information and belief, Defendants are liable for contributory infringement of the '916 Patent under 35 U.S.C. § 271(c) for offering to sell and selling in the United States the Accused Products which are especially made or adapted for use to infringe the '916 Patent. The Accused Products are a material component for use in practicing the '916 Patent, are specifically made for an infringing use, and are not a staple article of commerce suitable for a non-infringing use. For example, the Accused Products and the example functionality described above have no substantial non-infringing uses, but are specifically designed to practice the claims of the '916 Patent. The Accused Products have no substantial non-infringing uses because the accused functionality is an integral part of the Accused Products and must be performed for the Accused Products to perform their intended purpose. Indeed, the Accused Products are plasma collection systems, containing all the structural elements claimed in the '916 Patent, specifically designed for plasma collection.

**ANSWER**: Denied.

149. In addition, the Accused Products provided by Defendants constitute a material part of the claimed invention, providing all components and features of the claimed system of the '916 Patent. For example, the Accused Products constitute a material part of the invention claimed

because they contain each and every element of the claimed system, including a venipuncture needle, blood separator, plasma product collection container, donor line, a first pump, anticoagulant line, anticoagulant source, a second pump, touchscreen, and a controller configured to carry out the claimed functionality.

**ANSWER**: Denied.

150. On information and belief, the infringing acts of each partner or customer regarding the Accused Product are attributable to Defendants. For example, on information and belief, Defendants direct and control the activities or actions of their third-party customers in connection with the Accused Products by contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Product which, when followed and used, result in infringement.

**ANSWER**: Denied.

151. As a consequence of Defendants' direct and indirect infringement of the '916 Patent, both literally and under the doctrine of equivalents, Haemonetics has been and continues to be irreparably harmed.

**ANSWER**: Denied.

152. On information and belief, Defendants' infringement of the '916 Patent will continue in the future, and Haemonetics will be irreparably harmed as a consequence unless Defendants' infringing acts are enjoined by this Court.

**ANSWER**: Denied.

**COUNT III – INFRINGEMENT OF U.S. PATENT NO. 12,186,474**

153. Haemonetics realleges and incorporates the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER**: Paragraph 153 does not contain allegations that require a response. To the extent an answer is required, Fresenius denies any allegations.

154. On information and belief, Defendants have infringed and continue to infringe, directly and indirectly, literally and under the doctrine of equivalents, at least claims 9 and 14 of the '474 Patent by making, using, selling, and/or offering for sale the Accused Products.

**ANSWER**: Denied.

155. Claim 9 of the '474 Patent covers a novel plasma collection system and recites:

A system for collecting plasma, comprising:

a venipuncture needle configured to draw whole blood from a donor;

a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;

a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump;

an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump;

a touchscreen configured to receive input from an operator; and

a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume, the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

**ANSWER**: Fresenius admits Claim 9 of the '474 Patent recites:

A system for collecting plasma, comprising:

a venipuncture needle configured to draw whole blood from a donor;

a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;

a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump;

an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump;

a touchscreen configured to receive input from an operator; and

a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume, the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

To the extent there are allegations not expressly admitted above, those allegations are denied.

156. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

157. The Accused Products are a system for collecting plasma.

**ANSWER**: Paragraph 157 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products are systems for collecting plasma as claimed in the '474 Patent.

158. The Accused Products have a venipuncture needle configured to draw whole blood from a donor.

**ANSWER**: Paragraph 158 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies Accused Products have a venipuncture needle configured to draw whole blood from a donor as required by the system for collecting plasma as claimed in the '474 Patent.

159. The Accused Products have a blood separator configured to separate the whole blood into a plasma product and a second blood component, the second blood component including red blood cells and the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container.

**ANSWER**: Paragraph 159 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a blood separator configured to separate the whole blood into a plasma product and a second blood component, the

second blood component including red blood cells and the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container as required by the system for collecting plasma as claimed in the ’474 Patent.

160. The Accused Products have a donor line fluidly connected to the venipuncture needle and configured to introduce drawn whole blood to the blood separator, the flow through the first line being controlled by a first pump.

**ANSWER**: Paragraph 160 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a donor line fluidly connected to the venipuncture needle and configured to introduce drawn whole blood to the blood separator, the flow through the first line being controlled by a first pump as required by the system for collecting plasma as claimed in the ’474 Patent.

161. The Accused Products have an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, the flow through the anticoagulant line being controlled by a second pump.

**ANSWER**: Paragraph 161 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, the flow through the anticoagulant line being controlled by a second pump as required by the system for collecting plasma as claimed in the ’474 Patent.

162. The Accused Products have a touchscreen configured to receive input from an operator.

**ANSWER**: Paragraph 162 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a touchscreen configured to receive input from an operator as required by the system for collecting plasma as claimed in the ’474 Patent.

163. The Accused Products have a controller programmed to control operation of the system.

**ANSWER**: Paragraph 163 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a controller programmed to control operation of the system as required by the system for collecting plasma as claimed in the '474 Patent.

164. The controllers of the Accused Products are coupled to the touchscreen and programmed to receive at least a donor's weight, height, and hematocrit.

**ANSWER**: Paragraph 164 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are coupled to the touchscreen and programmed to receive at least a donor's weight, height, and hematocrit as required by the system for collecting plasma as claimed in the '474 Patent.

165. The controllers of the Accused Products are also programmed to determine a target volume for plasma product including raw plasma and anticoagulant, the target volume for plasma product determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume.

**ANSWER**: Paragraph 165 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are also programmed to determine a target volume for plasma product including raw plasma and anticoagulant, the target volume for plasma product determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume as required by the system for collecting plasma as claimed in the '474 Patent.

166. The controllers of the Accused Products are also programmed to control the system to operate draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.

**ANSWER**: Paragraph 166 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have controllers that are also programmed to control the system to operate draw and return cycles to withdraw whole blood

from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor as required by the system for collecting plasma as claimed in the ’474 Patent.

167. Claim 14 of the ’474 Patent depends from claim 9 and recites:

> The system of claim 9, wherein the controller is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.

**ANSWER**: Fresenius admits Claim 14 of the ’474 Patent purports to depend from claim 9 of the ’474 Patent. Fresenius admits that Claim 14 recites:

> The system of claim 9, wherein the controller is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.

To the extent there are allegations not expressly admitted above, those allegations are denied.

168. The Accused Products contain each of the above limitations. *See* Exhibit D.

**ANSWER**: Denied.

169. The Accused Products are a system of claim 9. *See* ¶¶ 155-166, *supra*.

**ANSWER**: Denied.

170. The Accused Products have a controller programmed to perform the draw and return cycles at least three times.

**ANSWER**: Paragraph 170 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a controller programmed to perform the draw and return cycles at least three times as required by the system for collecting plasma as claimed in the ’474 Patent.

171. The Accused Products have a controller programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.

**ANSWER**: Paragraph 171 contains legal conclusions to which no response is required. To the extent an answer is required, Fresenius denies the Accused Products have a controller programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase as required by the system for collecting plasma as claimed in the '474 Patent.

172. On information and belief, Defendants market and sell the Accused Products in the United States to their partners, clients, customers, and/or end users who use the Accused Products across this country and in this District.

**ANSWER**: Denied.

173. On information and belief, Defendants have induced and continue to induce others to infringe at least one claim of the '474 Patent under 35 U.S.C. § 271(b) by, among other things, actively aiding and abetting others to infringe with specific intent or willful blindness, such others including, but not limited to, Defendants' partners, clients, customers, and/or end users, whose use of the Accused Products constitutes direct infringement of at least one claim of the '474 Patent.

**ANSWER**: Denied.

174. In particular, on information and belief, Defendants' actions that aid and abet others such as their partners, clients, customers, and/or end users to infringe include advertising and distributing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.

**ANSWER**: Denied.

175. On information and belief, Defendants are liable for contributory infringement of the '474 Patent under 35 U.S.C. § 271(c) for offering to sell and selling in the United States the Accused Products which are especially made or adapted for use to infringe the '474 Patent. The Accused Products are a material component for use in practicing the '474 Patent, are specifically made for an infringing use, and are not a staple article of commerce suitable for a non-infringing use. For example, the Accused Products and the example functionality described above have no substantial non-infringing uses, but are specifically designed to practice the claims of the '474 Patent. The Accused Products have no substantial non-infringing uses because the accused functionality is an integral part of the Accused Products and must be performed for the Accused Products to perform their intended purpose. Indeed, the Accused Products are a plasma collection system, containing all the structural elements claimed in the '474 Patent, specifically designed for plasma collection.

**ANSWER**: Denied.

176. In addition, the Accused Products provided by Defendants constitute a material part of the claimed invention, providing all components and features of the claimed system of the ’474 Patent. For example, the Accused Products constitute a material part of the invention claimed because it contains each and every element of the claimed system, including a venipuncture needle, blood separator, plasma product collection container, donor line, first pump, anticoagulant line, anticoagulant source, second pump, touchscreen, and a controller configured to carry out the claimed functionality.

**ANSWER**: Denied.

177. On information and belief, the infringing acts of each partner or customer regarding the Accused Products are attributable to Defendants. For example, on information and belief, Defendants direct and control the activities or actions of their third-party customers in connection with the Accused Products by contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Products which, when followed and used, result in infringement. As a consequence of Defendants’ direct and indirect infringement of the ’474 Patent, both literally and under the doctrine of equivalents, Haemonetics has been and continues to be harmed.

**ANSWER**: Denied.

178. On information and belief, Defendants’ infringement of the ‘474 Patent will continue in the future, and Haemonetics will be irreparably harmed as a consequence unless Defendants’ infringing acts are enjoined by this Court.

**ANSWER**: Denied.

**[HAEMONETICS’] JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Haemonetics demands a trial by jury on all triable issues.

**ANSWER**: No response is required to Haemonetics’ demand for a trial by jury in this case.

**FRESENIUS’ RESPONSE TO HAEMONETICS’ PRAYER FOR RELIEF**

Fresenius denies Haemonetics is entitled to any relief sought in Haemonetics’ Prayer for Relief.

**FRESENIUS KABI USA, LLC AND FRESENIUS KABI AG’S DEFENSES**

1. Without prejudice to the denials set forth in its Answer, and without admitting any allegations of the FAC not expressly admitted, Fresenius asserts the following defenses to the

FAC without assuming the burden of proof on any such defense that would otherwise rest with Haemonetics. Fresenius reserves the right to amend its Answer to add additional defenses, including for example unenforceability due to inequitable conduct, consistent with the facts discovered in this case.

**FIRST DEFENSE (FAILURE TO STATE A CLAIM)**

2. The FAC fails to state a claim upon which relief can be granted.

**SECOND DEFENSE (NON-INFRINGEMENT)**

3. Fresenius has not infringed and does not infringe, under any theory of infringement including directly, whether individually or jointly, or whether literally or under the doctrine of equivalents, or indirectly, whether contributorily or by inducement, any valid and enforceable claim of U.S. Patent Nos. 10,758,652; 12,171,916; and 12,186,474. Haemonetics has not shown, and cannot show, that Fresenius has infringed any valid and enforceable claim of the Haemonetics Asserted Patents.

**THIRD DEFENSE (INVALIDITY)**

4. Each claim of U.S. Patent Nos. 10,758,652; 12,171,916; and 12,186,474 is invalid for failure to comply with one or more of the requirements of the patent laws of the United States, including without limitation, 35 U.S.C. §§ 101, 102, 103, and 112, and the rules, regulations, and laws pertaining thereto. The claims of the Haemonetics Asserted Patents are directed to non-statutory subject matter under 35 U.S.C. § 101, are anticipated by the prior art, including prior art disclosed by Fresenius, under 35 U.S.C. § 102, are rendered obvious by the prior art under 35 U.S.C. § 103, and fail to satisfy the requirements of 35 U.S.C. §112.

**FOURTH DEFENSE (PROSECUTION HISTORY ESTOPPEL AND PROSECUTION HISTORY DISCLAIMER)**

5. The claims of the Haemonetics Asserted Patents are not entitled to a scope sufficient to encompass any system alleged of infringement by Fresenius. For example, the doctrines of prosecution history estoppel (based on amendments and arguments made during prosecution of the Haemonetics Asserted Patents and related patent applications), disclosure-dedication (based on subject matter stated by not claimed in the Haemonetics Asserted Patents), and ensnarement of the prior art each preclude Haemonetics from asserting the Asserted Patents in the manner purportedly stated in the First Amended Complaint. Accordingly, the doctrine of equivalents is unavailable. Haemonetics' claims are further barred in whole or in part by the doctrine of waiver and/or other equitable doctrines.

**FIFTH DEFENSE (LACK OF STANDING)**

6. To the extent that Haemonetics is not the sole and total owner of any of the Haemonetics Asserted Patents as of the filing date of the FAC, including due to any incorrect inventorship, Haemonetics lacks standing to assert, in this case, infringement of any claim from such patent.

**SIXTH DEFENSE (FAILURE TO MARK)**

7. Haemonetics' patent infringement claims are barred in whole or in part for failure to plead compliance with patent marking pursuant to the requirements of 35 U.S.C. § 287(a).

**SEVENTH DEFENSE (STATUTE OF LIMITATIONS)**

8. Haemonetics is barred from recovery, in whole or in part, under the applicable statute of limitations as set forth in 35 U.S.C. § 286.

**EIGHTH DEFENSE (NOT AN EXCEPTIONAL CASE)**

9. The FAC fails to state a claim for exceptional case.

**NINTH DEFENSE (PATENT MISUSE)**

10. Each of the Haemonetics Asserted Patents is unenforceable because Haemonetics has misused the patents by attempting to impermissibly broaden the scope of the patents, impose anticompetitive conditions, or otherwise extend the patents beyond their lawful scope despite knowing that the Haemonetics Asserted Patents are invalid.

**TENTH DEFENSE (EQUITABLE RELIEF)**

11. Haemonetics is not entitled to equitable relief because the remedies at law to which it is entitled, if any, are adequate.

**ELEVENTH DEFENSE (NO COSTS)**

12. To the extent any claim of the Haemonetics Asserted Patents is invalid, Haemonetics is barred by 35 U.S.C. § 288 from recovering costs associated with its action.

**TWELFTH DEFENSE (SAFE HARBOR)**

13. Haemonetics' patent infringement claims are barred at least in part by the safe harbor provision of 35 U.S.C. § 271(e)(1).

**THIRTEENTH DEFENSE (NO WILLFUL INFRINGEMENT)**

14. Fresenius has not willfully infringed, and does not willfully infringe, any valid claim of any of the Asserted Patents.

* * *

15. Fresenius reserves all defenses, at law or equity, which may now exist or in the future be available on discovery and further factual investigation in this case. Fresenius further reserves the right to supplement and/or amend the foregoing defenses.

Dated: May 22, 2026

Respectfully submitted,

*/s/ Tasha Francis Gerasimow*

Tasha Francis Gerasimow (# 6334781)
tasha.gerasimow@kirkland.com
James F. Hurst (#6334781)
james.hurst@kirkland.com
Dan Sinclair (#6330450)
dan.sinclair@kirkland.com
**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

Gregory S. Arovas (NY 2553782)
greg.arovas@kirkland.com
Joseph A. Loy (*Pro Hac Vice*)
joseph.loy@kirkland.com
Brad Deem (*Pro Hac Vice*)
brad.deem@kirkland.com
**Kirkland & Ellis LLP**
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Counsel for Fresenius Kabi USA, LLC, Fresenius Kabi AG, and Fenwal, Inc.*

## CERTIFICATION OF AUTHORIZATION TO FILE AMENDED PLEADING

The foregoing First Amended Counterclaims and Answer and Defenses to First Amended Complaint is filed pursuant to Paragraph 6(d) of the Parties' Rule 26(f) Planning Meeting Report, which was entered by the Court on January 23, 2026. Dkts. 60, 61. Haemonetics has confirmed that it does not oppose the filing of this amended pleading. Pursuant to the Case Procedures for the Honorable LaShonda A. Hunt, attached hereto as Exhibit E is a redline comparison reflecting all change made in this First Amended Counterclaims and Answer and Defenses to First Amended Complaint to Fresenius's previous pleading filed in this action.

*/s/ Tasha Francis Gerasimow*
Tasha Francis Gerasimow