**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| HAEMONETICS CORPORATION,<br><br>*Plaintiff and Counterclaim Defendant,*<br><br>v.<br><br>FRESENIUS KABI USA, LLC<br>FRESENIUS KABI AG, and<br>FENWAL, INC.,<br><br>*Defendants and Counterclaim Plaintiffs.* | ) | Case No.: 1:25-cv-08680<br><br>**JURY TRIAL DEMANDED**<br><br>Honorable LaShonda A. Hunt |

**PLAINTIFF HAEMONETICS CORPORATION'S ANSWER AND DEFENSES TO DEFENDANT FENWAL, INC.'S FIRST AMENDED COUNTERCLAIMS**

Haemonetics Corporation ("Haemonetics"), by and through its undersigned counsel, hereby submits its Answer and Defenses to Defendant Fenwal, Inc.'s First Amended Counterclaims (ECF No. 87) filed by Fenwal, Inc. ("Fenwal").

Fenwal's First Amended Counterclaims are a smokescreen. Unable to defend against Haemonetics' well-founded infringement claims on their merits, Fenwal has constructed an elaborate but ultimately hollow narrative designed to distract this Court from the central issue in this case: Fenwal built and sold devices that infringe Haemonetics' valid and enforceable patents.

At the core of Fenwal's theory is a sensationalized allegation of "copying," arguing that Haemonetics lifted claim language from a Fenwal publication into its continuation applications for the '916 and '474 patents. Haemonetics does not dispute that it deliberately used language from Fenwal's US2021/0015989A1 publication when drafting the continuation claims. But Fenwal's narrative inverts reality and the actual sequence of innovation. Haemonetics is the original

inventor. It filed its foundational patent application, the ’652 patent, on May 30, 2017, establishing priority to the inventive concepts at issue nearly four years before Fenwal’s application published as US2021/0015989A1 in January 2021. The ’652 patent disclosed the controller-based plasma collection system, the hematocrit-adaptive volume targeting, and the draw-and-return cycle architecture that form the substance of the Asserted Patents. Fenwal’s later publication describes the same inventive concepts, because Fenwal copied Haemonetics’ invention, not the other way around. On information and belief, Defendants wrongfully obtained knowledge of Haemonetics’ inventive work, and then filed its own patent application claiming the same inventive subject matter that Haemonetics previously disclosed.

Haemonetics’ use of Fenwal’s published claim language in the ’916 and ’474 continuation applications was strategic: by drafting continuation claims that tracked the language of Fenwal’s publication, Haemonetics surmised that Fenwal’s product, which practices the very invention Haemonetics disclosed in 2017, would fall squarely within the scope of Haemonetics’ patent claims. This is not evidence that Fenwal invented first; it is evidence that Haemonetics recognized Fenwal was practicing Haemonetics’ invention and drafted claims accordingly. Critically, none of this applies to the ’652 patent, which was filed in 2017, years before Fenwal’s publication existed, over a year before Fenwal’s earliest priority application was filed, and whose claims were drafted without reference to any Fenwal application.

The terminology at issue in the claims, like “venipuncture needle,” “anticoagulant,” “hematocrit,” “reservoir,” “target volume,” and “blood separator,” is not the private property of Fresenius. These are the standard lexicon of plasmapheresis, and identical or very similar terms are used in Haemonetics’ preexisting 2018 NexSys device manual.

The irony of Fenwal's position is striking. Fenwal accuses Haemonetics of improperly "copying" claim language, while Fenwal itself copied Haemonetics' underlying invention. Fenwal's '989 Publication describes the same system Haemonetics disclosed in its '652 patent application filed in 2017. On information and belief, Defendants gained access to Haemonetics' inventive work and then filed its own application claiming the same technology. Haemonetics' response, drafting continuation claims that tracked the language of Fenwal's publication to ensure its own patent claims would capture the infringing product was a lawful and rational prosecution strategy. The terminology itself is standard in the field. The chronology is dispositive: Haemonetics invented and disclosed first; Fenwal published later; and Haemonetics then drafted continuation claims to protect against Fenwal's potential infringement. That sequence does not constitute inequitable conduct.

Fenwal's inequitable conduct claim is an attempt to weaponize the duty of candor into a sword for invalidating legitimately obtained patents. Its Walker Process antitrust claim piles speculation atop speculation. And its unclean hands defense is a legal nullity, totaling three conclusory paragraphs devoid of any independent factual theory. Haemonetics will demonstrate at trial that its patents were properly prosecuted, that its inventor independently conceived the claimed inventions, and that Fenwal's counterclaims are nothing more than a litigation tactic by a copycat competitor seeking to escape accountability for its own infringement.

Haemonetics denies all allegations in Fenwal's First Amended Counterclaims, whether express or implied, except those specifically admitted below. Each of the paragraphs 1-1046 below corresponds to the same-numbered paragraphs in Fenwal's First Amended Counterclaims. Any factual allegation below is admitted only as to the specific admitted facts, not as to any purported conclusions, characterizations, implications, or speculations that arguably follow from

the admitted facts. Haemonetics denies that Fenwal is entitled to the relief requested or any other relief. Haemonetics answers Fenwal's First Amended Counterclaims as follows:

## INTRODUCTION[1]

1. For more than 75 years, Fenwal has been a leader among life science companies, developing groundbreaking and innovative medical devices in pursuit of its mission to save and improve lives with high-quality, accessible, and innovative healthcare products. As a premier research-intensive life science company, Fenwal invests years researching, engineering, and developing each of its many products. Through the efforts of Fenwal's product development, regulatory affairs, and other business teams, Fenwal's research results in life-saving medical technology related to blood collection, separation, and transfusion, which is used globally to ensure a safe and available supply of blood products that provide care for critically and chronically ill patients.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

2. As just one example, Fenwal has pioneered the development of plasmapheresis systems, which withdraw the donor's blood, separate and collect the donor's plasma from the blood, and return the remaining blood components to the donor. Fenwal's plasmapheresis devices make plasma donation more accessible, convenient, and safer for donors. And in the case of the Adaptive Nomogram, they enable plasma collection facilities to collect an overall greater amount of plasma per donation session.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the remaining allegations in this paragraph. Haemonetics specifically denies that Fenwal has pioneered the development of plasmapheresis systems.

3. Plasma collected using Fenwal's systems is used to create life-saving therapies and medications for patients with serious medical conditions, including immune deficiencies, clotting disorders, autoimmune diseases, severe trauma, and cancer. These treatments cannot be synthetically produced; they must be derived from human plasma. Hundreds of plasma donations are typically required to treat just one patient with an immune disorder or autoimmune condition. Fenwal is one of the largest suppliers of plasmapheresis products in the United States. Fenwal's

---

[1] Haemonetics repeats the headings recited in the Counterclaims for convenience. To the extent such headings contain factual allegations to which a response is required, Haemonetics denies all such allegations.

technologies have far-reaching impact, as its products are used to help treat patients on six continents.[2]

**ANSWER:** Haemonetics admits that Fenwal is a supplier of plasmapheresis products in the United States and that plasmapheresis systems generally are used for the described purposes. Haemonetics otherwise lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the remaining allegations in this paragraph. Haemonetics refers to the cited document as to its contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

4. Haemonetics' patent infringement lawsuit against Fenwal and its affiliates seeks to rewrite history, re-casting Haemonetics—founded decades after Fenwal—as the leading innovator in the field. The reality is that far from being a leader, Haemonetics habitually follows Fenwal to market with its products. Rather than competing fairly in the market, Haemonetics seeks a competitive advantage through baseless litigation, using patents that cannot validly cover Fenwal's innovative plasmapheresis systems.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

5. Fenwal is entitled to have the cloud of infringement allegations removed from its innovative systems. Thus, Fenwal brings counterclaims under 28 U.S.C. § 2201 to seek declaratory judgment that the patents asserted by Haemonetics (U.S. Patent Nos. 10,758,652, 12,171,916, and 12,186,474) (collectively the "Haemonetics Asserted Patents") against Fenwal's plasmapheresis devices in the First Amended Complaint are neither valid nor infringed.

**ANSWER:** Haemonetics denies that Fenwal is entitled to have Haemonetics' infringement allegations removed. This paragraph also contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies these allegations in this paragraph.

6. Fenwal also counterclaims against Haemonetics under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, to vindicate its intellectual property rights based on Haemonetics' infringement of Fenwal's pioneering patents that cover plasmapheresis devices. Haemonetics makes, uses, sells/leases, offers for sale or lease, and/or unlawfully imports into the United States: (i) plasmapheresis devices, including the NexSys PCS® device, including those with YES® Technology, PERSONA® Technology, and/or PERSONA® Plus Technology (collectively,

---

[2] https://firstwordhealthtech.com/story/1410735 (last visited December 2, 2025) (FENWAL 00004760-FENWAL 00004762).

"NexSys PCS"), (ii) the disposable components and kits, including those used with the NexSys PCS ("Disposable Kits") and (iii) donor management software and related software, including software used with the NexSys PCS (collectively, "Accused Haemonetics Products").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies that it unlawfully imports any products into the United States, including the Accused Haemonetics Products. Haemonetics admits that it manufactures and sells the NexSys PCS® device with YES® Technology, PERSONA® Technology, and/or PERSONA® Plus Technology.

7. The Accused Haemonetics Products infringe at least the following valid and enforceable patents owned by Fenwal: U.S. Patent Nos. 10,431,334 ("the '334 Patent"); 10,643,748 ("the '748 Patent"); 10,872,693 ("the '693 Patent"); 11,672,891 ("the '891 Patent"); 12,397,089 ("the '089 Patent"); 11,285,251 ("the '251 Patent"); 11,369,724 ("the '724 Patent"); and 11,730,873 ("the '873 Patent") (collectively, the "Fenwal Asserted Patents").

**ANSWER:** Haemonetics denies the allegations in this paragraph.

## NATURE OF THE ACTION

8. This is an action for: (i) patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*; (ii) invalidity and unenforceability of the Haemonetics Asserted Patents under the Declaratory Judgment Act (28 U.S.C. § 2201); (iii) non-infringement of the Haemonetics Asserted Patents under 28 U.S.C. § 2201; (iv) damages and injunctive relief for attempted monopolization under the antitrust laws, 15 U.S.C. §§ 1 *et seq.*; and (v) such other relief as the Court deems just and proper.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

## THE PARTIES

9. Fenwal is a medical technology corporation organized and existing pursuant to the laws of the state of Delaware and has a principal place of business at 3 Corporate Drive, Lake Zurich, Illinois 60047.[3] Fenwal is a subsidiary of Fresenius Kabi AG, a corporation organized and existing under the laws of the Federal Republic of Germany.

---

[3] Fenwal, Inc. Statement of Good Standing (State of Delaware Dept. of State, Division of Corporations) (dated November 18, 2025) (FENWAL 00004766).

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the cited document as to its contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

10. Haemonetics Corporation (Haemonetics) is a Massachusetts corporation with its principal place of business at 125 Summer Street, Boston, Massachusetts 02110. Haemonetics is the FDA registered Specification Developer for the Accused Haemonetics Products that are manufactured, used, sold, leased, offer for sale or lease, and/or imported into the United States.

**ANSWER:** Haemonetics admits the allegations in this paragraph.

11. On information and belief, Haemonetics designs, develops, makes, imports, tests, offers for sale/lease, leases, and sells in the United States infringing plasmapheresis systems, their components, and related software, including devices sold under the tradenames NexSys PCS®, NexSys PCS® with YES® Technology, and NexSys PCS with PERSONA® Technology, and NexSys PCS with PERSONA® Plus Technology.[4] On information and belief, Haemonetics launched the NexSys PCS with YES® Technology in the United States in 2018, launched the NexSys PCS with PERSONA® Technology in the United States in 2020, and received clearance for the NexSys PCS with PERSONA® Plus Technology in 2026.[5]

**ANSWER:** Haemonetics admits that it manufacturers and sells the NexSys PCS® device and that the NexSys PCS with YES® Technology was launched in the United States in 2018, the NexSys PCS with PERSONA® Technology was launched in the United States in 2020, and Haemonetics

---

[4]https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm?start_search=1&showList=1&establishment Name=haemonetics&regNum=&StateName=&CountryName=&OwnerOperatorNumber=&OwnerOperatorName=&ProductCode=&DeviceName=&ProprietaryName=&establishmentType=&PAGENUM=10&SortColumn=EstablishmentName20%25ASC&RegistrationNumber=1219343 (last visited December 2, 2025) (FENWAL 00004774-FENWAL 00004778).

[5] https://haemonetics.gcs-web.com/news-releases/news-release-details/haemoneticsannounces-regulatory-clearances-nexsys-pcstm (last visited December 2, 2025) (FENWAL 00004770-FENWAL 00004772) (Haemonetics Press Release re: YES Technology); 510(k) Letter - BK180185 (FENWAL 00004721-FENWAL 00004723); 510(k) Summary - BK180185 (FENWAL 00004724-FENWAL 00004728); https://haemonetics.gcsweb.com/news-releases/news-release-details/haemonetics-receives-fda-clearance-nexsyspcsr-personatm (last visited December 2, 2025) (FENWAL 00005399-FENWAL 00005404) ("Haemonetics Press Release re: PERSONA Technology"); 510(k) Summary – BK251292 (HAEM-FRE_0091553).

received clearance for the NexSys PCS with PERSONA® Plus Technology in 2026. Haemonetics specifically denies that its devices infringe Fenwal's asserted patents. Haemonetics refers to the cited documents as to its contents which speak for themselves.

**JURISDICTION**

12. This Court has jurisdiction over Fenwal's counterclaims pursuant to 28 U.S.C. §§ 2201 *et seq.* and 28 U.S.C. §§ 1331, 1338(a), and § 1367. Furthermore, an actual, substantial, and continuing justiciable controversy exists between Fenwal and Haemonetics based on Haemonetics having filed its First Amended Complaint (ECF No. 32) against Fenwal alleging infringement of the Haemonetics Asserted Patents. The controversy concerns the invalidity and non-infringement of the Haemonetics Asserted Patents, as well as Haemonetics' violation of the antitrust laws.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics admits it filed a First Amended Complaint against Fenwal alleging infringement of the Haemonetics Asserted Patents.

13. This Court has personal jurisdiction over Haemonetics at least because Haemonetics has submitted to the personal jurisdiction of this Court by filing its Complaint (ECF No. 1) and First Amended Complaint (ECF No. 32) in this Court. This Court also has personal jurisdiction over Haemonetics because Haemonetics has committed acts of infringement in this District and the State of Illinois, including at least because it, directly and/or indirectly, advertises, makes, uses, sells, leases, and/or offers for sale/lease the infringing products at issue in this case in this District and the State of Illinois, and places those infringing products in the stream of commerce with the expectation and knowledge that they will be used by customers such as blood collection facilities in this District. Thus, Haemonetics has committed tortious acts of patent infringement in this District and the State of Illinois; has expressly aimed its actions at this District and the State of Illinois with the knowledge that they would cause harm and substantial injury to Fenwal in the District and the State of Illinois; and Fenwal's counterclaims relate to technologies in Haemonetics' products that infringe the Fenwal Asserted Patents and are imported, advertised, marketed, manufactured, used, offered for sale/lease, leased, and/or sold in this District and in the State of Illinois.

**ANSWER:** Haemonetics admits that this Court has personal jurisdiction over Haemonetics for the purpose of this proceeding only. Haemonetics specifically denies that it has committed any acts of infringement, in this District or elsewhere, and denies the remaining allegations in this paragraph.

## VENUE

14. Venue properly lies in this District under 28 U.S.C. §§ 1391 and 1400(b), because Haemonetics has consented to venue in this Court by filing its First Amended Complaint for patent infringement in this Court, and seeking other relief from this Court, thereby waiving any objections to venue for any counterclaims asserted against it. *See, e.g.*, *E & J Gallo Winery v. Morand Bros. Beverage Co.*, 247 F. Supp. 2d 973, 976-77 (N.D. Ill. 2002); *Shapo v. Engle*, No. 98-cv-7909, 2000 WL 198435, at *5 (N.D. Ill. Feb. 11, 2000).

**ANSWER:** Haemonetics admits that venue is proper in this District for the purpose of this proceeding only. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

## FENWAL IS A WORLD LEADER IN BLOOD COLLECTION AND SEPARATION TECHNOLOGIES

15. Fenwal has been a pioneer in blood-collection and blood-separation technologies, for more than 75 years, bringing numerous innovative products including reusable devices and disposable sets for blood collection, separation, and transfusion to the market during this time. Fenwal's products address critical medical needs, enabling collection of blood components used in life-saving therapies which help treat patients on six continents.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics specifically denies that Fenwal has been a pioneer in blood-collection and blood-separation technologies.

16. Fenwal was founded as Fenwal Laboratories in 1945, shortly after World War II, by T.L. Fenn and Carl Walter. From its inception, Fenwal Laboratories was dedicated to advancing blood collection and separation technologies. The company quickly distinguished itself as an innovator: In 1948, it introduced the first plastic blood bag to replace glass bottles—a milestone that revolutionized blood collection by improving safety and sterility, making blood separation and modern blood banking possible. This early innovation set the stage for Fenwal's ongoing leadership in the transfusion and plasmapheresis fields.[6]

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the

---

[6] https://www.biospace.com/fenwal-launched-as-independent-corporation-followingcompletion-of-divestiture-from-baxter-healthcare-corporation# (last visited December 2, 2025) (FENWAL 00004763-FENWAL 00004765); https://www.bioworld.com/articles/455418 (last visited December 2, 2025) (FENWAL 00004779-FENWAL 00004780).

cited document as to its contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

17. In 1959, Baxter International ("Baxter") acquired Fenwal Laboratories and operated it as Baxter's transfusion therapies division. Over the following decades, the Fenwal division continued to pioneer the development of technologies focused on automating the collection, separation, filtration, and transfusion of blood and blood components, with a focus on the evolving needs of blood centers and hospitals worldwide.[7]

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the cited document as to its contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

18. In 1972, the Fenwal division invented its landmark product, the "Fenwal CS-3000," an automated blood-cell separating device.[8] The term "apheresis," a Greek word for "to separate," was coined as a result and the term started to be used by clinicians in 1979.[9] The Fenwal CS-3000 enabled the automated, continuous-flow collection of specific blood components, from a single donor. This revolutionized the blood donation process making it possible for donors to donate blood more frequently than they otherwise would be able to because the process allows for the collection of plasma from donated blood, while returning the remaining components—primarily red blood cells and platelets—back to the donor. The Fenwal CS-3000 was distributed worldwide, and the inventors were widely recognized for their achievement through awards including the prestigious Dale A. Smith Memorial Award from the Association for the Advancement of Blood and Biotherapies (AABB), formerly known as the American Association for Blood Bankers.[10]

---

7 https://www.biospace.com/fenwal-launched-as-independent-corporation-followingcompletion-of-divestiture-from-baxter-healthcare-corporation# (last visited December 2, 2025) (FENWAL 00004763-FENWAL 00004765); Fenwal Company Fact Sheet (FENWAL 00005323-FENWAL 00005324) at 2; https://staging.giveplasma.ca/a-brief-history-ofapheresis-machines/ (last visited December 2, 2025) (FENWAL 00004710-FENWAL 00004711).

8 https://staging.giveplasma.ca/a-brief-history-of-apheresis-machines/ (last visited December 2, 2025) (FENWAL 00004710-FENWAL 00004711); https://americanhistory.si.edu/collections/object/nmah_600368 (last visited December 2, 2025) (FENWAL 00004719-FENWAL 00004720); Fenwal Company Fact Sheet at 2.

9 https://staging.giveplasma.ca/a-brief-history-of-apheresis-machines/ (last visited December 2, 2025) (FENWAL 00004710-FENWAL 00004711).

10 https://staging.giveplasma.ca/a-brief-history-of-apheresis-machines/ (last visited December 2, 2025) (FENWAL 00004710-FENWAL 00004711); https://www.aabb.org/aboutaabb/history#:~:text=Since %20its%20inception%20in%201947,

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the cited documents as to their contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

19. The Fenwal division continued to innovate in the field of plasmapheresis. In 1984, Fenwal introduced the Autopheresis-C device, an automated system that further streamlined plasma collection. Whereas the Fenwal CS-3000 device was a centrifugal apheresis system, the Autopheresis-C device used a unique spinning membrane technology, which resulted in virtually cell-free plasma. And in 2003, the Fenwal division introduced the Alyx, a portable/mobile, automated cell separation device. This device collects two units of red blood cells or red cells and plasma from a single donor in less than 30 minutes.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

20. In 2007, private investors acquired the Fenwal division from Baxter and launched it as Fenwal, Inc.[11] In 2012, Fenwal was acquired by Fresenius Kabi, a leading global healthcare company that focuses on medicines and medical devices aimed at improving human healthcare. Fenwal's integration with Fresenius Kabi provided Fenwal with resources to further its technological advancements.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the remaining allegations in this paragraph. Haemonetics refers to the cited document as to its contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

21. By April 2012, Fenwal received FDA clearance to market a revolutionary new plasma collection system called the Aurora plasmapheresis system ("the Aurora System"). The Aurora System contains improved hardware and software, to support two-way, wireless data communication, improving the system's accuracy and safety and enhancing the operator and patient experience. Among other things, the Aurora System had an interactive touch-screen display with intuitive menus and icons, connectivity with Fenwal DXT software, and a controller that works in conjunction with other components of the system to provide an improved system. For

---

advancing%20donor%20and%20patient%20care (last visited December 2, 2025) (FENWAL 00004712-FENWAL 00004718).

[11] See https://www.bioworld.com/articles/455418 (last visited December 2, 2025) (FENWAL 00004779-FENWAL 00004780).

example, the Aurora System enhanced donor safety in a revolutionary way by enabling more reliable identification and confirmation of the donor, ensuring that appropriate procedural parameters are set for each donor. The Aurora System also enhanced donor efficiency by automating the plasmapheresis procedure in a manner not achieved before.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

22. Fenwal continued to advance its plasmapheresis technologies, and in 2016, Fenwal released the Aurora Xi plasmapheresis system. This machine, which incorporated faster processing speeds and a larger spinning membrane, improved plasma donation center efficiency and donor experience by reducing donation times.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the remaining allegations in this paragraph.

23. Fenwal's recent innovations were critical in addressing the shortage of plasma precipitated by the COVID pandemic. During the pandemic, donations decreased, and the inventory of collected plasma relied upon to stabilize plasma-derived therapies was depleted. Pharmaceutical manufacturers, who rely on plasma collectors, utilized all source plasma reserves to meet the growing demand for plasma-based therapies.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

24. Fenwal's innovations related to the Adaptive Nomogram responded to this increased need for plasma. This proprietary and innovative nomogram, which is used with the Aurora Xi system to collect plasma, considers a donor's unique characteristics to determine an optimal amount of plasma to safely collect from the donor while providing an advantage compared to other on-market nomograms. In January 2025, Fenwal received FDA clearance for the Adaptive Nomogram.[12]

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the cited document as to its contents and denies knowledge and information sufficient to know whether

---

[12] https://www.fresenius-kabi.com/us/news-and-events/receives-fda-510k-clearance-adaptivenomogram-enhancing-plasma-collection-efficiency-aurora-xi-plasmapheresis-system (last visited December 2, 2025) (FENWAL 00004767-FENWAL 00004769).

those contents are accurate and complete. Haemonetics notes, however, that the cited documents indicates that defendant Fresenius-Kabi received FDA clearance for the Adaptive Nomogram.

25. The Adaptive Nomogram represents a significant industry milestone as it enabled the collection of an average of 11.5% more plasma per donation, supporting higher production of plasma-derived therapies.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

26. In bringing its plasmapheresis devices to market, Fenwal has made substantial investments including testing, research, development, engineering, design, data collection and analysis, clinical trials, manufacturing, sales, and marketing. Fenwal has conducted numerous clinical trials, costing millions of dollars each, to demonstrate the safety and efficacy of its products.[13]

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the cited document as to its contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

27. Today, Fenwal remains an innovative, market leader in blood collection systems. Fenwal's products have been used in millions of procedures worldwide, contributing to the safety, quality, and availability of plasma and other blood components for therapeutic use.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

**THE FENWAL ASSERTED PATENTS**

28. As a leading medical technology innovator, Fenwal invests in its intellectual property and possesses a significant portfolio of patents covering various aspects of plasmapheresis and systems for carrying out these procedures, including patents infringed by Haemonetics' devices (the "Fenwal Asserted Patents").[14] The Fenwal Asserted Patents fall into three groups:

---

[13] https://clinicaltrials.gov/search?term=fenwal,%20inc (last visited December 2, 2025) (FENWAL 00005320-FENWAL 00005322).

[14] *See, e.g.*, https://www.chicagobusiness.com/technology/chicagos-most-innovativecompanies-2025 (Chicago's Most Innovative Companies 2025) (Oct. 3, 2025)

(i) **The 2011 Fenwal Patents**: U.S. Patent No. 10,431,334 ("the '334 Patent"), U.S. Patent No. 10,643,748 ("the '748 Patent"), and U.S. Patent No. 10,872,693 ("the '693 Patent").

(ii) **The 2016 Fenwal Patents:** U.S. Patent No. 11,672,891 ("the '891 Patent") and U.S. Patent No. 12,397,089 ("the '089 Patent").

(iii) **The 2018 Fenwal Patents**: U.S. Patent No. 11,852,251 ("the '251 Patent"), U.S. Patent No. 11,369,724 ("the '724 Patent"), and U.S. Patent No. 11,730,873 ("the '873 Patent").

**ANSWER:** Haemonetics denies that the Haemonetics' devices infringe the Fenwal Asserted Patents, Haemonetics otherwise lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the remaining allegations in this paragraph. Haemonetics refers to the cited document as to its contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

***The 2011 Fenwal Patents***

29. While continuing to research and develop its plasmapheresis technology, Fenwal recognized that plasma collection, when performed improperly, posed a health and safety risk to patients and donors.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

30. For example, plasmapheresis procedures, when performed with incorrect parameters (*e.g.*, inaccurate donor-specific inputs), can lead and have led to adverse donor events, including hypotension, arrhythmias, hemolysis, shock, and in extreme cases, even death. *See e.g.* Garozzo *et al*., "Adverse reactions to blood donations: the READ project," Blood Transfus. 2010, 8: 49-62 (FENWAL 00005420-FENWAL 00005433); Gupte, "Automation in Blood Centre: Its impact on blood safety," Asian Journal of Transfusion Science, April 2015, Vol. 9, Supp. 1 (FENWAL 00005415-FENWAL 00005419). Use of procedure parameters that are unsuited to the patient/donor can also lead to inefficient under-collection of donor plasma. As explained in the specification of the 2011 Fenwal Patents, Fenwal inventors recognized these problems with use of procedure parameters that are not tailored to the donor:

> It is axiomatic that the parameters under which an at least partially automated medical procedure is performed, including without limitation

---

(FENWAL 00004735-FENWAL 00004752) (identifying Fenwal as a leading patent holder among Chicago-area companies).

> blood donations and apheresis, should correspond or be appropriate to the characteristics of the donor or patient upon which the procedure is being performed. For example, when performing a blood donation procedure, it may be advantageous for a number of parameters, such as the sex and weight of the donor or patient, to be taken into consideration. If the incorrect operational parameters are used, the procedure may be less efficient than it would otherwise be and/or in certain circumstances could possibly be harmful to the donor or patient. Accordingly, care should be taken that the operational parameters correspond to the unique characteristics of the donor or patient.

Exhibit 5 (the '693 Patent) at 1:28-41.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the cited documents as to their contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

31. Prior to Fenwal's inventions, these issues arose in part from errors in entry of donor or patient information into the system controlling the plasmapheresis collection, which led to inefficiencies in the collection procedure and/or dangers to the patient. *Id.* at 1:42-45, 1:46-52. The potential for error due to inaccurate application of donor-specific parameters was exacerbated by the fact that multiple different plasmapheresis devices may coexist in a single location, each running unique collection nomograms, with multiple donors being treated at the same time.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

32. Unlike the prior art systems, the systems and methods described in the 2011 Fenwal Patents enhance the plasmapheresis process by reducing error and increasing safety. The 2011 Fenwal Patents ensure the plasmapheresis procedures are accurately tailored to each donor's unique characteristics, including, for example, by the entry of donor-specific information, once, into a data storage location that can be reliably transmitted to control the plasmapheresis collection.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

33. The 2011 Fenwal Patents disclose a system that includes a database, a user interface, an apheresis treatment device, and a controller. The database is pre-programmed with one or more subject data entries, each subject data entry having associated with it subject-specific information (such as name, weight, sex, age, *etc.*). Additionally, the subject data entry may include procedural information, such as one or more parameters with which the medical procedure is to be

performed (*e.g.*, processing time in an apheresis procedure, flow rate, *etc.*). The user interface is adapted to receive an identity input from a unique subject. The controller is configured to compare the identity input to the subject-specific information of the subject data entries. If the identity input corresponds to the subject-specific information of a subject data entry, the controller commands the treatment device to perform a medical procedure with respect to the subject. If the identity input does not correspond to the subject-specific information of any of the subject data entries, the controller prevents the performance of the medical procedure with respect to the subject. *See* Exhibit 5 at 1:66-2:17.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. The contents of the 2011 Fenwal Patents speak for themselves.

34. The 2011 Fenwal Patents consist of three patents, listed below. The three patents share the same specification and claim priority to U.S. Application Ser. No. 13/110,520 ("the '520 Application"), which was filed on May 18, 2011 by inventors Brian C. Case and Lan L. Nguyen.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. The contents of the 2011 Fenwal Patents speak for themselves.

35. Fenwal owns by assignment the full right, title, and interest in each patent and patent application in the family that claims priority to the '520 Application. *See* Exhibits 2, 4, 6.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

***U.S. Patent No. 10,431,334***

36. U.S. Patent No. 10,431,334 is titled "Performing an apheresis procedure on a human subject with identity confirmation" and issued on October 1, 2019, with Brian C. Case and Lan L. Nguyen as inventors. A copy of the '334 Patent is attached as Exhibit 1.

**ANSWER:** Haemonetics admits the allegations of this paragraph based on the face of the '334 Patent.

37. The '334 Patent duly and legally issued from U.S. Application No. 16/162,867, a continuation of U.S. Application No. 15/836,227, which claims priority to the '520 Application through a chain of continuation applications.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

38. Fenwal owns by assignment the full right, title, and interest in the '334 Patent. A copy of the assignment history of the '334 Patent is attached as Exhibit 2.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

39. The '334 Patent is valid and enforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***U.S. Patent No. 10,643,748***

40. U.S. Patent No. 10,643,748 is titled "Performing an apheresis procedure on a human subject with identity confirmation" and issued on May 5, 2020, with Brian C. Case and Lan L. Nguyen as inventors. A copy of the '748 Patent is attached as Exhibit 3.

**ANSWER:** Haemonetics admits the allegations of this paragraph based on the face of the '748 Patent.

41. The '748 Patent duly and legally issued from U.S. Application No. 16/545,962, a continuation of U.S. Application No. 16/162,867 (which issued as the '334 Patent).

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

42. The '748 Patent is in the same family as the '334 Patent and also claims priority to the '520 Application.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

43. Fenwal owns by assignment the full right, title, and interest in the '748 Patent. A copy of the assignment history of the '748 Patent is attached as Exhibit 4.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

44. The '748 Patent is valid and enforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***U.S. Patent No. 10,872,693***

45. The '693 Patent is titled "Performing an apheresis procedure on a human subject with identity confirmation" and issued on December 22, 2020, with Brian C. Case and Lan L. Nguyen as inventors. A copy of the '693 Patent is attached as Exhibit 5.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the face of the '693 Patent.

46. The '693 Patent duly and legally issued from U.S. Application No. 16/842,879, a continuation of U.S. Application No. 16/545,962 (which issued as the '748 Patent).

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

47. The '693 Patent is in the same family as the '334 and '748 Patents and also claims priority to the '520 Application.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

48. Fenwal owns by assignment the full right, title, and interest in the '693 Patent. A copy of the assignment history of the '693 Patent is attached as Exhibit 6.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

49. The '693 Patent is valid and enforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***The 2016 Fenwal Patents***

50. Processing biological materials such as blood to separate out medically useful components safely, efficiently and economically, presents many challenges. At the time of the 2016 patent inventions, the industry recognized the importance of automated systems for blood processing. *See e.g.*, Pietersz et al. "Processing and storage of blood components: strategies to improve patient safety;" International Journal of Clinical Transfusion Medicine 2015:3 55–64 at 57 (FENWAL 00005331-FENWAL 00005340) ("Today, automated equipment for collecting whole blood in plastic bags, mixing, measuring the blood flow, weighing the blood components,

calculating the collection time, and documenting all data has been developed and has contributed to the safety by collecting a standardized volume of blood.”).

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the cited documents as to their contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

51. As described by the 2016 patents, in using automated equipment, there are several processing parameters that must be accounted for. These include, for example, the time required for the procedure, flow rates, centrifugation speeds, collection volumes and appropriate stopping points. *See e.g.*, Exhibit 7 (the ‘891 Patent) at 1:39-52. Running a procedure that fails to properly accord with one or more processing parameters incurs risks such as damaging the desired biological end-product, safety concerns due to overcollection of biological material from a donor, and prematurely ending the collection process impacting yield. Before the 2016 invention, processing operators had to rely on their own prior experience with the device and procedure and/or empirical data to estimate appropriate parameters for a processing procedure. This approach was less than ideal and raised, *inter alia*, safety, efficiency, and waste concerns.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. The 2016 patents speak for themselves.

52. The novel system of the 2016 Fenwal Patents avoids the need to make assumptions regarding the operation of the processing equipment based on potentially unreliable empirical data, which may have poor correlation to the operational conditions in individual procedures. The system provides for pre-process evaluation of one or more outputs and/or in process conditions in advance of performing the process. Such pre-process evaluation may prevent damage to the material being processed, avoid unsafe operating conditions, prevent wastage of the processor’s disposable elements and avoid producing a product that fails to meet the desired specifications. *See e.g.*, *id.* at 1:39-52, 5:5-18, 5:45-53, 5:62-67, 6:1-18. The 2016 Fenwal Patents describe a controller that calculates outputs prior to process initiation and can prevent the process from starting if the predicted process would exceed the system’s physical or operational constraints. In addition, the 2016 Fenwal Patents disclose real-time in process monitoring to compare parameters to pre-calculated expectations from the mathematical model. See, e.g., *id.* at 5:1-17. If a deviation is detected, the system can alert the operator. *See, e.g.*, *id.* at 6:10-19.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. The 2016 Fenwal Patents speak for themselves.

53. Specifically, the 2016 patents describe and claim systems and methods for performing a series of concrete steps that include, for example, a processing circuit configured to receive activation from the operator to turn the blood processing system on, conduct self-checks on the system, receive input data for a process parameter value from a touch screen, verify that value is within a preset range for the value, prior to initiating the centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected, provide that information to the operator via the touchscreen, prompt the operator to mount the disposable fluid circuit, automatically confirm that the circuit is installed, prime tubing of the disposable fluid circuit with a fluid, begin the centrifugation separation process on the biological fluid, check the air detector sensor for fluid/air interface; weigh the product container during the centrifugal separation process, process the biological fluid until the predetermined volume of the blood component is collected and alert the operator when the process is complete. *See e.g.*, *id.* at 12:53-19:41, Figures 6 and 7.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. The 2016 patents speak for themselves.

54. The ‘089 and ‘891 Patents share the same specification and claim priority to provisional U.S. Application Ser. No. 62/342,675 (“the ‘675 Provisional Application”), which was filed on May 27, 2016 by inventors Christopher Wegener, Daniel Boggs, Bret Olson, Steven Binninger, and James Hosek.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

55. Fenwal owns by assignment the full right, title, and interest in the patent and patent application in the family that claims priority to the ‘675 Application (including the ‘089 and ‘891 Patents). *See* Exhibits 8, 10.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

***U.S. Patent No. 11,672,891***

56. U.S. Patent No. 11,672,891 is titled “Cell processing system and method with preliminary process evaluation” and issued on June 13, 2023, with Christopher Wegener, Daniel Boggs, Bret Olson, Steven Binninger, and James Hosek as inventors. A copy of the ‘891 Patent is attached as Exhibit 7.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the face of the ’891 Patent.

57. The ‘891 Patent duly and legally issued from U.S. Application No. 17/398,780, a continuation of U.S. Application No. 15/456,853. The ‘891 Patent ultimately claims priority to the ‘675 Provisional Application.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

58. Fenwal owns by assignment the full right, title, and interest in the ‘891 Patent. A copy of the assignment history of the ‘891 Patent is attached as Exhibit 8.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

59. The ‘891 Patent is valid and enforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***U.S. Patent No. 12,397,089***

60. U.S. Patent No. 12,397,089 is titled “Cell processing system and method with preliminary process evaluation” and issued on August 26, 2025, with Christopher Wegener, Daniel Boggs, Bret Olson, Steven Binninger, and James Hosek as inventors. A copy of the ‘089 Patent is attached as Exhibit 9.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the face of the ’089 Patent.

61. The ‘089 Patent duly and legally issued from U.S. Application No. 18/180,637, a continuation of U.S. Application No. 17,398,780 (which issued as the ‘891 Patent).

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

62. The ‘089 Patent is in the same family as the ‘891 Patent and also claims priority to the ‘675 Provisional Application.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

63. Fenwal owns by assignment the full right, title, and interest in the ‘089 Patent. A copy of the assignment history of the ‘089 Patent is attached as Exhibit 10.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

64. The ‘089 Patent is valid and enforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***The 2018 Fenwal Patents***

65. Plasma saves lives. Countless patients with rare, chronic, and life-threatening conditions need regular therapies derived from plasma. The proteins in blood plasma provide the primary ingredients for many important biologic medicines. But each donation only contains a tiny amount of what is required to create a single dose for a patient. For example, more than 1200 plasma donations are required to treat a 150 lb. hemophilia patient for a year.[15] Plasma cannot be manufactured, and the sole source of this lifesaving blood component is donors. Studies show that a donor’s physical experience significantly impacts their willingness to repeat donations.[16] Thus, crucial to ensuring an ample supply of plasma is safeguarding the health and safety of the donors and making the donation process as efficient and relaxed as possible to encourage repeat donors, while maximizing the amount of plasma that can be safely collected.

**ANSWER:** Haemonetics generally admits the allegations in this paragraph, but refers to the cited documents as to their contents and denies knowledge and information sufficient to know whether those contents are accurate and complete.

66. The 2018 inventions strive to meet the ever-growing demand for plasma-derived medicines for patients in need, by focusing on donor-impacting details, such as safety and convenience, while safely optimizing the volume of raw plasma to be collected for a particular donor. *See* Exhibit 13 (‘724 Patent) at 1:25-29. At the time of the inventions of the 2018 Fenwal Patents, plasma collection centers primarily used a simplified nomogram issued by the FDA to set the maximum plasma collection volumes based on donor weight. *See id.* at 2:8-10; 4:36-38 and Figure 1. As described by the patents, the FDA’s simplified nomogram permitted the same volume of plasma to be drawn from for example, a donor weighing 110 pounds, and a donor weighing 149 pounds. Thus, it allowed for disproportionate collection among donors and potentially placed individuals particularly at the fringes of the weight groups, at risk for adverse events. Further, by failing to account for individual characteristics, the simplified nomogram did not maximize plasma collection volume.

---

15 *See* https://plasma.fresenius-kabi.us/donate (last visited December 2, 2025) (FENWAL 00004755-FENWAL 00004758).

16 Kumari, “Prevalence of acute adverse reactions among whole blood donors: A 7 years study,” Journal of Applied Hematology, vol. 6, Issue 4, October-December 2015 (FENWAL 00005325-FENWAL 00005330).

**ANSWER:** Haemonetics admits that "by failing to account for individual characteristics, the simplified nomogram did not maximize plasma collection volume." Haemonetics lacks information sufficient to admit or deny the remaining allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

67. The 2018 inventions allow for a personalized and improved donor experience. *See, e.g.*, *id.* at 51-59. They provide an automated system that maximizes the amount of plasma safely harvested from a donor, based on characteristics such as weight, height, hematocrit and the anticoagulant to whole blood ratio. ("ACR"). *See, e.g.*, *id.* at 2:66-3:21. The 2018 Fenwal Patents disclose aspects of the inventions including:

- An automated plasmapheresis system performing multiple cycles of draw and return, comprising a hardware component (with pumps, sensors, controller) and a disposable kit (including a separator, collection containers and tubing). *See, e.g.*, *id.* at 3:22-30, 6:26-35.
- A controller that is programmable and receives donor-specific parameters (such as weight, height, sex, hematocrit) either manually or electronically from a donor management system. The controller can be paired with a touchscreen for display and data entry. *See, e.g.*, *id.* at Abstract, 5:10-33, 6:3-6.
- The system can calculate the target of plasma to be collected based on the combination of donor hematocrit and the ACR. The system can control the ACR and consider the anticoagulant volume in the plasma product collected. *See, e.g.*, *id.* at 3:39-67. Algorithms that factor in donor hematocrit and total blood volume, among other factors, to determine the maximum safe volume of raw plasma that can be collected are disclosed. Id. During the plasmapheresis procedure, the donor's hematocrit changes as the plasma is removed and red-blood cells are returned to the donor. The system can re-calculate allowable plasma product to be collected after each cycle, ensuring maximum safe amount of plasma is collected throughout the procedure. *See e.g.*, *id.* at 17:3-6.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph. Haemonetics refers to the contents of the cited documents.

68. The 2018 Fenwal Patents share the same specification and claim priority to: (i) U.S. Application Ser. No. 62/846,400, filed May 10, 2019 ("the '400 Provisional Application"); (ii) U.S. Application Ser. No. 62/752,480 filed Oct. 30, 2018 ("the '480 Provisional Application"); (iii) U.S. Application Ser. No. 62/674,144, filed May 21, 2018 ("the '144 Provisional Application"); and (iv) PCT/US2019/033318 ("the '318 PCT Application").

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

69. Fenwal owns by assignment the full right, title, and interest in the '251, '724, and '873 Patents. *See* Exhibits 12, 14, 16.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

***U.S. Patent No. 11,285,251***

70. U.S. Patent No. 11,285,251 is titled "Systems and methods for optimization of plasma collection volumes" and issued on March 29, 2022, with Amit J. Patel, Samantha M. Planas, Walter T. Watts, Kyungyoon Min, and Daniel R. Boggs as inventors. A copy of the '251 Patent is attached as Exhibit 11.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the face of the '251 Patent.

71. The '251 Patent duly and legally issued from U.S. Application No. 17/386,992, a continuation of U.S. Application No. 17/194,410, which claims priority to the '144 Provisional Application through a chain of continuation applications.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

72. Fenwal owns by assignment the full right, title, and interest in the '251 Patent. A copy of the assignment history of the '251 Patent is attached as Exhibit 12.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

73. The '251 Patent is valid and enforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***U.S. Patent No. 11,369,724***

74. U.S. Patent No. 11,369,724 is titled "Systems and methods for optimization of plasma collection volumes" and issued on June 28, 2022, with Amit J. Patel, Samantha M. Planas, Walter T. Watts, Kyungyoon Min, and Daniel R. Boggs as inventors. A copy of the '724 Patent is attached as Exhibit 13.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the face of the '724 Patent.

75. The '724 Patent duly and legally issued from U.S. Application No. 17/675,824, a continuation of U.S. Application No. 17/386,992 (which issued as the '251 Patent).

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

76. Fenwal owns by assignment the full right, title, and interest in the '724 Patent. A copy of the assignment history of the '724 Patent is attached as Exhibit 14.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

77. The '724 Patent is valid and enforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***U.S. Patent No. 11,730,873***

78. U.S. Patent No. 11,730,873 is titled "Systems and methods for optimization of plasma collection volumes" and issued on August 22, 2023, with Amit J. Patel, Samantha M. Planas, Walter T. Watts, Kyungyoon Min, and Daniel R. Boggs as inventors. A copy of the '873 Patent is attached as Exhibit 15.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the face of the '873 Patent.

79. The '873 Patent duly and legally issued from U.S. Application No. 18/109,547, a continuation of U.S. Application No. 17/825,918.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

80. Fenwal owns by assignment the full right, title, and interest in the '873 Patent. A copy of the assignment history of the '873 Patent is attached as Exhibit 16.

**ANSWER:** Haemonetics lacks information sufficient to admit or deny the allegations in this paragraph, and on that basis, denies the allegations in this paragraph.

81. The '873 Patent is valid and enforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**HAEMONETICS AND THE ACCUSED HAEMONETICS PRODUCTS**

82. Haemonetics competes with Fenwal's Aurora and Aurora Xi device product lines in the automated plasma collection market.[17] Haemonetics has three principal businesses: Plasma, Blood Center, and Hospital.[18] Haemonetics' "Plasma" business "includes plasma collection devices and disposables, [and] donor management software and supporting software solutions sold to plasma customers."[19] Its "Blood Center" business "includes blood collection and processing devices and disposables for plasma, red cells and platelets."[20]

**ANSWER:** Haemonetics admits that it competes with Fenwal's devices in the automated plasma collection market. Haemonetics denies the characterizations of its business in this paragraph. Haemonetics refers to the cited document that speaks for itself.

83. Through its Plasma business, Haemonetics offers "automated plasma collection systems, donor management software and supporting software solutions."[21] Haemonetics' plasma products include plasma collection devices, associated disposable/consumable products, and software and services that are designed to support multiple facets of plasma collector operations.[22]

**ANSWER:** Haemonetics admits the allegations in this paragraph quoted from the cited document, but otherwise refers to the cited document that speaks for itself.

84. The plasmapheresis systems that Haemonetics makes/manufactures, imports, offers for sale/lease, leases, sells, and/or uses in the United States include: (i) the NexSys PCS plasmapheresis device, including those used with YES® and/or PERSONA® Technologies[23]

---

[17] https://haemonetics.gcs-web.com/static-files/c3810e5b-ce8f-46e3-8e76-c66ff4145609 (last visited December 2, 2025) ("2025 Haemonetics 10-K") (FENWAL 00004590-FENWAL 00004709) at 3.

[18] *Id.* at 1.

[19] *Id.* at 1.

[20] *Id.* at 1.

[21] *Id.* at 1.

[22] *Id.* at 2.

[23] References to PERSONA® herein are intended to incorporate the PERSONA® Plus Technology. Counsel for Haemonetics has represented that PERSONA Plus is an "upgrade to the existing PERSONA technology." 2026-03-20 Letter to Defendants re Initial Disclosure Deficiencies at 1. Haemonetics has to date produced no documents specifically describing the operation and

(collectively, NexSys PCS), (ii) Disposable Kits, and (iii) donor management software and related software used with the NexSys PCS (collectively, Accused Haemonetics Products). The Accused Haemonetics Products form an integrated system (the "NexSys PCS System") and are used by blood establishment centers and other entities in the United States to collect plasma.[24]

**ANSWER:** Haemonetics admits that Haemonetics manufactures and sells the NexSys PCS® System. Haemonetics denies the remaining characterizations regarding the Accused Haemonetics Products in this paragraph, and refers to the cited NexSys PCS User Manual, that speaks for itself. Additionally, Haemonetics denies that it has "produced no documents specifically describing the operation and construction of the NexSys PCS System with PERSONA Plus Technology" as stated in the footnote relating to Paragraph 84. *See, e.g.,* HAEM-FRE_0007439-7472.

85. Haemonetics represents that the NexSys PCS System includes the following parts that collectively function as a system:

- **NexSys PCS device:** The electro-mechanical device and graphical user interface (GUI) screen. The NexSys PCS device has built-in guided operation, automated procedure programming, donor information display, and bi-directional connectivity to Blood Establishment Computer Systems ("BECS"), which runs Haemonetics' NexLynk Data Management System or another third-party donor management system.[25,26] The NexSys PCS device is offered with the Standard nomogram, the YES Technology nomogram ("NexSys PCS YES"), or the PERSONA/PERSONA Plus Technology nomogram ("NexSys PCS PERSONA").

---

construction of the NexSys PCS System with PERSONA Plus Technology. Fenwal's investigation is ongoing and it reserves the right to amend and/or supplement its allegations as additional information is obtained via discovery regarding any material differences between the PERSONA Plus Technology and other Haemonetics plasmapheresis systems, including through its infringement contentions pursuant to the Local Patent Rules.

[24] NexSys PCS User Manual, 117649-US(AG) (Jan. 2020) ("NexSys PCS User Manual") (FENWAL 00004781-FENWAL 00004905) at 10; https://plasma.haemonetics.com/devicesolutions (last visited December 2, 2025) (FENWAL 00004753-FENWAL 00004754).

[25] https://plasma.haemonetics.com/device-solutions/nexsys-pcs (last visited December 2, 2025) (FENWAL 00005301-FENWAL 00005305).

[26] https://plasma.haemonetics.com/-/media/files/plasma/persona_brochure.pdf (last visited December 2, 2025) (FENWAL 00005316-FENWAL 00005319) ("NexSys PCS PERSONA Brochure").

- **Protocol:** The embedded software that controls the process used to gather blood components from a donor (including nomograms such as the YES® or PERSONA® nomograms)

- **Disposable set:** Single-use collection components (Disposable Kits), which are also sold by Haemonetics

- **Solutions:** Anticoagulant and (optionally) saline solutions for collecting and processing blood components (also sold by Haemonetics).[27]

**ANSWER:** Haemonetics refers to the cited documents and their contents, which speak for themselves.

86. In 2018, Haemonetics received 510(k) clearance from the U.S. Food and Drug Administration ("FDA") for use of the YES® Technology with the NexSys PCS device and released the device in the United States.[28] On the FDA Establishment Registration & Device Listing website, Haemonetics is listed as the Specification Developer for the NexSys PCS device with YES® Technology.[29]

**ANSWER:** Haemonetics admits that it received 510(k) clearance from the FDA for its YES® Technology in 2018. Haemonetics otherwise refers to the cited documents which speak for themselves.

---

27 NexSys PCS User Manual at 10; 2025 Haemonetics 10-K at 7.

28 https://haemonetics.gcs-web.com/news-releases/news-release-details/haemoneticsannounces-regulatory-clearances-nexsys-pcstm (last accessed December 2, 2025) (FENWAL 00004770-FENWAL 00004772); 510(k) Letter - BK180185 (FENWAL 00004721-FENWAL 00004723); 510(k) Summary - BK180185 (FENWAL 00004724-FENWAL 00004728).

29 On information and belief, the YES® nomogram was first released for PCS 300. On further information and belief, the FDA premarket submission number for the YES® nomogram is BK180185. *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm?start_search=1&showList=1&establishmentName=&regNum=&StateName=&CountryName=&OwnerOperatorNumber=&OwnerOperatorName=&ProductCode=GKT&DeviceName=&ProprietaryName=&establishmentType=&PAGENUM=10&SortColumn=EstablishmentName20%25ASC&RegistrationNumber=1219343 (FENWAL 00005397-FENWAL 00005398); https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm?lid=584566&lpcd=GKT (Establishment Registration & Device Listing for PCS 300, NexSys PCS, listing Haemonetics as the Specification Developer) (last visited December 2, 2025) (FENWAL 00004759).

87. Haemonetics has stated that Plasma Target Selection for the YES® Technology has the "option to target based on Plasma Volume/Weight or Collection Volume."[30]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself.

88. In 2020, Haemonetics received FDA 510(k) clearance for use of the PERSONA® Technology with the NexSys PCS and released the device in the United States.[31] On the FDA Establishment Registration & Device Listing website, Haemonetics is listed as the Specification Developer for the NexSys PCS® device with PERSONA® Technology.[32]

**ANSWER:** Haemonetics admits that it received 510(k) FDA clearance for the use of the PERSONA® Technology in 2020. Haemonetics otherwise refers to the cited documents which speak for themselves.

89. In 2026, Haemonetics received FDA 510(k) clearance for use of the PERSONA® Technology with the NexSys PCS.[33]

**ANSWER:** Haemonetics denies that it "received FDA 510(k) clearance for use of the PERSONA® Technology with the NexSys PCS" in 2026, but admits that it received 510(k) FDA clearance for the use of its Persona Plus Technology in 2026. Haemonetics otherwise refers to the cited document which speaks for itself.

90. Haemonetics advertises the PERSONA® Technology as "built upon the NexSys PCS platform."[34] On information and belief, the Persona Technology calculates a target volume of plasma for collection from the donor based on the donor's weight, height, and hematocrit (*i.e.*, the percentage of red blood cells in the total volume of blood). Haemonetics states that "NexSys

---

30 510(k) Summary - BK180185.

31 2025 Haemonetics 10-K at 2; Haemonetics Press Release re: PERSONA Technology.

32 https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm?start_search=1&showList=1&establishment Name=haemonetics&regNum=&StateName=&CountryName=&OwnerOperatorNumber=&OwnerOperatorName=&ProductCode=&DeviceName=&ProprietaryName=&establishmentType=&PAGENUM=10&SortColumn=EstablishmentName20%25ASC&RegistrationNumber=1219343 (last visited December 2, 2025) (FENWAL 00004759).

33 *See* 510(k) Summary – BK251292 (HAEM-FRE_0091553).

34 NexSys PCS PERSONA Brochure.

PCS with Persona technology uses a percent plasma nomogram that customizes plasma collection based on an individual donor's body composition."[35]

**ANSWER:** Haemonetics denies the characterizations of its technology in this paragraph, and refers to the cited documents which speak for themselves.

91. The NexSys PCS forms "bi-directional connectivity" with a BECS and may receive donor information stored on the BECS and send reports of a donor's plasmapheresis procedure to the BECS.[36]

**ANSWER:** Haemonetics denies the characterizations of its technology in this paragraph, and refers to the cited document that speaks for itself.

92. Haemonetics offers supporting software applications to provide connectivity between the NexSys PCS and BECS, including:

- **HaemoCommunicator**: This is a software application that "serves as middleware for data communication" between NexSys PCS and the BECS;[37]
- **NexSys PCS Device Driver:** This driver enables HaemoCommunicator to send and receive data from NexSys PCS. According to Haemonetics, "[w]ith this data, the NexSys PCS device can be pre-programmed for each collection, with information about the collection sent back to HaemoCommunicator once the donation is complete."[38]
- **HaemoCommunicator HTTP Driver:** This driver connects with BECS software solutions to permit integration of the NexSys PCS device with the BECS.[39]
- **NexSys PCS HL7 Driver:** On information and belief, similar to the HaemoCommunicator HTTP Driver, this driver enables data transfer between HaemoCommunicator and non-Haemonetics BECS software.[40]

---

[35] *Id.* at 2; *see also* Sept. 30, 2020 Haemonetics 510(k) Summary Submission (FENWAL 00004729-FENWAL 00004734) at 1.

[36] https://plasma.haemonetics.com/-/media/files/plasma/plasma-connectivity-brochure.pdf (last visited December 2, 2025) (FENWAL 00004909- FENWAL 00004911) ("NexSys PCS Bi-Directional Connectivity Brochure").

[37] NexSys PCS Bi-Directional Connectivity Brochure.

[38] *Id.*

[39] *Id.*

[40] NexSys PCS Bi-Directional Connectivity Brochure.

**ANSWER:** Haemonetics denies the characterizations of its technology in this paragraph, and refers to the cited documents which speak for themselves.

93. NexSys PCS includes bi-directional connectivity to Haemonetics' NexLynk Donor Management System ("DMS") to automate programming of donation procedures and automated data capture of procedure data.[41] Among other things, the NexLynk DMS software solution stores donor information (*e.g.*, donor characteristics) and provides donor information to the NexSys PCS.[42,43]

**ANSWER:** Haemonetics denies the characterizations of its technology in this paragraph, and refers to the cited documents which speak for themselves.

94. The Disposable Kits used with the NexSys PCS plasmapheresis devices include:

- Disposable Bowl;[44]
- Harness (includes the anticoagulant spike; a needle adapter; turning stops; Donor Pressure Monitor (DPM) Filter; Bowl Connector; Blood Filter; and Tubing (including the donor line and the anticoagulant line )); [45]
- Plasma Collection Container;[46]
- Venipuncture needle.[47]

---

41 2025 Haemonetics 10-K at 2.

42 https://plasma.haemonetics.com/-/media/files/plasma/nexsys_pcs_brochure.pdf (last visited December 2, 2025) (FENWAL 00005310-FENWAL 00005315) ("NexSys PCS Brochure").

43 https://plasma.haemonetics.com/-/media/files/plasma/nexlynk_dms_brochure.pdf (last visited December 2, 2025) (FENWAL 00004905-FENWAL 00004908) ("NexLynk DMS Brochure").

44 NexSys PCS User Manual at 40-42.

45 *Id.* at 42-43.

46 *Id.* at 43.

47 *See, e.g.*, https://www.graylinemedical.com/products/haemonetics-corp-apheresis-collectionneedles-sysloc-black-eye-needle-sterile-17g-x-1-824-1704#:~:text=Home%20Haemonetics%20Corp%20Apheresis%20Collection,Give%20us%20a%20call (last visited December 2, 2025) (FENWAL 00004773).

**ANSWER:** Haemonetics denies the characterizations of its Disposable Kits in this paragraph, and refers to the cited documents which speak for themselves.

95. On information and belief, as explained below, Haemonetics makes, uses, sells/leases, offers for sale/lease, and/or imports automated plasmapheresis systems (including NexSys PCS), their components, and related software in the United States.

**ANSWER:** Haemonetics admits that Haemonetics manufactures and sells the NexSys PCS® device, and otherwise denies characterizations of its products in this paragraph.

96. On further information and belief, Haemonetics has entered into agreements with its U.S. customers to adopt NexSys PCS in their global collection network.[48] On further information and belief, Haemonetics' customers are using the NexLynk DMS donor management software.[49]

**ANSWER:** Haemonetics denies the characterizations of its business in this paragraph, and refers to the cited document that speaks for itself.

97. Haemonetics leases the NexSys PCS devices to its blood-bank and plasma center customers under contractual arrangements that typically include an operating or sales-type lease as well as the purchase and consumption of a certain level of disposable products.[50] On information and belief, Haemonetics transfers the rights of possession and use of the NexSys PCS devices to its customers until the devices are returned to Haemonetics upon the termination or expiration of the agreement between Haemonetics and the customers and receives a fee from its customer for the use of the device in plasmapheresis procedures. On further information and belief, Haemonetics also sells some NexSys PCS devices to its customers.[51] On information and belief, Haemonetics imports NexSys PCS devices into the United States.[52]

**ANSWER:** Haemonetics denies the characterizations of its business in this paragraph, and refers to the cited documents which speak for themselves.

---

48 2025 Haemonetics 10-K at 3.

49 *Id.*

50 *See, e.g.*, 2025 Haemonetics 10-K at 84 ("Lessor Activity").

51 *Id.* at 58 ("Product Revenues").

52 *See* Haemonetics Malaysia Sdn Bhd Establishment Registration & Device Listing (FENWAL 00005434-FENWAL 00005436) and Importation Records (FENWAL 00005437).

98. On further information and belief, Haemonetics also sells[53] to its customers disposable products (Disposable Kits) that are used with the NexSys PCS device in plasmapheresis procedures.

**ANSWER:** Haemonetics admits it sells disposable products to customers relating to plasmapheresis procedures. Haemonetics otherwise denies the characterizations of its business in this paragraph, and refers to the cited document that speaks for itself.

99. On information and belief, Haemonetics sells and/or provides certain software to its customers, including the NexLynk DMS and other supporting software.[54]

**ANSWER:** Haemonetics admits it provides software to its customers. Haemonetics otherwise denies the characterizations of its business in this paragraph, and refers to the cited document that speaks for itself.

100. On further information and belief, Haemonetics' capital equipment is manufactured in Malaysia, Australia and the United States.[55] On information and belief, Haemonetics makes its plasma collection devices in Malaysia (through its wholly owned Malaysian subsidiary Haemonetics Malaysia) and/or in the United States.[56,57] On further information and belief, Haemonetics' primary disposable/consumable manufacturing operations are in North America and Malaysia.[58]

**ANSWER:** Haemonetics denies the characterizations of its business in this paragraph, and refers to the cited documents which speak for themselves.

101. On information and belief, Haemonetics provides training and services to its U.S. customers regarding the use of the Accused Haemonetics Products as a system to perform plasmapheresis. For example, Haemonetics provides user and service manuals for the NexSys PCS

---

53 *See, e.g.*, 2025 Haemonetics 10-K at 84 ("Lessor Activity"), 58 ("Product Revenues").

54 *See, e.g.*, *id.* at 1 ("Company Overview"), 34 ("Our Business"), 57, 59 ("Software and Other Revenues").

55 *Id.* at 7.

56 *Id.*

57 *See, e.g.*, *id.* at Ex. 21.1.

58 2025 Haemonetics 10-K at 7 ("Manufacturing").

System.[59] Moreover, Haemonetics makes available to its customers an Education Portal "featur[ing] useful information about the NexSys PCS® system, plasma software solutions, and more."[60]

**ANSWER:** Haemonetics admits that it makes user and service manuals for the NexSys PCS System available. Haemonetics otherwise denies the characterizations of its business in this paragraph, and refers to the cited documents which speak for themselves.

102. On further information and belief, Haemonetics employs a device and software implementation team to "support the planning and installation of the NexSys PCS Connectivity Package and provide support in establishing bi-directional communication with [the] BECS."[61] On information and belief, the Haemonetics Technical Service Team installs NexSys PCS devices, and the Haemonetics Software Implementation Team installs HaemoCommunicator and other software applications.[62] Haemonetics also provides ongoing product support to its customers.[63]

**ANSWER:** Haemonetics denies the characterizations of its business in this paragraph, and refers to the cited document that speaks for itself.

**COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 10,431,334**

103. Fenwal repeats and realleges herein by references the allegations set forth in each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

104. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1, 5, and 7-12 of the '334 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the Accused Haemonetics Products in the United States. The Accused Haemonetics Products meet each limitation of each of these claims, literally and/or under the doctrine of equivalents, as

---

[59] *See, e.g.*, NexSys PCS User Manual; NexSys PCS Service Manual (device LN PCS-300-US; software version PCS300.1.3.x) (Jan. 2019) (FENWAL 00004915-FENWAL 00005176) ("NexSys PCS Service Manual").

[60] https://plasma.haemonetics.com/device-solutions/nexsys-pcs-persona-technology (last visited December 2, 2025) (FENWAL 00005306-FENWAL 00005309).

[61] NexSys PCS Bi-Directional Connectivity Brochure.

[62] *Id.*

[63] *Id.*

described in Exhibit 19,[64] which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '334 Patent against Haemonetics based on discovery that will become available in due course.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

105. Claim 1 of the '334 Patent recites:

> 1. A system for performing an apheresis procedure on a human subject, comprising:
>
> an apheresis treatment device configured to draw blood from a human subject, separate the blood by blood component, and return at least one of the components to the human subject; and a remote data storage device located remotely from the apheresis treatment device and configured to communicate with the apheresis treatment device over a network, the remote data storage device programmed with a plurality of subject data entries, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, the remote data storage device configured to download subject-specific information comprising a name and a birth date from the subject data entry and further configured to program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure; the apheresis treatment device comprising:
>
>> a wireless circuit configured to communicate with the remote data storage device;
>>
>> a touch screen configured to receive an input; and
>
> a controller configured to confirm an identity of the human subject based on the input and, based at least in part on the result of the confirmation, provide access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

106. The Accused Haemonetics Products meet each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 19.

[64] All cites to Exhibits 19-27 are representative only.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

107. The Accused Haemonetics Products form a system for performing an apheresis procedure, *e.g.*, a plasmapheresis procedure, on a human subject (*e.g.*, a plasma donor).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Product form a system for performing an apheresis procedure as claimed in the '334 Patent.

108. The NexSys PCS is an apheresis treatment device that is configured to draw blood from a human subject, separate the blood components (*e.g.*, plasma and red blood cells), and return at least one of the components (*e.g.,* red blood cells) to the human subject.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Product is configured to draw blood from a human subject, separate the blood components, and return at least one of the components to the human subject as claimed in the '334 Patent.

109. The Accused Haemonetics Products have a remote data storage device located remotely from the NexSys PCS apheresis treatment device and configured to communicate with the apheresis treatment device over a network (*e.g.*, wired or wireless internet).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Product have a remote data storage device located remotely from the NexSys PCS apheresis treatment device and configured to communicate with the apheresis treatment device over a network as claimed in the '334 Patent.

110. On information and belief, the remote data storage device of the Accused Haemonetics Products runs the NexLynk DMS or a third party's donor management system software.

**ANSWER:** Haemonetics denies that the Accused Haemonetics Products have a remote storage device as claimed in the '334 Patent.

111. The remote data storage device of the Accused Haemonetics Products is programmed with a plurality of subject data entries, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products are programmed with a plurality of subject data entries, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information as claimed in the '334 Patent.

112. The subject-specific information programmed in the remote storage device includes, for example, donor name, donor ID, and donor date of birth.

**ANSWER:** Haemonetics denies that the Accused Haemonetics Product have a remote storage device as claimed in the '334 Patent.

113. Moreover, the data storage device of the Accused Haemonetics Products is configured to download subject-specific information comprising and is also configured to program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Product are configured to download subject-specific information comprising and is also configured to program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure as claimed in the '334 Patent.

114. For example, subject-specific information used with the Accused Haemonetics Products may include donor name, donor ID, and donor birth date from the subject data entry.

**ANSWER:** Haemonetics denies that the Accused Haemonetics Product are configured to download and program subject-specific information as claimed in the '334 Patent.

115. For example, the parameters used with the Accused Haemonetics Products may include one or more of: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Product uses parameters as claimed in the ’334 Patent.

116. The NexSys PCS apheresis device further includes a wireless circuit (*e.g.*, a Wi-Fi modem) that is configured to communicate with the remote data storage device.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS device includes a wireless circuit that is configured to communicate with the remote data storage device as claimed in the ’334 Patent.

117. The NexSys PCS apheresis device also includes a touch screen that is configured to receive user touch input.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS device includes a touch screen that is configured to receive user touch input as claimed in the ’334 Patent.

118. The NexSys PCS apheresis device also includes a controller that is configured to confirm an identity of the human subject based on the user input and, based at least in part on the result of the confirmation, provide access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device. Alternatively, the NexSys PCS apheresis device meets the controller limitation under the doctrine of equivalents, because the device performs substantially the same function as the recited limitation (confirm an identity of the human subject based on the user input and, based at least in part on the result of the confirmation, provide access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device), in substantially the same way, and achieves substantially the same result.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS device includes controller that is configured to confirm an identity of the human subject based on the user input and, based at least in part on the result of the confirmation, provide access to an apheresis procedure operated

according to the programmed parameters on the apheresis treatment device as claimed in the '334 Patent. Haemonetics denies the remaining allegations of this paragraph.

119. Claim 5 of the '334 Patent recites: "The system of claim 1, wherein if the controller confirms the identity of the human subject, the controller commands the treatment device to perform the apheresis procedure."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

120. The Accused Haemonetics Products practice claim 5 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

121. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

122. In the NexSys PCS, if the controller confirms the human subject's identity, the controller commands the NexSys PCS to perform the plasmapheresis procedure.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that if the controller confirms the human subject's identity, the controller commands the NexSys PCS to perform the plasmapheresis procedure as claimed in the '334 Patent.

123. Claim 7 of the '334 Patent recites: "The system of claim 1, wherein if the controller does not confirm the identity of the human subject, the controller is configured to respond by disabling or declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

124. The Accused Haemonetics Products practice claim 7 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

125. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

126. On information and belief, in the NexSys PCS, if the controller does not confirm the human subject's identity, the controller is configured to not allow the apheresis procedure to proceed and is also configured to provide at least a visual alert or alarm to inform the user.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that if the controller does not confirm the human subject's identity, the controller is configured to not allow the apheresis procedure to proceed and is also configured to provide at least a visual alert or alarm to inform the user as claimed in the '334 Patent.

127. Claim 8 of the '334 Patent recites: "The system of claim 7, wherein the alarm or alert comprises a text error message displayed on the touch screen."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

128. The Accused Haemonetics Products practice claim 8 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

129. As explained above, the Accused Haemonetics Products form a system that practices claim 7.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

130. On information and belief, the NexSys PCS informs the user that donor identity has not been confirmed through a notification that includes a text message.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS informs the user that donor identity has not been confirmed through a notification that includes a text message as claimed in the '334 Patent.

131. Claim 9 of the '334 Patent recites: "The system of claim 1, further comprising a bar code reader coupled to the apheresis treatment device."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

132. The Accused Haemonetics Products practice claim 9 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

133. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

134. The NexSys PCS has a bar code reader.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS has a bar code reader as claimed in the '334 Patent.

135. Claim 10 of the '334 Patent recites: "The system of claim 1, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

136. The Accused Haemonetics Products practice claim 10 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

137. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

138. On information and belief, the remote data storage device of the Accused Haemonetics Products is pre-programmed with the subject-specific information at a time before the system carrying out the apheresis procedure on the human subject.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the remote data storage device of the Accused Haemonetics Products is pre-programmed with the subject-specific information at a time before the system carrying out the apheresis procedure on the human subject as claimed in the '334 Patent.

139. On information and belief, the remote data storage device of the Accused Haemonetics Products runs the NexLynk DMS or a third party's donor management system software.

**ANSWER:** Haemonetics denies the Accused Haemonetics Products have a remote data storage device as claimed in the '334 Patent and, therefore, denies the allegations in this paragraph.

140. Claim 11 of the '334 Patent recites: "The system of claim 1, wherein at least one of the parameters used to program the apheresis treatment device for the apheresis medical procedure is stored in the subject data entry."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

141. The Accused Haemonetics Products practice claim 11 of the '334 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

142. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

143. On information and belief, at least "Plasma Target Volume" is a parameter that is used to program the NexSys PCS device for the apheresis medical procedure. On information and belief, "Plasma Target Volume" is the collection volume that is computed on the BECS (*e.g.*, NexLynk DMS) using the PERSONA nomogram. On further information and belief, Plasma Target Volume is stored in the data entry.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS device uses parameters as claimed in the '334 Patent.

144. Claim 12 of the '334 Patent recites:

> 12. A system for performing an apheresis procedure on a human subject, comprising:
>
> > an apheresis treatment device configured to draw blood from a human subject, separate the blood by blood component, and return at least one of the components to the human subject; and a remote data storage device located remotely from the apheresis treatment device and configured to communicate with the apheresis treatment device over a network, the remote data storage device programmed with a plurality of subject data entries, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, the data storage device configured to download a plurality of the subject-specific information of the human subject from the subject data entry and further configured to pre-program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure; the apheresis treatment device comprising:
> >
> > > an input device configured to receive a user input; and
> > >
> > > a processing circuit, wherein the processing circuit is disposed within the apheresis treatment device, the processing circuit configured to confirm the human subject based on the received user input and using the plurality of subject-specific information downloaded from the data storage device to provide access to an apheresis procedure on the apheresis treatment device operated according to the pre-programmed parameters.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

145. The Accused Haemonetics Products meet each of the foregoing limitations of claim 12, literally and/or under the doctrine of equivalents, as described in Exhibit 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

146. The Accused Haemonetics Products constitute a system for an apheresis procedure, *e.g.*, a plasmapheresis procedure, on a human subject, *e.g.*, a plasma donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products constitute a system for an apheresis procedure on a human subject as claimed in the ’334 Patent.

147. The NexSys PCS is an apheresis treatment device configured to draw blood from a donor, separate the blood components (*i.e.*, plasma and red blood cells), and return at least one of the components (red blood cells) to the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS is an apheresis treatment device configured to draw blood from a donor, separate the blood components, and return at least one of the components to the donor as claimed in the ’334 Patent.

148. The Accused Haemonetics Products have a remote data storage device (which may run the NexLynk DMS and/or a third-party donor management system software) that is located remotely from the NexSys PCS apheresis treatment device and configured to communicate with the apheresis treatment device over a network (*e.g.*, wired or wireless internet).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS have a remote data storage device that is located remotely from the NexSys PCS apheresis treatment device and configured to communicate with the apheresis treatment device over a network as claimed in the ’334 Patent.

149. The remote data storage device of the Accused Haemonetics Products is programmed with a plurality of subject data entries, each subject data entry associated with a donor, each subject data entry comprising subject-specific information (*e.g.*, donor name, donor ID, and donor date of birth).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the remote data storage device of the Accused Haemonetics Products is programmed with a plurality of subject data entries, each subject data entry associated with a donor, each subject data entry comprising subject-specific information as claimed in the ’334 Patent.

150. Moreover, the data storage device of Accused Haemonetics Products is configured to download a plurality of the subject-specific information of the donor from the subject data entry and is also configured to pre-program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure. For example, the parameters may include one or more of: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the data storage device of Accused Haemonetics Products is configured to download a plurality of the subject-specific information of the donor from the subject data entry and is also configured to pre-program the apheresis treatment device with a plurality of parameters for the apheresis medical procedure as claimed in the '334 Patent.

151. The NexSys PCS apheresis device further includes an input device configured to receive a user input.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS device includes an input device configured to receive a user input as claimed in the '334 Patent.

152. The NexSys PCS apheresis device also includes a processing circuit, wherein the processing circuit is disposed within the apheresis treatment device. For example, the Device Controller (DC) alone and/or in combination with the Motor Controller (MC) and/or the UI Processor,[65] constitute a "processing circuit."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS device includes a processing circuit, wherein the processing circuit is disposed within the apheresis treatment device as claimed in the '334 Patent. Haemonetics refers to the cited document that speaks for itself.

153. The processing circuit of Accused Haemonetics Products is configured to confirm the donor based on the received user input and using the plurality of subject-specific information downloaded from the data storage device to provide access to an apheresis procedure on the apheresis treatment device operated according to the pre-programmed parameters.

---

[65] *See, e.g.*, NexSys PCS Service Manual at 37-78

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the processing circuit of Accused Haemonetics Products is configured to confirm the donor based on the received user input and using the plurality of subject-specific information downloaded from the data storage device to provide access to an apheresis procedure on the apheresis treatment device operated according to the pre-programmed parameters as claimed in the '334 Patent.

154. Claim 16 of the '334 Patent recites: "The system of claim 12, wherein the downloaded plurality of subject-specific information comprises name, sex, weight and birthdate of the donor, wherein the apheresis treatment device is configured to operate the apheresis procedure based at least in part on a parameter derived from at least one of the sex and weight of the human subject upon which the apheresis procedure is performed."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '334 Patent.

155. Haemonetics directly infringes at least claims 1, 2, 5, 7-12, and 16 of the '334 Patent by using (including in tests, commercial demonstrations, and clinical trials), importing, making, offering to sell/lease, selling, and/or leasing the Accused Haemonetics Products in the United States to its partners, clients, customers, and/or end users who use the products across this country, including in this District.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

156. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '334 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

157. In addition to directly infringing the '334 Patent, Haemonetics has indirectly infringed at least claims 1, 2, 5, 7-12, and 16 of the '334 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '334 Patent (including claims 1, 2, 5, 7-12, and 16) at least by using the Accused Haemonetics Products in plasma donation centers. On information and

belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[66] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '334 Patent. On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the '334 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics further refers to the cited documents which speak for themselves.

158. Haemonetics has had knowledge of the '334 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics also has had knowledge that the induced acts of its customers and end users constitutes infringement of the '334 Patent since at least the filing of Fenwal's Counterclaims.

**ANSWER:** Haemonetics admits that it has knowledge of the '334 Patent at the time of filing of Fenwal's Counterclaims. Haemonetics denies the remaining allegations in this paragraph.

159. Haemonetics has also indirectly infringed at least claims 1, 5, and 7-12 of the '334 Patent as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the '334 Patent by third parties, such as its customers and end users. Such third parties infringe the '334 Patent at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics' affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contribute to the infringement of the '334 Patent (including claims 1, 5, and 7-12) because those components constitute a material part of the invention of the '334 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the '334 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

160. As a consequence of Haemonetics' direct and indirect infringement of the '334 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

161. Due to Haemonetics' infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

---

[66] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

162. On information and belief, unless enjoined, Haemonetics will continue to infringe the '334 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 10,643,748**

163. Fenwal repeats and realleges herein by reference the allegations in each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required.

To the extent a response is required, Haemonetics denies the allegations in this paragraph.

164. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1, 2, 5, 712, 15, 17, 19, and 20 of the '748 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the Accused Haemonetics Products in the United States. The use of the Accused Haemonetics Products meets each limitation of each of these claims, literally and/or under the doctrine of equivalents, as described in Exhibit 20, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '748 Patent against Haemonetics based on discovery that will become available in due course.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

165. Claim 1 of the '748 Patent covers a novel method of performing apheresis and recites:

> A method of performing an apheresis procedure on a donor, comprising:
>
> receiving donor information used to identify a donor;
>
> storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors;
>
> transmitting the donor information comprising a name and a birth date from the database to an apheresis treatment device;
>
> transmitting a plurality of parameters to the apheresis treatment device to program the apheresis treatment device for an apheresis procedure;
>
> receiving an input from a touch screen of the apheresis treatment device;

> confirming an identity of the donor based on the input; and
>
> performing the apheresis procedure according to the programmed parameters on the apheresis treatment device based on confirming the identity of the donor.

**ANSWER:** Haemonetics admits that claim 1 of the ’748 Patent recites the claim language as stated in this paragraph based on the language in the ’748 Patent. Haemonetics denies the remaining allegations in this paragraph.

166. The use of the Accused Haemonetics Products meets each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

167. Claim 1 of the ‘748 Patent recites in part, “[a] method of performing an apheresis procedure on a donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

168. As shown by at least the NexSys PCS User Manual, the Accused Haemonetics Products practice a method of performing an apheresis procedure on a donor. The NexSys PCS User Manual discloses instructions for the “plasmapheresis system designed for the highly efficient collection of plasma from donors.”[67]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice a method of performing an apheresis procedure on a donor as claimed in the ’748 Patent. Haemonetics refers to the cited document that speaks for itself.

169. End users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of performing an apheresis procedure on a donor.

[67] NexSys PCS User Manual, at 10.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies end users following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of performing an apheresis procedure on a donor as claimed in the ’748 Patent.

170. Claim 1 of the ‘748 Patent also recites in part, “receiving donor information used to identify a donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

171. As shown by at least the NexSys PCS User Manual, the Accused Haemonetics Products practice the step of “receiving donor information used to identify a donor.” The NexSys PCS User Manual discloses instructions for “verifying the donor” including “scan[ning] a donor barcode” or “enter[ing] the donor’s ID.”[68]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of receiving donor information used to identify a donor as claimed in the ’748 Patent. Heamonetics refers to the cited document that speaks for itself.

172. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “receiving donor information used to identify a donor.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of receiving donor information used to identify a donor as claimed in the ’748 Patent.

173. Claim 1 of the ‘748 Patent also recites in part, “storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

---

68 NexSys PCS User Manual, at 59.

174. As shown by at least the NexSys PCS User Manual and NexLynk DMS Brochure, the Accused Haemonetics Products practice the step of "storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors." The NexSys PCS User Manual describes a "BECS" which is a "central monitoring software system that exchanges information with the device via an approved server application."[69] It further describes how the Accused Haemonetics Products "receive[] [donor] information from the BECS."[70]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

175. The NexLynk DMS Brochure describes the software as helping users "manage information about your donors" and providing "donor management" functionality.[71]

**ANSWER:** Haemonetics denies the allegations in this paragraph and refers to the cited document that speaks for itself.

176. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual and utilizing the NexLynk DMS software or other third-party donor management system will perform the step of "storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of storing the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors as claimed in the '748 Patent.

177. Claim 1 of the '748 Patent also recites in part, "transmitting the donor information comprising a name and a birth date from the database to an apheresis treatment device."

---

69 NexSys PCS User Manual, at 59.

70 *Id.* at 59.

71 NexLynk DMS Brochure, at 3.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

178. As stated above, the NexSys PCS User Manual discloses that the Accused Haemonetics Products, including the NexSys PCS, “receive[] [donor] information from the BECS.”[72] As shown in the NexSys PCS User Manual, that donor information includes the donor name and birth date.[73]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the receiving donor information step as claimed in the ’748 Patent. Haemonetics refers to the cited documents which speak for themselves.

179. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “transmitting the donor information comprising a name and a birth date from the database to an apheresis treatment device.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of transmitting the donor information comprising a name and a birth date from the database to an apheresis treatment device as claimed in the ’748 Patent.

180. Claim 1 of the ‘748 Patent also recites in part, “transmitting a plurality of parameters to the apheresis treatment device to program the apheresis treatment device for an apheresis procedure.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

181. As shown at least in the NexSys PCS User Manual and NexLynk DMS Brochure, the Accused Haemonetics Products transmit a plurality of parameters to the NexSys PCS device

---

72 NexSys PCS User Manual, at 59.

73 *Id.* at 60, Fig. 22.

to program the device for an apheresis procedure. For example, the NexLynk DMS Brochure describes how the software "integrate[s] bidirectionally with the plasma collection device."[74]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products transmit a plurality of parameters to program the device for an apheresis procedure as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

182. The parameters may include: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.[75]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products use parameters as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

183. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "transmitting a plurality of parameters to the apheresis treatment device to program the apheresis treatment device for an apheresis procedure."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of transmitting a plurality of parameters to the apheresis treatment device to program the apheresis treatment device for an apheresis procedure as claimed in the '748 Patent.

184. Claim 1 of the '748 Patent also recites in part, "receiving an input from a touch screen of the apheresis treatment device."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

---

74 NexLynk DMS Brochure, at 4.

75 *See, e.g.*, NexSys PCS User Manual, at 59-60.

185. As shown in the NexSys PCS User Manual, the NexSys PCS device includes a "touchscreen graphical user interface."[76] The manual describes how the device receives inputs from a touchscreen periodically as part of its intended operation.[77]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of receiving an input from a touch screen of the apheresis treatment device as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

186. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "receiving an input from a touch screen of the apheresis treatment device."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of receiving an input from a touch screen of the apheresis treatment device as claimed in the '748 Patent.

187. Claim 1 of the '748 Patent also recites in part, "confirming an identity of the donor based on the input."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

188. As shown in the NexSys PCS User Manual, as part of the "verifying the donor" instructions, the touchscreen displays a "Confirm" button that the user presses to confirm donor information including donor identity.[78]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the

---

76 NexSys PCS User Manual, at 11.

77 *See, e.g.*, NexSys PCS User Manual, at 60, 71, 74.

78 NexSys PCS User Manual, at 60.

step of confirming an identity of the donor based on the input as claimed in the ’748 Patent. Haemonetics refers to the cited document that speaks for itself.

189. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “confirming an identity of the donor based on the input.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of confirming an identity of the donor based on the input as claimed in the ’748 Patent.

190. Claim 1 of the ‘748 Patent also recites in part, “performing the apheresis procedure according to the programmed parameters on the apheresis treatment device based on confirming the identity of the donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

191. As shown at least in the PCS PERSONA Brochure and NexSys PCS User Manual, the Accused Haemonetics Products comprise “plasmapheresis system designed for the highly efficient collection of plasma from donors,” *i.e.*, performing an apheresis procedure. The NexSys PCS User Manual shows that the apheresis procedure is performed according to parameters that are based on a confirmed donor identity.[79]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of performing the apheresis procedure according to the programmed parameters on the apheresis treatment device based on confirming the identity of the donor as claimed in the ’748 Patent. Haemonetics refers to the cited document that speaks for itself.

192. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “performing the apheresis procedure according to the programmed parameters on the apheresis treatment device based on confirming the identity of the donor.”

---

[79] *See, e.g.*, NexSys PCS User Manual, at 59-60.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice the step of performing the apheresis procedure according to the programmed parameters on the apheresis treatment device based on confirming the identity of the donor as claimed in the ’748 Patent.

193. Claim 2 of the ‘748 recites: “The method of claim 1, generating an error signal that prevents the performance of the apheresis procedure with respect to the donor in the case where the identity of the donor is not confirmed.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

194. The use of the Accused Haemonetics Products practices claim 2, literally and/or under the doctrine of equivalents, as described in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

195. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

196. During use of the NexSys PCS, the NexSys PCS generates an error signal that prevents the apheresis procedure from being performed on the human subject if the identity of the human subject is not confirmed.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS generating an error signal that prevents the performance of the apheresis procedure with respect to the donor in the case where the identity of the donor is not confirmed as claimed in the ’748 Patent.

197. Claim 5 of the ‘748 Patent recites: “The method of claim 1, wherein if the identity of the donor is confirmed, the method comprises commanding the treatment device to perform the apheresis procedure.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

198. The use of the Accused Haemonetics Products practices claim 5 of the ‘748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

199. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

200. As described above, during use of the NexSys PCS, donor identity is confirmed via an input to the touchscreen. The NexSys PCS User Manual thereafter explains the performance of an apheresis procedure, specifically plasmapheresis, initiated by a command to the treatment device.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies during the use of the NexSys PCS device, if the identity of the donor is confirmed, the method comprises commanding the treatment device to perform the apheresis procedure as claimed in the ’748 Patent.

201. Claim 7 of the ‘748 Patent recites: “The method of claim 1, wherein if the identity of the donor does not match the input, the apheresis treatment device responds by disabling or declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

202. The use of the Accused Haemonetics Products practices claim 7 of the ‘748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

203. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

204. On information and belief, during the use of the NexSys PCS, if the donor identity does not match the user input, the NexSys PCS does not proceed with the apheresis procedure and generates at least a visual alarm or alert for the user.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies during the use of the NexSys PCS device, if the identity of the donor does not match the input, the apheresis treatment device responds by disabling or declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert as claimed in the ’748 Patent.

205. Claim 8 of the ‘748 Patent recites: “The method of claim 7, wherein the alarm or alert comprises a text error message displayed on the touch screen.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

206. The use of the Accused Haemonetics Products practices claim 8 of the ‘748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

207. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 7.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

208. On information and belief, during the use of the NexSys PCS, if the donor identity does not match the user input, the NexSys PCS does not proceed with the apheresis procedure and generates at least a visual alarm or alert for the user, and this visual alarm or alert includes a text message.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS device generates an alarm or alert that comprises a text error message displayed on the touch screen as claimed in the ’748 Patent.

209. Claim 9 of the ‘748 Patent recites: “The method of claim 1, further comprising receiving data from a bar code reader coupled to the apheresis treatment device.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

210. The use of the Accused Haemonetics Products practices claim 9 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

211. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

212. As described in the NexSys PCS User Manual, the first step in the "verifying the donor" section is to "scan a donor barcode."[80] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the NexSys PCS device to "receiv[e] data from a bar code reader coupled to the apheresis treatment device."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS device receives data from a bar code reader coupled to the apheresis treatment device as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

213. Claim 10 of the '748 Patent recites: "The method of claim 1, wherein receiving and storing the donor information occurs at a time prior to carrying out the apheresis procedure on the donor."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

214. The use of the Accused Haemonetics Products practices claim 10 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

---

80 NexSys PCS User Manual at 59.

215. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

216. During the use of the NexSys PCS, receiving the donor information and storing the donor information in a data entry of a database (on the NexLynk DMS and/or other third-party donor management system) takes place before the plasmapheresis procedure is begun.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that with the NexSys PCS device receiving and storing the donor information occurs at a time prior to carrying out the apheresis procedure on the donor as claimed in the ’748 Patent.

217. Furthermore, as shown in the NexSys PCS User Manual, donor information is received and stored prior to carrying out the apheresis procedure on the donor, such that the information can be retrieved from NexLynk DMS or another third-party donor management system, prior to initiating the procedure.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that with the NexSys PCS device receiving and storing the donor information occurs at a time prior to carrying out the apheresis procedure on the donor as claimed in the ’748 Patent. Haemonetics refers to the NexSys PCS User Manual that speaks for itself.

218. Claim 11 of the ‘748 Patent recites: “The method of claim 1, wherein at least one of the parameters used to program the apheresis treatment device for the apheresis procedure is stored in the data entry.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

219. The use of the Accused Haemonetics Products practices claim 11 of the ‘748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

220. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

221. On information and belief, during use of the NexSys PCS, "Plasma Target Volume" is a parameter that is stored in the data entry.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS includes parameters as claimed in the '748 Patent.

222. Plasma Target Volume is the collection volume that is computed on the BECS (*e.g.*, NexLynk DMS) using the PERSONA nomogram.

**ANSWER:** Haemonetics denies the allegations as stated in this paragraph.

223. Claim 12 of the '748 Patent recites:

> 12. A method of performing an apheresis procedure on a human subject, comprising:
>
> receiving over a network donor information comprising a plurality of donor-specific information;
>
> receiving over the network a plurality of parameters for an apheresis procedure;
>
> receiving a user input from a touch screen to confirm a donor based on the plurality of donor-specific information;
>
> in response to confirming the donor, proceeding with an apheresis procedure operated according to the plurality of parameters, the apheresis procedure comprising drawing blood from a human subject, separating the blood by blood component, and returning at least one of the components to the donor.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

224. The use of the Accused Haemonetics Products practices claim 12 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

225. As described above in relation to claim 1, the Accused Haemonetics Products practice a method of performing an apheresis procedure on a human subject. The NexSys PCS User Manual discloses instructions for the "plasmapheresis system designed for the highly efficient collection of plasma from donors."[81]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method of performing an apheresis procedure on a human subject as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

226. At least end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of performing an apheresis procedure on a human subject.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method of performing an apheresis procedure on a human subject as claimed in the '748 Patent.

227. Claim 12 of the '748 Patent also recites in part, "receiving over a network donor information comprising a plurality of donor-specific information."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

228. As shown at least in the NexSys PCS Bi-Directional Connectivity Brochure, the NexSys PCS device communicates over a network with software systems. The NexSys PCS device includes an ethernet connection that "enables the device to communicate with the approved server application."[82] Information received includes donor-specific information such as name, weight, and date of birth.[83]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method including receiving over a network donor information comprising a plurality of donor-

---

81 NexSys PCS User Manual, at 10.

82 NexSys PCS User Manual, at 28.

83 *Id.* at 60.

specific information as claimed in the ’748 Patent. Haemonetics refers to the cited document that speaks for itself.

229. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the NexSys PCS device to perform the step of “receiving over a network donor information comprising a plurality of donor-specific information.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method including receiving over a network donor information comprising a plurality of donor-specific information as claimed in the ’748 Patent.

230. Claim 12 of the ‘748 Patent also recites in part, “receiving over the network a plurality of parameters for an apheresis procedure.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

231. As described above in relation to claim 1, when used according to the NexSys PCS User Manual, the NexSys PCS device receives a plurality of parameters for an apheresis procedure. As shown in at least the NexSys PCS Bi-Directional Connectivity Brochure, such plurality of parameters may be received over a network.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method including receiving over the network a plurality of parameters for an apheresis procedure as claimed in the ’748 Patent. Haemonetics refers to the NexSys PCS User Manual that speaks for itself.

232. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the NexSys PCS device to perform the step of “receiving over the network a plurality of parameters for an apheresis procedure.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice

a method including receiving over the network a plurality of parameters for an apheresis procedure as claimed in the ’748 Patent.

233. Claim 12 of the ‘748 Patent also recites in part, “receiving a user input from a touch screen to confirm a donor based on the plurality of donor-specific information.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

234. As described above in relation to claim 1, at least the NexSys PCS User Manual describes the user confirming a donor via a touchscreen input based on a plurality of donor-specific information. Said information may include name and date of birth.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method including receiving a user input from a touch screen to confirm a donor based on the plurality of donor-specific information as claimed in the ’748 Patent. Haemonetics refers to the NexSys PCS User Manual that speaks for itself.

235. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the NexSys PCS device to perform the step of “receiving a user input from a touch screen to confirm a donor based on the plurality of donor-specific information.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method including receiving a user input from a touch screen to confirm a donor based on the plurality of donor-specific information as claimed in the ’748 Patent. Haemonetics refers to the NexSys PCS User Manual that speaks for itself.

236. Claim 12 of the ‘748 Patent also recites in part, “in response to confirming the donor, proceeding with an apheresis procedure operated according to the plurality of parameters, the apheresis procedure comprising drawing blood from a human subject, separating the blood by blood component, and returning at least one of the components to the donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

237. As described above in relation to claim 1, in response to the user confirming the donor via a touchscreen input, the NexSys PCS device performs an apheresis procedure according to the plurality of parameters, the apheresis procedure comprising drawing blood from a human subject, separating the blood by blood component, and returning at least one of the components to the donor, at least including a plasmapheresis procedure.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method including in response to confirming the donor, proceeding with an apheresis procedure operated according to the plurality of parameters, the apheresis procedure comprising drawing blood from a human subject, separating the blood by blood component, and returning at least one of the components to the donor as claimed in the ’748 Patent.

238. Claim 15 of the ‘748 Patent recites: “The method of claim 12, wherein the plurality of donor-specific information are received wirelessly.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

239. The use of the Accused Haemonetics Products practices claim 15 of the ‘748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

240. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 12.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

241. During use of the NexSys PCS for a plasmapheresis procedure, the device receives donor-specific information wirelessly (through Wi-Fi).[84]

---

[84] *See, e.g.*, NexSys PCS Service Manual at 64 (explaining adjustments to wireless connection settings to connect the device to a “server application”).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method wherein the plurality of donor-specific information are received wirelessly as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

242. Claim 17 of the '748 Patent recites:

> 17. A method of performing an apheresis procedure on a human subject, comprising:
>
> storing a plurality of subject data entries in a data storage device located remotely from an apheresis treatment device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is preprogrammed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject;
>
> downloading subject-specific information comprising a name and a birth date from a subject data entry;
>
> programming the apheresis treatment device with a plurality of parameters for the apheresis medical procedure;
>
> receiving an input from a touch screen; and
>
> confirming an identity of the human subject based on the input and, based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

243. The use of the Accused Haemonetics Products practices claim 17 of the '748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

244. As described above in relation to claim 1, the Accused Haemonetics Products practice a method of performing an apheresis procedure on a human subject. The NexSys PCS

User Manual discloses instructions for the "plasmapheresis system designed for the highly efficient collection of plasma from donors."[85]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products practice a method of performing an apheresis procedure on a human subject as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

245. Claim 17 of the '748 Patent also recites in part, "storing a plurality of subject data entries in a data storage device located remotely from an apheresis treatment device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

246. As shown at least in the NexLynk DMS Brochure, the Accused Haemonetics Products store subject data in a data storage device remotely from the apheresis treatment device. Said subject data is associated with a human subject, *e.g.*, plasma donors, and comprises subject-specific information, *e.g.*, name, weight, and birth date.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products store subject data in a data storage device remotely from the apheresis treatment device as claimed in the '748 Patent. Haemonetics refers to the cited document that speaks for itself.

247. As evidenced at least by the NexSys PCS User Manual, said remote data storage device is pre-programmed with this information prior to the system carrying out the apheresis procedure on the human subject. The User Manual describes steps for "verifying the donor" that include retrieval of pre-programmed donor-specific information from a remote data storage device (*e.g.*, BECS, NexLynk DMS, or other third-party donor management system).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products' remote

85 NexSys PCS User Manual, at 10.

data storage device is pre-programmed with this information prior to the system carrying out the apheresis procedure on the human subject as claimed in the ’748 Patent. Haemonetics refers to the cited document that speaks for itself.

248. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of “storing a plurality of subject data entries in a data storage device located remotely from an apheresis treatment device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of storing a plurality of subject data entries in a data storage device located remotely from an apheresis treatment device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject as claimed in the ’748 Patent.

249. Claim 17 of the ‘748 Patent also recites in part, “downloading subject-specific information comprising a name and a birth date from a subject data entry.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

250. As shown at least in the NexSys PCS User Manual, the NexSys PCS device downloads subject-specific information from a subject data entry including name and birth date. NexSys PCS User Manual, at 60. Said information is downloaded via or from the NexLynk DMS or other third-party donor management system.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of downloading subject-specific information comprising a name and a birth date from a

subject data entry as claimed in the ’748 Patent. Haemonetics refers to the cited document that speaks for itself

251. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of “downloading subject-specific information comprising a name and a birth date from a subject data entry.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of downloading subject-specific information comprising a name and a birth date from a subject data entry as claimed in the ’748 Patent.

252. Claim 17 of the ‘748 Patent also recites in part, “programming the apheresis treatment device with a plurality of parameters for the apheresis medical procedure.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

253. As described above in relation to claim 1, the Accused Haemonetics Products comprise a “plasmapheresis system designed for the highly efficient collection of plasma from donors,” *i.e.*, performing an apheresis procedure. The apheresis procedure is performed by the apheresis treatment device that is “pre-programmed for each collection” according to data received by the device comprising “a plurality of parameters.”[86]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of programming the apheresis treatment device with a plurality of parameters for the apheresis medical procedure as claimed in the ’748 Patent. Haemonetics refers to the cited document that speaks for itself.

254. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused

---

[86] *See* NexSys PCS User Manual, at 59-60; NexSys PCS Bi-Directional Connectivity Brochure, at 2.

Haemonetics Products to perform the step of "programming the apheresis treatment device with a plurality of parameters for the apheresis medical procedure."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of programming the apheresis treatment device with a plurality of parameters for the apheresis medical procedure as claimed in the '748 Patent.

255. Claim 17 of the '748 Patent also recites in part, "receiving an input from a touch screen."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

256. As described above in relation to claim 1, the instructions for use of the NexSys PCS device include touchscreen inputs by the user.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of receiving an input from a touch screen as claimed in the '748 Patent.

257. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of "receiving an input from a touch screen."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of receiving an input from a touch screen as claimed in the '748 Patent.

258. Claim 17 of the '748 Patent also recites in part, "confirming an identity of the human subject based on the input."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

259. As described above in relation to claim 1, the instructions for use of the NexSys PCS device include confirming the identity of the human subject (*i.e.*, donor) through an input to the touchscreen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of confirming an identity of the human subject based on the input as claimed in the '748 Patent.

260. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of "confirming an identity of the human subject based on the input."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of confirming an identity of the human subject based on the input as claimed in the '748 Patent.

261. Claim 17 of the '748 Patent also recites in part, "based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '748 Patent.

262. As described above in relation to claim 1, the NexSys PCS device carries out an apheresis procedure (*e.g.*, plasmapheresis) based at least in part on the confirmation of human subject (*i.e.*, donor) identity. The apheresis procedure is operated according to the programmed parameters.[87]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of based at least in part on the result of the confirmation, providing access to an apheresis

[87] *See* NexSys PCS User Manual, at 59-60; NexSys PCS Bi-Directional Connectivity Brochure, at 2.

procedure operated according to the programmed parameters on the apheresis treatment device as claimed in the ’748 Patent. Haemonetics refers to the cited document that speaks for itself.

263. Accordingly, end users, such as customers and phlebotomists, following the instructions provided by Haemonetics in the NexSys PCS User Manual will cause the Accused Haemonetics Products to perform the step of “based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products perform the step of based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis treatment device as claimed in the ’748 Patent.

264. Claim 19 of the ‘748 Patent recites: “The method of claim 17, wherein if the controller does not confirm the identity of the human subject the controller is configured to respond by declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert, wherein the alarm or alert comprises a text error message displayed on the touch screen.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

265. The use of the Accused Haemonetics Products practices claim 19 of the ‘748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

266. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

267. If the donor identity does not match the user input, the NexSys PCS does not proceed with the apheresis procedure and generates at least a visual alarm or alert for the user. On information and belief, this visual alarm or alert includes a text message.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that in the Accused Haemonetics Products if the controller does not confirm the identity of the human subject the controller is configured to respond by declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert, wherein the alarm or alert comprises a text error message displayed on the touch screen as claimed in the ’748 Patent.

268. Claim 20 of the ‘748 Patent recites: “The method of claim 17, wherein at least one of the parameters used to program the apheresis treatment device for the apheresis medical procedure is stored in the subject data entry and downloaded from the subject data entry.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’748 Patent.

269. The use of the Accused Haemonetics Products practices claim 20 of the ‘748 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

270. As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

271. On information and belief, “Plasma Target Volume” is the collection volume that is computed on the BECS (*e.g.*, NexLynk DMS) using the PERSONA nomogram and is a parameter that is stored in the data entry.

**ANSWER:** Haemonetics denies the allegations as stated in this paragraph.

272. In addition to end users of the Accused Haemonetics Products, on information and belief, Haemonetics and its agents directly infringe at least claims 1, 2, 5, 7-12, 15, 17, 19, and 20 of the ‘748 Patent by using the Accused Haemonetics Products in the United States (for example in tests and commercial demonstrations) according to the instructions and guidance that Haemonetics provides to its end customers in the NexSys PCS User Manual and the NexSys PCS Service Manual.[88]

---

[88] *See generally* NexSys PCS User Manual; NexSys PCS Service Manual.

**ANSWER:** Haemonetics denies the allegations in this paragraph and refers to the cited document that speaks for itself.

273. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '748 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

274. In addition to directly infringing the '748 Patent, Haemonetics has indirectly infringed the '748 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '748 Patent (including claims 1, 2, 5, 7-12, 15, 17, 19, and 20) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[89] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '748 Patent. On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the '748 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph and refers to the cited document that speaks for itself.

275. Haemonetics has had knowledge of the '748 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitute infringement of the '748 Patent since at least the filing of Fenwal's Counterclaims.

---

[89] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

**ANSWER:** Haemonetics admits that it has had knowledge of the ’748 Patent since at least the filing of Fenwal’s Counterclaims. Haemonetics otherwise denies the remaining allegations in this paragraph.

276. Haemonetics has also indirectly infringed the ‘748 Patent (including claims 1, 2, 5, 7-12, 15, 17, 19, and 20) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ‘748 Patent by third parties, such as its customers and end users. Such third parties infringe the ‘748 Patent (including claims 1, 2, 5, 7-12, 15, 17, 19, and 20) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contribute to the infringement of the ‘748 Patent because those components constitute a material part of the invention of the ‘748 Patent (as their use practices all limitations of the claims), are specially made or adapted for use in infringing the ‘748 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

277. As a consequence of Haemonetics’ direct and indirect infringement of the ‘748 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

278. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

279. On information and belief, unless enjoined, Haemonetics will continue to infringe the ‘748 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 3: INFRINGEMENT OF U.S. PATENT NO. 10,872,693**

280. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

281. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1, 2, 4, 5, 7-12, 15, 17, 19, and 20 of the ‘693 Patent by making, importing, using, offering for sale/lease,

and/or selling/leasing the Accused Haemonetics Products in the United States. The Accused Haemonetics Products meet each limitation of each of these claims, literally and/or under the doctrine of equivalents, as described in Exhibit 21, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '693 Patent against Haemonetics based on discovery that will become available in due course.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

282. Claim 1 of the '693 Patent recites:

> 1. A system for performing an apheresis procedure on a donor, comprising:
>
> an apheresis device; and
>
> a server configured to:
>
> > receive donor information used to identify a donor;
> >
> > store the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors; and
> >
> > transmit the donor information comprising a name and a birth date from the database to the apheresis device;
> >
> > transmit a plurality of parameters to the apheresis device to program the apheresis device for an apheresis procedure; and
>
> the apheresis device configured to:
>
> > receive an input from a touch screen of the apheresis device;
> >
> > confirm an identity of the donor based on the input; and
> >
> > perform the apheresis procedure according to the programmed parameters on the apheresis device based on confirming the identity of the donor.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '693 Patent.

283. The Accused Haemonetics Products meet each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

284. The Accused Haemonetics Products comprise a system for performing an apheresis procedure (i.e., plasmapheresis) on a donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products comprise a system for performing an apheresis procedure on a donor as claimed in the ’693 Patent.

285. The NexSys PCS is an apheresis device.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS is an apheresis device as claimed in the ’693 Patent.

286. The system of the Accused Haemonetics Products includes a server. For example, the NexLynk DMS software (or other third-party donor management system) and/or their associated software applications (*e.g.*, HaemoCommunicator) constitute a server. Additionally, the aforementioned software, together with the hardware on which it runs, constitutes a server.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products include a server as claimed in the ’693 Patent.

287. On information and belief, the server of the Accused Haemonetics Products is configured to receive donor information to identify a donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the server of the Accused Haemonetics Products is configured to receive donor information to identify a donor as claimed in the ’693 Patent.

288. For example, donor information may include donor name, donor ID, and donor date of birth.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the server of the Accused Haemonetics

Products is configured to receive donor information to identify a donor as claimed in the '693 Patent.

289. On information and belief, the server of the Accused Haemonetics Products is configured to store the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors. The database resides in and/or communicates with the NexLynk DMS software or other third-party donor management system.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the server of the Accused Haemonetics Products is configured to store the donor information into a data entry of a database, the database comprising data entries for a plurality of different donors as claimed in the '693 Patent.

290. The server is configured to transmit the donor information comprising a name and a birth date from the database to the NexSys PCS.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the server is configured to transmit the donor information comprising a name and a birth date from the database to the NexSys PCS as claimed in the '693 Patent.

291. The sever is configured to transmit a plurality of parameters to the apheresis device to program the NexSys PCS for the plasmapheresis procedure.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the server is configured to transmit a plurality of parameters to the apheresis device to program the NexSys PCS for the plasmapheresis procedure as claimed in the '693 Patent.

292. For example, the parameters may include: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products use parameters as claimed in the '693 Patent.

293. The NexSys PCS is configured to receive user input from the device's touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured to receive user input from the device's touch screen as claimed in the '693 Patent.

294. The NexSys PCS is configured to confirm the identity of the donor based on the user input received from the touchscreen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured to confirm the identity of the donor based on the user input received from the touchscreen as claimed in the '693 Patent.

295. The NexSys PCS is configured to perform plasmapheresis with the programmed parameters based on confirming the identity of the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured to perform plasmapheresis with the programmed parameters based on confirming the identity of the donor as claimed in the '693 Patent.

296. Claim 2 of the '693 Patent recites: "The system of claim 1, the apheresis device configured to generate an error signal that prevents the performance of the apheresis procedure with respect to the donor in the case where the identity of the donor is not confirmed."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '693 Patent.

297. The Accused Haemonetics Products meet each of the foregoing limitations of claim 2, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

298. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

299. The NexSys PCS is configured to generate an error signal that prevents the plasmapheresis procedure from being performed on the donor in the case where the identity of the donor is not confirmed.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured to generate an error signal that prevents the plasmapheresis procedure from being performed on the donor in the case where the identity of the donor is not confirmed as claimed in the ’693 Patent.

300. Claim 4 of the ‘693 Patent recites: “The system of claim 1, wherein the apheresis procedure is a plasmapheresis procedure.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’693 Patent.

301. The Accused Haemonetics Products meet each of the foregoing limitations of claim 4, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

302. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

303. The NexSys PCS performs is a plasmapheresis machine, which performs a plasmapheresis procedure.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS performs is a plasmapheresis machine, which performs a plasmapheresis procedure as claimed in the ’693 Patent.

304. Claim 5 of the ‘693 Patent recites: “The system of claim 1, wherein if the identity of the donor is confirmed, the device is commanded to perform the apheresis procedure.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’693 Patent.

305. The Accused Haemonetics Products meet each of the foregoing limitations of claim 5, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

306. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

307. The NexSys PCS is configured such that, if the identity of the donor is confirmed, the NexSys PCS is commanded to perform the plasmapheresis procedure.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured such that, if the identity of the donor is confirmed, the NexSys PCS is commanded to perform the plasmapheresis procedure as claimed in the ’693 Patent.

308. Claim 7 of the ‘693 Patent recites: “The system of claim 1, wherein if the identity of the donor does not match the input, the apheresis device responds by disabling or declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’693 Patent.

309. The Accused Haemonetics Products practice claim 7 of the ‘693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

310. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

311. On information and belief, the NexSys PCS is configured such that, if the identity of the donor does not match the input, the device responds by disabling or declining to proceed with the plasmapheresis procedure for the tripper and by triggering at least a visual alert or alarm to inform the user.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured such that, if

the identity of the donor does not match the input, the device responds by disabling or declining to proceed with the plasmapheresis procedure for the tripper and by triggering at least a visual alert or alarm to inform the user as claimed in the '693 Patent.

312. Claim 8 of the '693 Patent recites: "8. The system of claim 7, wherein the alarm or alert comprises a text error message displayed on the touch screen."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '693 Patent.

313. The Accused Haemonetics Products practice claim 8 of the '693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

314. As explained above, the Accused Haemonetics Products form a system that practices claim 7.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

315. On information and belief, the NexSys PCS is configured such that the visual alarm or alert includes a text error message displayed on the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured such that the visual alarm or alert includes a text error message displayed on the touch screen as claimed in the '693 Patent.

316. Claim 9 of the '693 Patent recites: "The system of claim 1, further comprising a bar code reader coupled to the apheresis device configured to receive data."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '693 Patent.

317. The Accused Haemonetics Products practice claim 9 of the '693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

318. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

319. The NexSys PCS includes a bar code reader that is coupled to the apheresis device and is configured to received data (*e.g.* donor bar code).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS includes a bar code reader that is coupled to the apheresis device and is configured to received data as claimed in the '693 Patent.

320. Claim 10 of the '693 Patent recites: "The system of claim 1, wherein receiving and storing the donor information occurs at a time prior to carrying out the apheresis procedure on the donor."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language of the '693 Patent.

321. The Accused Haemonetics Products practice claim 10 of the '693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

322. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

323. On information and belief, prior to proceeding with the apheresis procedure, the donor undergoes a medical screening, at which point the donor's information (such as weight, height, and Hct) are entered into and stored on the BECS (*e.g.,* NexLynk).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that prior to carrying out the apheresis procedure on the donor, the BECS (e.g., NexLynk) receives and stores donor information (e.g., weight, height, and Hct) as claimed in the '693 Patent.

324. Claim 11 of the ‘693 Patent recites: “The system of claim 1, wherein at least one of the parameters used to program the apheresis device for the apheresis procedure is stored in the data entry.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’693 Patent.

325. The Accused Haemonetics Products practice claim 11 of the ‘693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

326. As explained above, the Accused Haemonetics Products form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

327. At least one of the parameters of the Accused Haemonetics Products used to program the NexSys PCS for the plasmapheresis procedure is stored in the data entry.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that at least of one of the parameters of the Accused Haemonetics Products used to program the NexSys PCS for the plasmapheresis procedure is stored in the data entry as claimed in the ’693 Patent.

328. On information and belief, “Plasma Target Volume” is a parameter that is used to program the NexSys PCS device and is stored in the data entry.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that “Plasma Target Volume” is a parameter that is used to program the NexSys PCS device and is stored in the data entry as claimed in the ’693 Patent.

329. Claim 12 of the ‘693 Patent covers a novel system for performing an apheresis procedure and recites:

> 12. A system for performing an apheresis procedure on a donor, comprising:
>
> an apheresis device configured to:

> receive over a network donor information comprising donor-specific information;
>
> receive over the network a plurality of parameters for an apheresis procedure;
>
> receive a user input from a touch screen to confirm a donor based on the donor-specific information; and
>
> in response to confirming the donor, proceed with an apheresis procedure operated according to the plurality of parameters, the apheresis procedure configured to draw whole blood from the don[o]r, separate at least one component from the whole blood, and return at least one other component of the whole blood to the donor.

**ANSWER:** Haemonetics admits that Claim 12 of the ’693 Patent recites the stated claim language based on the language in the ’693 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

330. The Accused Haemonetics Products meet each of the foregoing limitations of claim 12, literally and/or under the doctrine of equivalents, as described in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

331. The Accused Haemonetics Products form a system for an apheresis procedure (i.e., a plasmapheresis procedure), on a plasma donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products form a system for an apheresis procedure, on a plasma donor as claimed in the ’693 Patent.

332. The system includes the NexSys PCS, which is an apheresis device.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS system includes the NexSys PCS, which is an apheresis device as claimed in the ’693 Patent.

333. The NexSys PCS is configured to receive over a network (*e.g.*, internet) donor information. On information and belief, the NexSys PCS receives the donor information from the NexLynk DMS or another third-party data management system.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS is configured to receive over a network donor information as claimed in the '693 Patent.

334. For example, donor information includes donor-specific information, such as donor name, date of birth, and donor ID.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured to receive donor information that includes donor-specific information as claimed in the '693 Patent.

335. The NexSys PCS is configured to receive over the network a plurality of parameters for an apheresis procedure. For example, the parameters may include: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume. On information and belief, the NexSys PCS receives this information from the NexLynk DMS or another third-party data management system.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured to receive over the network a plurality of parameters for an apheresis procedure as claimed in the '693 Patent.

336. The NexSys PCS is configured to receive a user input from a touch screen to confirm a donor based on the donor-specific information.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured to receive a user input from a touch screen to confirm a donor based on the donor-specific information as claimed in the '693 Patent.

337. The NexSys PCS is configured such that, in response to confirming the donor, it proceeds with a plasmapheresis procedure (which is an apheresis procedure) operated according to the plurality of parameters. The plasmapheresis procedure is configured to draw whole blood from the donor, separate at least one component (plasma) from the whole blood, and return at least one other component of the whole blood (red blood cells) to the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS is configured such that, in

response to confirming the donor, it proceeds with an apheresis procedure operated according to the plurality of parameters and the apheresis procedure is configured to draw whole blood from the donor, separate at least one component from the whole blood, and return at least one other component of the whole blood to the donor as claimed in the ’693 Patent.

338. Claim 15 of the ‘693 Patent recites: “The system of claim 12, wherein the apheresis procedure is a plasmapheresis procedure, wherein the at least one component separated from the whole blood comprises plasma.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’693 Patent.

339. The Accused Haemonetics Products practice claim 15 of the ‘693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

340. As explained above, the Accused Haemonetics Products form a system that practices claim 12.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

341. The apheresis procedure that the NexSys PCS device performs is a plasmapheresis procedure, and at least component that is separate from the whole blood drawn from the donor includes plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the apheresis procedure that the NexSys PCS device performs is a plasmapheresis procedure, and at least component that is separate from the whole blood drawn from the donor includes plasma as claimed in the ’693 Patent.

342. Claim 17 of the ‘693 Patent recites:

> 17. A system for performing an apheresis procedure on a human subject, comprising:
>
> an apheresis device; and
>
> a server configured to:

> store a plurality of subject data entries in a data storage device located remotely from the apheresis device, each subject data entry associated with a human subject, each subject data entry comprising subject-specific information, wherein the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the human subject;
>
> download subject-specific information comprising a name and a birth date from a subject data entry;
>
> program the apheresis device with a plurality of parameters for the apheresis medical procedure;
>
> wherein the apheresis device is configured to:
>
> receive an input from a touch screen; confirm an identity of the human subject based on the input; and
>
> based at least in part on the result of the confirmation, providing access to an apheresis procedure operated according to the programmed parameters on the apheresis device.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’693 Patent.

343. The Accused Haemonetics Products practice claim 17 of the ‘693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

344. The Accused Haemonetics Products comprise a system for performing an apheresis procedure (plasmapheresis) on a human subject (*e.g.*, a donor).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products comprise a system for performing an apheresis procedure on a human subject as claimed in the ’693 Patent.

345. The system includes the NexSys PCS, which is an apheresis device.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the Accused Haemonetics Products comprise a system that includes the NexSys PCS, which is an apheresis device as claimed in the ’693 Patent.

346. The system of the Accused Haemonetics Products includes a server. For example, the NexLynk DMS software (or other third-party donor management system) and/or their associated software applications (*e.g.*, HaemoCommunicator) constitute a server. Additionally, the aforementioned software, together with the hardware on which it runs, constitutes a server.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the system of the Accused Haemonetics Products includes a server as claimed in the ’693 Patent.

347. The server that is part of the system of the Accused Haemonetics Products is configured to store a plurality of subject data entries in a data storage device (which runs the NexLynk DMS and/or other third-party donor management system) that is located remotely from the apheresis device.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the server that is part of the system of the Accused Haemonetics Products is configured to store a plurality of subject data entries in a data storage device that is located remotely from the apheresis device as claimed in the ’693 Patent.

348. Further, each subject data entry is associated with a donor, and each subject data entry includes subject-specific information. For example, said subject-specific information may include donor name, donor ID, donor date of birth, and donor weight.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that in the Accused Haemonetics Products each subject data entry is associated with a donor, and each subject data entry includes subject-specific information as claimed in the ’693 Patent.

349. The remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the remote data storage device is pre-programmed with the subject-specific information at a time prior to the system carrying out the apheresis procedure on the donor as claimed in the ’693 Patent.

350. The server that is part of the system is configured to download subject-specific information, including donor name and donor date of birth, from the subject data entry in NexLynk DMS or other third-party donor management system.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the server that is part of the system is configured to download subject-specific information, including donor name and donor date of birth as claimed in the ’693 Patent.

351. The server that is part of the system is configured to program the apheresis device with a plurality of parameters for the apheresis medical procedure. For example, the parameters may include: Plasma Target Volume, Max Plasma Per Cycle, Saline Type, Total Saline Volume to Return, and/or AC Solution Volume.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the server that is part of the system is configured to program the apheresis device with a plurality of parameters for the apheresis medical procedure as claimed in the ’693 Patent.

352. The NexSys PCS is configured to receive an input from the touch screen on the device.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS is configured to receive an input from the touch screen on the device as claimed in the ’693 Patent.

353. The NexSys PCS is also configured to confirm an identity of the human subject based on the user input received from the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS is also configured to confirm an identity of the human subject based on the user input received from the touch screen as claimed in the ’693 Patent.

354. The NexSys PCS is also configured such that, based at least in part on the result of the confirmation, the NexSys PCS allows a plasmapheresis procedure to be performed with the device according to the programmed parameters.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS is configured such that, based at least in part on the result of the confirmation, the NexSys PCS allows a plasmapheresis procedure to be performed with the device according to the programmed parameters as claimed in the ’693 Patent.

355. Claim 19 of the ‘693 Patent recites: “The system of claim 17, wherein if the apheresis device does not confirm the identity of the human subject, the apheresis device is configured to respond by declining to proceed with the apheresis procedure and by triggering an audible and/or visual alarm or alert, wherein the alarm or alert comprises a text error message displayed on the touch screen.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’693 Patent.

356. The Accused Haemonetics Products practice claim 19 of the ‘693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

357. As explained above, the Accused Haemonetics Products form a system that practices claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

358. If the NexSys PCS cannot confirm the identity of the human subject, the device is configured to respond by declining to proceed with the plasmapheresis procedure and by triggering an audible and/or visual alarm or alert, wherein the alarm or alert comprises a text error message displayed on the touch screen. On information and belief, the NexSys PCS informs the user that donor identity has not been confirmed through a notification that includes a text message.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that if the NexSys PCS cannot confirm the identity of the human subject, the device is configured to respond by declining to proceed with the plasmapheresis procedure and by triggering an audible and/or visual alarm or alert, wherein the alarm or alert comprises a text error message displayed on the touch screen as claimed in the '693 Patent.

359. Claim 20 of the '693 Patent recites: "The system of claim 17, wherein at least one of the parameters used to program the apheresis device for the apheresis medical procedure is stored in the subject data entry and downloaded from the subject data entry."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '693 Patent.

360. The Accused Haemonetics Products practice claim 20 of the '693 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

361. As explained above, the Accused Haemonetics Products form a system that practices claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

362. On information and belief, "Plasma Target Volume" is used to program the NexSys PCS (with YES or PERSONA Technologies) for the apheresis medical procedure and is stored in the data entry.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that "Plasma Target Volume" is a parameter as claimed in the '693 Patent and further denies that "Plasma Target Volume" is a parameter used to program the NexSys PCS for the apheresis medical procedure and is stored in the data entry as claimed in the '693 Patent.

363. Haemonetics directly infringes at least claims 1, 2, 4, 5, 7-12, 15, 17, 19, and 20 of the '693 Patent by using (including in tests, commercial demonstrations, and clinical trials),

making, importing, offering for sale/lease, selling, and/or leasing the Accused Haemonetics Products in the United States.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

364. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '693 Patent, including at least claims 1, 2, 4, 5, 7-12, 15, 17, 19, and 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

365. In addition to directly infringing the '693 Patent, Haemonetics has indirectly infringed the '693 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '693 Patent (including claims 1, 2, 4, 5, 7-12, 15, 17, 19, and 20) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[90] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '693 Patent (including claims 1, 2, 4, 5, 7-12, 15, 17, 19, and 20). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the '693 Patent (including claims 1, 2, 4, 5, 7-12, 15, 17, 19, and 20).

**ANSWER:** Haemonetics denies the allegations in this paragraph.

366. Haemonetics has had knowledge of the '693 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitute infringement of the '693 Patent since at least the filing of Fenwal's Counterclaims.

---

[90] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

**ANSWER:** Haemonetics admits that it has had knowledge of the '693 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics otherwise denies the remaining allegations in this paragraph.

367. Haemonetics has also indirectly infringed the '693 Patent (including claims 1, 2, 4, 5, 7-12, 15, 17, 19, and 20) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the '693 Patent by third parties, such as its customers and end users. Such third parties infringe the '693 Patent (including claims 1, 2, 4, 5, 7-12, 15, 17, 19, and 20) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics' affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contribute to the infringement of the '693 Patent because those components constitute a material part of the invention of the '693 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the '693 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

368. As a consequence of Haemonetics' direct and indirect infringement of the '693 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

369. Due to Haemonetics' infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

370. On information and belief, unless enjoined, Haemonetics will continue to infringe the '693 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 4: INFRINGEMENT OF U.S. PATENT NO. 11,672,891**

371. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

372. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1-3, 5, 6, 8, 9, 11-15 of the '891 Patent by making, importing, using, offering for sale/lease, and/or

selling/leasing the NexSys PCS YES, the NexSys PCS PERSONA, and Disposable Kits in the United States. The Accused Haemonetics Products meet each limitation of each of the foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 22, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '891 Patent against Haemonetics based on discovery that will become available in due course.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

373. Claim 1 of the '891 Patent covers a novel system for collecting a blood component and recites:

> 1. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component in a product container, the reusable hardware comprising a weight scale configured to weigh the product container and an air detector sensor;
>
> a touch screen configured to receive input from an operator;
>
> a transmitter/receiver device configured to communicate over a network and to receive process parameters from a server computer; and
>
> a processing circuit coupled to the blood processing apparatus and the network, the processing circuit configured to receive the process parameters from the server computer and store them in a memory, the processing circuit configured to store default process parameters in the memory, the processing circuit configured to:
>
>> receive an activation from the operator to switch on the blood processing system;
>>
>> conduct self-checks on the blood processing apparatus;
>>
>> receive input data for a value of a process parameter from the touch screen;
>>
>> verify that the value is within a preset range for the value;
>>
>> prior to operating the blood processing apparatus according to a centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected in the product container and provide an indication of the volume to an operator via the touch screen;

> prompt the operator to mount the disposable fluid circuit;
>
> automatically check to determine whether the disposable fluid circuit is installed;
>
> prime tubing of the disposable fluid circuit with a fluid;
>
> commence the centrifugal separation process on the biological fluid;
>
> check the air detector sensor for a fluid/air interface;
>
> weigh the product container during the centrifugal separation process;
>
> process the biological fluid until the volume of the blood component to be collected is collected; and
>
> upon completion of the centrifugal separation process, prompt the operator.

**ANSWER:** Haemonetics admits that Claim 1 of the ’891 Patent recites the stated claim language based on the language in the ’891 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

374. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute “blood processing system[s]” that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute blood processing systems as claimed in the ’891 Patent.

375. The NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters as claimed in the '891 Patent. Haemonetics further denies that the NexSys systems include a weight scale and air detector sensor as claimed in the '891 Patent.

376. Each of the NexSys PCS YES and NexSys PCS PERSONA has a touch screen which is configured to receive an input (*e.g.*, donor ID, various parameters) from the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS systems have a touch screen which is configured to receive an input as claimed in the '891 Patent.

377. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and to receive data from a server computer. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a "server" run on a server computer.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS systems have a transmitter and receiver device configured to communicate over a network and to receive data from a server computer as claimed in the '891 Patent. Haemonetics further denies the BECS running a data management system software application constitutes a server as claimed in the '891 Patent.

378. Each of the NexSys PCS YES and the NexSys PCS PERSONA includes a processing circuit that is coupled to the blood processing apparatus and a network, and the processing circuit is configured to receive the data from the server computer and store the data in a memory. The processing circuit of the NexSys PCS YES and the NexSys PCS PERSONA is also configured to store default process parameters in a memory.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS systems includes a processing circuit that is coupled to the blood processing apparatus and a network, and the processing circuit

is configured to receive the data from the server computer and store the data in a memory as claimed in the ’891 Patent. Haemonetics further denies the processing circuit of the NexSys PCS YES and the NexSys PCS PERSONA is also configured to store default process parameters in a memory as claimed in the ’891 Patent.

379. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and the NexSys PCS PERSONA are turned on with a switch by the operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and the NexSys PCS PERSONA are turned on with a switch by the operator as claimed in the ’891 Patent.

380. When the NexSys PCS YES and the NexSys PCS PERSONA are powered on, the processing circuits of each is configured to conduct self-checks on the blood processing apparatus.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that when the NexSys PCS YES and the NexSys PCS PERSONA are powered on, the processing circuits of each is configured conduct self-checks on the blood processing apparatus as claimed in the ’891 Patent.

381. The NexSys PCS YES and the NexSys PCS PERSONA have a touch screen and the processing circuits in the NexSys PCS YES and the NexSys PCS PERSONA are configured to receive input data for the value of a process parameter. For example, values for process parameters such as pump speed and “Max Plasma Per Cycle” can be input via the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA have a touch screen and the processing circuits in the NexSys PCS YES and the NexSys PCS PERSONA are configured to receive input data for the value of a process parameter

as claimed in the ’891 Patent. Haemonetics further denies that pump speed and “Max Plasma Per Cycle” are parameters as claimed in the ’891 Patent.

382. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA verify that the value of the process parameter is within a present range. For example, values for process parameters such as “Max Plasma Per Cycle,” “Total Saline Volume to Return,” “Empty AC Bag Weight,” and “AC Solution Volume” must fall within the preset ranges.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA verify that the value of the process parameter is within a preset range as claimed in the ’891 Patent. Haemonetics further denies that “Max Plasma Per Cycle,” “Total Saline Volume to Return,” “Empty AC Bag Weight,” and “AC Solution Volume” are parameters as claimed in the ’891 Patent.

383. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to store a pre-process calculation of a volume of the blood component to be collected. For example, using the PERSONA nomogram, a target plasma collection volume is calculated based on weight, height, and hematocrit of the donor. Further, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to display on the touch screen the volume of the blood component to be collected before the blood processing procedure commences.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to store a pre-process calculation of a volume of the blood component to be collected as claimed in the ’891 Patent. Haemonetics further denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to display on the touch screen the volume of the blood component to be collected before the blood processing procedure commences as claimed in the ’891 Patent.

384. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), a Disposable Kit comprising a single-use disposable set that includes the Harness connecting disposable components is installed on the NexSys PCS YES and the NexSys PCS

PERSONA. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, through the touch screen, to install the disposable tubing set.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that before commencing a blood processing procedure, a Disposable Kit is installed on the NexSys system and the processing circuits of the NexSys system are configured to prompt an operator, through the touch screen, to install the disposable tubing set as claimed in the '891 Patent.

385. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed as claimed in the '891 Patent.

386. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to commence the centrifugal separation process on the biological fluid.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS system are configured to operate the anticoagulant short prime feature and, upon completion, the processing circuits are configured to commence the centrifugal separation process on the biological fluid as claimed in the '891 Patent.

387. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA check air detectors which are ultrasonic sensors for the donor line, the anticoagulant line, and the blood line. The ultrasonic air sensors in the NexSys PCS YES and the NexSys PCS PERSONA detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA check air detectors which are ultrasonic sensors, which detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface, for the donor line, the anticoagulant line, and the blood line as claimed in the '891 Patent.

388. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA operate the processing of the biological fluid until the volume of the blood component to be collected is collected. Upon completion, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to provide visual prompts to the operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation and, upon completion, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to provide visual prompts to the operator as claimed in the '891 Patent.

389. Claim 2 of the '891 Patent recites: "The blood processing system of claim 1, further comprising a barcode reader, wherein the processing circuit is further configured to receive input data for a value for a second process parameter from a barcode reader."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '891 Patent.

390. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 2 of the '891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

391. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

392. The NexSys PCS YES and the NexSys PCS PERSONA each comprise a barcode reader, and a processing circuit of each device is configured to receive input data for a value for a second process parameter from the barcode reader.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA each comprise a barcode reader, and a processing circuit of each device is configured to receive input data for a value for a second process parameter from the barcode reader as claimed in the '891 Patent.

393. Claim 3 of the '891 Patent recites: *"The blood processing system of claim 1, wherein the disposable fluid circuit comprises a saline access site."*

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '891 Patent.

394. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 3 of the '891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

395. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

396. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, include a disposable fluid circuit which comprises a saline access site.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, include a disposable fluid circuit which comprises a saline access site as claimed in the '891 Patent.

397. Claim 5 of the '891 Patent covers a novel system for collecting a blood component and recites:

5. A blood processing system comprising:

a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component in a product container, the reusable hardware comprising a weight scale configured to weigh the product container and an air detector sensor;

a touch screen configured to receive input from an operator;

a transmitter/receiver device configured to communicate over a network and to receive data from a server computer; and

a processing circuit coupled to the blood processing apparatus and the network, the processing circuit configured to receive the data from the server computer and store the data in a memory, the processing circuit configured to store default process parameters in the memory, the processing circuit configured to:

> receive an instruction from the operator to activate the blood processing system;
>
> conduct self-checks on the blood processing apparatus;
>
> receive input data for a value of a process parameter from the touch screen;
>
> verify that the value is within a preset range for the value;
>
> prior to operating the blood processing apparatus according to a centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected in the product container based at least in part on the value of the process parameter received from the touch screen;
>
> provide an indication of the volume to be collected to an operator via the touch screen;
>
> prompt the operator to mount the disposable fluid circuit;
>
> automatically check to determine whether the disposable fluid circuit is installed;
>
> prime tubing of the disposable fluid circuit with a fluid;

> commence the centrifugal separation process on the biological fluid;
>
> check the air detector sensor for a fluid/air interface;
>
> weigh the product container during the centrifugal separation process;
>
> process the biological fluid until the volume of the blood component to be collected is collected.

**ANSWER:** Haemonetics admits that Claim 5 of the '891 Patent recites the stated claim language based on the language in the '891 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

398. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute "blood processing system[s]" that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute blood processing systems as claimed in the '891 Patent.

399. The NexSys PCS YES and the NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS YES and the NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters as

claimed in the '891 Patent. Haemonetics further denies that the NexSys PCS systems include a weight scale and air detector sensor as claimed in the '891 Patent.

400. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen which is configured to receive an input (*e.g.*, donor ID, various process parameters) from an operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen which is configured to receive an input from an operator as claimed in the '891 Patent.

401. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and to receive data from a server computer. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a "server" run on a server computer.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and to receive data from a server computer as claimed in the '891 Patent. Haemonetics further denies the BECS running a data management system software application constitutes a server run on a server computer as claimed in the '891 Patent.

402. Each of the NexSys PCS YES and the NexSys PCS PERSONA includes a processing circuit that is coupled to the blood processing apparatus and a network and is configured to receive the data from the server computer and store the data in a memory. The processing circuit of the NexSys PCS YES and the NexSys PCS PERSONA is also configured to store default process parameters in a memory.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA includes a processing circuit that is coupled to the blood processing apparatus and a network and is configured to receive the data from the server computer and store the data in a

memory and the processing circuit of the NexSys PCS YES and the NexSys PCS PERSONA is also configured to store default process parameters in a memory as claimed in the ’891 Patent.

403. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a processing circuit configured to receive an activation from the operator when the NexSys PCS YES and the NexSys PCS PERSONA are activated with a switch by the operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA has a processing circuit configured to receive an activation from the operator when the NexSys PCS YES and the NexSys PCS PERSONA are activated with a switch by the operator as claimed in the ’891 Patent.

404. When the NexSys PCS YES and the NexSys PCS PERSONA are powered on, a processing circuit of each is configured to conduct self-checks on the blood processing apparatus.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that when the NexSys PCS YES and the NexSys PCS PERSONA are powered on, a processing circuit of each is configured to conduct self-checks on the blood processing apparatus as claimed in the ’891 Patent.

405. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen, and the processing circuits of each device are configured to receive an input data for the value of a process parameter. For example, values for process parameters such as target collection volume, pump speed, “Max Plasma Per Cycle” can be input via the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen, and the processing circuits of each device are configured to receive an input data for the value of a process parameter as claimed in the ’891 Patent. Haemonetics further denies that target collection volume, pump speed, and “Max Plasma Per Cycle” are parameters that can be input via the touch screen as claimed in the ’891 Patent.

406. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA verify that the value of the process parameter is within a preset range. For example, values for process parameters such as "Max Plasma Per Cycle," "Total Saline Volume to Return," "Empty AC Bag Weight," and "AC Solution Volume" must fall within the preset ranges.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA verify that the value of the process parameter is within a present range as claimed in the '891 Patent. Haemonetics further denies that "Max Plasma Per Cycle," "Total Saline Volume to Return," "Empty AC Bag Weight," and "AC Solution Volume" are parameters that can be input via the touch screen as claimed in the '891 Patent.

407. The processing circuits of the NexSys PCS with YES and PERSONA are configured to store a pre-process calculation of a volume of the blood component to be collected based on the value of the process parameter received from the touch screen. For example, the target plasma volume can be based on the value for target plasma collection volume received through the touch screen. Further, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to display on the touch screen the volume of the blood component to be collected before the blood processing procedure commences.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS with YES and PERSONA are configured to store a pre-process calculation of a volume of the blood component to be collected based on the value of the process parameter received from the touch screen as claimed in the '891 Patent. Haemonetics further denies that target plasma volume is a parameter as claimed in the '891 Patent. Haemonetics also denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to display on the touch screen the volume of the blood component to be collected before the blood processing procedure commences as claimed in the '891 Patent.

408. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), a Disposable Kit comprising a single-use disposable set that includes the Harness connecting disposable components is installed on the NexSys PCS YES and the NexSys PCS PERSONA. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are

configured to prompt an operator, through the touch screen, to install the disposable tubing set. A processing circuit of the NexSys PCS YES and the NexSys PCS PERSONA automatically checks to determine whether the disposable fluid circuit is installed.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that before commencing a blood processing procedure, a Disposable Kit is installed on the NexSys PCS system and the processing circuits of are configured to prompt an operator, through the touch screen, to install the disposable tubing set and automatically checks to determine whether the disposable fluid circuit is installed as claimed in the ’891 Patent.

409. The processing circuits of the NexSys PCS with YES and PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to commence the centrifugal separation process on the biological fluid.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS are configured to operate the anticoagulant short prime feature and, upon completion, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to commence the centrifugal separation process on the biological fluid as claimed in the ’891 Patent.

410. The processing circuits of the NexSys PCS with YES and PERSONA check air detectors which are ultrasonic sensors for the donor line, the anticoagulant line, and the blood line. The ultrasonic air sensors in the NexSys PCS with YES and PERSONA detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS with YES and PERSONA check air detectors which are ultrasonic sensors, which detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface, for the donor line, the anticoagulant line, and the blood line as claimed in the ’891 Patent.

411. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA operate the processing of the biological fluid until the volume of the blood component to be collected is collected.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS system are configured to weigh the plasma product container during the centrifugal separation and operate the processing of the biological fluid until the volume of the blood component to be collected is collected as claimed in the ’891 Patent.

412. Claim 6 of the ‘891 Patent recites: “The blood processing system of claim 5, wherein the processing circuit is further configured to, upon completion of the centrifugal separation process, prompt the operator.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’891 Patent.

413. The NexSys PCS YES and the NexSys PCS PERSONA NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 6 of the ‘891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

414. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 5.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

415. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to provide visual prompts to alert the operator upon completion of the centrifugal separation process.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to provide visual prompts to alert the operator upon completion of the centrifugal separation process as claimed in the ’891 Patent.

416. Claim 8 of the ‘891 Patent recites: “The blood processing system of claim 5, wherein the pre-process calculation is based at least in part on the data received from the server computer.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’891 Patent.

417. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 8 of the ‘891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

418. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 5.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

419. The NexSys PCS with YES and PERSONA calculates a pre-collection target plasma volume based on data received from the server computer. For example, the calculation can be based on donor information such as weight and hematocrit received from the BECS ran in a remote server computer.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS with YES and PERSONA calculates a pre-collection target plasma volume based on data received from the server computer as claimed in the ’891 Patent.

420. Claim 9 of the ’891 Patent recites: “The blood processing system of claim 1, further comprising a barcode reader, wherein the processing circuit is further configured to receive input data for a value for a second process parameter from a barcode reader.”

**ANSWER:** Haemonetics admits that Claim 9 of the ’891 Patent recites the stated claim language based on the language in the ’891 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

421. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 9 of the ’891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

422. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 5.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

423. The NexSys PCS YES and the NexSys PCS PERSONA each comprise a barcode reader, and a processing circuit, of each device is configured to receive input data for a value for a second process parameter from the barcode reader.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA each comprise a barcode reader and processing circuit configured to receive input data for a value for a second process parameter from the barcode reader as claimed in the '891 Patent.

424. Claim 11 of the '891 Patent covers a novel system for collecting a blood component and recites:

> 11. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component to a product container, the reusable hardware comprising a weight scale configured to weigh the product container and an air detector sensor;
>
> a touch screen configured to receive input from an operator; and
>
> a control unit coupled to the blood processing apparatus, the control unit configured to store default process parameters in the memory, the control unit configured to:
>
> > receive an instruction from the operator to activate the blood processing system;
> >
> > conduct self-checks on the blood processing apparatus;
> >
> > receive input data for a value of a process parameter from the touch screen;
> >
> > prior to operating the blood processing apparatus according to a centrifugal separation process, calculate a volume of the blood component to be collected in the product container

> based at least in part on the value of the process parameter received from the touch screen;
>
> provide an indication of the volume to be collected to an operator via the touch screen;
>
> prime tubing of the disposable fluid circuit with a fluid;
>
> commence the centrifugal separation process on the biological fluid using the default process parameters;
>
> check the air detector sensor for a fluid/air interface;
>
> weigh the product container during the centrifugal separation process;
>
> process the biological fluid to collect the volume of the blood component to be collected.

**ANSWER:** Haemonetics admits that Claim 11 of the ’891 Patent recites the stated claim language based on the language in the ’891 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

425. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute “blood processing system[s]” that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute blood processing systems as claimed in the ’891 Patent.

426. The NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters as claimed in the '891 Patent. Haemonetics further denies that the NexSys PCS systems include a weight scale and air detector sensor as claimed in the '891 Patent.

427. Each of the NexSys PCS YES and NexSys PCS PERSONA has a touch screen which is configured to receive an input (*e.g.*, donor ID, various process parameters) from the operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA has a touch screen which is configured to receive an input from the operator as claimed in the '891 Patent.

428. Each of the NexSys PCS YES and NexSys PCS PERSONA includes a control unit coupled to the blood processing apparatus. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to store default process parameters in a memory.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA includes a control unit coupled to the blood processing apparatus that is configured to store process parameters in a memory as claimed in the '891 Patent.

429. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the

NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator as claimed in the ’891 Patent.

430. When the NexSys PCS YES and NexSys PCS PERSONA are activated, a control unit of each conducts self-checks on the blood processing apparatus.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that when the NexSys PCS YES and NexSys PCS PERSONA are activated, a control unit of each conducts self-checks on the blood processing apparatus as claimed in the ’891 Patent.

431. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive input data for a value of a process parameter from the touch screen. For example, values for process parameters such as target plasma volume, pump speed and “Max Plasma Per Cycle” can be input via the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive input data for a value of a process parameter from the touch screen as claimed in the ’891 Patent. Haemonetics further denies that target plasma volume, pump speed and “Max Plasma Per Cycle” are process parameters that can be input via the touch screen as claimed in the ’891 Patent.

432. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to calculate a volume of the blood component to be collected based on the value of the process parameter received from the touch screen. For example, the target plasma volume can be based on the value for target plasma collection volume received through the touch screen. The control unit is configured to provide an indication of the volume to be collected by displaying the volume on the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to calculate a volume of the blood component to be collected based on the value of the process parameter received from the touch screen as claimed

in the ’891 Patent. Haemonetics further denies that target plasma volume is a process parameter that can be input via the touch screen as claimed in the ’891 Patent. Haemonetics also denies that the control unit is configured to provide an indication of the volume to be collected by displaying the volume on the touch screen as claimed in the ’891 Patent.

433. The control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the control units are configured to commence the centrifugal separation process.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the control units of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime and, upon completion, the control units are configured to commence the centrifugal separation process as claimed in the ’891 Patent.

434. The control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to check air detectors which are ultrasonic sensors for the donor line, the anticoagulant line, and the blood line. The ultrasonic air sensors in the NexSys PCS YES and the NexSys PCS PERSONA detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to check air detectors which are ultrasonic sensors, which detect the presence of air based on differences in sound impedance of the air and the fluid at the fluid/air interface, for the donor line, the anticoagulant line, and the blood line as claimed in the ’891 Patent.

435. The control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation. The control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to operate the processing of the biological fluid until the volume of the blood component to be collected is collected.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation and are configured to operate the processing of the biological fluid until the volume of the blood component to be collected is collected as claimed in the '891 Patent.

436. Claim 12 of the '891 Patent recites: "The blood processing system of claim 11, wherein the control unit is further configured to verify that the value is within a preset range for the value."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '891 Patent.

437. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 12 of the '891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

438. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 11.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

439. The control units of the NexSys PCS YES and the NexSys PCS PERSONA verify that the value of the process parameter is within a preset range.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA include control units that verify the value of the process parameter is within a preset range as claimed in the '891 Patent.

440. Claim 13 of the '891 Patent recites: "The blood processing system of claim 11, further comprising a transmitter/receiver device configured to communicate over a network and to receive data from a server computer, the control unit configured to receive the data from the server computer and store the data in a memory."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’891 Patent.

441. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 13 of the ‘891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

442. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 11.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

443. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive data from a server computer and the control unit of each device is configured to receive data from the server computer and store the data in a memory. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a “server” run on a server computer.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive data from a server computer and the control unit of each device is configured to receive data from the server computer and store the data in a memory as claimed in the ’891 Patent. Haemonetics further denies that the BECS running a data management system software application constitutes a server run on a server computer as claimed in the ’891 Patent.

444. Claim 14 of the ’891 Patent recites: “The blood processing system of claim 13, wherein the control unit is configured to calculate the volume of the blood component to be collected in the product container based at least in part on the data received from the server computer.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’891 Patent.

445. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 14 of the ’891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

446. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 13.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

447. On information and belief, the control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to calculate the volume of the blood component to be collected in the product container based at least in part on data received from the server computer (*e.g.,* plasma target, hematocrit, height, and weight). The calculation, which is carried out by the control unit, of a volume of the blood component to be collected in the product container is based at least in part on the values of this data.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to calculate the volume of the blood component to be collected in the product container based at least in part on data received from the server computer as claimed in the ’891 Patent. Haemonetics further denies that the calculation, carried out by the control unit, of a volume of the blood component to be collected in the product container is based at least in part on the values of this data as claimed in the ’891 Patent.

448. Claim 15 of the ‘891 Patent recites: “The blood processing system of claim 14, wherein the control unit is further configured to: prompt the operator to mount the disposable fluid circuit; and automatically check to determine whether the disposable fluid circuit is installed.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’891 Patent.

449. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 15 of the ‘891 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 22.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

450. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 14.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

451. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), the control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, on the touch screen, to install the Disposable Kit. The control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that before commencing a blood processing procedure, the control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, on the touch screen, to install the Disposable Kit as claimed in the ’891 Patent. Haemonetics further denies that the control units of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed as claimed in the ’891 Patent.

452. Haemonetics directly infringes at least claims 1-3, 5, 6, 8, 9, and 11-15 of the ‘891 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering for sale/lease, selling, and/or leasing the Accused Haemonetics Products in the United States.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

453. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics’ customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics’ partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the ‘891 Patent, including at least claims 1-3, 5, 6, 8, 9, and 11-15.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

454. In addition to directly infringing the ‘891 Patent, Haemonetics has indirectly infringed the ‘891 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the ‘891 Patent (including claims 1-3, 5, 6, 8, 9, and 11-15) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional

materials, sales and marketing materials, and/or demonstrations to customers and end users.[91] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '891 Patent (including claims 1-3, 5, 6, 8, 9, and 11-15). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the '891 Patent (including claims 1-3, 5, 6, 8, 9, and 11-15).

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics refers to the document cited that speaks for itself.

455. Haemonetics has had knowledge of the '891 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the '891 Patent since at least the filing of Fenwal's Counterclaims.

**ANSWER:** Haemonetics admits it has had knowledge of the '891 Patent since at least the filing of these Counterclaims. Haemonetics otherwise denies the remaining allegations in this paragraph.

456. Haemonetics has also indirectly infringed the '891 Patent (including claims 1-3, 5, 6, 8, 9, and 11-15) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the '891 Patent by third parties, such as its customers and end users. Such third parties infringe the '891 Patent (including claims 1-3, 5, 6, 8, 9, and 11-15) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics' affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contribute to the infringement of the '891 Patent because those components constitute a material part of the invention of the '891 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the '891 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

457. As a consequence of Haemonetics' direct and indirect infringement of the '891 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

458. Due to Haemonetics' infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

---

[91] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

459. On information and belief, unless enjoined, Haemonetics will continue to infringe the '891 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 5: INFRINGEMENT OF U.S. PATENT NO. 12,397,089**

460. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required.

To the extent a response is required, Haemonetics denies the allegations in this paragraph.

461. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 16-18, 20, 21, 23, and 24 of the '089 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the NexSys PCS YES, the NexSys PCS PERSONA, and Disposable Kits in the United States. The Accused Haemonetics Products meet each limitation of each of the foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 23, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '089 Patent against Haemonetics based on discovery that will become available in due course.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

462. Claim 16 of the '089 Patent covers a novel system for collecting plasma and recites:

> 16. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component in a product container, the reusable hardware comprising a weight scale configured to weigh the product container;
>
> a transmitter/receiver device configured to communicate over a network and to receive instructions and/or information from a server computer;
>
> a barcode reader configured to receive input data for a pre-process calculation from a barcode; and
>
> a processing circuit coupled to the blood processing apparatus and the network, the processing circuit configured to receive the input data for the pro-process calculation from the barcode reader and store the input data in

a memory, the processing circuit configured to store default process parameters in the memory, the processing circuit configured to:

receive an activation from the operator to switch on the blood processing system;

conduct self-checks on the blood processing apparatus;

receive the input data for the pre-process calculation from the barcode reader;

verify that the value is within a preset range for the value;

prior to operating the blood processing apparatus according to a centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected in the product container and provide an indication of the volume to an operator via the touch screen;

prompt the operator to mount the disposable fluid circuit;

automatically check to determine whether the disposable fluid circuit is installed;

prime tubing of the disposable fluid circuit with a fluid;

commence the centrifugal separation process on the biological fluid;

weigh the product container during the centrifugal separation process;

process the biological fluid until the volume of the blood component to be collected is collected; and

upon completion of the centrifugal separation process, prompt the operator.

**ANSWER:** Haemonetics admits that Claim 16 of the ’089 Patent recites the stated claim language based on the language in the ’089 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

463. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute “blood processing system[s]” that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma),

and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute blood processing systems as claimed in the ’089 Patent.

464. The NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters as claimed in the ’089 Patent. Haemonetics further denies that the NexSys PCS systems include a weight sscale or air detector sensor as claimed in the ’089 Patent.

465. Each of the NexSys PCS YES and NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive instructions and/or information from a server computer. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a “server” run on a server computer.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive instructions and/or information from a server computer as claimed in the ’089 Patent. Haemonetics further denies that the BECS running a data management system software application constitutes a server run on a server computer as claimed in the ’089 Patent.

466. Each of the NexSys PCS YES and NexSys PCS PERSONA has a barcode reader which is configured to receive input data for a pre-process calculation from a barcode.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA has a barcode reader which is configured to receive input data for a pre-process calculation from a barcode as claimed in the ’089 Patent.

467. Each of the NexSys PCS YES and NexSys PCS PERSONA includes a processing circuit coupled to the blood processing apparatus and a network. The processing circuit of each is configured to receive input data for a pre-process calculation from the barcode reader and store the input data in memory. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are also configured to store default process parameters in memory.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA includes a processing circuit coupled to the blood processing apparatus and a network that are configured to receive input data for a pre-process calculation from the barcode reader and store the input data in memory and store default process parameters in memory as claimed in the ’089 Patent.

468. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator as claimed in the ’089 Patent.

469. When the NexSys PCS YES and NexSys PCS PERSONA are powered on, the processing circuit of each is configured to conduct self-checks on the blood processing apparatus.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA is powered on, the processing circuit of each is configured to conduct self-checks on the blood processing apparatus as claimed in the '089 Patent.

470. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive input data for a pre-process calculation from a barcode reader. For example, through the bar code reader, the processing circuit can receive information such as process parameters or donor information such as weight and hematocrit, which is used to calculate a target plasma volume. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to verify that the values received are within a preset range.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive input data for a pre-process calculation from a barcode reader as claimed in the '089 Patent. Haemonetics further denies that the NexSys PCS system uses process parameters and/or donor information as claimed in the '089 Patent. Haemonetics denies the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to verify that the values received are within a preset range as claimed in the '089 Patent.

471. Prior to operating the blood centrifugal separation process, the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA store a pre-collection volume of the blood component to be collected. Further, the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to provide an indication of the volume of the blood component to be collected to the operator via a touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that prior to operating the blood centrifugal separation process, the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA store a pre-collection volume of the blood component to be collected as claimed in the '089 Patent. Haemonetics further denies that the processing circuits of the NexSys PCS YES and NexSys PCS

PERSONA are configured to provide an indication of the volume of the blood component to be collected to the operator via a touch screen as claimed in the ’089 Patent.

472. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, on the touch screen, to install the Disposable Kit. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that before commencing a blood processing procedure, the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to prompt an operator, on the touch screen, to install the Disposable Kit as claimed in the ’089 Patent. Haemonetics further denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed as claimed in the ’089 Patent.

473. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the blood processing procedure (*e.g.*, a plasmapheresis procedure) is commenced, including centrifugal separation process on the biological fluid.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime feature and, upon completion, the blood processing procedure is commenced, including centrifugal separation process on the biological fluid as claimed in the ’089 Patent.

474. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation. The processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to operate the processing of the biological fluid until the volume of the blood component to be collected is collected. Upon completion, the processing circuit of the NexSys PCS with YES and PERSONA is configured to prompt the operator with visual alerts.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to weigh the plasma product container during the centrifugal separation as claimed in the ’089 Patent. Haemonetics further denies the processing circuits of the NexSys PCS YES and the NexSys PCS PERSONA are configured to operate the processing of the biological fluid until the volume of the blood component to be collected is collected and, upon completion, configured to prompt the operator with visual alerts as claimed in the ’089 Patent.

475. Claim 17 of the ’089 Patent recites: “The blood processing system of claim 16, wherein the blood processing apparatus further comprises an air detector which is associated with the fluid flow circuit and the processing circuit is further configured to check an air detector sensor for a fluid/air interface.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’089 Patent.

476. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 17 of the ’089 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 23.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

477. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 16.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

478. The NexSys PCS YES and the NexSys PCS PERSONA have air detectors that are ultrasonic sensors for the donor line, the anticoagulant line, and the blood line. The processing circuit is configured to check the air detector sensors for a fluid/air interface.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA have air detectors that are ultrasonic sensors for the donor line, the anticoagulant line, and the blood line as claimed in the ’089 Patent. Haemonetics further denies that the processing

circuit of the NexSys PCS YES and the NexSys PCS PERSONA is configured to check the air detector sensors for a fluid/air interface as claimed in the ’089 Patent.

479. Claim 18 of the ‘089 Patent recites: *“The blood processing system of claim 16, wherein the disposable fluid circuit comprises a saline access site.”*

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’089 Patent.

480. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 18 of the ‘089 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 23.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

481. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 16.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

482. The tubing of the Disposable Kit used with NexSys PCS YES and the NexSys PCS PERSONA comprise a saline access site.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the tubing of the Disposable Kit used with NexSys PCS YES and the NexSys PCS PERSONA comprise a saline access site as claimed in the ’089 Patent.

483. Claim 20 of the ‘089 Patent covers a novel system for collecting a blood component and recites:

> 20. A blood processing system comprising:
>
> a blood processing apparatus comprising reusable hardware and a disposable fluid circuit, the blood processing apparatus comprising a separator configured to perform a centrifugal separation process on a biological fluid from a source to provide a blood component in a product container, the reusable hardware comprising a weight scale configured to weigh the product container;
>
> a touch screen configured to receive input from an operator;

a transmitter/receiver device configured to communicate over a network and to receive data from a server computer; and

a processing circuit coupled to the blood processing apparatus and the network, the processing circuit configured to receive the data from the server computer and store the data in a memory, the processing circuit configured to store default process parameters in the memory, the processing circuit configured to:

receive an instruction from the operator to activate the blood processing system;

conduct self-checks on the blood processing apparatus;

receive input data for a value of a process parameter from the touch screen;

verify that the value is within a preset range for the value;

prior to operating the blood processing apparatus according to the centrifugal separation process, store a pre-process calculation of a volume of the blood component to be collected in the product container based at least in part on the value of the process parameter received from the touch screen and/or based on the data received from the server computer;

provide an indication of the volume to be collected to an operator via the touch screen;

prompt the operator to mount the disposable fluid circuit;

prime tubing of the disposable fluid circuit with a fluid;

commence the centrifugal separation process on the biological fluid, wherein the centrifugal separation process is based at least in part on the default process parameters;

process the biological fluid until the volume of the blood component to be collected is collected.

**ANSWER:** Haemonetics admits that Claim 20 of the ’089 Patent recites the stated claim language based on the language in the ’089 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

484. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute "blood processing system[s]" that draw and collect whole blood from a donor, separate the whole blood into its components (*e.g.*, red cells, white cells/platelets, and plasma), and return at least one other component of the whole blood to the donor (*e.g.*, red cells, white cells/platelets).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, constitute blood processing systems as claimed in the '089 Patent.

485. The NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware (*e.g.,* Centrifuge) and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters. One set of tubing is used to connect to a donor via a venipuncture needle when drawing whole blood from the donor. After separation of the whole blood in a centrifuge separator, the separated plasma is collected in a plasma collection container that is placed in a bottle holder connected to a weigher arm that weighs the container and its contents. The reusable hardware also comprises several air detector sensors.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA incorporate a blood processing apparatus comprising reusable hardware and a Disposable Kit constituting a disposable fluid circuit including a collection of tubing and filters as claimed in the '089 Patent. Haemonetics further denies that the NexSys PCS systems include a weight scale or air detector sensors as claimed in the '089 Patent.

486. Each the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen which is configured to receive an input (*e.g.*, donor ID, various process parameters) from the operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA has a touch screen which is configured to receive an input from the operator as claimed in the '089 Patent.

487. Each of the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive data from a server computer. The BECS running a data management system software application (*e.g.*, NexLynk DMS) constitutes a "server" run on a server computer.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA has a transmitter and receiver device configured to communicate over a network and receive data from a server computer as claimed in the '089 Patent. Haemonetics further denies the BECS running a data management system software application constitutes a server run on a server computer as claimed in the '089 Patent.

488. Each of the NexSys PCS YES and the NexSys PCS PERSONA includes a processing circuit coupled to the blood processing apparatus and a network, that is configured to receive data from a server computer and to store the data in a memory. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to store default process parameters in a memory.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and the NexSys PCS PERSONA includes a processing circuit coupled to the blood processing apparatus and a network, that is configured to receive data from a server computer and to store the data in a memory and to store the data in a memory as claimed in the '089 Patent.

489. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive an activation from the operator when the NexSys PCS YES and NexSys PCS PERSONA are activated with a switch by the operator as claimed in the '089 Patent.

490. When the NexSys PCS YES and NexSys PCS PERSONA are powered on, the processing circuit is configured to conduct self-checks on the blood processing apparatus.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that when the NexSys PCS YES and NexSys PCS PERSONA are powered on, the processing circuit is configured to conduct self-checks on the blood processing apparatus as claimed in the '089 Patent.

491. The NexSys PCS YES and NexSys PCS PERSONA have a touch screen and a processing circuit of each is configured to receive an input data for a value of a process parameter through the touch screen. For example, values for process parameters such as pump speed and "Max Plasma Per Cycle" can be input via the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the NexSys PCS YES and NexSys PCS PERSONA have a touch screen and a processing circuit of each is configured to receive an input data for a value of a process parameter through the touch screen as claimed in the '089 Patent. Haemonetics further denies pump speed and "Max Plasma Per Cycle" are process parameters that can be input via the touch screen as claimed in the '089 Patent.

492. The processing circuit of the NexSys PCS YES and NexSys PCS PERSONA verifies that the value of the process parameter is within a preset range. For example, values for process parameters such as "Max Plasma Per Cycle," "Total Saline Volume to Return," "Empty AC Bag Weight," and "AC Solution Volume" must fall within the preset ranges.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuit of the NexSys PCS YES and NexSys PCS PERSONA verifies that the value of the process parameter is within a present range as claimed in the '089 Patent. Haemonetics further denies "Max Plasma Per Cycle," "Total Saline Volume to Return," "Empty AC Bag Weight," and "AC Solution Volume" are process parameters as claimed in the '089 Patent.

493. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to store a pre-collection calculation of a volume of the blood component to be collected

in the product container based on the value of the process parameter received from the touch screen and/or based on the data received from the server computer. For example, the server computer transmits donor information to the NexSys PCS YES and NexSys PCS PERSONA. Using the PERSONA nomogram, a target plasma collection volume is calculated based on weight, height, and hematocrit of the donor received from the touch screen or from the server computer. The processing circuit of each device is configured to provide an indication of the volume of the blood component via the touch screen.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to store a pre-collection calculation of a volume of the blood component to be collected in the product container based on the value of the process parameter received from the touch screen and/or based on the data received from the server computer as claimed in the ’089 Patent. Haemonetics further denies the processing circuit of each device is configured to provide an indication of the volume of the blood component via the touch screen as claimed in the ’089 Patent.

494. Before commencing a blood processing procedure (*e.g.*, a plasmapheresis procedure), a single-use disposable set that includes the Harness connecting disposable components is installed on the NexSys PCS with YES and PERSONA. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to prompt an operator, through the touch screen, to install the disposable tubing set.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies that before commencing a blood processing procedure, a single-use disposable set that includes the Harness connecting disposable components is installed on the NexSys PCS with YES and PERSONA and the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to prompt an operator, through the touch screen, to install the disposable tubing set as claimed in the ’089 Patent.

495. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime (AC Short Prime) feature. This feature involves priming with anticoagulant the Harness before a blood processing procedure (*e.g.*, a plasmapheresis procedure). Upon completion of the anticoagulant prime, the blood processing procedure (*e.g.*, a plasmapheresis procedure) is commenced, including the centrifugal separation

process which is based at least in part on default process parameters. A processing circuit of each device operates the processing of the biological fluid until the volume of blood component to be collected is collected.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to operate the anticoagulant short prime feature and, upon completion, the blood processing procedure is commenced, including the centrifugal separation process which is based at least in part on default process parameters as claimed in the '089 Patent. Haemonetics further denies a processing circuit of each device operates the processing of the biological fluid until the volume of blood component to be collected is collected as claimed in the '089 Patent.

496. Claim 21 of the '089 Patent recites: "The blood processing system of claim 20, wherein the processing circuit is further configured to, upon completion of the centrifugal separation process, prompt the operator."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '089 Patent.

497. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 21 of the '089 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 23, which is incorporated herein by reference.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

498. As explained above, the Accused Haemonetics Products form a system that practices claim 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

499. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to provide visual prompts to alert the operator upon completion of the centrifugal separation process.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the processing circuits of the NexSys PCS YES

and NexSys PCS PERSONA are configured to provide visual prompts to alert the operator upon completion of the centrifugal separation process as claimed in the ’089 Patent.

500. Claim 23 of the ‘089 Patent recites: “The blood processing system of claim 20, wherein the processing circuit is configured to automatically check to determine whether the disposable fluid circuit is installed.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’089 Patent.

501. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 23 of the ‘089 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 23.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

502. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

503. The processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to automatically check to determine whether the disposable fluid circuit is installed as claimed in the ’089 Patent.

504. Claim 24 of the ’089 Patent recites: “The blood processing system of claim 20, further comprising a barcode reader, wherein the processing circuit is further configured to receive input data for a value for a second process parameter from a barcode reader.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’089 Patent.

505. The NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, practice claim 24 of the ’089 Patent, literally and/or under the doctrine of equivalents as explained in Exhibit 23.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

506. As explained above, the NexSys PCS YES and the NexSys PCS PERSONA, each with a Disposable Kit, form a system that practices claim 20.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

507. The NexSys PCS YES and the NexSys PCS PERSONA each comprise a barcode reader, and a processing circuit of each device is configured to receive input data for a value for a second process parameter from the barcode reader.

**ANSWER**: This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the processing circuits of the NexSys PCS YES and NexSys PCS PERSONA are configured to receive input data for a value for a second process parameter from the barcode reader as claimed in the ’089 Patent.

508. Haemonetics directly infringes at least claims 16-18, 20, 21, 23, and 24 of the ‘089 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering for sale/lease, selling, and/or leasing the Accused Haemonetics Products in the United States.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

509. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics’ customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics’ partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the ‘089 Patent, including at least claims 16-18, 20, 21, 23, and 24.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

510. In addition to directly infringing the ‘089 Patent, Haemonetics has indirectly infringed the ‘089 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the ‘089 Patent (including claims 16-18, 20, 21, 23, and 24) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional

materials, sales and marketing materials, and/or demonstrations to customers and end users.[92] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '089 Patent (including claims 16-18, 20, 21, 23, and 24). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the '089 Patent (including claims 16-18, 20, 21, 23, and 24).

**ANSWER:** Haemonetics denies the allegations in this paragraph and refers to the cited document that speaks for itself.

511. Haemonetics has had knowledge of the '089 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the '089 Patent since at least the filing of Fenwal's Counterclaims.

**ANSWER:** Haemonetics admits that it has had knowledge of the '089 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics otherwise denies the remaining allegations in this paragraph.

512. Haemonetics has also indirectly infringed the '089 Patent (including claims 16-18, 20, 21, 23, and 24) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the '089 Patent by third parties, such as its customers and end users. Such third parties infringe the '089 Patent (including claims 16-18, 20, 21, 23, and 24) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics' affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the '089 Patent because those components constitute a material part of the invention of the '089 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the '089 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

513. As a consequence of Haemonetics' direct and indirect infringement of the '089 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

514. Due to Haemonetics' infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

---

[92] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

515. On information and belief, unless enjoined, Haemonetics will continue to infringe the '089 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 6: INFRINGEMENT OF U.S. PATENT NO. 11,285,251**

516. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required.

To the extent a response is required, Haemonetics denies the allegations in this paragraph.

517. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, claims 1-9 of the '251 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the NexSys PCS PERSONA and Disposable Kits in the United States. The Accused Haemonetics Products meet each limitation of each of the foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 24, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '251 Patent against Haemonetics based on discovery that will become available in due course.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

518. Claim 1 of the '251 Patent covers a novel system for collecting plasma and recites:

> 1. A system for collecting plasma, comprising:
>
> a venipuncture needle configured to draw whole blood from a donor;
>
> a separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;
>
> a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump;
>
> an anticoagulant line coupled to an anticoagulant source, flow through the anticoagulant line being controlled by a second pump to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR);

> a touchscreen configured to receive input from an operator; and
>
> a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a donor management system, to use a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor; the controller to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor, wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).

**ANSWER:** Haemonetics admits that Claim 1 of the '251 Patent recites the stated claim language based on the language in the '251 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

519. The NexSys PCS PERSONA with a Disposable Kit meets each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 24, which is incorporated herein by reference.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

520. The NexSys PCS PERSONA with a Disposable Kit constitutes "[a] system for collecting plasma."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with a Disposable Kit constitutes a system for collecting plasma as claimed in the '251 Patent.

521. The Disposable Kit includes a venipuncture needle for withdrawing whole blood from the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Disposable Kit includes a venipuncture needle for withdrawing whole blood from the donor as claimed in the '251 Patent.

522. The NexSys PCS PERSONA with the Disposable Kit has a separator (including, for example, the centrifuge and disposable bowl) that is configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells.[93]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has a separator that is configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells as claimed in the '251 Patent. Haemonetics refers to the cited document that speaks for itself.

523. The blood separator has a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container. The disposable bowl has a plasma output port that is coupled to a plasma line (which is part of the tubing), and the plasma line is configured to send the plasma product (plasma and anticoagulant) to a plasma product collection container (the Plasma Collection Container).[94]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the blood separator has a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container and the disposable bowl has a plasma output port that is coupled to a plasma line, and the plasma line is configured to send the plasma product to a plasma product collection container as claimed in the '251 Patent. Haemonetics refers to the cited document that speaks for itself.

---

[93] *See, e.g.*, NexSys PCS User Manual at 21-22, 40-41; NexSys PCS Service Manual at 186-188.

[94] *See, e.g.*, NexSys PCS User Manual at 43.

524. The Disposable Kit includes a donor line that is fluidly coupled to the venipuncture needle and is configured to introduce the whole blood from the donor to the separator. The flow through the donor line is controlled by a "first pump" (the Blood Pump).[95]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Disposable Kit includes a donor line that is fluidly coupled to the venipuncture needle and is configured to introduce the whole blood from the donor to the separator and the flow through the donor line controlled by a first pump as claimed in the '251 Patent. Haemonetics refers to the cited document that speaks for itself.

525. The Disposable Kit includes an anticoagulant line that is coupled to an anticoagulant source (the anticoagulant solution bag).[96] The flow through the anticoagulant line is controlled by a second pump (the Anticoagulant Pump).[97] The second pump combines anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR) of 1:16.[98]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Disposable Kit includes an anticoagulant line that is coupled to an anticoagulant source, the flow through the anticoagulant line controlled by a second pump that combines anticoagulant with whole blood from the donor based on an anticoagulant ratio as claimed in the '251 Patent. Haemonetics refers to the cited document that speaks for itself.

526. The NexSys PCS PERSONA has a touchscreen that is configured to receive an input from an operator.[99]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA has a touchscreen

---

95 *See, e.g.*, NexSys PCS User Manual at 23.

96 *See, e.g.*, NexSys PCS User Manual at 23.

97 *Id.* at 23.

98 *Id.*

99 *See, e.g.*, NexSys PCS User Manual at 20, 28-29.

that is configured to receive an input from an operator as claimed in the ’251 Patent. Haemonetics refers to the cited document that speaks for itself.

527. The NexSys PCS PERSONA has a “controller” that is programmed (via software/firmware) to control the operation of the system composed of the NexSys PCS PERSONA and Donor Kit.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA has a controller that is programmed to control the operation of the system composed of the NexSys PCS PERSONA and Donor Kit as claimed in the ’251 Patent. Haemonetics refers to the cited document that speaks for itself.

528. The controller is coupled to the touchscreen and is also programmed to receive donor parameters electronically from a donor management system.[100]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller is coupled to the touchscreen and is also programmed to receive donor parameters electronically from a donor management system as claimed in the ’251 Patent. Haemonetics refers to the cited document that speaks for itself.

529. The controller is programmed to use a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume. The NexSys PCS PERSONA determines the donor’s total blood volume using donor weight and height.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller is programmed to use a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume as claimed in the ’251 Patent. Haemonetics further denies that the NexSys PCS

[100] *See* NexSys PCS Service Manual at 31, 37-38, 59-60.

PERSONA determines the donor's total blood volume using donor weight and height as claimed in the '251 Patent.

530. The NexSys PCS PERSONA controller sets the target volume for raw plasma is prior to blood collection from the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller sets the target volume for raw plasma is prior to blood collection from the donor as claimed in the '251 Patent.

531. The controller controls the NexSys PCS PERSONA and Disposable Kit system to operate draw and return phases (Draw Cycle and Return Cycle respectively)[101] to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component (*e.g.*, red blood cells) and to return the second blood component to the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller controls the NexSys PCS PERSONA and Disposable Kit system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor as claimed in the '251 Patent. Haemonetics refers to the cited document that speaks for itself.

532. The NexSys PCS PERSONA controller is configured to operate the draw and return phases until a volume of raw plasma (VRP) in the collection container (Plasma Collection Container) equals the target volume of raw plasma. The volume of raw plasma (VRP) is based on a measured volume of plasma product (VPP). The NexSys PCS PERSONA weighs the plasma product to determine if the volume of raw plasma collected equals the target volume of raw plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller is configured to operate the draw and return phases until a volume of raw plasma, based on a

[101] *See, e.g.*, NexSys PCS User Manual at 10.

measured volume of plasma product, in the collection container equals the target volume of raw plasma as claimed in the ’251 Patent. Haemonetics further denies the NexSys PCS PERSONA weighs the plasma product to determine if the volume of raw plasma collected equals the target volume of raw plasma as claimed in the ’251 Patent.

533. Alternatively, the NexSys PCS PERSONA meets the controller limitation under the doctrine of equivalents, because the device performs substantially the same function as the recited limitation (“a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a donor management system, to use a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor; the controller to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor, wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP)”), in substantially the same way, and achieves substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

534. Claim 2 of the ‘251 Patent recites: “The system of claim 1, wherein ACR=Volume of Whole Blood/Volume of Anticoagulant.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’251 Patent.

535. The NexSys PCS PERSONA with Disposable Kit meets each element of claim 2 of the ‘251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

536. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

537. The ACR used in the NexSys PCS PERSONA is equal to the volume of whole blood divided by the volume of anticoagulant. For example, where the system combines 16 units of whole blood with 1 unit of anticoagulant, the ACR is 16/1 or 16.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the ACR used in the NexSys PCS PERSONA is equal to the volume of whole blood divided by the volume of anticoagulant as claimed in the ’251 Patent.

538. Claim 3 of the ‘251 Patent recites: “The system of claim 1, wherein the volume of plasma product (VPP) is measured by a weigh scale.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’251 Patent.

539. The NexSys PCS PERSONA with Disposable Kit meets each element of claim 3 of the ‘251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

540. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

541. The NexSys PCS PERSONA measures the volume of plasma product by using a weigh scale which measures the plasma collection container as plasma product (anticoagulant and raw plasma) is being collected in the container.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA measures the volume of plasma product by using a weigh scale which measures the plasma collection container as plasma product is being collected in the container as claimed in the ’251 Patent.

542. Claim 4 of the ‘251 Patent recites: “The system of claim 1, wherein the controller is configured to receive the donor’s weight and hematocrit electronically from the donor management system, wherein the donor management system is used for qualification screening.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’251 Patent.

543. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 4 of the ‘251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24, which is incorporated herein by reference.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

544. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

545. The NexSys PCS PERSONA has a controller that is further configured to receive the donor’s weight and hematocrit electronically from the donor management system (*e.g.*, the NexLynk DMS or another third-party donor management system), wherein the donor management system is used for qualification screening.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA has a controller that is further configured to receive the donor’s weight and hematocrit electronically from the donor management system, wherein the donor management system is used for qualification screening as claimed in the ’251 Patent.

546. On information and belief, the donor management system (*e.g.*, the NexLynk DMS and/or another third-party donor management system) is used for qualification screening, *e.g.*, to ensure that donor is medically qualified to donate plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the donor management system is used for qualification screening as claimed in the ’251 Patent.

547. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to receive the donor’s weight and hematocrit electronically from the donor management system, wherein the donor management system is used for qualification screening), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

548. Claim 5 of the ‘251 Patent recites: “The system of claim 1, wherein the controller is programmed to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total blood volume or the total plasma volume for the donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’251 Patent.

549. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 5 of the ‘251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

550. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

551. The NexSys PCS PERSONA has a controller that is programmed to calculate, using the PERSONA nomogram, the target volume of raw plasma (VRP) by calculating a fraction of the total blood volume or the total plasma volume for the donor. Specifically, the controller calculates the target volume of raw plasma as 28.5% of the total plasma volume of the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA has a controller that is programmed to calculate, using the PERSONA nomogram, the target volume of raw plasma by calculating a fraction of the total blood volume or the total plasma volume for the donor as claimed in the ’251 Patent.

552. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total blood volume or the total plasma volume for the donor), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

553. Claim 6 of the ‘251 Patent recites: “The system of claim 1, wherein the controller is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’251 Patent.

554. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 6 of the ‘251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

555. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

556. The NexSys PCS PERSONA has a controller that is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA has a controller that is programmed to perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase as claimed in the ’251 Patent.

557. Alternatively, the NexSys PCS PERSONA device meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (perform the draw and return cycles at least three times and the controller is programmed to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

558. Claim 7 of the ‘251 Patent recites: “The system of claim 1, wherein the venipuncture needle is a single needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’251 Patent.

559. NexSys PCS PERSONA with the Disposable Kit meets each element of claim 7 of the ‘251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

560. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

561. The Disposable Kit has a single venipuncture needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Disposable Kit has a single venipuncture needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase as claimed in the ’251 Patent.

562. Claim 8 of the ‘251 Patent recites: “The system of claim 1, wherein the controller is configured to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’251 Patent.

563. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 8 of the ‘251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

564. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

565. The NexSys PCS PERSONA controller is configured to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller is configured to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio as claimed in the ’251 Patent.

566. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

567. Claim 9 of the '251 Patent recites: "The system of claim 1, wherein the donor management system calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, wherein the donor management system transmits the target volume for raw plasma to the controller."

**ANSWER:** Haemonetics admit the allegations in this paragraph based on the language in the '251 Patent.

568. The NexSys PCS PERSONA with the Disposable Kit meet each element of claim 9 of the '251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 24.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

569. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

570. The donor management system (*e.g.*, the NexSys Link or a third-party donor management system) running on the BECS uses the PERSONA nomogram to calculate the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume. In the PERSONA nomogram, the algorithm uses donor height and weight to calculate donor blood volume. The algorithm also uses hematocrit to calculate the total donor plasma volume.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the donor management system of the NexSys PCS system calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume as claimed in the '251 Patent.

571. The donor management system (*e.g.*, NexLynk DMS or other third-party donor management system) transmits the target volume for raw plasma to the controller.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the donor management system transmits the target volume for raw plasma to the controller as claimed in the '251 Patent.

572. Haemonetics directly infringes at least claims 1-9 of the '251 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering for sale/lease, selling, and/or leasing the NexSys PCS PERSONA and Disposable Kits in the United States.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

573. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '251 Patent, including at least claims 1-9.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

574. In addition to directly infringing the '251 Patent, Haemonetics has indirectly infringed the '251 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '251 Patent (including claims 1-9) at least by using the NexSys PCS PERSONA and Disposable Kits in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[102] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '251 Patent (including claims 1-9). On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the '251 Patent (including claims 1-9).

**ANSWER:** Haemonetics denies the allegations in this paragraph.

---

[102] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

575. Haemonetics has had knowledge of the '251 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the '251 Patent since at least the filing of Fenwal's Counterclaims.

**ANSWER:** Haemonetics admits that it has had knowledge of the '251 Patent since at least the filing of Fenwal's Counterclaims, but otherwise denies the allegations in this paragraph.

576. Haemonetics has also indirectly infringed the '251 Patent (including claims 1-9) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the '251 Patent by third parties, such as its customers and end users. Such third parties infringe the '251 Patent (including claims 1-9) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics' affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contribute to the infringement of the '251 Patent because those components constitute a material part of the invention of the '251 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the '251 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

577. As a consequence of Haemonetics' direct and indirect infringement of the '251 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

578. Due to Haemonetics' infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

579. On information and belief, unless enjoined, Haemonetics will continue to infringe the '251 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 7: INFRINGEMENT OF U.S. PATENT NO. 11,369,724**

580. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

581. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1-13, 16, 19, 21, 22, 24, and 25 of the '724 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing NexSys PCS PERSONA and Disposable Kits in the United States. The Accused Haemonetics Products meet each limitation of each of the foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 25, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '724 Patent against Haemonetics based on discovery that will become available in due course.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

582. Claim 1 of the '724 Patent covers a novel system for collecting plasma and recites:

> 1. A system for collecting plasma, comprising:
>
> a separator configured to separate whole blood into a plasma product and a second blood component comprising red blood cells, the separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;
>
> a donor line configured to introduce the whole blood from a donor to the separator;
>
> a touchscreen configured to receive input from an operator; and
>
> a controller configured to control operation of the system, the controller coupled to the touchscreen and configured to receive donor parameters electronically from a donor management system,
>
> to use a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume,
>
> the target volume for raw plasma based on the total donor blood volume, wherein the target volume for raw plasma is set prior to blood collection from the donor;
>
> the controller to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor,
>
> wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).

**ANSWER:** Haemonetics admits that Claim 1 of the '724 Patent recites the stated claim language based on the language in the '724 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

583. The NexSys PCS PERSONA meets each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

584. The NexSys PCS PERSONA with a Disposable Kit forms a system for collecting plasma of a human subject, *e.g.*, a plasma donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with a Disposable Kit forms a system for collecting plasma of a human subject as claimed in the '724 Patent.

585. The NexSys PCS PERSONA with the Disposable Kit has a "separator" (including, for example, the centrifuge and disposable bowl) that is configured to separate whole blood into a plasma product and a second blood component comprising red blood cells.[103]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has a separator that is configured to separate whole blood into a plasma product and a second blood component comprising red blood cells as claimed in the '724 Patent. Haemonetics refers to the cited document that speaks for itself.

586. The disposable bowl of the separator has a plasma output port that is coupled to a plasma line (which is part of the tubing), and the plasma line is configured to send the plasma product (plasma and anticoagulant) to a plasma product collection container (the Plasma Collection Container).[104]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the disposable bowl of the separator has a plasma

[103] *See, e.g.*, NexSys PCS User Manual at 21-22, 40-41; NexSys PCS Service Manual at 186-188.

[104] *See, e.g.*, NexSys PCS User Manual at 43.

output port that is coupled to a plasma line, and the plasma line is configured to send the plasma product to a plasma product collection container as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

587. The NexSys PCS PERSONA with the Disposable Kit includes a donor line configured to introduce the whole blood from the donor to the separator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit includes a donor line configured to introduce the whole blood from the donor to the separator as claimed in the ’724 Patent.

588. The NexSys PCS PERSONA with the Disposable Kit has an anticoagulant line coupled to an anticoagulant source (the anticoagulant solution bag)[105] configured to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR).[106]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has an anticoagulant line coupled to an anticoagulant source configured to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

589. The NexSys PCS PERSONA with the Disposable Kit has a touchscreen that is configured to receive an input from an operator.[107]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has a touchscreen that is configured to receive an input from an operator as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

---

[105] *See, e.g.*, NexSys PCS User Manual at 23.

[106] *Id.*

[107] *See, e.g.*, NexSys PCS User Manual at 20, 28-29.

590. The NexSys PCS PERSONA with the Disposable Kit has a "controller" that is configured (via software/firmware) to control the operation of the system composed of the NexSys PCS PERSONA and Donor Kit.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has a controller that is configured to control the operation of the system as claimed in the '724 Patent.

591. The controller is coupled to the touchscreen and is also programmed to receive donor parameters electronically from a donor management system (*e.g.*, NexLynk DMS).[108]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller is coupled to the touchscreen and is also programmed to receive donor parameters electronically from a donor management system as claimed in the '724 Patent. Haemonetics refers to the cited document that speaks for itself.

592. The controller is programmed to use a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume. The NexSys PCS PERSONA with the Disposable Kit determines the donor's total blood volume using donor weight and height.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller is programmed to use a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume as claimed in the '724 Patent.

593. The controller computes the target volume for raw plasma based on the total donor blood volume, wherein the target volume for raw plasma is set prior to blood collection from the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller computes the target volume for

---

[108] *See* NexSys PCS Service Manual at 31, 37-38, 59-60.

raw plasma based on the total donor blood volume, wherein the target volume for raw plasma is set prior to blood collection from the donor as claimed in the ’724 Patent.

594. The controller controls the system consisting of the NexSys PCS PERSONA and the Disposable Kit to operate draw and return phases (Draw Cycle and Return Cycle respectively)[109] to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component (*e.g.*, red blood cells) and to return the second blood component to the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller controls the system consisting of the NexSys PCS PERSONA and the Disposable Kit to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

595. The controller is also configured to operate the draw and return phases until a volume of raw plasma (VRP) in the collection container (Plasma Collection Container) equals the target volume of raw plasma. The volume of raw plasma (VRP) is based on a measured volume of plasma product (VPP). The NexSys PCS PERSONA weighs the plasma product to determine if the volume of raw plasma collected equals the target volume of raw plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller is also configured to operate the draw and return phases until a volume of raw plasma in the collection container equals the target volume of raw plasma, based on a measured volume of plasma product, as claimed in the ’724 Patent. Haemonetics further denies that the NexSys PCS PERSONA weighs the plasma product to determine if the volume of raw plasma collected equals the target volume of raw plasma as claimed in the ’724 Patent.

596. Alternatively, the NexSys PCS PERSONA device meets the controller limitation under the doctrine of equivalents, because the device performs substantially the same function as

[109] *See, e.g.*, NexSys PCS User Manual at 10.

the recited limitation ("a controller configured to control operation of the system, the controller coupled to the touchscreen and configured to receive donor parameters electronically from a donor management system, to use a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume, wherein the target volume for raw plasma is set prior to blood collection from the donor; the controller to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor, wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP)"), in substantially the same way, and achieves substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

597. Claim 2 of the '724 Patent recites: "The system of claim 1, wherein ACR=Volume of Whole Blood/Volume of Anticoagulant."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '724 Patent.

598. The NexSys PCS PERSONA with Disposable Kit meets each element of claim 2 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

599. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

600. The ACR used in the NexSys PCS PERSONA is equal to the volume of whole blood divided by the volume of anticoagulant. For example, where the system combines 16 units of whole blood with 1 unit of anticoagulant, the ACR is 16/1 or 16.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the ACR used in the NexSys PCS PERSONA is equal to the volume of whole blood divided by the volume of anticoagulant as claimed in the '724 Patent.

601. Claim 3 of the '724 Patent recites: "The system of claim 1, wherein the volume of plasma product (VPP) is measured by a weigh scale."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

602. The NexSys PCS PERSONA with Disposable Kit meets each element of claim 3 of the ‘251 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

603. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

604. The NexSys PCS PERSONA measures the volume of plasma product by using a weigh scale which measures the weight of the plasma collection container as plasma product (raw plasma and anticoagulant) is being collected in the container.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA measures the volume of plasma product by using a weigh scale which measures the weight of the plasma collection container as plasma product is being collected in the container as claimed in the ’724 Patent.

605. Claim 4 of the ‘724 Patent recites: “The system of claim 3, wherein the controller is configured to calculate the volume of raw plasma (VRP) in the collection container based on a measured volume of plasma product (VPP), the ACR and a hematocrit of the donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

606. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 4 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

607. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 3.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

608. The NexSys PCS PERSONA controller is configured to calculate the volume of raw plasma in the Plasma Collection Container based on the measured volume of plasma product, the ACR and the donor hematocrit.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller is configured to calculate the volume of raw plasma in the Plasma Collection Container based on the measured volume of plasma product, the ACR and the donor hematocrit as claimed in the ’724 Patent.

609. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to calculate the volume of raw plasma (VRP) in the collection container based on a measured volume of plasma product (VPP), the ACR and a hematocrit of the donor), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

610. The NexSys PCS PERSONA with the Disposable Kit meets each element of claim 4 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25, which is incorporated herein by reference.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

611. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

612. The NexSys PCS PERSONA has a controller that is further configured to receive the donor’s weight and hematocrit electronically from the donor management system (*e.g.*, the NexLynk DMS or another third-party donor management system), wherein the donor management system is used for qualification screening.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA has a controller that is further configured to receive the donor’s weight and hematocrit electronically from the donor management system, wherein the donor management system is used for qualification screening as claimed in the ’724 Patent.

613. On information and belief, the donor management system (*e.g.*, the NexLynk DMS and/or another third-party donor management system) is used for qualification screening, *e.g.*, to ensure that donor is medically qualified to donate plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the donor management system is used for qualification screening as claimed in the '724 Patent.

614. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to receive the donor's weight and hematocrit electronically from the donor management system, wherein the donor management system is used for qualification screening), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

615. Claim 6 of the '724 Patent recites: "The system of claim 5, further comprising the donor management system."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '724 Patent.

616. The NexSys PCS PERSONA with Donor Kit, together with the NexLynk DMS donor management system or a third-party donor management system, practices claim 6 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25, which is incorporated herein by reference.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

617. As explained above, the NexSys PCS PERSONA with the Disposable Kit is a system that practices claim 5.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

618. The NexLynk DMS is a donor management system. On information and belief, third party providers also offer donor management systems that can function with the NexSys PCS PERSONA in an integrated system.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexLynk DMS is a donor management system. On information and belief, third party providers also offer donor management systems that

can function with the NexSys PCS PERSONA in an integrated system as claimed in the '724 Patent.

619. Claim 7 of the '724 Patent recites: "The system of claim 1, wherein the target volume for raw plasma is based on the raw plasma volume of the donor."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '724 Patent.

620. The NexSys PCS PERSONA with Disposable Kit practices claim 7 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

621. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

622. On information and belief, the NexSys PCS PERSONA tailors the raw plasma donation targets to each donor based on the raw plasma volume of the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA tailors the raw plasma donation targets to each donor based on the raw plasma volume of the donor as claimed in the '724 Patent.

623. Claim 8 of the '724 Patent recites: "The system of claim 7, wherein the controller is configured to calculate the target volume for raw plasma by calculating a fraction of the plasma volume for the donor."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '724 Patent.

624. The NexSys PCS PERSONA with Disposable Kit practices claim 8 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

625. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 7.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

626. The NexSys PCS PERSONA controller is configured to calculate the target volume for raw plasma based on a calculated percentage (fraction) of the donor's total plasma volume.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller is configured to calculate the target volume for raw plasma based on a calculated percentage of the donor's total plasma volume as claimed in the '724 Patent.

627. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to calculate the target volume for raw plasma by calculating a fraction of the plasma volume for the donor), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

628. Claim 9 of the '724 Patent recites: "The system of claim 1, wherein the controller is configured to perform the draw and return cycles at least three times and the controller is configured to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '724 Patent.

629. The NexSys PCS PERSONA with Disposable Kit practices claim 9 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

630. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

631. The NexSys PCS PERSONA controller is programmed to collect at least three collection and reinfusion cycles and to draw a lower volume of whole blood in the final cycle.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS PERSONA controller is

programmed to collect at least three collection and reinfusion cycles and to draw a lower volume of whole blood in the final cycle as claimed in the ’724 Patent.

632. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to perform the draw and return cycles at least three times and the controller is configured to determine a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

633. Claim 10 of the ‘724 Patent recites: “The system of claim 9, wherein a first draw phase of a draw and return cycle draws approximately 500 mL of whole blood.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

634. The NexSys PCS PERSONA with Disposable Kit practices claim 10 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

635. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 9.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

636. The NexSys PCS PERSONA with Disposable Kit is configured to collect up to 300 mL of plasma per cycle (with the default value being 300 mL), which would require drawing approximately 500 mL of whole blood per cycle, depending on the donor’s hematocrit.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs a first draw phase of a draw and return cycle draws approximately 500 mL of whole blood as claimed in the ’724 Patent.

637. Claim 11 of the ‘724 Patent recites: “The system of claim 1, further comprising a venipuncture needle which is a single needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

638. The NexSys PCS PERSONA with Disposable Kit practices claim 11 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

639. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

640. The Disposable Kit includes a venipuncture needle, which is a single needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase.[110]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Disposable Kit includes a venipuncture needle, which is a single needle through which whole blood is drawn from the donor in a collection phase and the second blood component is returned to the donor in a return phase as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

641. Claim 12 of the ‘724 Patent recites: “The system of claim 1, wherein the controller is configured to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

642. The NexSys PCS PERSONA with Disposable Kit practices claim 12 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

643. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

---

[110] *See, e.g.*, NexSys PCS User Manual at 1, 42.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

644. The NexSys PCS PERSONA controller is configured to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.[111]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller is configured to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio of about 16 parts of whole blood to 1 part of anticoagulant as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself. Haemonetics refers to the cited document that speaks for itself.

645. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to control operation of the system to combine anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

646. Claim 13 of the ‘724 Patent recites: “The system of claim 1, wherein the donor management system calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, wherein the donor management system transmits the target volume for raw plasma to the controller.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

647. The NexSys PCS PERSONA with Disposable Kit practices claim 13 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

648. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

---

[111] *See id.* at 23.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

649. The NexLynk DMS is a donor management system that, on information and belief, uses the PERSONA nomogram to calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume. The target volume for raw plasma collection with the NexSys PCS PERSONA is based on a calculated percentage of the donor's total plasma volume, hematocrit, weight, and height.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexLynk DMS is a donor management system that, on information and belief, uses the PERSONA nomogram to calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume as claimed in the '724 Patent.

650. On further information and belief, the NexLynk DMS donor management system transmits the target volume for raw plasma to the NexSys PCS PERSONA controller. According to the NexSys PCS User Manual, when the device is connected to a Blood Establishment Computer Systems (BECS) or compatible central monitoring software system (which runs the NexLynk DMS), the NexSys PCS PERSONA receives donor information, including hematocrit and plasma target, from the BECS.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexLynk DMS donor management system transmits the target volume for raw plasma to the NexSys PCS PERSONA controller as claimed in the '724 Patent. The NexSys PCS User Manual speaks for itself.

651. Claim 16 of the '724 Patent recites: "The system of claim 1, wherein the controller is configured to receive from the touch screen a donor ID, donor weight, donor hematocrit and a target plasma volume."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '724 Patent.

652. The NexSys PCS PERSONA with Disposable Kit practices claim 16 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

653. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

654. The NexSys PCS PERSONA controller is configured to receive from the touchscreen donor ID, donor weight, donor hematocrit, and a target plasma volume.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller is configured to receive from the touchscreen donor ID, donor weight, donor hematocrit, and a target plasma volume as claimed in the ’724 Patent.

655. Alternatively, the NexSys PCS PERSONA meets this limitation under the doctrine of equivalents, because it performs substantially the same function as the recited limitation (to receive from the touch screen a donor ID, donor weight, donor hematocrit and a target plasma volume), in substantially the same way, to achieve substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

656. Claim 19 of the ‘724 Patent covers a novel system for collecting plasma and recites:

> 19. A system for collecting plasma, comprising:
>
> a blood separator configured to separate whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container;
>
> a donor line configured to introduce the whole blood from the donor to the blood separator;
>
> an anticoagulant line coupled to an anticoagulant source configured to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR);
>
> a touchscreen configured to receive input from an operator; and
>
> a controller configured to control operation of the system, the controller coupled to the touchscreen and configured to receive donor parameters electronically from a donor management system, to determine a target volume for plasma product and/or raw plasma

> which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, the controller to control the system to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to reinfuse the second blood component to the donor, wherein the controller is programmed to perform the collection and reinfusion cycles at least three times and the controller is programmed to perform a final collection and reinfusion cycle by drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle.

**ANSWER:** Haemonetics admits that Claim 19 of the ’724 Patent recites the stated claim language based on the language in the ’724 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

657. The NexSys PCS PERSONA meets each of the foregoing limitations of claim 19, literally and/or under the doctrine of equivalents, as described in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

658. The NexSys PCS PERSONA with a Disposable Kit forms a system for collecting plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with a Disposable Kit forms a system for collecting plasma as claimed in the ’724 Patent.

659. The NexSys PCS PERSONA with the Disposable Kit has a “blood separator” (including, for example, the centrifuge and disposable bowl) that is configured to separate whole blood into a plasma product and a second blood component comprising red blood cells.[112]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has a blood separator that is configured to separate whole blood into a plasma product and a

[112] *See, e.g.*, NexSys PCS User Manual at 21-22, 40-41; NexSys PCS Service Manual at 186-188.

second blood component comprising red blood cells as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

660. The disposable bowl of the blood separator has a plasma output port that is coupled to a plasma line (which is part of the tubing), and the plasma line is configured to send the plasma product (plasma and anticoagulant) to a plasma product collection container (the Plasma Collection Container).[113]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the disposable bowl of the blood separator has a plasma output port that is coupled to a plasma line, and the plasma line is configured to send the plasma product to a plasma product collection container as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

661. The NexSys PCS PERSONA with the Disposable Kit includes a donor line configured to introduce the whole blood from the donor to the separator.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit includes a donor line configured to introduce the whole blood from the donor to the separator as claimed in the ’724 Patent.

662. The NexSys PCS PERSONA with the Disposable Kit has an anticoagulant line coupled to an anticoagulant source (the anticoagulant solution bag)[114] configured to combine anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR).[115]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has an anticoagulant line coupled to an anticoagulant source configured to combine

---

[113] *See, e.g.*, NexSys PCS User Manual at 43.

[114] *See, e.g.*, NexSys PCS User Manual at 23.

[115] *Id.*

anticoagulant with the whole blood from the donor based on an anticoagulant ratio as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

663. The NexSys PCS PERSONA with the Disposable Kit has a touchscreen that is configured to receive an input from an operator.[116]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has a touchscreen that is configured to receive an input from an operator as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

664. The NexSys PCS PERSONA with the Disposable Kit has a “controller” that is configured (via software/firmware) to control the operation of the system composed of the NexSys PCS PERSONA with Donor Kit.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA with the Disposable Kit has a controller that is configured to control the operation of the system as claimed in the ’724 Patent.

665. The controller is coupled to the touchscreen and is also configured to receive donor parameters electronically from a donor management system (*e.g.*, NexLynk DMS).[117]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller is coupled to the touchscreen and is also configured to receive donor parameters electronically from a donor management system as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

666. The controller is configured to determine a target volume for plasma product (anticoagulant and raw plasma) and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume. The NexSys PCS PERSONA controller is configured to determine the donor’s total blood volume using donor weight and height. The NexSys PCS PERSONA controller

[116] *See, e.g.*, NexSys PCS User Manual at 20, 28-29.

[117] *See* NexSys PCS Service Manual at 31, 37-38, 59-60.

is configured to compute the target volume for raw plasma based on the total donor blood volume and hematocrit (Hct) which is used to calculate donor plasma volume.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller is configured to determine a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume as claimed in the ’724 Patent. Haemonetics further denies the NexSys PCS PERSONA controller is configured to compute the target volume for raw plasma based on the total donor blood volume and hematocrit which is used to calculate donor plasma volume as claimed in the ’724 Patent.

667. The controller controls the system consisting of the NexSys PCS PERSONA with Disposable Kit to operate collection and reinfusion phases (Draw Cycle and Return Cycle respectively)[118] to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component (*e.g.*, red blood cells) and to reinfuse the second blood component to the donor.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller controls the system consisting of the NexSys PCS PERSONA with Disposable Kit to operate collection and reinfusion phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to reinfuse the second blood component to the donor as claimed in the ’724 Patent. Haemonetics refers to the cited document that speaks for itself.

668. The controller is also programmed to perform the collection and reinfusion cycles at least three times and the controller is programmed to perform a final collection and reinfusion cycle by drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle. The NexSys PCS PERSONA with Disposable Kit is configured to collect up to 300 mL of plasma per cycle (with the default value being 300 mL), which would require drawing approximately 500 mL of whole blood per cycle, depending on the donor’s hematocrit. At least for certain collection ranges, the NexSys PCS PERSONA with

[118] *See, e.g.*, NexSys PCS User Manual at 10.

Disposable Kit must withdraw whole blood in at least three cycles, and the volume of whole blood drawn in the third cycle is less than the volume of whole blood drawn in prior collection cycles (approximately 500 mL).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller is also programmed to perform the collection and reinfusion cycles at least three times and the controller is programmed to perform a final collection and reinfusion cycle by drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle as claimed in the ’724 Patent. Haemonetics also denies the NexSys PCS system withdraws a volume of whole blood approximating 500 mL as claimed in the ’724 Patent.

669. Alternatively, the NexSys PCS PERSONA device meets the controller limitation under the doctrine of equivalents, because the device performs substantially the same function as the recited limitation (“a controller configured to control operation of the system, the controller coupled to the touchscreen and configured to receive donor parameters electronically from a donor management system, to determine a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, the controller to control the system to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to reinfuse the second blood component to the donor, wherein the controller is programmed to perform the collection and reinfusion cycles at least three times and the controller is programmed to perform a final collection and reinfusion cycle by drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle”), in substantially the same way, and achieves substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

670. Claim 21 of the ‘724 Patent recites: “The system of claim 19, further comprising the donor management system, wherein the donor management system is used for qualification screening and is in electronic communication with the controller.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

671. The NexSys PCS PERSONA with Disposable Kit and the donor management system (*e.g.*, NexLynk DMS or other third-party donor management system) together practice claim 21 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

672. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

673. On information and belief, the donor management system (*e.g.*, the NexLynk DMS and/or another third-party donor management system) is used for qualification screening, *e.g.*, to ensure that donor is medically qualified to donate plasma and is in electronic communication with the controller using a wired or wireless network.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the donor management system is used for qualification screening and is in electronic communication with the controller using a wired or wireless network as claimed in the ’724 Patent.

674. Claim 22 of the ‘724 Patent recites: “The system of claim 21, wherein the donor management system is configured to calculate the target volume for plasma product and/or raw plasma and the controller is configured to determine a target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

675. The NexSys PCS PERSONA with Disposable Kit and the donor management system (*e.g.*, NexLynk DMS or other third-party donor management system) together practice claim 22 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

676. As explained above, the NexSys PCS PERSONA with Disposable Kit and the donor management system (*e.g.*, NexLynk DMS or other third-party donor management system) together form a system that practices claim 21.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

677. On information and belief, the NexLynk DMS and/or other third-party donor management system is configured to calculate the target volume for plasma product (based on the donor’s total plasma volume, hematocrit, weight, and height), and the NexSys PCS PERSONA controller is also configured to determine a target volume for plasma product and/or raw plasma

by receiving the target volume for plasma product and/or raw plasma from the donor management system.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the donor management system is configured to calculate the target volume for plasma product and the NexSys PCS PERSONA controller is also configured to determine a target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system as claimed in the ’724 Patent.

678. Alternatively, NexSys PCS PERSONA meets the controller limitation under the doctrine of equivalence, because the device perform substantially the same function as the recited limitation (“to determine a target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system”), in substantially the same way, and achieves substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

679. Claim 24 of the ‘724 Patent recites: “The system of claim 19, wherein the controller is configured to determine the donor’s total blood volume before whole blood is withdrawn from the donor during a donation.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’724 Patent.

680. The NexSys PCS PERSONA with Disposable Kit practices claim 24 of the ‘724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

681. As explained above, the NexSys PCS PERSONA with Disposable Kit is a system that practices claim 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

682. The NexSys PCS PERSONA controller is configured to determine the donor’s total blood volume before whole blood is withdrawn from the donor during a donation. The NexSys PCS PERSONA controller uses donor characteristics (height, weight, and hematocrit) to determine the target plasma collection volume based on total available plasma prior to the start of the donation procedure. On information and belief, the NexSys PCS PERSONA controller is configured to determine the donor’s total blood volume and uses that value to calculate the total available plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller is configured to determine the donor's total blood volume before whole blood is withdrawn from the donor during a donation as claimed in the '724 Patent. Haemonetics further denies the NexSys PCS PERSONA controller is configured to determine determines the donor's total blood volume and uses that value to calculate the total available plasma as claimed in the '724 Patent.

683. Alternatively, the NexSys PCS PERSONA meets the controller limitation under the doctrine of equivalents, because the device performs substantially the same function as the recited limitation ("to determine the donor's total blood volume before whole blood is withdrawn from the donor during a donation"), in substantially the same way, and achieves substantially the same result.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

684. Claim 25 of the '724 Patent recites: "The system of claim 19, wherein the controller is configured to determine the target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight and the donor's hematocrit."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '724 Patent.

685. The NexSys PCS PERSONA with Disposable Kit practices claim 25 of the '724 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

686. As explained above, NexSys PCS PERSONA with Disposable Kit is a system that practices claim 19.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

687. The NexSys PCS PERSONA controller is configured to determine the target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight and the donor's hematocrit. Specifically, the controller is configured to compute the target volume for plasma product based at least in part on the anticoagulant ration, the donor's body-mass index (which is calculated using the donor's height and weight), and the donor's hematocrit.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA controller is configured to determine the target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight and the donor's hematocrit as claimed in the '724 Patent.

688. Haemonetics directly infringes at least claims 1-3, 16, 19, 21, 22, 24, and 25 of the '724 Patent by using (including in tests, commercial demonstrations, and clinical trials), making, importing, offering for sale/lease, selling, and/or leasing the Accused Haemonetics Products in the United States.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

689. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics' customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics' partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the '724 Patent, including at least claims 1-3, 16, 19, 21, 22, 24, and 25.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

690. In addition to directly infringing the '724 Patent, Haemonetics has indirectly infringed the '724 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the '724 Patent (including claims 1-3, 16, 19, 21, 22, 24, and 25) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[119] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the '724 Patent (including claims 1-3, 16, 19, 21, 22, 24, and 25). On information and belief, Haemonetics performed, and continues to perform, the acts that

[119] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the '724 Patent (including claims 1-16 and 19-25).

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics refers to the cited document that speaks for itself.

691. Haemonetics has had knowledge of the '724 Patent since at least the filing of Fenwal's Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitutes infringement of the '724 Patent since at least the filing of these Counterclaims.

**ANSWER:** Haemonetics admits that it has had knowledge of the '724 Patent since at least the filing of the Counterclaims. Haemonetics otherwise denies the remaining allegations in this paragraph.

692. Haemonetics has also indirectly infringed the '724 Patent (including claims 1-3, 16, 19, 21, 22, 24, and 25) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the '724 Patent by third parties, such as its customers and end users. Such third parties infringe the '724 Patent (including claims 1-3, 16, 19, 21, 22, 24, and 25) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics' affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the '724 Patent because those components constitute a material part of the invention of the '724 Patent (as they embody all limitations of the claims), are specially made or adapted for use in infringing the '724 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

693. As a consequence of Haemonetics' direct and indirect infringement of the '724 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

694. Due to Haemonetics' infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

695. On information and belief, unless enjoined, Haemonetics will continue to infringe the '724 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 8: INFRINGEMENT OF U.S. PATENT NO. 11,730,873**

696. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

697. On information and belief, Haemonetics has infringed and continues to infringe, directly and indirectly, literally and/or under the doctrine of equivalents, at least claims 1, 2, 4-8, 12, and 14-23 of the '873 Patent by making, importing, using, offering for sale/lease, and/or selling/leasing the Accused Haemonetics Products in the United States. The use of the Accused Haemonetics Products meets each limitation of each of the foregoing claims, literally and/or under the doctrine of equivalents, as described in Exhibit 26, which is incorporated herein by reference. Fenwal reserves the right to assert additional claims of the '873 Patent against Haemonetics based on discovery that will become available in due course.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

698. Claim 1 of the '873 Patent covers a novel method of collecting plasma and recites:

> 1. A method of collecting plasma, comprising:
>
> receiving input from an operator via a touchscreen of a plasma collection device;
>
> receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system;
>
> storing a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume;
>
> setting the target volume for raw plasma prior to blood collection from a donor;
>
> controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor,
>
> wherein each draw and return phase comprises:

> introducing whole blood from the donor to a separator via a donor line;
>
> combining anticoagulant with the whole blood from the donor using an anticoagulant line based on an anticoagulant ratio (ACR);
>
> separating whole blood into the plasma product and the second blood component comprising red blood cells; and
>
> sending the plasma product to a plasma product collection container,
>
> wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).

**ANSWER:** Haemonetics admits that Claim 1 of the ’873 Patent recites the stated claim language based on the language in the ’873 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

699. The use of the NexSys PCS PERSONA with a Disposable Kit meets each of the foregoing limitations of claim 1, literally and/or under the doctrine of equivalents, as described in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

700. Claim 1 of the ‘873 Patent recites in part, “[a] method of collecting plasma.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

701. As shown by at least the NexSys PCS User Manual, the Accused Haemonetics Products practice a method of collecting plasma. The NexSys PCS User Manual discloses instructions for the “plasmapheresis system designed for the highly efficient collection of plasma from donors.”[120]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice a

[120] NexSys PCS User Manual, at 10.

method of collecting plasma as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

702. End users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of collecting plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the Accused Haemonetics Products practice a method of collecting plasma as claimed in the ’873 Patent.

703. Claim 1 of the ‘873 Patent also recites in part, “receiving input from an operator via a touchscreen of a plasma collection device.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

704. As shown in the NexSys PCS User Manual, the NexSys PCS device includes a “touchscreen graphical user interface.” NexSys PCS User Manual, at 11. The manual describes how the device receives inputs from a touchscreen periodically as part of its intended operation.[121]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS device includes a touchscreen graphical user interface as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

705. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “receiving an input from a touch screen of the apheresis treatment device.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS device will perform the step of receiving an input from a touch screen of the apheresis treatment device as claimed in the ’873 Patent.

---

[121] *See, e.g.*, NexSys PCS User Manual, at 60, 71, 74.

706. Claim 1 of the ‘873 Patent also recites in part, “receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

707. The NexSys PCS User Manual describes a “BECS” which is a “central monitoring software system that exchanges information with the device via an approved server application.” NexSys PCS User Manual, at 120. It further describes how the NexSys PCS device “receives [donor] information from the BECS.”[122]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system includes a central monitoring software system that exchanges information with the device via an approved server application as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

708. The donor management system may be the Haemonetics NexLynk DMS system or a third-party donor management system. The NexLynk DMS Brochure describes the software as helping users “manage information about your donors” and providing “donor management” functionality.[123]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system includes a donor management system as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

709. The NexSys PCS User Manual describes how the NexSys PCS device receives donor parameters and displays them at the touchscreen user interface.[124]

---

[122] NexSys PCS User Manual, at 59.

[123] NexLynk DMS Brochure, at 3.

[124] NexSys PCS User Manual, at 59-60.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the the NexSys PCS device receives donor parameters and displays them at the touchscreen user interface as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

710. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system as claimed in the ’873 Patent.

711. Claim 1 of the ‘873 Patent also recites in part, “storing a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

712. The NexSys PCS PERSONA stores a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume. For example, the NexSys PCS PERSONA Brochure describes plasma collection according to total blood volume based on BMI, which is a function of height and weight.[125]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS PERSONA stores a target volume for raw plasma which is based at least in part on donor height and weight used to calculate

[125] NexSys PCS PERSONA Brochure, at 2.

total donor blood volume, the target volume for raw plasma based on the total donor blood volume as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

713. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "storing a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of storing a target volume for raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume, the target volume for raw plasma based on the total donor blood volume as claimed in the ’873 Patent.

714. Claim 1 of the ‘873 Patent also recites in part, "setting the target volume for raw plasma prior to blood collection from a donor."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

715. The NexSys PCS User Manual shows the target volume for raw plasma on the user interface, which is displayed with other donor information prior to blood collection from the donor.[126]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system shows the target volume for raw plasma on the user interface, which is displayed with other donor information prior to blood collection from the donor as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

716. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "setting the target volume for raw plasma prior to blood collection from a donor."

[126] NexSys PCS User Manual, at 59.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of setting the target volume for raw plasma prior to blood collection from a donor as claimed in the ’873 Patent.

717. Claim 1 of the ‘873 Patent also recites in part, “controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

718. The NexSys PCS User Manual describes the operation comprising two phases, Draw and Return.[127]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs draw and return phases as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

719. The User Manual also describes how, “during the collection procedure,” the device separates “plasma components” of whole blood which are directed into a “plasma collection container for storage” while the non-selected blood components “are returned to the donor during the Return cycle.”[128]

**ANSWER:** To the extent this paragraph contains legal conclusions, no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system controls the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red

[127] NexSys PCS User Manual, at 33.

[128] *Id.* at 10.

blood cells and to return the second blood component to the donor as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

720. The User Manual also describes the parameters controlling the Draw and Return phases and provides instructions to modify those parameters.[129]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs draw and return phases as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

721. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system controls the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor as claimed in the ’873 Patent.

722. Claim 1 of the ‘873 Patent also recites in part, “wherein each draw and return phase comprises: introducing whole blood from the donor to a separator via a donor line.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

723. The NexSys PCS User Manual describes disposable sets of tubing including one set connected to a donor via a venipuncture needle when drawing whole blood.[130]

---

[129] *Id.* at 79-80.

[130] NexSys PCS User Manual, at 10, 42, 68.

**ANSWER:** To the extent this paragraph contains legal conclusions, no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of introducing whole blood from the donor to a separator via a donor line as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

724. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step “wherein each draw and return phase comprises: introducing whole blood from the donor to a separator via a donor line.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of wherein each draw and return phase comprises: introducing whole blood from the donor to a separator via a donor line as claimed in the ’873 Patent.

725. Claim 1 of the ‘873 Patent also recites in part, “combining anticoagulant with the whole blood from the donor using an anticoagulant line based on an anticoagulant ratio (ACR).”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in ’873 Patent.

726. The NexSys PCS User Manual describes an anticoagulant pump which mixes anticoagulant solution with whole blood from the donor.[131] The device regulates mixing based on an “AC [anticoagulant] ratio.”[132]

**ANSWER:** To the extent this paragraph contains legal conclusions, no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of combining anticoagulant with the whole blood from the donor using an anticoagulant line based on an anticoagulant ratio as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

---

[131] NexSys PCS User Manual, at 23.

[132] NexSys PCS User Manual, at 23.

727. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "combining anticoagulant with the whole blood from the donor using an anticoagulant line based on an anticoagulant ratio (ACR)."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of combining anticoagulant with the whole blood from the donor using an anticoagulant line based on an anticoagulant ratio as claimed in the '873 Patent.

728. Claim 1 of the '873 Patent also recites in part, "separating whole blood into the plasma product and the second blood component comprising red blood cells."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

729. The NexSys PCS User Manual describes how the NexSys PCS device separates whole blood in a centrifuge separator into layers of blood components, of which one layer is plasma and a second layer comprises red cells.[133]

**ANSWER:** To the extent this paragraph contains legal conclusions, no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of separating whole blood into the plasma product and the second blood component comprising red blood cells as claimed in the '873 Patent. Haemonetics refers to the cited document that speaks for itself.

730. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "separating whole blood into the plasma product and the second blood component comprising red blood cells."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of

---

[133] NexSys PCS User Manual, at 10, 40.

separating whole blood into the plasma product and the second blood component comprising red blood cells as claimed in the ’873 Patent.

731. Claim 1 of the ‘873 Patent also recites in part, “sending the plasma product to a plasma product collection container.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

732. The NexSys PCS User Manual describes how, “during the collection procedure,” the device separates “plasma components” of whole blood which are directed into a “plasma collection container for storage.”[134]

**ANSWER:** To the extent this paragraph contains legal conclusions, no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of sending the plasma product to a plasma product collection container as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

733. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step “sending the plasma product to a plasma product collection container.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system performs the step of sending the plasma product to a plasma product collection container as claimed in the ’873 Patent.

734. Claim 1 of the ‘873 Patent also recites in part, “wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

735. A controller of the NexSys PCS PERSONA is configured to operate the draw and return phases until a volume of raw plasma collected equals the target volume of raw plasma. For

[134] NexSys PCS User Manual, at 10, 41, 68.

example, the NexSys PCS User Manual describes how the device measures the collection volume of plasma and ends the collection cycle "when the plasma target collection has been achieved."[135]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the controller of the NexSys PCS PERSONA is configured to operate the draw and return phases until a volume of raw plasma collected equals the target volume of raw plasma as claimed in the '873 Patent. Haemonetics refers to the cited document that speaks for itself.

736. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP)."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs the step of wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP) as claimed in the '873 Patent.

737. Claim 2 of the '873 Patent recites: "The method of claim 1, wherein ACR=Volume of Whole Blood/Volume of Anticoagulant."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

738. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 2 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

---

[135] NexSys PCS User Manual, at 25.

739. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

740. During use of the NexSys PCS PERSONA, the ACR utilized is equal to the volume of whole blood divided by the volume of anticoagulant. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "wherein ACR=Volume of Whole Blood/Volume of Anticoagulant."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs the step of wherein ACR=Volume of Whole Blood/Volume of Anticoagulant as claimed in the '873 Patent.

741. Claim 4 of the '873 Patent recites: "The method of claim 1, further comprising receiving the donor's weight and hematocrit electronically at the controller from the donor management system, wherein the donor management system is used for qualification screening."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

742. The use of the Accused Haemonetics Products practices claim 4 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

743. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

744. The NexSys PCS PERSONA comprises a controller that is coupled to a touchscreen and is configured to electronically receive donor parameters, such as weight and hematocrit, from the NexLynk DMS or another third-party data management system. The data management system (*e.g.*, NexLynk DMS) downloads and transmits the donor information—including donor ID, donor name, donor birth date, donor weight, and donor hematocrit—from a database to the NexSys PCS device. The NexSys PCS device displays information about the donor that is used for qualification screening (*e.g.*, verify the identity of the donor).[136] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User

[136] *See, e.g.* NexSys PCS User Manual, at 59-60.

Manual will perform the step: "receiving the donor's weight and hematocrit electronically at the controller from the donor management system, wherein the donor management system is used for qualification screening."

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs the step of receiving the donor's weight and hematocrit electronically at the controller from the donor management system, wherein the donor management system is used for qualification screening as claimed in the '873 Patent.

745. Claim 5 of the '873 Patent recites: "The method of claim 1, further comprising calculating the target volume for raw plasma by calculating a fraction of total donor plasma volume."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

746. The use of the NexSys PCS PERSONA meets each element of claim 5 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

747. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

748. The target volume for raw plasma collection with the NexSys PCS PERSONA is calculated based on a calculated percentage of the donor's total plasma volume.[137]. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "calculating the target volume for raw plasma by calculating a fraction of total donor plasma volume."

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required,

[137] *See, e.g.*, NexSys PCS PERSONA Brochure, at 2.

Haemonetics denies NexSys PCS system performs the step of calculating the target volume for raw plasma by calculating a fraction of total donor plasma volume as claimed in the ’873 Patent.

749. Claim 6 of the ‘873 Patent recites: “The method of claim 1, further comprising performing the draw and return cycles at least three times and determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

750. The use of the NexSys PCS PERSONA meets each element of claim 6 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

751. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

752. The controller of the NexSys PCS PERSONA can be programmed to collect at least three collection and reinfusion cycles and to draw a lower volume of whole blood in the final cycle.[138] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “performing the draw and return cycles at least three times and determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase.”

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs the step of performing the draw and return cycles at least three times and determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase as claimed in the ’873 Patent.

753. Claim 7 of the ‘873 Patent recites: “The method of claim 1, further comprising combining anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.”

---

[138] *See* NexSys PCS User Manual, at 33-34.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

754. The use of the NexSys PCS PERSONA meets each element of claim 7 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

755. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

756. The NexSys PCS PERSONA mixes anticoagulant with the donor’s whole blood as whole blood is drawn from the donor to prevent blood from clotting. The NexSys PCS PERSONA combines anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.[139] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “combining anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant.”

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs the step of combining anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant as claimed in the ’873 Patent.

757. Claim 8 of the ‘873 Patent recites: “The method of claim 1, wherein the donor management system calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, further comprising transmitting the target volume for raw plasma from the donor management system to the controller.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

---

[139] NexSys PCS User Manual, at 23.

758. The use of the Accused Haemonetics Products meets each element of claim 8 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

759. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 1.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

760. The donor management system calculates the target volume for raw plasma based on donor height and weight used to calculate total donor blood volume and hematocrit used to determine the total donor plasma volume.[140] Further, the NexSys PCS User Manual states that when the device is connected to a BECS or compatible central monitoring software system, the target volume for raw plasma is transmitted from the donor management system to the controller.[141] Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “wherein the donor management system calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, further comprising transmitting the target volume for raw plasma from the donor management system to the controller.”

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs the step of wherein the donor management system calculates the target volume for raw plasma based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume, further comprising transmitting the target volume for raw plasma from the donor management system to the controller as claimed in the ’873 Patent.

761. Claim 12 of the ‘873 Patent covers a novel method of collecting plasma and recites:

12. A method of collecting plasma, comprising:

---

[140] *See, e.g.*, NexSys PCS PERSONA Brochure, at 2.

[141] NexSys PCS User Manual, at 59.

> receiving input from an operator via a touchscreen of a plasma collection device;
>
> receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system;
>
> determining a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume;
>
> controlling the plasma collection device to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to reinfuse the second blood component to the donor, wherein each collection and reinfusion cycle comprises:
>
> introducing the whole blood from the donor to a blood separator;
>
> combining anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR);
>
> separating whole blood into the plasma product and the second blood component comprising red blood cells; and
>
> sending the plasma product to a plasma product collection container,
>
> wherein the controller controls the plasma collection device to operate the collection and reinfusion cycles on the donor at least three times, wherein a final collection and reinfusion cycle comprises drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle.

**ANSWER:** Haemonetics admits that Claim 12 of the ’873 Patent recites the stated claim language based on the language in the ’873 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

762. The use of the NexSys PCS PERSONA with a Disposable Kit meets each of the foregoing limitations of claim 12, literally and/or under the doctrine of equivalents, as described in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

763. Claim 12 of the '873 Patent recites in part, "[a] method of collecting plasma."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

764. As shown by at least the NexSys PCS User Manual, the NexSys PCS PERSONA with a Disposable Kit practices a method of collecting plasma. The NexSys PCS User Manual discloses instructions for the "plasmapheresis system designed for the highly efficient collection of plasma from donors."[142]

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs a method of collecting plasma as claimed in the '873 Patent.

765. End users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of collecting plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs a method of collecting plasma as claimed in the '873 Patent.

766. Claim 12 of the '873 Patent also recites in part, "receiving input from an operator via a touchscreen of a plasma collection device."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

767. As described above in relation to claim 1, the NexSys PCS device includes a "touchscreen graphical user interface."[143] The User Manual describes how the device receives inputs from a touchscreen periodically as part of its intended operation.[144]

---

[142] NexSys PCS User Manual, at 10.

[143] NexSys PCS User Manual, at 11.

[144] *See, e.g.*, NexSys PCS User Manual, at 60, 71, 74.

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system includes a touchscreen graphical user interface as claimed in the ’873 Patent.

768. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “receiving an input from a touch screen of the apheresis treatment device.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies NexSys PCS system performs the step of receiving an input from a touch screen of the apheresis treatment device as claimed in the ’873 Patent.

769. Claim 12 of the ‘873 Patent also recites in part, “receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

770. As described above in relation to claim 1, the NexSys PCS User Manual describes a BECS which is a “central monitoring software system that exchanges information with the device via an approved server application.”[145] It further describes how the NexSys PCS device “receives [donor] information from the BECS.”[146]

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system receives donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system in the ’873 Patent.

---

[145] NexSys PCS User Manual, at 120.

[146] *Id.* at 59.

771. The donor management system may be the Haemonetics NexLynk DMS system or a third-party donor management system. The NexLynk DMS Brochure describes the software as helping users "manage information about your donors" and providing "donor management" functionality.[147]

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system receives donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system in the '873 Patent.

772. The NexSys PCS User Manual describes how the NexSys PCS device receives donor parameters and displays them at a controller of the plasma collection device, namely the touchscreen user interface.[148]

**ANSWER:** Haemonetics refers to the cited document which speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system receives donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system in the '873 Patent.

773. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "receiving donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS system receives donor parameters at a controller of the plasma collection device, wherein the donor parameters are received electronically from a donor management system as claimed in the '873 Patent.

---

[147] NexLynk DMS Brochure, at 3.

[148] NexSys PCS User Manual, at 59-60.

774. Claim 12 of the '873 Patent also recites in part, "determining a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

775. The NexSys PCS PERSONA determines a target volume for plasma product and/or raw plasma based on donor height and weight used to calculate total donor blood volume and hematocrit used to calculate total donor plasma volume. For example, the NexSys PCS PERSONA Brochure describes plasma collection according to total blood volume based on BMI, which is a function of height and weight, and donor plasma volume based on hematocrit.[149]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS determines a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume as claimed in the '873 Patent. Haemonetics refers to the cited document that speaks for itself.

776. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "determining a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of determining a target volume for plasma product and/or raw plasma which is based at least in part on donor height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume as claimed in the '873 Patent.

[149] NexSys PCS PERSONA Brochure, at 2.

777. Claim 12 of the '873 Patent also recites in part, "controlling the plasma collection device to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to reinfuse the second blood component to the donor."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

778. As described above in relation to claim 1, The NexSys PCS User Manual describes the operation comprising two phases, Draw (*i.e.,* collection) and Return (*i.e.*, reinfusion).[150]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs a draw and return phase as claimed in the '873 Patent. Haemonetics refers to the cited document which speaks for itself.

779. The User Manual also describes how, "during the collection procedure," the device separates "plasma components" of whole blood which are directed into a "plasma collection container for storage" while the non-selected blood components "are returned to the donor during the Return cycle."[151]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs a draw and return phase as claimed in the '873 Patent. Haemonetics refers to the cited document that speaks for itself.

780. The User Manual also describes the parameters controlling the Draw and Return phases and provides instructions to modify those parameters.[152]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs a draw and return phase as claimed in the '873 Patent. Haemonetics refers to the cited document that speaks for itself.

781. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of

[150] NexSys PCS User Manual, at 33.

[151] *Id.* at 10.

[152] *Id.* at 79-80.

"controlling the plasma collection device to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to reinfuse the second blood component to the donor."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of controlling the plasma collection device to operate collection and reinfusion cycles to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to reinfuse the second blood component to the donor as claimed in the '873 Patent.

782. Claim 12 of the '873 Patent also recites in part, "wherein each collection and reinfusion cycle comprises: introducing the whole blood from the donor to a blood separator."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

783. As described above in relation to claim 1, the NexSys PCS User Manual describes disposable sets of tubing including one set connected to a donor via a venipuncture needle when drawing whole blood.[153] The NexSys PCS device introduces the whole blood to a blood separator where it is "separated by centrifugal force into its various components."[154]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of introducing the whole blood from the donor to a blood separator as claimed in the '873 Patent.

784. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "wherein each collection and reinfusion cycle comprises: introducing the whole blood from the donor to a blood separator."

[153] NexSys PCS User Manual, at 10, 42, 68.

[154] *Id.* at 10.

**ANSWER:** To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of wherein each collection and reinfusion cycle comprises introducing the whole blood from the donor to a blood separator as claimed in the ’873 Patent.

785. Claim 12 of the ‘873 Patent also recites in part, “combining anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR).”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

786. As described above in relation to claim 1, the NexSys PCS User Manual describes an anticoagulant pump which mixes anticoagulant solution with whole blood from the donor.[155] The device regulates mixing based on an “AC [anticoagulant] ratio.”[156]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step combining anticoagulant with the whole blood from the donor based on an anticoagulant ratio as claimed in the ’873 Patent.

787. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step “combining anticoagulant with the whole blood from the donor based on an anticoagulant ratio (ACR).”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step combining anticoagulant with the whole blood from the donor based on an anticoagulant ratio as claimed in the ’873 Patent.

788. Claim 12 of the ‘873 Patent also recites in part, “separating whole blood into the plasma product and the second blood component comprising red blood cells.”

---

155 NexSys PCS User Manual, at 23.

156 *Id.*

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

789. As described above in relation to claim 1, the NexSys PCS User Manual describes how the NexSys PCS device separates whole blood in a centrifuge separator into layers of blood components, of which one layer is plasma and a second layer comprises red cells.[157]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step separating whole blood into the plasma product and the second blood component comprising red blood cells as claimed in the '873 Patent.

790. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "separating whole blood into the plasma product and the second blood component comprising red blood cells."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step separating whole blood into the plasma product and the second blood component comprising red blood cells as claimed in the '873 Patent.

791. Claim 12 of the '873 Patent also recites in part, "sending the plasma product to a plasma product collection container."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

792. As described above in relation to claim 1, the NexSys PCS User Manual describes how, "during the collection procedure," the device separates "plasma components" of whole blood which are directed into a "plasma collection container for storage."[158]

[157] NexSys PCS User Manual, at 10, 40.

[158] NexSys PCS User Manual, at 10, 41, 68.

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step sending the plasma product to a plasma product collection container as claimed in the ’873 Patent.

793. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step “sending the plasma product to a plasma product collection container.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step sending the plasma product to a plasma product collection container as claimed in the ’873 Patent.

794. Claim 12 of the ‘873 Patent also recites in part, “wherein the controller controls the plasma collection device to operate the collection and reinfusion cycles on the donor at least three times, wherein a final collection and reinfusion cycle comprises drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

795. As described above in relation to claim 6, the controller of the NexSys PCS PERSONA can be programmed to collect at least three collection and reinfusion cycles and to draw a lower volume of whole blood in the final cycle.[159]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step wherein the controller controls the plasma collection device to operate the collection and reinfusion cycles on the donor at least three times, wherein a final collection and reinfusion cycle comprises drawing a volume of whole blood which

[159] *See* NexSys PCS User Manual, at 33-34.

is less than a volume of whole blood drawn in a prior collection and reinfusion cycle as claimed in the ’873 Patent.

796. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step “wherein the controller controls the plasma collection device to operate the collection and reinfusion cycles on the donor at least three times, wherein a final collection and reinfusion cycle comprises drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step wherein the controller controls the plasma collection device to operate the collection and reinfusion cycles on the donor at least three times, wherein a final collection and reinfusion cycle comprises drawing a volume of whole blood which is less than a volume of whole blood drawn in a prior collection and reinfusion cycle as claimed in the ’873 Patent.

797. Claim 14 of the ‘873 Patent recites: “The method of claim 13, further comprising performing qualification screening using the donor management system.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

798. The use of the Accused Haemonetics Products meets each element of claim 14 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

799. Claim 13 of the ’873 Patent recites: “The method of claim 12, wherein the controller uses the parameters received from the donor management system to determine the target volume for plasma product and/or raw plasma.” As explained above, the use of the Accused Haemonetics Products by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 12. The NexSys PCS System with NexLynk DMS is configured to connect a data storage device and the apheresis treatment device over a network (*e.g.*, wired or wireless internet). The remote data storage device communicates electronically with the controller and provides parameters to the NexSys PCS PERSONA which are used to determine the target volume for plasma product and/or raw plasma. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step:

wherein the controller uses the parameters received from the donor management system to determine the target volume for plasma product and/or raw plasma."

**ANSWER:** Haemonetics admits that claim 13 recites "The method of claim 12, wherein the controller uses the parameters received from the donor management system to determine the target volume for plasma product and/or raw plasma" based on the language in the '873 Patent. Haemonetics otherwise denies the allegations in this paragraph. Additionally, this paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step wherein the controller uses the parameters received from the donor management system to determine the target volume for plasma product and/or raw plasma as claimed in the '873 Patent.

800. The use of the NexSys PCS device with a donor management system (such as NexLynk DMS) in electronic communication with the controller, is designed to use parameters received from the donor management system to perform qualification screening. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "performing qualification screening using the donor management system."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step performing qualification screening using the donor management system as claimed in the '873 Patent.

801. Claim 15 of the '873 Patent recites: "The method of claim 12, wherein the donor management system calculates the target volume for plasma product and/or raw plasma and the controller determines the target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

802. The use of the Accused Haemonetics Products meets each element of claim 15 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

803. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 12.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

804. The NexSys PCS System, including NexSys PCS PERSONA configurations with YES, is designed to interface with donor management systems (DMS) or BECS. The DMS can calculate the target volume for plasma product (and/or raw plasma) and the controller of the NexSys PCS PERSONA can determine the target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system. For example, the DMS will calculate the target volume for raw plasma and transmit it to the NexSys PCS PERSONA. The NexSys PCS PERSONA will then determine the target volume for plasma product. The Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "wherein the donor management system calculates the target volume for plasma product and/or raw plasma and the controller determines the target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step wherein the donor management system calculates the target volume for plasma product and/or raw plasma and the controller determines the target volume for plasma product and/or raw plasma by receiving the target volume for plasma product and/or raw plasma from the donor management system as claimed in the ’873 Patent.

805. Claim 16 of the ‘873 Patent recites: "The method of claim 12, further comprising determining the total donor blood volume before whole blood is withdrawn from the donor during a donation."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

806. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 16 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

807. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 12.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

808. The NexSys PCS system determines the total donor blood volume before whole blood is withdrawn from the donor during a donation. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "determining the total donor blood volume before whole blood is withdrawn from the donor during a donation."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step determining the total donor blood volume before whole blood is withdrawn from the donor during a donation as claimed in the '873 Patent.

809. Claim 17 of the '873 Patent covers a novel method of collecting plasma and recites:

> 17. A method of collecting plasma, comprising:
>
> receiving input from an operator via a touchscreen of a plasma collection device;
>
> receive donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system;
>
> setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor;
>
> controlling the plasma collection device to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component and to return the second blood component to the donor, controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor,
>
> wherein each draw and return phase comprises:

> pumping whole blood from a donor to a separator of the plasma collection device;
>
> combining anticoagulant from an anticoagulant source with the whole blood from the donor based on an anticoagulant ratio (ACR); separating the whole blood into a plasma product and a second blood component comprising red blood cells; and sending the plasma product to a plasma product collection container, wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).

**ANSWER:** Haemonetics admits that Claim 17 of the '873 Patent recites the stated claim language based on the language in the '873 Patent. Haemonetics otherwise denies the remaining allegations in this paragraph.

810. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 17 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

811. Claim 17 of the '873 Patent recites in part, "[a] method of collecting plasma."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

812. As shown by at least the NexSys PCS User Manual, the Accused Haemonetics Products practice a method of collecting plasma. The NexSys PCS User Manual discloses instructions for the "plasmapheresis system designed for the highly efficient collection of plasma from donors."[160]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs a method of collecting plasma as claimed in the '873 Patent.

[160] NexSys PCS User Manual, at 10.

813. End users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform a method of collecting plasma.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs a method of collecting plasma as claimed in the ’873 Patent.

814. Claim 17 of the ‘873 Patent also recites in part, “receiving input from an operator via a touchscreen of a plasma collection device.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

815. As described in relation to claim 1, the NexSys PCS device includes a “touchscreen graphical user interface.” NexSys PCS User Manual, at 11. The manual describes how the device receives inputs from a touchscreen periodically as part of its intended operation.[161]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of receiving input from an operator via a touchscreen of a plasma collection device as claimed in the ’873 Patent.

816. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “receiving input from an operator via a touchscreen of a plasma collection device.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of receiving input from an operator via a touchscreen of a plasma collection device as claimed in the ’873 Patent.

817. Claim 17 of the ‘873 Patent also recites in part, “receive [sic] donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system.”

---

[161] *See, e.g.*, NexSys PCS User Manual, at 60, 71, 74.

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

818. As described in relation to claim 1, the NexSys PCS User Manual describes a BECS which is a “central monitoring software system that exchanges information with the device via an approved server application.”[162] It further describes how the NexSys PCS device “receives [donor] information from the BECS.”[163]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of receiving donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system as claimed in the ’873 Patent.

819. The donor management system may be the Haemonetics NexLynk DMS system or a third-party donor management system. The NexLynk DMS Brochure describes the software as helping users “manage information about your donors” and providing “donor management” functionality.[164]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of receiving donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system as claimed in the ’873 Patent.

820. The NexSys PCS User Manual describes how the NexSys PCS device receives donor parameters and displays them at a controller of the plasma collection device, namely the touchscreen user interface.[165]

---

[162] NexSys PCS User Manual, at 120.

[163] *Id.* at 59.

[164] NexLynk DMS Brochure, at 3.

[165] NexSys PCS User Manual, at 59-60.

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of receiving donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system as claimed in the ’873 Patent.

821. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “receive [sic] donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of receiving donor parameters at a controller local to the plasma collection device, wherein the donor parameters are received electronically from a donor management system as claimed in the ’873 Patent.

822. Claim 17 of the ‘873 Patent also recites in part, “setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

823. The NexSys PCS System sets a target volume for raw plasma based on donor parameters comprising donor weight and height used to calculate total donor blood volume and hematocrit to calculate total donor plasma volume. For example, the NexSys PCS PERSONA Brochure describes plasma collection according to total blood volume based on BMI, which is a function of height and weight, and donor plasma volume based on hematocrit.[166]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required,

[166] NexSys PCS PERSONA Brochure, at 2.

Haemonetics denies the NexSys PCS performs the step of setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor as claimed in the ’873 Patent.

824. The NexSys PCS User Manual shows the target volume for raw plasma on the user interface, which is displayed with other donor information prior to blood collection from the donor.[167]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor as claimed in the ’873 Patent.

825. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of “setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of setting a target volume for raw plasma which is based at least in part on donor parameters comprising height and weight used to calculate total donor blood volume and hematocrit (Hct) used to calculate total

[167] NexSys PCS User Manual, at 59.

donor plasma volume, wherein the target volume for raw plasma is set prior to blood collection from the donor as claimed in the ’873 Patent.

826. Claim 17 of the ‘873 Patent also recites in part, “controlling the plasma collection device to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component and to return the second blood component to the donor, controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

827. As described above in relation to claim 12, the NexSys PCS User Manual describes the operation comprising two phases, Draw and Return.[168]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs draw and return cycles as claimed in the ’873 Patent.

828. The User Manual also describes how, “during the collection procedure,” the device separates “plasma components” of whole blood which are directed into a “plasma collection container for storage” while the non-selected blood components “are returned to the donor during the Return cycle.”[169]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of controlling the plasma collection device to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component and to return the second blood

[168] NexSys PCS User Manual, at 33.

[169] *Id.* at 10.

component to the donor, controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor as claimed in the ’873 Patent.

829. The User Manual also describes the parameters controlling the Draw and Return phases and provides instructions to modify those parameters.[170]

**ANSWER:** Haemonetics refers to the cited document that speaks for itself. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs draw and return cycles and modifies parameters as claimed in the ’873 Patent.

830. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step of "controlling the plasma collection device to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component and to return the second blood component to the donor, controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of controlling the plasma collection device to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into a plasma product and a second blood component and to return the second blood component to the donor, controlling the plasma collection device to operate draw and return phases to withdraw whole blood from the donor and separate the whole blood into a plasma product and a second blood component comprising red blood cells and to return the second blood component to the donor as claimed in the ’873 Patent.

[170] *Id.* at 79-80.

831. Claim 17 of the '873 Patent also recites in part, "wherein each draw and return phase comprises: pumping whole blood from a donor to a separator of the plasma collection device."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

832. As described above in relations to claims 1 and 12, the NexSys PCS User Manual describes disposable sets of tubing including one set connected to a donor via a venipuncture needle when drawing whole blood.[171] The NexSys PCS device comprises a blood pump for pumping whole blood to the separator centrifuge.[172]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of wherein each draw and return phase comprises: pumping whole blood from a donor to a separator of the plasma collection device as claimed in the '873 Patent. Haemonetics refers to the cited document that speaks for itself.

833. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "wherein each draw and return phase comprises: pumping whole blood from a donor to a separator of the plasma collection device."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of wherein each draw and return phase comprises: pumping whole blood from a donor to a separator of the plasma collection device as claimed in the '873 Patent.

834. Claim 17 of the '873 Patent also recites in part, "combining anticoagulant from an anticoagulant source with the whole blood from the donor based on an anticoagulant ratio (ACR)."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

---

[171] NexSys PCS User Manual, at 10, 42, 68.

[172] *Id.* at 23, 68.

835. As described above in relation to claims 1 and 12, the NexSys PCS User Manual describes an anticoagulant pump which mixes anticoagulant solution with whole blood from the donor.[173] The device regulates mixing based on an "AC [anticoagulant] ratio." *Id.*

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of combining anticoagulant from an anticoagulant source with the whole blood from the donor based on an anticoagulant ratio as claimed in the '873 Patent. Haemonetics refers to the cited document that speaks for itself.

836. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step "combining anticoagulant from an anticoagulant source with the whole blood from the donor based on an anticoagulant ratio (ACR)."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of combining anticoagulant from an anticoagulant source with the whole blood from the donor based on an anticoagulant ratio as claimed in the '873 Patent.

837. Claim 17 of the '873 Patent also recites in part, "separating the whole blood into a plasma product and a second blood component comprising red blood cells."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

838. As described above in relation to claims 1 and 12, the NexSys PCS User Manual describes how the NexSys PCS device separates whole blood in a centrifuge separator into layers of blood components, of which one layer is plasma and a second layer comprises red cells.[174]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of separating

---

[173] NexSys PCS User Manual, at 23.

[174] NexSys PCS User Manual, at 10, 40.

the whole blood into a plasma product and a second blood component comprising red blood cells as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

839. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step “separating the whole blood into a plasma product and a second blood component comprising red blood cells.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of separating the whole blood into a plasma product and a second blood component comprising red blood cells as claimed in the ’873 Patent.

840. Claim 17 of the ‘873 Patent also recites in part, “sending the plasma product to a plasma product collection container.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

841. As described above in relation to claims 1 and 12, the NexSys PCS User Manual describes how, “during the collection procedure,” the device separates “plasma components” of whole blood which are directed into a “plasma collection container for storage.”[175]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of sending the plasma product to a plasma product collection container as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

842. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step “sending the plasma product to a plasma product collection container.”

---

[175] NexSys PCS User Manual, at 10, 41, 68.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of sending the plasma product to a plasma product collection container as claimed in the ’873 Patent.

843. Claim 17 of the ‘873 Patent also recites in part, “wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

844. As described above in relation to claim 1, on information and belief, the controller of the NexSys PCS device is configured to operate the draw and return phases until a volume of raw plasma collected equals the target volume of raw plasma. For example, the NexSys PCS User Manual describes how the device measures the collection volume of plasma and ends the collection cycle “when the plasma target collection has been achieved.”[176]

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP) as claimed in the ’873 Patent. Haemonetics refers to the cited document that speaks for itself.

845. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step “wherein the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP).”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step of wherein

[176] NexSys PCS User Manual, at 25.

the controller is further configured to operate the draw and return phases until a volume of raw plasma (VRP) in the plasma product collection container equals the target volume of raw plasma, the volume of raw plasma (VRP) based on a measured volume of plasma product (VPP) as claimed in the ’873 Patent.

846. Claim 18 of the ‘873 Patent recites: “The method of claim 17, wherein ACR = Volume of Whole Blood/Volume of Anticoagulant.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

847. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 18 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

848. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

849. The ACR used in the NexSys PCS PERSONA is equal to the volume of whole blood divided by the volume of anticoagulant. For example, where the system combines 16 units of whole blood with 1 unit of anticoagulant, the ACR is 16/1 or 16. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “wherein ACR = Volume of Whole Blood/Volume of Anticoagulant.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step wherein ACR = Volume of Whole Blood/Volume of Anticoagulant as claimed in the ’873 Patent.

850. Claim 19 of the ‘873 Patent recites: “The method of claim 17, further comprising performing donor qualification screening using the donor management system, wherein the donor parameters received from the donor management system comprise the donor weight and height and hematocrit (Hct).”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

851. The use of the Accused Haemonetics Products meets each element of claim 19 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

852. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

853. The use of the NexSys PCS PERSONA with a donor management system (such as NexLynk DMS) in electronic communication with the controller, is designed to use donor parameters (*e.g.*, weight, height hematocrit) received from the donor management system to perform qualification screening (*e.g.*, verify the identity of the donor). Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “performing donor qualification screening using the donor management system, wherein the donor parameters received from the donor management system comprise the donor weight and height and hematocrit (Hct).”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step performing donor qualification screening using the donor management system, wherein the donor parameters received from the donor management system comprise the donor weight and height and hematocrit (Hct) as claimed in the ’873 Patent.

854. Claim 20 of the ‘873 Patent recites: “The method of claim 17, wherein the controller is programmed to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total donor blood volume or the total donor plasma volume.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

855. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 20 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

856. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

857. The controller of the NexSys PCS PERSONA using the PERSONA nomogram is programmed to calculate a target volume of raw plasma by calculating a fraction of the total donor plasma volume. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "The method of claim 17, wherein the controller is programmed to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total donor blood volume or the total donor plasma volume."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step wherein the controller is programmed to calculate the target volume of raw plasma (VRP) by calculating a fraction of the total donor blood volume or the total donor plasma volume as claimed in the '873 Patent.

858. Claim 21 of the '873 Patent recites: "The method of claim 17, further comprising operating the draw and return phases at least three times and further comprising determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

859. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 21 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

860. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

861. The controller of the NexSys PCS PERSONA can be programmed to collect at least three draw and return phases and to determine a volume of whole blood to be drawn in a final draw

phase which is different than a volume drawn in a prior draw phase. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "operating the draw and return phases at least three times and further comprising determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step operating the draw and return phases at least three times and further comprising determining a volume of whole blood to be drawn in a final draw phase which is different than a volume drawn in a prior draw phase as claimed in the '873 Patent.

862. Claim 22 of the '873 Patent recites: "The method of claim 17, further comprising combining the anticoagulant with the whole blood at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant."

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the '873 Patent.

863. The use of the NexSys PCS PERSONA with a Disposable Kit meets each element of claim 22 of the '873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

864. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

865. The NexSys PCS PERSONA mixes anticoagulant with the donor's whole blood as whole blood is drawn from the donor to prevent blood from clotting. NexSys PCS PERSONA combines anticoagulant with the whole blood from the donor at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: "combining the anticoagulant with the whole blood at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant."

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step combining

the anticoagulant with the whole blood at an anticoagulant ratio (ACR) of about 16 parts of whole blood to 1 part of anticoagulant as claimed in the ’873 Patent.

866. Claim 23 of the ‘873 Patent recites: “The method of claim 17, further comprising: calculating the target volume for raw plasma at the donor management system based at least in part on the donor height and weight used to calculate the total donor blood volume and the hematocrit used to calculate the total donor plasma volume; and transmitting the target volume for raw plasma from the donor management system to the controller.”

**ANSWER:** Haemonetics admits the allegations in this paragraph based on the language in the ’873 Patent.

867. The use of the Accused Haemonetics Products meets each element of claim 23 of the ‘873 Patent, literally and/or under the doctrine of equivalents, as explained in Exhibit 26.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

868. As explained above, the use of the NexSys PCS PERSONA with a Disposable Kit by end users such as customers and phlebotomists following the instructions provided by Haemonetics in at least the NexSys PCS User Manual will perform the method of claim 17.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

869. The target volume for raw plasma collection with the NexSys PCS PERSONA using the PERSONA nomogram is based on a calculated percentage of the donor’s total plasma volume, and the hematocrit, weight and height of the donor. This calculation can be done at the donor management system. The user manual for the NexSys PCS device states that when the device is connected to a BECS or compatible central monitoring software system, the target volume for raw plasma is transmitted from the donor management system to the controller. Accordingly, end users such as customers and phlebotomists following the instructions provided by Haemonetics in the NexSys PCS User Manual will perform the step: “calculating the target volume for raw plasma at the donor management system based at least in part on the donor height and weight used to calculate the total donor blood volume and the hematocrit used to calculate the total donor plasma volume; and transmitting the target volume for raw plasma from the donor management system to the controller.”

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the NexSys PCS performs the step calculating the target volume for raw plasma at the donor management system based at least in part on the donor height and weight used to calculate the total donor blood volume and the hematocrit used to

calculate the total donor plasma volume; and transmitting the target volume for raw plasma from the donor management system to the controller as claimed in the ’873 Patent.

870. In addition to end users of the Accused Haemonetics Products, on information and belief, Haemonetics and its agents directly infringe at least claims 1, 2, 4-8, 12, and 14-23 of the ‘873 Patent by using the Accused Haemonetics Products in the United States (for example in tests and commercial demonstrations) according to the instructions and guidance that Haemonetics provides to its end customers in the NexSys PCS User Manual and the NexSys PCS Service Manual.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

871. Additionally, on information and belief, the infringing acts of third parties (such as Haemonetics’ customers, clients, partners, and end users such as clinicians and phlebotomists) are attributable to Haemonetics. Haemonetics’ partners, clients, customers, and/or end users in the United States lease and/or buy the Accused Haemonetics Products across this country, including in this District. On information and belief, Haemonetics directs and controls the activities or actions of its third-party customers with respect to the Accused Haemonetics Products through contractual agreement, or otherwise providing, or requiring customers to provide, information and instructions to end users of the Accused Haemonetics Products which, when followed and used, result in infringement of the ‘873 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

872. In addition to directly infringing the ‘873 Patent, Haemonetics has indirectly infringed the ‘873 Patent as provided by 35 U.S.C. § 271(b), and continues to do so, by actively inducing others, including at least its customers and end users, to infringe one or more claims of the ‘873 Patent (including claims 1, 2, 4-8, 12, and 14-23) at least by using the Accused Haemonetics Products in plasma donation centers. On information and belief, Haemonetics markets, offers to sell/lease, and/or sells/leases the Accused Haemonetics Products to customers and/or end users. On additional information and belief, Haemonetics provides, *inter alia*, training, written guidance (*e.g.*, User Manuals and Service Manuals), technical assistance, promotional materials, sales and marketing materials, and/or demonstrations to customers and end users.[177] On information and belief, these acts induce said third parties to perform acts intended by Haemonetics to cause direct infringement of the ‘873 Patent. On information and belief, Haemonetics performed, and continues to perform, the acts that constitute inducement with knowledge or at least willful blindness that the induced acts would constitute infringement of the ‘873 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph and refers to the cited document that speaks for itself.

---

[177] *See, e.g.*, NexSys PCS Service Manual; NexSys PCS User Manual; NexSys PCS PERSONA Brochure; NexSys PCS Brochure.

873. Haemonetics has had knowledge of the ‘873 Patent since at least the filing of Fenwal’s Counterclaims. Haemonetics has had knowledge that the induced acts of its customers and end users constitute infringement of the ‘873 Patent since at least the filing of Fenwal’s Counterclaims.

**ANSWER:** Haemonetics admits it has had knowledge of the ’873 Patent since at least the filing of Fenwal’s Counterclaims. Haemonetics otherwise denies the remaining allegations in this paragraph.

874. Haemonetics has also indirectly infringed the ‘873 Patent (including claims 1, 2, 4-8, 12, and 14-23) as provided by 35 U.S.C. § 271(c) and continues to do so by contributing to the infringement of the ‘873 Patent by third parties, such as its customers and end users. Such third parties infringe the ‘873 Patent (including claims 1, 2, 4-8, 12, and 14-23) at least by using the Accused Haemonetics Products in plasma donation centers. Haemonetics’ affirmative acts of making, importing, leasing, and/or selling the Accused Haemonetics Products contributes to the infringement of the ‘873 Patent because those components constitute a material part of the invention of the ‘873 Patent (as their use practices all limitations of the claims), are specially made or adapted for use in infringing the ‘873 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

875. As a consequence of Haemonetics’ direct and indirect infringement of the ‘873 Patent, both literally and under the doctrine of equivalents, Fenwal has been and continues to be irreparably harmed.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

876. Due to Haemonetics’ infringing acts, Fenwal has been and will be damaged in an amount to be determined at trial.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

877. On information and belief, unless enjoined, Haemonetics will continue to infringe the ‘873 Patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

## COUNT 10: NON-INFRINGEMENT OF U.S. PATENT NO. 10,758,652[178]

878. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

879. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fenwal (ECF No. 32), an actual and justiciable controversy exists between Fenwal and Haemonetics concerning alleged infringement of the U.S. Patent No. 10,758,652 ("the '652 patent").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement claims against Fenwal regarding the '652 patent.

880. Fenwal has not made, used, offered to sell, or sold any alleged invention claimed in the '652 patent within the United States, or imported any alleged invention claimed in the '652 patent into the United States. Fenwal therefore has not infringed and does not currently infringe any asserted claim of the '652 patent, literally or under the doctrine of equivalents, directly or indirectly. For example, with respect to asserted claim 11, Fenwal has not made, used, offered to sell, sold, or imported within or into the United States any system that includes the following (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): "the controller configured to calculate (1) a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container, and (2) a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component, the controller configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container."

**ANSWER:** Haemonetics denies the allegations in this paragraph.

881. Fenwal has not actively induced any infringement of the '652 patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

882. Fenwal has not contributed to any infringement of the '652 patent.

[178] Fenwal withdrew the '624 Patent in its March 31, 2026 Initial Infringement Contentions as part of the agreed claim narrowing process under the Parties' Scheduling Order. *See* Dkt. 60 ¶ 5(a). Accordingly, Fenwal withdraws Count 9 of its original Counterclaims, Dkt. 51, but has maintained the original Count numbering herein.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

883. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the '652 patent, that it has not actively induced the infringement of the '652 patent, and that it has not contributed to the infringement of the '652 patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 11: INVALIDITY OF U.S. PATENT NO. 10,758,652**

884. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

885. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fenwal and Haemonetics concerning the validity of the '652 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

886. The claims of the '652 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* IPR2025-01391 (petition for *inter partes* review of U.S. Patent No. 10,758,652). The Court may take judicial notice of IPR2025-01391, which is a matter of public record before the USPTO, and which Fenwal incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

**ANSWER:** Haemonetics denies the allegations in this paragraph.

887. For example, the claims of the '652 patent are anticipated by the prior art, under 35 U.S.C. §102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. U.S. Patent No. 8,075,468 to Min et al. ("Min")

b. U.S. Patent No. 9,370,324 to Barret et al. ("Barrett")

c. U.S. Patent No. 6,296,602 to Headley ("Headley")

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. U.S. Patent Publication No. 2017/0029762 ("Turgut")

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S-0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. U.S. Patent Publication No. 2012/0175313 to Barry et al. ("Barry")

i. U.S. Publication No. 2002/0033370 to Bainbridge et al. ("Bainbridge")

j. U.S. Patent No. 10,195,319 to Kimura ("Kimura")

k. U.S. Patent No. 6,743,192 to Sakota et al. ("Sakota")

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

**ANSWER:** Haemonetics denies the allegations in this paragraph.

888. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '652 patent, is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 12: NON-INFRINGEMENT OF U.S. PATENT NO. 12,171,916**

889. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

890. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fenwal (ECF No. 32), an actual and justiciable controversy exists between Fenwal and Haemonetics concerning alleged infringement of the U.S. Patent No. 12,171,916 ("the '916 patent").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits that it has asserted patent infringement claims concerning the '916 patent against Fenwal.

891. Fenwal has not made, used, offered to sell, or sold any alleged invention claimed in the '916 patent within the United States, or imported any alleged invention claimed in the '916 patent into the United States. Fenwal therefore has not infringed and does not currently infringe any asserted claim of the '916 patent, literally or under the doctrine of equivalents, directly or indirectly. For example, with respect to asserted claim 14, the accused Fenwal products do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): "a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor."

**ANSWER:** Haemonetics denies the allegations in this paragraph.

892. Fenwal has not actively induced any infringement of the '916 patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

893. Fenwal has not contributed to any infringement of the '916 patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

894. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the '916 patent, that it has not actively induced the infringement of the '916 patent, and that it has not contributed to the infringement of the '916 patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 13: INVALIDITY OF U.S. PATENT NO. 12,171,916**

895. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

896. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fenwal and Haemonetics concerning the validity of the '916 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

897. The claims of the '916 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* PGR2025-00078 (petition for post-grant review of U.S. Patent No. 12,171,916). The Court may take judicial notice of PGR2025-00078, which is a matter of public record before the USPTO, and which Fenwal incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

**ANSWER:** Haemonetics denies the allegations in this paragraph.

898. For example, the claims of the '916 patent are anticipated by the prior art, under 35 U.S.C. § 102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. Min

b. Barrett

c. Headley

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. Turgut

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. Barry

i. Bainbridge

j. Kimura

k. Sakota

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

**ANSWER:** Haemonetics denies the allegations in this paragraph.

899. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '916 patent, is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 14: NON-INFRINGEMENT OF U.S. PATENT NO. 12,186,474**

900. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required.

To the extent a response is required, Haemonetics denies the allegations in this paragraph.

901. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fenwal (ECF No. 32), an actual and justiciable controversy exists between Fenwal and Haemonetics concerning alleged infringement of the U.S. Patent No. 12,186,474 ("the '474 patent").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement allegations against Fenwal concerning the '474 Patent.

902. Fenwal has not made, used, offered to sell, or sold any alleged invention claimed in the '474 patent within the United States, or imported any alleged invention claimed in the '474 patent into the United States. Fenwal therefore has not infringed and does not currently infringe any asserted claim of the '474 patent, literally or under the doctrine of equivalents, directly or indirectly. For example, with respect to asserted claim 9, the accused Fenwal products do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): "a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma

volume, the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor."

**ANSWER:** Haemonetics denies the allegations in this paragraph.

903. Fenwal has not actively induced any infringement of the '474 patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

904. Fenwal has not contributed to any infringement of the '474 patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

905. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the '474 patent, that it has not actively induced the infringement of the '474 patent, and that it has not contributed to the infringement of the '474 patent.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 15: INVALIDITY OF U.S. PATENT NO. 12,186,474**

906. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

907. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fenwal and Haemonetics concerning the validity of the '474 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

908. The claims of the '474 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* PGR2025-00077 (petition for post-grant review of U.S. Patent No. 12,186,474). The Court may take judicial notice of PGR2025-00077, which is a matter of public record before the USPTO, and which Fenwal incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

**ANSWER:** Haemonetics denies the allegations in this paragraph.

909. For example, the claims of the '474 patent are anticipated by the prior art, under 35 U.S.C. § 102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. Min

b. Barrett

c. Headley

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. Turgut

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. Barry

i. Bainbridge

j. Kimura

k. Sakota

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

**ANSWER:** Haemonetics denies the allegations in this paragraph.

910. Fenwal is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '474 patent, is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

## COUNT 16: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE ’652, ’916, AND ’474 PATENTS DUE TO INEQUITABLE CONDUCT (FENWAL PRIOR ART)

911. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

912. Haemonetics’ Asserted Patents (the ’652, ’916, and ’474 patents) are unenforceable on account of inequitable conduct before the United States Patent and Trademark Office (“USPTO”).

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics’ Asserted Patents are valid and enforceable. Haemonetics denies that any inequitable conduct occurred before the USPTO during prosecution of the Asserted Patents.

913. Haemonetics obtained the Asserted Patents through fraud. Unable to compete with Fenwal’s innovative Aurora Xi Plasmapheresis system on the merits, Haemonetics chose a different path: copy Fenwal’s published patent claims nearly verbatim, conceal the copied source from the Patent Office, and suppress disclosure of Fenwal’s prior art device that would have rendered Haemonetics’ patents unpatentable.

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics has not obtained any patent through fraud. Haemonetics has not suppressed or concealed any information from the USPTO, with intent to deceive or otherwise. Far from being “unable to compete” with Fenwal’s Aurora Xi system, Haemonetics has succeeded in the plasmapheresis market through continuous innovation, a market position earned through superior patented technology and customer service, not litigation strategy. The Aurora Xi device, standing alone, does not render any claim of the Asserted Patents unpatentable. Fenwal’s bare assertion to the contrary conflates the existence of a competitor’s product with anticipation or obviousness, ignoring the specific novel features claimed in Haemonetics’ patents. To the extent Paragraph 913 alleges that Haemonetics “cop[ied] Fenwal's published patent claims nearly verbatim,” Haemonetics admits that it used language from Fenwal’s

’989 Publication in drafting the continuation claims for the ’916 and ’474 patents. Haemonetics denies that this constitutes fraud or inequitable conduct. The inventive concepts underlying the Asserted Patents were conceived by Michael Ragusa and disclosed in the ’652 patent application filed on May 30, 2017, nearly four years before the Fenwal ’989 Publication existed and before its earliest provisional was even filed. Haemonetics’ use of Fenwal’s published claim language was a deliberate prosecution strategy to ensure that Fenwal’s device, which practices the invention Haemonetics disclosed in 2017, would be captured by Haemonetics’ claims. On information and belief, it is Fenwal that misappropriated Haemonetics’ inventive work, having improperly obtained knowledge of the invention. The ’652 patent itself, filed years before Fenwal’s publication, contains no language copied from any Fenwal source.

914. Over 98% of the claim language in Haemonetics’ applications was lifted directly from Fenwal’s prior-published patent application, including technical terminology that does not even appear in Haemonetics’ own patent specification.

**ANSWER:** Haemonetics admits that it used language from Fenwal’s ’989 Publication in drafting the continuation claims for the ’916 and ’474 patents. To the extent that Fenwal contends certain claim terminology does not appear in Haemonetics’ specification, Haemonetics states that the Haemonetics Asserted Patents contain adequate written description support for the asserted claims despite the exact words in the claims not being present in the specification. Haemonetics reserves its right to supplement this response as appropriate following further investigation. Haemonetics denies the remainder of the allegations in this paragraph.

915. The named inventor of the Asserted Patents, Michael Ragusa, and prosecuting attorney, John Lovely, knew of Fenwal’s Aurora Xi device and Fenwal’s related publications and patents, yet deliberately withheld this material information from the USPTO with the specific intent to deceive the Patent Office Examiner and secure patents Haemonetics could weaponize against its only competitors.

**ANSWER:** Haemonetics denies the allegations in this paragraph. There was no intent to deceive the USPTO. Michael Ragusa, the named inventor of the Haemonetics Asserted Patents,

independently conceived the claimed inventions based on more than 30 years of experience in apheresis device research and development. Any omission of references during prosecution was not the product of deceptive intent. The duty of candor under 37 C.F.R. § 1.56 does not impose a requirement of omniscience, and the failure to cite a particular reference does not, without more, give rise to an inference of intentional deception. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc) (holding that the accused infringer must prove by clear and convincing evidence that the applicant "made a deliberate decision to withhold a known material reference" and that "the single most reasonable inference" is deceptive intent).

916. The Asserted Patents are the fruit of this fraud and should be declared unenforceable in their entirety. *See Guardant Health, Inc. v. Found. Med. Inc.*, No. CV 17-1616-LPS-CJB, 2020 WL 2477522, at *4 (D. Del. Jan. 7, 2020) ("Inequitable conduct regarding any single claim in the prosecution of a patent renders the entire patent unenforceable, not just that claim. Moreover, the taint of a finding of inequitable conduct can affect not just the improperly-prosecuted patent, but can also 'render unenforceable other related patents and applications to the same technology. This concept is what courts have referred to as the doctrine of 'infectious unenforceability.'") (citing *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1288-89 (Fed. Cir. 2011) (en banc)).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies that the Asserted Patents are "the fruit of ... fraud" or that they should be declared unenforceable. Haemonetics further denies that the doctrine of "infectious unenforceability" has any application here. To the extent Fenwal relies on alleged misconduct during prosecution of the continuation patents (the '916 and '474 patents) to render the parent '652 patent unenforceable, this theory is doctrinally unsound. The infectious unenforceability doctrine, as recognized by the Federal Circuit, flows from parent to child. In other words, tainted prosecution of a parent application may infect continuations that derive from it. It does not operate in reverse. The '652 patent was filed in May 2017, prosecuted independently, and issued September 1, 2020. Nothing that occurred during the later prosecution of the '916 and '474 continuation applications, both of

which were filed on March 18, 2021, can retroactively contaminate the ’652 patent’s prosecution. *See Therasense*, 649 F.3d at 1288–89. The ’652 patent’s prosecution was complete on its own terms, and the duty of candor owed during its pendency was satisfied by the disclosures made at that time.

917. Upon information and belief, at least one individual associated with the filing and prosecution of the applications that issued as the Asserted Patents, which include Jonathan Perullo, Michael Ragusa, and/or Johnathan Lovely and/or their agent(s), engaged in inequitable conduct before the USPTO.

**ANSWER:** Haemonetics denies that any individual associated with the filing and prosecution of the Haemonetics Asserted Patents engaged in inequitable conduct before the USPTO.

918. The inequitable conduct comprised intentional misrepresentations and/or omissions including, without limitation, the material omission of copying from Fenwal’s published applications and the failure to disclose one or more pieces of prior art, during prosecution of the Asserted Patents in breach of the duty of candor and good faith required by 37 CFR § 1.56 with the intent to deceive the Patent Office.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

919. Despite clear knowledge of its main competitor in the field, Fenwal, and Fenwal’s patents and competing products, the above-mentioned individuals failed to disclose critical information about the source of their copied claims, Fenwal’s prior art devices, patents and publications that would have been material to the patentability of the Asserted Patents, with the goal of obtaining patents for Haemonetics to assert against the competition in hopes of gaining a competitive edge, and greater market share, as opposed to fairly competing within the market.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***Haemonetics’ Prosecution of the Asserted Patents***

920. The ’652 patent issued from United States Patent Application Serial No. 15/608,183 (“the ’183 application”), titled “System and Method for Collecting Plasma,” which was filed on May 30, 2017. On the same date, John Perullo, the Vice President, Legal Affairs of Haemonetics, executed a Power of Attorney appointing the law firm of Sunstein Kann Murphy & Timbers to represent Haemonetics Corporation in connection with any and all patent applications where Haemonetics Corporation is named. The ’916 patent is a continuation of the ’652 patent and the ’474 patent is a continuation in part of the ’652 patent.

**ANSWER:** Haemonetics admits that the ’652 patent issued from U.S. Patent Application Serial No. 15/608,183, titled “System and Method for Collecting Plasma,” filed on May 30, 2017.

Haemonetics admits that the ’916 patent is a continuation of the ’652 patent and the ’474 patent is a continuation-in-part of the ’652 patent. Haemonetics admits that John Perullo executed a Power of Attorney appointing the law firm of Sunstein Kann Murphy & Timbers. Haemonetics denies the remaining characterizations and allegations in this paragraph.

921. Shortly after the ’183 application was filed, Johnathan C. Lovely, an attorney then with the law firm of Sunstein Kann Murphy & Timbers, filed a Response to Informational Notice to Applicant and submitted an inventor’s executed declaration to the USPTO. Michael Ragusa (the sole inventor of the Asserted Patents) signed a Declaration that was submitted to the USPTO. The Declaration stated that Ragusa believed himself “to be the original inventor … of a claimed invention in the application.” HAEM-FRE_0003516 at -4668. In addition, he “acknowledge[d] the duty to disclose to the US Patent and Trademark Office all information known to me to be material to patentability.” *Id.* The Declaration acknowledged and cited 18 U.S.C. § 1001, which proscribes the making of a false statement to the federal government.

**ANSWER**: Haemonetics admits that Jonathan C. Lovely filed a Response to Informational Notice to Applicant and submitted an inventor’s executed declaration to the USPTO. Haemonetics admits that Michael Ragusa signed a Declaration that was submitted to the USPTO. Haemonetics denies any inference of impropriety from these routine patent prosecution filings.

922. Thus, during prosecution of the Asserted Patents, at the very least, the following persons were subject to the duty of disclosure under 37 CFR § 1.56 and had a duty of candor and good faith in dealing with the USPTO: Perullo, Ragusa, and/or Lovely, and/or their agent(s).

**ANSWER:** Haemonetics admits that Perullo, Ragusa, and Lovely owed duties of disclosure under 37 C.F.R. § 1.56 during prosecution of the Asserted Patents.

***Fenwal Prior Art***

923. Fenwal has been an innovator in the field of apheresis dating back more than 75 years. During this time, Fenwal has brought to market several successful apheresis products. Each time, Haemonetics subsequently released copycat versions.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations regarding Fenwal’s history as an “innovator in the field of apheresis dating back more than 75 years” and on that basis denies them. Haemonetics denies

that it has "subsequently released copycat versions" of Fenwal products. Haemonetics has independently developed its own products based on its own patented innovations.

924. For example, in 2012, Fenwal debuted its Aurora plasmapheresis device. FENWAL 00004760. The Aurora system built on the proprietary separation technology that powered Fenwal's prior Autopheresis-C® system and improved operator and donor experience.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations regarding the debut of the Aurora plasmapheresis device in 2012 or the technical details of the Autopheresis-C system, and on that basis, denies them.

925. Fenwal continued to innovate, later launching its Aurora Xi products in 2016. FENWAL 00013973. Haemonetics followed in 2017 and 2018 with its NexSys PCS device. FENWAL 00004724; FENWAL 00004770.

**ANSWER:** Haemonetics admits that Fenwal launched Aurora Xi products in 2016 and that Haemonetics launched its NexSys PCS device. Haemonetics launched its PCS plasmapheresis device and PCS®2 device prior to Fenwal's launch of the Aurora Xi. Haemonetics denies the remaining allegations in this paragraph.

926. Most recently, Fenwal received FDA approval for its Adaptive Nomogram in January 2025, FENWAL 00004767; with Haemonetics following a year later with its NexSys PCS Persona Plus device in February 2026, HAEM-FRE_0091553, available at: https://www.fda.gov/media/191271/download?attachment (510K Summary Letter).

**ANSWER:** Haemonetics admits that Fresenius received FDA approval for its Adaptive Nomogram in January 2025. Haemonetics admits that it received FDA approval for its NexSys PCS Persona Plus device in February 2026. Haemonetics received FDA approval for its NexSys YES device in March 2018 and received FDA approval for its NexSys PERSONA device in October 2020, before Fresenius received FDA approval.

927. In other words: Fenwal invented, Haemonetics followed.

**ANSWER:** Haemonetics denies the allegations in this paragraph. The characterization that "Fenwal invented, Haemonetics followed" is a self-serving narrative based on a false premise and

contradicted by the prosecution history of the Asserted Patents, which establish Haemonetics' independent innovation and priority.

928. Relevant to the inequitable conduct claims, in September 2016, Fenwal received FDA clearance for its Aurora Xi System. *See* FAC ¶ 76 ("The Aurora Xi System received FDA clearance[] in September 2016.").

**ANSWER:** Haemonetics admits that Fresenius received FDA clearance for its Aurora Xi System in September 2016. Haemonetics denies all remaining characterizations and allegations in this paragraph.

929. The 2016 Aurora Xi System was made available to the public after FDA approval in 2016.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

930. An Operator's Manual and Service Manual ("Prior Art Manuals") for the Aurora Xi System were published in October 2016 and accompanied each Aurora Xi Device. FENWAL 00029246 (WI-MF-936PK001 C - Aurora Xi Packaging Prep).

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

931. The 2016 Prior Art Manuals describe the Aurora Xi 2016 System and its functionality. FENWAL 00006371; FENWAL 00013985.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

932. The Fresenius Aurora Xi Plasmapheresis System Operator's Manual Software Version 1.0 and related Service Manual, dated October 2016 and January 2017, in addition to the Aurora Xi System itself (collectively the "Aurora Xi Prior Art"), constitute material prior art that was withheld from the Examiner during prosecution of the Asserted Patents.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***Haemonetics Monitored Fenwal***

933. Haemonetics (including at least Ragusa, Perullo, and Lovely) was aware of Fenwal, its patent applications, and its devices, including the Aurora Xi device, prior to the filing of the applications for the Asserted Patents.

**ANSWER:** Haemonetics admits that it was aware of Fenwal as a competitor in the plasmapheresis market. Haemonetics denies that such awareness establishes knowledge of the specific references Fenwal contends should have been disclosed and denies the remaining allegations in this paragraph.

934. Haemonetics claims the U.S. market for plasmapheresis devices was "highly concentrated" as of 2025 and "include[d] only three main competitors" – Haemonetics, Fenwal (a Fresenius Kabi AG subsidiary), and Terumo. FENWAL 00013903 at -3909 (IPR2025-01391, PO's Brief Requesting Discretionary Denial).

**ANSWER:** Haemonetics admits the allegations in this paragraph include quotes from a separate proceeding.

935. At the time the Asserted Patents were being prosecuted, the market was even more concentrated because Terumo had not yet entered. *Id.* (Terumo did not "enter[] this highly concentrated market with its competing product [until] 2022").

**ANSWER:** Haemonetics admits that it has described the plasmapheresis market in certain filings. Haemonetics otherwise lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

936. Prior to May 30, 2017, by Haemonetics' admission, the only competitors in the field were Haemonetics and Fenwal/Fresenius Kabi. FENWAL 00029160 (Haemonetics Corp. Analyst Investor Day, May 20, 2014), at -9180 ("Who's the competition?"…Plasma, it's us and it's Fenwal."); FENWAL 00013976 (Haemonetics Corp. Company Conference Presentation, January 14, 2015), at -3979 ("Let me start with plasma . . . . The biggest competitor in that space being Fenwal now owned by Fresenius.").

**ANSWER:** Haemonetics admits that it has acknowledged Fenwal/Fresenius Kabi as a competitor in the plasmapheresis market. Haemonetics denies the remaining allegations in this paragraph.

937. Haemonetics was aware of its only competitor Fenwal's plasmapheresis products. Haemonetics characterizes the market to be "a tightly confined industry, where each participant closely monitors the others' products, regulatory filings, and patent activity," making awareness of competitor products "undeniable." FENWAL 00013903 at -3909. Haemonetics further states, "[u]nlike some broader industries, there can be no doubt about competitor awareness here." *Id.*

**ANSWER:** Haemonetics admits that it has described the plasmapheresis market in certain filings. Haemonetics otherwise lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

938. Haemonetics was well aware of and actively monitored Fenwal's plasmapheresis devices, including the Aurora Xi device.

**ANSWER:** Haemonetics admits that it has acknowledged Fresenius/Fenwal as a competitor in the plasmapheresis market. Haemonetics denies the remaining allegations in this paragraph.

939. Haemonetics consistently referenced Fenwal and the Aurora Xi in its public statements, including its 10-K submissions and at conferences. In the context of its 2015 10-K submissions to the SEC, Haemonetics specifically stated, "In the automated plasma collection market, we principally compete with Fresenius, which acquired Fenwal." FENWAL 00014351 (Haemonetics Corp. 2015 Form 10-K), at -4359.

**ANSWER:** Haemonetics admits that it referenced Fresenius/Fenwal and the Aurora Xi in certain public statements, including 10-K submissions. Haemonetics denies the remaining allegations in this paragraph.

940. In Haemonetics' 2018 10-K, Haemonetics clarified, "in the automated plasma collection market, we principally compete with Fresenius' Fenwal Aurora and Aurora Xi product line." FENWAL 00014578 (Haemonetics Corp. 2018 Form 10-K), at -4586.

**ANSWER:** Haemonetics admits that the quoted language in this paragraph is accurate.

941. As another example, each year at the Raymond James Annual Institution Investors Conference, Haemonetics identified "Fresenius Fenwal (Aurora)" as its competition in the Plasmapheresis space. FENWAL 00029256 at -9262, available at: https://haemonetics.gcsweb.com/static-files/b855d07a-edcd-4b70-b6d9-8690de1a7daa ; FENWAL 00029275 at 7, available at: https://haemonetics.gcs-web.com/static-files/8d70200b-0ee6-4e3c-bbee-0c01fb2d51df.

**ANSWER:** Haemonetics admits that at least once it identified Fresenius Fenwal as its competition at an investor conference. Haemonetics denies the remaining allegations in this paragraph.

942. Individuals involved in the prosecution of the Asserted Patents on behalf of Haemonetics had specific knowledge of Fenwal's devices. Ragusa, the sole named inventor of the Asserted Patents, has been employed by Haemonetics for more than 30 years. Over the three decades Ragusa has worked for Haemonetics, he has held roles ranging from Manager of Research and Development in the Apheresis Department, Director of all R&D Departments, and VP of R&D Donor Division, where he was a Member of the Division Executive Staff.

**ANSWER:** Haemonetics admits that Ragusa has been employed by Haemonetics for more than 30 years and has held various roles within the company. Haemonetics denies the remaining allegations in this paragraph.

943. Ragusa worked on plasma collection devices. FENWAL 00014347 (Ragusa LinkedIn Biography). He was R&D Manager of Apheresis Development; he published articles related to "Personalized Collection of plasma from healthy donors" and "Source plasma collection in the United States." *Id.* at -4737. Ragusa was "responsible for technical product roadmap across all business segments" including "plasmapheresis." *Id.* at -4738. Throughout this work, Ragusa admits that he "immersed himself in customer's business and identified areas of technical need." *Id.* at -4739. He was involved in "technical due diligence" projects. And he was responsible for "expand[ing] and manag[ing], with Legal support, the Intellectual Property portfolio." *Id.* at -4738.

**ANSWER:** Haemonetics admits that Ragusa worked on plasma collection devices and held the roles described and published certain articles. These facts establish Ragusa's independent expertise as a prolific inventor in the field, not the inference of misconduct Fresenius attempts to draw. Haemonetics denies the remaining allegations in this paragraph.

944. Ragusa, who has spent his entire professional career working for Haemonetics developing devices, was aware of the Aurora Xi device—the plasmapheresis product of its main competitor.

**ANSWER:** Haemonetics admits that Ragusa was generally aware of competing products including the Aurora Xi. Haemonetics denies the remaining allegations in this paragraph.

945. On information and belief, Ragusa was involved in the development of the NexSys PCS Plasma Apheresis System for which Haemonetics Corporation received FDA 510(k) clearance on July 25, 2017—the device designed to compete against the Aurora Xi.

**ANSWER:** Haemonetics admits that Ragusa was involved in the development of the NexSys PCS device. Haemonetics denies the remaining allegations in this paragraph.

946. Thus, Ragusa was simultaneously developing the competing NexSys PCS device and prosecuting the Asserted Patents—all while fully aware of Fenwal's Aurora Xi device.

**ANSWER:** Haemonetics admits that Ragusa was involved in the development of the NexSys PCS device. Haemonetics denies the remaining allegations in this paragraph.

947. Ragusa is the named inventor on 24 issued U.S. patents (in addition to the three Asserted Patents), all of which are assigned to Haemonetics and relate to blood processing devices and/or fluid sampling systems. He also communicated directly with the Executive and Board members about his work related to plasmapheresis products. By the time of the filing of the '916 and '474 applications in 2021, Ragusa was the Senior Director of Research and Development where he admits he "provided review of technical initiatives to CEO and Board Members." FENWAL 00014347 at -4349.

**ANSWER:** Haemonetics admits that Ragusa is the named inventor on additional U.S. patents assigned to Haemonetics and that Ragusa communicated with Haemonetics' executives regarding plasmapheresis products. Haemonetics denies the remaining allegations in this paragraph.

948. Perullo, the Vice President, Associate General Counsel, and Chief Intellectual Property Officer, has worked for Haemonetics for more than 21 years, and now "oversees all general, commercial, and regulatory compliance for the global hospital business and all IP legal matters corporate-wide." FENWAL 00017083. He "participat[es] in strategic business discussions throughout the entire decision making process [at Haemonetics] and advis[es] on IP, technology, competitor, and market landscape issues." *Id.* at -7084. He admits to managing Haemonetics' "portfolio of 400+ issued patents and almost 300 pending applications" and "working with innovators on new concepts." *Id.* In addition, Perullo was responsible for "drafting and negotiating business-focused contracts" for Haemonetics. *Id.*

**ANSWER:** Haemonetics admits that Perullo has held the roles described and has managed Haemonetics' patent portfolio. Haemonetics denies the remaining allegations in this paragraph.

949. Given his responsibilities at Haemonetics, and the limited competition in 2021 (only Fresenius/Fenwal competed with Haemonetics), Perullo was aware of the Aurora Xi.

**ANSWER:** Haemonetics denies that awareness of the Aurora Xi is established by virtue of Perullo's position. Haemonetics denies the remaining allegations in this paragraph.

950. Lovely, who had been prosecuting patents for Haemonetics in the field of blood collection systems since at least November 2007, knew about Haemonetics' main competitor's devices at least as part of the diligence that accompanies the filing of new patent applications.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

***Haemonetics Copied Fenwal***

951. On January 21, 2021, Fenwal's U.S. 17/062,368 patent application, which is related to "a plasmapheresis system and a method for operating a plasmapheresis system," published as US2021/0015989A1. FENWAL 00017060.

**ANSWER:** Haemonetics admits that Fenwal's U.S. Patent Application No. 17/062,368 published as US2021/0015989A1 on January 21, 2021.

952. Figure 2 of the Fenwal '989 Publication includes a technical drawing of the Aurora Xi device (compare Figure 2 of the '989 Publication on the left with an image of Aurora Xi device):




Fig. 2

FENWAL 00017060 at -17062.



FENWAL 00013973 at -3973.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations regarding the contents of Figure 2 of the Fenwal ’989 Publication or its similarity to the Aurora Xi device.

953. On March 18, 2021, two months ***after*** Fenwal’s US2021/0015989A1 application was published, Haemonetics filed patent application numbers 17/205,374 (the “’374 application”) and 17/205,400 (the “’400 application”), which granted as the ’916 and ’474 asserted Haemonetics patents, respectively. HAEM-FRE_0004804; HAEM-FRE_0005372.

**ANSWER:** Haemonetics admits that it filed patent application numbers 17/205,374 and 17/205,400 on March 18, 2021 and that the ’989 Publication was published approximately two months before these filings. Haemonetics denies the remaining allegations in this paragraph.

954. The claims in the ’374 and ’400 applications, as submitted by Lovely and Ragusa on March 18, 2021, are identical or nearly identical to the claims in Fenwal’s US2021/0015989A1 publication.

**ANSWER:** Haemonetics admits that the claims in the ’374 and ’400 applications are identical or nearly identical to the claims in the ’989 Publication. Haemonetics denies that this constitutes fraud, inequitable conduct, or misappropriation of any inventive contribution by Fenwal. The inventive concepts claimed in the ’374 and ’400 applications were disclosed by Haemonetics in its ’652 patent application filed in May 2017, years before the Fenwal publication existed. Haemonetics used Fenwal’s published claim language because Fenwal’s claims described the same invention Haemonetics had previously disclosed. Haemonetics denies the remaining allegation in this paragraph.

955. For example, and as shown below, Claim 1 of the Haemonetics ’400 application is a verbatim copy of Claim 42 of Fenwal’s ’989 Publication:

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1**<br>**Claim 42**<br><br>**Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,400**<br>**COPIED Claim 1**<br><br>**Filed March 18, 2021** |
|---|---|
| A system for collecting plasma, comprising:<br>a venipuncture needle configured to draw whole blood from a donor; | A system for collecting plasma, comprising:<br>a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; and | a touchscreen configured to receive input from an operator; and |
| a controller programmed to control operation of the system, | a controller programmed to control operation of the system, |
| the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit,<br><br>to determine a target volume for plasma product and/or raw plasma, to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood component and | the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit,<br><br>to determine a target volume for plasma product and/or raw plasma, to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood component and |

| Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1<br>Claim 42<br><br>Published January 21, 2021 | Haemonetics U.S. Pat. App. No. 17/205,400<br>COPIED Claim 1<br><br>Filed March 18, 2021 |
|---|---|
| to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. | to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. |

**ANSWER:** Haemonetics admits that Claim 1 of the ’400 application uses language identical to Claim 42 of Fenwal’s ’989 Publication.

956. Haemonetics did not just copy Claim 42 of the Fenwal ’989 Publication. All 27 claims of the ’400 application were copied from the earlier Fenwal ’989 Publication.

**ANSWER:** Haemonetics admits that all 27 claims of the ’400 application were drafted using language from Fenwal’s ’989 Publication.

957. 21 claims were copied verbatim, 4 claims were modified to drop the phrase “from a donor management system” and 2 claims were modified to use the term “control system” instead of “donor management system.” This copying is evidenced in Appendix E-1 to Defendants’ Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, which is attached hereto as Exhibit A.

**ANSWER:** Haemonetics admits that variations were made to certain claims in the ’400 application. Haemonetics denies the remaining allegations in this paragraph.

958. In sum, Haemonetics copied more than 1,750 Fenwal claim words and claimed them as its own in the ’400 application.

**ANSWER:** Haemonetics admits that claims in the ’400 application were the same as the words in the ’989 Publication. Haemonetics denies the remaining allegations in this paragraph.

959. Further evidence of Haemonetics’ copying is provided by the fact that technical claim language Haemonetics introduced in its ’400 application does not appear anywhere in the specification accompanying the ’400 application.

**ANSWER:** Haemonetics admits that certain claim terms used in the continuation applications do not appear verbatim in the accompanying Haemonetics specification. Haemonetics denies the remaining allegations in this paragraph.

960. For example, the claim language "plasma output port" (Haemonetics Claims 1, 7, 10, 16) does not appear anywhere in the Haemonetics specification for the '400 application—it only appears in the copied claim language. In comparison, "plasma output port" is found in both the specification ([0021], [0038], [0096]) and claims (Claims 48, 52 and 60) of the Fenwal '989 Publication.

**ANSWER:** Haemonetics admits that the term "plasma output port" does not appear in the '400 application specification and it does appear in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

961. Similarly, "donor parameters," which appears in Haemonetics' copied claims 16, 21, and 22, does not appear in the Haemonetics specification. "Donor parameters" appears in the Fenwal specification at paragraphs [0059], [0064], and [0095] and claims 60, 65, and 66.

**ANSWER:** Haemonetics admits that the term "donor parameters" does not appear in the '400 application specification and it does appear in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

962. Likewise, the claim language "current value of the hematocrit of the donor" of Haemonetics Claim 1 appears only in the copied claim language. In comparison, this language is present in both the specification ([0066] ("current value for the hematocrit of the donor")) and claims (Claim 42) of the Fenwal '989 Publication.

**ANSWER:** Haemonetics admits that the term "current value of the hematocrit of the donor" does not appear in the '400 application specification but similar language does appear in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

963. Other examples of Haemonetics' copied claims including Fenwal technical language include:

(i) "Raw Plasma," which only appears in Haemonetics copied Claims 1-3, 5, 6, 7, 10, 16, 17, 19, 20, 21, 22, 26 but which originally appears in Fenwal's '989 Publication 98 times including, for example, at Abstract, [0001], [0007] and Claims 42-44, 46-49.

(ii) "Venipuncture Needle," which only appears in Haemonetics copied Claims 1, 7, 10, 16, but which originally appears in Fenwal's '989 Publication 14 times including, for example, at [0021], [0030] and Claims 42, 48, 52, 60.

(iii) "Draw and Return Cycle," which only appears in Haemonetics copied Claims 1, 2, 10, 15, but which originally appears in Fenwal's '989 Publication at [0066] and Claims 42, 43, 44.

(iv) "Reservoir," which only appears in Haemonetics copied Claim 27, but which originally appears in Fenwal's '989 Publication at [0021], [0038], [0039] and Claim 71.

(v) "Anticoagulant Ratio," which only appears in Haemonetics copied Claims 10 and 26, but which originally appears in Fenwal's '989 Publication at [0016], [0017], [0056] and Claims 49, 52, 56.

**ANSWER:** Haemonetics admits that the listed terms do not appear in the '400 application specification but do appear in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

964. Haemonetics' copying is not limited to the '400 application. In the '374 application, filed on the same day, Haemonetics similarly copied the earlier published Fenwal claims, making comparable minor variations.

**ANSWER:** Haemonetics admits that certain language in the '374 application is the same as the language in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

965. For example, and as shown below, Claim 10 of the Haemonetics '374 application is a verbatim copy of Claim 52 of Fenwal's '989 Publication, but for Haemonetics' omission of the word "height" in two instances (see highlighting):

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1**<br>**Claim 52**<br><br>**Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,374**<br>**COPIED Claim 10**<br><br>**Filed March 18, 2021** |
|---|---|
| A system for collecting plasma, comprising: | A system for collecting plasma, comprising: |
| a venipuncture needle configured to draw whole blood from a donor; | a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; and | a touchscreen configured to receive input from an operator; and |

| Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1<br>Claim 52<br><br>Published January 21, 2021 | Haemonetics U.S. Pat. App. No. 17/205,374<br>COPIED Claim 10<br><br>Filed March 18, 2021 |
|---|---|
| a controller | a controller |
| programmed to control operation of the system, the controller coupled to the touchscreen<br><br>and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant,<br><br>wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight, height and the donor's hematocrit,<br><br>the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor. | programmed to control operation of the system, the controller coupled to the touchscreen<br><br>and programmed to receive at least a donor's weight and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant,<br><br>wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight and the donor's hematocrit,<br><br>the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor. |

**<u>ANSWER:</u>** Haemonetics admits that Claim 10 of the '374 application uses language substantially identical to Claim 52 of Fenwal's '989 Publication.

966. In other words, out of the 264 words in Fenwal's Claim 52, 262 of those words (over 99%) were copied into Haemonetics' later-filed Claim 10.

**<u>ANSWER:</u>** Haemonetics admits that Claim 10 of the '374 application uses language substantially identical to Claim 52 of Fenwal's '989 Publication.

967. Out of the 232 words in Fenwal's Claim 48, 228 of those words (over 98%) are present in Haemonetics' Claim 7 (which is identical but for Haemonetics' removal of the words "height" and "sex" in two instances).

**<u>ANSWER:</u>** Haemonetics admits that claim 7 of the '374 application uses language substantially identical to Claim 48 of Fenwal's '989 Publication.

968. Likewise, out of the 276 words in Fenwal's Claim 42, 274 of those words (over 98%) are identical to Haemonetics' 278-word Claim 1; here, Haemonetics merely changed the word "touchscreen" found in Fenwal's patent application to "user interface."

**ANSWER:** Haemonetics admits that claim 1 of the '374 application uses language substantially identical to Claim 42 of Fenwal's '989 Publication.

969. Other examples of copying are evident from a cursory review of the remaining claims in the '374 application, as evidenced in Appendix E-2 to Defendants' Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, which is attached hereto as Exhibit B.

**ANSWER:** Haemonetics admits that Appendix E-2 to Defendants' Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, includes the remaining claims of the '374 application.

970. Haemonetics, including prosecuting attorney Lovely, drafted the applications that became the '916 and '474 patents by copying Fenwal's claims nearly verbatim.

**ANSWER:** Haemonetics admits that it used language from Fenwal's Publication in drafting certain claims but denies that it drafted any entire patent applications by copying claims.

971. Following the initial filing of its '374 and '400 applications, Haemonetics continued to rely on Fenwal's '989 Publication to modify its own patent claims to track Fenwal's—again without disclosure to the PTO.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

972. In its first response to an Office Action in the pending '400 application prosecution, which occurred on August 6, 2024, Haemonetics amended "its" claims to further mirror Fenwal's claims by revising the copied claim language to add additional Fenwal claim limitations.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

973. Specifically, Haemonetics amended the independent claims to include the limitation "to determine a target volume for plasma product and/or raw plasma based on the donor's total blood volume and/or the donor's plasma volume" (addition underlined), which is copied from claims found in Fenwal's '989 Publication. For example:

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1**<br>**Claim 46**<br><br>**Published January 21, 2021** | **Haemonetics US Patent No. 12,186,474**<br><br>**Amended August 6, 2024** |
|---|---|
| Claim 42 | COPIED Claim 1 |

| | |
|---|---|
| A system for collecting plasma comprising: | A system for collecting plasma, comprising: |
| a venipuncture needle configured to draw whole blood from a donor; | a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, |
| the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; | a touchscreen configured to receive input from an operator; and |
| and a controller programmed to control operation of the system, | a controller programmed to control operation of the system, |
| the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit, | the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit, |
| to determine a target volume for plasma product and/or raw plasma, | to determine a target volume for plasma product and/or raw plasma based on the donor's total blood volume and/or the donor's plasma volume, |
| to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood | to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood |

| | |
|---|---|
| component and to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. | component and to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. |
| Claim 46 | |
| 46. The system of claim 42, wherein the controller is programmed to determine the target volume for plasma product and/or raw plasma based on the donor's total blood volume and the donor's plasma volume. | |

**ANSWER:** Haemonetics admits that it amended its independent claims to include the quoted language. Haemonetics denies the remaining allegations in this paragraph.

974. Strikingly, the phrase "based on the donor's total blood volume and/or donor's plasma volume" does not appear anywhere in the specification of the Haemonetics '400 application. It only exists in the context of the Haemonetics copied claims (and the Fenwal application from which it was derived).

**ANSWER:** Haemonetics denies the allegations in this paragraph. The presence of certain claim terms in the claims but not verbatim in the specification does not by itself establish copying.

975. Haemonetics' copying of Fenwal's claims infects the patents Haemonetics asserts. For example, Claim 10 of the '916 Patent as issued is identical to the copied Claim 10 of Haemonetics' '374 application (and by extension, Fenwal's '989 Publication).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

976. Other asserted claims exhibit only minor differences. For example, Claim 14 of the '916 Patent replaces the term "donor management system" from Claim 60 of the '989 Publication with "control system," but is otherwise identical. *See also, e.g.*, Claim 15 of the '474 Patent versus Claim 60 of the '989 Publication (omitting "from a donor management system" and adding "donor's total blood volume" and "donor's total plasma volume" language originally found in Fenwal's '989 Publication).

**ANSWER:** Haemonetics admits that there are minor differences between certain of its claims and the ’989 Publication.

977. In sum, the overlap is substantial, with the minor differences being essentially minor word variations or omissions.

**ANSWER:** Haemonetics admits that there are minor differences between certain of its claims in the ’400 application and the ’374 application and the ’989 Publication.

978. It is simply unbelievable that Haemonetics independently wrote identical claims without knowledge of Fenwal’s activities and patent claims. The only reasonable conclusion is that Haemonetics, including at least Ragusa and Lovely, had knowledge of Fenwal’s patents and the information they contained, including the Aurora Xi, and copied Fenwal’s claims.

**ANSWER:** Haemonetics admits that its prosecuting attorney had knowledge of Fenwal’s published claims and used that language in the continuation applications. Haemonetics denies the remaining allegations in this paragraph.

979. Haemonetics, including Ragusa and Lovely, did not cite the ’989 Publication when filing its application 17/205,374 and 17/205,400. Nor did they file any Information Disclosure Statement during the prosecution of the ’652, ’474 or ’916 patents which disclosed any of the following: (a) the Aurora Xi System; (b) the Aurora Xi System Operator’s Manual (October 2016); or (c) the Aurora Xi System Service Manual (January 2017).

**ANSWER:** Haemonetics admits that the ’989 Publication was not cited in an Information Disclosure Statement during prosecution of the ’652, ’474, or ’916 patents. As to the ’652 patent: the ’989 Publication did not exist during its prosecution and therefore could not have been disclosed. As to the ’916 and ’474 patents: Haemonetics admits that the ’989 Publication was not cited despite Haemonetics' awareness of it. Haemonetics denies that this failure was the product of deceptive intent. The ’989 Publication is not prior art to the ’474 or ’916 patents. Haemonetics admits that no Information Disclosure Statement disclosed the Aurora Xi System, the Aurora Xi Operator's Manual, or the Aurora Xi Service Manual during prosecution of these patents. Denied that the failure to cite these references constitutes inequitable conduct or was the product of deceptive intent.

980. Haemonetics, including at least Ragusa and Lovely, committed fraud upon the USPTO when they failed to cite Fenwal U.S. Patent Application Publication No. 2021/0015989 and the Aurora Xi Prior Art when filing its 17/205,374 and 17/205,400 applications.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. The failure to cite a reference does not constitute "fraud upon the USPTO". Haemonetics denies that any individual associated with the prosecution of the Asserted Patents acted with intent to deceive.

***Haemonetics Acknowledges the Materiality of the Prior Art***

981. Haemonetics (specifically Perullo, Ragusa and Lovely) knew disclosure of the Aurora Xi Prior Art and Fenwal application during the prosecution of the Asserted Patents would have been material to the patentability of these applications.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

982. As an initial matter, the fact that Haemonetics' issued patents contain nearly identical claims as a prior Fenwal published application raises a substantial inventorship question that is material to the patentability of the Haemonetics patents. *See, e.g.*, *Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1360 (Fed. Cir. 2010) (finding failure to disclose a patent application containing nearly identical claim language during prosecution was material at least with regard to inventorship).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

983. Moreover, Haemonetics' failure to disclose the prior art Aurora Xi device impacted the patentability of the claims. Haemonetics acknowledges the materiality of the Aurora Xi device Prior Art by citing to it in Haemonetics' First Amended Complaint. *See, e.g.*, *Upsher-Smith Labs., Inc. v. Pamlab, LLC*, 412 F.3d 1319, 1322 (2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

984. The same images and text that Haemonetics cites from the 2025 Aurora Xi Manual to support allegations of infringement of its patents appear in the prior art versions of the Operator's Manual and Service Manual (and the publicly available device itself) that were published in October 2016 and January 2017, respectively.

**ANSWER:** Haemonetics admits that some images from the 2025 Aurora Xi Manual appear in versions of the Operator's Manual and Service Manual that were published in October 2016 and January 2017, respectively.

985. Both manuals predate the earliest priority date of Haemonetics' Asserted Patents. Relevant examples from Haemonetics' infringement allegations as to the '916 Patent are reproduced below, with the claim limitation on the left, Haemonetics' infringement allegations in the middle, and identical or nearly identical text and images from Fenwal's October 2016 or January 2017 manuals on the right.

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[d] an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | Figure 1: Collection Phase   FENWAL_00007068 |   2.1 Collection Phase<br>FENWAL 00014012 |

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[a] a venipuncture needle configured to draw whole blood from a donor; | The disposable set also includes several tubing lines for transporting anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant within the device during the Collection/Reinfusion Phases. The individual lines in a set are as follows:<br>FENWAL_00007083<br><br>**AC Line:** Transports AC solution through the AC pump to the Y1-connector.<br>FENWAL_00007083<br><br>**Blood Line:** Transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this tubing from the reservoir and go back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL_00007083<br><br>**Donor Line:** Transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir and go back to the donor.<br>FENWAL_00007083<br><br>**Plasma Line:** Transports plasma from the separator to the plasma collection container.<br>FENWAL_00007083<br><br>**Reinfusion Line:** Transports reservoir contents from the reservoir to the blood line.<br>FENWAL_00007083<br><br>**Saline Line:** Transports saline from the saline container to the Y5-connector. The line does not transport fluids for a No Saline Protocol, although it may contain blood on the right side of the saline clamp while performing a No Saline Protocol.<br>FENWAL_00007083 | **Disposable Set Tubing**<br>The disposable set also includes several tubing lines; each of which is used to transport either anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant from one location on the instrument to another during the Collection/Reinfusion Phases. The individual lines comprising a set are as follows:<br>FENWAL 00014028<br>• **AC Line:** The AC line tubing transports AC solution through the AC pump to the Y1-connector.<br>FENWAL 00014029<br>• **Blood Line:** The blood line tubing transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this section of tubing from the reservoir back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL 00014029<br>• **Donor Line:** The donor line tubing transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir back to the donor.<br>FENWAL 00014029<br>• **Plasma Line:** The plasma line transports plasma from the separator to the plasma collection container.<br>FENWAL 00014029<br>• **Reinfusion Line:** The reinfusion line tubing transports reservoir contents from the reservoir to the blood line.<br>FENWAL 00014029<br>• **Saline Line:** The saline line tubing transports saline from the saline container to the Y5-connector. The line is not used to transport fluids for a No Saline Protocol although it may contain blood on the right side of the saline clamp while performing a No Saline Protocol.<br>FENWAL 00014029 |

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[b] a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | The plasma then moves from the plasma output port, through the plasma line, and into the plasma collection container. Concentrated cells are pumped from the concentrated cell output port and into the reservoir.<br>**Figure 9: Separator**<br>plasma output port<br><br>The disposable set also includes several tubing lines for transporting anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant within the device during the Collection/Reinfusion Phases. The individual lines in a set are as follows:<br>FENWAL_00007082 (annotated)<br><br>**AC Line:** Transports AC solution through the AC pump to the Y1-connector.<br>FENWAL_00007083<br><br>**Blood Line:** Transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this tubing from the reservoir and go back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL_00007083<br><br>**Donor Line:** Transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir and go back to the donor.<br>FENWAL_00007083 | <br>2.9 Separator<br>FENWAL 00014028<br>**Disposable Set Tubing**<br>The disposable set also includes several tubing lines; each of which is used to transport either anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant from one location on the instrument to another during the Collection/Reinfusion Phases. The individual lines comprising a set are as follows:<br>FENWAL 00014028<br>• **AC Line:** The AC line tubing transports AC solution through the AC pump to the Y1-connector.<br>FENWAL 00014029<br>• **Blood Line:** The blood line tubing transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this section of tubing from the reservoir back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL 00014029<br>• **Donor Line:** The donor line tubing transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir back to the donor.<br>FENWAL 00014029 |

| ’916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator’s Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[c] a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump; | **Pumps**<br>Three peristaltic pumps are located on the front panel. The individual functions are described below.<br>• **AC Pump:** Delivers the AC solution at a controlled rate into the blood line as whole blood enters the set from the donor during the Collection Phase. This pump does not operate during the Reinfusion Phase.<br>• **Blood Pump:** Primes the disposable set and clears air from the donor line. Collects whole blood from the donor and delivers anticoagulated blood to the separator during the Collection Phase (see Figure 1 — Collection Phase). The blood pump reverses and pumps concentrated cellular components from the reservoir back to the donor through the same venipuncture site during the Reinfusion Phase (see Figure 2 — Reinfusion Phase). If a Saline Protocol is used, the blood pump also delivers saline to the donor during the Final Reinfusion Phase.<br>• **Cell Pump:** Delivers concentrated cellular components from the separator to the reservoir during the Collection Phase. It also primes the disposable set. This pump does not operate during the Reinfusion Phase except to clear blood from the separator during the Final Reinfusion Phase.<br>FENWAL_00007073 | **Pumps**<br>Three peristaltic pumps are located on the front panel. The individual functions are described below.<br>• **AC Pump:** During the Collection Phase, delivers the AC solution at a controlled rate into the blood line as whole blood enters the set from the donor. This pump does not operate during the Reinfusion Phase.<br>• **Blood Pump:** It primes the disposable set and clears air from the donor line. During the Collection Phase, collects whole blood from the donor and delivers anticoagulated blood to the separator (see Figure 2.1 for a diagram showing the Collection Phase). During the Reinfusion Phase, the blood pump reverses and pumps concentrated cellular components from the reservoir back to the donor through the same venipuncture site (see Figure 2.2 for a diagram showing the Reinfusion Phase). It may also deliver saline to the donor during the Final Reinfusion Phase, if a Saline Protocol is used.<br>• **Cell Pump:** During the Collection Phase, delivers concentrated cellular components from the separator to the reservoir. It also primes the disposable set. This pump does not operate during the Reinfusion Phase except to clear blood from the separator during the Final Reinfusion Phase.<br>FENWAL 00014018-19 |

| ’916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator’s Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[f] a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw … | **Main Data Entry Overlay**<br>**Figure 45: Typical Main Data Entry Screen – Donor Data**<br><br>**Donor ID Button:** If enabled, allows entry of the donor ID number for the procedure.<br>**Donor Gender Button:** If enabled, allows entry of the donor's gender for the procedure.<br>**Donor Height Button:** If enabled, allows entry of the donor's height for the procedure. This can be in inches or centimeters, depending on the administrative settings.<br>**Donor Weight Button:** Allows entry of the weight of the donor. This can be in kilograms or pounds, depending on administrative settings.<br>**Donor Hematocrit/Hemoglobin Button:** Allows entry of the hematocrit or hemoglobin value of the donor. Note this displays as either hematocrit or hemoglobin, depending on the administrative settings.<br>**Target Saline Infusion Volume Button:** Allows entry of the target saline infusion volume for the procedure during a Saline Protocol.<br>FENWAL_00007118 | *Main Data Entry Overlay*<br><br>**4.8 Typical Main Data Entry Screen — Donor Data**<br>**Donor ID Button:** If enabled, allows entry of the donor ID number for the procedure. For information on the overlay, see the alphanumeric extended keypad information in Chapter 2.<br>**Donor Gender Button:** If enabled, allows entry of the donor's gender for the procedure. This overlay is shown in the Donor Gender Overlay section.<br>**Donor Height Button:** If enabled, allows entry of the donor's height for the procedure. This can be in inches or centimeters, depending on the administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Donor Weight Button:** Allows entry of the weight of the donor. This can be in kilograms or pounds, depending on administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Donor Hematocrit/Hemoglobin Button:** Allows entry of the hematocrit or hemoglobin value of the donor. Note that this is either the hematocrit or hemoglobin, depending on the administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Target Saline Infusion Volume Button:** Allows entry of the target saline infusion volume for the procedure, if a saline protocol is selected.<br>FENWAL 00014061-62 |

**ANSWER:** Haemonetics admits that some images from the 2025 Aurora Xi Manual appear in manuals that predate the earliest priority date of Haemonetics’ Asserted Patents.

986. Full comparisons for the infringement allegations found in Haemonetics’ First Amended Complaint and accompanying claim charts as to the asserted claims in the ’916 and ’474 Patents are found in Exhibit C (’916 Patent comparison chart) and Exhibit D (’474 Patent comparison chart) attached hereto.

**ANSWER:** Haemonetics admits that the identified charts were attached to Fenwal's First Amended Counterclaims.

987. In its Initial Infringement Contentions served on March 31, 2026, and amended on April 15, 2026, Haemonetics continues to acknowledge the materiality of the 2016 Aurora Xi device, as it cites the October 2016 and January 2017 Aurora Xi manuals as evidence of infringement. This is evidenced by Appendices E-3 and E-4 to Defendants' Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, both of which Fenwal incorporates by reference.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

988. Thus, by Haemonetics' own interpretation of the Asserted Patent claims, the Aurora Xi 2016 device is material prior art.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

989. Haemonetics (specifically Ragusa, Perullo, and Lovely) never provided information about the Aurora Xi device or the related manuals to the US Patent Office during prosecution of the Asserted Patents.

**ANSWER:** Haemonetics admits that no Information Disclosure Statement filed during prosecution of the Asserted Patents disclosed information about the Aurora Xi device or related manuals.

990. No Information Disclosure Statement filed during prosecution of U.S. Patent Application Serial No. 15/608,183 (which issued as the '652 Patent), U.S. Patent Application Serial No. 17/205,374 (which issued as the '916 Patent), or U.S. Patent Application Serial No. 17/205,400 (which issued as the '474 Patent) disclosed (a) the Aurora Xi System, (b) the Aurora Xi System Operator's Manual (October 2016), or (c) the Aurora Xi System Service Manual (January 2017).

**ANSWER:** Haemonetics admits the allegations in this paragraph.

991. Thus, across the prosecution of all three Asserted Patents, despite full awareness of the Aurora Xi device and its manuals, Haemonetics never disclosed any of these material references to the USPTO.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

992. The decision not to search for or disclose Fenwal's prior art was not an inadvertent oversight—it was a deliberate choice by individuals who admittedly monitored Fenwal's every move in the marketplace.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

993. In fact, during the late stages of prosecution of the '916 patent, the Examiner identified Fenwal art US2012/0165685 (not previously disclosed) and issued a rejection. HAEMFRE_ 0004804 ('916 Patent FH May 3, 2024 Non Final Rejection), at -4874. US2012/0165685 relates to "blood collection system[s] including an operator user interface to allow an operator to configure the system for a blood collection procedure form a donor." HAEM-FRE_0065504 ('685 Publication), at -5504. US2012/0165685 also includes an image of an Aurora device in Figure 1:




FIG. 1

**ANSWER:** Haemonetics admits that during prosecution of the '916 patent, the Examiner identified Fenwal art US2012/0165685 and issued a rejection. Haemonetics denies the remaining

allegations in this paragraph, including any inference of impropriety from the Examiner's independent identification of this reference.

994. The Examiner issued a rejection noting the pending Haemonetics' claims were obvious over Fenwal US2012/0165685, which "discloses a plasmapheresis apparatus with venous access, containers, and pumps, coupled with a touchscreen user interface to enter patient parameters, enter control schemes, and relay information." *See, e.g.*, HAEM-FRE_0004804 at -4874–75.

**ANSWER:** Haemonetics admits that the Examiner issued a rejection based on Fenwal US2012/0165685.

995. Instead of attempting to distinguish the art, Haemonetics, specifically Lovely, filed a terminal disclaimer, improperly claiming priority to the '652 priority date of May 2017 to overcome the rejection. *Id.* at -4863. But, yet again, Haemonetics was not forthright with the Examiner because, in reality, there is no support for these claims in the applications it claims priority to. *See, e.g.*, FENWAL 00033667 at -3764 (PGR2025-00078, Petition for Post Grant Review of U.S. Patent No. 12,171,916 filed by Terumo alleging lack of written description support in the specification of the '916 patent178 for the Asserted Claims).

**ANSWER:** Haemonetics admits that it filed a terminal disclaimer during prosecution of the '916 patent. Haemonetics denies the remaining allegations in this paragraph.

996. Haemonetics cannot rely on any alleged claim to the May 30, 2017 priority date of the '652 patent to avoid its disclosure obligations or to insulate the '916 and '474 patents from Fenwal's prior art.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

997. As a threshold matter, a claimed priority date has no bearing on the duty of candor. Under 37 C.F.R. § 1.56, Haemonetics owed a continuing duty of candor and good faith to the USPTO throughout the pendency of each application, which obligated it to disclose all information known to be material to patentability—including the '989 Publication and the Aurora Xi Prior Art—as of the actual filing date of the '374 and '400 applications on March 18, 2021 and throughout the entire period those applications remained pending.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

998. No priority claim can override or eliminate the applicant's obligation to disclose material prior art known at the time the application was filed and prosecuted. The duty of

disclosure exists to ensure the Examiner has the full picture of relevant art when evaluating claims, and Haemonetics' deliberate concealment of the very publication from which it copied its claims is not excused by pointing to an earlier priority date.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

999. Moreover, Haemonetics' claim to the May 2017 priority date is itself false. Under 35 U.S.C. § 120, a continuation or continuation-in-part application is entitled to the benefit of an earlier filing date only for claims supported by the written description of the earlier application.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1000. The claims Haemonetics copied from Fenwal's '989 Publication contain technical terminology—including "plasma output port," "donor parameters," "current value of the hematocrit of the donor," "raw plasma," "venipuncture needle," "draw and return cycle," "reservoir," "anticoagulant ratio," and "based on the donor's total blood volume and/or the donor's plasma volume"—that does not appear anywhere in the specification of the '652 patent or its continuations.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1001. Because these claim terms originate from Fenwal's application and not from Haemonetics' own disclosure, the earlier-filed Haemonetics applications do not provide written description support for the copied claims, and Haemonetics is not entitled to any earlier priority date for them.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1002. Terumo BCT—the other of Haemonetics' two competitors, which Haemonetics is also attempting to exclude from the market—has raised precisely this point. In Post Grant Review Petition No. PGR2025-00078, Terumo alleges that the specification of the '916 patent lacks adequate written description support for the asserted claims.

**ANSWER:** Haemonetics admits that Terumo made certain allegations in PGR2025-00078, for which institution was denied. This paragraph contains legal conclusions to which no response is

required. To the extent a response is required, Haemonetics denies the remaining allegations in this paragraph.

1003. That Haemonetics filed a terminal disclaimer to the ’652 patent to overcome the Examiner’s rejection based on Fenwal prior art US2012/0165685—rather than distinguishing its claims on the merits—further confirms that Haemonetics knew its copied claims could not withstand scrutiny against Fenwal’s prior art and chose procedural maneuvering over candor with the Patent Office. Haemonetics cannot shield its fraud on the PTO behind a priority date to which it is not entitled for claims it did not invent and cannot support with its own specification.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1004. The fact that Haemonetics failed to distinguish its claimed invention from this art further demonstrates the materiality of the Fenwal art. By failing to bring to the Examiner’s attention Fenwal prior art known to (and copied by) Haemonetics (specifically Ragusa and Lovely), including the Aurora Xi device and manual, it is clear Haemonetics had the intent to purposefully omit material prior art to the PTO in an effort to obtain the patents it now seeks to assert against its (only) two competitors in the field of plasmapheresis.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

***Haemonetics’ History and Motivation to Litigate***

1005. It is beyond dispute that Haemonetics (specifically Ragusa and Lovely) filed the original applications for the Asserted Patents after the Aurora Xi device was in use in the public domain and known to them.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

1006. The single most reasonable inference from this evidence is that Haemonetics (specifically Ragusa, Perullo, and/or Lovely) withheld this information with the specific intent to mislead or deceive the Patent Office and with knowledge that the withheld information was material to patentability, so the Asserted Patents would issue, and Haemonetics would have leverage to assert over its competitors.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1007. In other words, Haemonetics (specifically Ragusa, Perullo, and/or Lovely) made a deliberate decision not to disclose the Aurora art to the USPTO for the purpose of avoiding rejection.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1008. The motivation is simple—Haemonetics, including Perullo, sought to obtain intellectual property rights to leverage in the future, with the goal of gaining market share through litigation, as opposed to competing fairly in the market.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1009. In 2021, Haemonetics enjoyed a dominant market position, commanding approximately 75% share of the U.S. market for plasmapheresis devices. But the market was threatened in 2021 when a third competitor—Terumo BCT—announced that it would be entering the market and, worse for Haemonetics, that competitor was collaborating with a major Haemonetics customer to develop a new plasmapheresis device. These competitive forces had a demonstrable impact.

**ANSWER:** Haemonetics admits that it held a significant share of the U.S. market for plasmapheresis devices. Haemonetics denies that this market position was "threatened" simply by the appearance of competition in the market in the manner Fenwal alleges or that it motivated any improper conduct.

1010. On information and belief, Haemonetics now faces new price pressure and has even been forced to make price concessions to try to lock in other customers.

**ANSWER:** Haemonetics admits that it faces price pressure and has been forced to make price concessions for customers.

1011. Faced with these strong competitive pressures, Haemonetics chose not to compete on the merits and instead turned to its thicket "of 400+ issued patents and almost 300 pending applications" to try to protect its market position. FENWAL 00017083 at -7083.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

1012. On information and belief, Haemonetics sought to prevent customers from contracting with Fenwal by publicly threatening to sue Fenwal for infringement.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

1013. Haemonetics then did in fact file infringement lawsuits against both of its competitors. It filed the instant lawsuits against Fenwal, Fresenius Kabi USA, and Fresenius Kabi AG.

**ANSWER:** Haemonetics admits that it filed lawsuits against Fenwal, Fresenius Kabi USA, and Fresenius Kabi AG.

1014. Haemonetics filed a comparable lawsuit against Terumo for alleged infringement of nine Haemonetics patents, three of which overlap with the Asserted Patents in this case. Compl. ¶ 1, *Haemonetics Corp. v. Terumo BCT, Inc.*, No. 25-cv-1409, 2025 WL 1841196 (D. Colo. May 5, 2025).

**ANSWER:** Haemonetics admits that it filed a separate lawsuit against Terumo.

1015. If Haemonetics' lawsuits succeed, neither Fenwal nor Terumo will be able to offer their current plasmapheresis devices in the United States, and Haemonetics will once again be dominant.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1016. This is not the first time Haemonetics has engaged in this type of anticompetitive behavior. Haemonetics has a history of attempting to leverage litigation to gain a competitive advantage in this highly concentrated market.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

1017. For example, in 2005 (when Perullo was counsel for Haemonetics), Haemonetics filed a lawsuit alleging Fenwal's ALYX System (a blood component collection system) infringed a patent Haemonetics purchased from a third party. *See Haemonetics Corp. v. Fenwal, Inc.*, 811 F. Supp. 2d 548, 549 (D. Mass. 2011); FENWAL 00028284 (assignment of '983 patent from Biofluid Systems to Haemonetics for "valuable consideration").

**ANSWER:** Haemonetics admits that it filed a lawsuit regarding the ALYX System. Haemonetics denies the remaining allegations in this paragraph.

1018. Following a trial, appeal, and remand, Fenwal was victorious and found to not infringe the asserted patent. *Haemonetics Corp.*, 811 F. Supp. 2d at 553 ("Fenwal's products do not infringe the '983 Patent, either literally or under the doctrine of equivalents.").

**ANSWER:** Haemonetics admits that the prior ALYX litigation resulted in a finding of non-infringement following appeal of a jury verdict in which Haemonetics prevailed and Fenwal was found to infringe.

1019. In sum, Haemonetics' conduct before the USPTO was not mere negligence or oversight—it was a calculated scheme to obtain patent rights through deception and for the purpose of preventing fair competition in the marketplace.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

1020. Haemonetics copied Fenwal's claims word-for-word, concealed the source of its copied claims from the USPTO, and deliberately withheld disclosure of Fenwal's Aurora Xi prior art device—all while knowing this information was material to patentability and with the specific intent to deceive the Patent Office into issuing patents it otherwise would not have granted.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

1021. The single most reasonable inference from the evidence is that Haemonetics, through Ragusa and Lovely, committed fraud on the USPTO to obtain patents it now seeks to wield against the very competitor whose innovations it copied. Such inequitable conduct renders all claims of the Asserted Patents and related family members unenforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 17: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE '652, '916, AND '474 PATENTS DUE TO INEQUITABLE CONDUCT (UNCLEAN HANDS)**

1022. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** The allegations in Paragraph 1022 merely incorporate prior paragraphs by reference. To the extent a response is required, Haemonetics responds to the incorporated paragraphs as set forth elsewhere in this Answer.

1023. Haemonetics and its agents have engaged in a pattern of litigation and prosecution misconduct to gain an advantage in this litigation that constitutes unclean hands.

**ANSWER:** Haemonetics denies the allegations in this paragraph. Fenwal's allegation of a "pattern of litigation and prosecution misconduct" is conclusory and lacks any factual basis. Fenwal has failed to identify any specific acts constituting patent misuse or unclean hands distinct from its

manufactured inequitable conduct theory. The unclean hands doctrine requires misconduct that is directly related to the matter in litigation and that goes beyond a mere restatement of other claims. *See Princo Corp. v. ITC*, 616 F.3d 1318 (Fed. Cir. 2010) (en banc). Fenwal has identified no tying arrangement, no impermissible broadening of Haemonetics' patent rights, and no other specific misconduct that would support an independent unclean hands defense.

1024. Defendants request that the Court declare that Haemonetics' unclean hands bar any recovery in this suit.

**ANSWER:** Haemonetics denies that its conduct warrants any declaration of unclean hands.

**COUNT 18: *WALKER PROCESS* ANTITRUST VIOLATION (ATTEMPTED MONOPOLIZATION, 15 U.S.C. §§ 2, 15(a), 26)**

1025. Fenwal repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** The allegations in Paragraph 1025 merely incorporate prior paragraphs by reference. To the extent a response is required, Haemonetics responds to the incorporated paragraphs as set forth elsewhere in this Answer.

1026. During prosecution of the Asserted Haemonetics Patents, Haemonetics, the named inventor, and its prosecuting attorneys intentionally failed to cite and withheld material prior art information and publications describing Fenwal's Aurora Xi device and related patent publications.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1027. Had these individuals not withheld this prior art information, the Patent Office would not have issued any of the Asserted Patents.

**ANSWER:** Haemonetics denies the allegations in this paragraph. The speculation that the Patent Office "would not have issued" the Asserted Patents but for the alleged withholding of prior art is a legal conclusion unsupported by the facts.

1028. Haemonetics' withholding and selective disclosure of prior art related to the Aurora Xi and Fenwal's patents renders the Asserted Haemonetics Patents unenforceable. *See American Calcar, Inc. v. American Honda Motor Co.*, 768 F.3d 1185, 1188-92 (Fed. Cir. 2014).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1029. According to Haemonetics, the U.S. market for plasma collection or apheresis devices is a highly concentrated, three-player market consisting of Haemonetics, Fresenius Kabi/Fenwal, and Terumo BCT.

**ANSWER:** Haemonetics admits that the U.S. market for plasma collection devices includes Haemonetics, Fresenius Kabi/Fenwal, and Terumo BCT as principal competitors.

1030. At the time of filing the fraudulent patent applications, Haemonetics was the dominant market leader.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

1031. On information and belief, Haemonetics expected and feared a dramatic erosion of its dominant position in 2021 at least because Terumo BCT had announced that it was collaborating with a major Haemonetics customer to develop a new plasmapheresis device.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

1032. Haemonetics responded by using litigation—specifically patent infringement litigation—to try to maintain its market dominance. That use of patents to exclude rivals is exclusionary conduct that gives rise to antitrust liability under Section 2 of the Sherman Act. *See Walker Process Equip., Inc. v. Food Machinery Corp.*, 382 U.S. 172 (1965).

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics' enforcement of its valid patent rights is not "exclusionary conduct" within the meaning of the Sherman Act. The assertion of duly issued patents against infringers is protected by the *Noerr-Pennington* doctrine and is not an antitrust violation absent a showing of knowing and willful fraud on the PTO — a showing Fenwal has not and cannot make. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993).

1033. On information and belief, Haemonetics' fraud on the Patent Office, assertion of the asserted patents against Defendants, and threats of infringement litigation in the marketplace are anticompetitive conduct designed to monopolize the market for plasmapheresis devices

generally, and the submarket for automated plasma collection systems specifically, in violation of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1034. Haemonetics obtained the patents by knowing and willful fraud on the patent office and maintained and enforced the patents with knowledge of the fraudulent procurement. *See TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016); *see also In re Lipitor Antitrust Litig.*, 868 F.3d 231, 266 (3d Cir. 2017); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1073 (Fed. Cir. 1998).

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics did not obtain any patent through "knowing and willful fraud on the patent office". Walker Process fraud requires affirmative fraud that exceeds garden-variety inequitable conduct and rises to the level of common-law fraud. *See TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). Fenwal's allegations, even taken at face value, do not clear this heightened bar.

1035. Through its fraud and litigation-related conduct, Haemonetics engaged in predatory and anticompetitive conduct with a specific intent to monopolize the market.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1036. The relevant product market is plasmapheresis devices, which are not reasonably interchangeable with or substitutable for other blood collection technologies; they serve a distinct function in separating plasma from whole blood for commercial fractionation. Automated plasma collection systems constitute a recognized submarket within the broader blood collection equipment market.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1037. The relevant geographic market is the United States.

**ANSWER:** Haemonetics admits the allegations in this paragraph.

1038. There are significant barriers to entering the markets, including: (i) Haemonetics' exclusionary and fraudulently obtained Asserted Patents, which Haemonetics is now wielding against its only competitors to prevent entry and expansion; (ii) substantial capital costs required

to develop, manufacture, and obtain FDA approval for plasmapheresis devices; (iii) technological obstacles inherent in designing systems that meet the stringent regulatory and performance requirements for blood collection equipment; (iv) the need for partnerships with plasma collectors, which Haemonetics has cultivated over decades through its dominant market position; and (v) Haemonetics' deliberate strategy of maintaining a closed, non-interoperable software ecosystem that locks customers into its platform and prevents competitors from offering competing products compatible with its software.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1039. In light of its broad construction of its patents and the limited number of competitors, both of whom would be largely barred from the market if Haemonetics' litigation tactics are successful, there is a dangerous probability that Haemonetics will achieve monopoly power in the market for plasmapheresis devices and the submarket for automated plasma collection systems.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1040. Haemonetics' attempted enforcement of the Asserted Patents and its anticompetitive conduct did cause and threatens to continue to cause significant injury to Defendants, which have expended substantial amounts of money, time, and human resources defending this action.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

1041. Moreover, Haemonetics' patents and actions during prosecution and thereafter have forced Fenwal to change its business behavior, have disturbed Fenwal's course of business dealings, and have resulted in lost profits.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations in this paragraph and, on that basis, denies them.

1042. Beyond that, on information and belief, Haemonetics has disseminated information about this litigation to customers to dissuade customers from purchasing Fenwal's plasmapheresis devices, resulting in reputational damage and additional lost sales.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations in this paragraph and, on that basis, denies them.

1043. Haemonetics' anticompetitive conduct has caused harm to the competitive process, and it has caused harm and continues to cause harm specifically to Fenwal's business.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations in this paragraph and, on that basis, denies them.

1044. Because of Haemonetics' unlawful acts, Defendants did and will continue to suffer antitrust injury in an amount to be proven at trial.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations in this paragraph and, on that basis, denies them.

1045. Haemonetics has violated Section 2 of the Sherman Act.

**ANSWER:** Haemonetics denies that it has violated Section 2 of the Sherman Act.

## [FENWAL'S] PRAYER FOR RELIEF

1046. Fenwal respectfully requests that this Court enter judgment in its favor and grant the following relief:

i. A determination that Haemonetics has infringed each of the Fenwal Asserted Patents (the '334 Patent, the '748 Patent, the '693 Patent, the '891 Patent, the '089 Patent, the '251 Patent, the '724 Patent, and the '873 Patent).

ii. An award of a permanent injunction enjoining Haemonetics form continuing to infringe, directly and indirectly, the '334, '748, '693, '891, '089, '251, '724, and the '873 Patents;

iii. An award of damages to be paid by Haemonetics adequate to compensate Fenwal for Haemonetics' infringement of the '334, '748, '693, '891, '089, '251, '724, '873, and the '624 Patents that is no less than a reasonable royalty for the use of the Accused Haemonetics Products or lost profits suffered by Fenwal, as well as pre- and post-judgment interest;

iv. An adjudication that Haemonetics' infringement has been willful and an award of treble damages;

v. A determination and declaratory judgment that Fenwal has not infringed any valid claim of the '652 patent;

vi. A determination and declaratory judgment that each and every claim of the '652 patent is invalid;

vii. A determination and declaratory judgment that Fenwal has not infringed any valid claim of the '916 patent;

viii. A determination and declaratory judgment that each and every claim of the '916 patent is invalid;

ix. A determination and declaratory judgment that Fenwal has not infringed any valid claim of the '474 patent;

x. A determination and declaratory judgment that each and every claim of the '474 patent is invalid;

xi. A determination and declaratory judgment that the '652, '916, and '474 patents are unenforceable due to inequitable conduct;

xii. xii. A judgment that Haemonetics has violated the Sherman Act, 15 U.S.C. § 2;

xiii. An award of the cost of suit and treble damages for all antitrust injuries under the Clayton Act, 15 U.S.C. § 15, including legal fees incurred in this lawsuit;

xiv. An award of a permanent injunction enjoining Haemonetics from attempting to monopolize the relevant product and geographic markets, as provided by 15 U.S.C. § 26;

xv. An order declaring that this is an exceptional case and awarding Fenwal its costs, expenses, and reasonable attorneys' fees under 35 U.S.C. § 285 and/or 15 U.S.C. § 1117(a) and all other applicable statutes, rules, and common law;

xvi. xvi. All costs be taxed against Haemonetics; and

xvii. Any such other relief as the Court may deem appropriate and just under the circumstances.

**ANSWER:** Haemonetics denies Fenwal is entitled to any relief sought in Fenwal's Prayer for Relief.

**[FENWAL'S] JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Fenwal, by and through is undersigned counsel, hereby demands a trial by jury on all claims so triable in this action.

**ANSWER:** No response is required to Fenwal's demand for a trial by jury in this case.

**HAEMONETICS' DEFENSES**

Without prejudice to the denials set forth in its Answer, and without admitting any allegations of the Counterclaim not expressly admitted, Haemonetics asserts the following defenses to the Counterclaims without assuming the burden of proof on any such defense that would otherwise rest with Fenwal. Haemonetics reserves the right to amend its Answer to add additional defenses, including for example unenforceability due to inequitable conduct, consistent with the facts discovered in this case.

**FIRST DEFENSE (FAILURE TO STATE A CLAIM)**

1. The Counterclaim fails to state a claim upon which relief can be granted.

**SECOND DEFENSE (NON-INFRINGEMENT)**

2. Haemonetics has not infringed and does not infringe, under any theory of infringement including directly, whether individually or jointly, or whether literally or under the doctrine of equivalents, or indirectly, whether contributorily or by inducement, any valid and enforceable claim of U.S. Patent Nos. 10,431,334, 10,643,748, 10,872,693, 11,672,891, 12,397,089, 11,285,251, 11,369,724, and 11,730,873. Fenwal has not shown, and cannot show, that Haemonetics has infringed any valid and enforceable claim of the Fenwal Asserted Patents.

**THIRD DEFENSE (INVALIDITY)**

3. Each claim of U.S. Patent Nos. 10,431,334, 10,643,748, 10,872,693, 11,672,891, 12,397,089, 11,285,251, 11,369,724, and 11,730,873 is invalid for failure to comply with one or more of the requirements of the patent laws of the United States, including without limitation, 35 U.S.C. §§ 101, 102, 103, and 112, and the rules, regulations, and laws pertaining thereto. The claims of the Fenwal Asserted Patents are directed to non-statutory subject matter under 35 U.S.C. § 101, are anticipated by the prior art, including prior art disclosed by Haemonetics, under 35 U.S.C. § 102, are rendered obvious by the prior art under 35 U.S.C. § 103, and fail to satisfy the requirements of 35 U.S.C. § 112.

**FOURTH DEFENSE (PROSECUTION HISTORY ESTOPPEL AND PROSECUTION HISTORY DISCLAIMER)**

4. The claims of the Fenwal Asserted Patents are not entitled to a scope sufficient to encompass any system employed by Haemonetics. For example, the doctrines of prosecution history estoppel (based on amendments and arguments made during prosecution of the Fenwal Asserted Patents and related patent applications), disclosure-dedication (based on subject matter stated but not claimed in the Fenwal Asserted Patents), and ensnarement of the prior art, each preclude Fenwal from asserting the Asserted Patents in the manner purportedly stated in the

Counterclaim. Accordingly, the doctrine of equivalents is unavailable. Fenwal's claims are further barred in whole or in part by the doctrine of waiver and/or other equitable doctrines.

**FIFTH DEFENSE (LACK OF STANDING)**

5. To the extent that Fenwal is not the sole and total owner of any of the Fenwal Asserted Patents as of the filing date of the Counterclaim, Fenwal lacks standing to assert, in this case, infringement of any claim from such patent.

**SIXTH DEFENSE (FAILURE TO MARK)**

6. Fenwal's recovery of damages is barred or limited by failure to comply with 35 U.S.C. § 287(a).

**SEVENTH DEFENSE (STATUTE OF LIMITATIONS)**

7. Fenwal is barred from recovery, in whole or in part, under the applicable statute of limitations as set forth in 35 U.S.C. § 286.

**EIGHTH DEFENSE (NOT AN EXCEPTIONAL CASE)**

8. The Counterclaims fail to state a claim for exceptional case.

**NINTH DEFENSE (PATENT MISUSE)**

9. At least the 2018 Fenwal Asserted Patents are unenforceable because Fenwal has misused the patents by attempting to impermissibly broaden the scope of the patents, impose anticompetitive conditions, or otherwise extend the patents beyond their lawful scope despite knowing that the Fenwal Asserted Patents are invalid. For example, Fenwal's disclosure and claims within the 2018 Patents was derived from the Haemonetics' own patents, including specifically U.S. Patent No. 10,758,652 and 10,792,416, which were filed before the earliest application to which the 2018 Patents claim priority. Fenwal's 2018 Patents were, therefore,

improperly obtained and Fenwal's assertion of these patents against Haemonetics constitutes patent misuse.

**TENTH DEFENSE (EQUITABLE RELIEF)**

10. Fenwal is not entitled to equitable relief because the remedies at law to which it is entitled, if any, are adequate.

**ELEVENTH DEFENSE (NO COSTS)**

11. To the extent any claim of the Fenwal Asserted Patents is invalid, Fenwal is barred by 35 U.S.C. § 288 from recovering costs associated with its action.

**TWELFTH DEFENSE (SAFE HARBOR)**

12. Fenwal's patent infringement claims are barred at least in part by the safe harbor provisions of 35 U.S.C. § 271(e)(1). Pursuant to 35 U.S.C. § 271(e)(1), Haemonetics is not liable for infringement pertaining to the Fenwal Asserted Patents during the period of time when it was making and testing the Haemonetics Accused Products solely for uses reasonably related to the development and submission of information to the FDA. For example, Haemonetics submitted 510(k) applications to the U.S. FDA in conjunction with its NexSys with YES technology, NexSys with PERSONA technology, NexLynk software, and NexSys with PESRONA PLUS technology. Prior to these dates, Haemonetics was performing certain preclinical and clinical testing, as well as other testing and studies, solely for the purpose of regulatory development and submission.

**THIRTEENTH DEFENSE (NO WILLFUL INFRINGEMENT)**

13. Haemonetics has not willfully infringed, and does not willfully infringe, any valid claim of any of the Asserted Patents.

**FOURTEENTH DEFENSE (EXHAUSTION)**

14. Fenwal's claims are barred, in whole or in part, by license, implied license, covenant not to sue, patent exhaustion, or other authorization.

**FIFTEENTH DEFENSE (UNCLEAN HANDS)**

15. Fenwal's claims are barred by the doctrine of unclean hands. At least the 2018 Fenwal Asserted Patents were improperly obtained by Fenwal by copying disclosures and mirroring claims within Haemonetics' preexisting plasmapheresis patents, including at least U.S. Patent Nos. 10,758,652 and 10,792,416. Fenwal's attempt to now assert the 2018 Patents against the very party from whom it derived its patents is improper and the 2018 Patents are unenforceable under the doctrine of unclean hands.

**SIXTEENTH DEFENSE (INTERVENING RIGHTS)**

16. Fenwal's claims are barred, in whole or in part, by the doctrines of absolute and equitable intervening rights under 35 U.S.C. §§ 252 and 307(b).

**SEVENTEENTH DEFENSE (LACHES)**

17. Fenwal's claims for injunctive and other equitable relief are barred, in whole or in part, by the doctrine of laches. Fenwal has been aware of the NexSys PCS platform and Haemonetics' use of the accused technology since at least 2018, when Haemonetics publicly launched the NexSys PCS with YES® Technology in the United States and received FDA 510(k) clearance for the same. Despite this knowledge, Fenwal unreasonably delayed in asserting its patent rights against Haemonetics for a period of years during which Haemonetics made substantial investments in the development, commercialization, and deployment of the NexSys PCS System, including the NexSys PCS with PERSONA® Technology launched in 2020 and the NexSys PCS with PERSONA® PLUS Technology cleared in 2026. During this period of

unreasonable delay, Haemonetics incurred significant costs and commitments in reliance on Fenwal’s failure to act, including capital investments in manufacturing, customer agreements, regulatory submissions, and continued research and development. Fenwal’s delay has caused material economic prejudice to Haemonetics, and Fenwal is not entitled to injunctive or other equitable relief as a consequence of its laches.

**EIGHTEENTH DEFENSE (WAIVER AND EQUITABLE ESTOPPEL)**

18. Fenwal's claims are barred, in whole or in part, by the doctrines of waiver and equitable estoppel. On information and belief, Fenwal had actual knowledge of the NexSys PCS platform, including the NexSys PCS with YES® Technology and the NexSys PCS with PERSONA® Technology, since at least 2018. Despite this knowledge, Fenwal engaged in conduct that led Haemonetics reasonably to believe that Fenwal would not assert the Fenwal Asserted Patents against the NexSys PCS System, including by failing to provide notice of alleged infringement, failing to assert its patent rights for years while monitoring Haemonetics’ commercial activities, and, on information and belief, improperly obtaining knowledge of Haemonetics’ inventive work and thereafter filing its own patent applications directed to the same technology without objection to Haemonetics’ parallel commercialization of that technology. In reasonable reliance on Fenwal’s misleading conduct and silence, Haemonetics made substantial investments in its NexSys PCS platform, including expenditures on product development, manufacturing, regulatory clearances, customer deployment, and marketing. Fenwal’s assertion of the Fenwal Asserted Patents against Haemonetics after years of delay and acquiescence would cause material prejudice to Haemonetics that cannot be remedied by damages alone. Accordingly, Fenwal has waived its right to assert the Fenwal Asserted Patents and is equitably estopped from doing so.

* * *

20. Haemonetics reserves all defenses, at law or equity, which may now exist or in the future be available on discovery and further factual investigation in this case. Haemonetics further reserves the right to supplement and/or amend the foregoing defenses.

Dated: June 5, 2026

/s/ *Erik B. Milch*
Todd J. Ohlms
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone: (312) 962-3550
tohlms@proskauer.com

Erik B. Milch (pro hac vice)
Elizabeth Shrieves (pro hac vice)
Proskauer Rose LLP
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004-2533
Telephone: (202) 416-6899
Email: emilch@proskauer.com
Email: eshrieves@proskauer.com

Joseph M. Drayton
Connor J. Villar (pro hac vice)
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-2900
Email: cvillar@proskauer.com
Email: jdrayton@proskauer.com

Alan S. Teran (pro hac vice)
Proskauer Rose LLP
2255 Glades Road
Suite 421 Atrium
Boca Raton, FL 33431-7360
Telephone: (561) 995-4723
Email: ateran@proskauer.com

*Counsel for Plaintiff Haemonetics Corporation*