**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| HAEMONETICS CORPORATION,<br><br>*Plaintiff and Counterclaim Defendant,*<br><br>v.<br><br>FRESENIUS KABI USA, LLC,<br>FRESENIUS KABI AG,<br>FENWAL, INC.,<br><br>*Defendants and Counterclaim Plaintiffs.* | ) | Case No.: 1:25-cv-08680<br><br>**JURY TRIAL DEMANDED**<br><br>Honorable LaShonda A. Hunt |

**PLAINTIFF HAEMONETICS CORPORATION'S ANSWER AND DEFENSES TO DEFENDANTS FRESENIUS KABI USA, LLC AND FRESENIUS KABI AG'S FIRST AMENDED COUNTERCLAIMS**

Haemonetics Corporation ("Haemonetics"), by and through its undersigned counsel, hereby submits its Answer and Defenses to Defendants' First Amended Counterclaims (ECF No. 88) filed by Fresenius Kabi USA, LLC and Fresenius Kabi AG (collectively "Fresenius").

Fresenius' First Amended Counterclaims are a smokescreen. Unable to defend against Haemonetics' well-founded infringement claims on their merits, Fresenius has constructed an elaborate but ultimately hollow narrative designed to distract this Court from the central issue in this case: Fresenius built and sold devices that infringe Haemonetics' valid and enforceable patents.

At the core of Fresenius' theory is a sensationalized allegation of "copying," arguing that Haemonetics lifted claim language from a Fenwal publication into its continuation applications for the '916 and '474 patents. Haemonetics does not dispute that it deliberately used language from Fenwal's US2021/0015989A1 publication when drafting the continuation claims. But Fresenius' narrative inverts reality and the actual sequence of innovation. Haemonetics is the original

inventor. It filed its foundational patent application, the ’652 patent, on May 30, 2017, establishing priority to the inventive concepts at issue nearly four years before Fenwal’s application published as US2021/0015989A1 in January 2021. The ’652 patent disclosed the controller-based plasma collection system, the hematocrit-adaptive volume targeting, and the draw-and-return cycle architecture that form the substance of the Asserted Patents. Fenwal’s later publication describes the same inventive concepts, because Fenwal—a subsidiary of Fresenius—copied Haemonetics’ invention, not the other way around. On information and belief, Defendants wrongfully obtained knowledge of Haemonetics’ inventive work and then filed its own patent application claiming the same inventive subject matter that Haemonetics previously disclosed.

Haemonetics’ use of Fenwal’s published claim language in the ’916 and ’474 continuation applications was strategic: by drafting continuation claims that tracked the language of Fenwal’s publication, Haemonetics surmised that Fenwal’s and Fresenius’ infringing product, which practices the very invention Haemonetics disclosed in 2017, would fall squarely within the scope of Haemonetics’ patent claims. This is not evidence that Fenwal invented first; it is evidence that Haemonetics recognized Fenwal and Fresenius were practicing Haemonetics’ invention and drafted claims accordingly. Critically, none of this applies to the ’652 patent, which was filed in 2017, years before Fenwal’s publication existed, over a year before Fenwal’s earliest priority application was filed, and whose claims were drafted without reference to any Fenwal application.

The terminology at issue in the claims, like “venipuncture needle,” “anticoagulant,” “hematocrit,” “reservoir,” “target volume,” and “blood separator,” is not the private property of Fresenius. These are the standard lexicon of plasmapheresis, and identical or very similar terms are used in Haemonetics’ preexisting 2018 NexSys device manual.

The irony of Fresenius' position is striking. Fresenius accuses Haemonetics of improperly "copying" claim language, while Fenwal itself copied Haemonetics' underlying invention. Fenwal's '989 Publication describes the same system Haemonetics disclosed in its '652 patent application filed in 2017. On information and belief, Defendants gained access to Haemonetics' inventive work and then filed its own application claiming the same technology. Haemonetics' response, drafting continuation claims that tracked the language of Fenwal's publication to ensure its own patent claims would capture the infringing product was a lawful and rational prosecution strategy. The terminology itself is standard in the field. The chronology is dispositive: Haemonetics invented and disclosed first; Fenwal published later; and Haemonetics then drafted continuation claims to protect against Defendants' potential infringement. That sequence does not constitute inequitable conduct.

Fresenius' inequitable conduct claim is an attempt to weaponize the duty of candor into a sword for invalidating legitimately obtained patents. Its Walker Process antitrust claim piles speculation atop speculation. And its unclean hands defense is a legal nullity, totaling three conclusory paragraphs devoid of any independent factual theory. Haemonetics will demonstrate at trial that its patents were properly prosecuted, that its inventor independently conceived the claimed inventions, and that Fresenius' counterclaims are nothing more than a litigation tactic by a copycat competitor seeking to escape accountability for its own infringement.

Haemonetics denies all allegations in Fresenius' First Amended Counterclaims, whether express or implied, except those specifically admitted below. Each of the paragraphs 1-190 below corresponds to the same-numbered paragraphs in Fresenius' First Amended Counterclaims. Any factual allegation below is admitted only as to the specific admitted facts, not as to any purported conclusions, characterizations, implications, or speculations that arguably follow from the

admitted facts. Haemonetics denies that Fresenius is entitled to the relief requested or any other relief. Haemonetics answers Fresenius' First Amended Counterclaims as follows:

## INTRODUCTION

1. Haemonetics' failure to conduct a diligent investigation into its claims has resulted in a scattershot approach that improperly ensnares defendants Fresenius Kabi USA, LLC and Fresenius Kabi AG (collectively "Fresenius") in this litigation based on nothing more than "information and belief."

**ANSWER:** Haemonetics denies the allegations in this paragraph. As stated in the Original and First Amended Complaints, this lawsuit relates to the accused Aurora Xi Plasmapheresis System ("Aurora Xi System"). Prior to filing suit, Haemonetics conducted a reasonable and diligent investigation into this product based on publicly available information. That investigation showed that Fresenius held itself out as the entity responsible for the Aurora Xi System. The materials indicated to Haemonetics that the Aurora Xi Plasmapheresis System was made, used, sold, offered for sale, imported, and/or distributed by Fresenius within the United States. Haemonetics referred to many of these publicly available materials in the First Amended Complaint. *See* ECF No. 32 ¶ 70 (Fresenius advertises the Aurora Xi System on its website); *id.* (plasma and customer support contacts are listed with Fresenius email addresses); *id.* (Fresenius publishes YouTube videos regarding these systems); ¶ 71 (showing Fresenius received FDA clearance for the Aurora Xi System and referred to the Aurora Xi software as property of Fresenius); *id.* (Fresenius claimed responsibility for developing the Aurora Xi System); *id.* ¶ 72 (Fresenius published the Aurora Xi's operator's manual); *id.* (the manual indicates the Aurora Xi System is manufactured by Fresenius).

Thus, Haemonetics' thorough investigation revealed that virtually all activities concerning the Aurora Xi System were carried out by Fresenius. Based on this evidence, Haemonetics had a good-faith basis to allege that Fresenius made, used, sold, offered for sale, or imported the accused system in the United States. Haemonetics only added Fenwal, Inc. as a defendant in the First

Amended Complaint based on Defendants' counsel's representation that Fenwal, Inc. is the proper entity that makes, uses, sells, offers for sale, and/or imports the Aurora Xi System. Haemonetics' initial investigation did not identify any facts that pointed to Fenwal as a separate company that was involved in the manufacture, use, or sale of the Aurora Xi System.

2. Haemonetics filed its Original Complaint against Fresenius Kabi USA, LLC on July 25, 2025. (ECF No. 1). As part of the meet and confer required under the Northern District of Illinois Local Rules prior to filing a motion to dismiss, counsel for Fresenius Kabi USA highlighted the deficiencies in Haemonetics' Complaint against Fresenius Kabi USA, advising that Fresenius Kabi USA had no involvement in the allegations and products described in that complaint.

**ANSWER:** Haemonetics admits that it filed its Original Complaint against Fresenius Kabi USA, LLC on July 25, 2025, and that the parties met and conferred regarding Fresenius Kabi USA's planned motion to dismiss. Haemonetics further admits that during the parties' meet and confer, Defendants' counsel represented that Fenwal, Inc. was the proper defense entity in this lawsuit. Haemonetics denies the remaining characterizations of non-involvement. Despite its assertion of alleged deficiencies, Fresenius Kabi USA, LLC has not filed a motion to dismiss to date.

3. The parties filed a Joint Motion to Vacate Case Deadlines, which the Court granted, to allow time for Haemonetics to investigate the proper parties for the lawsuit. (ECF Nos. 27, 31).

**ANSWER:** Haemonetics admits the parties filed a Joint Motion to Vacate Case Deadlines but denies the remaining characterizations of this paragraph. *See* ECF No. 31. During this period, Haemonetics continued its investigation and repeatedly sought information from Defendants to clarify the proper parties and their roles with respect to the Aurora Xi System. Haemonetics and Defendants met and conferred on more than one occasion and Defendants provided limited documents that did not resolve Haemonetics' concerns. Despite requesting a declaration and/or detailed written assurances that Fresenius was not involved in any infringing activities, Fresenius did not provide any such verification. In the absence of such information and in light of Defendants' own public statements, Haemonetics reasonably maintained its claims.

4. Haemonetics' First Amended Complaint ("FAC") contains the same deficiencies identified its Original Complaint, containing only conclusory, formulaic recitations of the elements of direct infringement and lacking any factual content to support its allegations that either Fresenius Kabi USA and/or Fresenius Kabi AG infringe the asserted Haemonetics patents.

**ANSWER:** Haemonetics denies the allegations in this paragraph. As explained in response to Paragraph 1 above, Haemonetics' First Amended Complaint was replete with publicly-available information concerning Fresenius' ties to the Aurora Xi System and this case. Haemonetics specifically denies that its allegations lack "factual content" as they cite directly to Fresenius' publicly-available materials.

5. Haemonetics alleges Fresenius' infringement consists of "market[ing]" and "advertising" activities, "[being] directly associated with the Aurora Xi System," and "own[ing] all copyrights," but these are not acts of alleged infringement. *E.g.,* FAC ¶¶ 123, 145, 172 ("market[ing]"), 19, 20, 26, 27, 70, 125, 147 ("advertising"), ¶ 71 ("associated with"), ¶ 73 ("owns all copyrights"); *see also Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) ("[A]dvertisements are not considered offers for sale, but are instead merely solicitations for offers."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (communications that describe the allegedly infringing materials but "do not contain any price terms . . . on their face . . . cannot be construed as an 'offer' which [the offeree] could make into a binding contract by simple acceptance"). Nor are postings of YouTube videos (FAC ¶ 70) or serving as correspondent or Applicant on a 510(k) submission (*id.* ¶ 76). *See* 35 U.S.C. § 271(a). Haemonetics' remaining allegations against Fresenius are alleged on "information and belief." *See e.g.*, FAC ¶¶ 3-8, 18, 24, 68-69, 71, 74, 77-78, 80, 123-126, 128, 130, 132, 145-148, 150, 152, 154, 172-175, 177-178, *etc.* (40 allegations based "on information and belief").

**ANSWER:** This paragraph consists largely of legal conclusions and mischaracterizations to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement claims against Fresenius Kabi USA and Fresenius Kabi AG and refers to the First Amended Complaint (ECF No. 32) ("FAC"), which speaks for itself. Haemonetics specifically denies Defendants' characterization of the FAC. The FAC alleges multiple forms of infringing conduct supported by factual allegations and documentary evidence. Defendants' attempt to isolate and recharacterize select allegations does not negate the well-pleaded claims set forth in the FAC.

6. That Haemonetics' allegations against Fresenius are deficient is not surprising. Neither Fresenius entity "makes" or "manufactures" the accused Aurora Xi plasmapheresis device, nor do they "offer for sale," "sell" or "import" the Aurora Xi or induce parties to engage in any alleged infringing acts related to the Aurora Xi devices.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph, including Defendants' assertion that they have no involvement with the Aurora Xi System, which is contradicted by their own public representations.

7. By failing to exercise the requisite due diligence expected before asserting claims of patent infringement, Haemonetics has recklessly cast a cloud of uncertainty over Fresenius and forced them to incur significant, unwarranted litigation costs. Despite having been alerted to this issue by counsel for Fresenius Kabi USA, Haemonetics turned a blind eye. This pattern of behavior suggests a litigation strategy of harassment rather than a good-faith pursuit of legal rights.

**ANSWER:** This paragraph contains legal conclusions and improper characterizations to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

Haemonetics conducted a reasonable pre-suit investigation and acted in good faith at all times. After filing suit, Haemonetics further investigated Defendants' assertions through meet-and-confers and requests for information. Defendants, however, declined to provide clear, competent evidence disclaiming involvement in the accused activities.

Under these circumstances, Haemonetics reasonably relied on Defendants' own public-facing materials and maintained its claims. Haemonetics denies any allegations of harassment, bad faith, or improper litigation conduct.

Haemonetics specifically denies the allegation that it "turned a blind eye" to the propriety of Fresenius as Defendants. Haemonetics worked with Defendants' counsel to identify and receive documents and information that would prove Fresenius was not involved with the make, use, sale, offer for sale, or importation of the Aurora Xi System. In fact, certain documents provided by

Defendants indicated to Haemonetics that Fresenius was properly named in the lawsuit. Fresenius was unable to provide the requested information and, in light of the publicly available information that specifically identifies Fresenius as the entity associated with the Aurora Xi System, Haemonetics has maintained this litigation.

8. Consequently, Defendants/Counterclaim Plaintiffs Fresenius Kabi USA, LLC and Fresenius Kabi AG (collectively "Fresenius"), by and through its undersigned attorneys, hereby assert the following counterclaims against Plaintiff/Counterclaim Defendant Haemonetics Corporation ("Haemonetics" or "Counterclaim Defendant") for declaratory judgment that the claims of U.S. Patent Nos. 10,758,652 (the "'652 Patent"), 12,171,916 (the "'916 Patent"), and 12,186,474 (the "'474 Patent") (collectively, the "Haemonetics Asserted Patents") are invalid and not infringed by the products that are the subject matter of Haemonetics' FAC.

**ANSWER:** This paragraph contains legal conclusions and factual allegations to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

## NATURE OF ACTION

9. This is an action for: (i) invalidity and unenforceability of the Haemonetics Asserted Patents under the Declaratory Judgment Act (28 U.S.C. § 2201); (ii) non-infringement of the Haemonetics Asserted Patents under 28 U.S.C. § 2201; (iii) damages and injunctive relief for attempted monopolization under the antitrust laws, 15 U.S.C. §§ 1 et seq.; and (iv) such other relief as the Court deems just and proper.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

## THE PARTIES

10. Fresenius Kabi USA, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at Three Corporate Drive, Lake Zurich, Illinois 60047.

**ANSWER:** Haemonetics admits the allegations in this paragraph.

11. Fresenius Kabi AG is a corporation organized and existing under the laws of Germany with its principal place of business at Else-Kröner-Straße 1, 61352 Bad Homburg, Germany.

**ANSWER:** Haemonetics admits the allegations in this paragraph.

12. Haemonetics Corporation is a Massachusetts corporation with its principal place of business at 125 Summer Street, Boston, Massachusetts 02110.

**ANSWER:** Haemonetics admits the allegations in this paragraph.

**JURISDICTION**

13. This Court has jurisdiction over Fresenius' counterclaims pursuant to 28 U.S.C. §§ 2201 *et seq.* and 28 U.S.C. §§ 1331, 1338(a), and § 1367. Furthermore, an actual, substantial, and continuing justiciable controversy exists between Fresenius and Haemonetics based on Haemonetics having filed its First Amended Complaint (ECF No. 32) against Fresenius alleging infringement of the Haemonetics Asserted Patents. The controversy concerns the invalidity and non-infringement of the Haemonetics Asserted Patents, as well as Haemonetics' violation of the antitrust laws.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics admits it filed its First Amended Complaint (ECF No. 32) against Fresenius alleging infringement of the Haemonetics Asserted Patents.

14. This Court has personal jurisdiction over Haemonetics at least because Haemonetics has submitted to the personal jurisdiction of this Court by filing its Complaint (ECF No. 1) and First Amended Complaint (ECF No. 32) in this Court. Haemonetics has consented to this Court's jurisdiction for the purpose of this proceeding. FAC ¶ 14.

**ANSWER:** Haemonetics admits that this Court has personal jurisdiction over Haemonetics for the purpose of this proceeding only.

**VENUE**

15. Venue properly lies in this District under 28 U.S.C. §§ 1391 and 1400(b), because Haemonetics has consented to venue in this Court by filing its First Amended Complaint for patent infringement in this Court, and seeking other relief from this Court, thereby waiving any objections to venue for any counterclaims asserted against it. *See, e.g.*, *E & J Gallo Winery v. Morand Bros. Beverage Co.*, 247 F. Supp. 2d 973, 976-77 (N.D. Ill. 2002); *Shapo v. Engle*, No. 98-cv-7909, 2000 WL 198435, at *5 (N.D. Ill. Feb. 11, 2000); *see also* FAC ¶¶ 15-17.

**ANSWER:** Haemonetics admits that venue is proper in this District for the purpose of this proceeding only. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

**COUNT 1: NON-INFRINGEMENT OF U.S. PATENT NO. 10,758,652**

16. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

17. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fresenius (ECF No. 32), an actual and justiciable controversy exists between Fresenius and Haemonetics concerning alleged infringement of the U.S. Patent No. 10,758,652 ("the '652 patent").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement claims against Fresenius regarding the '652 Patent.

18. Fresenius has not made, used, offered to sell, or sold any alleged invention claimed in the '652 patent within the United States, or imported any alleged invention claimed in the '652 patent into the United States. Fresenius therefore has not infringed and does not currently infringe any asserted claim of the '652 patent, literally or under the doctrine of equivalents, directly or indirectly.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

19. Neither Fresenius Kabi AG nor Fresenius Kabi USA "make" or "manufacture" the Aurora Xi, nor does Fresenius Kabi AG or Fresenius Kabi USA "offer for sale," "sell" or "import" the Aurora Xi. Haemonetics alleges Fresenius engaged in "market[ing]" and "advertising," "[is] directly associated with the Aurora Xi System," and "owns all copyrights," but these are not acts of direct infringement. *See e.g.*, FAC ¶¶ 123, 145, 172 ("market[ing]"), ¶¶ 19, 20, 26, 27, 70, 125, 147 ("advertising"), ¶ 71 ("associated with"), ¶ 73 ("owns all copyrights"); *see also Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) ("[A]dvertisements are not considered offers for sale, but are instead merely solicitations for offers."); *Indag GmbH & Co. v. IMA S.P.A*, 150 F. Supp. 3d 946, 966 (N.D. Ill. 2015) ("To constitute an 'offer to sell' under traditional contract principles, an offer requires a definite price term, otherwise the offeree could make the offer into a binding contract by a simple acceptance."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1376 (Fed. Cir. 2005) (communications that describe the allegedly infringing materials but "do not contain any price terms . . . on their face . . . cannot be construed as an 'offer' which [the offeree] could make into a binding contract by simple acceptance"). In addition, acting as correspondent on a 510(k) submission is not an act of direct infringement, nor is acting as an Applicant for 510(k) clearance forms. *See* 35 U.S.C. § 271(a); *see also* FAC ¶ 71 (alleged submission of software to FDA).

**ANSWER:** This paragraph contains legal conclusions and mischaracterizations to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies all remaining allegations in this paragraph, if any.

20. Similarly, neither Fresenius Kabi AG nor Fresenius Kabi USA indirectly infringe the ’652 patent. As an initial matter, there is no indirect infringement because there is no direct infringement of the ’652 patent by the accused plasmapheresis systems at least because the accused plasmapheresis do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): “the controller configured to calculate (1) a volume of anticoagulant in the collected plasma component as the plasma component is being collected in the plasma container, and (2) a volume of pure plasma collected within the plasma container based, at least in part, upon the volume of anticoagulant in the collected plasma component, the controller configured to stop the blood draw pump when a target volume of pure plasma is collected within the plasma container.” Absent direct infringement of the claims of a patent, there can be neither contributory infringement nor inducement of infringement. 35 U.S.C. § 271.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies all remaining allegations in this paragraph, if any.

21. Fresenius has not actively induced any infringement of the ’652 patent. Fresenius lacks the requisite specific knowledge and intent to encourage infringement of the ’652 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

22. Fresenius has not contributed to any infringement of the ’652 patent. Fresenius does not offer to sell, sell, or import the Accused Products or any component thereof into the United States.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

23. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the ’652 patent, that it has not actively induced the infringement of the ’652 patent, and that it has not contributed to the infringement of the ’652 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

**COUNT 2: INVALIDITY OF U.S. PATENT NO. 10,758,652**

24. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

25. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fresenius and Haemonetics concerning the validity of the '652 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement claims against Fresenius regarding the '652 Patent.

26. The claims of the '652 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* IPR2025-01391 (petition for *inter partes* review of U.S. Patent No. 10,758,652). The Court may take judicial notice of IPR2025-01391, which is a matter of public record before the USPTO, and which Fresenius incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies the remaining allegations in this paragraph, if any.

27. For example, the claims of the '652 patent are anticipated by the prior art, under 35 U.S.C. § 102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. U.S. Patent No. 8,075,468 to Min et al. ("Min")

b. U.S. Patent No. 9,370,324 to Barret et al. ("Barrett")

c. U.S. Patent No. 6,296,602 to Headley ("Headley")

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. U.S. Patent Publication No. 2017/0029762 ("Turgut")

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. U.S. Patent Publication No. 2012/0175313 to Barry et al. ("Barry")

i. U.S. Publication No. 2002/0033370 to Bainbridge et al. ("Bainbridge")

j. U.S. Patent No. 10,195,319 to Kimura ("Kimura")

k. U.S. Patent No. 6,743,192 to Sakota et al. ("Sakota")

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

28. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '652 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

**COUNT 3: NON-INFRINGEMENT OF U.S. PATENT NO. 12,171,916**

29. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

30. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fresenius (ECF No. 32), an actual and justiciable controversy exists between Fresenius and Haemonetics concerning alleged infringement of the U.S. Patent No. 12,171,916 ("the '916 patent").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement claims against Fresenius regarding the '916 Patent.

31. Fresenius has not made, used, offered to sell, or sold any alleged invention claimed in the '916 patent within the United States, or imported any alleged invention claimed in the '916 patent into the United States. Fresenius therefore has not infringed and does not currently infringe any asserted claim of the '916 patent, literally or under the doctrine of equivalents, directly or indirectly.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

32. Neither Fresenius Kabi AG nor Fresenius Kabi USA "make" or "manufacture" the Aurora Xi, nor does Fresenius Kabi AG or Fresenius Kabi USA "offer for sale," "sell" or "import" the Aurora Xi. Haemonetics alleges Fresenius engaged in "market[ing]" and "advertising," "[is] directly associated with the Aurora Xi System," and "owns all copyrights," but these are not acts of direct infringement. *See e.g.*, FAC ¶¶ 123, 145, 172 ("market[ing]"), ¶¶ 19, 20, 26, 27, 70, 125, 147 ("advertising"), ¶ 71 ("associated with"), ¶ 73 ("owns all copyrights"); *see also Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) ("[A]dvertisements are not considered offers for sale, but are instead merely solicitations for offers."); *Indag GmbH & Co. v. IMA S.P.A*, 150 F. Supp. 3d 946, 966 (N.D. Ill. 2015) ("To constitute an 'offer to sell' under traditional contract principles, an offer requires a definite price term, otherwise the offeree could make the offer into a binding contract by a simple acceptance."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1376 (Fed. Cir. 2005) (communications that describe the allegedly infringing materials but "do not contain any price terms . . . on their face . . .cannot be construed as an 'offer' which [the offeree] could make into a binding contract by simple acceptance"). In addition, acting as correspondent on a 510(k) submission is not an act of direct infringement, nor is acting as an Applicant for 510(k) clearance forms. *See* 35 U.S.C. § 271(a); *see also* FAC ¶ 71 (alleged submission of software to FDA).

**ANSWER:** This paragraph contains legal conclusions and mischaracterizations to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies the remaining allegations in this paragraph, if any.

33. Similarly, neither Fresenius Kabi AG nor Fresenius Kabi USA indirectly infringe the '916 patent. As an initial matter, there is no indirect infringement because there is no

direct infringement of the ’916 patent by the accused plasmapheresis systems at least because the accused plasmapheresis do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): “a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw whole blood from a donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor.” Absent direct infringement of the claims of a patent, there can be neither contributory infringement nor inducement of infringement. 35 U.S.C. § 271.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies the remaining allegations in this paragraph, if any.

34. Fresenius has not actively induced any infringement of the ’916 patent. Fresenius lacks the requisite specific knowledge and intent to encourage infringement of the ’916 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

35. Fresenius has not contributed to any infringement of the ’916 patent. Fresenius does not offer to sell, sell, or import the Accused Products or any component thereof into the United States.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

36. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the ’916 patent, that it has not actively induced the infringement of the ’916 patent, and that it has not contributed to the infringement of the ’916 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

**COUNT 4: INVALIDITY OF U.S. PATENT NO. 12,171,916**

37. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

38. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fresenius and Haemonetics concerning the validity of the '916 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement claims against Fresenius regarding the '916 Patent.

39. The claims of the '916 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* PGR2025-00078 (petition for post-grant review of U.S. Patent No. 12,171,916). The Court may take judicial notice of PGR2025-00078, which is a matter of public record before the USPTO, and which Fresenius incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits that PGR2025-00078 is a matter of public record before the USPTO, but notes that Director Squires discretionarily denied this petition for post-grant review on March 10, 2026. Haemonetics denies the remaining allegations in this paragraph.

40. For example, the claims of the '916 patent are anticipated by the prior art, under 35 U.S.C. § 102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. Min

b. Barrett

c. Headley

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. Turgut

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. Barry

i. Bainbridge

j. Kimura

k. Sakota

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck")

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

41. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '916 patent, is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

## COUNT 5: NON-INFRINGEMENT OF U.S. PATENT NO. 12,186,474

42. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

43. Based on at least the allegations contained in the Haemonetics' First Amended Complaint against Fresenius (ECF No. 32), an actual and justiciable controversy exists between Fresenius and Haemonetics concerning alleged infringement of the U.S. Patent No. 12,186,474 ("the '474 patent").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement claims against Fresenius regarding the '474 Patent.

44. Fresenius has not made, used, offered to sell, or sold any alleged invention claimed in the '474 patent within the United States, or imported any alleged invention claimed in the '474 patent into the United States. Fresenius therefore has not infringed and does not currently infringe any asserted claim of the '474 patent, literally or under the doctrine of equivalents, directly or indirectly.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

45. Neither Fresenius Kabi AG nor Fresenius Kabi USA "make" or "manufacture" the Aurora Xi, nor does Fresenius Kabi AG or Fresenius Kabi USA "offer for sale," "sell" or "import" the Aurora Xi. Haemonetics alleges Fresenius engaged in "market[ing]" and "advertising," "[is] directly associated with the Aurora Xi System," and "owns all copyrights," but these are not acts of direct infringement. *See e.g.*, FAC ¶¶ 123, 145, 172 ("market[ing]"), ¶¶ 19, 20, 26, 27, 70, 125, 147 ("advertising"), ¶ 71 ("associated with"), ¶ 73 ("owns all copyrights"); *see also Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) ("[A]dvertisements are not considered offers for sale, but are instead merely solicitations for offers."); *Indag GmbH & Co. v. IMA S.P.A*, 150 F. Supp. 3d 946, 966 (N.D. Ill. 2015) ("To constitute an 'offer to sell' under traditional contract principles, an offer requires a definite price term, otherwise the offeree could make the offer into a binding contract by a simple acceptance."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1376 (Fed. Cir. 2005) (communications that describe the allegedly infringing materials but "do not contain any price terms . . . on their face . . .cannot be construed as an 'offer' which [the offeree] could make into a binding contract by simple acceptance"). In addition, acting as correspondent on a 510(k) submission is not an act of direct infringement, nor is acting as an Applicant for 510(k) clearance forms. *See* 35 U.S.C. § 271(a); *see also* FAC ¶ 71 (alleged submission of software to FDA).

**ANSWER:** This paragraph contains legal conclusions and mischaracterizations to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies the remaining allegations in this paragraph, if any.

46. Similarly, neither Fresenius Kabi AG nor Fresenius Kabi USA indirectly infringe the '474 patent. As an initial matter, there is no indirect infringement because there is no direct infringement of the '474 patent by the accused plasmapheresis systems at least because the accused plasmapheresis do not practice, literally or under the doctrine of equivalents, at least the following limitations (to the extent such terms are understandable at this juncture without the benefit of formal claim construction): "a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive at least a donor's weight,

height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant, wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on the donor's total blood volume and/or the donor's plasma volume, the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor." Absent direct infringement of the claims of a patent, there can be neither contributory infringement nor inducement of infringement. 35 U.S.C. § 271.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies the remaining allegations in this paragraph, if any.

47. Fresenius has not actively induced any infringement of the '474 patent. Fresenius lacks the requisite specific knowledge and intent to encourage infringement of the '474 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

48. Fresenius has not contributed to any infringement of the '474 patent. Fresenius does not offer to sell, sell, or import the Accused Products or any component thereof into the United States.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

49. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that it has not and does not infringe the '474 patent, that it has not actively induced the infringement of the '474 patent, and that it has not contributed to the infringement of the '474 patent.

**ANSEWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

**COUNT 6: INVALIDITY OF U.S. PATENT NO. 12,186,474**

50. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

51. Due to at least the allegations contained in Haemonetics' First Amended Complaint, an actual and justiciable controversy exists between Fresenius and Haemonetics concerning the validity of the '474 patent.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits it has asserted patent infringement claims against Fresenius regarding the '474 Patent.

52. The claims of the '474 patent are invalid for failure to satisfy one or more conditions of patentability specified in Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, and 112. *See also* PGR2025-00077 (petition for post-grant review of U.S. Patent No. 12,186,474). The Court may take judicial notice of PGR2025-00077, which is a matter of public record before the USPTO, and which Fresenius incorporates by reference. *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics admits that PGR2025-00077 is a matter of public record before the USPTO, but notes that Director Squires discretionarily denied this petition for post-grant review on March 10, 2026. Haemonetics denies the remaining allegations in this paragraph.

53. For example, the claims of the '474 patent are anticipated by the prior art, under 35 U.S.C. § 102, and are rendered obvious by the prior art under 35 U.S.C. § 103. The prior art is evidenced by at least the following:

a. Min

b. Barrett

c. Headley

d. "Membrane versus centrifuge-based therapeutic plasma exchange: a randomized prospective crossover study," Carsten Hafer et al., Int. Urol. Nephrol (2016) 48:133-138; Springer Science+Business Media Dordrecht 2015.

e. Turgut

f. "Volume Limits – Automated Collection of Source Plasma," November 4, 1992, Memorandum issued by the FDA Center for Biologics Evaluation and Research, Docket Number FDA-2013-S- 0613.

g. Bruce C. McLeod, MD, et al., "Apheresis: Principles and Practice," 3rd Edition, AABB Press 2010.

h. Barry

i. Bainbridge

j. Kimura

k. Sakota

l. Merleen M. Neyrinck & Hans Vrielink, "Calculations in Apheresis" Journal of Clinical Apheresis 30:38–42 (2015) ("Neyrinck").

m. Samuel B. Nadler et al., Prediction of blood volume in normal human adults, 51 Journal of Investigative Surgery 224-232 (1962) ("Nadler").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

54. Fresenius is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 from this Court that each and every claim of the '474 patent, is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

**COUNT 7: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE '652, '916, AND '474 PATENTS DUE TO INEQUITABLE CONDUCT (FENWAL PRIOR ART)**

55. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** This paragraph does not contain factual allegations to which a response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

56. Haemonetics' Asserted Patents (the '652, '916, and '474 patents) are unenforceable on account of inequitable conduct before the United States Patent and Trademark Office ("USPTO").

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics' Asserted Patents are valid and enforceable. Haemonetics denies that any inequitable conduct occurred before the USPTO during prosecution of the Asserted Patents.

57. Haemonetics obtained the Asserted Patents through fraud. Unable to compete with Fenwal's innovative Aurora Xi Plasmapheresis system on the merits, Haemonetics chose a different path: copy Fenwal's published patent claims nearly verbatim, conceal the copied source from the Patent Office, and suppress disclosure of Fenwal's prior art device that would have rendered Haemonetics' patents unpatentable.

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics has not obtained any patent through fraud. Haemonetics has not suppressed or concealed any information from the USPTO, with intent to deceive or otherwise. Far from being "unable to compete" with Fenwal's Aurora Xi system, Haemonetics has succeeded in the plasmapheresis market through continuous innovation, a market position earned through superior patented technology and customer service, not litigation strategy. The Aurora Xi device, standing alone, does not render any claim of the Asserted Patents unpatentable. Fresenius' bare assertion to the contrary conflates the existence of a competitor's product with anticipation or obviousness, ignoring the specific novel features claimed in Haemonetics' patents. To the extent Paragraph 57 alleges that Haemonetics "cop[ied] Fenwal's published patent claims nearly verbatim," Haemonetics admits that it used language from Fenwal's '989 Publication in drafting the continuation claims for the '916 and '474 patents. Haemonetics denies that this constitutes fraud or inequitable conduct. The inventive concepts underlying the Asserted Patents were conceived by Michael Ragusa and disclosed in the '652 patent application filed on May 30, 2017, nearly four years before the Fenwal '989 Publication existed and before its earliest provisional was even filed. Haemonetics' use of Fenwal's published claim language was a deliberate prosecution strategy to ensure that Fenwal's device, which practices the invention Haemonetics disclosed in 2017, would be captured by Haemonetics' claims. On information and belief, it is Fenwal that misappropriated Haemonetics' inventive work, having

improperly obtained knowledge of the invention. The '652 patent itself, filed years before Fenwal's publication, contains no language copied from any Fenwal source.

58. Over 98% of the claim language in Haemonetics' applications was lifted directly from Fenwal's prior-published patent application, including technical terminology that does not even appear in Haemonetics' own patent specification.

**ANSWER:** Haemonetics admits that it used language from Fenwal's '989 Publication in drafting the continuation claims for the '916 and '474 patents. To the extent that Fresenius contends certain claim terminology does not appear in Haemonetics' specification, Haemonetics states that the Haemonetics Asserted Patents contain adequate written description support for the asserted claims despite the exact words in the claims not being present in the specification. Haemonetics reserves its right to supplement this response as appropriate following further investigation. Haemonetics denies the remainder of the allegations in this paragraph.

59. The named inventor of the Asserted Patents, Michael Ragusa, and prosecuting attorney, John Lovely, knew of Fenwal's Aurora Xi device and Fenwal's related publications and patents, yet deliberately withheld this material information from the USPTO with the specific intent to deceive the Patent Office Examiner and secure patents Haemonetics could weaponize against its only competitors.

**ANSWER:** Haemonetics denies the allegations in this paragraph. There was no intent to deceive the USPTO. Michael Ragusa, the named inventor of the Haemonetics Asserted Patents, independently conceived the claimed inventions based on more than 30 years of experience in apheresis device research and development. Any omission of references during prosecution was not the product of deceptive intent. The duty of candor under 37 C.F.R. § 1.56 does not impose a requirement of omniscience, and the failure to cite a particular reference does not, without more, give rise to an inference of intentional deception. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc) (holding that the accused infringer must prove by clear and convincing evidence that the applicant "made a deliberate decision to withhold a known material reference" and that "the single most reasonable inference" is deceptive intent).

60. The Asserted Patents are the fruit of this fraud and should be declared unenforceable in their entirety. *See Guardant Health, Inc. v. Found. Med., Inc.*, No. CV 17-1616-LPS-CJB, 2020 WL 2477522, at *4 (D. Del. Jan. 7, 2020) ("Inequitable conduct regarding any single claim in the prosecution of a patent renders the entire patent unenforceable, not just that claim. Moreover, the taint of a finding of inequitable conduct can affect not just the improperly prosecuted patent, but can also 'render unenforceable other related patents and applications to the same technology. This concept is what courts have referred to as the doctrine of 'infectious unenforceability.'") (citing *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1288-89 (Fed. Cir. 2011) (en banc)).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. Haemonetics denies that the Asserted Patents are "the fruit of ... fraud" or that they should be declared unenforceable. Haemonetics further denies that the doctrine of "infectious unenforceability" has any application here. To the extent Fresenius relies on alleged misconduct during prosecution of the continuation patents (the '916 and '474 patents) to render the parent '652 patent unenforceable, this theory is doctrinally unsound. The infectious unenforceability doctrine, as recognized by the Federal Circuit, flows from parent to child. In other words, tainted prosecution of a parent application may infect continuations that derive from it. It does not operate in reverse. The '652 patent was filed in May 2017, prosecuted independently, and issued September 1, 2020. Nothing that occurred during the later prosecution of the '916 and '474 continuation applications, both of which were filed on March 18, 2021, can retroactively contaminate the '652 patent's prosecution. *See Therasense*, 649 F.3d at 1288–89. The '652 patent's prosecution was complete on its own terms, and the duty of candor owed during its pendency was satisfied by the disclosures made at that time.

61. Upon information and belief, at least one individual associated with the filing and prosecution of the applications that issued as the Asserted Patents, which include Johnathan Perullo, Michael Ragusa, and/or Johnathan Lovely and/or their agent(s), engaged in inequitable conduct before the USPTO.

**ANSWER:** Haemonetics denies that any individual associated with the filing and prosecution of the Haemonetics Asserted Patents engaged in inequitable conduct before the USPTO.

62. The inequitable conduct comprised intentional misrepresentations and/or omissions including, without limitation, the material omission of copying from Fenwal's published applications and the failure to disclose one or more pieces of prior art, during prosecution of the Asserted Patents in breach of the duty of candor and good faith required by 37 CFR § 1.56 with the intent to deceive the Patent Office.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

63. Despite clear knowledge of its main competitor in the field, Fenwal, and Fenwal's patents and competing products, the above-mentioned individuals failed to disclose critical information about the source of their copied claims, Fenwal's prior art devices, patents and publications that would have been material to the patentability of the Asserted Patents, with the goal of obtaining patents for Haemonetics to assert against the competition in hopes of gaining a competitive edge, and greater market share, as opposed to fairly competing within the market.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***Haemonetics' Prosecution of the Asserted Patents***

64. The '652 patent issued from United States Patent Application Serial No. 15/608,183 ("the '183 application"), titled "System and Method for Collecting Plasma," which was filed on May 30, 2017. On the same date, John Perullo, the Vice President, Legal Affairs of Haemonetics, executed a Power of Attorney appointing the law firm of Sunstein Kann Murphy & Timbers to represent Haemonetics Corporation in connection with any and all patent applications where Haemonetics Corporation is named. The '916 patent is a continuation of the '652 patent and the '474 patent is a continuation in part of the '652 patent.

**ANSWER:** Haemonetics admits that the '652 patent issued from U.S. Patent Application Serial No. 15/608,183, titled "System and Method for Collecting Plasma," filed on May 30, 2017. Haemonetics admits that the '916 patent is a continuation of the '652 patent and the '474 patent is a continuation-in-part of the '652 patent. Haemonetics admits that John Perullo executed a Power of Attorney appointing the law firm of Sunstein Kann Murphy & Timbers. Haemonetics denies the remaining characterizations and allegations in this paragraph.

65. Shortly after the '183 application was filed, Johnathan C. Lovely, an attorney then with the law firm of Sunstein Kann Murphy & Timbers, filed a Response to Informational Notice to Applicant and submitted an inventor's executed declaration to the USPTO. Michael Ragusa (the sole inventor of the Asserted Patents) signed a Declaration that was submitted to the

USPTO. The Declaration stated that Ragusa believed himself "to be the original inventor … of a claimed invention in the application." HAEM-FRE_0003516 at -4668. In addition, he "acknowledge[d] the duty to disclose to the US Patent and Trademark Office all information known to me to be material to patentability." *Id.* The Declaration acknowledged and cited 18 U.S.C. § 1001, which proscribes the making of a false statement to the federal government.

**ANSWER:** Haemonetics admits that Jonathan C. Lovely filed a Response to Informational Notice to Applicant and submitted an inventor's executed declaration to the USPTO. Haemonetics admits that Michael Ragusa signed a Declaration that was submitted to the USPTO. Haemonetics denies any inference of impropriety from these routine patent prosecution filings.

66. Thus, during prosecution of the Asserted Patents, at the very least, the following persons were subject to the duty of disclosure under 37 CFR § 1.56 and had a duty of candor and good faith in dealing with the USPTO: Perullo, Ragusa, and/or Lovely, and/or their agent(s).

**ANSWER:** Haemonetics admits that Perullo, Ragusa, and Lovely owed duties of disclosure under 37 C.F.R. § 1.56 during prosecution of the Asserted Patents.

***Fenwal Prior Art***

67. Fenwal has been an innovator in the field of apheresis dating back more than 75 years. During this time, Fenwal has brought to market several successful apheresis products. Each time, Haemonetics subsequently released copycat versions.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations regarding Fenwal's history as an "innovator in the field of apheresis dating back more than 75 years" and on that basis denies them. Haemonetics denies that it has "subsequently released copycat versions" of Fenwal products. Haemonetics has independently developed its own products based on its own patented innovations.

68. For example, in 2012, Fenwal debuted its Aurora plasmapheresis device. FENWAL 00004760. The Aurora system built on the proprietary separation technology that powered Fenwal's prior Autopheresis-C® system and improved operator and donor experience.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations regarding the debut of the Aurora plasmapheresis device in 2012 or the technical details of the Autopheresis-C system, and on that basis, denies them.

69. Fenwal continued to innovate, later launching its Aurora Xi products in 2016. FENWAL 00013973. Haemonetics followed in 2017 and 2018 with its NexSys PCS device. FENWAL 00004724; FENWAL 00004770.

**ANSWER:** Haemonetics admits that Fenwal launched Aurora Xi products in 2016 and that Haemonetics launched its NexSys PCS device. Haemonetics launched its PCS plasmapheresis device and PCS®2 device prior to Fenwal's launch of the Aurora Xi. Haemonetics denies the remaining allegations in this paragraph.

70. Most recently, Fenwal received FDA approval for its Adaptive Nomogram in January 2025, FENWAL 00004767; with Haemonetics following a year later with its NexSys PCS Persona Plus device in February 2026, HAEM-FRE_0091553, available at: https://www.fda.gov/media/191271/download?attachment (510K Summary Letter).

**ANSWER:** Haemonetics admits that Fresenius received FDA approval for its Adaptive Nomogram in January 2025. Haemonetics admits that it received FDA approval for its NexSys PCS Persona Plus device in February 2026. Haemonetics received FDA approval for its NexSys YES device in March 2018 and received FDA approval for its NexSys PERSONA device in October 2020, before Fresenius received FDA approval.

71. In other words: Fenwal invented, Haemonetics followed.

**ANSWER:** Haemonetics denies the allegations in this paragraph. The characterization that "Fenwal invented, Haemonetics followed" is a self-serving narrative based on a false premise and contradicted by the prosecution history of the Asserted Patents, which establish Haemonetics' independent innovation and priority.

72. Relevant to the inequitable conduct claims, in September 2016, Fenwal received FDA clearance for its Aurora Xi System. *See* FAC ¶ 76 ("The Aurora Xi System received FDA clearance[] in September 2016.").

**ANSWER:** Haemonetics admits that Fresenius received FDA clearance for its Aurora Xi System in September 2016. Haemonetics denies all remaining characterizations and allegations in this paragraph.

73. The 2016 Aurora Xi System was made available to the public after FDA approval in 2016.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

74. An Operator's Manual and Service Manual ("Prior Art Manuals") for the Aurora Xi System were published in October 2016 and accompanied each Aurora Xi Device. FENWAL 00029246 (WI-MF-936PK001 C - Aurora Xi Packaging Prep).

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

75. The 2016 Prior Art Manuals describe the Aurora Xi 2016 System and its functionality. FENWAL 00006371; FENWAL 00013985.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

76. The Fresenius Aurora Xi Plasmapheresis System Operator's Manual Software Version 1.0 and related Service Manual, dated October 2016 and January 2017, in addition to the Aurora Xi System itself (collectively the "Aurora Xi Prior Art"), constitute material prior art that was withheld from the Examiner during prosecution of the Asserted Patents.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

***Haemonetics Monitored Fenwal***

77. Haemonetics (including at least Ragusa, Perullo, and Lovely) was aware of Fenwal, its patent applications, and its devices, including the Aurora Xi device, prior to the filing of the applications for the Asserted Patents.

**ANSWER:** Haemonetics admits that it was aware of Fenwal as a competitor in the plasmapheresis market. Haemonetics denies that such awareness establishes knowledge of the specific references

Fresenius contends should have been disclosed and denies the remaining allegations in this paragraph.

78. Haemonetics claims the U.S. market for plasmapheresis devices was "highly concentrated" as of 2025 and "include[d] only three main competitors" – Haemonetics, Fenwal (a Fresenius Kabi AG subsidiary), and Terumo. FENWAL 00013903 at -3909 (IPR2025-01391, PO's Brief Requesting Discretionary Denial).

**ANSWER:** Haemonetics admits the allegations in this paragraph include quotes from a separate proceeding.

79. At the time the Asserted Patents were being prosecuted, the market was even more concentrated because Terumo had not yet entered. *Id.* (Terumo did not "enter[] this highly concentrated market with its competing product [until] 2022").

**ANSWER:** Haemonetics admits that it has described the plasmapheresis market in certain filings. Haemonetics otherwise lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

80. Prior to May 30, 2017, by Haemonetics' admission, the only competitors in the field were Haemonetics and Fenwal/Fresenius Kabi. FENWAL 00029160 (Haemonetics Corp. Analyst Investor Day, May 20, 2014), at -9180 ("Who's the competition?"…Plasma, it's us and it's Fenwal."); FENWAL 00013976 (Haemonetics Corp. Company Conference Presentation, January 14, 2015), at -3979 ("Let me start with plasma . . . . The biggest competitor in that space being Fenwal now owned by Fresenius.").

**ANSWER:** Haemonetics admits that it has acknowledged Fenwal/Fresenius Kabi as a competitor in the plasmapheresis market. Haemonetics denies the remaining allegations in this paragraph.

81. Haemonetics was aware of its only competitor Fenwal's plasmapheresis products. Haemonetics characterizes the market to be "a tightly confined industry, where each participant closely monitors the others' products, regulatory filings, and patent activity," making awareness of competitor products "undeniable." FENWAL 00013903 at -3909. Haemonetics further states, "[u]nlike some broader industries, there can be no doubt about competitor awareness here." *Id.*

**ANSWER:** Haemonetics admits that it has described the plasmapheresis market in certain filings. Haemonetics otherwise lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

82. Haemonetics was well aware of and actively monitored Fenwal's plasmapheresis devices, including the Aurora Xi device.

**ANSWER:** Haemonetics admits that it has acknowledged Fresenius/Fenwal as a competitor in the plasmapheresis market. Haemonetics denies the remaining allegations in this paragraph.

83. Haemonetics consistently referenced Fenwal and the Aurora Xi in its public statements, including its 10-K submissions and at conferences. In the context of its 2015 10-K submissions to the SEC, Haemonetics specifically stated, "In the automated plasma collection market, we principally compete with Fresenius, which acquired Fenwal." FENWAL 00014351 (Haemonetics Corp. 2015 Form 10-K), at -4359.

**ANSWER:** Haemonetics admits that it referenced Fresenius/Fenwal and the Aurora Xi in certain public statements, including 10-K submissions. Haemonetics denies the remaining allegations in this paragraph.

84. In Haemonetics' 2018 10-K, Haemonetics clarified, "in the automated plasma collection market, we principally compete with Fresenius' Fenwal Aurora and Aurora Xi product line." FENWAL 00014578 (Haemonetics Corp. 2018 Form 10-K), at -4586.

**ANSWER:** Haemonetics admits that the quoted language in this paragraph is accurate.

85. As another example, each year at the Raymond James Annual Institution Investors Conference, Haemonetics identified "Fresenius Fenwal (Aurora)" as its competition in the Plasmapheresis space. FENWAL 00029256 at -9262, available at: https://haemonetics.gcs-web.com/static-files/b855d07a-edcd-4b70-b6d9-8690de1a7daa ; FENWAL 00029275 at 7, available at: https://haemonetics.gcs-web.com/static-files/8d70200b-0ee6-4e3c-bbee-0c01fb2d51df.

**ANSWER:** Haemonetics admits that at least once it identified Fresenius Fenwal as its competition at an investor conference. Haemonetics denies the remaining allegations in this paragraph.

86. Individuals involved in the prosecution of the Asserted Patents on behalf of Haemonetics had specific knowledge of Fenwal's devices. Ragusa, the sole named inventor of the Asserted Patents, has been employed by Haemonetics for more than 30 years. Over the three decades Ragusa has worked for Haemonetics, he has held roles ranging from Manager of Research and Development in the Apheresis Department, Director of all R&D Departments, and VP of R&D Donor Division, where he was a Member of the Division Executive Staff.

**ANSWER:** Haemonetics admits that Ragusa has been employed by Haemonetics for more than 30 years and has held various roles within the company. Haemonetics denies the remaining allegations in this paragraph.

87. Ragusa worked on plasma collection devices. FENWAL 00014347 (Ragusa LinkedIn Biography). He was R&D Manager of Apheresis Development; he published articles related to "Personalized Collection of plasma from healthy donors" and "Source plasma collection in the United States." *Id.* at -4737. Ragusa was "responsible for technical product roadmap across all business segments" including "plasmapheresis." *Id.* at -4738. Throughout this work, Ragusa admits that he "immersed himself in customer's business and identified areas of technical need." *Id.* at -4739. He was involved in "technical due diligence" projects. And he was responsible for "expand[ing] and manag[ing], with Legal support, the Intellectual Property portfolio." *Id.* at -4738.

**ANSWER:** Haemonetics admits that Ragusa worked on plasma collection devices and held the roles described and published certain articles. These facts establish Ragusa's independent expertise as a prolific inventor in the field, not the inference of misconduct Fresenius attempts to draw. Haemonetics denies the remaining allegations in this paragraph.

88. Ragusa, who has spent his entire professional career working for Haemonetics developing devices, was aware of the Aurora Xi device—the plasmapheresis product of its main competitor.

**ANSWER:** Haemonetics admits that Ragusa was generally aware of competing products including the Aurora Xi. Haemonetics denies the remaining allegations in this paragraph.

89. On information and belief, Ragusa was involved in the development of the NexSys PCS Plasma Apheresis System for which Haemonetics Corporation received FDA 510(k) clearance on July 25, 2017—the device designed to compete against the Aurora Xi.

**ANSWER:** Haemonetics admits that Ragusa was involved in the development of the NexSys PCS device. Haemonetics denies the remaining allegations in this paragraph.

90. Thus, Ragusa was simultaneously developing the competing NexSys PCS device and prosecuting the Asserted Patents—all while fully aware of Fenwal's Aurora Xi device.

**ANSWER:** Haemonetics admits that Ragusa was involved in the development of the NexSys PCS device. Haemonetics denies the remaining allegations in this paragraph.

91. Ragusa is the named inventor on 24 issued U.S. patents (in addition to the three Asserted Patents), all of which are assigned to Haemonetics and relate to blood processing devices and/or fluid sampling systems. He also communicated directly with the Executive and Board members about his work related to plasmapheresis products. By the time of the filing of the ’916 and ’474 applications in 2021, Ragusa was the Senior Director of Research and Development where he admits he “provided review of technical initiatives to CEO and Board Members.” FENWAL 00014347 at -4349.

**ANSWER:** Haemonetics admits that Ragusa is the named inventor on additional U.S. patents assigned to Haemonetics and that Ragusa communicated with Haemonetics’ executives regarding plasmapheresis products. Haemonetics denies the remaining allegations in this paragraph.

92. Perullo, the Vice President, Associate General Counsel, and Chief Intellectual Property Officer, has worked for Haemonetics for more than 21 years, and now “oversees all general, commercial, and regulatory compliance for the global hospital business and all IP legal matters corporate-wide.” FENWAL 00017083. He “participat[es] in strategic business discussions throughout the entire decision making process [at Haemonetics] and advis[es] on IP, technology, competitor, and market landscape issues.” *Id.* at -7084. He admits to managing Haemonetics’ “portfolio of 400+ issued patents and almost 300 pending applications” and “working with innovators on new concepts.” *Id.* In addition, Perullo was responsible for “drafting and negotiating business-focused contracts” for Haemonetics. *Id.*

**ANSWER:** Haemonetics admits that Perullo has held the roles described and has managed Haemonetics’ patent portfolio. Haemonetics denies the remaining allegations in this paragraph.

93. Given his responsibilities at Haemonetics, and the limited competition in 2021 (only Fresenius/Fenwal competed with Haemonetics), Perullo was aware of the Aurora Xi.

**ANSWER:** Haemonetics denies that awareness of the Aurora Xi is established by virtue of Perullo’s position. Haemonetics denies the remaining allegations in this paragraph.

94. Lovely, who had been prosecuting patents for Haemonetics in the field of blood collection systems since at least November 2007, knew about Haemonetics’ main competitor’s devices at least as part of the diligence that accompanies the filing of new patent applications.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and, on that basis, denies them.

***Haemonetics Copied Fenwal***

95. On January 21, 2021, Fenwal's U.S. 17/062,368 patent application, which is related to "a plasmapheresis system and a method for operating a plasmapheresis system," published as US2021/0015989A1. FENWAL 00017060.

**ANSWER:** Haemonetics admits that Fenwal's U.S. Patent Application No. 17/062,368 published as US2021/0015989A1 on January 21, 2021.

96. Figure 2 of the Fenwal '989 Publication includes a technical drawing of the Aurora Xi device (compare Figure 2 of the '989 Publication on the left with an image of Aurora Xi device):




*Fig. 2*



FENWAL 00017060 at -17062.

FENWAL 00013973 at -3973.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations regarding the contents of Figure 2 of the Fenwal '989 Publication or its similarity to the Aurora Xi device.

97. On March 18, 2021, two months ***after*** Fenwal's US2021/0015989A1 application was published, Haemonetics filed patent application numbers 17/205,374 (the "'374 application") and 17/205,400 (the "'400 application"), which granted as the '916 and '474 asserted Haemonetics patents, respectively. HAEM-FRE_0004804; HAEM-FRE_0005372.

**ANSWER:** Haemonetics admits that it filed patent application numbers 17/205,374 and 17/205,400 on March 18, 2021 and that the '989 Publication was published approximately two months before these filings. Haemonetics denies the remaining allegations in this paragraph.

98. The claims in the '374 and '400 applications, as submitted by Lovely and Ragusa on March 18, 2021, are identical or nearly identical to the claims in Fenwal's US2021/0015989A1 publication.

**ANSWER:** Haemonetics admits that the claims in the '374 and '400 applications are identical or nearly identical to the claims in the '989 Publication. Haemonetics denies that this constitutes fraud, inequitable conduct, or misappropriation of any inventive contribution by Fenwal. The inventive concepts claimed in the '374 and '400 applications were disclosed by Haemonetics in its '652 patent application filed in May 2017, years before the Fenwal publication existed. Haemonetics used Fenwal's published claim language because Fenwal's claims described the same invention Haemonetics had previously disclosed. Haemonetics denies the remaining allegation in this paragraph.

99. For example, and as shown below, Claim 1 of the Haemonetics '400 application is a verbatim copy of Claim 42 of Fenwal's '989 Publication:

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1<br>Claim 42<br><br>Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,400 COPIED Claim 1<br><br>Filed March 18, 2021** |
|---|---|
| A system for collecting plasma, comprising:<br>a venipuncture needle configured to draw whole blood from a donor; | A system for collecting plasma, comprising:<br>a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; and | a touchscreen configured to receive input from an operator; and |
| a controller programmed to control operation of the system, | a controller programmed to control operation of the system, |
| the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit,<br><br>to determine a target volume for plasma product and/or raw plasma, to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood component and | the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit,<br><br>to determine a target volume for plasma product and/or raw plasma, to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood component and |

| Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1<br>Claim 42<br><br>Published January 21, 2021 | Haemonetics U.S. Pat. App. No. 17/205,400<br>COPIED Claim 1<br><br>Filed March 18, 2021 |
|---|---|
| to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. | to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. |

**ANSWER:** Haemonetics admits that Claim 1 of the '400 application uses language identical to Claim 42 of Fenwal's '989 Publication.

100. Haemonetics did not just copy Claim 42 of the Fenwal '989 Publication. All 27 claims of the '400 application were copied from the earlier Fenwal '989 Publication.

**ANSWER:** Haemonetics admits that all 27 claims of the '400 application were drafted using language from Fenwal's '989 Publication.

101. 21 claims were copied verbatim, 4 claims were modified to drop the phrase "from a donor management system" and 2 claims were modified to use the term "control system" instead of "donor management system." This copying is evidenced in Appendix E-1 to Defendants' Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, which is attached hereto as Exhibit A.

**ANSWER:** Haemonetics admits that variations were made to certain claims in the '400 application. Haemonetics denies the remaining allegations in this paragraph.

102. In sum, Haemonetics copied more than 1,750 Fenwal claim words and claimed them as its own in the '400 application.

**ANSWER:** Haemonetics admits that claims in the '400 application were the same as the words in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

103. Further evidence of Haemonetics' copying is provided by the fact that technical claim language Haemonetics introduced in its '400 application does not appear anywhere in the specification accompanying the '400 application.

**ANSWER:** Haemonetics admits that certain claim terms used in the continuation applications do not appear verbatim in the accompanying Haemonetics specification. Haemonetics denies the remaining allegations in this paragraph.

104. For example, the claim language "plasma output port" (Haemonetics Claims 1, 7, 10, 16) does not appear anywhere in the Haemonetics specification for the '400 application—it only appears in the copied claim language. In comparison, "plasma output port" is found in both the specification ([0021], [0038], [0096]) and claims (Claims 48, 52 and 60) of the Fenwal '989 Publication.

**ANSWER:** Haemonetics admits that the term "plasma output port" does not appear in the '400 application specification and it does appear in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

105. Similarly, "donor parameters," which appears in Haemonetics' copied claims 16, 21, and 22, does not appear in the Haemonetics specification. "Donor parameters" appears in the Fenwal specification at paragraphs [0059], [0064], and [0095] and claims 60, 65, and 66.

**ANSWER:** Haemonetics admits that the term "donor parameters" does not appear in the '400 application specification and it does appear in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

106. Likewise, the claim language "current value of the hematocrit of the donor" of Haemonetics Claim 1 appears only in the copied claim language. In comparison, this language is present in both the specification ([0066] ("current value for the hematocrit of the donor")) and claims (Claim 42) of the Fenwal '989 Publication.

**ANSWER:** Haemonetics admits that the term "current value of the hematocrit of the donor" does not appear in the '400 application specification but similar language does appear in the '989 Publication. Haemonetics denies the remaining allegations in this paragraph.

107. Other examples of Haemonetics' copied claims including Fenwal technical language include:

(i.) “Raw Plasma,” which only appears in Haemonetics copied Claims 1-3, 5, 6, 7, 10, 16, 17, 19, 20, 21, 22, 26 but which originally appears in Fenwal’s ’989 Publication 98 times including, for example, at Abstract, [0001], [0007] and Claims 42-44, 46-49.

(ii.) “Venipuncture Needle,” which only appears in Haemonetics copied Claims 1, 7, 10, 16, but which originally appears in Fenwal’s ’989 Publication 14 times including, for example, at [0021], [0030] and Claims 42, 48, 52, 60.

(iii.) “Draw and Return Cycle,” which only appears in Haemonetics copied Claims 1, 2, 10, 15, but which originally appears in Fenwal’s ’989 Publication at [0066] and Claims 42, 43, 44.

(iv.) “Reservoir,” which only appears in Haemonetics copied Claim 27, but which originally appears in Fenwal’s ’989 Publication at [0021], [0038], [0039] and Claim 71.

(v.) “Anticoagulant Ratio,” which only appears in Haemonetics copied Claims 10 and 26, but which originally appears in Fenwal’s ’989 publication at [0016], [0017], [0056] and Claims 49, 52, 56.

**ANSWER:** Haemonetics admits that the listed terms do not appear in the ’400 application specification but do appear in the ’989 Publication. Haemonetics denies the remaining allegations in this paragraph.

108. Haemonetics’ copying is not limited to the ’400 application. In the ’374 application, filed on the same day, Haemonetics similarly copied the earlier published Fenwal claims, making comparable minor variations.

**ANSWER:** Haemonetics admits that certain language in the ‘374 application is the same as the language in the ’989 Publication. Haemonetics denies the remaining allegations in this paragraph.

109. For example, and as shown below, Claim 10 of the Haemonetics ’374 application is a verbatim copy of Claim 52 of Fenwal’s ’989 Publication, but for Haemonetics’ omission of the word “height” in two instances (see highlighting):

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1<br>Claim 52<br><br>Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,374<br>COPIED Claim 10<br><br>Filed March 18, 2021** |
|---|---|
| A system for collecting plasma, comprising: | A system for collecting plasma, comprising: |
| a venipuncture needle configured to draw whole blood from a donor; | a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; and | a touchscreen configured to receive input from an operator; and |

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1**<br>**Claim 52**<br><br>**Published January 21, 2021** | **Haemonetics U.S. Pat. App. No. 17/205,374**<br>**COPIED Claim 10**<br><br>**Filed March 18, 2021** |
|---|---|
| a controller | a controller |
| programmed to control operation of the system, the controller coupled to the touchscreen<br><br>and programmed to receive at least a donor's weight, height and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant,<br><br>wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight, height and the donor's hematocrit,<br><br>the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor. | programmed to control operation of the system, the controller coupled to the touchscreen<br><br>and programmed to receive at least a donor's weight and hematocrit and to determine a target volume for plasma product comprising raw plasma and anticoagulant,<br><br>wherein the target volume for plasma product is determined prior to withdrawing the whole blood from the donor based at least in part on an anticoagulant ratio, the donor's weight and the donor's hematocrit,<br><br>the controller programmed to then control the system to operate a plurality of draw and return cycles to withdraw whole blood from the donor and separate the whole blood into the plasma product and the second blood component and to return the second blood component to the donor. |

**<u>ANSWER:</u>** Haemonetics admits that Claim 10 of the '374 application uses language substantially identical to Claim 52 of Fenwal's '989 Publication.

110. In other words, out of the 264 words in Fenwal's Claim 52, 262 of those words (over 99%) were copied into Haemonetics' later-filed Claim 10.

**<u>ANSWER:</u>** Haemonetics admits that Claim 10 of the '374 application uses language substantially identical to Claim 52 of Fenwal's '989 Publication.

111. Out of the 232 words in Fenwal's Claim 48, 228 of those words (over 98%) are present in Haemonetics' Claim 7 (which is identical but for Haemonetics' removal of the words "height" and "sex" in two instances).

**<u>ANSWER:</u>** Haemonetics admits that claim 7 of the '374 application uses language substantially identical to Claim 48 of Fenwal's '989 Publication.

112. Likewise, out of the 276 words in Fenwal's Claim 42, 274 of those words (over 98%) are identical to Haemonetics' 278-word Claim 1; here, Haemonetics merely changed the word "touchscreen" found in Fenwal's patent application to "user interface."

**ANSWER:** Haemonetics admits that claim 1 of the '374 application uses language substantially identical to Claim 42 of Fenwal's '989 Publication.

113. Other examples of copying are evident from a cursory review of the remaining claims in the '374 application, as evidenced in Appendix E-2 to Defendants' Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, which is attached hereto as Exhibit B.

**ANSWER:** Haemonetics admits that Appendix E-2 to Defendants' Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, includes the remaining claims of the '374 application.

114. Haemonetics, including prosecuting attorney Lovely, drafted the applications that became the '916 and '474 patents by copying Fenwal's claims nearly verbatim.

**ANSWER:** Haemonetics admits that it used language from Fenwal's Publication in drafting certain claims but denies that it drafted any entire patent applications by copying claims.

115. Following the initial filing of its '374 and '400 applications, Haemonetics continued to rely on Fenwal's '989 Publication to modify its own patent claims to track Fenwal's—again without disclosure to the PTO.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

116. In its first response to an Office Action in the pending '400 application prosecution, which occurred on August 6, 2024, Haemonetics amended "its" claims to further mirror Fenwal's claims by revising the copied claim language to add additional Fenwal claim limitations.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

117. Specifically, Haemonetics amended the independent claims to include the limitation "to determine a target volume for plasma product and/or raw plasma based on the donor's total blood volume and/or the donor's plasma volume" (addition underlined), which is copied from claims found in Fenwal's '989 Publication. For example:

| **Fenwal U.S. Pat. App. Pub. No. 2021/0015989A1**<br>**Claim 46**<br><br>**Published January 21, 2021** | **Haemonetics US Patent No. 12,186,474**<br><br>**Amended August 6, 2024** |
|---|---|
| Claim 42 | COPIED Claim 1 |

| | |
|---|---|
| A system for collecting plasma comprising: | A system for collecting plasma, comprising: |
| a venipuncture needle configured to draw whole blood from a donor; | a venipuncture needle configured to draw whole blood from a donor; |
| a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, | a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, |
| the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; |
| a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; | a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the blood separator, flow through the donor line being controlled by a first pump; |
| an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; |
| a touchscreen configured to receive input from an operator; | a touchscreen configured to receive input from an operator; and |
| and a controller programmed to control operation of the system, | a controller programmed to control operation of the system, |
| the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit, | the controller coupled to the touchscreen and programmed to receive at least a donor's weight and hematocrit, |
| to determine a target volume for plasma product and/or raw plasma, | to determine a target volume for plasma product and/or raw plasma based on the donor's total blood volume and/or the donor's plasma volume, |
| to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood | to control the system to operate a draw and return cycle to withdraw the whole blood from the donor and separate the whole blood into the plasma product and the second blood |

| | |
|---|---|
| component and to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. | component and to return the second blood component to the donor, to establish a current value of the hematocrit of the donor and a new target volume for plasma product and/or raw plasma, and to control the system to operate a subsequent draw and return cycle, whereby the donor's changing hematocrit is taken into account in calculating the new target volume for plasma product and/or raw plasma. |
| Claim 46 | |
| 46. The system of claim 42, wherein the controller is programmed to determine the target volume for plasma product and/or raw plasma based on the donor's total blood volume and the donor's plasma volume. | |

**ANSWER:** Haemonetics admits that it amended its independent claims to include the quoted language. Haemonetics denies the remaining allegations in this paragraph.

118. Strikingly, the phrase "based on the donor's total blood volume and/or donor's plasma volume" does not appear anywhere in the specification of the Haemonetics '400 application. It only exists in the context of the Haemonetics copied claims (and the Fenwal application from which it was derived).

**ANSWER:** Haemonetics denies the allegations in this paragraph. The presence of certain claim terms in the claims but not verbatim in the specification does not by itself establish copying.

119. Haemonetics' copying of Fenwal's claims infects the patents Haemonetics asserts. For example, Claim 10 of the '916 Patent as issued is identical to the copied Claim 10 of Haemonetics' '374 application (and by extension, Fenwal's '989 Publication).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

120. Other asserted claims exhibit only minor differences. For example, Claim 14 of the '916 Patent replaces the term "donor management system" from Claim 60 of the '989 Publication with "control system," but is otherwise identical. *See also, e.g.*, Claim 15 of the '474 Patent versus Claim 60 of the '989 Publication (omitting "from a donor management system" and adding "donor's total blood volume" and "donor's total plasma volume" language originally found in Fenwal's '989 Publication).

**ANSWER:** Haemonetics admits that there are minor differences between certain of its claims and the '989 Publication.

121. In sum, the overlap is substantial, with the minor differences being essentially minor word variations or omissions.

**ANSWER:** Haemonetics admits that there are minor differences between certain of its claims in the '400 application and the '374 application and the '989 Publication.

122. It is simply unbelievable that Haemonetics independently wrote identical claims without knowledge of Fenwal's activities and patent claims. The only reasonable conclusion is that Haemonetics, including at least Ragusa and Lovely, had knowledge of Fenwal's patents and the information they contained, including the Aurora Xi, and copied Fenwal's claims.

**ANSWER:** Haemonetics admits that its prosecuting attorney had knowledge of Fenwal's published claims and used that language in the continuation applications. Haemonetics denies the remaining allegations in this paragraph.

123. Haemonetics, including Ragusa and Lovely, did not cite the '989 Publication when filing its application 17/205,374 and 17/205,400. Nor did they file any Information Disclosure Statement during the prosecution of the '652, '474 or '916 patents which disclosed any of the following: (a) the Aurora Xi System; (b) the Aurora Xi System Operator's Manual (October 2016); or (c) the Aurora Xi System Service Manual (January 2017).

**ANSWER:** Haemonetics admits that the '989 Publication was not cited in an Information Disclosure Statement during prosecution of the '652, '474, or '916 patents. As to the '652 patent: the '989 Publication did not exist during its prosecution and therefore could not have been disclosed. As to the '916 and '474 patents: Haemonetics admits that the '989 Publication was not cited despite Haemonetics' awareness of it. Haemonetics denies that this failure was the product of deceptive intent. The '989 Publication is not prior art to the '474 or '916 patents. Haemonetics admits that no Information Disclosure Statement disclosed the Aurora Xi System, the Aurora Xi Operator's Manual, or the Aurora Xi Service Manual during prosecution of these patents. Denied that the failure to cite these references constitutes inequitable conduct or was the product of deceptive intent.

124. Haemonetics, including at least Ragusa and Lovely, committed fraud upon the USPTO when they failed to cite Fenwal U.S. Patent Application Publication No. 2021/0015989 and the Aurora Xi Prior Art when filing its 17/205,374 and 17/205,400 applications.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph. The failure to cite a reference does not constitute "fraud upon the USPTO". Haemonetics denies that any individual associated with the prosecution of the Asserted Patents acted with intent to deceive.

***Haemonetics Acknowledges the Materiality of the Prior Art***

125. Haemonetics (specifically Perullo, Ragusa and Lovely) knew disclosure of the Aurora Xi Prior Art and Fenwal application during the prosecution of the Asserted Patents would have been material to the patentability of these applications.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

126. As an initial matter, the fact that Haemonetics' issued patents contain nearly identical claims as a prior Fenwal published application raises a substantial inventorship question that is material to the patentability of the Haemonetics' patents. *See, e.g.*, *Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1360 (Fed. Cir. 2010) (finding failure to disclose a patent application containing nearly identical claim language during prosecution was material at least with regard to inventorship).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

127. Moreover, Haemonetics' failure to disclose the prior art Aurora Xi device impacted the patentability of the claims. Haemonetics acknowledges the materiality of the Aurora Xi device Prior Art by citing to it in Haemonetics' First Amended Complaint. *See, e.g.*, *Upsher-Smith Labs., Inc. v. Pamlab, LLC*, 412 F.3d 1319, 1322 (2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'").

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

128. The same images and text that Haemonetics cites from the 2025 Aurora Xi Manual to support allegations of infringement of its patents appear in the prior art versions of the Operator's Manual and Service Manual (and the publicly available device itself) that were published in October 2016 and January 2017, respectively.

**ANSWER:** Haemonetics admits that some images from the 2025 Aurora Xi Manual appear in versions of the Operator's Manual and Service Manual that were published in October 2016 and January 2017, respectively.

129. Both manuals predate the earliest priority date of Haemonetics' Asserted Patents. Relevant examples from Haemonetics' infringement allegations as to the '916 Patent are reproduced below, with the claim limitation on the left, Haemonetics' infringement allegations in the middle, and identical or nearly identical text and images from Fenwal's October 2016 or January 2017 manuals on the right.

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[d] an anticoagulant line coupled to an anticoagulant source, the anticoagulant line configured to combine anticoagulant with the whole blood from the donor, flow through the anticoagulant line being controlled by a second pump; | Figure 1: Collection Phase<br><br>FENWAL_00007068 | <br>2.1 Collection Phase<br>FENWAL 00014012 |

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[a] a venipuncture needle configured to draw whole blood from a donor; | The disposable set also includes several tubing lines for transporting anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant within the device during the Collection/Reinfusion Phases. The individual lines in a set are as follows:<br>FENWAL_00007083<br><br>**AC Line:** Transports AC solution through the AC pump to the Y1-connector.<br>FENWAL_00007083<br><br>**Blood Line:** Transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this tubing from the reservoir and go back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL_00007083<br><br>**Donor Line:** Transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir and go back to the donor.<br>FENWAL_00007083<br><br>**Plasma Line:** Transports plasma from the separator to the plasma collection container.<br>FENWAL_00007083<br><br>**Reinfusion Line:** Transports reservoir contents from the reservoir to the blood line.<br>FENWAL_00007083<br><br>**Saline Line:** Transports saline from the saline container to the Y5-connector. The line does not transport fluids for a No Saline Protocol, although it may contain blood on the right side of the saline clamp while performing a No Saline Protocol.<br>FENWAL_00007083 | **Disposable Set Tubing**<br>The disposable set also includes several tubing lines; each of which is used to transport either anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant from one location on the instrument to another during the Collection/Reinfusion Phases. The individual lines comprising a set are as follows:<br>FENWAL 00014028<br>• **AC Line:** The AC line tubing transports AC solution through the AC pump to the Y1-connector.<br>FENWAL 00014029<br>• **Blood Line:** The blood line tubing transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this section of tubing from the reservoir back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL 00014029<br>• **Donor Line:** The donor line tubing transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir back to the donor.<br>FENWAL 00014029<br>• **Plasma Line:** The plasma line transports plasma from the separator to the plasma collection container.<br>FENWAL 00014029<br>• **Reinfusion Line:** The reinfusion line tubing transports reservoir contents from the reservoir to the blood line.<br>FENWAL 00014029<br>• **Saline Line:** The saline line tubing transports saline from the saline container to the Y5-connector. The line is not used to transport fluids for a No Saline Protocol although it may contain blood on the right side of the saline clamp while performing a No Saline Protocol.<br>FENWAL 00014029 |

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[b] a blood separator configured to separate the whole blood into a plasma product and a second blood component comprising red blood cells, the blood separator having a plasma output port coupled to a plasma line configured to send the plasma product to a plasma product collection container; | The plasma then moves from the plasma output port, through the plasma line, and into the plasma collection container. Concentrated cells are pumped from the concentrated cell output port and into the reservoir.<br>Figure 9: Separator<br><br><br>The disposable set also includes several tubing lines for transporting anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant within the device during the Collection/Reinfusion Phases. The individual lines in a set are as follows:<br>FENWAL_00007082 (annotated)<br>**AC Line:** Transports AC solution through the AC pump to the Y1-connector.<br>FENWAL_00007083<br>**Blood Line:** Transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this tubing from the reservoir and go back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL_00007083<br>**Donor Line:** Transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir and go back to the donor.<br>FENWAL_00007083 | <br><br>2.9 Separator<br>FENWAL 00014028<br>**Disposable Set Tubing**<br>The disposable set also includes several tubing lines; each of which is used to transport either anticoagulated whole blood, concentrated cells, plasma, saline, or anticoagulant from one location on the instrument to another during the Collection/Reinfusion Phases. The individual lines comprising a set are as follows:<br>FENWAL 00014028<br>• **AC Line:** The AC line tubing transports AC solution through the AC pump to the Y1-connector.<br>FENWAL 00014029<br>• **Blood Line:** The blood line tubing transports anticoagulated whole blood from the Y2-connector through the Y3- and Y4-connectors to the Y5-connector at the separator. Reservoir contents also pass through part of this section of tubing from the reservoir back to the donor (i.e., from the Y3-connector to the Y2-connector).<br>FENWAL 00014029<br>• **Donor Line:** The donor line tubing transports anticoagulated whole blood from the Y1-connector to the Y2-connector. Reservoir contents also pass through this tubing section from the reservoir back to the donor.<br>FENWAL 00014029 |

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[c] a donor line fluidly coupled to the venipuncture needle configured to introduce the whole blood from the donor to the separator, flow through the donor line being controlled by a first pump; | **Pumps**<br>Three peristaltic pumps are located on the front panel. The individual functions are described below.<br>• **AC Pump:** Delivers the AC solution at a controlled rate into the blood line as whole blood enters the set from the donor during the Collection Phase. This pump does not operate during the Reinfusion Phase.<br>• **Blood Pump:** Primes the disposable set and clears air from the donor line. Collects whole blood from the donor and delivers anticoagulated blood to the separator during the Collection Phase (see Figure 1 – Collection Phase). The blood pump reverses and pumps concentrated cellular components from the reservoir back to the donor through the same venipuncture site during the Reinfusion Phase (see Figure 2 – Reinfusion Phase). If a Saline Protocol is used, the blood pump also delivers saline to the donor during the Final Reinfusion Phase.<br>• **Cell Pump:** Delivers concentrated cellular components from the separator to the reservoir during the Collection Phase. It also primes the disposable set. This pump does not operate during the Reinfusion Phase except to clear blood from the separator during the Final Reinfusion Phase.<br>FENWAL_00007073 | **Pumps**<br>Three peristaltic pumps are located on the front panel. The individual functions are described below.<br>• **AC Pump:** During the Collection Phase, delivers the AC solution at a controlled rate into the blood line as whole blood enters the set from the donor. This pump does not operate during the Reinfusion Phase.<br>• **Blood Pump:** It primes the disposable set and clears air from the donor line. During the Collection Phase, collects whole blood from the donor and delivers anticoagulated blood to the separator (see Figure 2.1 for a diagram showing the Collection Phase). During the Reinfusion Phase, the blood pump reverses and pumps concentrated cellular components from the reservoir back to the donor through the same venipuncture site (see Figure 2.2 for a diagram showing the Reinfusion Phase). It may also deliver saline to the donor during the Final Reinfusion Phase, if a Saline Protocol is used.<br>• **Cell Pump:** During the Collection Phase, delivers concentrated cellular components from the separator to the reservoir. It also primes the disposable set. This pump does not operate during the Reinfusion Phase except to clear blood from the separator during the Final Reinfusion Phase.<br>FENWAL 00014018-19 |

| '916 Patent Claims 14-17, 19, 22 | Representative Evidence of the Accused Instrumentalities | Aurora Xi Plasmapheresis Plasmapheresis System Operator's Manual Version 1.0 dated October 2016 |
|---|---|---|
| 14[f] a controller programmed to control operation of the system, the controller coupled to the touchscreen and programmed to receive donor parameters electronically from a control system, to determine a target volume for plasma product and/or raw plasma based at least in part on the donor parameters and to control the system to operate draw and return phases to withdraw … | **Main Data Entry Overlay**<br>**Donor ID Button:** If enabled, allows entry of the donor ID number for the procedure.<br>**Donor Gender Button:** If enabled, allows entry of the donor's gender for the procedure.<br>**Donor Height Button:** If enabled, allows entry of the donor's height for the procedure. This can be in inches or centimeters, depending on the administrative settings.<br>**Donor Weight Button:** Allows entry of the weight of the donor. This can be in kilograms or pounds, depending on administrative settings.<br>**Figure 45: Typical Main Data Entry Screen – Donor Data**<br><br>**Donor Hematocrit/Hemoglobin Button:** Allows entry of the hematocrit or hemoglobin value of the donor. Note this displays as either hematocrit or hemoglobin, depending on the administrative settings.<br>**Target Saline Infusion Volume Button:** Allows entry of the target saline infusion volume for the procedure during a Saline Protocol.<br>FENWAL_00007118 | *Main Data Entry Overlay*<br><br>4.8 Typical Main Data Entry Screen — Donor Data<br>**Donor ID Button:** If enabled, allows entry of the donor ID number for the procedure. For information on the overlay, see the alphanumeric extended keypad information in Chapter 2.<br>**Donor Gender Button:** If enabled, allows entry of the donor's gender for the procedure. This overlay is shown in the Donor Gender Overlay section.<br>**Donor Height Button:** If enabled, allows entry of the donor's height for the procedure. This can be in inches or centimeters, depending on the administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Donor Weight Button:** Allows entry of the weight of the donor. This can be in kilograms or pounds, depending on administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Donor Hematocrit/Hemoglobin Button:** Allows entry of the hematocrit or hemoglobin value of the donor. Note that this is either the hematocrit or hemoglobin, depending on the administrative settings. For information on the overlay, see the numeric keypad information in Chapter 2.<br>**Target Saline Infusion Volume Button:** Allows entry of the target saline infusion volume for the procedure, if a saline protocol is selected.<br>FENWAL 00014061-62 |

**ANSWER:** Haemonetics admits that some images from the 2025 Aurora Xi Manual appear in manuals that predate the earliest priority date of Haemonetics' Asserted Patents.

130. Full comparisons for the infringement allegations found in Haemonetics' First Amended Complaint and accompanying claim charts as to the asserted claims in the '916 and '474 Patents are found in Exhibit C ('916 Patent comparison chart) and Exhibit D ('474 Patent comparison chart) attached hereto.

**ANSWER:** Haemonetics admits that the identified charts were attached to Fenwal's First Amended Counterclaims.

131. In its Initial Infringement Contentions served on March 31, 2026, and amended on April 15, 2026, Haemonetics continues to acknowledge the materiality of the 2016 Aurora Xi device, as it cites the October 2016 and January 2017 Aurora Xi manuals as evidence of infringement. This is evidenced by Appendices E-3 and E-4 to Defendants' Initial Non-Infringement, Invalidity, and Unenforceability Contentions, served May 5, 2026, both of which Fresenius incorporates by reference.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

132. Thus, by Haemonetics' own interpretation of the Asserted Patent claims, the Aurora Xi 2016 device is material prior art.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

133. Haemonetics (specifically Ragusa, Perullo, and Lovely) never provided information about the Aurora Xi device or the related manuals to the US Patent Office during prosecution of the Asserted Patents.

**ANSWER:** Haemonetics admits that no Information Disclosure Statement filed during prosecution of the Asserted Patents disclosed information about the Aurora Xi device or related manuals.

134. No Information Disclosure Statement filed during prosecution of U.S. Patent Application Serial No. 15/608,183 (which issued as the '652 Patent), U.S. Patent Application Serial No. 17/205,374 (which issued as the '916 Patent), or U.S. Patent Application Serial No. 17/205,400 (which issued as the '474 Patent) disclosed (a) the Aurora Xi System, (b) the Aurora Xi System Operator's Manual (October 2016), or (c) the Aurora Xi System Service Manual (January 2017).

**ANSWER:** Haemonetics admits the allegations in this paragraph.

135. Thus, across the prosecution of all three Asserted Patents, despite full awareness of the Aurora Xi device and its manuals, Haemonetics never disclosed any of these material references to the USPTO.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

136. The decision not to search for or disclose Fenwal's prior art was not an inadvertent oversight—it was a deliberate choice by individuals who admittedly monitored Fenwal's every move in the marketplace.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

137. In fact, during the late stages of prosecution of the '916 patent, the Examiner identified Fenwal art US2012/0165685 (not previously disclosed) and issued a rejection. HAEMFRE_0004804 ('916 Patent FH May 3, 2024 Non Final Rejection), at -4874. US2012/0165685 relates to "blood collection system[s] including an operator user interface to allow an operator to configure the system for a blood collection procedure form a donor." HAEM-

FRE_0065504 ('685 Publication), at -5504. US2012/0165685 also includes an image of an Aurora device in Figure 1:




FIG. 1

**ANSWER:** Haemonetics admits that during prosecution of the '916 patent, the Examiner identified Fenwal art US2012/0165685 and issued a rejection. Haemonetics denies the remaining allegations in this paragraph, including any inference of impropriety from the Examiner's independent identification of this reference.

138. The Examiner issued a rejection noting the pending Haemonetics' claims were obvious over Fenwal US2012/0165685, which "discloses a plasmapheresis apparatus with venous access, containers, and pumps, coupled with a touchscreen user interface to enter patient parameters, enter control schemes, and relay information." *See, e.g.*, HAEM-FRE_0004804 at -4874–75.

**ANSWER:** Haemonetics admits that the Examiner issued a rejection based on Fenwal US2012/0165685.

139. Instead of attempting to distinguish the art, Haemonetics, specifically Lovely, filed a terminal disclaimer, improperly claiming priority to the '652 priority date of May 2017 to overcome the rejection. *Id.* at -4863. But, yet again, Haemonetics was not forthright with the Examiner because, in reality, there is no support for these claims in the applications it claims priority to. *See, e.g.*, FENWAL 00033667 at -3764 (PGR2025-00078, Petition for Post Grant

Review of U.S. Patent No. 12,171,916 filed by Terumo alleging lack of written description support in the specification of the '916 patent1 for the Asserted Claims).

**ANSWER:** Haemonetics admits that it filed a terminal disclaimer during prosecution of the '916 patent. Haemonetics denies the remaining allegations in this paragraph.

140. Haemonetics cannot rely on any alleged claim to the May 30, 2017 priority date of the '652 patent to avoid its disclosure obligations or to insulate the '916 and '474 patents from Fenwal's prior art.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

141. As a threshold matter, a claimed priority date has no bearing on the duty of candor. Under 37 C.F.R. § 1.56, Haemonetics owed a continuing duty of candor and good faith to the USPTO throughout the pendency of each application, which obligated it to disclose all information known to be material to patentability—including the '989 Publication and the Aurora Xi Prior Art—as of the actual filing date of the '374 and '400 applications on March 18, 2021 and throughout the entire period those applications remained pending.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

142. No priority claim can override or eliminate the applicant's obligation to disclose material prior art known at the time the application was filed and prosecuted. The duty of disclosure exists to ensure the Examiner has the full picture of relevant art when evaluating claims, and Haemonetics' deliberate concealment of the very publication from which it copied its claims is not excused by pointing to an earlier priority date.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

143. Moreover, Haemonetics' claim to the May 2017 priority date is itself false. Under 35 U.S.C. § 120, a continuation or continuation-in-part application is entitled to the benefit of an earlier filing date only for claims supported by the written description of the earlier application.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

144. The claims Haemonetics copied from Fenwal's '989 Publication contain technical terminology—including "plasma output port," "donor parameters," "current value of the

hematocrit of the donor," "raw plasma," "venipuncture needle," "draw and return cycle," "reservoir," "anticoagulant ratio," and "based on the donor's total blood volume and/or the donor's plasma volume"—that does not appear anywhere in the specification of the '652 patent or its continuations.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

145. Because these claim terms originate from Fenwal's application and not from Haemonetics' own disclosure, the earlier-filed Haemonetics applications do not provide written description support for the copied claims, and Haemonetics is not entitled to any earlier priority date for them.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

146. Terumo BCT—the other of Haemonetics' two competitors, which Haemonetics is also attempting to exclude from the market—has raised precisely this point. In Post Grant Review Petition No. PGR2025-00078, Terumo alleges that the specification of the '916 patent lacks adequate written description support for the asserted claims.

**ANSWER:** Haemonetics admits that Terumo made certain allegations in PGR2025-00078, for which institution was denied. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the remaining allegations in this paragraph.

147. That Haemonetics filed a terminal disclaimer to the '652 patent to overcome the Examiner's rejection based on Fenwal prior art US2012/0165685—rather than distinguishing its claims on the merits—further confirms that Haemonetics knew its copied claims could not withstand scrutiny against Fenwal's prior art and chose procedural maneuvering over candor with the Patent Office. Haemonetics cannot shield its fraud on the PTO behind a priority date to which it is not entitled for claims it did not invent and cannot support with its own specification.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

148. The fact that Haemonetics failed to distinguish its claimed invention from this art further demonstrates the materiality of the Fenwal art. By failing to bring to the Examiner's attention Fenwal prior art known to (and copied by) Haemonetics (specifically Ragusa and Lovely), including the Aurora Xi device and manual, it is clear Haemonetics had the intent to

purposefully omit material prior art to the PTO in an effort to obtain the patents it now seeks to assert against its (only) two competitors in the field of plasmapheresis.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

***Haemonetics' History and Motivation to Litigate***

149. 149. It is beyond dispute that Haemonetics (specifically Ragusa and Lovely) filed the original applications for the Asserted Patents after the Aurora Xi device was in use in the public domain and known to them.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

150. The single most reasonable inference from this evidence is that Haemonetics (specifically Ragusa, Perullo, and/or Lovely) withheld this information with the specific intent to mislead or deceive the Patent Office and with knowledge that the withheld information was material to patentability, so the Asserted Patents would issue, and Haemonetics would have leverage to assert over its competitors.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

151. In other words, Haemonetics (specifically Ragusa, Perullo, and/or Lovely) made a deliberate decision not to disclose the Aurora art to the USPTO for the purpose of avoiding rejection.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

152. The motivation is simple—Haemonetics, including Perullo, sought to obtain intellectual property rights to leverage in the future, with the goal of gaining market share through litigation, as opposed to competing fairly in the market.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

153. In 2021, Haemonetics enjoyed a dominant market position, commanding approximately 75% share of the U.S. market for plasmapheresis devices. But the market was threatened in 2021 when a third competitor—Terumo BCT—announced that it would be entering the market and, worse for Haemonetics, that competitor was collaborating with a major Haemonetics customer to develop a new plasmapheresis device. These competitive forces had a demonstrable impact.

**ANSWER:** Haemonetics admits that it held a significant share of the U.S. market for plasmapheresis devices. Haemonetics denies that this market position was "threatened" simply by the appearance of competition in the market in the manner Fresenius alleges or that it motivated any improper conduct.

154. On information and belief, Haemonetics now faces new price pressure and has even been forced to make price concessions to try to lock in other customers.

**ANSWER:** Haemonetics admits that it faces price pressure and has been forced to make price concessions for customers.

155. Faced with these strong competitive pressures, Haemonetics chose not to compete on the merits and instead turned to its thicket "of 400+ issued patents and almost 300 pending applications" to try to protect its market position. FENWAL 00017083 at -7083.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

156. On information and belief, Haemonetics sought to prevent customers from contracting with Fenwal by publicly threatening to sue Fenwal for infringement.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

157. Haemonetics then did in fact file infringement lawsuits against both of its competitors. It filed the instant lawsuits against Fenwal, Fresenius Kabi USA, and Fresenius Kabi AG.

**ANSWER:** Haemonetics admits that it filed lawsuits against Fenwal, Fresenius Kabi USA, and Fresenius Kabi AG.

158. Haemonetics filed a comparable lawsuit against Terumo for alleged infringement of nine Haemonetics patents, three of which overlap with the Asserted Patents in this case. Compl. ¶ 1, *Haemonetics Corp. v. Terumo BCT, Inc.*, No. 25-cv-1409, 2025 WL 1841196 (D. Colo. May 5, 2025).

**ANSWER:** Haemonetics admits that it filed a separate lawsuit against Terumo.

159. If Haemonetics' lawsuits succeed, neither Fenwal nor Terumo will be able to offer their current plasmapheresis devices in the United States, and Haemonetics will once again be dominant.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

160. This is not the first time Haemonetics has engaged in this type of anticompetitive behavior. Haemonetics has a history of attempting to leverage litigation to gain a competitive advantage in this highly concentrated market.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

161. For example, in 2005 (when Perullo was counsel for Haemonetics), Haemonetics filed a lawsuit alleging Fenwal's ALYX System (a blood component collection system) infringed a patent Haemonetics purchased from a third party. *See Haemonetics Corp. v. Fenwal, Inc.*, 811 F. Supp. 2d 548, 549 (D. Mass. 2011); FENWAL 00028284 (assignment of '983 patent from Biofluid Systems to Haemonetics for "valuable consideration").

**ANSWER:** Haemonetics admits that it filed a lawsuit regarding the ALYX System. Haemonetics denies the remaining allegations in this paragraph.

162. Following a trial, appeal, and remand, Fenwal was victorious and found to not infringe the asserted patent. *Haemonetics Corp.*, 811 F. Supp. 2d at 553 ("Fenwal's products do not infringe the '983 Patent, either literally or under the doctrine of equivalents.").

**ANSWER:** Haemonetics admits that the prior ALYX litigation resulted in a finding of non-infringement following appeal of a jury verdict in which Haemonetics prevailed and Fenwal was found to infringe.

163. In sum, Haemonetics' conduct before the USPTO was not mere negligence or oversight—it was a calculated scheme to obtain patent rights through deception and for the purpose of preventing fair competition in the marketplace.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

164. Haemonetics copied Fenwal's claims word-for-word, concealed the source of its copied claims from the USPTO, and deliberately withheld disclosure of Fenwal's Aurora Xi prior art device—all while knowing this information was material to patentability and with the specific intent to deceive the Patent Office into issuing patents it otherwise would not have granted.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

165. The single most reasonable inference from the evidence is that Haemonetics, through Ragusa and Lovely, committed fraud on the USPTO to obtain patents it now seeks to wield against the very competitor whose innovations it copied. Such inequitable conduct renders all claims of the Asserted Patents and related family members unenforceable.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

**COUNT 8: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE '652, '916, AND '474 PATENTS DUE TO INEQUITABLE CONDUCT (UNCLEAN HANDS)**

166. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** The allegations in Paragraph 166 merely incorporate prior paragraphs by reference. To the extent a response is required, Haemonetics responds to the incorporated paragraphs as set forth elsewhere in this Answer.

167. Haemonetics and its agents have engaged in a pattern of litigation and prosecution misconduct to gain an advantage in this litigation that constitutes unclean hands.

**ANSWER:** Haemonetics denies the allegations in this paragraph. Fresenius' allegation of a "pattern of litigation and prosecution misconduct" is conclusory and lacks any factual basis. Fresenius has failed to identify any specific acts constituting patent misuse or unclean hands distinct from its manufactured inequitable conduct theory. The unclean hands doctrine requires misconduct that is directly related to the matter in litigation and that goes beyond a mere restatement of other claims. *See Princo Corp. v. ITC*, 616 F.3d 1318 (Fed. Cir. 2010) (en banc). Fresenius has identified no tying arrangement, no impermissible broadening of Haemonetics' patent rights, and no other specific misconduct that would support an independent unclean hands defense.

168. Defendants request that the Court declare that Haemonetics' unclean hands bar any recovery in this suit.

**ANSWER:** Haemonetics denies that its conduct warrants any declaration of unclean hands.

**COUNT 9: *WALKER PROCESS* ANTITRUST VIOLATION (ATTEMPTED MONOPOLIZATION, 15 U.S.C. §§ 2, 15(a), 26)**

169. Fresenius repeats and realleges herein by reference the allegations of each of the foregoing paragraphs.

**ANSWER:** The allegations in Paragraph 169 merely incorporate prior paragraphs by reference. To the extent a response is required, Haemonetics responds to the incorporated paragraphs as set forth elsewhere in this Answer.

170. During prosecution of the Asserted Haemonetics Patents, Haemonetics, the named inventor, and its prosecuting attorneys intentionally failed to cite and withheld material prior art information and publications describing Fenwal's Aurora Xi device and related patent publications.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

171. Had these individuals not withheld this prior art information, the Patent Office would not have issued any of the Asserted Patents.

**ANSWER:** Haemonetics denies the allegations in this paragraph. The speculation that the Patent Office "would not have issued" the Asserted Patents but for the alleged withholding of prior art is a legal conclusion unsupported by the facts.

172. Haemonetics' withholding and selective disclosure of prior art related to the Aurora Xi and Fenwal's patents renders the Asserted Haemonetics Patents unenforceable. *See American Calcar, Inc. v. American Honda Motor Co.*, 768 F.3d 1185, 1188-92 (Fed. Cir. 2014).

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

173. According to Haemonetics, the U.S. market for plasma collection or apheresis devices is a highly concentrated, three-player market consisting of Haemonetics, Fresenius Kabi/Fenwal, and Terumo BCT.

**ANSWER:** Haemonetics admits that the U.S. market for plasma collection devices includes Haemonetics, Fresenius Kabi/Fenwal, and Terumo BCT as principal competitors.

174. At the time of filing the fraudulent patent applications, Haemonetics was the dominant market leader.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

175. On information and belief, Haemonetics expected and feared a dramatic erosion of its dominant position in 2021 at least because Terumo BCT had announced that it was collaborating with a major Haemonetics customer to develop a new plasmapheresis device.

**ANSWER:** Haemonetics denies the allegations in this paragraph.

176. Haemonetics responded by using litigation—specifically patent infringement litigation—to try to maintain its market dominance. That use of patents to exclude rivals is exclusionary conduct that gives rise to antitrust liability under Section 2 of the Sherman Act. *See Walker Process Equip., Inc. v. Food Machinery Corp.*, 382 U.S. 172 (1965).

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics' enforcement of its valid patent rights is not "exclusionary conduct" within the meaning of the Sherman Act. The assertion of duly issued patents against infringers is protected by the *Noerr-Pennington* doctrine and is not an antitrust violation absent a showing of knowing and willful fraud on the PTO — a showing Fresenius has not and cannot make. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993).

177. On information and belief, Haemonetics' fraud on the Patent Office, assertion of the asserted patents against Defendants, and threats of infringement litigation in the marketplace are anticompetitive conduct designed to monopolize the market for plasmapheresis devices generally, and the submarket for automated plasma collection systems specifically, in violation of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

178. Haemonetics obtained the patents by knowing and willful fraud on the patent office and maintained and enforced the patents with knowledge of the fraudulent procurement. *See TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016); *see also In re Lipitor Antitrust Litig.*, 868 F.3d 231, 266 (3d Cir. 2017); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1073 (Fed. Cir. 1998).

**ANSWER:** Haemonetics denies the allegations in this paragraph. Haemonetics did not obtain any patent through "knowing and willful fraud on the patent office". Walker Process fraud requires affirmative fraud that exceeds garden-variety inequitable conduct and rises to the level of common-

law fraud. *See TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). Fresenius' allegations, even taken at face value, do not clear this heightened bar.

179. Through its fraud and litigation-related conduct, Haemonetics engaged in predatory and anticompetitive conduct with a specific intent to monopolize the market.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

180. The relevant product market is plasmapheresis devices, which are not reasonably interchangeable with or substitutable for other blood collection technologies; they serve a distinct function in separating plasma from whole blood for commercial fractionation. Automated plasma collection systems constitute a recognized submarket within the broader blood collection equipment market.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

181. The relevant geographic market is the United States.

**ANSWER:** Haemonetics admits the allegations in this paragraph.

182. There are significant barriers to entering the markets, including: (i) Haemonetics' exclusionary and fraudulently obtained Asserted Patents, which Haemonetics is now wielding against its only competitors to prevent entry and expansion; (ii) substantial capital costs required to develop, manufacture, and obtain FDA approval for plasmapheresis devices; (iii) technological obstacles inherent in designing systems that meet the stringent regulatory and performance requirements for blood collection equipment; (iv) the need for partnerships with plasma collectors, which Haemonetics has cultivated over decades through its dominant market position; and (v) Haemonetics' deliberate strategy of maintaining a closed, non-interoperable software ecosystem that locks customers into its platform and prevents competitors from offering competing products compatible with its software.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

183. In light of its broad construction of its patents and the limited number of competitors, both of whom would be largely barred from the market if Haemonetics' litigation tactics are successful, there is a dangerous probability that Haemonetics will achieve monopoly power in the market for plasmapheresis devices and the submarket for automated plasma collection systems.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

184. Haemonetics' attempted enforcement of the Asserted Patents and its anticompetitive conduct did cause and threatens to continue to cause significant injury to Defendants, which have expended substantial amounts of money, time, and human resources defending this action.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Haemonetics denies the allegations in this paragraph.

185. Moreover, Haemonetics' patents and actions during prosecution and thereafter have forced Fresenius Kabi/Fenwal to change its business behavior, have disturbed Fresenius Kabi/Fenwal's course of business dealings, and have resulted in lost profits.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations in this paragraph and, on that basis, denies them.

186. Beyond that, on information and belief, Haemonetics has disseminated information about this litigation to customers to dissuade customers from purchasing Fresenius Kabi/Fenwal's plasmapheresis devices, resulting in reputational damage and additional lost sales.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations in this paragraph and, on that basis, denies them.

187. Haemonetics' anticompetitive conduct has caused harm to the competitive process, and it has caused harm and continues to cause harm specifically to Fresenius Kabi/Fenwal's business.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations in this paragraph and, on that basis, denies them.

188. Because of Haemonetics' unlawful acts, Defendants did and will continue to suffer antitrust injury in an amount to be proven at trial.

**ANSWER:** Haemonetics lacks sufficient knowledge or information to admit or deny the specific allegations in this paragraph and, on that basis, denies them.

189. Haemonetics has violated Section 2 of the Sherman Act.

**ANSWER:** Haemonetics denies that it has violated Section 2 of the Sherman Act.

## PRAYER FOR RELIEF

190. Fresenius respectfully requests that this Court enter judgment in its favor and grant the following relief:

i. A determination and declaratory judgment that Fresenius has not infringed any valid claim of the ’652 patent;

ii. A determination and declaratory judgment that each and every claim of the ’652 patent is invalid;

iii. A determination and declaratory judgment that Fresenius has not infringed any valid claim of the ’916 patent;

iv. A determination and declaratory judgment that each and every claim of the ’916 patent is invalid;

v. A determination and declaratory judgment that Fresenius has not infringed any valid claim of the ’474 patent;

vi. A determination and declaratory judgment that each and every claim of the ’474 patent is invalid;

vii. A determination and declaratory judgment that the ’652, ’916, and ’474 patents are unenforceable due to inequitable conduct;

viii. A judgment that Haemonetics has violated the Sherman Act, 15 U.S.C. § 2;

ix. An award of the cost of suit and treble damages for all antitrust injuries under the Clayton Act, 15 U.S.C. § 15, including legal fees incurred in this lawsuit;

x. An award of a permanent injunction enjoining Haemonetics from attempting to monopolize the relevant product and geographic markets, as provided by 15 U.S.C. § 26;

xi. An order declaring that this is an exceptional case and awarding Fresenius its costs, expenses, and reasonable attorneys’ fees under 35 U.S.C. § 285 and/or 15 U.S.C. § 1117(a) and all other applicable statutes, rules, and common law;

xii. All costs be taxed against Haemonetics; and

xiii. Any such other relief as the Court may deem appropriate and just under the circumstances.

**ANSWER:** Haemonetics denies that Fresenius is entitled to any relief sought in Fresenius’ Prayer for Relief.

**[FRESENIUS'] JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Fresenius, by and through its undersigned counsel, hereby demands a trial by jury on all claims so triable in this action.

**ANSWER:** No response is required to Fresenius' demand for a trial by jury in this case.

**HAEMONETICS' DEFENSES**

Without prejudice to the denials set forth in its Answer, and without admitting any allegations within Fresenius' Counterclaims that were not expressly admitted, Haemonetics asserts the following defenses to the Counterclaims without assuming the burden of proof on any such defense that would not otherwise rest with Fresenius. Haemonetics reserves the right to amend its Answer to add additional defenses consistent with the facts discovered in this case.

**FIRST DEFENSE (FAILURE TO STATE A CLAIM)**

1. The Counterclaims fail to state a claim upon which relief can be granted.

**SECOND DEFENSE (NOT AN EXCEPTIONAL CASE)**

2. The Counterclaims fail to state a claim for an exceptional case.

**THIRD DEFENSE (EQUITABLE RELIEF)**

3. Fresenius is not entitled to equitable relief because the remedies at law to which it is entitled, if any, are adequate.

* * *

4. Haemonetics reserves all defenses, at law or equity, which may now exist or in the future be available on discovery and further factual investigation in this case. Haemonetics further reserves the right to supplement and/or amend the foregoing defenses.

Dated: June 5, 2026

/s/ *Erik B. Milch*
Todd J. Ohlms
70 West Madison, Suite 3800
Chicago, IL 60602-4342

Telephone: (312) 962-3550
tohlms@proskauer.com

Erik B. Milch (pro hac vice)
Elizabeth Shrieves (pro hac vice)
Proskauer Rose LLP
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004-2533
Telephone: (202) 416-6899
Email: emilch@proskauer.com
Email: eshrieves@proskauer.com

Joseph M. Drayton
Connor J. Villar (pro hac vice)
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-2900
Email: cvillar@proskauer.com
Email: jdrayton@proskauer.com

Alan S. Teran (pro hac vice)
Proskauer Rose LLP
2255 Glades Road
Suite 421 Atrium
Boca Raton, FL 33431-7360
Telephone: (561) 995-4723
Email: ateran@proskauer.com

*Counsel for Plaintiff Haemonetics Corporation*